**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA                                                                PLAINTIFF

v.                                    Case No. 4:09CV00033 JLH

STATE OF ARKANSAS; THE HONORABLE
MIKE BEEBE, Governor of the State of Arkansas,
in his official capacity only; JOHN M. SELIG,
Director of the Arkansas Department of Human
Services, in his official capacity only;
JAMES C. GREEN, PH.D., Director of the
Arkansas Division of Developmental Disabilities
Services, in his official capacity only; and
CALVIN PRICE, Superintendent of the
Conway Human Development Center,
in his official capacity only                                                            DEFENDANTS

**OPINION AND ORDER**

The United States of America has moved for a preliminary injunction in connection with its complaint filed on January 16, 2009, against the State of Arkansas; Mike Beebe, Governor of Arkansas; John Selig, Director of the Arkansas Department of Human Services (ADHS); James Green, Ph.D., Director of the Arkansas Division of Developmental Disabilities Services; and Calvin Price, Superintendent of the Conway Human Development Center.[1] The United States asserts that CHDC residents live under imminent and serious threats of harm to their life, health, safety, and liberty; have suffered violations of the Americans with Disabilities Act; and are exposed to death and injury as a result of unconstitutional medication management and restraint practices. The United States asks the Court to halt further admissions of children to the CHDC and to impose immediate relief protecting all CHDC residents from the facility's medication management and restraint

---

[1] The complaint asserts claims against the named individuals only in their respective official capacities.

practices. In response, the defendants have filed a motion to strike the United States' motion for preliminary injunction, arguing in part that the United States' delay in seeking a preliminary injunction belies any claim of irreparable harm. The United States has responded to the defendants' motion to strike.[2] For the following reasons, the United States' motion for a preliminary injunction is denied.

## I.

The Conway Human Development Center (CHDC), located in Conway, Arkansas, is certified as an Intermediate Care Facility for the Mentally Retarded (ICF/MR) and houses approximately 510 individuals with developmental disabilities. On November 8, 2002, the Civil Rights Division of the Department of Justice informed the State of Arkansas of its intent to conduct a formal investigation into the conditions at CHDC pursuant to the Civil Rights of Institutionalized Persons Act (CRIPA), 42 U.S.C. § 1997. The Civil Rights Division conducted onsite inspections in February, April, and May 2003 with expert consultants from various professional backgrounds. In addition to the site visits, the Civil Rights Division reviewed policies and procedures, interviewed administrators and staff, and observed CHDC residents. The Civil Rights Division conveyed preliminary findings after each site visit in February, April, and May 2003.

On April 21, 2004, Assistant Attorney General R. Alexander Acosta issued a 50-page letter reporting the findings of the Civil Rights Division. Those findings included the following:

---

[2] Although the defendants characterize their response as a motion to strike and ask for an extension of time to respond more fully, their motion to strike provides a substantive response to the United States' arguments for a preliminary injunction. Therefore, the Court will treat the defendants' motion to strike as a response to the motion for preliminary injunction, and the United States' response to the motion to strike as a reply to the defendants' response.

> [W]e find that residents of [CHDC] suffer significant harm or risk of harm from shortcomings in the facilities' health care, habilitative treatment services, restraint practices, and protection from harm policies. We further find that the State fails to provide residents with required education services pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1401 *et seq.* Finally, it appears that the State does not provide services to individuals with disabilities in the most integrated setting appropriate to individual residents' needs. *See Olmstead v. L.C.*, 527 U.S. 581 (1999); Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; 28 C.F.R. § 35.130(d).

The 50-page document then went on to describe in detail the bases for the findings.

On January 16, 2009—more than six years after initiating its investigation of CHDC, and almost five years after issuing its findings from the investigation—the United States commenced the instant action against the defendants. The complaint alleges that the defendants have failed and are continuing to fail to do the following:

    a.    Provide reasonably safe conditions and ensure the reasonable safety and personal security of CHDC residents.

    b.    Provide the CHDC residents with that level of habilitation and training, including behavioral and related training programs, necessary to protect the residents' liberty interests and ensure their safety and freedom from undue or unreasonable restraint.

    c.    Ensure that restraints are administered to residents by appropriately qualified professionals in keeping with accepted professional standards, and are not used as punishment, in lieu of treatment, or for the convenience of staff.

    d.    Adequately supervise residents in restraints to protect them from harm.

    e.    Adequately assess individuals residing in the CHDC to ascertain whether they are receiving treatment in the most integrated setting appropriate for their individual needs.

    f.    Ensure that residents whom professionals determine should be placed in the community, and who do not oppose such placement, are placed there.

      g.      Ensure that residents are evaluated and provided the necessary support and services to receive a free and appropriate public education in the least restrictive environment.

      h.      Provide adequate psychological and behavioral services; adequate medical, neurological, and nursing services; adequate psychiatric services; adequate habilitation and therapy services, including physical therapy, occupational therapy, speech and language therapy, and nutritional services; and adequate protections from harm.

The complaint then alleges violations of the Fourteenth Amendment's Due Process protections; the Americans with Disabilities Act; and the Individuals with Disabilities Education Act.

Finally, on March 9, 2010—more than one year after filing its complaint, and more than seven years after initiating its investigations into the CHDC—the United States filed the pending motion for a preliminary injunction. The United States filed its motion only after its experts completed their reports. According to the United States, immediate injunctive relief is

> necessary to stop ongoing, severe, and irreparable harm. That relief must target the conditions at CHDC that place all residents at the most imminent risk—conditions that have led to death, organ failure, and exposure to lethal side effects of medication and have exposed individuals to needless and harmful restraints—while requiring that the State ensure that no more of its youngest and most vulnerable citizens are exposed to this unsafe and inappropriately segregated institutional environment.

The United States asserts that the delayed timing of its motion is due, in part, to only recently obtained "substantial and alarming evidence that CHDC residents face increasing and grave risk of harm with each and every day that deficiencies are ignored." This evidence includes emails produced in late 2009 documenting the defendants' intention to increase the number of children housed in state institutions; an incident in October 2009 in which a resident was hospitalized for lithium poisoning; and an admission in December 2009 from the CHDC's Chief of Psychology that approximately 70-80 CHDC residents have treatment programs that include restraint use.

## II.

In considering whether to grant a preliminary injunction, a court must consider four factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm; (3) the state of balance between the threat of harm and the injury that granting the injunction will inflict on other parties; and (4) the public interest. *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). The district court's inquiry is an equitable one, requiring the court to consider "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Velek v. Arkansas*, 198 F.R.D. 661, 663 (E.D. Ark. 2001) (quoting *Dataphase*, 640 F.2d at 113). No single factor is determinative, and the factors are not a rigid formula. *Id.* The party seeking a preliminary injunction bears the burden of proving that an injunction is necessary, and the decision to grant or deny the preliminary injunction is within the broad discretion of the district court. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006); *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987).

### A. THREAT OF IRREPARABLE HARM

Having carefully considered the parties' arguments and supportive case law, the Court concludes that the United States' motion for preliminary injunctive relief turns on the second *Dataphase* factor, the threat of irreparable harm in the absence of a preliminary injunction. "Perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered. . . ." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 139 (2d ed. 1995). "There must be a likelihood that irreparable harm will occur. . . . [A] preliminary injunction will not be issued simply

to prevent the possibility of some remote future injury." *Id.* § 2948.1, at 153-55; *see also Kaplan v. Bd. of Educ. of City Sch. Dist. of City of New York*, 759 F.2d 256, 259 (2d Cir. 1985) (predictions of havoc and unrest were too speculative to constitute clear showing of immediate irreparable harm).

The United States has delayed moving for injunctive relief for a significant period of time after it knew of the conditions at the CHDC of which it now complains. "A long delay by plaintiff after learning of the threatened harm may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1, at 156 and n.12 (2d ed. 1995); *see also Klauber Bros., Inc. v. Lady Marlene Brassiere Corp.*, 285 F. Supp. 806, 808 (D.C.N.Y. 1968) (where plaintiff was aware of defendant's activities for about one year prior to filing the lawsuit, plaintiff's inaction disentitled it from receiving a preliminary injunction); *Poe v. Michael Todd Co.*, 151 F. Supp. 801, 803 (D.C.N.Y. 1957) (that the plaintiff waited three months after filing suit to move for injunctive relief was a factor militating against granting preliminary injunction). As the Second Circuit has stated:

> Though . . . delay may not warrant the denial of ultimate relief, it may, standing alone, preclude the granting of preliminary injunctive relief because the failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury. Although delay may not negate the presumption of irreparable harm if the delay was caused by the plaintiff's ignorance of the defendant's [conduct], if it is not so explainable, delay alone may justify denial of a preliminary injunction.

*Tough Traveler, Ltd. v. Outbound Products*, 60 F.3d 964, 968 (2d Cir. 1995) (internal quotes, citations, ellipses omitted); *see also Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598 (8th Cir. 1999) (affirming the district court's determination that the plaintiff's delay in objecting

to the defendant's use of its product "belies any claim of irreparable injury pending trial") (citing *Tough Traveler*, 60 F.3d at 968).

The Court does not take lightly the seriousness of the accusations in the United States' complaint and motion for preliminary injunction. The second *Dataphase* factor is not, however, a matter solely of the seriousness of the allegations; the issue is whether harm will be irreparable but for immediate Court intervention. The United States has moved for a preliminary injunction more than seven years after it started investigations; almost six years after issuing its findings on the investigations; almost fourteen months after the complaint was initially filed; approximately six months after its experts completed weeks of onsite investigations at the CHDC; and only six months in advance of a potentially month-long trial on the merits.[3] By its own delay in requesting a preliminary injunction, the United States has tacitly shown that it does not believe the threat of irreparable harm is so great as to warrant preliminary injunctive relief. Based on the record, the United States cannot say that its delay was caused by its ignorance of the defendants' conduct, *Tough Traveler*, 60 F.3d at 968, so its delay suggests that there is, in fact, no danger of irreparable harm absent Court intervention. Moreover, the fact that trial on the merits is near minimizes the danger that irreparable harm will occur before a decision is reached on the merits.

The Court has carefully reviewed the allegations contained in the United States' 50-page findings letter, the complaint, and the motion for preliminary injunction. The allegations in the motion for preliminary injunction are in substance the same as the allegations in the 2004 findings letter. The Court has also carefully reviewed the declarations and reports of the six experts engaged by the United States. Each expert conducted an onsite investigation over a period of days between

---

[3] The trial is scheduled to begin on September 8, 2010.

July and September of 2009. Each expert severely criticizes the CHDC. None, however, opined that the deficiencies at the CHDC created an emergency situation that needed to be rectified immediately. Had any of the experts observed an emergency situation that needed to be corrected immediately, one would have expected a motion for preliminary injunction accompanied by an affidavit shortly after conclusion of the onsite investigations in September. Instead, each expert issued a report in mid to late December of 2009—more than three months after conclusion of the onsite investigations. The United States then waited another three months to file its motion for a preliminary injunction. Having waited eight years from the beginning of its investigation, six years since issuing the findings letter, fourteen months since commencing this action, six months since completion of the experts' onsite investigation, and three months since receiving its expert reports, the United States now argues that the status quo cannot continue another six months until the trial on the merits—which is not credible.

The United States has the burden of showing that an emergency preliminary injunction is now necessary to prevent irreparable harm that otherwise was not a danger back when the complaint was filed or when it was conducting investigations. The United States has failed to carry that burden.

Nor has the United States shown that a preliminary injunction is necessary to maintain the status quo. The purpose of a preliminary injunction is to preserve the status quo so that the court can render a meaningful decision on the merits after a trial. *See Penn v. San Juan Hosp., Inc.*, 528 F.2d 1181, 1185 (10th Cir. 1975) ("The object of the preliminary injunction is to preserve the status quo pending the litigation of the merits."); *Missouri-Kansas-Texas R. Co. v. Randolph*, 182 F.2d 996, 999 (8th Cir. 1950) ("A temporary injunction is usually issued to preserve the status quo until a

hearing on the merits may be had."); *United States v. Adler's Creamery*, 107 F.2d 987, 990 (2d Cir. 1939) (stating that a preliminary injunction's "ordinary function is to preserve the status quo and it is to be issued only upon a showing that there would otherwise be danger of irreparable injury"); 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2947 (2d ed. 1995). "Ordinarily, the court in its discretion may grant a preliminary injunction where it appears that there is a substantial controversy between the parties and that one of them is committing an act or threatening the immediate commission of an act that will cause irreparable injury or destroy the status quo of the controversy before a full hearing can be had on the merits of the case, and generally such an injunction will be granted whenever necessary to the orderly administration of justice." *Missouri-Kansas-Texas R. Co.*, 182 F.2d at 999 (quoting *Benson Hotel Corp. v. Woods*, 168 F.2d 694, 697 (8th Cir. 1948)).

Here, the relief requested by the United States would, in fact, change the status quo. According to the United States' own investigations and expert reports, there has been no significant change in the kinds of treatment and procedures used at the CHDC since 2002, when the United States began investigating. The United States seeks changes in the admissions, treatment, and evaluation procedures at the CHDC and seeks those changes only six months before a trial on the merits is to begin. The United States' motion makes clear that it, in fact, does not want the status quo to remain the same, as the status quo is what the United States alleges is harmful to CHDC residents.

**B.   REMAINING FACTORS**

The remaining factors that the Court must consider are the probability of success on the merits, the balance of harms, and the public interest. As for the probability that the United States

will succeed on the merits at trial, it is clear from the parties' briefs that the opinions of each party's respective expert witnesses will play a significant role in the Court's determination on the merits. In moving for a preliminary injunction, the United States relies heavily on its expert witnesses' reports. Determining the likelihood of success requires full consideration of the expert reports from both sides, but pursuant to the schedule to which the parties agreed and which the Court, in reliance on the agreement of the parties, adopted, the time for the defense experts to submit their reports has not yet arrived. The parties agreed to a schedule whereby the expert reports for the United States would be disclosed by December 23, 2009; the defense experts' onsite investigations would conclude by March 25, 2010; and the expert report for the defense would be disclosed by April 27, 2010. Document #24-2. The Court adopted that agreed schedule. Document #25. The Court cannot determine the likelihood of success without considering the defendants' expert reports, which are, by agreement and by court order, not yet due.

The other two factors—the public interest and the state of balance between the threat of harm and the injury that granting the injunction will inflict on other parties—are closely tied. Neither of them points more strongly toward granting an injunction than not, in part because of the nature of the injunction requested. The United States requests that the Court issue an order providing immediate relief to:

    a.    Cease all admissions of school-age children to the CHDC;

    b.    Prohibit the treatment of children at the CHDC with psychotropic medications prescribed by a psychiatrist not accredited in child and adolescent psychiatry and appoint an independent psychiatric consultant to perform a medication side effect assessment of each CHDC resident who is receiving or has received psychotropic medications; and

   c. Prohibit the use at the CHDC of the most severe, outdated forms of mechanical restraints.

The United States also requests that within ninety days of the Court's order, all other forms of restraint should be reviewed and revised as appropriate by an independent team of doctoral level behavioral clinicians with actual training and experience in contemporary, evidence-based behavioral management programs; within thirty days of the Court's order the parties should jointly choose an individual to act as Community Placement Evaluator; within ninety days the Community Placement Evaluator should access all of the children at the CHDC for community placement; and within thirty days of the assessment transition plans should be developed for all of the children.

  As to the first aspect of the preliminary injunction requested by the United States, in the absence of specific information about the specific circumstances of a specific child who might be admitted to the CHDC, the Court has no means by which to balance the harm and assess the public interest associated with granting a preliminary injunction. Without specific information involving a particular child, the Court cannot say whether admitting that child to the CHDC or prohibiting the admission of that child to the CHDC would be in the best interest of the child or in the public interest.

  In the second aspect of the preliminary injunction requested by the United States, the United States requests that the Court prohibit treatment of children with psychotropic medications prescribed by the CHDC psychiatrist. Without knowing the specific facts of a particular case, the Court cannot say whether the potential harm from psychotropic medications would outweigh the benefit of those psychotropic medications. With respect to the request that the Court appoint an independent psychiatric consultant to perform a medication side effect assessment, obviously it

would take a span of time to find a child psychiatrist capable of performing the assessment and available to perform the assessment; and then actually performing the assessment would require another span of time. The Court cannot say that the benefit of commencing that process five months before trial would outweigh the harm that could be caused by waiting until the trial on the merits to determine whether such a process is really necessary.

In the third aspect of the request for injunction, the United States requests that the Court prohibit the use of "the most severe, outdated forms of mechanical restraints." Elsewhere in its request for a preliminary injunction, the United States refers to papoose boards, restraint chairs, straightjackets, "and similar outdated, extreme forms of behavioral restraints on children," as the restraints that should be prohibited. The declaration of the expert retained by the United States on this issue, however, does not say that such restraints are never appropriate. The expert declaration says:

> Mechanical restraints may be used in certain, carefully limited circumstances consistent with clinical standards. These standards require a careful evaluation of the benefits and risks of using restraints by qualified staff. To accurately evaluate these benefits and risks, clinicians must have an understanding of basic psychological principles and evidence-based treatment approaches. With appropriate review and oversight, mechanical restraints may then be used in a manner consistent with those principles. CHDC's mechanical restraint practices substantially depart from these generally accepted standards and principals [sic].

Assuming that the Court were to accept this statement by the United States' expert, the remedy would not be to eliminate completely the use of mechanical restraints but to require the CHDC to adopt appropriate clinical standards for using them. If the use of mechanical restraints is appropriate in some circumstances, as apparently everyone agrees, there is insufficient information before the Court by which the Court can assess the balance of harms and the public interest associated with

completely prohibiting the use of straightjackets, restraint chairs, and papoose boards between now and a decision on the merits.

All of the other aspects of the request for a preliminary injunction involve requests that the Court order the commencement of processes that will take some months to complete. These may be valid requests, and the Court may order such processes to begin after a trial on the merits; but there is no information from which the Court can conclude that the potential harm in waiting the brief period of time between now and trial outweighs the potential harm associated with ordering the commencement of these processes before a trial on the merits.

The United States has failed to meet its burden of showing that the public interest and the balance of harms favor granting the injunction.

## CONCLUSION

Nothing in this Opinion and Order should be construed as discounting the seriousness of the issues. The decisions to be made are important—important enough to wait a few more months so that they can be based on all of the evidence.

For the foregoing reasons, the United States' motion for a preliminary injunction is DENIED. Document #42. The defendants' motion to strike is DENIED as moot. Document #49.

IT IS SO ORDERED this 7th day of April, 2010.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE