1              IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
2                        WESTERN DIVISION

3    UNITED STATES OF AMERICA,
                          Plaintiff,
4         v.                                No. 4:09CV00033 JLH

5    STATE OF ARKANSAS, MIKE BEEBE, Honorable    September 8, 2010
     Governor of the State of Arkansas; JOHN     Little Rock, Arkansas
6    M. SELIG, Director of the Arkansas          9:00 a.m.
     Department of Human Services; JAMES C.
7    GREEN, Ph.D., Director of the Arkansas
     Division of Developmental Disabilities
8    Services; CALVIN PRICE, Superintendent of
     the Conway Human Development Center,
9    in their official capacities only,
                          Defendants.
10
                  **TRANSCRIPT OF COURT TRIAL - VOLUME 1**
11              BEFORE THE HONORABLE J. LEON HOLMES,
                    UNITED STATES DISTRICT JUDGE
12   APPEARANCES:
     On Behalf of the Plaintiff:
13       MR. BENJAMIN O. TAYLOE, JR., Special Counsel
         MR. CHRISTOPHER N. CHENG, Trial Attorney
14       MR. MATTHEW J. DONNELLY, Trial Attorney
         MS. JACQUELINE K. CUNCANNAN, Trial Attorney
15       MS. LAURA L. COON, Trial Attorney
         MR. VINCENT P. HERMAN, Trial Attorney
16         U.S. Department of Justice, Civil Rights Division
           950 Pennsylvania Avenue, N.W., Room 4300
17         Washington, D.C.  20530

18   On Behalf of the Defendants:
         MR. THOMAS B. YORK, Attorney at Law
19       MR. DONALD B. ZAYCOSKY, Attorney at Law
         MS. CORDELIA ELIS, Attorney at Law
20         York Legal Group, LLC
           3511 North Front Street
21         Harrisburg, Pennsylvania  17110

22    MS. LORI FRENO-ENGMAN, Senior Assistant Attorney General
           Arkansas Attorney General's Office
23         Catlett-Prien Tower Building, 323 Center Street, Suite 200
           Little Rock, Arkansas  72201-2610
24
           Proceedings reported by machine stenography; transcript
25   prepared utilizing computer-aided transcription.


                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

1                    **I N D E X - VOLUME 1**

2    Plaintiff's Opening Statement............................ 9

3    Defendants' Opening Statement............................ 18

4    **WITNESSES FOR THE PLAINTIFF:**    **Direct   Cross   Redirect   Recross**

5    CARLA JO OSGOOD                  36

6    **EXHIBITS:**                                           **RECEIVED**
     Plaintiff's Exhibit 1-1.................................. 43
7    Plaintiff's Exhibit 2 (under seal)...................... 61
     Plaintiff's Exhibit 3................................... 65
8    Plaintiff's Exhibit 4 (under seal)...................... 71
     Plaintiff's Exhibit 5 (under seal)...................... 76
9    Plaintiff's Exhibit 6 (under seal)...................... 78
     Plaintiff's Exhibit 7 (under seal)...................... 82
10   Plaintiff's Exhibits 8 and 9 (under seal)............... 85
     Plaintiff's Exhibit 10 (under seal)..................... 86
11   Plaintiff's Exhibit 11 (under seal)..................... 87
     Plaintiff's Exhibits 12-1, 12-2, 2006 (under seal)...... 89
12   Plaintiff's Exhibits 13 and 2011 (under seal)........... 90
     Plaintiff's Exhibit 14 (under seal)..................... 91
13   Plaintiff's Exhibit 15 (under seal)..................... 92
     Plaintiff's Exhibit 16 (under seal)..................... 94
14   Plaintiff's Exhibits 18 and 19.......................... 101
     Plaintiff's Exhibits 23-1 and 23-2 (under seal)......... 104
15   Plaintiff's Exhibit 37 (under seal)..................... 116
     Plaintiff's Exhibit 38.................................. 127
16   Plaintiff's Exhibit 40 (under seal)..................... 133
     Plaintiff's Exhibit 2016 (under seal)................... 136
17   Plaintiff's Exhibit 2010 (under seal)................... 142
     Plaintiff's Exhibit 49 (under seal)..................... 144
18   Plaintiff's Exhibits 39-1 and 39-8...................... 153
     Plaintiff's Exhibit 43 (under seal)..................... 159
19   Plaintiff's Exhibit 44 (under seal)..................... 162
     Plaintiff's Exhibits 45 and 46 (under seal)............. 163
20   Plaintiff's Exhibits 47, 48, 55, 62 (under seal)........ 169
     Plaintiff's Exhibit 50 (under seal)..................... 172
21   Plaintiff's Exhibit 2015 (under seal)................... 175
     Plaintiff's Exhibits 51 and 52 (under seal)............. 176
22   Plaintiff's Exhibit 54 (under seal)..................... 177
     Plaintiff's Exhibits 56 and 53 (under seal)............. 178
23   Plaintiff's Exhibit 57 (under seal)..................... 180
     Plaintiff's Exhibit 58 (under seal)..................... 181
24   Plaintiff's Exhibit 59 (under seal)..................... 182
     Plaintiff's Exhibit 60 (under seal)..................... 182
25   Plaintiff's Exhibit 61 (under seal)..................... 183

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1          P R O C E E D I N G S

2          (Sidebar conference reported as follows:)

3              THE COURT:  In this instance, because of the number of

4     people who are interested, I think we ought to go into opening

5     statements, let you all do your opening statements and tell me

6     where you're going to go with the case, start with the

7     witnesses, and work out the housekeeping matters about

8     scheduling and whatever pretrial matters we need to take up

9     later on this afternoon, late in the day, or first thing in the

10    morning, or something like that.  I am concerned about how long

11    we're going to take, so that's an issue that we'll need to talk

12    about as we go and how to handle that.  But I just wanted to

13    come out and meet you and tell you, if it's okay with you, if

14    there's nothing else we need to take up, let's go directly into

15    opening statements and start the case and then work out any

16    pretrial matters later.  If there's something we need to take up

17    before we do that, then we can do that, but I want to do it

18    where everybody gets to hear.

19             MR. DONNELLY:  I have one issue that sort of can't

20    wait.  This case has lots to do with people's medical records

21    and things like that, so there was a redaction -- and, you know,

22    these aren't all redacted, so we propose turning off those two

23    screens.

24             THE COURT:  I was going to talk about that on the

25    record.  I think when we get the official set in, they do need

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

1   to be redacted because somebody could come and ask for a copy.

2   But for now, we don't have to show them on the screen.  If you

3   tell me that this has personal identifying information that's

4   confidential, then we will not show it to the gallery.

5          MR. TAYLOE:  For the most part, Your Honor, all of

6   these records are going to have some reference to individuals'

7   personal information.

8          THE COURT:  All right.  You all talk about it and

9   figure it out and discuss with me as we go how we're going to

10  handle this, because I don't want to expose a lot of private

11  information for these patients and parents and other people

12  unnecessarily.  I don't want to do that.  Let's figure that out

13  as we go.  Be careful about putting things into the record, and

14  if you do put something in the record or on the transcript, it

15  is up to you to notify the court reporter it has to be redacted.

16  Under the Rules of Civil Procedure, that's your job, to figure

17  out what's to be redacted.  So make sure you do that.

18         MR. DONNELLY:  When these documents come in and

19  admitted --

20         THE COURT:  We'll need to figure out a way to redact

21  them as we go or put them all under seal, which I loathe to do

22  because there's so much public interest.  On the one hand,

23  there's a lot of private information, on the other hand, there's

24  a public interest and people ought to be entitled to see the

25  evidence.  But let's figure that out as we go.  Let's don't

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    stand here and keep these people waiting.

2            MR. DONNELLY:  One last question.  Rule on witnesses.

3    I wanted to talk about the rule on witnesses beforehand.

4            THE COURT:  You want to invoke the rule?

5            MR. DONNELLY:  We want to invoke the rule.  I wanted

6    to sort of note the parameters because I've seen courts

7    interpret it different ways.  One part of the rule is anybody

8    who stands in the back can't later come on to testify, but then

9    I've also been in cases where you can't talk to the witness

10   during their testimony, that's part of the rule, and then the

11   third part I've seen is you can't tell another witness, unless

12   it's an expert or someone who can hear it, about something

13   that's happened.

14           THE COURT:  I think all three applies.  That's my

15   interpretation of the rule.  If someone is in the courtroom,

16   they cannot later testify, unless they're an expert or someone

17   who is excused.  And even experts aren't excluded from the rule

18   unless they're hearing something they need to rely on for their

19   testimony or unless the parties agree.  Obviously, you all agree

20   experts on both sides can sit in and that's going to be okay.

21   Can't talk to witnesses about their testimony once they take the

22   stand, can't take a break and woodshed them about their

23   testimony, and third -- what was the third thing you said?

24           MR. DONNELLY:  You can't relay someone else's

25   testimony to another witness.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1          THE COURT:  That defeats the whole purpose.  Witness

2     so and so just said this, that kind of defeats the purpose of

3     having the rule.

4          MR. YORK:  Your Honor, I think it probably goes

5     without saying, though, that that doesn't apply to named

6     defendants, they can be here throughout the trial.

7          THE COURT:  That's right.

8          MR. YORK:  We have a need for at least two individuals

9     from the facility who are assisting us.

10          THE COURT:  You have your corporate representative,

11     Mr. Price?

12          MR. YORK:  Well, in a way, yes, but he's also a named

13     defendant.  We have two other people, though, that are

14     absolutely crucial to the operations of the facility --

15          THE COURT:  Talk to them about it.  If there's an

16     issue, I'll take it up on the record in front of everybody.  If

17     you all have a disagreement, I'll rule on it.  You talk with

18     them about it and see if you have a disagreement before we do

19     that.

20          MR. DONNELLY:  I think along the same lines, I have a

21     couple of investigators and agents that would not be testifying

22     about anything substantive, other than to lay foundation for

23     some summary charts.

24          THE COURT:  Talk with them about it.  We'll take a

25     recess, you all confer, I'll come back in and we'll go on the

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   record and start our opening statements.

2       One other thing I need to remind you, even though you have

3   your electronics, you have to turn them off.  Your cell phones

4   have to be turned off, internet connections, you can't have an

5   internet connection during the trial.  Everything has to be

6   turned off, except your laptops you use for exhibits.  No

7   internet conductivity or cell phones operating during the trial.

8       Anything else?

9           MR. YORK:  That's it.

10          MS. FRENO-ENGMAN:  Your Honor, with regard to

11  separation, there's several people here who are going to be

12  witnesses.  Are they allowed to stay for opening statements

13  since openings are not evidence?

14          THE COURT:  I think so.

15          MS. FRENO-ENGMAN:  I'm sorry.

16          THE COURT:  After opening statements, then I'll

17  announce that anybody who is a witness will have to leave the

18  courtroom before we call the first witness.

19          MR. DONNELLY:  Put a note on the door?  I'll talk to

20  the security officer.

21          THE COURT:  The court security officers are pretty

22  good about checking with people as they come in, and you'll need

23  to keep an eye out.  If you see someone who is a witness, keep

24  them out.

25      Let's take five minutes and let you all visit, and as soon

1    as you're ready, I'm ready to start the trial.

2         (Recess from 9:21 a.m. until 9:29 a.m.)

3              THE COURT:  Everyone be seated.

4         We're here this morning for trial in the case of United

5    States of America, plaintiffs, versus State of Arkansas, et al,

6    defendants, Case No. 4:09CV33.

7         Is the plaintiff ready?

8              MR. DONNELLY:  We are, Your Honor.

9              THE COURT:  Are the defendants ready?

10             MR. YORK:  Yes, Your Honor.

11             THE COURT:  All right.  I know I've just met all of

12   you, but I just met you for the first time, and there are other

13   people here who don't know who everyone is, so if you'll

14   introduce everyone at your table and then we'll hear opening

15   statements.

16             MR. DONNELLY:  Your Honor, I'm Matt Donnelly.  I'm

17   here representing the United States.  I think I will let the

18   people at the table introduce themselves.  I would like to call

19   your attention to people out in the audience.  Joan Yost is an

20   investigator in my office.  And Gary Garcia is a paralegal in my

21   office.

22             THE COURT:  Say the name again.

23             MR. DONNELLY:  Gary Graca.

24             MR. TAYLOE:  Benjamin Tayloe for the United States.

25             MR. KOST:  John Kost, providing technical support for

1    the government.

2              MS. COON:  Laura Coon on behalf of the United States.

3              MR. HERMAN:  Vincent Herman for the United States.

4              MS. CUNCANNAN:  Jackie Cuncannan for the United

5    States.

6              THE COURT:  All right.  Mr. York?

7              MR. YORK:  Good morning, Your Honor.  To my left here

8    is Don Zaycosky from my office, an attorney.  And to the left of

9    him is Calvin Price, the superintendent of CHDC.  And Cordelia

10   Elias is from my office.  And we have Lori Freno from the office

11   of the Attorney General, Your Honor.  And behind us we have

12   Christine Consiglio, an attorney from our office.

13             THE COURT:  Tell me your name again.

14             MR. YORK:  That's Christine Consiglio.  And Your

15   Honor, we also have over here John Selig, who is the director of

16   the Department of Human Services.  And we also have Charlie

17   Green, the commissioner of the Division of Developmental

18   Services.

19             THE COURT:  Thank you.

20        Does the plaintiff wish to make an opening statement?

21             MR. TAYLOE:  Yes, Your Honor.

22             THE COURT:  You may, Mr. Tayloe.

23             MR. TAYLOE:  May it please the Court, Your Honor.

24   This is a case about protecting the federal rights of

25   individuals institutionalized at Conway Human Development

 1   Center, including the right to be able to choose to live in the

 2   most integrated setting appropriate to their needs without being

 3   denied government services and the price of that choice.  This

 4   is a case about protecting these individuals' federal rights to

 5   live in reasonable safety, receive constitutionally sufficient

 6   care, and obtain educational and other services to which they're

 7   entitled under the law.

 8       The evidence will show that the defendants are systemically

 9   violating these rights and that injunctive relief is warranted

10   to remedy the unlawful conditions at CHDC and address the

11   violations there with the Americans with Disabilities Act and

12   the Individuals with Disabilities Education Act.

13       Your Honor, the evidence will show that CHDC is a facility

14   geared toward the lifelong institutionalization of persons with

15   developmental disabilities.  A person admitted to CHDC is more

16   likely to die a resident of that facility than ever return to

17   life in the community setting.  Further, residents of CHDC die,

18   on average, at the strikingly young age of 46 years old.  As its

19   residents die, CHDC is repopulating itself with young children.

20   When this institution opened in 1959, its name was the Arkansas

21   Children's Colony, and it is trending back to its origins, a

22   colony for children who spend their days isolated from their

23   nondisabled peers.  In fact, the evidence will show that

24   notwithstanding assessments indicating that individuals at CHDC

25   do not require institutionalization to have their needs met and

1    notwithstanding the unmistaken requirements of the ADA, the

2    defendants have continued unabated to institutionalize

3    individuals at CHDC rather than serve them in more integrated

4    settings.  The state is thus risking the consignment of another

5    generation of persons to a lifetime of needless

6    institutionalization in violation of the law.  You will hear

7    overwhelming evidence of CHDC's bias towards the continued

8    institutionalization of its residents.  We will show CHDC's

9    assessments of individuals' strengths and needs are formulaic

10   and devoid of a focus of the factors that led to the

11   individual's institutionalization in the first place.  We will

12   prove that CHDC's staff responsible for assessing whether

13   individuals can be served in more integrated services have

14   little knowledge of the services that can be and are provided in

15   the community.  Further, we will show that CHDC's staff conclude

16   that this institution is the most integrated setting appropriate

17   for individuals based on factors that are irrelevant to such a

18   determination and that their assessments of the individuals'

19   needs serve to obstruct community placement.

20        Consequently, the evidence will show that CHDC's staff

21   rarely conclude that an individual could be served anywhere but

22   CHDC.  In fact, almost without exception, staff will not

23   recommend the facility resident for community placement unless

24   that resident's guardian first proactively indicates a

25   preference for the community.  Collectively, the foregoing

1   practices result in systemic violations of the ADA, as

2   articulated by the Supreme Court in *Olmstead*.

3        Separately we will show that the lack of knowledge about

4   the community by CHDC staff leaves them unable to provide the

5   individual and families and guardians sufficient information so

6   that the individual can make an informed decision whether to

7   oppose community placement.  Instead, staff violated the ADA by

8   offering at best an abstract choice between CHDC and unspecific

9   community services.  The guardian, after being denied the

10  benefit of a knowledgeable objective assessment of what the

11  individual needs to live in the community and being given

12  virtually no information about providers who could meet that

13  individual's identified needs, unsurprisingly opt to have their

14  loved one remain in the institution.

15       Your Honor, we will show that CHDC admits it's part of the

16  system that needlessly drives individuals toward

17  institutionalization.  The evidence will show that at least

18  1,600 people or, according to the latest calculations of

19  defendants' experts, 3,000 people are on a waiting list to

20  receive services in the community, in community settings,

21  pursuant to the state's home and community-based waiver program.

22  By the state's own recent estimates, many of these people can

23  expect to remain on a waiting list for community services for

24  approximately 14 years.  By comparison, CHDC has about 500

25  residents and a wait list of about 65 people, and these people

 1    may also be on the state's waiver wait list.  In practical

 2    terms, individuals have no choice but institutionalization if

 3    they need the state's help.

 4         We will prove that the average annual cost for an

 5    individual to participate in the state's waiver program is

 6    $38,000, while the average annual cost in Arkansas for placement

 7    in an institution such as CHDC is roughly $68,000.

 8         Your Honor, we will convincingly demonstrate that while the

 9    defendants force residents into lifelong institutionalization,

10    they also subject these residents to harm from unlawful

11    conditions and other deprivations of their federal rights,

12    particularly the rights of school-aged children under the IDEA.

13    The evidence will show that much of this harm is attributable to

14    the fact that CHDC substitutes administrative processes for

15    professional decision-making.  Notably, we will prove that

16    defendants violated CHDC's residents constitutional rights by

17    exposing them to repeated injury and victimization by other

18    residents.  Although CHDC may document such occurrences, its

19    professionals rarely intervene to prevent or mitigate their

20    reoccurrence.  Similarly, CHDC's professionals rarely conduct a

21    clinical review of episodes of restraint, not even when staff

22    restrain the same individual over and over and over again.  In

23    particular, the evidence will show that CHDC's psychology staff

24    do not clinically assess restraint episodes to determine whether

25    behavioral interventions are appropriate, whether staff are

1    implementing these behavioral interventions correctly, or

2    whether a change in behavioral interventions would mitigate the

3    restraint's use.  Without clinical oversight, staff repeatedly

4    subject residents to unnecessary physical and mechanical

5    restraints for extended periods of time.

6          Similarly, you will hear compelling evidence that

7    defendants' lack of clinical oversight of the use and side

8    effects of psychotropic medications has caused significant and

9    even fatal harm to CHDC's residents.  Although defendants

10   administer powerful psychotropic medications to hundreds of

11   CHDC's residents on an ongoing basis, the facility lacks a

12   coherent means for staff to identify the existence of medication

13   side effects.  In particular, CHDC fails to train staff on the

14   particular sides effects of regularly used psychotropic

15   medications.  Consequently, defendants fail to detect even

16   commonly occurring side effects at CHDC.  Separately, the

17   evidence will show that CHDC's psychiatrists are not trained to

18   treat the many children on his caseload identified by defendants

19   as having significant mental illness, and his general caseload

20   at CHDC is so great that he sees individuals, on average, less

21   than a paltry 2.5 hours a year.  Consequently, instead of

22   providing adequate clinical oversight in which his treatment

23   decisions are based on his own contemporaneous assessments,

24   CHDC's psychiatrists simply recommend prospective medication

25   changes to be implemented based on determining delegating it to

1  unqualified nonmedical staff.

2      Likewise, the evidence will show that clinical staff

3  responsible for the implementation of mealtime and other

4  supports necessary to prevent choking and aspiration in

5  residents of CHDC do not provide these individuals with clinical

6  monitoring consistent with their level of risk.  Consequently,

7  defendants needlessly expose individuals who at are high risk of

8  aspiration and choking to severe harm, including death.   In

9  fact, the evidence will show that most CHDC's residents die of

10  aspiration-related causes.

11      Finally, we will prove that defendants violate the IDEA in

12  multiple respects.  In fact, the state itself has found this

13  facility is violating the IDEA.  Most notably, any special

14  education instructions the defendants provide to CHDC's

15  school-aged residents is inside the facility, away from any

16  other children.  The evidence will show that, in violation of

17  the IDEA, none of the approximately 50 school-aged children at

18  CHDC attends a single class with their nondisabled peers,

19  although many came from public schools where they interacted

20  daily with other children, regardless of disability.  Further,

21  defendants provide none of the CHDC children a full day of

22  special education services or an adequate transition plan, nor

23  do defendants provide CHDC students with IDEA-required statewide

24  and district-wide assessments, thereby depriving them of the

25  opportunity to assess and benefit from statewide academic

1   content and achievement standards in contravention of the IDEA.

2       You will hear overwhelming evidence that defendants'

3   complete educational segregation of CHDC's students from their

4   nondisabled peers is perpetuated by defendants' failure to

5   insure that all required individual education plan team members

6   participate in CHDC student IEP meetings.  In fact, the only

7   regular participants at CHDC IEP meetings are CHDC staff.

8   Defendants' failure to comply with the IDEA requirements that a

9   local education agency representative and the regular education

10  teacher attend CHDC IEP meetings further contributes to these

11  students' continued denial of access to public school resources

12  and regular interaction with nondisabled students.

13      Defendants' filings indicate that they will contend that

14  they're immune from scrutiny because although the state's own

15  survey agency has repeatedly found CHDC noncompliant with

16  regulations qualifying the institution for funding from the

17  federal Centers for Medicare and Medicaid Services, known as

18  CMS, CMS has not taken the step of terminating that funding.

19  Similarly, they're likely to contend that CHDC's accreditation

20  by a nongovernmental agency, the Commission on Accreditation of

21  Rehabilitation Facilities, or CARF, insulates it from further

22  scrutiny.  But the evidence will show that the defendants closed

23  CHDC's sister facility, the Alexander Human Development Center,

24  in the face of serious deficiencies that arose even while

25  CARF-accredited.

1        In any event, the law on this issue is abundantly clear.

2   Funding regulations and CARF accreditation do not equate to

3   complying with individuals' rights to constitutional care.  The

4   defendants likely will also contend the violations we identify

5   are insufficient to make a pattern or practice.  But the

6   evidence of a systemic failure to exercise professional judgment

7   surfaces repeatedly.  In any event, under the law, we need only

8   show that these violations are not isolated.

9        The defendants may try to argue that a CHDC resident need

10  not have an independent objective assessment whether they are in

11  the most integrated setting appropriate to their needs until the

12  individual's guardian indicates a willingness to explore other

13  settings.  But that completely puts the cart before the horse.

14  Families who already have made the heartwrenching decision to

15  agree to the institutionalization of their loved one in order to

16  get government services are at an enormous disadvantage in

17  reassessing in that decision.  An independent objective

18  assessment is necessary precisely to insure that the decision

19  regarding continued institutionalization is an informed one.

20  Similarly, defendants likely will contend that many families are

21  supportive of CHDC.  But the evidence will also show that

22  families are supportive of CHDC because they have no

23  alternatives to it.

24       Finally, defendants are likely to point to some recent

25  efforts to address the foregoing violations of the law.  We ask

1    the Court to consider with reservation any reforms that the

2    state undertook after the United States filed suit, particularly

3    because the defendants have been on notice of these violations

4    since at least November 2004 when the United States first issued

5    its findings regarding CHDC.

6         In summary, Your Honor, we will convincingly demonstrate

7    the choice defendants give to individuals with developmental

8    disabilities who need assistance is a choice of

9    institutionalization as the price for assistance, and that once

10   institutionalized at CHDC, a person has little hope of ever

11   living in the community again.  We will show that defendants'

12   violations of the CHDC's residents' rights under the ADA are

13   serious and pervasive, and we will likewise show that

14   defendants' violations of CHDC's residents' rights to reasonable

15   safety and adequate care under the Constitution and to

16   educational benefits under the IDEA are also serious and

17   pervasive.  Accordingly, we seek this Court's injunctive relief

18   to compel defendants to comply with the law and to protect the

19   rights of the residents of CHDC.

20        Thank you, Your Honor.

21            THE COURT:  Thank you, Mr. Tayloe.

22        Mr. York.

23            MR. YORK:  Good morning, Your Honor.

24            THE COURT:  Good morning.

25            MR. YORK:  Your Honor, CHDC remains fully certified by

                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

2c35a309735ebf21

1  the Centers for Medicare and Medicare Services, CMS.  CHDC

2  complies with extensive ICF/MR regulations.  CHDC also

3  voluntarily sought and received full accreditation from the

4  Commission on Accreditation of Rehabilitation Facilities, known

5  as CARF.  CARF conducts an independent nonprofit accreditation

6  of facilities like CHDC.  Not only was CHDC accredited, but it

7  received, Your Honor, the longest period allowed of three years,

8  which is only given to the very best facilities.

9          Your Honor, because the DOJ does not like these facts, it

10  claims they have no weight whatsoever.  However, that position

11  is belied by several factors, or several facts here, Your Honor.

12  When any facility is cited for deficiencies under CMS

13  regulations, the DOJ leaps and does not hesitate to use that as

14  evidence to allege that there's a failure to meet standards.  So

15  they use the regulations when it suits their purpose, but they

16  decline to use them when it doesn't suit their purpose.  You

17  will even hear, Your Honor, from the DOJ's own experts that

18  varying weight should be given to the CMS regulations.  Some of

19  their own experts rely in part on those CMS regulations

20  themselves, as you will hear in their testimony.  But the DOJ

21  will tell you that, no, you shouldn't look at them at all, even

22  though their own experts say they looked at them at least in

23  part.  Our experts will clearly testify that CMS and CARF are

24  relevant and important and they should be considered.

25          The case law cited by Mr. Tayloe has to be distorted, or

1    you have to distort our position for them to argue that that in

2    some way protects them or that they don't have to consider CMS

3    regulations.  We never argued, Your Honor, that CARF

4    certification or CMS regulatory certification isolates us, or

5    insulates us from further scrutiny.  We've never said that.

6    We've not in any of our pleadings said that.  What we have said,

7    Your Honor, is that the case law clearly recognizes that you

8    have to give weight to those factors, that they're important and

9    you should consider them.  It's the DOJ who says, Your Honor,

10   don't consider them at all, which is contrary to the law.  The

11   cases they cite simply say that that alone, the fact that you're

12   CARF certified or that your ICF/MR certified, that that alone

13   does not mean that you meet constitutional standards, and we

14   agree with that, that's the complete interpretation of the law.

15   But at the same time you must consider all the good things that

16   are going on at CHDC because they are certified by these

17   regulatory agencies.  And great weight, Your Honor, should be

18   given to the fact that they are indeed CMS certified and they

19   are CARF certified.

20       The DOJ experts offer little or no support for their

21   alleged standards.  We asked them frequently at deposition, What

22   is your standard, where does it come from, and it was always

23   just, Trust me, essentially, Your Honor.  It's a standard I

24   know.  I can't cite it any literature, I can't cite it in any

25   regulation, just trust us.  Well, instead they offer their

1   personal idiosyncratic opinions as to what the standard should

2   be.  In fact, some of them admit that they are applying

3   standards that are optimal or the very best.  As Your Honor

4   knows, the Court is not to choose between the treating

5   professionals and the DOJ experts as to what is the best

6   treatment, as the Court should not replace the judgment of

7   treating professionals.  The law is absolutely clear on that,

8   Your Honor, as I'm sure you're aware.  The Court need only

9   confirm that professional judgment was indeed rendered by the

10  treating professionals.  There is no reason to supplant the good

11  professional judgment that is exercised every single day at

12  CHDC.  In fact, plaintiff's experts have barely, if at all, even

13  addressed whether professional judgment was exercised, as you

14  will hear in their reports and in their testimony.

15          Your Honor, I'm going to read just a short section of one

16  of the reports because it says it better than what I can say,

17  but it sort of somewhat is representative of all the flaws of

18  all the DOJ experts.  And I'm just going to read a short excerpt

19  here.  And it happens to be an excerpt from Dr. Walsh, who is a

20  trained psychologist and an expert in risk management, and he's

21  commenting on Ms. Osgood, and he says:  "One wonders what Ms.

22  Osgood's report really says about CHDC, because she did not

23  approach her review of the facility in an objective fashion, did

24  not take any systematic samples of individuals or conduct any

25  organized review or data extraction, it cannot be said that her

1    report is a scientific examination of practices at CHDC.

2    Rather, it seems that Ms. Osgood concentrated on finding

3    instances of errors or problems upon which she could build

4    criticisms of the operation of the facility.  In short, in her

5    work at CHDC, what Ms. Osgood carried out was not an objective

6    review of care practices.  After carefully reviewing her report

7    and comparing it to what I know to be true from my own

8    investigation of the facility, it is my opinion that Ms. Osgood,

9    based on a particular set of ideological beliefs, knew what she

10   wanted her report to say prior to carrying out her review."

11        And that really somewhat relates to every one of their

12   experts, as you will hear in the testimony as they're

13   cross-examined and as you hear or read their reports.

14        Your Honor, what they essentially do, and as you'll see

15   they're going to try to introduce, even though we may have

16   objections to them, what they call these summary charts, and

17   they're lists of injury after injury after injury, without any

18   insight into how the injury occurred, why it occurred, what

19   action was taken to address the injury, you know, whether the

20   injury was reasonable or not, because what they're trying to do

21   is have sensationalism, to get this emotional response from the

22   Court, or the press, or whoever they're appealing to, Your

23   Honor.  And the reality is, those charts only represent that

24   there's been some minor injuries at CHDC, just like there is in

25   any facility across the country, any school setting across the

1    country, any hospital setting across the country.  It happens.

2    It's unfortunate, but they happen.  But the reality is that

3    there's not an excessive number of injuries.  There's not an

4    excessive number of incidents that occur at CHDC if you compare

5    it to other data from other similar facilities, or even other

6    settings like nursing homes or hospitals.  But they will try to

7    distort that by simply overwhelming you with here's a hundred

8    examples in two years or five years of whenever people were

9    injured.  Well, without any analysis of each one of those, it

10   really tells you very little or nothing about the quality of

11   care, the great quality of care that exists at CHDC.

12        They offer, Your Honor, no comparative benchmarks or data

13   to support their claims.  They will claim, you'll hear, Oh,

14   injury rates are high, or use of restraint is high, but you will

15   not receive from them, we've asked them at deposition over and

16   over again.  How does it compare to other facilities?  They

17   don't know.  Again, you're just supposed to take their word off

18   the top of their heads that indeed those rates are high.

19   Actually, Your Honor, they also place CHDC in a very unfair

20   position.  And I'll just give you one example.  And there's a

21   number I could give you.  But one example is they claim the

22   restraints are too high.  However, if CHDC reduces the use of

23   restraints, the injury rates will probably go up, and then they

24   would complain the injury rates are too high.  And if they try

25   to address that with some kind of medication, some kind of drugs

1    or something, they would claim the medication rates are too

2    high, and so on and so on.  So that their criticism is they have

3    an unrealistic review that there should not be any injuries at

4    the facility, and that's not consistent with logic and it's not

5    consistent with the experience in other facilities all across

6    the country.

7         Plaintiff's experts clearly set out to find fault with CHDC

8    as they know they were to do.  Most, if not all, were biased

9    before they ever set foot on CHDC's grounds, by their own

10   opposition to institutional bias that they have and by having

11   been previously provided with the complaint and with the DOJ

12   findings letter from earlier reviews by experts.  So all these

13   people that had this stuff went in knowing already what the DOJ

14   wanted them or expected them to find.  The DOJ also usually

15   selected documents for review by its experts, they provided

16   summaries for these experts, again, guiding them to what they

17   should look at in many cases, again, creating a great deal of

18   bias.  In short, these experts knew what they were to find and

19   they found exactly that, Your Honor, as they were expected.  The

20   plaintiff's experts did not use scientific sampling techniques

21   or scientific methodology of assessing services, and that will

22   be strongly shown by the testimony of especially of our experts.

23   We have 15 experts, Your Honor, nationally known experts who

24   will come in and critique the job that was done by the

25   plaintiff's nine experts, and they'll point out how it was not

1    scientific.  They didn't take scientific samples, they didn't

2    use scientific assessment tools, on and on and on.  They went in

3    there to find the worst possible cases, places where accidents

4    happened, and then they tried to reason that is characteristic

5    of the entire facility being inadequate.  And if that was the

6    standard, Your Honor, there is not a facility in the country,

7    including hospitals, that could operate anymore.

8        Your Honor, our experts will -- who, as I pointed out, are

9    nationally recognized and respected -- will testify that the

10   allegations by plaintiff and by their experts are unfounded and

11   that services at CHDC meet and usually exceed all accepted

12   professional standards.  And that is summarized, Your Honor, we

13   gave a brief summary in our brief that we submitted to the

14   Court, and I'll rely on that, on pages 19 through 32, if Your

15   Honor would like to take a look at that.

16       The evidence will show, Your Honor, that consistent with

17   the Individuals with Disabilities Education Act, all children at

18   CHDC are receiving a free appropriate education, just as the law

19   requires.  These children are at CHDC because they have failed

20   dramatically often in community school settings.  No students at

21   CHDC have been deprived an educational opportunity, so there's

22   full compliance with the IDEA, Your Honor.  Instead, the DOJ

23   would like you to force these children back out into the

24   community where they fell before, some of them almost risking

25   their lives in the process, and they want to force them back out

1   into the community again.  And the parents instead are very

2   satisfied with the services that they're receiving now at CHDC

3   and these children have progressed tremendously well while at

4   CHDC.

5        There was a misrepresentation made to the Court just a

6   moment ago that the state itself has found CHDC in violation of

7   the IDEA.  That is absolutely false, Your Honor.  What is going

8   on is a normal survey type of process.  It is almost like a

9   quality assurance or quality improvement process that is typical

10  of every school setting.  And people went in from the Department

11  of Education, they conducted a review, they had some concerns,

12  they stated those concerns to the people at CHDC, and a

13  compliance plan has been drafted and proposed by CHDC, which we

14  believe will be or has been accepted by the Department of

15  Education.  So they did not find them in violation of the IDEA.

16       Tellingly, the plaintiff cannot identify anyone for whom

17  the treating professionals have recommended community placement

18  and the guardians have consented to trying a community placement

19  who have not been moved or are not in the process of moving.  In

20  fact, people from CHDC are moved to the top of the waiting list

21  for waiver services, Your Honor.  So when you hear the statistic

22  that there's 3,000 people on the waiting list, that really has

23  very little or no relevancy to this case, because we're dealing

24  with CHDC here, not the statewide system, even though they've

25  tried to turn this case into a statewide case.  But the reality

1    is, CHDC people come first when they're designated to make the
2    move.  So they don't wait on the waiting list like everyone
3    else.  And by the way, Your Honor, you know, there's a waiting
4    list even to get into CHDC, because there are a lot of people
5    out there who recognize the high quality of services that exist
6    there.  So there are many parents who would love to get their
7    children into CHDC.  And that's not maybe typical at other
8    facilities, but it is truthful for CHDC.
9        As the evidence will reveal, Your Honor, the plaintiff is
10   really a group of attorneys without any real client.  CRIPA
11   authorizes lawsuits even if the DOJ does not have the support of
12   the very people they claim to represent.  Tellingly, the
13   plaintiff will have very few or no residents at CHDC who support
14   its efforts to attack their home.  The plaintiff will have very
15   few parents or guardians who support its efforts to eliminate
16   the services available at CHDC.  The parents and the residents
17   do not support what the DOJ is doing here.  And the claim was
18   made falsely that there are no alternatives for these parents
19   and that's the only way they choose that.  In this courtroom
20   there's a number of parents, and you'll hear from a number of
21   them, that that is absolutely false.  These parents are
22   intelligent, knowledgeable, and caring individuals who work very
23   hard to make sure their children get into the right location,
24   and to say they have no alternative other than CHDC is
25   absolutely false.  They have made a conscious, knowledgeable

1    decision to place their children at CHDC, and they have been

2    very pleased with the results.  The evidence, contrary to the

3    assertions of the DOJ, will demonstrate that parents, family

4    members, and guardians are well-informed, intelligent, caring,

5    and loving individuals who know their loved ones the best and

6    know all the options available.  These parents, guardians, and

7    family members have reasonably and responsibly chosen services

8    at CHDC, and they're very pleased with the services and results.

9    Unfortunately, not only does the DOJ and its experts want to

10   replace the professional judgment of treating professionals,

11   they want to usurp the rights and powers of parents, family

12   members, and guardians.  This is not only contrary to *Olmstead*,

13   Your Honor, and other law, but it is also reasonably and morally

14   incorrect.  Although most of the DOJ experts pay lip service to

15   the rights of parents, family members, and guardians to make

16   decisions, they suggest essentially that these loving and

17   involved parents and family members and guardians be re-educated

18   essentially to join in with their politically correct position

19   that everyone is better in the community.  The facts do not

20   support that the community is better for everyone.  The

21   experience of these parents, family members, and guardians does

22   not support that claim either.  They found the opposite.  And

23   they do not believe that the community is better for everyone.

24   And in fact, Your Honor, there are some tragic incidences in

25   community settings, including some failures of people that are

1   now at CHDC.  That's why they came to CHDC, because their

2   children already failed out in the community.  The plaintiff and

3   its experts should not be allowed to supplant the good judgment

4   of the parents and family members and the guardians.  And one

5   example of that, for example, Your Honor, Mr. Gettings is one of

6   their experts.  He says that he understands that parents should

7   be heard and he's willing to listen to them.  And I asked him at

8   deposition, I said, "Mr. Gettings, how often after they've

9   turned you down, how many times do you go back to them, how many

10  times do you force them again to go to another meeting?"  "Well,

11  until they change their mind, because otherwise they won't enter

12  the community."  Well, Your Honor, it borders on harassment.  I

13  mean it borders on something I ever thought could ever happen in

14  this country, some kind of forced re-education on people to

15  force them to accept the political philosophy of the DOJ.

16      There is an underlying assumption by all the plaintiff's

17  experts that all people must eventually end up in the community,

18  and that is contrary to *Olmstead* and to other case law, Your

19  Honor.  Providing the valuable resources of CHDC for some

20  severely impaired persons is not discrimination based upon

21  disability, Your Honor, any more than I would say providing

22  certain serious medical procedures in a hospital is

23  discrimination to the seriously ill.  It is a benefit in the

24  continuum of services for the developmentally disabled that is

25  needed and wanted, Your Honor.

1       The professionals at CHDC have been unfairly impugned, Your

2   Honor.  These professionals are not only extremely competent,

3   but they're caring, devoted, and self-sacrificing.  The parents,

4   family members, and guardians have been unfairly insulted too,

5   Your Honor.  These parents, family members, and guardians are

6   not only loving and involved, but they're extremely

7   knowledgeable, contrary to what the DOJ claims, about available

8   options, including community options.  We believe, Your Honor,

9   the evidence in this case will overwhelming show you that you

10  will issue an order that will redeem and restore the reputations

11  of these good people, Your Honor.

12      Thank you.

13      THE COURT:  Thank you.  The parties have invoked Rule

14  615, which requires witnesses to be excluded from the courtroom.

15  So witnesses, other than the parties, people who are named as

16  parties and corporate representatives, are excluded.  Was there

17  any disagreement about who should be excluded?  I know you were

18  going to talk about that.

19      MR. YORK:  We have talked about it, but we have some

20  disagreement.  We still want some of our representatives who are

21  here who are crucial.

22      THE COURT:  Tell me what the disagreement is.  Who do

23  you want in that they want to exclude?

24      MR. YORK:  Your Honor, we have essentially the

25  assistant director, and I'm thinking the other title -- they're

1    high executive members of the CHDC staff who are essential for

2    us to respond to various allegations and gather the right

3    documents.

4              THE COURT:  Give me names.

5              MR. YORK:  Marilyn Junyor, Your Honor, and Gail

6    Miller.

7              THE COURT:  All right.  And who else?

8              MR. YORK:  That's it, Your Honor.  Some named

9    defendants also, Your Honor.

10             THE COURT:  I don't think there's an issue about the

11   named defendants.  Tell me what Ms. Junyor and Ms. Miller's

12   positions are and why you need them in the courtroom.

13             MR. YORK:  Yes.  They're high-ranking executive staff.

14   I think Ms. Junyor is actually assistant director of the

15   facility.  And Gail Miller is also high-ranking executive staff

16   there.  Essentially, they have their finger on the pulse of the

17   entire facility.  They know where all the records are, they know

18   what all the issues are, they have everything that we need to

19   appropriately respond to the allegations that are being made.

20             THE COURT:  Let me address this to Mr. Donnelly,

21   Mr. Tayloe, whoever is going to speak for you on this issue.

22   I'm wondering if it would solve your question if they were

23   allowed to stay in during the examination of your witnesses, who

24   are excluded during the examination of witnesses from the

25   defense, so that they could not hear what other defense

1   witnesses said.

2        MR. DONNELLY:  Unfortunately, Your Honor, that doesn't

3   quite address our concerns.  As Mr. York has indicated, they're

4   very high-ranking officials at the facility, and for them to be

5   able to shape their testimony based on what they've heard our

6   witnesses say is something that the United States objects to.  I

7   would add that we're not saying that he can't have them -- it

8   seems like the position that he's looking for is that they would

9   be able to use them to find documents and track down information

10  about something that happens here, which is -- I don't see why

11  they have to be in the courtroom for that to happen.  We're not

12  objecting to them doing this work for them.  We're objecting to

13  them listening to witnesses and shaping their testimony based on

14  them.

15       MR. YORK:  As Your Honor knows, there is really very

16  little or no chance at all that they're going to conform their

17  testimony to any of the testimony of the plaintiff's witnesses.

18  And if they're willing to let us relay the information to them,

19  why can't it go to them directly then, because we need their

20  assistance to prepare our defense, Your Honor.

21       MR. DONNELLY:  I didn't mean conform to fit my

22  witnesses' testimony, but to shape it so that it contradicts it.

23       MR. YORK:  We have a right to contradict it, Your

24  Honor.

25       THE COURT:  Let me hear what he has to say.  One at a

1    time.

2            MR. DONNELLY:  Again, Your Honor, the problem is that

3    they would be able to, as I'm sure you understand, be able to

4    alter their testimony based on what they hear.

5            THE COURT:  Right.  I'm prepared to rule.  Rule 615

6    says that "At the request of a party the court shall order

7    witnesses excluded so that they cannot hear the testimony of

8    other witnesses," and it says, "This rule does not authorize

9    exclusion of a party who is a natural person, an officer, or

10   employee of a party which is not a natural person designated as

11   its representative by its attorney, or a person whose presence

12   is shown by a party to be essential to the presentation of the

13   party's cause."

14      Here we have Mr. Selig and Mr. Green who are named parties

15   and they'll be allowed to stay in.  We also have Mr. Price who

16   is named as the corporate representative, and he's also a named

17   party.  We have Mr. Price, Mr. Green, and Mr. Selig, all of whom

18   will be able to stay in because they're named.  I think you get

19   to name one more as a representative, and then you can pick

20   which one you want, and then the other person will need to be

21   excluded.

22           MR. DONNELLY:  Your Honor, along those lines, I

23   introduced earlier, I have two, for lack of a better term, case

24   agents.  I assume I get to keep one of those as well?

25           THE COURT:  Yes, certainly you get to keep a

Eugenie M. Power, RMR, CRR, CCR<br>United States Court Reporter

```
 1    representative as a case agent.  I've had criminal cases where
 2    there's been case agents and sometimes the defense doesn't
 3    object and let two in.  But I don't know if Mr. York is going to
 4    agree to let you have two people unless you let both of his
 5    people in.  So you get to pick one, if they're going to testify.
 6    If they're not going to testify, it's not an issue.  You can
 7    keep anybody in the courtroom who is not going to testify.  But
 8    if they're going to testify, then you can only get to have one
 9    corporate representative, and anybody else who is going to
10    testify would have to be excluded.
11             MR. DONNELLY:  Yes, Your Honor.
12             THE COURT:  Mr. York, I think that you can decide.
13    You can keep Ms. Junyor or Ms. Miller as your corporate
14    representative, the person can sit at counsel table, if you
15    wish, or sit out there with Mr. Green and Mr. Selig.  But the
16    others will need to be excluded pursuant to the rule.
17             MR. YORK:  Thank you, Your Honor.
18             MR. DONNELLY:  Thank you, Your Honor.
19             THE COURT:  Now, the witnesses who are in the
20    courtroom will need to be excluded.  That also applies -- I want
21    to tell you that we have more people than can fit in the
22    courtroom, and the proceedings are being simulcast into the
23    adjacent courtroom.  And witnesses in that courtroom will also
24    need to be excluded.  So if you're in the courtroom, you can't
25    be hearing the testimony.  I mean, if you're a witness, you
```

1    can't be hearing the testimony.  You'll need to leave this

2    courtroom, and you can't go next door and listen to it over

3    there.  And if you're next door, you've got to leave and you

4    can't come over here and listen.  The rule is that witnesses are

5    not allowed to hear what other witnesses have testified about.

6    It also says that if you're a witness, that you can't talk to

7    other potential witnesses about what has been said here in the

8    courtroom.  So that's the rule.  And so I'll need all of you who

9    may be called to testify to leave, because if you don't, then

10   you could be excluded from testifying when your time comes.

11          MR. DONNELLY:  Your Honor, I have one more thing I'd

12   like to put on the record.  We spoke about experts before.  I

13   believe we've come to an agreement, for administrative purposes,

14   that experts can sit in the courtroom and hear everything.

15          THE COURT:  And that's not uncommon.  So the experts

16   can sit in and listen because they very often base their

17   testimony -- I mean, they base their opinions on the testimony

18   and they need to hear the testimony, so that's not uncommon.  So

19   experts will be permitted.  Each side will have one corporate

20   representative.  Everybody else will need to leave this

21   courtroom and the adjacent courtroom.  There are rooms on either

22   side out there where witnesses can sit, and, of course, in the

23   hall.

24          MR. DONNELLY:  Thank you, Your Honor.

25          THE COURT:  All right.  You can call your first

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

                                    Osgood - Direct                          36

 1  witness, but everybody else will need to leave.

 2          MR. YORK:  Your Honor, could we have a short recess?

 3  We have listed all the parents, and not all of them may know

 4  they're on the witness list.

 5          THE COURT:  I think that's fair.  We'll take a short

 6  recess and you all tell me when you're ready.

 7      (Recess from 10:10 a.m. until 10:20 a.m.)

 8          THE COURT:  Mr. Donnelly, have you designated your

 9  corporate representative?

10          MR. DONNELLY:  I have, Your Honor.  Mr. Graca.  He's

11  over there to help out with the exhibits.

12          THE COURT:  I don't have a problem with that.  If you

13  want to get him closer to you, inside the bar, that's okay.

14      Mr. York, did you designate a corporate representative?

15          MR. YORK:  Yes, Your Honor.  The unlucky one is Gail

16  Miller.

17          THE COURT:  Ms. Coon, are you going to call the first

18  witness?

19          MS. COON:  Yes, Your Honor.  The United States would

20  like to call Ms. Carla Jo Osgood.

21          **CARLA JO OSGOOD, PLAINTIFF'S WITNESS, DULY SWORN**

22                          DIRECT EXAMINATION

23  BY MS. COON:

24  Q.   Good morning, Ms. Osgood.

25  A.   Good morning.

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

1    Q.   Could you state your full name for the record?

2    A.   Carla Jo Osgood.

3    Q.   Thank you.  And could you, please, describe briefly for the

4    Court your area of expertise.

5    A.   Evaluating protection from harm systems.

6    Q.   And could you explain for the Court what is meant by the

7    term "protection-from-harm systems"?

8    A.   Protection from harm is an organization's various systems

9    to identify individuals' risks of harm and respond to those

10   incidents where harm occurs, and also doing oversight both at an

11   individual and systemic level of incidents of harm.  It also

12   includes looking at incident and injury trends, various systems,

13   including incident and risk management, which speak to the

14   prevention and responsive component to harm, the use of

15   restraints and abuse and neglect.

16   Q.   And Ms. Osgood, how long have you been in this field?

17   A.   Approximately, 20 years.

18   Q.   I'd like to talk about your employment currently, and then,

19   after that, your employment prior to your current employment.

20   So let's start with your current employment.  Could you, please,

21   explain what you are doing currently?

22   A.   I serve as consultant to a variety of state and federal

23   agencies with respect to improving services for individuals with

24   cognitive disabilities, mental health disabilities,

25   developmental disabilities.

1    Q.    And who are your clients in your consulting?

2    A.    Actually, it's various clients.  I work with some core

3    monitors that are monitoring either agreements between states

4    and federal government or agreements between -- private

5    lawsuits.  I consult with the State Department of Human

6    Services' agencies to improve their -- organizational

7    improvement, but also to help them to both develop and implement

8    systems that protect individuals from harm.  And, obviously, I

9    work with DOJ to evaluate whether facilities and teams are

10   adequately identifying individuals' risks of harm, whether

11   they're adequately responding to those harms, if they're using

12   appropriate practices.

13   Q.    Approximately, how many systems would you say that you have

14   evaluated in terms of their protection-from-harm practices?

15   A.    This is really a very rough guess, but between 25 and 30.

16   Q.    And have those various systems that you have evaluated been

17   in the same state or different states?

18   A.    No, they've been at least in 15 states.

19   Q.    And in addition to your consulting, could you tell the

20   Court what you did before you were a consultant?

21   A.    I actually was assisting the State of Indiana with coming

22   into compliance with a settlement agreement that that state was

23   in with the Department of Justice after a corporate

24   investigation.  I was not an employee of the state.  I was an

25   employee of a private consulting firm.  And I had a variety of

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    functions there.  When I first began, I was -- my entire tenure
2    there was in quality management, and initially it was in program
3    evaluation, making sure that treatment teams were effectively
4    assessing and identifying and responding to individuals' risks
5    of harm as well as, you know, actual incidents of harm.  I then
6    was named the assistant superintendent of the facility which
7    covered quality assurance, quality management, and quality
8    improvement.  There were some other departments I supervised, as
9    well as data management.  My role in, actually, both of those
10   positions was to assist both the facility and the state at large
11   develop the appropriate systems, to meet the requirements of the
12   settlement agreement on the one hand, but conform to generally
13   accepted standards of practice.
14   Q.   As a consultant, have you written reports regarding systems
15   for protection from harm?
16   A.   Yes.
17   Q.   Approximately, how many reports would you say that you've
18   written regarding systems for protection from harm?
19   A.   And again, it's probably a leeway of ten on each side,
20   perhaps, but probably 150.
21   Q.   And what kinds of areas did you evaluate when you wrote
22   these reports?  Were they the areas you just described?
23   A.   Yes, they were.  And in addition, some reports also
24   addressed case management, treatment planning.
25   Q.   Have you also assisted any organizations in improving

1   services through technical assistance or policy consulting or

2   otherwise?

3   A.    Yes.

4   Q.    And what have you done in those arenas?

5   A.    Drafted policies for -- typically, whatever it's called in

6   one state from another.  Typically, the Department of Human

7   Services draft policies that address the areas, and all of these

8   areas really fall under the umbrella of "protection from harm,"

9   in the areas of risk management, clinical services, peer review,

10  restraint use, investigations, which includes abuse and neglect.

11  I believe there's more, but I can't recall.  And overall quality

12  management systems.  And treatment planning.

13  Q.    Okay.  Any other relevant work history that we haven't

14  covered that is relevant to the areas of your expertise?

15  A.    When I first started in the field, I initially began

16  providing services for youth at risk, and most of those

17  individuals were victims of abuse or neglect and most had one

18  form of disability or another.  I then began providing case

19  management services.  I moved into foster care and insured that

20  the individuals in foster care were receiving the appropriate

21  services, be them clinical services or educational services.  I

22  worked with teams in insuring that program planning was -- there

23  was a continuum of care across settings, whether it was IEPs,

24  therapy services.  I then also was asked by the Center for

25  Independent Living to develop a grassroots program in the

1    greater Cincinnati area to assist individuals with disabilities

2    who were homeless, or at risk of being homeless, or were already

3    in shelters, or were victim of caregiver abuse and needed to go

4    into an alternative situation.  And in that role, I did

5    consultation with various shelters and service providers in the

6    area to assist them understand the needs of individuals with

7    disabilities, whether those disabilities were developmental,

8    cognitive, or mental health or physical.  I did some assessments

9    at a variety of organizations with regard to compliance with the

10   ADAAG regulations.

11   Q.    Can you define what that is?

12   A.    The Americans with Disabilities Act Accessibility

13   Guidelines.

14   Q.    Any other relevant work experience?

15   A.    Off the top of my head, I can't think of any.

16   Q.    Could you briefly summarize your education?

17   A.    I have a bachelor's degree in political science from Purdue

18   University.  I did graduate work at the Cincinnati Bible

19   Seminary, and then moved to another master's program that

20   addressed pastoral counseling and pastoral family services with

21   the intent of getting into practical ministries.

22   Q.    And I understand that those degrees were achieved some

23   years ago.  Do you stay abreast of professional standards in any

24   way since you achieved your educational degrees?

25   A.    Oh, yes, yes.  That's a key part of my responsibility.

1   Q.    And how do you stay current with professional standards

2   pertaining to protection of individuals with intellectual and

3   developmental disabilities from harm?

4   A.    Now in the electronic age, I do constant, it seems,

5   research with regards to what various organizations and

6   consortiums and the general approach to developing systems,

7   implementing systems, appropriate treatment interventions.   I

8   read a variety of publications.   I look at recommendations to

9   Congress from the National Council on Disability.   I look at

10  peer reports.   I have an opportunity to work closely with some

11  of my peers in this field, and information sharing.   And because

12  I actually travel a lot and am able to see what types of systems

13  are in place or being developed in other organizations, whether

14  those be community-based organizations or institutional

15  organizations, in the field of developmental and cognitive

16  disabilities, as well as mental health and nursing care.

17  Q.    And are you a member of any professional organizations?

18  A.    At present, I'm a member of the National Association for

19  the Dually Diagnosed.

20  Q.    Ms. Osgood, have you ever testified before?

21  A.    Not in a matter of this nature, no.

22  Q.    I'd like to show you, Ms. Osgood, what's been marked as

23  Exhibit 1-1.

24  A.    Yes.

25  Q.    Do you recognize this document?

1    A.    Yes, I do.  Yes, I do.

2    Q.    What is this document, Ms. Osgood?

3    A.    This is my resume, or CV.

4    Q.    And is this an accurate summary of your overall work

5    experience and educational background?

6    A.    Yes, by and large, it is.

7    Q.    Is there anything in particular that is missing or is

8    inaccurate?

9    A.    Unfortunately, this was updated in 2006, so I've done

10   additional consultative work that may or may not be reflected in

11   here, such as currently addressing treatment programming in a

12   variety of settings and also doing data analysis at the

13   community level, state-wide.

14   Q.    So other than the potential things that you have mentioned,

15   is Exhibit 1-1 an accurate summary of your work experience in

16   education?

17   A.    Yes.

18   Q.    And did you prepare this document?

19   A.    Yes, I did.

20         MS. COON:  Your Honor, we would move Exhibit 1-1 into

21   evidence.

22         MR. YORK:  No objection, Your Honor.

23         THE COURT:  It's received.

24      (Plaintiff's Exhibit 1-1 received in evidence.)

25   BY MS. COON:

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1   Q.   Ms. Osgood, were you asked to render an opinion in this

2   matter?

3   A.   Yes, I was.

4   Q.   What were you asked to provide an opinion regarding?

5   A.   Generally speaking, it was regarding a number of issues

6   that fall under, for matter of simplicity, protection from harm,

7   and that included looking at a facility's systems and the

8   overall governance of the management of the facility with

9   respect to addressing an individual's harm, whether it be actual

10  or potential; determining whether they have preventive measures

11  in place, whether their measures are also responsive, which

12  would include a preventive measure; what factors may influence

13  an individual's risk status or ability to stay safe, and that

14  may include staff supervision, adequate staff education, the use

15  of restraints, and whether those comport, in type and practice,

16  with generally accepted standards of practice; investigations

17  into abuse, neglect, and other serious injuries.  And when I say

18  "systems," I'm speaking of what's generally regarded as risk

19  management systems, incident management systems, quality

20  management.

21  Q.   And Ms. Osgood, do you have an opinion regarding these

22  issues that you were asked to evaluate as to the Conway Human

23  Development Center?

24  A.   Yes, I do.

25  Q.   What is your opinion, generally?

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1    A.    That HDC -- CHDC does not meet generally accepted standards

2    of practice in those areas, and in many respects does not meet

3    minimally accepted standards of practice.

4    Q.    When you refer to "standards of practice," upon what

5    standards do you base your review?

6    A.    As far as the standards that they're measured by, that is,

7    the standards that are generally accepted in the field of

8    providing services for individuals with disabilities, as I

9    mentioned before, as far as how I stay on top of those.  And

10   those standards are evident across the country on what's an

11   accepted matter of system development, system implementation,

12   abuse and neglect, how the facility responds to these incidents.

13   And over the years, I've just gained a body of knowledge from my

14   experience.

15   Q.    Can you briefly summarize the major ways in which you

16   believe that the state fails to adequately protect Conway

17   residents from harm and risk of harm?

18   A.    Generally, with respect to this particular area, protecting

19   individuals from harm, while the facility has a number of

20   policies and procedures in place, they fail to adequately

21   provide guidance to staff in how to implement various procedures

22   with respect to staff supervision -- I mean -- excuse me --

23   resident supervision.  The programs that each individual has,

24   there is significant evidence that staff working with

25   individuals were not adequately prepared to work with those

1    individuals.  They did not understand the needs of those

2    individuals and thereby were not able to adequately respond to

3    potential harm, or in the event that harm actually occurred,

4    able to identify how that could have been prevented.

5         Can you repeat the question?  I know there's several

6    categories under this, so --

7    Q.   I was asking if you could summarize the major ways, or the

8    major categories in which you believe the state falls short in

9    adequately protecting residents at CHDC from harm or risk of

10   harm.

11   A.   Okay.  So I spoke a little bit about the policies and

12   procedures and the shortcomings there with staff understanding

13   what they need to do and having the competencies to do that.

14   The systems that most facilities have and which are identified

15   as risk management, incident management, to both prevent and

16   respond to harm, are lacking.

17        The quality assurance practices -- and I'm not speaking

18   about a quality assurance department.  But quality assurance

19   needs to be woven into the very fabric of an organization and

20   the processes that are put into place to protect individuals.

21   Those quality assurance mechanisms were not in place, pervasive

22   with respect to the areas that I looked at.  With respect to the

23   quality management department, it was primarily focused on

24   compliance issues that were related to federal funding through

25   the Medicaid program and were not in line with generally

1    accepted standards which call for a comprehensive look at the

2    outcomes of the facility systemically, procedurally of outcomes

3    of individuals, and were not able to complete any meaningful

4    transanalysis and implement remedial measures to address any

5    adverse trends.  Their lack of prevention and a response to

6    incidents when individuals were placed at harm, there was often

7    a cursory review of those incidents by a very large group, by a

8    very large team.  And while that is a good format for doing

9    those things, those meetings lacked substance to really have any

10   impact on preventing harm and preventing risk to the folks

11   they're serving.

12        I found restraint practices to be, again, with respect to

13   staff education, the restraint practices overall were very

14   antiquated approaches to restraining individuals.  For example,

15   there were -- they used restraint chairs, which I think I've

16   seen maybe in one other institution I've reviewed.  That's a

17   very antiquated intervention strategy.  They use papoose boards.

18   Q.   Can you explain what papoose boards are, Ms. Osgood?

19   A.   The easiest way for me to explain is, if somebody's

20   downhill skiing and they have a serious incident, there's a long

21   board that I'm sure we've all seen.  A papoose board is very

22   similar to that.  And individuals are strapped onto this, on

23   their back.  And it just varies how long individuals, you know,

24   are placed on this.  That, again, similar facilities in other

25   states have moved away from the use of papoose boards, actually,

1    a number of years ago.  There are other restrictive

2    interventions such as modified clothing that is regarded by the

3    facility as a restrictive intervention but is not documented as

4    a use of restraint.  These two are very antiquated, and those

5    involve putting perhaps an entire body suit on someone in order

6    that they do not scratch themselves or, without going into great

7    detail, engage in other self-abusive behavior.

8    Q.    And did you also have an opinion regarding the

9    implementation or review of these types of restraints?

10   A.    Yes.  The facility does not comport with the generally

11   accepted standards, which are that each restraint, number one,

12   should only be employed when lesser restrictive measures have

13   been used.  And what those would be are working through some

14   de-escalation strategies with individuals if they are having an

15   outburst of some sort, making sure that the environment is not

16   -- the environment or the actions of staff don't in any way

17   provoke behavioral episodes.  And the use of restraints needs to

18   be thoroughly documented and there should be an authorization.

19   Most importantly, where I found the facility deficient with

20   respect to systemic issues with restraint of generally accepted

21   standards is that when a restraint is used, that that restraint

22   is reviewed usually the following day by the interdisciplinary

23   team.  And when I say "reviewed," I don't mean that they just

24   say it happened and this is why it happened, but a more thorough

25   review of what were the precipitating factors that led to the

1    restraint; how is the restraint employed; was it used properly

2    in accordance with policy; was the individual monitored during

3    the use of restraint to insure that there were no injuries; did

4    staff use the de-escalating types of strategies that were

5    indicated in a behavior plan, if that was indicated.  And if

6    there's any trends with that individual, to look at the

7    historical use of restraint and see if there are any trends that

8    the team needs to really kind of look at and recognize that

9    interventions are not working and kind of regroup and say, Well,

10   how can we better serve this individual and protect them from

11   harm while respecting their autonomy?

12   Q.   You had mentioned having an opinion regarding staff

13   obtaining competencies they need to perform their jobs.  Did you

14   also have an opinion regarding the sufficiency of staff to

15   provide adequate supervision to protect individuals from harm or

16   from risk of harm?

17   A.   Generally speaking, I'm speaking with respect to the

18   various needs of particular individuals.  Staff who were

19   assigned to work with individuals, across all areas, frequently

20   admitted that they had not reviewed the materials that they

21   needed to review; in some instances, didn't even know the names

22   of some children that they were working with or what their next

23   program was going to be.  The facility uses what are called

24   "quick reference guides," which is kind of a snapshot of an

25   individual and what an individual's needs are, and these are

1   actually very common practice across facilities and they can be

2   a very helpful tool.  They're never intended to serve as a

3   replacement for adequate staff education.  But the facility,

4   actually by its own admission, relies on these to educate staff,

5   including what are called "float staff" that come in if there's

6   a shortage and somebody needs to -- a staff member needs to be

7   moved from one living area to another to meet coverage.  There

8   was indication in one memo that I saw, I believe on the order of

9   19 Maple, there was a directive that any float staff that came

10  into the unit to cover, they were not assigned a resident based

11  on the resident's needs and whether they were adequately trained

12  to work with that individual, but they were assigned based on

13  the staff member whom they were replacing.  And due to this

14  fact, a lot of pull-in staff -- and I use "pull-in staff" and

15  "float staff" interchangeably because it is used that way in the

16  field.  The pull-in staff were not thoroughly educated on the

17  needs of individuals and, therefore, were often assigned to some

18  of the most high-risk individuals at the facility.

19  Q.   Did you also have any opinion regarding abuse and neglect

20  of individuals at Conway Human Development Center?

21  A.   The abuse and neglect is very troubling, and perhaps most

22  troubling is that the seriousness, the egregiousness of what

23  individuals that are being abused has not really declined over

24  time.  There's some of the same issues coming up, very serious

25  types of abuse issues.  There was large indication that there

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    existed a culture of silence.  And what that refers to is that

2    many of these facilities have staff who have been there for

3    years and years, sometimes their entire career, and a culture

4    has developed, and an institution, just as it is in any other

5    organization, and abuse was often reported by some of the most

6    newly employed individuals who had not yet really become part of

7    that culture.  There seems to be a tolerance for verbally

8    abusing individuals, using punitive measures.  And this is

9    verbal abuse, physical abuse.  It pretty much covers the gamut.

10   The investigations that were conducted were, I would say, by and

11   large -- by and large, well written, but the interventions at

12   the facility took -- were not effective in reducing the abuse

13   that was occurring, either in frequency or in severity.  And let

14   me qualify that, because severity of abuse, I don't mean to

15   suggest that one type of abuse is worse than another.  But

16   perhaps just the egregiousness.

17   Q.   And did you find evidence that these areas in which you

18   found deficiencies had resulted in harm or risk of harm to

19   residents at the Conway Human Development Center?

20   A.   Yes.

21   Q.   Before we get to those examples, I'd like to talk with you,

22   Ms. Osgood, a little bit about the sources of information that

23   you had available to you in forming your opinions and how you

24   went about forming your opinions.

25        Can we first talk about the sources of information that you

1  had available to you in forming your opinions?

2  A.    From the perspective, process perspective, I conducted

3  interviews with key individuals at the facility that had some

4  sort of relationship with the protection-from-harm area.  I did

5  informal interviews with staff on live-in units.  And I say

6  "informal" because they were engaged in working with

7  individuals, and my intent was not to pull them away from doing

8  that, but as I found it appropriate and didn't put people at

9  risk, I asked questions, whether it was how long have you worked

10  here, how long have you worked on this unit, what training did

11  you receive, things of that nature.  I spoke with a couple of

12  individuals who lived there.  I conducted a review of all

13  investigations, I believe, in an 18-month period.  Looked at

14  incident and injury reports, which are in addition to

15  investigations.  Looked at marks reports, behavioral reports,

16  observation reports, meeting minutes from a variety of

17  committees, whether they were then sent to review committees at

18  the local level or the broader one that is conducted that looks

19  facility-wide.

20  Q.    Did you observe any meetings in addition to reviewing

21  minutes of meetings?

22  A.    Yes, I did.

23  Q.    What kinds of meetings did you observe?

24  A.    I observed the daily incident review meetings, in Conway

25  it's called the IRC, and I reviewed meetings of each of the five

1    areas.  I believe I reviewed those twice in each area.  I may be

2    mistaken by one or two areas.

3    Q.   Did you make any observations of residents in their daily

4    lives at the facility?

5    A.   Yes, I did.

6    Q.   And what proportion of the facility would you say that you

7    had the opportunity to observe residents in?

8    A.   I believe I went to every living unit.  I also went to the

9    canteen, which is a small, little type of store that individuals

10   have an opportunity to buy, you know, small food or trinkets, if

11   you will.  There's a gymnasium.  I observed individuals in the

12   gymnasium.  I observed individuals in their rehabilitative

13   training programs, and also a few observations in classrooms,

14   and as well as watching individuals move about the campus.

15   Q.   How much time did you spend on-site at the Conway Human

16   Development Center as part of your evaluation in this case?

17   A.   I can't recall if it was ten days or nine days.

18   Q.   Were they consecutive days?

19   A.   Yes.

20   Q.   And did you --

21   A.   Two different time periods.  I did one week in July of '09

22   and one week in September of '09.

23   Q.   And you referred to various documents that you reviewed.

24   How did you describe the volume of documents that you reviewed

25   in this case?

1    A.   Some documents I reviewed electronically, so I can't really

2    say from a volume perspective.  I know I had 13 boxes at home.

3    And thousands and thousands, I'm sure.

4    Q.   You mentioned various categories of documents.  Did you

5    also mention policies?  Did you review policies?

6    A.   Yes, I did.  And also the -- what are called administrative

7    reviews.  I don't know if I mentioned the minutes taken at the

8    various IRC meetings.  I looked at human rights meetings, a

9    number of clinical records, restraint reports.  And when I say

10   "investigations," I mean the entire packet, which would also

11   include the facility's response to whatever the findings were.

12   I attempted to look at the minutes from the quality assurance

13   committee, but they were not available for, like, a 12-month

14   period.

15   Q.   Do you know why they were not available?

16   A.   No.

17   Q.   Did you request them?

18   A.   Yes, I did.  Yes, I did.

19   Q.   Speaking of the various documents, documents that you

20   reviewed and interviews that you conducted and observations that

21   you made, who chose the documents and the identity of the staff

22   you interviewed and where you chose to observe at the facility?

23   A.   I did.

24   Q.   You also mentioned reviewing various clinical records and

25   observing various individuals around the facility.  Did you also

1    conduct a more in-depth review of certain individuals at Conway

2    Human Development Center, a sample of individuals, so to speak?

3    A.    Yes, I did.

4    Q.    And how did you choose which individuals to sample to look

5    at in a more in-depth review?

6    A.    With respect to the sample, I reviewed a variety of

7    documents with respect to protection from harm, and those would

8    be the documents that I just indicated were restraints,

9    incidents, injuries, and identified those people who had

10   significant injuries, significant trends across settings,

11   whether it was individuals who had physical assistance needs,

12   behavioral needs, individuals who showed recurring harm.  I

13   intended to get a variety of individuals from the spectrum of

14   what their disabilities would be.  Perhaps most importantly,

15   however, in conducting a protection-from-harm review, obviously

16   you must rely on the documents that are directly related to

17   protection from harm to evaluate whether the facility is

18   actually protecting the individuals there.  Does that answer

19   your question?

20   Q.    Yes.  And to follow up on that, I think you explained why

21   you focused on those areas.  Can you tell us, first of all, if

22   you did any, quote, "statistical sampling," and if not, why not?

23   A.    No, I did not conduct statistical sampling.  That's not

24   generally used in protection-from-harm reviews because it does

25   not get a real picture of whether individuals were protected

1   from harm.  The intent of doing this kind of a review is to look

2   at the outcomes, both facility outcomes aggregate data and to

3   look at the outcome of individuals who are living there, how

4   they -- what their experiences are.  And so in doing just a

5   statistical type of sampling would not yield an accurate picture

6   of what I was looking at.

7   Q.   You had mentioned outcomes.  Did you also look at any rates

8   of injury at Conway as compared to any rates of injury at other

9   facilities?

10  A.   No, that would not be appropriate.  Because of the number

11  of institutions across the country and a lack of standards with

12  respect to how do you define a fall, how do you define

13  self-injurious behavior, to look at a spectrum of facilities and

14  compare how one -- and look at how one compares to another more

15  than likely is comparing apples and oranges, because the way

16  facilities define these things, as well as and equally

17  important, the procedures they have in reporting these various

18  episodes of harm differs so greatly that it wouldn't be

19  appropriate.

20  Q.   So there's not a standard way of reporting injuries at

21  facilities like Conway across the country?

22  A.   That's -- that's perhaps a different issue.  There is a

23  standard that all injuries should be reported.  How different

24  facilities define what those injuries are may differ somewhat.

25  How facilities may define particular types of incidents may

1   differ, such as a fall.  And while this may sound -- it may on

2   the face of it not sound complicated, but one facility may call

3   a fall, reported fall as something where an individual fell all

4   the way to the floor without any type of staff intervention.

5   Another facility may call a fall, include those episodes where

6   perhaps a staff person assisted them to the floor.  Yet another

7   facility, if someone -- if an individual chooses to throw

8   themselves on the floor is perhaps in retaliation for wanting to

9   complete a task, another facility may call that a fall.  So just

10  in that example, you can see the wide variety of definitions.

11  So, again, comparing institution to institution in that kind of

12  a micro sense would not be appropriate.

13  Q.   But is it possible to compare practices from institution to

14  institution?

15  A.   Oh, certainly, certainly.

16  Q.   Going back to your sources of information that you had

17  available to you for your review, are these the sources of

18  information that are generally used when evaluating

19  protection-from-harm systems?

20  A.   Yes.

21  Q.   And was the information provided to you adequate to

22  determine whether Conway provides adequate protection of its

23  residents from harm and risk of harm?

24  A.   Yes, there was -- there was enough information.

25  Q.   I'd like to move on and talk about each of the opinions

1    that you referenced generally in some more detail.

2         I'd like to start out and ask you first about policies,

3    procedures, and protocols to guide staff.  Do you have an

4    opinion regarding the adequacy of Conway's policies, procedures,

5    and protocols to guide staff in providing adequate care and

6    supervision?

7    A.   Yes, I do.

8    Q.   And what is your opinion?

9    A.   That they do not adequately provide staff that needed

10   guidance.  And, again, they have a number of policies, but

11   what's in those policies and how the staff are trained are not

12   sufficient -- are not adequate.  Excuse me.

13   Q.   What is the significance of not having adequate guidelines

14   and training on those guidelines to staff?

15   A.   Individuals are harmed.

16   Q.   Do you have any examples to support your opinion?

17   A.   Certainly.

18   Q.   I'd like to first show you a document that's previously

19   been marked as Exhibit 2.  Can you identify what Exhibit 2 is?

20   A.   It is a maltreatment report, investigative report.

21   Q.   And are you familiar with Exhibit 2?

22   A.   Yes, I am.

23   Q.   Can you tell us if Exhibit 2 provides any illustration

24   regarding your opinion on adequacy of policies, procedures, and

25   protocols?

1    A.    Yes, it does.

2    Q.    What happened as indicated by the investigation in

3    Exhibit 2?   And I would just remind you that we can't mention

4    any names in court and will refer by initials.

5    A.    Okay.   This is a circumstance where a group of individuals

6    were going to the Special Olympics and spending the night at a

7    hotel there in -- I don't recall what city it was, perhaps 50 or

8    60 miles from Conway.   And there were seven individuals assigned

9    between two rooms.   Someone had actually reserved four rooms.

10   And there were three staff to supervise these folks.   Following

11   the event on the following day, one of the gentlemen was asked

12   about his bowel movement and he became very agitated and upset

13   because he had a history of being sexually abused.   The bottom

14   line is this:   That there was no policy and procedure in place

15   that specifically addressed to staff the guidelines for how to

16   supervise individuals on overnight trips, how to make room

17   assignments, whether or not there would be checking individuals

18   in accordance with the CHDC policy, as far as bed checks.   The

19   individual reported that he was raped by a non-Conway who was

20   sharing a room with him.   This person, the victim, was

21   bilaterally deaf, and when he reported the incident, he needed

22   to report it to a peer because there were no staff available, or

23   the investigation did not indicate whether staff was, or

24   American Sign Language was available.   The cause of this

25   incident was because there were no policies and procedures.   The

1    three staff who were assigned to these individuals put the

2    Conway residents in two rooms and the staff members put

3    themselves in two rooms, with one staff member having his own

4    room, and completed bed checks only every two hours, and had an

5    individual who was not a Conway resident in that room as well.

6    Q.    Did Conway try to respond to any of the systemic issues

7    indicated by this incident?

8    A.    They responded to the incident -- and if I might look at

9    that response.  They instituted a protocol on appropriate

10   procedures for when individuals go on overnight trips to the

11   Special Olympics.  It spoke to the fact that they would no

12   longer be traveling or staying overnight with persons who are

13   not residents of Conway; that a staff member would be in each

14   room with the residents.  It fell short, however, in that it was

15   a very isolated response -- this was a systemic issue that

16   addressed a failure to provide guidance for staff when residents

17   were on overnight trips, and not just the Special Olympics.

18          MS. COON:  Your Honor, we would move for Exhibit 2 to

19   be moved into evidence, and note for the record that this

20   exhibit contains confidential information, including individual

21   resident names.

22          MR. YORK:  No objection, Your Honor.

23          THE COURT:  It will be received.  The Exhibit 2 will

24   be received, and it will be under seal until it's redacted, if

25   we can get it redacted at some appropriate time.  And we'll also

1    need to do this with the exhibit list since there's been

2    description of what's in the exhibit, and the exhibit list

3    actually has names.  And that's a public record, so we'll need

4    to change that to initials, if we can do that on a version of

5    the exhibit list.

6            MS. COON:  Yes, Your Honor.  And I'd also like to

7    point out that the majority of the exhibits going forward that

8    pertain to Ms. Osgood's testimony will have confidential

9    information in them, and so I would ask, if it's possible, to

10   have them all admitted under seal, unless we indicate that the

11   document does not have confidential information.

12           THE COURT:  We'll do that.

13           MS. COON:  Thank you, Your Honor.

14       (Plaintiff's Exhibit 2 received in evidence under seal.)

15   BY MS. COON:

16   Q.   Next I'd like to show you what's previously been marked as

17   Exhibit 3.  Do you recognize Exhibit 3, Ms. Osgood?

18   A.   Yes, I do.

19   Q.   And what is this exhibit?

20   A.   It is an administrative review into employee misconduct,

21   investigative report.

22   Q.   And do you know what happened in this incident as indicated

23   by the administrative review?

24   A.   Yes.  In this incident, there were some children on one

25   living unit, and because the facility was short-staffed for the

1   upcoming overnight shift, at midnight it moved the entire

2   children's unit into two separate living units.  And the

3   following morning, about 5:30, one of the children was found

4   unattended on his original unit, a young man with autism and a

5   seizure disorder, sleeping in a recliner.

6   Q.   Had he been under any supervision during the night?

7   A.   No.

8   Q.   Did that -- I'm sorry?

9   A.   No, he had not.  And it was not until an individual staff

10  member came on the next morning to report to work that they

11  found this young man in the recliner and then reported it to the

12  supervisor, who had worked the entire night, and actually the

13  supervisor who coordinated the move.

14  Q.   You mentioned that this individual child had autism and

15  seizure disorder.  Would he be at risk for harm if he had been

16  left alone overnight?

17  A.   Yes, yes.  In addition, he communicates in a manner other

18  than verbally, so had he gone into crisis of any sort, he may

19  not have been able to have his needs known.

20  Q.   Does this example provide any illustration of your opinion

21  regarding adequacy of policies, procedures, and guidance to

22  staff at Conway?

23  A.   Yes, it does.

24  Q.   How so?

25  A.   The episode or the practice of moving an entire unit to one

```
 1   other area because of staffing shortages is -- this is not an
 2   isolated case of that.  And prior to this incident happening,
 3   there were no procedural guidelines for staff to follow, whether
 4   it was the direct line staff or the supervisors on how to move
 5   these individuals to the other unit to insure their safety, to
 6   insure that everyone made it to where they were supposed to make
 7   it, whether all of their documentation would follow them,
 8   whether their sleep charts would follow them.  And in this
 9   particular instance, as I said, it happened right before
10   midnight, and two employees, who were just getting ready to get
11   off duty, were asked by their supervisor to, you know, get the
12   boys ready for the move because there was another unit coming
13   over to get them and then transport them over.  And it was very
14   unclear who was responsible for insuring that that happened.
15   The supervisor who arranged for that to happen, as I said, was
16   also the supervisor who was on duty the following morning, so
17   she was at the facility overnight.  It apparently was not clear
18   to her to physically insure that all the residents made it to
19   the other unit.  There was just -- there were holes all the way
20   along for opportunities for risk.
21   Q.    Did Conway take any corrective action after this incident?
22   A.    Yes, they did.
23   Q.    Was the corrective action adequate?
24   A.    In my opinion, no.
25   Q.    What kind of corrective action did Conway take here?
```

1   A.    There was a memo that was sent out to the living units that

2   staff were supposed to read and sign indicating the proper

3   procedures for and accountability for individuals who are going

4   to be moved, who is responsible.  That was pretty much the

5   extent of it.

6   Q.    Were staff made aware of the new protocol?

7   A.    It was my understanding that all staff had been trained on

8   the protocol.  However, as a follow-up to this incident, I

9   interviewed a number of staff on a number of units and they were

10  not aware of what they were to do if this even happened again on

11  their units.  The supervisor on the unit, on one unit did not

12  know the protocol.  The protocol was not found on that live-in

13  unit.  There was no evidence that there was any thorough

14  training with staff on this.  I actually found the memo

15  underneath several in-service forms on a clipboard hanging in

16  the unit, which said to staff "Read and Sign."

17  Q.    Does that term "Read and Sign" have any significance at the

18  facility, to your understanding?

19  A.    At Conway in particular or --

20  Q.    Yes, at Conway in particular.

21  A.    It does.  There is -- there was an obvious practice that

22  when directives or memos or protocols, if you will, would be

23  disseminated to the various live-in units and placed on a

24  clipboard and individuals and staff were responsible to

25  apparently read and sign these, whether they actually did that,

1    there was no evidence that there was any quality assurance to

2    see that that was done.  And based on my interviews, staff did

3    not have an understanding of how this process was supposed to

4    work.

5            MS. COON:  Your Honor, the United States would move

6    Exhibit 3 into evidence.

7            MR. YORK:  No objection, Your Honor.

8            THE COURT:  It's received.

9        (Plaintiff's Exhibit 3 received in evidence.)

10           THE COURT:  Let me ask you, are the exhibits that

11   you're going through, is it in Box 1 of 1 up here?  Is that

12   where they are?

13           MS. COON:  That's correct, Your Honor.

14           THE COURT:  Then if you'll take a second, I'll get

15   Box 1 of 1, I'll be able to go along with the paper copy as you

16   go through it.

17           MS. COON:  Certainly, Your Honor.

18           THE COURT:  Proceed.

19   BY MS. COON:

20   Q.   Next, I'd like to show you what's previously been marked as

21   Exhibit 4.  Are you familiar with this document?

22   A.   Yes, I am.

23   Q.   Generally speaking, what type of document is this?

24   A.   This is a document -- this is a letter sent to the

25   superintendent by the Office of Long-Term Care services, which

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    is the state agency contracted by CMS to conduct surveys of

2    facilities that are receiving Medicaid funding.  And this cover

3    letter and the documents behind it, in summary, it's a -- it

4    contains a complaint survey that the Office of Long-Term Care

5    received regarding an incident, and the Office of Long-Term

6    Care substantiated the complaint and put the facility on notice that

7    an immediate jeopardy existed and that they were at risk of

8    losing their federal funding if the risks were not immediately

9    addressed.

10   Q.    Before we go further in this document, Ms. Osgood, you were

11   here this morning for the opening statements.  Is this the same

12   type of survey that was referenced by the parties in the opening

13   statements as a CMS survey?

14   A.    Yes.

15   Q.    And you also mentioned that the CMS survey is conducted by

16   an office called OLTC.  Is that a state agency that conducts the

17   survey?

18   A.    Yes, it is.  It's a state agency contracted by CMS, the

19   federal agency.

20   Q.    And you also referred to a finding of immediate jeopardy.

21   Can you explain what it means for a facility to be found in

22   immediate jeopardy through a CMS survey?

23   A.    Well, if I might, generally speaking, surveys are conducted

24   on an annual basis, and facilities may be found out of

25   compliance with a number of standards that the facility

1    corrects, does a plan of correction, and that's not uncommon for

2    some citations to be issued.  An immediate jeopardy, however, is

3    when the survey team comes in and determines that there is --

4    that serious harm, impairment to an individual, or death to an

5    individual has occurred or is likely to occur.  And, in essence,

6    it's -- it's the most serious type of citation a facility can

7    receive.

8    Q.   And what does immediate jeopardy have to do with federal

9    funding?

10   A.   If the facility does not take actions that are considered

11   appropriate by the state agency overseeing the surveys, they're

12   at risk of losing all of their Medicaid funding under that

13   provider agreement.  So it would be if there's only one provider

14   agreement at Conway, however many federal dollars they're

15   getting for that entire facility would be at jeopardy.

16   Q.   I believe this letter also refers to conditions of

17   participation.  Can you explain what is a condition of

18   participation?

19   A.   Basically, there are conditions of participation within the

20   CMS guidelines, there are conditions of participation, which

21   are, basically, broad categories.  Client protection is one.

22   Medical care.  Active treatment.  Underneath each of those are

23   some of the subsets of other tags that are related to that

24   condition.  Does that answer your question?

25   Q.   Yes.  Thank you.  You mentioned client protection as an

1    example of a condition of participation.  Was that condition of

2    participation at issue, as indicated in Exhibit 4?  And I direct

3    your attention to page 10 of 36 within the underlying document.

4    A.    Okay.  I'm sorry.  What was the question?

5    Q.    What was the condition of participation at issue in this

6    Medicaid survey, as indicated by the pages --

7    A.    It was the condition of participation of client protection.

8    Q.    That may be self-explanatory, but how would you define what

9    the condition of client -- what the condition of participation

10   of client protection is?

11   A.    In many respects, it's pieces of the protection from harm.

12   It's insuring that individuals are free from abuse, neglect,

13   exploitation; they're free from recurring injuries, that their

14   health and safety and rights are being protected.

15   Q.    Are you familiar with the facts of the complaint that led

16   the surveyors to conduct this investigation regarding client

17   protection?

18   A.    Yes.

19   Q.    And can you briefly summarize the facts at issue in this

20   complaint survey?  And I'll actually direct your attention back

21   to page 5 of 36 in this report.

22   A.    Page 5 of the actual document or page 5 of the exhibit?

23   Q.    Page 5 of 36, in the second half of that page, under the

24   heading "Client Protections."

25   A.    Yes.  You'd like a summary of the incident?

1   Q.   Yes, please.  What does this document indicate happened to

2   lead surveyors to conduct a complaint survey regarding client

3   protections at Conway?

4   A.   Per the citation, it indicates the facility failed to meet

5   the requirements of the condition of participation for client

6   protection by neglecting to provide an effective system of

7   client supervision, monitoring, and protection, which resulted

8   in one individual being left outdoors, on his live-in unit

9   patio, in a wheelchair, in the extreme heat for an extended

10  period of time.  This failed practice resulted in immediate

11  jeopardy which caused or could have caused serious harm, injury,

12  or death to the client, No. 56.  He was not monitored after

13  being taken outside and left in the heat for an extended period

14  of time, resulting in heat stroke.

15  Q.   You had mentioned this individual was in a wheelchair.  Is

16  that significant to the circumstances of this incident?

17  A.   It's significant in that the -- it revealed that -- a

18  review of this incident revealed that the individual was locked,

19  his wheelchair was locked on the patio.  I believe he was there

20  for about -- close to four hours.  And he had the ability to use

21  one of his hands to move the wheelchair, but the area that was

22  locked on the wheelchair was the alternate -- was the side that

23  he would have used.

24  Q.   What condition was this resident found in?

25  A.   Well, as I said, he had heat stroke.  He was found to be

1    smelling of urine.  His program plan was that he was supposed to

2    be changed at 3:30, and was not changed, and he was soiled.

3    Q.    And so how long had he been left unsupervised?

4    A.    My recollection is close to four hours.  I believe it was

5    three hours and 45 minutes.

6    Q.    In addition to this issue regarding client protections, was

7    Conway cited regarding anything else?  And I would direct your

8    attention to page 22 of 36, particularly paragraphs 16 and 17.

9    A.    In summary, this speaks to investigative reports not being

10   completed in a timely fashion and in accordance with CMS

11   regulations.

12   Q.    Does this have any significance?

13   A.    Yes, it does.  Investigations need to be completed in a

14   timely fashion.  When they're not, most frequently the

15   facility's not in a position to take protective measures.

16   Q.    Does the deficiency with regard to client protections in

17   this exhibit have any bearing on or illustrate any of your

18   opinions in this case?

19   A.    Yes, it further supports my opinion.

20   Q.    How so?

21   A.    As cited by the Office of Long-Term Care, the facility

22   failed to have a system in place that provided appropriate -- I

23   would prefer to read the citation.  "Neglecting to provide an

24   effective system for client supervision, monitoring, and

25   protection."

1    Q.    Thank you.

2              MS. COON:   We would move Exhibit 4 into evidence.

3              THE COURT:   Exhibit 4 will be received.   Is this one

4    that needs to be under seal?   I didn't see any personal

5    identifiers, but I hadn't looked through the whole report.

6              MS. COON:   We would prefer to have it under seal for

7    now, just in case there are any identifiers.   And we would

8    request the opportunity to move for it to be removed from seal

9    if it does not.

10             THE COURT:   All right.   We can do that.

11             MS. COON:   Thank you.

12        (Plaintiff's Exhibit 4 received in evidence under seal.)

13   BY MS. COON:

14   Q.    Ms. Osgood, I would like to move on to another area in

15   which you indicated you had provided an opinion, and that's

16   staff training.   Are there any generally accepted standards with

17   regard to training of staff who are charged with caring for

18   individuals with intellectual and developmental disabilities?

19   A.    Yes, there are.

20   Q.    What would those generally accepted standards be?

21   A.    Basically, that the individuals who are -- the staff who

22   are assigned to work with residents are able to demonstrate the

23   competencies needed to complete the duties assigned to them,

24   whether that's to intervene in behavioral issues or position

25   people appropriately.

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

1   Q.   How do facilities generally accomplish that standard of

2   having staff able to demonstrate competencies?

3   A.   Most facilities use one form or another of what's called

4   "competency-based training."  And that's a rather broad subject

5   and can be done in a number of fashions, but it needs to be

6   outcome-based, it needs to measure whether the employee

7   understands what he's supposed to perform and how he's supposed

8   to perform it.  And that is typically, especially with working

9   with individuals, that's typically evaluating whether or not

10  they can demonstrate that.

11  Q.   Is Conway's staff training competency-based?

12  A.   I can't speak to the whole of the training program at

13  Conway, but I can say that the individuals that I observed and

14  based on record review, staff did not possess those competencies

15  or demonstrate those competencies.

16  Q.   You had mentioned that facilities generally use

17  competency-based training.  Is it possible to provide all staff

18  with competency-based training, such as, for example, you had

19  referenced float staff or pull-in staff, is it possible to have

20  those staff trained in a competency-based way as well?

21  A.   Oh, certainly.

22  Q.   And how do facilities do that, generally?

23  A.   They can do it in a number of ways.  Some of the most

24  effective that I've seen is maintaining a list of employees that

25  will be working with an individual and having whichever

1    appropriate discipline -- for instance, I think the best way to

2    explain it is in a behavior support plan.  If there's a behavior

3    support plan written by a psychologist, or called psych

4    examiners at Conway, then that psych examiner would train the

5    staff who most frequently work with the individual, and that

6    would include the supervisors and QMRP, to insure that they, as

7    well, had competency in implementing this.  And once staff had

8    been able to demonstrate competency, you maintain data -- and,

9    of course, that's much easier now with all the technology.  But

10   you maintain data on who's been adequately trained to work with

11   which individual.

12            THE COURT:  What's QMRP?

13            THE WITNESS:  Quality mental retardation professional.

14   BY MS. COON:

15   Q.   Does Conway have a process like you just described?

16   A.   No.

17   Q.   Does Conway do anything else to try to make staff aware of

18   the needs of the individuals and their care?

19   A.   Can you further explain your question?

20   Q.   Is there any other method or document by which Conway tries

21   to convey information about residents to staff who will be

22   charged with caring for those individuals?

23   A.   Yes.  They have what they term as quick reference guides,

24   which are actually a pretty standard tool used in institutions.

25   And it includes some information with regards to what an

1    individual's diagnosis are, needs, what have you.  It doesn't

2    have specific information relative to what staff are supposed to

3    do, which obviously is needed in any kind of training program.

4    They use these a lot based on interviews and investigative

5    reviews, especially with float staff that come into the unit.

6    Q.   Is it sufficient to rely on these quick reference guides

7    that are used?

8    A.   No.

9    Q.   And why not?

10   A.   Because individuals who are assigned to work with the folks

11   at Conway, number one, they're not competency-based on support

12   plans and what they're supposed to do, what they need to do to

13   assist individuals, and individuals are placed at harm.

14   Q.   Is the substance of the QRGs at Conway themselves

15   sufficient?

16   A.   No.

17   Q.   And why not?

18   A.   I've reviewed every QRG there, and in one fashion or

19   another, each of them was deficient in some fashion.  Again,

20   they were found to be outdated.  Some information on some folks,

21   the information was very sparse.  They may have indicated that

22   someone was at choking risk but didn't necessarily indicate what

23   staff was supposed to do to address that.  And these are --

24   going back to the competencies, these are the things that are

25   essential in order that staff can demonstrate the competency to

1    work with these high-risk folks.

2    Q.    Are you aware of whether there's been any harm or risk of

3    harm to residents from relying on these quick reference guides?

4    A.    Yes.

5    Q.    Let me show you what's previously been marked as Exhibit 5.

6    Do you recognize Exhibit 5?

7    A.    Yes, I do.

8    Q.    What is Exhibit 5?

9    A.    Again, this is what I will term as an investigative report.

10   Q.    And does this investigative report provide any illustration

11   of your opinion with regard to staff training and Conway's

12   assurance that staff have the competencies needed to protect

13   residents and their care?

14   A.    Yes, it does.  In this instance, a resident, it was

15   actually one of the most at-risk residents at Conway, was not

16   provided his protective helmet and he fell in the day room and

17   incurred a nosebleed and bruised his right elbow.

18   Q.    If you look at page 48532, is there any indication in that

19   part of this document as to the role that quick reference guides

20   played in the incident of harm suffered by this resident?

21   A.    There were two issues, two issues here that the staff who

22   was working with this individual had not read the quick

23   reference guide, and that it was further illuminated through the

24   investigation that the quick reference guide itself had not even

25   contained the individual's need for the protective helmet.  So

1    had staff read the quick reference guide, it would not have

2    provided sufficient information to protect this individual.

3    Q.   Do you have any sense for the extent to which staff

4    generally rely on the quick reference guides?

5    A.   Through interview, the staff indicated that that was their

6    tool.  Through investigative review, there was a number of

7    incidents where it was evident that staff admitted to not having

8    read the quick reference guide.

9           MS. COON:  Your Honor, we would move Exhibit 5 into

10   evidence.

11          THE COURT:  Received under seal.

12      (Plaintiff's Exhibit 5 received in evidence under seal.)

13   BY MS. COON:

14   Q.   Ms. Osgood, next I'd like to talk about staffing and

15   sufficiency of staffing to supervise and provide care to

16   residents at CHDC.  Do you have any opinion regarding the

17   sufficiency of staff supervision to protect CHDC residents from

18   harm and risk of harm?

19   A.   Yes.

20   Q.   And what is your opinion on this issue?

21   A.   That there is not a sufficient number of staff to protect

22   individuals.

23   Q.   And have Conway residents been placed at harm or at risk of

24   harm as a result of that?

25   A.   Oh, yes.

1   Q.   I'd like to show you what's previously been marked as

2   Exhibits -- this is Exhibit 6, but I'd like to direct your

3   attention to Exhibit 6-2 and 6-3.  Are you familiar with the

4   exhibits marked 6-2 and 6-3?

5   A.   Yes.

6   Q.   Can you give a brief summary of what happened in these

7   exhibits, or as indicated by the information in these exhibits?

8   A.   In this incident, a woman who had required supervision had

9   entered the kitchen and gotten some bologna that she was not

10  supposed to have, based on her treatment program, and she did

11  this alone.  Staff later found her on the floor with her mouth

12  full of bologna, she choked, and was sent to the hospital where

13  she later died.

14  Q.   Had there been any previous indication that this individual

15  might attempt to obtain food that's not within her diet and

16  ingest the food in the way that she did?

17  A.   Yes, there is.  I'm going to need time to look in the

18  record to find that though, unless you have a particular cite.

19  Q.   If we look on Exhibit 6-3 at page 9496, does the first full

20  paragraph provide any indication of notice to staff of the

21  potential risk to this resident?

22  A.   The individual's program plan states she exhibited problems

23  during mealtime with filling her mouth full, swallowing food

24  without chewing, eating too fast, and refusing to eat at times.

25  Q.   Was staff on notice regarding this individual's risk?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   A.   Yes.

2   Q.   Following the death of this individual, did the facility

3   take any corrective action?

4   A.   Initially, it did not.

5   Q.   And your response indicates that eventually they did what?

6   What prompted the facility to take corrective action?

7   A.   The Office of Long-Term Care came and did an investigation.

8   Q.   And does this exhibit support your opinion regarding staff

9   supervision?

10  A.   Yes.

11  Q.   How so?

12  A.   Again, it provides further evidence that staff supervision

13  is inadequate and insufficient.

14          MS. COON:   Your Honor, we would move Exhibit 6 into

15  evidence, including its subparts.

16          THE COURT:   It's received under seal.

17      (Plaintiff's Exhibit 6 received in evidence under seal.)

18  BY MS. COON:

19  Q.   Ms. Osgood, next I'd like to show you Exhibit 7.   And this

20  exhibit is a little bit lengthy.   It has subparts 7-1, 7-2, and

21  7-3.   So I'll give you a moment to look at those and ask you --

22  first of all, are you familiar with these exhibits?

23  A.   Yes, I am.

24  Q.   And once you have a chance to look up these exhibits, I'd

25  ask you if you could explain what happened as indicated by these

1   exhibits.

2   A.    In summary, this is --

3   Q.    Actually, I'm sorry.  Before we get to that, can I ask you

4   what type of document this exhibit is?

5   A.    7-1 is an investigative report.  7-2 is an investigative

6   report.  And 7-3 is a special staffing.

7   Q.    Thank you.  And going back to the previous question, what

8   do these exhibits indicate with regard to staff supervision?

9   A.    An individual who required visual supervision, which is

10  defined as maintaining someone, whoever you're assigned to, in

11  your line of sight at all times so you know where they are and

12  what they're doing.  This was not provided to this individual

13  and he was able to get into the kitchen undetected.  7-2 relates

14  to the same individual.

15  Q.    What is the time frame of these two incidents?

16  A.    The one occurred on March -- the first occurred on March 19

17  of 2009, and the second occurred on March 29, 2009.  And the

18  second instance, the same individual was left unattended and he

19  was later found by staff to be sitting on the floor by another

20  resident 's bed.  When he was found by the other resident's bed,

21  this individual had a catheter, the second individual, that

22  person's catheter had been pulled out, but part of the catheter

23  laying on the floor in front of the original individual.  Staff

24  were not providing the visual supervision that needed to occur.

25  Q.    But do you know if any protective measures were taken with

Osgood - Direct                                    80

1   regard to this individual who pulled the catheter out of the

2   other individual?

3   A.   That would be in Exhibit 7-3.  And if I might add something

4   about the -- the individual in these two cases requires visual

5   supervision because of his history of ingesting things, which is

6   also called "pica."

7   Q.   Can you define what "pica" is for the Court?

8   A.   I'm not a psychologist, so I don't diagnose.  But,

9   generally, it is the ingestion of nonedible items.  It is a very

10  high-risk behavior, and individuals have been found to ingest a

11  variety of items, whether they're batteries or doorknobs or

12  metal objects.

13  Q.   And is that a condition for which facilities should take

14  protective measures?

15  A.   Oh, certainly.

16  Q.   What kind of protective measures would facilities generally

17  take?

18  A.   Well, I can't speak to what protective measures they would

19  take with regard to any particular individual, but, generally

20  speaking, those protective measures include behavior support

21  plans which outline what types of items that individual may be

22  inclined to ingest, what staff ought to do if they suspect that

23  someone is beginning to move towards trying to ingest something.

24  From a risk perspective, the facility's responsible for insuring

25  the environment is safe and free from any types of items.  In

Osgood - Direct                                    81

1    this case, it looks like they assigned visual supervision to

2    this individual.

3    Q.    Was that supervision carried out effectively?

4    A.    No.

5    Q.    And were there any protective measures taken after the fact

6    with regard to the individual who had pica?

7    A.    I'm having difficulty locating the review that occurred

8    following these incidents.

9    Q.    Is there any other document that might refresh your

10   recollection?

11   A.    Perhaps my report.

12          MS. COON:   Your Honor, we would request that Ms.

13   Osgood be permitted to refresh her recollection with her report

14   as to whether protective measures were taken following this

15   incident.

16          THE COURT:   Sure.

17   BY MS. COON:

18   Q.    Ms. Osgood, your report is Exhibit 1 in that binder.  And I

19   would direct your attention to the first paragraph on page 11.

20   A.    Yes.  The facility terminated the individual that was

21   responsible for providing the supervision.

22   Q.    With regard to the individual, was any corrective action

23   taken with regard to potential harm from that incident, as

24   indicated by the documentation?

25   A.    Because this individual had a history of pica, and

1  ingestible items are often found stuck somewhere in the

2  intestinal system, he probably should have been evaluated to see

3  if he had ingested any of that catheter, as pieces were on the

4  floor near him, as well as blood from the original individual.

5  Q.   And --

6  A.   There was no evidence that that had occurred.

7       MS. COON:  We would move Exhibit 7 into evidence,

8  including its subparts.

9       THE COURT:  Exhibit 7 will be received under seal.

10      (Plaintiff's Exhibit 7 received in evidence under seal.)

11 BY MS. COON:

12 Q.   Next, I'd like to direct your attention, Ms. Osgood, to

13 Exhibit 8.

14      THE COURT:  Let me interrupt you here, Ms. Coon.  I

15 wonder if this would be an appropriate time to take our noon

16 recess.  Would this be convenient for you?

17      MS. COON:  This would be convenient.

18      THE COURT:  Since we're transitioning from one

19 document to another, I thought this would be an appropriate

20 time.  We'll be in recess for an hour.

21      (Lunch recess at 12:10 p.m.)

22                  C E R T I F I C A T E
        I, Eugenie M. Power, Official Court Reporter, do hereby
23 certify that the foregoing is a true and correct transcript of
   proceedings in the above-entitled case.
24
   /s/ Eugenie M. Power, RMR, CRR, CCR       Date:  October 17, 2010
25 United States Court Reporter


                    Eugenie M. Power, RMR, CRR, CCR
                       United States Court Reporter

Osgood – Direct

1    (Proceedings continuing in open court at 1:14 p.m.)

2         THE COURT:  Everyone be seated.

3    Ms. Coon, you may proceed.

4         MS. COON:  Thank you, Your Honor.

5         THE COURT:  Ms. Osgood, if you'll come back up and

6    take the stand.

7    BY MS. COON:

8    Q.   Ms. Osgood, prior to our break today, we had been talking

9    about examples regarding inadequate staff supervision.  And I'd

10   like to next draw your attention to another exhibit, which has

11   been previously marked as Exhibit 8.  And I would draw your

12   attention to the synopsis on Exhibit 8.  Do you recognize this

13   document?

14   A.   Yes.

15   Q.   What is this document?

16   A.   It is an investigative report.

17   Q.   And what happened as indicated by this investigative

18   report?

19   A.   The coordinator walked in the back hall of a particular

20   unit and found a gentleman sitting in a recliner naked buckled

21   in and chewing on a piece of torn blanket.

22   Q.   Does this exhibit illustrate anything regarding your

23   opinion about staff supervision?

24   A.   Yes, it does.

25   Q.   Drawing your attention to page 3 of this exhibit,

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1    paragraph 1, I'd like to ask you if this exhibit also indicates

2    anything regarding restraints?

3    A.   Yes, the resident in the investigation, the subject or

4    victim was placed in an unauthorized restraint.

5    Q.   And what kind of restraint was used here?

6    A.   He was put into a wheelchair.

7    Q.   And I'd like to also direct your attention on page 3 to

8    paragraph 17, and ask you if this provides any illustration of

9    your opinions regarding restraints as well.

10   A.   Yes, it does.  The application of the restraint per the

11   investigation indicated injuries that might have been caused by

12   the same was a one-and-one-half-inch abrasion at the chin, a

13   one-by-four-inch abrasion at the right hip, a one-by-two-inch

14   yellow and blue bruise to the right flank, a 2.16-inch red

15   bruise to the infraumbilical area, and a .75-inch-by-one-inch

16   red bruises on the dowel aspect of the shaft of the penis.

17   Q.   Are you aware of whether the United States requested in

18   discovery documentation of injuries from restraints that

19   occurred at Conway?

20   A.   Yes, I am.

21   Q.   Do you know what the facility's response was?

22   A.   That there were no injuries in restraints.

23        MS. COON:  The United States would like to move

24   Exhibit 8 into evidence.

25        MR. YORK:  No objection, Your Honor.


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

```
 1              THE COURT:  I'm sorry.  It's received under seal.
 2          (Plaintiff's Exhibit 8 received in evidence under seal.)
 3     BY MS. COON:
 4     Q.   Next I would like to turn your attention, Ms. Osgood, to
 5     Exhibit 9.  Do you recognize what Exhibit 9 is?
 6     A.   Yes, I do.
 7     Q.   And what is Exhibit 9?
 8     A.   An investigative report involving the same consumer that
 9     was just mentioned on the previous exhibit.
10     Q.   And what does Exhibit 9 indicate with regard to staff
11     supervision?
12     A.   That the gentleman, the consumer in the incident, was
13     found sitting in the floor amidst Kool-Aid, plates and cups.
14     Q.   Why is it significant, if it is, that he was found with
15     Kool-Aid, plates and cups?
16     A.   Because he was at risk of choking as identified by the
17     facility and was not receiving a level of supervision he was
18     supposed to have.
19              MS. COON:  The United States would move Exhibit 9 into
20     evidence.
21              THE COURT:  It's received under seal.
22          (Plaintiff's Exhibit 9 received in evidence under seal.)
23     BY MS. COON:
24     Q.   Moving on to Exhibit 10, Ms. Osgood, are you able to
25     identify what Exhibit 10 is?
```

Osgood – Direct

1    A.    Yes, I am.

2    Q.    And what is Exhibit 10?

3    A.    An investigative report.

4    Q.    And how does this investigative report provide any insight

5    into your opinion regarding staff supervision?

6    A.    It further supports it.

7    Q.    And what happened in this case as indicated by Exhibit 10?

8    A.    Another consumer gentleman was found in the parking lot

9    between 16 and 17 Cypress unattended between 9:30 and 10:00 in

10   the morning.

11   Q.    And do you know what kind of supervision that individual

12   was supposed to be receiving?

13   A.    He was supposed to be receiving visual supervision.

14         MS. COON:  The United States would move Exhibit 10

15   into evidence.

16         THE COURT:  Received under seal.

17      (Plaintiff's Exhibit 10 received in evidence under seal.)

18   BY MS. COON:

19   Q.    Moving to Exhibit 11, Ms. Osgood, do you recognize what

20   Exhibit 11 is?

21   A.    Yes, I do.

22   Q.    What is Exhibit 11?

23   A.    An investigative report.

24   Q.    And what does Exhibit 11 indicate happened with regard to

25   staff supervision?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    A.   This gentleman was also assigned visual supervision,

2    however, he was found on the sidewalk unattended and dressed

3    only in a pair of underwear.

4    Q.   And what kind of supervision was this individual supposed

5    to receive?

6    A.   Visual supervision.

7            MS. COON:  The United States would move for Exhibit 11

8    to be admitted into evidence.

9            THE COURT:  Received under seal.

10       (Plaintiff's Exhibit 11 received in evidence under seal.)

11   BY MS. COON:

12   Q.   Next, Ms. Osgood, I would like to show you a series of

13   exhibits, and two of these exhibits are within that binder, and

14   the third one is in a separate binder, Exhibits 12-1, 12-2,

15   and 2006.

16           MR. DONNELLY:  Court's indulgence, Your Honor.

17       (Mr. Donnelly and Ms. Coon confer briefly.)

18   BY MS. COON:

19   Q.   Starting with Exhibit 12-1, do you recognize what this

20   exhibit is?

21   A.   Yes.

22   Q.   And what is this exhibit?

23   A.   Investigative report.

24   Q.   And what does this exhibit indicate with regard to staff

25   supervision?

Osgood - Direct

1   A.   This investigation involves an individual who was on

2   enhanced supervision due to a previous suicide attempt, and she

3   was found unattended.

4   Q.   Was this the only time that this individual on suicide

5   watch was found unattended?

6   A.   No.

7   Q.   I'd like to draw your attention to Exhibit 2006, which

8   we'll call up on the screen here and draw your attention to

9   page 3 of that exhibit or 52336.

10  A.   Yes.

11  Q.   Are you familiar with what happened as indicated by this

12  exhibit -- what is this exhibit, first of all?

13  A.   It is an attachment to an investigative report.

14  Q.   And what is indicated by this exhibit in terms of staffing

15  supervision?

16  A.   That an RN in the infirmary had received a call -- if I

17  might just read this real quick.  The individual, as in the

18  other one, was on one-to-one supervision due to her risk of

19  suicide.  And she was found in the infirmary with no staff

20  person present.

21  Q.   And this is the same -- is this the same individual from

22  the previous exhibit?

23  A.   Yes, it is.

24  Q.   And was she also supposed to be on suicide watch in this

25  instance?

Osgood – Direct

1    A.    Yes.

2    Q.    And if I could next direct your attention to Exhibit 12-2.

3    Can you identify what this exhibit is?

4    A.    It is an investigative report.

5    Q.    And who is this investigative report regarding?

6    A.    The same woman that we just spoke with regards to in the

7    last two exhibits.

8    Q.    And what happened as indicated by this third exhibit in

9    the series?

10   A.    Again, staff were not maintaining the level of supervision

11   that they were supposed to.

12   Q.    And was she also on suicide watch in this instance?

13   A.    Yes, she was.

14   Q.    And so was the suicide watch appropriately carried out in

15   the instances exhibited in the last three exhibits?

16   A.    No, it was not.

17        MS. COON:  The United States would move into evidence

18   the Exhibits 12-1, 2006, and 12-2.

19        THE COURT:  Received under seal.

20        (Plaintiff's Exhibits 12-1, 12-2, and 2006 received in

21   evidence under seal.)

22   BY MS. COON:

23   Q.    Next I would like to draw your attention, Ms. Osgood, to

24   Exhibit 13.  And if you look in particular on page 48956, do

25   you recognize what this exhibit is?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    A.    An investigative report.

2    Q.    And if you look at the first paragraph here, what is

3    indicated as having happened with regard to staff supervision

4    in this exhibit?

5    A.    The individual involved in this investigation was on

6    visual supervision, staff were to maintain eye contact at all

7    times, and she was found without staff supervision awake in the

8    bedroom, and chewed up -- she had chewed up a magic marker

9    ingesting some of the ink.

10   Q.    In conjunction with this exhibit, I'd also like to show

11   you Exhibit 2011, which we'll pull up on the screen here.  Can

12   you identify what type of document this exhibit is?

13   A.    This is an investigative report involving the same woman

14   of Exhibit 13.

15   Q.    And is anything indicated with regard to staff supervision

16   for the same individual in this exhibit?

17   A.    Yes.  Once again, she was not provided the visual

18   supervision that she was assigned.

19         MS. COON:  The United States moves to admit

20   Exhibits 13 and 2011 into evidence.

21         THE COURT:  Received under seal.

22      (Plaintiff's Exhibits 13 and 2011 received in evidence

23   under seal.)

24   BY MS. COON:

25   Q.    Next I would like to draw your attention, Ms. Osgood, to

Osgood – Direct

1    Exhibit 14.  Can you identify what Exhibit 14 is?

2    A.   Investigative report.

3    Q.   And is anything regarding staff supervision indicated by

4    this investigative report?

5    A.   Yes.  This individual, a youth, she was assigned enhanced

6    supervision, and was not provided that level of supervision,

7    and she jumped or fell off of a dresser.

8    Q.   And what kind of supervision was this individual supposed

9    to be under?

10   A.   On enhanced supervision.

11        MS. COON:  The United States moves to admit Exhibit 14

12   into evidence.

13        THE COURT:  Received under seal.

14        (Plaintiff's Exhibit 14 received in evidence under seal.)

15   BY MS. COON:

16   Q.   Moving next to Exhibit 15, can you identify what type of

17   document Exhibit 15 is?

18   A.   I only have the synopsis here, but it is an investigative

19   report.

20   Q.   And what does Exhibit 15 indicate happened with regard to

21   staff supervision?

22   A.   That a young man who was on one-to-one supervision was

23   found with a purple mouth, and it was discovered that the young

24   man had eaten -- eaten a part of a purple crayon.

25        MS. COON:  The United States would move to admit

Osgood – Direct

1    Exhibit 15 into evidence.

2            THE COURT:  Received under seal.

3        (Plaintiff's Exhibit 15 received in evidence under seal.)

4    BY MS. COON:

5    Q.   Next, Ms. Osgood, I would like to direct your attention to

6    Exhibit 16.  Do you know what kind of document Exhibit 16 is?

7    A.   An investigative report.

8    Q.   And is anything regarding staff supervision indicated by

9    Exhibit 16?

10   A.   Yes.  In this incident, a woman was able to reach into her

11   drawer and get a can of feminine deodorant spray and ingest the

12   nozzle.

13   Q.   Drawing your attention to page 19838, paragraph 2, does

14   paragraph 2 provide any insight into the significance of this

15   incident?

16   A.   Yes.  The resident was assigned one-to-one enhanced

17   supervision during all waking hours and visual supervision when

18   she was asleep because of her history of pica behavior.

19   Q.   And drawing your attention to page 19840, paragraph 4,

20   should the facility have been on notice that this was a risk

21   factor for this resident?

22   A.   Yes.

23   Q.   And why is that?

24   A.   The paragraph indicates this is the second incident where

25   the individual had swallowed the spray nozzle of a deodorant

Osgood – Direct

1    spray can.  And they -- the action -- one of the actions taken

2    was to forward the team to relocate any items that have a spray

3    nozzle to ensure -- and to ensure that staff are inserviced

4    that she is to have supervision when using these items.

5    Q.   Does paragraph 3 also indicate another potential

6    corrective action that the facility may be taking with regard

7    to this individual?

8    A.   Yes.  The paragraph speaks to the corrective action that a

9    special staffing be scheduled with the interdisciplinary team

10   to discuss the individual's behavior and determine if there is

11   a need for a helmet.  Appropriate inservice should be conducted

12   if those changes are made to her treatment plan.

13   Q.   Are helmets a generally accepted response to an

14   individual's pica behavior?

15   A.   Not generally, no.  And if those are used, and that should

16   be very rare, they would only be used under the circumstances

17   at all if other measures were tried that were less restrictive.

18   Part of the issue with this is that the facility had identified

19   that she was able to ingest the nozzle because she was not

20   provided the adequate supervision, but moved to consider

21   whether a helmet would be appropriate for her.

22   Q.   Did that seem like an appropriate response to the

23   incident?

24   A.   Based on the incident, no.

25   Q.   Why not?

Osgood – Direct

1    A.   Because based on the causal factors identified within the

2    investigative report, her ability to gain access to that item

3    was due to a lack of appropriate supervision as set forth in

4    her IPP as well as the previous incident had to do with staff

5    supervision.  To move towards placing a restrictive

6    intervention on this woman, especially to the degree that she

7    would have a helmet be placed, is -- isn't appropriate.  It

8    doesn't speak to the root cause of the incidence and is

9    basically going from zero to 80 when it comes to a hierarchy of

10   restrictive interventions.

11        MS. COON:  The United States moves for Exhibit 16 to

12   be admitted into evidence.

13        THE COURT:  Received under seal.

14     (Plaintiff's Exhibit 16 received in evidence under seal.)

15   BY MS. COON:

16   Q.   Ms. Osgood, aside from document review indicating these

17   instances of insufficient supervision, did you have any

18   observations while on site at the Conway Human Development

19   Center regarding staff supervision?

20   A.   Yes, I did.

21   Q.   I would like to ask you first about ratios or numbers of

22   staff as compared to numbers of residents.  Did you have any

23   observations about the staffing ratios as you toured the

24   facility last year?

25   A.   The number of staff that were in living units when we

Osgood - Direct

1   visited those were not adequate to meet the needs of the

2   individuals there.  In virtually every living area that was

3   visited, the environment was very chaotic, individuals were

4   found either sitting idly engaged in no meaningful activity,

5   they were engaging in behaviors that put themselves at harm and

6   others at harm whether they were injuring themselves or

7   attempting to harm others.  And there was little, if any, staff

8   intervention in these instances.  Staff, by and large, were

9   trying to manage the more serious of behaviors while some of

10  what might be considered the less serious or behaviors that

11  didn't -- didn't cause an immediate threat of serious harm,

12  those were not abated.

13  Q.   Did you observe any examples of individuals whose safety

14  appeared to be of concern given the staffing that you observed

15  on the units?

16  A.   There was an incident where a gentleman laid sideways on

17  the couch with some type of apparatus wrapped around his neck

18  with no staff intervention.  Another woman was lying on a

19  couch, but kind of falling over poking -- poking at her one eye

20  and poking a little bit in the eye socket of the other eye.

21  The other eye had already been removed several years ago due to

22  trauma she had put on that eye.  That went unnoticed.

23      In another living area, I observed staff just -- it was

24  obvious they were very much struggling to keep pace with the

25  individuals living there even though some of them were in

Osgood – Direct

1   wheelchairs and not moving about so quickly.  One woman

2   approached me and pointed to an injury on her hand, and as I

3   looked back up at her, I noticed a bleeding laceration to her

4   forehead that staff were unaware of.  And obviously I took her

5   to the staff to report that.

6       In one instance, we had been at the canteen and were --

7   some young boys were there.  It appeared that they were there

8   on their lunch break with some staff.  And when it was time

9   to -- for lunch to be over and they move on to their next

10  programming activity, the boys just scattered in three

11  different directions.  The staff who were assigned to work with

12  those boys, interviewing one of them, she didn't even know the

13  names of the individuals to whom she was assigned, nor did she

14  know where their next programming activity was.

15  Q.   You had made reference to individuals sitting idly.  I

16  wanted to ask you to explain whether that has anything to do

17  with protection from harm issues?

18  A.   Yes, it does.  The literature, professional standards,

19  it's common knowledge at this point that when individuals were

20  engaged in meaningful activity, that their rate of injury goes

21  down.  And that includes the incidences of them being injured

22  themselves as well as incidents of them causing injury to

23  others.

24      Just as you and I need meaningful activity in our lives,

25  individuals need meaningful activity to talk by themselves, to

Osgood – Direct

1    have a greater purpose towards something.  And in the absence

2    of that, folks, especially folks with developmental

3    disabilities, will resort to behaviors that are

4    self-stimulating, whether it be rocking or banging their head

5    or biting at their arm or going after other individuals.  So

6    the provision of what's regarded as active treatment in

7    regulations, but basically meaningful activity that has some

8    type of motivated function, is directly related to injury.

9    Q.   Along the lines of protecting individuals from injury and

10   from risk of harm, you had referred earlier to risk management

11   and incident management systems.  And I wanted to ask you to

12   explain what generally accepted standards require regarding the

13   kinds of systems that are necessary to protect individuals with

14   intellectual and developmental disabilities from harm and from

15   risk of harm.

16   A.   The systems that are required basically must ensure that

17   teams properly assess individuals to see their areas of risk,

18   to determine what their areas of risk are, to develop

19   appropriate intervention strategies.  If they're medical risks,

20   then there would be some types of medical interventions,

21   medical treatment.  If it's behavioral risks, they would

22   develop behavior support plans or something of that nature.

23   The team is then charged with monitoring whether those

24   intervention strategies are actually working.  This is

25   generally done minimally on a monthly basis, but always if an

1    incident occurs.  And if indicated, the team is then

2    responsible for reevaluating the individual, reassessing them

3    if necessary, but reevaluating the efficacy with which the

4    intervention program is having on that individual's life and

5    modifying it as necessary.  And that can basically generally be

6    summed up in the term of risk management.

7         On the other side of that, the facility is charged with

8    knowing when things happen to people.  And even the best

9    intentions, people will be harmed.  But the team is charged

10   with looking at each of those incidents and determining a

11   number of things actually, but determining why it happened, No.

12   1, what were the circumstances, was it caused by lack of staff

13   training or inadequate staff, or because the interventions that

14   were in place didn't work, or because there were not sufficient

15   interventions.  Perhaps someone began having a new behavioral

16   issue that was just being exhibited.  And, you know, so the

17   team wouldn't have had an opportunity to assess that yet.

18        But as prevention is the cornerstone of health care

19   worldwide, the prevention piece needs to be part of the risk

20   management as well as the incident management program.

21   Q.   So these two pieces are interrelated?

22   A.   Yes.

23   Q.   I'd like to break that down and take certain pieces of

24   that.  First of all, I'd like to talk to you about systems for

25   reporting harm when it does occur.  We may not be going in the

1    exact order of the cycle, however, we'll jump in with incident

2    reporting.  I wanted to show you Exhibits 18 and 19.

3    A.   I'm sorry?  18 and 19?

4    Q.   Yes.  Do you recognize these two exhibits?

5    A.   Yes, I do.

6    Q.   Starting with Exhibit 18, can you explain what Exhibit 18

7    is?

8    A.   This is entitled "the Conway Human Development Center

9    incident report log."

10   Q.   And do you also recognize what Exhibit 19 is?

11   A.   Yes, I do.  It is a residential injury reporting log.

12   Q.   Do these exhibits provide any insight into incident

13   reporting systems at Conway?

14        MR. YORK:  Your Honor, I would object at this time.

15   This document was created after her report was due, and now

16   they are simply trying to supplement her report with further

17   comments.  And she should be limited to her opinions as

18   rendered by the due date of her expert report.

19        THE COURT:  I'm sorry.  I didn't follow the first part

20   of your objection, Mr. York.  You said the document was --

21        MR. YORK:  The document is dated after her expert

22   report was due, so she could not have considered it when doing

23   her report.

24        THE COURT:  I understand.  Okay.

25        What's your response to that?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1          MS. COON:  The United States is not seeking to provide

2     any new opinions through Ms. Osgood.  Any additional documents,

3     just like any additional lay testimony that our experts might

4     hear, would, you know, merely be additional documents that we

5     would be asking if they reflect on opinions already set forth

6     in the report.

7          THE COURT:  Did she give opinions in her report

8     regarding the adequacy of the reporting methods?

9          MS. COON:  Yes.  She gives extensive opinions

10    on incident management of which incident reporting is a key

11    part of incident management.

12         THE COURT:  Okay.  All right.

13       Mr. York, is there any objection to authenticity to these

14    two documents?

15         MR. YORK:  No, Your Honor.  We have no problem if they

16    were introduced in a different fashion or if she is really,

17    truly not going to comment to the extent of her opinions on

18    this report, but I believe she's going to --

19         THE COURT:  I'm going to receive the documents as

20    authentic and as relevant, and so they are admissible.  And

21    based on Ms. Coon's representation to me that Ms. Osgood opined

22    in her report about the sufficiency of the reporting

23    mechanisms, I'm going to overrule your objection and let her

24    testify.

25         MR. YORK:  Your Honor, will we have the same liberty

Osgood - Direct

1    then?  I assume our experts who rebutted her will be able to

2    also rely on this document and comment on it?

3              THE COURT:  They certainly can -- once these documents

4    are in evidence, they can comment on them.  But if she was

5    giving an opinion that she had not given in her report, I would

6    not allow her to do that.  But what I've been told is she gave

7    an opinion in her report that the reporting mechanisms were

8    inadequate.  These are authentic documents that show the

9    reporting mechanism.  And she's entitled, I think, to comment

10   on them, and that does not expand her report.

11        That's my ruling.  So you may proceed.

12        (Plaintiff's Exhibits 18 and 19 received in evidence.)

13   BY MS. COON:

14   Q.   Ms. Osgood, do Exhibits 18 and 19 illustrate anything with

15   regard to incident management?

16   A.   Yes, they do.

17   Q.   And what do they illustrate?

18   A.   The documents contained -- like I said, was an incident

19   report log which is data compiled at a level of the facility

20   that it's being recorded electronically and then put into a

21   data base to be retrieved in this fashion.  Exhibit No. 19 is a

22   residential injury reporting log that is as indicated at the

23   bottom of this document, is to be kept in each resident and

24   forwarded to the team office when filled out as directed by the

25   team leader.

1       There are injuries that are contained in Exhibit 19 which

2    do not make it into Exhibit 18.  And that's problematic for a

3    number of reasons.  These two exhibits actually are just two

4    examples of how the reporting processes are very -- they are

5    like silos, they are not all going into the same place, they

6    are very fragmented.  On the one hand, you have this level of

7    incident or injury reporting -- being reported in this manner,

8    another type of injury being reported in this manner, such as

9    the injury reporting log.

10      There are also other documents such as behavior reports,

11   observation reports, marks reports that are documented in other

12   areas.  And the significance of that is that when the team gets

13   together, they do not have the ability nor do they based on

14   observation of the IRC meetings -- they don't look at the

15   totality of the individual.  They look at incidents in

16   isolation.  And it renders them incapable of identifying

17   trends, patterns of injuries, or patterns of risky behaviors,

18   patterns of victimization.  And you need to look at the whole

19   of a person in order to adequately serve that person and meet

20   their needs, especially their need to protect them from harm.

21      Another comment on the residential injury reporting log,

22   if one was to scroll through the various pages, a great number

23   of these injuries have what's identified by the facility as an

24   unknown source, so.

25   Q.  What's the significance of the unknown source?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    A.   Well, we all have unknown injuries that we wake up with

2    one morning and have a bruise here or a scratch there, and

3    that's normal to a certain degree.  Individuals that are under

4    24-hour observation and service that are receiving a number of

5    unknown injuries can be indicative of abuse, it can be

6    indicative of neglect, they need to be adequately investigated

7    to see what their ultimate origin is to determine what type of

8    intervention strategies a team needs to make to protect this

9    person.

10   Q.   Do the process deficiencies that you just discussed have

11   any relationship with repeated harm at Conway?

12   A.   Yes.

13   Q.   I'd like to show you another exhibit, Exhibit 23-1 and

14   23-2.  Do you recognize Exhibits 23-1 and 23-2?

15   A.   Yes, I do.

16   Q.   What are these exhibits?

17   A.   They are reports weighing from data bases maintained by

18   Conway Human Developmental Center that -- extracted bites in

19   particular means that an individual was bitten by another.

20   Q.   And do these documents provide any illustration regarding

21   your opinion on incident management?

22   A.   Yes, they do.  If I might just take a minute to look

23   through.  These documents reveal that there are a number of

24   persons that are repeatedly harmed by their peers, and are

25   subject to their peers biting them.  Because this is limited to

1   bites, it's not a report of the totality of victimization that

2   happens at the facility, but victimization that is targeted

3   towards individuals being bitten.

4   Q.   And do these exhibits provide any illustration regarding

5   interventions that are taken regarding bites?

6   A.   Yes, they do.  There are a number of individuals that have

7   anywhere from 10 to 15 incidents of being bitten.  In many of

8   these incidents, for instance, if you look at page 3 of 16 on

9   Exhibit 23-1, there is a woman, the third person down, was a

10  victim on repeated occasions.  And if you look towards the

11  aggressor column, which is the third column over, she was a

12  victim of -- one individual perpetrator victimized her on four

13  occasions.  So this speaks to both the preventive strategies

14  that were not taken during incident review processes to, No. 1,

15  protect the victim, and, No. 2, appropriately or effectively

16  intervene in the aggressor's behavior.  So these exhibits

17  reveal that people are repeatedly victimized and people who are

18  aggressors repeatedly aggress with that effective action not

19  being taken.

20          MS. COON:  The United States moves Exhibits 23-1 and

21  23-2 into evidence.

22          THE COURT:  Received under seal.

23      (Plaintiff's Exhibits 23-1 and 23-2 received in evidence

24  under seal.)

25  BY MS. COON:

Osgood - Direct

1    Q.   Ms. Osgood, have you seen any other documentation that

2    particular individuals have suffered repeated harm other than

3    the examples regarding bites?

4    A.   I've seen another -- a number of documents.

5    Q.   And did you see any such patterns in the review you

6    conducted through your sampling of residents that we talked

7    about earlier?

8    A.   Can you better explain the question or -- with more

9    specificity?

10   Q.   Sure.  When you did the in-depth review of a sample of

11   residents that we spoke about earlier, did you see examples of

12   repeated harm to these individuals?

13   A.   Yes.

14   Q.   And what types of facility documents did you see these

15   trends in harm in?  Behavior reports, or admin reviews, or what

16   types of reports?

17   A.   They were in -- all of the above, investigative reports,

18   behavior reports, restraint reports, observation reports, marks

19   reports.

20   Q.   What kind of volume of documents did you review to

21   discover such patterns and trends of repeated harm?

22   A.   As I alluded to earlier, thousands of pages.

23   Q.   Have you also reviewed any summaries reflecting harm to

24   these individuals from your sample?

25   A.   Yes, I have.

Osgood - Direct

1    Q.   I'd like to show you what's been marked as Exhibits 24

2    through 36.

3              MS. COON:  May I approach the witness, Your Honor?

4              THE COURT:  You may.

5              MR. YORK:  Your Honor, we object to all of those

6    exhibits.  They were produced to us only within the last few

7    days.  We've had no fair opportunity to review them or analyze

8    them.  We don't know if the information is even remotely

9    accurate.  And it's grossly trying to supplement the opinion of

10   this expert, that the whole expert report of her opinions are

11   allowed to be supplemented by the data that has recently been

12   compiled -- we don't even know who did these lists.  And now

13   this is supposedly going to become part of her opinions, her

14   expert opinions, that were due back in December that we

15   responded to?

16             THE COURT:  Ms. Coon?

17             MS. COON:  Yes, Your Honor.  First of all, Mr. York

18   stated these exhibits were received a few days ago.  They were

19   actually produced a few weeks ago.  And these exhibits are

20   summary charts that summarize the same individuals who are

21   disclosed in Ms. Osgood's report and that summarize the

22   voluminous documents that she reviewed to provide the opinions

23   in her report.  And these documents are being offered as

24   summary exhibits under Federal Rule of Evidence 1006.

25        The United States has pointed out to the defendants on

Osgood - Direct

1    several occasions since providing these weeks ago that these

2    are summary exhibits that the United States intended to move to

3    introduce as summary exhibits pursuant to Federal Rule of

4    Evidence 1006.  We also have disclosed the exact Bates number

5    on each of the entries in these summary exhibits.  And when we

6    produced the documents to the defendants, we produced all of

7    the underlying documentation that these summary exhibits

8    summarize.

9           MR. YORK:  Your Honor, this representation that was

10   weeks ago is a very loose representation here.  They were

11   produced, arguably, for the first time on August 26 when

12   documents and exhibits were supposed to -- not only did we have

13   a request for exhibits back in August of 2009 that we didn't

14   get these, not only should they have been included in her

15   expert report and attached as exhibits and we didn't get them,

16   but now they didn't even meet the deadline disclosing them

17   properly on July 30th.  We got them, arguably, on August 26.

18   On August 29th we were told that some of these exhibits had to

19   be replaced or altered, so we held off in printing them off and

20   reviewing them.  We got the revised discs with these exhibits

21   on September 1st, Your Honor.  And now we're told that we're

22   supposed to be allowing these into evidence when we've had no

23   fair opportunity whatever to review them and to consider them

24   and to cross-examine this witness on that is going to form a

25   basis on part of her opinions?

Osgood – Direct

1          MS. COON:  Your Honor, these exhibits here that are

2     summarized are the exact exhibits that were detailed in a

3     multipage appendix to Ms. Osgood's report.  These are the

4     State's own documents which they produced to us and which we've

5     disclosed and Ms. Osgood reviewed in her report.  And

6     Ms. Osgood has opined on the incident management issues raised

7     by these documents previously.  She has used these individuals

8     as examples in her report in lieu of bringing pages and pages

9     of voluminous documents, which we actually have here in the

10    courtroom today and are represented by approximately six of

11    those boxes.  Instead of going document by document through

12    those, we've generated the summary exhibits which the

13    defendants have had for some time and also had the underlying

14    documentation since it's their own documentation.  And that

15    documentation was disclosed in the appendix to Ms. Osgood's

16    report.

17          MR. YORK:  Your Honor, we are not objecting to the

18    underlying records that were reviewed.  We're objecting to

19    these summaries that we've had no fair opportunity whatsoever

20    to review and to consider and to use in cross-examination of

21    this witness.  These summary documents were not attached to her

22    report, and they've been done only recently, and we don't even

23    know who did them, who even summarized them.

24          THE COURT:  Talking about Exhibits 24 through 36?

25          MS. COON:  Yes, Your Honor.


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1          THE COURT:  Does that include 26-1 and --

2          MS. COON:  If I might explain, the summary exhibit is

3    the number, so No. 24, 25, 26.  And then we have provided all

4    of the underlying documents to which the summaries refer by

5    Bates range as sub-exhibits to each of the summary exhibits so

6    that the underlying documentation is readily available to the

7    Court, is readily available to the defendants.  And we have all

8    of the underlying documents here today and identified as

9    sub-exhibits to each of the summaries for ready comparison.

10         THE COURT:  I reached around and found a box that has

11   some of these, and I just opened one and I have Exhibit 26.

12   And it has a summary of a series of events.  The first one is

13   dated 7-23-07, 7-26-07, and so forth, through October 8th of

14   '07.  And then behind that are a series of individual incident

15   reports.  Are all of them like the one that I'm looking at

16   here?

17         MS. COON:  They are, Your Honor.

18         THE COURT:  And you're saying that the report that was

19   provided by Ms. Osgood last December had as an appendix what

20   would be here 26-1 through 26- whatever -- it looks like

21   there's a lot -- but it had those documents, but not this

22   summary chart of dates with events?

23         MS. COON:  That's correct, the underlying --

24         THE COURT:  The underlying documents were provided

25   with her report?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1          MS. COON:  Yes.  There's an appendix to Ms. Osgood's

2     report that -- several appendices, one listing the individuals

3     who she reviewed as part of her sample, and the other list by

4     Bates range a series of pages and pages of these types of

5     documents that she reviewed as part of her report.  And then

6     she opines in her report that individuals are subjected to

7     repeated victimization.  And in lieu of bringing in and

8     introducing all of these underlying documents, which would take

9     hours of the Court's time, perhaps days of the Court's time, an

10    investigator for the United States prepared summaries of these

11    underlying documents based on what was provided in Ms. Osgood's

12    report, and that investigator is here today if the Court has

13    any questions with regard to how the summaries were prepared.

14         MR. YORK:  Your Honor, see, this witness didn't even

15    prepare these documents.  We're talking about an advocate

16    essentially, someone who works for the Department of Justice,

17    on the other side, has prepared these documents, surprised us

18    with them very recently, and now we're supposed to allow them

19    to be put into evidence when we don't even know if they are

20    accurate.

21         THE COURT:  What are you proposing to do in terms of

22    her testimony with 24 through 36?

23         MS. COON:  Ms. Osgood's testimony would be quite

24    brief.  We would ask her if she's reviewed these documents.  We

25    would ask her if she's reviewed underlying documentation.  We

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    would ask her if the summaries are an accurate representation

2    of the documents that she reviewed.  We would ask her if they

3    provided indication of her opinion with regard to incident

4    management.  And in this fashion we would be saving the Court

5    days of testimony which would necessarily occur if we were to

6    present her with each of the underlying documents, which number

7    in the hundreds.

8         THE COURT:  What did she say in her report that this

9    is going to relate to?  That's what I want to know.

10        MS. COON:  She states that the facility fails to take

11   action in the face of repeated harm to prevent repeated harm to

12   individuals, and she refers to several individuals who have

13   suffered repeated victimization.

14        THE COURT:  Let's do this.  Let's let her give her

15   opinion and talk about what she said in her report and not

16   address these summaries.  I mean, I don't think she needs to go

17   through all of them in order to tell me that.  And then if at

18   some point later in the trial you feel like it's necessary to

19   introduce the volumes of documents that support that opinion,

20   then we may introduce the volumes of documents that support the

21   opinion.  But we obviously are going to be here awhile.  We

22   don't have to do everything today.

23        But if she's testified -- if she gave a report that

24   offered some opinions, then I think she can testify about her

25   opinions and she can say that she -- and she's already said

1    that she reviewed thousands of pages of documents.  If at some

2    point in time again you want to introduce the underlying

3    documents, fine.  If, during the course of the trial, there's

4    time that Mr. York's problems with the summaries can be

5    addressed and resolved, then we may be able to do that.  But in

6    terms of what she's doing here today, I don't know that we need

7    to go through all of those.  I think you can ask for her

8    opinions and what did she review and then he can cross-examine

9    her about the foundation.  Is that okay?

10            MS. COON:  Yes, Your Honor.

11            THE COURT:  All right.  Let's do it that way.

12   BY MS. COON:

13   Q.   Ms. Osgood, do you have an opinion regarding incident

14   management at Conway?

15   A.   Yes, I do.

16   Q.   And what is your opinion regarding incident management at

17   Conway?

18   A.   That it does not adequately address the incidents that are

19   occurring in individuals' lives that either are causing

20   recurring or serious harm, or have the potential to cause the

21   same harm.  Intervention strategies that are taken are most

22   frequently ineffective.

23   Q.   And do you have examples to support these opinions?

24   A.   Yes, I do.

25   Q.   And what are the examples you have to support these

1    opinions?

2    A.   There are examples within my report, these exhibits.

3    Q.   How would you describe, you know, the number of people who

4    have been subjected to repeated harm at Conway?

5    A.   How would I describe the number?

6    Q.   The number of people who have been subjected to repeated

7    harm?

8    A.   There's a great number of people subjected to recurring

9    harm.

10   Q.   And when you looked at these incidents of recurring harm,

11   did you look to see whether the facility was taking action in

12   response to the recurring harm?

13   A.   Yes.

14   Q.   And what did you find?

15   A.   That they were not taking sufficient action or action that

16   was adequate to abate the harm.

17   Q.   And how is that indicated?

18   A.   Because of recurring incidents and injuries.

19   Q.   How do facilities generally approach incident management

20   in order to prevent these kinds of repeated injuries that

21   you've seen throughout Conway?

22   A.   Well, again, it's the process of identifying areas that

23   people have the potential to harm themselves or harm others.

24   If we're speaking strictly with incidents versus medical

25   interventions, I will put it in a separate category at this

Osgood – Direct

1  point for the purpose of argument.  There is the prevention

2  piece that should be occurring on an ongoing basis with

3  individuals in the event that incidents do happen.  In the

4  event that individuals are placed at risk of harm or incur

5  serious or recurring injuries, the team needs to meet.  And

6  this can be in the form of an IRC such as Conway uses.  But

7  they need to do a root cause analysis to determine what caused

8  the incident to occur, what were the precipitating factors that

9  led to this behavior or led to this fall or led to this

10  altercation between individuals, and then, as a team, address

11  what needs to be done to prevent that in the future.  And when

12  that prevention piece that is part of incident management --

13  when that prevention piece is not strong enough or effective,

14  you're going to see repeated and recurring incidents of harm.

15  Q.   You mentioned that Conway has an incident review

16  committee.  Does this committee discuss incidents?

17  A.   I don't know that they discuss them.  They -- typically

18  what happens is it's a rather large meeting.  And one

19  individual reads the report, whatever is written on the report,

20  the marks report, behavior report, what have you, and just

21  reads it.  There was limited dialogue between team members

22  regarding these reports.  They would often -- these meetings

23  would often -- back to the -- how things are so fragmented,

24  these meetings, they would often just read through all of the

25  marks reports and then read through the behavior reports and

1    then read through another series of reports instead of focusing

2    their review on individuals and looking at one individual and

3    what marks reports did they have in the last 24 or 48 hours,

4    how many behavior reports, to look at the totality of the

5    individual and discern what needs to happen in order to

6    effectively, you know, reduce the harm that this person is

7    exposed to.

8    Q.   I'd like to show you Exhibit No. 37.  Do you recognize

9    what Exhibit 37 is?

10   A.   Yes, I do.

11   Q.   What is Exhibit 37?

12   A.   These are the minutes from one of the IRC meetings in one

13   area for the month of April of '09.

14   Q.   Do these IRC meeting minutes provide any insight into the

15   efficacy of Conway's incident review committees?

16   A.   Yes, they do.

17   Q.   How so?

18   A.   In each of these, these sheets here, there is a -- the

19   date is indicated of when something happened, who the

20   individual was, what type of incident occurred, what's needed,

21   and followup.  If you look through it -- I'm just going to stop

22   at page 46.  If you look at the first 46 pages, the action

23   identified as being necessary to be taken is -- with limited

24   exception is indicated as NA, not applicable, and followup

25   action is NA, not applicable.  Also, there is further evidence

1    of individuals being -- having recurring incidents.  But

2    perhaps most telling in this is -- along with the

3    repetitiveness with which some people are on this list, is a

4    lack of corrective actions being taken following these events.

5    Q.   Are these samples of meeting minutes a representative

6    sample of minutes that you reviewed?

7    A.   Yes, they are.

8         MS. COON:  The United States would move Exhibit 37

9    into evidence.

10        MR. YORK:  No objection, Your Honor.

11        THE COURT:  Received without objection and under seal.

12      (Plaintiff's Exhibit 37 received in evidence under seal.)

13   BY MS. COON:

14   Q.   Moving on to the topic of quality management, can you

15   explain what generally accepted professional standards provide

16   regarding what a quality management system at a facility like

17   Conway should look like?

18   A.   I think first it's important to differentiate between

19   quality assurance and a department that's entitled something

20   like quality management.  Some are entitled quality management,

21   quality assurance.  Quality assurance is a practice that is --

22   generally accepted standards is woven into the fabric of an

23   organization.  It is basically a checks and balances to make

24   sure that what the organization purposes to do is having the

25   desired outcomes, that those processes are taking place in

Osgood - Direct

1    accordance with how the organization designed them to occur.

2    And quality assurance in this type of setting, it is a part

3    of -- let me say it should be a part, in keeping with generally

4    accepted standards -- is a part of the habilitative

5    programming, clinical services, including medical services,

6    physical plant, which, you know, would be if there are any

7    physical safety issues, you know, with respect to the

8    institution.

9         The quality management department -- and, again, I use

10   that term interchangeably with how other facilities may deem

11   it, their charge is two-fold.  On the one hand, they are

12   typically responsible for ensuring that the facility stays in

13   compliance with any regulatory bodies that they are assigned,

14   you know, such in this case would be CMS.  And so it's very

15   compliance driven, very quality control, if you will, driven.

16        The other side of that is to measure the outcomes, to

17   measure the experiences of the people who live at the facility.

18   And those outcomes need to be looked at both at an individual

19   level, if John Doe is at risk of choking and at risk of

20   aspiration pneumonia, they should be looking to see with what

21   kind of frequency he's having these events.  But they should

22   also be looking at the aggregate data so they can get a full

23   picture of how things are happening at the facility.  So

24   it's -- it has both a micro and macro level.

25        Did that answer your question?

Osgood – Direct

1   Q.   Yes.

2   A.   Okay.

3   Q.   Do you have any opinion regarding quality management at

4   Conway?

5   A.   In my opinion, the quality management department at Conway

6   doesn't have enough resources to do the things it needs to do.

7   It's not -- as I alluded to earlier, with respect to quality

8   council or quality assurance committee minutes, they were not

9   being captured, you know, for the last 12 months, or they were

10  not provided.  Most of the functions that this department is

11  doing are along the lines of compliance.  And they are not

12  based on the habilitative and clinical outcomes experienced by

13  the people who are living there.  This is important in order

14  that -- in order that the facility can see how it's operating

15  on a broad level.

16       And back to, you know, an example of aspiration pneumonia,

17  that's just one clinical indicator.  But if there are increases

18  or decreases, you know, where are these happening, are they

19  happening with people at a high risk -- to be able to look at

20  that information and analyze it.  And typically these

21  departments will also be able to, you know, with technology,

22  pull data together, if teams aren't able to already do so, that

23  really get at the outcomes that different individuals are

24  experiencing.

25  Q.   Are there outcomes that a facility should look at --

1   facility like Conway should look at that Conway does not look

2   at?

3   A.    There are a number.  There are a number.  The first one

4   that comes to mind is the use of restraints.  This is an area

5   that at best is getting a cursory review as far as numbers with

6   restraints and not the causal factors or the effectiveness of

7   intervention strategies other than the restrictive application

8   of restraints.

9       They don't analyze any of the restraint numbers because

10   Conway does not have a process in place to review restraints

11   after they occur.  They do not measure whether these reviews

12   are being conducted timely which is, you know, another

13   standard.  So the quality management department -- and quality

14   management in whole is not a gotcha' game.  In years past, it

15   was a very, you know, this is what's wrong and this is who is

16   to blame.  But it's more looking at the processes at the

17   facility and seeing what needs to be done to improve those

18   processes because it's those processes more than likely that

19   are going to positively impact the outcomes of individuals

20   living there.

21   Q.    Does Conway's QA team look at abuse and neglect, for

22   instance?

23   A.    Not in any type of systemic or organized fashion, no.

24   Q.    What about incident and injury data?

25   A.    There is an incident review committee that looks at

1    facility-wide incident data.  But based on a review of all of

2    those minutes, they were primarily looking at staff injuries.

3    And while that's important, it's not sufficient.

4    Q.   You had mentioned QA looking at compliance issues.  What

5    types of compliance issues should a facility look at and is

6    Conway looking at the appropriate ones?

7    A.   They do some environmental checks.  There is or was at the

8    time of the tour an individual who was designated to do

9    environmental monitoring.  And that's a valid piece of quality

10   assurance.  They also do some very quantitative reviews of

11   IPPs, as far as making sure that all of the documents are there

12   and what have you, but it's primarily a quantitative review.

13        And with regards to, you know, because the facility

14   receives Medicaid funding, they, you know, are obligated to

15   meet the requirements of Title 19, the department also attracts

16   corrective action plans that arise out of deficiencies noted by

17   CMS.

18   Q.   Should a quality assurance also look at compliance with

19   other laws such as the ADA?

20   A.   Certainly, certainly.  With respect to transitions, if

21   there are people identified to be transitioned into the

22   community, they should be looking at whether the transition

23   plan is in line with the individual's IPP and truly meets the

24   needs of this individual, making sure that whatever community

25   area they were going to -- and I say area, whether it's

Osgood – Direct

1   supported living, or group homes, or, you know, their

2   apartment, or basically back to their family, are the supports

3   needed for that person, are they in place at the -- at the

4   destination before the person moves.  This would include if

5   somebody was being placed and needed a ramp in order to get

6   into the front door and be able to leave, wide enough doorways,

7   whatever kind of accessible needs they had.  They should also,

8   you know, be measuring if -- based on the ADA, you know, if

9   they are complying with the requirements, evaluating people if

10  they are living in the least restrictive setting.  And so, yes,

11  to answer your question, yes.

12  Q.   Does Conway's quality assurance team do that?

13  A.   I saw no evidence of that.

14  Q.   Should a quality assurance team also look at rights

15  restrictions?

16  A.   Yes.

17  Q.   And how would that work?

18  A.   Looking at rights restrictions should be a very key part

19  of the quality assurance, quality management department.  And I

20  say that because typically a lot of the quality improvement

21  initiatives are kind of led by the QM staff, quality

22  management, QM, staff.  They should be, at the very least,

23  making sure that informed consent is obtained and is current.

24  They should be looking at the number of people who have

25  restrictive interventions in their plan to see if there's any

Osgood – Direct

1       kind of a pattern at the facility.  And that would -- you know,

2       that would include restrictive interventions such as the

3       facility uses a lot of modified clothing that need approval in

4       order to use by the human rights committee and the parents and

5       guardians.  And while they should be looking to make sure that

6       from a compliance standpoint that all of the appropriate

7       consents are there, they should also be gathering that data to

8       look to see if there are any transient patterns, patterns of

9       practice at the facility that indicate that perhaps -- perhaps

10      we're not moving in the right direction of where we want to be

11      with, you know, reducing restraints or other types of

12      restrictive interventions.

13      Q.   Does Conway's quality management team perform that role

14      with regard to the evaluation of various rights restrictions?

15      A.   No.

16      Q.   Are there other ways that facilities look at rights

17      restrictions such as through a human rights committee?

18      A.   Yes, most -- well, all ICF/MRs need to have a human rights

19      committee.

20      Q.   Can you explain what's required with regard to human

21      rights committees?

22      A.   I can't cite the exact regulation under CMS, but basically

23      if a team determines that some type of restriction needs to be

24      placed on individuals, a restriction, for example, against

25      their privacy or their person or their ability to move about

Osgood – Direct

1    freely, whether it's with their limbs, or from here to the

2    other side of the room, their rights to be free from restraint

3    unless absolutely necessary, human rights committees need to

4    review all of those.  The facility is responsible for

5    submitting any kind of rights or restrictions to the human

6    rights committee and also getting informed consent from the

7    guardians or parents, whoever is appointed as the individual's

8    guardian.

9    Q.   Do you have any opinion regarding the human rights

10   committee at Conway?

11   A.   I did not see evidence that the human rights committee is

12   involved at all in the review of all restrictive practices at

13   Conway.

14   Q.   And would those be -- the missing restrictive practices

15   would be the ones you referenced earlier, or any additional

16   ones?

17   A.   They are -- in addition to that, and I allude to it in my

18   report, on a number of units, the determination was made that

19   cameras would be placed in various spots around the units.  And

20   that's a privacy infringement.  It's not necessarily a bad

21   idea.  Many facilities have been able to reduce the number of

22   abuse events and unauthorized restraints and what have you.  So

23   my opinion is not on the usefulness or merit of cameras, but it

24   is a -- it is an invasion on one's privacy.  And, therefore, it

25   would be necessary to put that type of -- that type of

Osgood – Direct

1    initiative, to have that go through a human rights committee

2    prior to implementing it.

3    Q.   And did that happen at Conway?

4    A.   No, it did not.

5    Q.   Were the cameras in the home units at least approved by

6    the residents or their parents and guardians ahead of time?

7    A.   I did not see any evidence of that.  I was told during

8    interview that at a parents' meeting that parents approved of

9    that.

10   Q.   But there was no evidence of that in the records that you

11   reviewed?

12   A.   No.  What I found in the records was a letter sent to the

13   guardians of those individuals living in those homes that the

14   cameras were placed in that very briefly said, I'm summarizing,

15   that we have chosen to do this for the following reasons, and

16   please sign this to acknowledge that you know this.

17   Q.   More broadly speaking, do you have any opinion with regard

18   to how Conway generally obtains informed consent from parents

19   and guardians?

20   A.   I reviewed a policy -- well, the informed consent policy

21   at the facility, and that raised a number of concerns.

22   Informed consent is in itself providing the individual who is

23   going to give that consent a thorough understanding of the

24   risks and benefits of what's being proposed.  And there needs

25   to be some level of education there in order for it to be, you

Osgood - Direct

1    know, honestly informed.  The informed consent policy at Conway

2    purposes -- and I can't recite it verbatim, but the purpose of

3    the policy is to ensure that informed consent forms are

4    returned quickly to the facility by the guardians.  I would

5    expect -- and in keeping with standards, I would expect that

6    the policy would instead purpose to establish how we're going

7    to inform guardians and parents of the risks and benefits

8    involved with whatever types of restriction is being proposed

9    and the manner in which that consent is going to be -- is going

10   to be obtained.  I didn't see any indication in the policy that

11   there was recognition that parents and guardians should be part

12   of the planning process, part of the team process, that is

13   initiated to even propose these restrictions.  Again, it was

14   along the lines of after the fact.  And there was language in

15   there that I found to be very coercive and intimidating to

16   parents.  And without having the policy in front of me -- I

17   would rather comment more fully on that if I had the policy in

18   front of me.

19   Q.   Actually I would like to show you Exhibit 38 and ask if

20   you could identify that document.

21   A.   Yes, this is the policy I was referencing.

22   Q.   And you had referred to coercive in the policy.  Can you

23   identify where that language is found?

24   A.   With respect to the purpose, it's under the underlined

25   word "Purpose" which reads, "to develop guidelines for ensuring

Osgood - Direct

1  expedient return of signed consent forms from guardians -- or

2  signed consents from parents and guardians."

3  Q.   And you had just started to talk about another portion of

4  the policy that appeared to be coercive.  Can you identify what

5  portion that is?

6  A.   Yes.  If I might comment on another line item here?

7  Q.   Sure.

8  A.   In No. 1, it says, "Consent in conjunction with annual

9  reviews or as current written informed consents expire."  What

10  is concerning here is there is no reference to the dialogue,

11  the participation of parents or guardians, in the consent.  And

12  having said that, there's some parents and guardians that feel

13  more comfortable with the team making decisions.  And if that's

14  how they feel, then, you know, their wishes, nine times out of

15  ten, should be honored.  But to the coercive part that I felt

16  to be coercive, again, the purpose is to try to get these forms

17  back as quickly as possible.

18      It says, a social worker -- in line 4, "if they have not

19  received it, the social worker will make at least two

20  documented attempts within 20 days to obtain the consent.  If

21  it still is not returned," line 5 or No. 5, "the social worker

22  will notify the superintendent, a copy will be sent to the team

23  leader, and this will indicate the type of consent requested,

24  the dates the social worker attempted to contact the parent or

25  guardian regarding the consent, and the results of the followup

1    and those attempts."

2         And at that juncture then, No. 6 goes on to say, "at this

3    point, the superintendent will notify the parent/guardian and

4    reiterate the importance of prompt return of the consent and

5    further inform the parent/guardian that if the consent is not

6    returned, the center will be forced to look at the

7    circumstantial discharge of their child/family member/ward."

8         MS. COON:  Going back to a particular form of rights

9    restriction that you mentioned earlier -- actually, before I

10   move on, the United States would move Exhibit 38 into evidence.

11        THE COURT:  38 is received.

12        (Plaintiff's Exhibit 38 received in evidence.)

13   BY MS. COON:

14   Q.   Moving on to a form of rights restriction that you

15   referred to today, restraints, I'd like to talk a little bit

16   more in detail about restraints starting off with asking you

17   what generally accepted standards require with regard to a

18   facility review of restraints.  And first of all, I'd like to

19   ask you what generally are the standards for when restraints

20   may be used?

21   A.   Restraints, be it any, whether it's an ICF or mental

22   health, are to be used only in -- when there's imminent threat

23   of serious injury to oneself or to someone else, whether that

24   be -- someone else be another consumer or staff member.  They

25   should only be employed in a hierarchy fashion, meaning that if

Osgood – Direct

1    an individual becomes very aggressive, that staff are provided

2    with deescalation strategies to try to calm the individual down

3    or redirect the individual to some other activity or speak with

4    the individual, whatever the team determines to be appropriate

5    nonrestrictive interventions.  If and only when those

6    interventions don't work or there's documentation indicating

7    that they are, for some reason, contraindicated, that --

8    restraints can be applied or should be applied.

9        Once they are applied, or once the decision is made that

10   this is what's needed, proper authorization should be obtained.

11   And different facilities do that in different ways.  And the

12   standards aren't completely clear on that.  There's varying

13   degrees of who can authorize those things.  But once a person

14   is placed in a restraint, they need to be monitored on a

15   regular basis.  And the restraint, whether it be a manual or

16   physical restraint, or be it a mechanical restraint such as in

17   Conway they use the papoose boards and restraint chairs, that

18   they be released from those when the threat of immediate

19   harm -- threat of immediate serious harm has been lifted.

20       On to the review of restraints, after a restraint event

21   occurs, typically there is a debriefing that happens with

22   staff, and, if the team feels appropriate, also with the

23   individual who was restrained.  Minimally each restraint should

24   be reviewed by the interdisciplinary team within 24 or 48

25   hours.  And this review is important because basically it's a

Osgood - Direct

1   quality assurance process for ensuring that the restraint was

2   only applied under the conditions that I listed above, when

3   they should be applied; and was there a threat of immediate

4   harm; were less restrictive interventions tried; is there any

5   reason to believe that they shouldn't have been tried; is there

6   documentation to support that it's contraindicated; was the

7   individual monitored appropriately while they were in

8   restraint; and were they released when the threat of harm had

9   vacated.

10  Q.   Do you have an opinion regarding the first issue of

11  Conway's application of restraints?

12  A.   There is -- there is a number of examples that indicate

13  that restraints are applied to individuals at times in a

14  punitive fashion and that staff do not always have clear

15  guidance on when it is appropriate to apply restraint.

16  Q.   And do you have an opinion with regard to review of

17  restraints?

18  A.   They do not review the restraints.  There is a cursory

19  mention of the restraints at the daily IRC, but there is no

20  review that looks into what occurred, was the restraint

21  actually necessary, were less intuitive measures attempted, and

22  then as far as the procedural guidelines for the restraint and

23  how it's applied and the monitoring and the release, if all of

24  those were followed.

25  Q.   And what do you base that opinion on with regard to

Osgood - Direct

1    inadequate review of restraints?

2    A.   Document review, interviews with the chief psychologist.

3    Q.   And did you attend these IRC meetings sufficiently to be

4    aware of whether and the extent to which restraints were

5    discussed?

6    A.   Yes.

7    Q.   Is it enough if Conway just tries to reduce the numbers of

8    restraints or minutes in restraints, however they might go

9    about doing it?

10   A.   Well, first, if I might, there's some restraints at Conway

11   that are not being logged, documented, as restraints.  I

12   alluded to garments that restrict an individual's access to

13   themselves.  While those restrictions may undergo human rights

14   approval and guardian consent, they are not captured into the

15   restraint numbers at Conway.  So with respect to data and

16   whether or not restraints are being reduced, I don't know that

17   the -- well, I know the data would not be accurate in that

18   regard.

19        It's not sufficient to just look to see if the number of

20   restraints are being reduced and if the time in restraints is

21   being reduced.  Having a restraint applied is, for some people,

22   a very frightening experience.  And if an individual is at the

23   point that they need to be tied down to a board for extended

24   periods of time, I think it is incumbent upon the facility to

25   determine if that type of intervention met that person's needs.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    And when you only look at numbers and you only look at time

2    spent in a restraint, you lose a picture of the person.  They

3    should be looking at the number of people restrained to make

4    sure that that's going down.  Individually they should be

5    looking at for -- they should be looking at an individual's

6    experience in restraints, and then also collectively the

7    aggregate number of restraints and who is being restrained,

8    what kind of restraints they are, and move away from these

9    highly restrictive interventions.

10   Q.   I'd like to show you some documents and ask if they

11   reflect on your opinions regarding restraints.  First I would

12   direct your attention to Exhibit 40.  And in particular, I'd

13   like to, well, first ask you if you can identify what this

14   exhibit is?

15   A.   Yes.

16   Q.   What is this exhibit?

17   A.   It is a safety plan for a young woman at the facility.

18   Q.   What is your understanding of what a safety plan is at

19   Conway?

20   A.   My understanding is that it is an intervention plan when

21   serious behaviors occur.

22   Q.   And what kinds of interventions are generally included in

23   a safety plan?

24   A.   Typically there's some type of restrictive intervention.

25   Q.   Is the safety plan at Conway -- is this different from a

Osgood – Direct

1    behavior plan?

2    A.    I believe that they are, but I can't say that with all

3    certainty.

4    Q.    And this particular safety plan, if we look at page 7427

5    at paragraph B, does this paragraph provide any illustration of

6    your opinion regarding restraints?

7    A.    Yes, it does.  And if I might, just one thing I hadn't

8    explained earlier, under no circumstances should restraints be

9    applied because there's insufficient staffing or because it's

10   more convenient for staff than it is to provide a program or as

11   a means of punishment.  And this particular paragraph speaks to

12   that in that this young woman says she "usually escalates even

13   further in response to personal restraints.  So it is usually

14   best to use personal restraint only until the papoose board

15   is" -- excuse me -- can you reduce this?  I'm sorry.  What page

16   number are we on?

17   Q.    This is page 7427.

18   A.    Okay.  I'm sorry.  This is too big for me to read on the

19   screen.  "The individual usually escalates even further in

20   response to personal restraint.  So it is usually best to use

21   personal restraint only until the papoose board is ready and

22   there are enough people present to place her on it.  The

23   following procedures will be used as required to establish

24   safety until the individual is calm."  And "calm" here is being

25   described as "no longer aggressing, appears relaxed, and is

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    apologetic."

2    Q.   Are those appropriate criteria for release?

3    A.   No.  An individual needing to apologize in order to be

4    released from a restraint is obvious -- it's being used for a

5    punitive purpose, and the individual is to express remorse for

6    whatever they had done.  Again, restraint is only to be applied

7    to remove a serious imminent threat of immediate harm.

8           MS. COON:  The United States would move to admit 40

9    into evidence.

10          THE COURT:  It will be received without objection

11   under seal.

12       (Plaintiff's Exhibit 40 received in evidence under seal.)

13   BY MS. COON:

14   Q.   Next, Ms. Osgood, I would like to show you Exhibit 2016 --

15          THE COURT:  Is this a new topic?

16          MS. COON:  This is along the same topic, restraints.

17          THE COURT:  When you get to a new topic, why don't you

18   let us know and we'll take a recess?

19          MS. COON:  We could take our recess now if you like

20   because it might be a little while before we get to a new

21   topic, to be honest with you.

22          THE COURT:  I think it would be a good idea to take a

23   recess now.  We'll take our afternoon recess now, about 15

24   minutes.

25       (Recess at 2:55 p.m. until 3:16 p.m.)


                   Judith A. Ammons, RPR, CRR, CCR
                    United States Court Reporter

Osgood – Direct

```
1            THE COURT:  Everyone be seated.  Have you realized how
2   much good exercise you're going to get over the length of this
3   trial if you stand up and sit down every time I come out?  I do
4   believe in the formality, not because of me personally, but
5   because of the law.  That's what the black robe and all of this
6   represents, and people stand up.  I think we do that when we
7   come in in order to recognize our commitment to the rule of
8   law, and it's not for me personally.  But if we get down the
9   road and we go on for so long, we might -- I've never dispensed
10  with it during a trial, but I do have a colleague who regularly
11  dispenses with that.  I don't do that for the reason I stated.
12  But down the road we might dispense with all of the rising so
13  everyone doesn't wear completely out before we get through with
14  this trial.
15          Ms. Coon, you may proceed.
16            MS. COON:  Thank you, Your Honor.
17  BY MS. COON:
18  Q.   Ms. Osgood, I would like to show you another exhibit which
19  has previously been marked as 2016.  Can you identify what type
20  of document this is?
21  A.   An investigative report.
22  Q.   And my question to you will be whether this document sheds
23  any light on your opinions regarding use of restraints at
24  Conway?
25  A.   Yes, it does.
```

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    Q.    And how so?

2    A.    In this allegation from March of 2010, staff witnessed

3    another staff member straddle a young woman -- a young woman's

4    leg on the couch in the day room to try to get her up and tell

5    her that she was going to place her on the papoose board.  She

6    then followed the resident to her bedroom where both the

7    resident and the employee -- excuse me, where both -- where the

8    employee, the reporting employee, witnessed the resident being

9    pinned by the alleged aggressor yelling at her she was not

10   going to get away with attacking her and telling the resident

11   that she was going to the board.

12   Q.    And if you also look at page 28970, paragraph 11, does

13   this provide any insight into reasons that staff have used for

14   restraints at Conway?

15   A.    Yes, it does, if I might read it.

16   Q.    Sure.  How does it reflect on reasons for restraints?

17   A.    I'm sorry -- for reasons --

18   Q.    For reasons that staff have provided for restraining

19   individuals?

20   A.    For retaliation, for punitive reasons.

21   Q.    And how is that illustrated in this exhibit?

22   A.    "The alleged perpetrator took the consumer's hands in both

23   of her hands holding them down on to the bed.  When the

24   perpetrator's knees were on top of the resident's knees, the

25   aggressor was literally holding the victim on the bed and was

Osgood – Direct

1    saying to her, You are not getting away with this.  You're

2    going on the board.  You are not just going to attack me."  And

3    for a matter of clarification, through my review and interview

4    with at least one resident, "going to the board" references an

5    individual who is going to be placed on the papoose board.  And

6    it's in the documentation and interviews, it is a phrase that

7    staff use, "You're going to the board."

8            MS. COON:  The United States would move Exhibit 2016

9    into evidence.

10           THE COURT:  Received under seal.

11       (Plaintiff's Exhibit 2016 received in evidence under

12   seal.)

13   BY MS. COON:

14   Q.   I'd like to next show you Exhibit 2010.  Do you recognize

15   what type of document 2010 is?

16   A.   This is again an investigation into a verbal threat.

17   Q.   And does this investigation provide any illustration

18   regarding your opinions on use of restraints at Conway?

19   A.   Yes, it does.

20   Q.   How so?

21   A.   In this incident, an LPN was upset with one of the young

22   ladies at the facility after she had refused to take her

23   medication.  She began yelling at her and told her that if she

24   kept refusing to take her medication, she would be placed on

25   the board.

Osgood - Direct

1    Q.   And directing your attention to another page --

2         MR. YORK:  Excuse me, Your Honor.  Your Honor, we are

3    getting constant supplementation of her opinions to new

4    examples that we've had no chance to inquire about at her

5    deposition, no chance to factor in or even prepare for her

6    cross-examination.  These are, again, reports that are done

7    after her report was submitted, Your Honor.  And we're getting

8    this expansion of her opinions.  And she's basing them upon new

9    examples that we've had no opportunity to conduct discovery on

10   or to prepare for.

11        MS. COON:  Again, Your Honor, these examples are

12   related to the same opinions that were provided in Ms. Osgood's

13   report.  And these are examples that support those same

14   opinions that are in the report.  And the United States is here

15   for this trial to prove ongoing conditions at the facility

16   violate certain laws including the Civil Rights of

17   Institutionalized Persons Act, the Americans with Disabilities

18   Act, and the IDEA.  And we've been provided various documents

19   throughout discovery of which this was one document provided

20   during the discovery period.  And we're presenting these

21   documents here today to show additional documents that continue

22   to illustrate an ongoing pattern or practice of constitutional

23   violations at the facility.

24        THE COURT:  Let me ask you about these two.  Maybe

25   this is a question for the witness and it doesn't go directly

Osgood – Direct

1     to the objection, but I'm not forgetting your objection,

2     Mr. York.

3          Were these two reports, the investigation reports, were

4     those initiated because the action by the staff member was

5     contrary to the policy?  And I haven't had a chance to look at

6     these documents in toto, but it looked like the accusation was

7     that the staff member had acted contrary to the policy.  Was

8     that correct?

9          MS. COON:  And contrary to generally accepted

10    professional standards as well.

11         THE COURT:  Does that -- I mean, I guess I have a

12    question as to whether or not those examples support the

13    opinion that Ms. Osgood is giving because those examples would

14    seem to be instances where staff members were acting contrary

15    to policy as opposed to staff members pursuing a policy that

16    she thinks is inadequate and should be changed.  And so I'm not

17    sure that those particular instances -- I don't know if they

18    get us -- maybe they do.  Maybe they get us somewhere, but I

19    wasn't sure if they do or not.

20         MS. COON:  And these examples are also relevant to

21    Ms. Osgood's opinions set forth in her report regarding ongoing

22    abuse and neglect in the facility and trends that should be

23    apparent to facility administrators, and they're not being

24    recognized as --

25         THE COURT:  How many of these do you have that

Osgood – Direct

1      postdate her report?

2            MS. COON:  A very limited number, less than five.

3            THE COURT:  Less than five.  And I take it that they

4      are all in your exhibits that you -- have you given -- did you

5      give Mr. York any notice that you intended to introduce these

6      exhibits and use these examples at some point during the trial?

7            MS. COON:  Yes, Your Honor.  These were provided on

8      our exhibit list and were provided when we produced the

9      exhibits to the State.

10           THE COURT:  Okay.  Mr. York, do you agree that all of

11     these documents are authentic, are admissible?  Even if not

12     through this witness, do you agree they are authentic and

13     admissible?

14           MR. YORK:  Yes, Your Honor.  But, again, to allow them

15     to keep expanding and adding to this witness's opinion, it not

16     only defeats the purpose of the extra report in the schedule,

17     but it hinders our ability to cross-examine her.

18           THE COURT:  Yeah.  And I understand your objection and

19     your frustration, but I'm going to overrule it because, first

20     of all, I don't think it expands her opinion, and, secondly,

21     the documents themselves are independently admissible.  And

22     they could call her back, they could put somebody else on the

23     witness stand, they could call one of your people on the

24     witness stand to authenticate the documents, and they would be

25     in evidence.  And I don't really see any harm -- if the

Osgood - Direct

1      documents themselves are admissible, I really don't see any

2      prejudice to you from allowing them to go ahead and put them in

3      now as opposed to later through some other witness.

4              MR. YORK:  Your Honor, I would agree with that

5      rationale if this witness wasn't constantly being asked, does

6      this further support your opinion, does this further support

7      your position?  So they are rendering or obtaining additional

8      opinions from her that these support her opinion.

9              THE COURT:  I don't think they are.  I think that what

10     they are doing is giving further examples of what she

11     alleged -- what they allege was a pattern and practice that she

12     described in her report that was introduced last December.  And

13     I don't think that it's unfairly prejudicial to you if they

14     have further examples that postdate the report.  So long as the

15     opinion was there in the original report, I don't think it's

16     unfairly -- and the documents themselves could come in through

17     somebody else, and they could make the same argument to me.

18     Independently of her, they could not ask her about them.  They

19     could call Mr. Price or somebody else to the witness stand and

20     introduce these documents and then make the argument, "Your

21     Honor, these are further examples of what Ms. Osgood was

22     talking about."  So we're in the same point -- we're going to

23     get to the same place however we do it.  And it seems to me

24     that this is the most efficient way to do it.

25              And I am concerned -- I want to be completely and totally

Osgood - Direct

1    fair to everybody.  I also want to make sure we get the truth

2    and we get all of the facts that are relevant and that I

3    understand them.  But after that, my next concern is to do this

4    as efficiently as possible because of the length of the trial.

5    And I think this is an efficient way that gets us exactly to

6    the same point and the same evidence and the same argument.

7    And it's quicker to do it this way than to do it some other

8    way.  So I'm going to overrule your objection.

9           MR. YORK:  Your Honor, I just want to note for the

10   record that these documents were not revealed to us until

11   August 26th.  We've had no fair opportunity to prepare for

12   these documents, especially not in relation to this witness.

13   And it was only a couple of days ago that we learned that this

14   witness was going to be -- and these exhibits were going to be

15   offered with this witness.

16          THE COURT:  All right.  Thank you.

17      Proceed, Ms. Coon.

18   BY MS. COON:

19   Q.   Ms. Osgood, did you have any other information regarding

20   the general facts reflected in this incident?

21   A.   Forgive me.  I don't recall where we had left off, so.

22   Q.   Is there anything else that's significant in the synopsis

23   of the exhibit?  If not, I'll move forward and direct your

24   attention to something else.

25   A.   No.  This is just in line with my findings from previous

1    reports, that individuals are placed on the papoose board for

2    unnecessary reasons and for punitive reasons.

3    Q.   Also looking at page 27370 of this document, in the fourth

4    paragraph of the report, does this provide any illustration of

5    any of the other opinions that you've previously stated

6    regarding protection from harm at the facility?

7    A.   One of my opinions in the report was that there were a

8    significant number of allegations of abuse or neglect that were

9    being reported from new employees, and this is a further

10   example of that.  In this particular instance, when the threat

11   that the consumer was going to be placed on the papoose board,

12   there were three staff members present when that threat was

13   made.  One individual was a supervisor who had five years on

14   the job.  One individual had one year on the job.  And the

15   reporting witness had six months on the job.  And of note is

16   why it was the employee with the least amount of time on the

17   job that was the reporting witness.

18        MS. COON:  Your Honor, we would move into evidence

19   Exhibits 2010 and 2016 if we didn't previously do so.

20        THE COURT:  2016 was previously admitted.  2010 will

21   be received under seal.

22     (Plaintiff's Exhibit 2010 received in evidence under

23   seal.)

24   Q.   Ms. Osgood, next I would like to direct your attention to

25   Exhibit 49.  Ms. Osgood, can you identify what Exhibit 49 is?

Osgood – Direct

1    A.   This is an investigative report into physical abuse.

2    Q.   And can you describe what happened as reflected in the

3    facility's document marked as Exhibit 49?

4    A.   In this particular instance, a direct support staff got

5    into an altercation with one of the female residents and placed

6    that resident in a chokehold and threw her to the floor while

7    in the kitchen.

8    Q.   If you could look further on in this exhibit, I don't have

9    a particular page in front of me, but I want to ask you if this

10   exhibit provided any insight into your opinion regarding

11   restraints?

12   A.   It may be more time effective if I could reference my

13   report.

14        MS. COON:  Your Honor, may Ms. Osgood refresh her

15   recollection with her report?

16        THE COURT:  Yes.

17        THE WITNESS:  The summary of this incident was

18   actually a little bit longer than what the synopsis in the

19   investigative report contained.  And in addition to placing

20   this resident in a chokehold and throwing her to the floor, the

21   employee grabbed the woman's arm and drug her across the

22   kitchen, through the living room, through the back hallway, and

23   into the client's bedroom.  She then reportedly threw her on to

24   the bed and physically restrained her until both the consumer

25   and the employee fell to the floor.  The employee then struck

Osgood - Direct

1    the consumer in the stomach several times and then assisted

2    putting her on the papoose board, apparently because the young

3    woman had bit the employee.  In this instance with respect to

4    restraints, it's further evidence of the restraints being used

5    in a punitive fashion.  And of additional significance is the

6    allegation the physical abuse was reported by staff regarding

7    this incident, but the improper use of restraint was not.  And

8    this was not noted by either the investigator or the

9    administration, this improper use of restraint.

10          MS. COON:  The United States would move into evidence

11   Exhibit 49.

12          THE COURT:  It's received under seal.

13      (Plaintiff's Exhibit 49 received in evidence under seal.)

14   BY MS. COON:

15   Q.   In addition to these document instances regarding use of

16   restraints at Conway, did you speak with any residents at

17   Conway regarding use of restraints and circumstances in which

18   restraints are used on them?

19   A.   Yes.  There was one resident in particular, a very capable

20   young woman who I spoke with at great length and she indicated

21   that when she, quote, acted up, unquote, she was placed on the

22   board and that she incurred injuries around her wrists when

23   that would occur.

24   Q.   How did you interpret that statement that when she acted

25   up she would be placed on the board?

Osgood – Direct

1    A.    I interpreted that as a punitive abuse of restraint.

2    Q.    Now, what types of restraints are used at Conway?  We've

3    talked here and there about various types, but what's your

4    understanding of the types of restraints that are used at

5    Conway?

6    A.    There are a variety of restraints used.  I had mentioned

7    the alternative clothing before, which could be a full body

8    suit, that the consumer cannot access their body oftentimes.

9    There are sleeves sown in with mittens at the end and strings

10   that tie the individual's arms back around their back similar

11   to what a straightjacket might do.  There are seat belts in

12   recliners to stop individuals from getting up out of the

13   recliners.  The rationale use for these often is their chance

14   of falling.  But staff supervision should be able to prevent

15   that instead of using the restraints.

16        Again, the use of the papoose board.  The papoose boards

17   were openly present in a number of units.  And somebody else

18   uses what are called restraint chairs.  And these are very

19   large apparatus that individuals are placed in and strapped at

20   various points across their body, their wrists, their arms,

21   their legs, their waist, their chest.  And a number of

22   individuals have these in their program plans that, if need be,

23   they are placed in the restraint chair.

24   Q.    Are all of these types of restraints typical of types of

25   restraints that you've seen in the 15 or so or more states that

Osgood – Direct

1    you've visited?

2    A.   No.   They -- they are very antiquated restraints.   Most

3    states have moved completely away from using papoose boards,

4    with some exception perhaps with dental procedures.   In all of

5    the facilities I've toured, at best, I think I've seen one

6    other facility with a restraint chair in the last ten years.

7    So, no, they are not in keeping with general practices or

8    general accepted practices.

9    Q.   Did Conway staff seem to be aware of that?

10   A.   No.   Actually on one unit where there was a small storage

11   room where two restraint chairs were for -- where a restraint

12   chair was there for two different women who apparently were

13   placed in it, it was located in a back storage area.   And the

14   young woman who was escorting us as we toured around the

15   facility, obviously a very dedicated and caring staff, was very

16   helpful in showing us areas.   And I asked her about the

17   restraints, and she very openly said that this -- we use these

18   restraint chairs for the two individuals for whom they were

19   assigned.   And in asking her what they do as far as when

20   individuals are placed into these, she showed absolutely no

21   reservation in the facility's use of these.   And my

22   interpretation of her candor and openness -- and actually I

23   don't know if excitement to discuss the residents and their

24   treatment is the right word for lack of a better word.   I felt

25   she was being very genuine in explaining how things happened

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    there and felt quite comfortable with the fact that they used

2    restraint chairs as well as papoose boards on other units.

3         MS. COON:  Your Honor, for the record, we had

4    subpoenaed papoose boards to be brought here today so that we

5    could show the Court what we're talking about when we're

6    talking about papoose boards, and apparently the objections

7    were filed yesterday --

8         THE COURT:  There were objections filed yesterday, and

9    I didn't see them until after hours, and didn't know there was

10   an issue.  But at an appropriate time -- as I said, we're going

11   to be here for awhile -- and I'll look at the restraints and

12   we'll look at the chairs or pictures, whatever, but we'll work

13   out a way.  They've asked me to go tour, maybe we'll do it that

14   way.  But I'll look at those items at some point during the

15   course of this trial either with photographs or having them

16   brought in or going to the facility.

17        Mr. York?

18        MR. YORK:  Your Honor, I just want to note for the

19   record because if there was any implication that we were late

20   in responding to that, we were served with that subpoena last

21   week.  I didn't see it until Friday morning.  And we filed

22   something as promptly as we possibly could.

23        THE COURT:  It's -- nobody is accusing anybody of

24   anything, and I think everybody agrees at some point I need to

25   look at those, it's just a question of getting it here today.

1    They objected to doing that.  And I'm going to look at the

2    papoose boards and any other thing -- restraints I need to look

3    at in order to understand the testimony.  And I'll either go to

4    the facility, have them brought here, or we'll have pictures.

5    We'll do something that makes sense that everybody can live

6    with.

7            MS. COON:  Thank you, Your Honor.

8    BY MS. COON:

9    Q.   Ms. Osgood, does the facility track whether restraints

10   avoided harm or caused harm?

11   A.   I saw no evidence of that.

12   Q.   I'd like to show you what's been marked as Exhibit 39.

13   A.   39 what?

14   Q.   Let's start with 39.  It should be a one-paged document.

15   A.   No.

16   Q.   Well, in lieu of that, I can ask you if you've seen any

17   documentation from the facility indicating in response to

18   questioning by the United States if there have been injuries in

19   restraints at Conway?

20   A.   Yes.  Exhibit 39-1, on the front page of that indicates

21   the United States requests any list, roster, summary, or report

22   of all residents injured during or as a result of restraint

23   used at CHDC including the date of the incident.  On the back

24   page, the facility's response is there have been no injuries

25   resulting from restraint use.

Osgood – Direct

1    Q.   And is that consistent with the documents that follow

2    39-1?  And now I'm referring to Exhibits 39-2 through 8.  And I

3    do apologize.  There is no Exhibit 39.  It's Exhibit 39-1

4    through -8?

5    A.   Understood.  On Exhibit 39-2, the bottom of the page,

6    reads the initials of an individual, and it says, "went to the

7    board at 1:50 a.m.  Certain staff were notified.  And the

8    resident received Tylenol and Mylanta in case of pain."

9    Q.   And how about the remaining exhibits in this series,

10   moving to Exhibit 39-3?  What does that indicate?  And I would

11   direct your attention to the last paragraph in that exhibit.

12   A.   It says the individual was put on the board and said he

13   hurt his foot.

14   Q.   And how about Exhibit 39-4?  If you look at the middle

15   paragraph, what does that indicate?

16   A.   That a blister was discovered on an individual above his

17   waist on the right side -- on the waist on the right side at

18   6:00 p.m.  "Nurse thinks it was caused by the seat belt in his

19   recliner.  Marks card filled out and SC notified."

20   Q.   And moving to Exhibit 39-5, what does this exhibit

21   indicate regarding injuries and restraints?  I would direct

22   your attention to the middle paragraph.

23   A.   "The individual has red marks on the right side of her

24   face from rubbing her head on her arm splints.  The helmet was

25   taken off prior to bathing.  Nurse was called."

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    Q.    And moving to Exhibit 39-6, if you look at the 2-4-08

2    entry near the bottom of the page regarding LL, does that

3    indicate anything regarding injuries and restraints?

4    A.    "LL in mitten jacket at 2:30 p.m.  Released after 30

5    minutes when he was calm.  Red marks made on LL for the 3

6    scratches on his left elbow caused by self-injury to" --

7    Q.    What is a mitten jacket?

8    A.    A mitten jacket is what I had described earlier, is a

9    restrictive piece of clothing that is typically made out of

10   nontear material, and it restricts an individual's movements

11   with their hands and fingers sometimes being crossed against

12   their chest to tie behind them, basically limiting or

13   restricting access to their various body parts.

14   Q.    Did you see that available for use when you were at

15   Conway?

16   A.    Yes, I saw several individuals in them.

17   Q.    Moving on to Exhibit 39-7 and drawing your attention to

18   the third paragraph.

19   A.    "In this incident, January of 2009, an abrasion was noted

20   to consumer's left shoulder."  And the paragraph you reference

21   indicates, "Although none of the staff witnessed a specific

22   incident that could have caused the mark, it is believed that

23   the mark on the consumer's left shoulder was caused during a

24   behavior on 1-26-09.  S was placed on the papoose board as a

25   result of the behavior.  The mark is consistent with the strap

Osgood - Direct

1    across the shoulder.  Therefore, I have concluded that the mark

2    on individual's left shoulder was caused by the shoulder strap

3    on the papoose board."

4    Q.   In moving to Exhibit 39-8, this is a similar document to

5    39-9 -- I'm sorry -- 39-7.  What kind of documents --

6    A.   These are administrative review documents.

7    Q.   And what are administrative reviews?

8    A.   When certain types of incidents occur, administrative

9    reviews are recommended, they are completed, I believe, by and

10   large, by the team leaders and submitted to the superintendent.

11   Oftentimes these are injuries that have an unknown origin.

12   Q.   And does this exhibit also provide any illustration

13   regarding injuries caused by restraints?

14   A.   Yes.  In this incident, this involves a young boy who was

15   noted with bruises to his right hip -- excuse me -- a bruise to

16   his right hip.  And the paragraph that you referenced,

17   "Although none of the staff witnessed a specific incident that

18   could have caused the mark, it is believed that the bruise on

19   this boy's right hip is from the papoose board.  The boy was

20   placed on the papoose board on 2-16 12:33 p.m.  The bruise is

21   consistent with the height of the wrist restraints.  Therefore,

22   I have concluded the bruise on the boy's right hip is from him

23   being placed on the papoose board."

24   Q.   Does this document indicate any facility response to this

25   incident?

Osgood – Direct

1    A.    Yes.  It indicates whether there was or not.  There are

2    what appear to be two parallel systems in place with regards to

3    incident and injuries.  One is the IRC, the incident review

4    committee, that we spoke of earlier.  And then there's these

5    administrative reviews that are conducted after there's a

6    referral made for them to be conducted.  And at the end of this

7    administrative review, it says that the incident will be

8    submitted to the IRC for review.

9    Q.    And is there any indication as to what the IRC did?

10   A.    Yes.  In the top right-hand corner, it says, "IRC

11   reviewed.  No recommendations."

12   Q.    Did you have any observations regarding the relationship

13   between the IRC committee and individuals or the -- the

14   conducting of the administrative reviews?

15   A.    There was a relationship in that they often pointed to the

16   other.  The administrative reviews would often say that this is

17   going to be reviewed by the IRC.  And then the IRC would say

18   this is going to be reviewed by -- through an administrative

19   review.  And in a vast number of these, neither of those

20   reviews as evidenced here had any substantive kind of remedial

21   measures put in place.

22   Q.    So with regard to the series of exhibits that are appended

23   to Exhibit 39, do these reflect on your opinion regarding

24   restraints?

25   A.    Yes.


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1   Q.   And how so?

2   A.   In a number of ways, but most specifically with what we

3   addressed here, that people are being injured in restraints and

4   that the facility is not taking action to prevent the injuries

5   from occurring.  The very purpose of a restraint or a

6   restrictive measure such as that is to protect individuals from

7   harm.  And when that very restrictive intervention actually

8   causes harm, there should always be some level of review to

9   determine why that happened and if that is actually the most

10  appropriate intervention in the hierarchy of interventions.

11  Q.   And is that kind of review being done at Conway?

12  A.   No.  No.

13       MS. COON:  Your Honor, we would move Exhibit 39,

14  subparts 1 through 8, into evidence.

15       THE COURT:  Received.

16       (Plaintiff's Exhibit 39-1 - 39-8 received in evidence.)

17  BY MS. COON:

18  Q.   I would like to talk now about abuse and neglect of

19  investigations.  Generally speaking, Ms. Osgood, are there

20  generally accepted professional standards for providing

21  residents at facilities like Conway with reasonable safety from

22  abuse and neglect?

23  A.   Yes.

24  Q.   And what are these generally accepted professional

25  standards?

Osgood − Direct

1    A.    That individuals are to be free of abuse and neglect.

2    Q.    And what do facilities generally do to try to achieve that

3    goal?

4    A.    It's most common, on one hand, to provide training to

5    staff, both an initial type of training, that would include the

6    prohibitions surrounding abuse and neglect, what those

7    definitions are and what constitute each of those.  And this

8    also includes exploitation and psychological abuse, not just

9    physical and verbal, sexual abuse as well.  And so the staff

10   clearly understand what those definitions are, clearly

11   articulate guidelines with how to report these incidents,

12   having the incidents investigated immediately and thoroughly by

13   competent investigators who have been adequately trained in

14   conducting investigations.  They also need -- they, being

15   staff, also need to have sufficient training surrounding the

16   identification of abuse and neglect.  And it's probably easier

17   to just give some examples.

18        If people show a level of fright when a certain staff

19   member enters the room or approaches them, or if consumers are

20   being overly cooperative and following the rule or demands

21   placed on them by staff, there's typically some level of

22   intimidation going on.  Facilities also usually reach out to

23   medical professionals who can speak to the physical signs of

24   abuse, such as we all incur injuries to our limbs and our legs

25   and things like that.  Repeated injuries to the trunk area or

1    to the head where the hair has hidden the scalp can be

2    indicative of abuse.  So there is a wide spectrum of abuse and

3    neglect prevention training that staff are to undergo.

4    Q.   Anything else that facilities should do with regard to

5    reporting of abuse or ensuring that abuse reporting happens?

6    A.   I don't know if you want to be more specific.  I mean,

7    it's, by and large, mandated that if there's a suspicion that

8    abuse or neglect has occurred, that it be promptly reported to

9    whatever body that the facility has determined is the recipient

10   of that information.  They, again, then need to be investigated

11   promptly and timely, and the facility needs to look at whether

12   or not there are any trends such as if they are seeing abuse

13   and neglect in particular areas of the facility with particular

14   individuals, during particular shifts, with particular alleged

15   aggressors or perpetrators.  And when it's suspected that there

16   is a problem in any particular area, there needs to be real

17   depth analysis into looking at things outside of the realm of

18   abuse and neglect and seeing if, for instance, injury patterns

19   on a living unit are more prevalent when a certain group of

20   employees are working together, or if it's occurring during

21   certain shifts, or if it's occurring when overtime is being

22   used, things of that nature.

23   Q.   And do you have an opinion regarding whether Conway is

24   meeting those standards that you articulated?

25   A.   Based on the recurring fashion of abuse and neglect at the

Osgood – Direct

1    facility, I don't believe that they are meeting those

2    standards.  They do provide quarterly inservice trainings that

3    I understand are inservice packets the different areas are

4    supposed to review and sign off on.  I don't know that the

5    administration is taking a hard enough look at whether that is

6    really preventing the abuse and neglect from occurring.  They

7    also need to look at the -- who is reporting the abuse, if it's

8    quite often new employees that have just come out of

9    orientation training, which is typically where they get the

10   most comprehensive abuse and neglect prevention training.  If

11   it's oftentimes these employees and they are reporting on

12   senior staff, that can be problematic and it can be indicative

13   of a culture of silence wherein staff who have been senior

14   staff or seasoned staff who have been in the units and have a

15   certain way of doing things don't necessarily report on their

16   peers.  And there may be some general level of acceptance at

17   that level of the organization, you know, with respect to abuse

18   and neglect.

19   Q.   Do the characteristics of the reporting staff at Conway

20   give any indication as to whether that's an issue there?

21   A.   Yes, it does.  And, again, I would refer back to the

22   recent example of the staff threatened to put an individual on

23   the papoose board because she wasn't taking her medication.

24   And of the three staff that reported that incident, it was the

25   one with, by far, the less tenure and may have still been on

Osgood - Direct

1   probation for all I know.  It takes a great deal of courage to

2   report abuse and neglect in an institutional setting because

3   it's typically a very tight community.  And so for someone --

4   for the new kid on the block to report something like that,

5   they are -- they have to exercise a lot of courage and

6   understand that there may be repercussions.  And along those

7   same lines, many investigations indicate that people reported

8   being either intimidated by senior staff or concerned that

9   their supervisor was -- concerned that their supervisor had

10  some sort of personal relationship at some level with the

11  alleged perpetrator.  And in at least two investigations, a

12  staff member reported late because they were literally afraid

13  to leave the living unit while this one staff member remained

14  with the residents and could continue to abuse them in the way

15  that they had alleged.

16  Q.   What happened to these reporting staff members?

17  A.   In some cases they were terminated and in some cases they

18  were disciplined.

19  Q.   Do you know what the rationale was for that discipline?

20  A.   No.

21  Q.   Let's talk about some exhibits.  And I would like to ask

22  you if and how they illustrate your opinion.  Did you find

23  examples illustrating your opinion in your review of documents?

24  A.   Oh, yes.

25  Q.   I would like to show you what's been marked as Exhibit 43.

Osgood – Direct

1    Do you recognize Exhibit 43?

2    A.   Yes, it's an investigative report into child abuse.

3    Q.   And what happened as reflected by this investigation?

4    A.    In this particular instance, the male staff member had one

5    resident hit another resident because the second resident was

6    acting out.  So basically encouraged infighting, if you will.

7    Q.   And let me also refer you to page 51153, the first and

8    fifth paragraphs, and ask you if these excerpts reflect on any

9    part of your opinion regarding abuse and neglect.

10   A.    In this instance, the reporting witness had one and a half

11   months on the job.

12   Q.    And if you look at page 51097 and 51098, is there any

13   indication of what happened with the reporting employee after

14   he reported that staff had held a youth and allowed other youth

15   to hit him?

16   A.   The reporting witness did not report the incident

17   immediately because he said he did not trust the shift

18   coordinator; because he did not have a number to contact anyone

19   else, and he said that he did not trust the shift coordinator

20   because he had seen her take smoke breaks with one of the other

21   gentlemen involved in the incident.

22   Q.   What was the discipline for the reporting employee?

23   A.   What's the Bates number again?

24   Q.   51098.

25   A.   The supervising staff member was directed to notify the

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    reporting witness that he is being terminated effective

2    immediately for violation of employee minimum conduct codes.

3    Q.   Do you know if the victim in this case suffered any

4    injuries?

5    A.   Yes, he did.

6    Q.   And are those injuries reflected at page 51135 through 38?

7    A.   There are photos here that indicate a number of injuries.

8    What was your reference page?

9    Q.   51135 through 38.

10   A.   Yes, those are the photos of the injuries.  The

11   description from the medical services abuse report indicates

12   there are bruises -- "bruises noted below.  There is no pattern

13   compliant with finger/hand marks.  Skin not warm over bruises.

14   The pictures reflect a number of bruises on his hands,

15   forearms, legs, back, and his chest."

16   Q.   And so how does this exhibit reflect on your opinions

17   regarding abuse and neglect?

18   A.   That they frequently occur at Conway and often cause

19   injury.

20        MS. COON:  The United States would move to admit

21   Exhibit 43 into evidence.

22        THE COURT:  Received under seal.

23       (Plaintiff's Exhibit 43 received in evidence under seal.)

24   Q.   Moving on to Exhibit 44, do you recognize Exhibit 44,

25   Ms. Osgood?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1  A.   Yes, I do.  This is an investigative report into child

2  abuse.

3  Q.   And what happened as indicated by this investigation?

4  A.   This gentleman was in his -- was found in his shower chair

5  visibly upset with his nose bleeding.  He was taken to his room

6  to dress and calm down.  Staff then reported that while he was

7  being showered, he engaged in what was determined as

8  inappropriate behavior.  He apparently was threatening to beat

9  the staff and get her fired.

10       Another individual -- another staff member then intervened

11  to help with the resident.  And when the resident grabbed this

12  other staff member's shirt and wouldn't let go, the staff

13  member hit the victim's head against the door in the bathroom.

14  The incident escalated between the two.  And staff reported

15  that the aggressor hit the victim's head against the bathroom

16  door several times.  When she realized that she could not break

17  up the altercation, she yelled for John -- she yelled for

18  another staff member.

19  Q.   And did this victim suffer any injuries?

20  A.   Yes.  The exam noted nasal swelling, no facial

21  lacerations, chest marks bilaterally, which were likely finger.

22  Q.   Are those injuries also depicted at page 51378?

23  A.   Yes, they are.  The gentleman victim had abrasions or

24  bruises to his back.  Blood noted is -- there's blood noted on

25  the shower wall.

Osgood - Direct

1   Q.   Do you know if the victim was a youth, or an adult?

2   A.   He was a young adult.

3   Q.   Do you know how old he was at the time of the incident?

4   A.   26.

5   Q.   And do you know if the staff who were found to have abused

6   this individual had any prior disciplinary issues?

7   A.   Yes, that is indicated within the investigative report.

8        THE COURT:  I want to go back to this thing about me

9   not being good at arithmetic.  What I'm looking at is the date

10  of birth and the date of the investigation, it looks like he

11  was 16.

12       THE WITNESS:  I'm sorry.

13       THE COURT:  Am I miscounting?  Is it 26?

14       THE WITNESS:  No.

15       THE COURT:  Did you say 16?

16       THE WITNESS:  No.  I said 26.

17       THE COURT:  Is it 16, or 26?

18       THE WITNESS:  I think it's 16.  My mistake.  I'm not a

19  math expert.

20  BY MS. COON:

21  Q.   If you look at page 51352, does that provide any

22  indication of the staff's history, the perpetrating staff?

23  A.   Yes.  In -- also in '08, that employee allegedly failed

24  enhanced provision assignment of a resident, and the resident

25  went out of bounds.  That case was substantiated.  New

Osgood - Direct

1    information was given to the superintendent, and the employee

2    was reinstated.

3    Q.   And how does this exhibit reflect on your opinion

4    regarding abuse and neglect?

5    A.   That it is serious.

6         MS. COON:  The United States would move to admit

7    Exhibit 44.

8         THE COURT:  Received under seal.

9         (Plaintiff's Exhibit 44 received in evidence under seal.)

10   Q.   Moving on to Exhibit 45, do you recognize this exhibit?

11   A.   Yes, I do.  It's an investigation into child abuse.

12   Q.   And what happened as indicated by Exhibit 45?

13   A.   In this instance, a staff member sat on top of a child's

14   stomach on the couch in an effort to restrain him.

15   Q.   Does this pose a risk of harm?

16   A.   It poses a significant risk of harm, the potential for

17   death by asphyxiation.  This is equivalent to a prone

18   restraint, which all the literature shows is a highly dangerous

19   and often lethal form of restraint.

20   Q.   And did this staff member have anything in his personnel

21   file indicating a risk?  I would refer you to page 49578 in

22   reference to my question.

23   A.   Yes.  In 2007, the employee allegedly grabbed a resident

24   by the neck and forcibly sat him down two different times in

25   the training area.  That investigation was unsubstantiated.

Osgood - Direct

1        MS. COON:  The United States would move Exhibit 45

2   into evidence.

3        THE COURT:  It's received under seal.

4       (Plaintiff's Exhibit 45 received in evidence under seal.)

5   Q.  Moving on to Exhibit 46, do you recognize this exhibit,

6   Ms. Osgood?

7   A.  Yes, I do.  It's an investigation into child abuse.

8   Q.  And what happened here as indicated by Exhibit -- excuse

9   me -- 46?

10  A.   In this instance, the client and the staff member got into

11  an altercation.  The staff member scratched the child's chest,

12  twisted his arm, and tried to force him to go to another

13  residence.

14       MS. COON:  The United States would move Exhibit 46

15  into evidence.

16       THE COURT:  Received under seal.

17      (Plaintiff's Exhibit 46 received in evidence under seal.)

18  Q.  Moving on, I would like you to look at Exhibits 47 and 48,

19  Ms. Osgood.  Do you recognize these exhibits?

20  A.  Yes, I do.  They are investigations into child abuse.

21  Q.  And I know these are lengthy documents, but if you could

22  just take a moment and give us a brief summary of what happened

23  as indicated by these two documents.  And I can refer you to

24  particular pages, but I think what we would like to get first

25  is the summary of the events as indicated by the documents.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1   A.   In the first incident, a young man while visiting with his

2   mother made a statement to his brothers in the car after one of

3   them had fell and said, "Ha-ha, you little itty-bitty baby.

4   You got what you deserved."  The mother at this point stated

5   that this was not typical language that her son -- her son

6   used, and asked him where he had heard this.  And the young boy

7   told his mother that he was referring to an employee at Conway.

8   And after further questioning, the child indicated that this is

9   said to him when this employee hits him.

10       He was examined in the clinic for evaluation, and a bruise

11  was found on his left arm.  The young boy told his mother that

12  the staff member called him names and hit him every day.  The

13  allegation was not substantiated based on uncredible evidence.

14  Q.   What information did the facility have regarding this

15  staff member?  I would ask you if you could refer to pages

16  55751 and 55752.

17  A.   At this point, the employee had received multiple forms of

18  discipline.  These included failure to complete assigned duties

19  in an efficient manner, and a written warning was given with

20  disciplinary points.  About five months later, he was given a

21  suspension after failure to complete assigned duties in an

22  efficient manner.  The following year, he was found to be

23  engaging in conduct which may be injurious to the department or

24  which interferes with the efficient operations, damages the

25  reputation of the Department of Human Services, or interferes

Osgood – Direct

1    with the department's ability to serve consumers and the

2    public.  He again received a disciplinary action.  And later

3    there in 2008, he was found to -- he was found failing to

4    comply with standard operating procedures and practices, and

5    again was disciplined.

6    Q.   Did he have any other abuse allegations?

7    A.   He did.  In 2008 he had two.  In one of them, he had

8    allegedly grabbed a client by the shirt collar, dragged him

9    into the day room from the patio, and forcibly shoved him into

10   a chair.  That was unsubstantiated.  He also allegedly grabbed

11   a client by the neck while behind him, put him into a headlock,

12   and forcefully drug him away lifting his feet off the ground.

13   That also was unsubstantiated.

14   Q.   Moving on to Exhibit 48, which we also have before us, is

15   this exhibit related to the prior exhibit?

16   A.   Yes, it is.  It involves the same young man and the same

17   employee.

18   Q.   And what's the timing on this second exhibit in the

19   series?  I would direct your attention to page 3 or 54768 in

20   the first two paragraphs.  I apologize.  Those paragraphs don't

21   actually indicate the answer to my question.  But if you do

22   know, how much later was this incident in relation to the

23   incident in the previous exhibit?

24   A.   This was less than three months later, less than three

25   months.  And in this particular example, the young man -- and,

Osgood - Direct

1    again, the same young boy had gotten out of the bed to go to

2    the bathroom.  And when he did this, the staff member noticed

3    red marks on the side of the young man's face.  And when the

4    staff asked what happened, the young man said, "This employee

5    did this to me."

6    Q.   And what had the employee done?

7    A.   The employee had placed the young boy in a papoose board

8    and had stepped on his face.

9    Q.   And did the boy suffer injuries from that?

10   A.   Yes.  Yes.  He had reddish purple stripes across his left

11   cheek up towards the left eye and down on to the left chin side

12   of the face.  And it was noted by the examiner, "Looks like the

13   imprint of a sole of a tennis shoe."

14   Q.   And are those indicated at pages 54785 and 86?

15   A.   No.  This was -- could you reverse?

16   Q.   Was this the boy who was the victim of that incident at

17   54786?

18   A.   This is the same young man we had been speaking about in

19   the previous exhibits.

20   Q.   Do you know whether this boy continued to be subject to a

21   plan that permitted use of a papoose board --

22   A.   Yes, he did.

23   Q.   -- after this incident?

24   A.   Yes, he did.  And it's generally accepted that prior to an

25   individual being placed in restrictive types of positions or

Osgood - Direct

1    devices, that their psychological well-being be evaluated to
2    see if that is appropriate.  This would include, for instance,
3    determining whether women or men, for that matter, boys or
4    girls, have been sexually abused, and placing them in --
5    restricting them in positions such as lying down and stopping
6    their ability to move and free themselves can be extremely
7    traumatic for these individuals who have already been victims
8    of abuse.  In this particular case, this young boy had
9    obviously witnessed, experienced a significant event of abuse
10   when a man stepped on his head while he was restraining him to
11   the papoose board.  It would have been appropriate for the use
12   of a papoose board to cease from being used with this young
13   man.

14   Q.   But it wasn't?

15   A.   No.

16   Q.   Related to these two exhibits, I'd also like you to look
17   at Exhibits 55 and 62.  Do these investigations involve the
18   same staff person who had been found to have stomped on the
19   face of a youth in a papoose board?

20   A.   Yes, they do.

21   Q.   And just briefly, what alleged incidents do these two
22   exhibits involve starting with Exhibit 55?

23   A.    In this instance, it was alleged that the victim was
24   pulled by the staff member by his shirt on the patio and
25   forcibly shoved into a chair.  And in 56 --

Osgood – Direct

1    Q.   Do you mean 62?

2    A.   Excuse me.  What was the second one?  I'm sorry.

3    Q.   62.

4    A.   62.  In this instance, this same staff person grabbed the

5    resident around the neck from behind placing him in a headlock

6    and lifting his feet off of the ground and he drug him to the

7    sofa in the day room.

8    Q.   Were either of these two allegations substantiated?

9    A.   No, they were not.

10   Q.   I'd like to direct your attention within Exhibit 62 to

11   page 53012.  So the alleged perpetrator did not have a

12   substantiated finding here, but what happened to the reporting

13   staff member?

14   A.   The reporting staff member had four weeks on the job.  And

15   according to this document, a written warning was given to him

16   for violation of the DHS policy instructing him to -- with

17   failure to perform assigned duties in the efficient and

18   productive manner, late reporting of a maltreatment allegation.

19   Q.   So do Exhibits 47, 48, 55 and 62 illustrate any of your

20   opinions regarding abuse and neglect?

21   A.   Yes.

22   Q.   How so?

23   A.   That they remain problematic at Conway.

24        MS. COON:  The United States would move to admit

25   Exhibits 47, 48, 55 and 62.

Osgood – Direct

1          THE COURT:  Received under seal.

2          (Plaintiff's Exhibits 47, 48, 55 and 62 received in

3     evidence under seal.)

4     BY MS. COON:

5     Q.   Ms. Osgood, I would like to direct your attention to

6     Exhibit 50.  Do you recognize what this exhibit is?

7     A.   Yes.  This is an investigation into physical abuse.

8     Q.   And what is indicated by this exhibit, particularly the

9     synopsis on page 50083?

10    A.   This is not a terribly complete synopsis, but indicates

11    that a staff member caused marks on a consumer's neck, arms,

12    shoulders, and legs.

13    Q.   Do you have any other information about the incident that

14    occurred as reflected in this exhibit?  I would also refer you

15    to page 50092.

16    A.   The findings in this investigation show that upon

17    examination the victim was found with multiple injuries that

18    were determined to be caused by a broken clothes hanger.

19    Q.   What kinds of injuries were caused?

20    A.   To the left shoulder, there's a whelp noted by -- as three

21    and a half inches by three-quarter-inch.  On the left upper

22    arm, two whelps measuring two and a half inches by

23    one-quarter-inch wide were found; a faint whelp to the left

24    upper arm by one and a half inches by one-eighth-inch; a left

25    back faint mark measuring one and a half inches by

Osgood – Direct

1      one-eighth-inch, one inch by one-half-inch wide, one inch by

2      one-quarter-inch wide, and three-quarter-inch by one-quarter

3      wide.

4           The mid upper back, a whelp measuring seven inches by

5      one-fourth, and one and one-fourth-inch by one-half-inch whelp.

6      At the base of the neck, there were faint marks noted measuring

7      one and a half inches by one-quarter.

8           Right shoulder whelps include one measuring two and three

9      quarter inches by one-quarter wide, three inches by one-quarter

10     wide, three and a half inches by one-quarter wide, and a four

11     and a half inch by one inch wide.

12          On her upper right arm, whelps were noted measuring two

13     inches by a quarter-inch wide, and two and a half inches by a

14     quarter-inch, and two inches by one-quarter-inch wide, two and

15     a half inches by one-half-inch wide, two inch by

16     one-quarter-inch wide.

17          On the right forearm noted is a one and one-half-inch by

18     one-quarter-inch whelp.

19          A chest whelp measuring seven inches by one-quarter-inch,

20     and one and one-quarter-inch wide by -- this is illegible.  I

21     don't know if it's one inch.

22          A right buttock mark measuring four inches by

23     one-half-inch wide, a right anterior thigh whelp at one and

24     one-half inches by one-quarter-inch wide, and one and

25     three-quarter by one fourth inch wide.

Osgood – Direct

1      Bruises were noted to the left upper arm one inch by

2   three-quarter-inch.  Left back, two bruises measuring

3   three-quarter-inch by three inch -- by three foot and four

4   inches each.

5      Right back bruises measuring three and a half inches by

6   eight-tenths of an inch.  A right upper arm bruise, three

7   bruises measuring two inches by one inch, three inch by

8   quarter-inch, and one inch by one inch.  Right forearm bruises

9   measuring two and a half inches by one and a half inch.

10  Q.   Who caused these injuries?

11  A.   Staff.

12  Q.   Had the staff previously been terminated for abuse?  And I

13  would refer you to page 50091.

14  A.   Yes.  In 2005, this staff member was terminated for abuse

15  of a resident.  In that matter, allegedly the staff member had

16  sat on a resident in 32 Poplar and had pressed the resident's

17  face into the couch.  During the medication -- during the

18  mediation of her termination, it was agreed if she took and

19  passed a polygraph exam, she would be returned to work.  A

20  polygraph was administered by S. Whittington Brown on

21  November 8, 2005, and the employee passed this exam.  There was

22  no evidence of deception when she denied sitting on a resident

23  and pressing her face into the couch.

24  Q.   Is this exhibit reflective on your opinions regarding

25  abuse and neglect?

Osgood - Direct

1    A.    Yes, it is.

2    Q.    How so?

3    A.    Ongoing and pervasive issues of abuse and neglect

4    oftentimes with repeat offenders.

5         MS. COON:  The United States would move to admit

6    Exhibit 50.

7         THE COURT:  Received under seal.

8         (Plaintiff's Exhibit 50 received in evidence under seal.)

9    BY MS. COON:

10   Q.    Have you seen other instances in which staff have abused

11   residents with an object?

12   A.    I believe that I have.

13   Q.    I would like to show you Exhibit 2015.  Do you recognize

14   what type of document this exhibit is?

15   A.    This is an investigative report into physical abuse.

16   Q.    And what happened as indicated by this exhibit?

17   A.    In this exhibit, a gentleman was found with a bruise.  And

18   upon further inspection, it was determined that a belt located

19   near the room was the cause of the injury.  The belt -- a

20   buckle had the exact same measurements and design that of the

21   injury.

22   Q.    And who caused these injuries?

23   A.    Staff.

24   Q.    And is this the first time that this particular victim has

25   been the victim of abuse or neglect?

Osgood - Direct

1    A.    No.   Actually he's been a victim on a number of occasions.

2    Q.    Are those occasions indicated at least in part on pages

3    29055 and 29056?

4    A.    Yes.   In 2003, it was alleged an employee allowed the

5    resident to go out of bounds from home only wearing his long

6    pants.   In 2004, staff failed to maintain enhanced supervision

7    and the resident went out of bounds.   That was substantiated

8    and that staff member terminated.   In the first instance, it

9    was unsubstantiated.   2004, an employee failed enhanced

10   supervision and the resident went out of bounds from the home.

11   That was substantiated and the employee terminated.   2007, an

12   employee straddled resident with his feet picking him up from

13   the floor and dropped him.   The employee also made

14   disrespectful comments about the consumer.   This was

15   substantiated and the employee was terminated.

16        Again in 2007, an employee allegedly grabbed the resident

17   by the neck and sat him down in a chair two times within ten

18   minutes.   That was unsubstantiated.   2007, two employees

19   allegedly left the client unattended in the back hall strapped

20   in a recliner naked and covered with a blanket.   That was

21   substantiated.   Both employees were terminated.   2007, employee

22   allegedly pushed on the side of the resident's face using his

23   forearm.   This was unsubstantiated.

24        2008, employee allegedly failed his enhanced supervision

25   assignment of the resident and the resident left the home, and

Osgood – Direct

1    was discovered in the kitchen area of another home on grounds;

2    substantiated and the employee was terminated.  2008, employee

3    allegedly grabbed the client around the neck behind him, put

4    him in a lockhold, and forcefully drug him away lifting his

5    feet off the ground.  This was unsubstantiated.

6         2008, the employee allegedly failed enhanced supervision

7    assignment.  The client was found outside the residence

8    unattended.  This was unsubstantiated.  2009, an employee

9    allegedly grabbed their jacket away from the resident when he

10   was found chewing on it and then slapped him on the hands.

11   Employee was -- allegation was substantiated, and the employee

12   was terminated.

13   Q.  Is it a sufficient administrative response to staff who

14   engage in abuse and neglect to terminate the offending staff

15   member?

16   A.  It's an appropriate response to terminate them when all

17   indication indicates that the allegations are substantiated.

18   It is not enough to do so if you have recurring incidents of

19   abuse and neglect.  In here I would refer back to the analyses

20   of abuse and neglect incidents where they are occurring, who

21   are the frequent alleged perpetrators, who are the frequent

22   victims, where is it occurring, what types of incidents are

23   occurring, who are reporting these types of incidents, what

24   shifts they are occurring on.  A variety of levels of analyses

25   need to occur in order to really get a handle on reducing the

Osgood – Direct

1    abuse and neglect.

2    Q.   And is Conway engaged in that kind of analysis?

3    A.   No, it is not.

4            MS. COON:  The United States would move to admit 2015.

5            THE COURT:  Received under seal.

6        (Plaintiff's Exhibit 2015 received in evidence under

7    seal.)

8    BY MS. COON:

9    Q.   I'd like to draw your attention to Exhibit 51, Ms. Osgood.

10   Do you recognize what this exhibit is?

11   A.   It is an investigative report into physical abuse.

12   Q.   And briefly what does this exhibit indicate happened?

13   A.   In this instant, an employee hit a client in the chest

14   with a musical keyboard and told him to get away from him.

15   Q.   And did you have any other information about the reporting

16   staff and the perpetrator of this incident?

17   A.   With respect to the reporting witness?

18   Q.   Yes, and the relationship between the perpetrator and the

19   reporting witness in terms of the interaction that occurred

20   before the report.  Is that indicated on page 53169,

21   particularly in paragraph 5?

22   A.   Yes.  In this incident when the alleged perpetrator was

23   identified, when she realized that she was seen doing this, she

24   stated to the other employee, "You did not see this."

25   Q.   What, if anything, does that indicate about abuse

1    reporting?

2    A.    That there's an effort by staff to conceal incidents of

3    abuse.

4           MS. COON:   The United States would move to admit

5    Exhibit 51 into evidence.

6           THE COURT:   Received under seal.

7       (Plaintiff's Exhibit 51 received in evidence under seal.)

8    BY MS. COON:

9    Q.    Moving on to Exhibit 52, do you recognize this exhibit?

10   A.    Yes.   This is an investigative report into physical abuse.

11   Q.    And briefly what does this exhibit indicate?

12   A.    In this instance, the consumer was in the infirmary and

13   the nurse there saw a staff member hit the resident on top of

14   his hands as she took her jacket away from him.

15   Q.    And was this allegation of abuse substantiated?

16   A.    Yes.

17   Q.    And does this provide another example of your opinion

18   regarding abuse and neglect?

19   A.    It does.

20          MS. COON:   The United States would move to admit

21   Exhibit 52 into evidence.

22          THE COURT:   Received under seal.

23      (Plaintiff's Exhibit 52 received in evidence under seal.)

24   Q.    Moving to Exhibit 54, if you look at page 49406 -- first

25   of all, do you recognize what this exhibit is?

Osgood – Direct

1    A.   Yes, it's an investigative report into physical abuse.

2    Q.   And if you look at page 49406, what is indicated with

3    regard to abuse and neglect by this exhibit?

4    A.   In this incident, an employee was seen hitting a consumer

5    who was in a wheelchair, hitting him in the chest with his

6    fist.

7    Q.   Was it significant that the victim was in a wheelchair?

8    A.   Yes.  While abuse should not happen to anyone, causing

9    this type of injury or abusive act to a person in a wheelchair

10   can be interpreted as even more outrageous than their abuse

11   just because of their inability to defend themselves.

12        MS. COON:  The United States would move to admit

13   Exhibit 54 into evidence.

14        THE COURT:  Received under seal.

15        (Plaintiff's Exhibit 54 received in evidence under seal.)

16   BY MS. COON:

17   Q.   Moving on to Exhibit 56, do you recognize this exhibit?

18   A.   Yes.  It's an investigative report into the physical

19   abuse.

20   Q.   And what happened in this particular instance?

21   A.   An employee slapped a resident on the left side of his

22   face after the resident had hit the employee in the nose with a

23   magazine.

24   Q.   And does this exhibit provide any further illustration of

25   your opinion regarding abuse and neglect?

Osgood - Direct

1    A.   Yes, it does, further supports.

2            MS. COON:  The United States would move to admit

3    Exhibit 56.

4            THE COURT:  Received under seal.

5        (Plaintiff's Exhibit 56 received in evidence under seal.)

6    BY MS. COON:

7    Q.   Have you also seen instances of residents at Conway being

8    subjected to verbal abuse?

9    A.   Yes, I have.

10   Q.   Have you seen that in your review of documentation?

11   A.   Yes, I have.

12   Q.   Is one example indicated on Exhibit 53?

13   A.   In this instance, a staff member began cursing a resident

14   after he had soiled himself and had threatened to hit him if he

15   had hit another consumer.

16   Q.   And is this exhibit reflective of your opinions regarding

17   abuse and neglect?

18   A.   Yes, it is.

19           MS. COON:  The United States would move to admit

20   Exhibit 53 into evidence.

21           THE COURT:  Received under seal.

22       (Plaintiff's Exhibit 53 received in evidence under seal.)

23   BY MS. COON:

24   Q.   I'd like to show you Exhibit 57, Ms. Osgood.  Do you

25   recognize what this exhibit is?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    A.    Yes.  This is an investigative report into physical abuse.

2    Q.    And what happened as indicated by Exhibit 57?

3    A.    That a consumer became involved in an altercation with a

4    staff member, the staff member in turn struck the consumer in

5    the right temple area of his face three times, and the consumer

6    received injury to his shoulder during the same altercation.

7    Q.    I'd like to refer you to page 49439 of this exhibit and

8    ask you to look at paragraphs 3 and 2.  I say them in that

9    order because 3 comes before 2 on the page.  I'd like to ask

10   you if this part of the exhibit provides any illustration of

11   your opinions regarding abuse and neglect reporting?

12   A.    Yes.  In this instance, reporting -- the reporting witness

13   had reported late and he had indicated that he had not worked

14   with the alleged perpetrator very much, and that he was

15   intimidated by him, that he was shocked by what he had seen,

16   and he was guessing, questioning himself whether he had

17   actually seen what he thought he had seen.  In turn, the

18   administration took action against the reporting witness and

19   issued a written warning for violation of a policy addressing

20   the timely reporting.  The reporting witness in this is -- it's

21   worth mentioning is also commended within this paragraph for

22   his honesty and truthfulness in coming forward with his witness

23   and knowledge of the incident, but did not do so until the

24   following day, and therefore the written warning was issued to

25   him.

1    Q.   Does this reflect on your opinion regarding abuse and

2    neglect reporting?

3    A.   Yes, it does.

4         MS. COON:   The United States would move to admit

5    Exhibit 57 into evidence.

6         THE COURT:   Received under seal.

7         (Plaintiff's Exhibit 57 received in evidence under seal.)

8    BY MS. COON:

9    Q.   I'd like to show you Exhibit 58.  Do you recognize what

10   Exhibit 58 is?

11   A.   Yes, I do.  It's an investigative report into physical

12   abuse.

13   Q.   And was this allegation substantiated?

14   A.   Yes, it is.

15   Q.   And what happened in this incident as indicated by the

16   substantiated investigation at Exhibit 58?

17   A.   In this incident, a staff member grabbed a woman by the

18   neck and shoved her into her room.  And the alleged perpetrator

19   took a blanket or comforter away from the victim saying it's

20   one of the things that can be done to -- in order for her to

21   behave.

22   Q.   Is that appropriate --

23   A.   No.

24   Q.   -- behavior management?

25   A.   No.

Osgood – Direct

1    Q.   So does this exhibit reflect on your opinions regarding

2    abuse and neglect?

3    A.   It does.

4         MS. COON:   The United States would move to admit

5    Exhibit 58 into evidence.

6         THE COURT:   Received under seal.

7         (Plaintiff's Exhibit 58 received in evidence under seal.)

8    BY MS. COON:

9    Q.   I would like you to look at Exhibit 59, Ms. Osgood.  Do

10   you recognize what this exhibit is?

11   A.   It is an investigative report into physical abuse.

12   Q.   And was the physical abuse substantiated here?

13   A.   Yes, it was.

14   Q.   And what happened as indicated by this exhibit?

15   A.   An employee pushed a resident down on to the floor in the

16   day room.

17   Q.   And if I could also ask you to look at page 54954 and ask

18   you if there's anything significant about who reported the

19   incident?

20   A.   Yes.  The reporting witness had one month on the job.

21   Q.   So does this exhibit reflect your opinions regarding abuse

22   and neglect?

23   A.   Yes, it does.

24         MS. COON:   The United States would move to admit

25   Exhibit 59 into evidence.


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

1    THE COURT:  Received under seal.

2    (Plaintiff's Exhibit 59 received in evidence under seal.)

3    BY MS. COON:

4    Q.   I'd like to show you Exhibit 60.  Do you recognize what

5    Exhibit 60 is?

6    A.   Yes.  It's an investigative report into verbal abuse.

7    Q.   And if I could direct your opinion to page 55829.  Is

8    there anything significant about who reported the allegations

9    in this case?

10   A.   The reporting witness had worked at Conway for three

11   months.

12   Q.   Is Exhibit 60 reflective of your opinions regarding abuse

13   and neglect?

14   A.   Yes.

15   MS. COON:  The United States would move to admit

16   Exhibit 60 into evidence.

17   THE COURT:  It's received under seal.

18   (Plaintiff's Exhibit 60 received in evidence under seal.)

19   MS. COON:  We are coming down the home stretch with

20   the exhibits.

21   THE COURT:  What's that?

22   MS. COON:  We are coming down the home stretch with

23   the exhibits in case anyone was wondering.

24   THE COURT:  Good.  I was hoping we were coming down

25   the home stretch on the exhibits.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood – Direct

```
1   BY MS. COON:
2   Q.   We have another one, Exhibit 61, that I would like to
3   direct your attention to, Ms. Osgood.  Do you recognize what
4   kind of document Exhibit 61 is?
5   A.   Yes, investigation, investigative report.
6   Q.   And what does Exhibit 61 indicate happened?
7   A.   That while at the Conway Radiology Consultants, it was
8   reported that a staff member stepped on the right hand of a
9   consumer while there in the waiting room when the consumer was
10  agitated.
11  Q.   And was the abuse in this case substantiated?
12  A.   Yes, it was.
13  Q.   And if I could direct your attention to 50449 and ask you
14  if there is anything significant about who reported the abuse
15  in this case?
16  A.   Yes.  The employee had just two months on the job.
17  Q.   And so is Exhibit 61 reflective of your opinion on abuse
18  and neglect?
19  A.   Yes, it is.
20       MS. COON:  The United States would move to admit
21  Exhibit 61 into evidence.
22       THE COURT:  Received under seal.
23    (Plaintiff's Exhibit 61 received in evidence under seal.)
24  BY MS. COON:
25  Q.   Ms. Osgood, do these exhibits that we've gone through
```

Osgood – Direct

1    illustrate your opinions regarding abuse and neglect generally?

2    A.   Yes, they do.

3    Q.   And, again, how do they exhibit your opinion with regard

4    to abuse and neglect?

5         THE COURT:  I think any time you ask a question that

6    begins with "again," you probably are repeating, and we don't

7    need to do that at this time of the day.  I've followed -- I've

8    looked at every exhibit.  I know what she said about her

9    general opinions.  I know what she said about each exhibit.  So

10   we really don't need it again.

11        MS. COON:  Then you wouldn't like my next question

12   which was going to be a summary of her opinions.

13        THE COURT:  If that's your last question, I'll let you

14   ask it.

15        MS. COON:  That is my last question.

16        THE COURT:  You want to summarize your opinions,

17   Ms. Osgood?

18        THE WITNESS:  Sure.

19        THE COURT:  Fire away.

20        THE WITNESS:  All right.  My findings after doing the

21   review and assessment of Conway is that individuals are not

22   protected from harm, and either experience recurring or serious

23   harm in frequent fashion, and that has not declined in severity

24   in the last several years.  The systems that they have in place

25   to both identify individual's needs with respect to protection

Osgood - Direct

1     from harm do not adequately do so and lack the preventive

2     components necessary to effectively protect individuals.

3     Likewise, the systems surrounding the responses to harm which

4     do occur, and -- those also are lacking as I mentioned with

5     respect to the various incident review committees, both at the

6     unit level and broader facility level.

7          The quality management part -- department is monitoring

8     some facility outcome data, but it is largely built around

9     compliance regulations.  And just to reemphasize, the

10    compliance regulations speak to whether or not the state can

11    maintain funding to continue services at Conway through the

12    Medicaid program.  Those are not always comfortable with

13    generally accepted standards of practice.  And those standards

14    are two decades old.

15         With respect to consumers' rights, infrequent and

16    pervasive ways individuals are subjected to restrictive

17    interventions that are not -- are not in line with generally

18    accepted standards of practice.  But these systems that are in

19    place to review the efficacy of plans and whether or not

20    restraint is the appropriate intervention strategy are not in

21    place.  That is critical in ensuring the safety of individuals

22    living there as seen by some of the restraint injuries.

23         We just closed with abuse and neglect.  And based on the

24    examples presented here as well as other examples that I

25    believe were supplemented in my report, there is serious harm

Osgood - Direct

1    and especially with children.  The harm to children is

2    especially troublesome here.  And children being subjective to

3    restraint practices is very troubling as well.  That is, across

4    the country, the removal of restraints with children and

5    adolescents is becoming the standard.

6         MS. COON:  Thank you very much for your testimony,

7    Ms. Osgood.

8         THE COURT:  All right.  Thank you, Ms. Coon.

9      Mr. York, I have a suspicion your cross might take awhile.

10   What do you think?

11        MR. YORK:  Your Honor, I think it's probably at least

12   two hours.  That's my best estimate right now until --

13        THE COURT:  I think everybody is tired, so I think

14   we'll recess for the evening.  And I'm going to -- I'm going to

15   propose a tentative schedule.  And we need to talk about

16   scheduling and some other things.  If everybody is comfortable,

17   we'll do that right now.  If you need a little recess and then

18   come back and talk about the housekeeping, we can do that, too.

19   Is everybody ready to go, or do we need to take a brief recess?

20        MR. YORK:  I'm ready to go.

21        MR. DONNELLY:  We're ready to go.

22        THE COURT:  What I'm going to propose as a schedule

23   would be Monday through Thursday from 9:00 to 1:00 and 2:00 to

24   6:00.  It's a little longer than we would normally go in a day,

25   but I am concerned about the length of the trial.  And I have a

Osgood – Direct

1    two-week criminal trial that's scheduled immediately after the

2    last day that we have set aside for this.  And so it's -- you

3    know, I do need to get through.  And then on Friday I would

4    propose that we start at 8:30 and quit at 4:00.  And I know

5    that you all want to be able to get home at least some of the

6    weekends.  Would that accommodate your needs to be able to

7    travel?

8           MR. DONNELLY:  I believe so, Your Honor.  I'm speaking

9    for the United States.  We haven't actually checked on the

10   weekend flights.  I assume so --

11          THE COURT:  If you check on it and it turns out that

12   doesn't work, we'll see what we can do to accommodate you.

13          MR. YORK:  And I think 4 o'clock, Your Honor, probably

14   would work or it's very close to working.  Maybe another half

15   an hour might make a difference.

16          THE COURT:  All of these times are going to be

17   flexible, or at least the end times are flexible, because I

18   don't necessarily quit -- like tonight, we didn't quit at

19   5 o'clock because it seemed we were going to get through if we

20   go a little longer, and that was true.  And, you know, we won't

21   necessarily quit directly at 6:00.  But on Fridays, if you have

22   flights to catch and you need to leave, we need to make it 3:30

23   or 3:45, I'll work with you.  We'll make it possible for you to

24   be able to go home and see your families and do the other

25   things that you have to do besides this.  So let's do that.

Osgood - Direct

1       Let's plan on that as the schedule.  And if someone has an
2    objection to any part of the schedule and you think it's overly
3    ambitious and doesn't work, let me know.
4           Now, let me talk about exhibits a little bit.  We're going
5    to have bookcases brought up here on either side, four
6    bookcases for me to shelve these notebooks in so I can get to
7    them without having to go through boxes during the middle of
8    trial, which I know is distracting.  And it'll be a lot more
9    convenient.  So if we can get these boxes moved out of the way,
10   we'll put two bookshelves over here tonight, two bookshelves
11   over here tonight.  And then if you can get somebody to work
12   with Mr. Alarcon and get your exhibits organized.  We don't
13   have to do that tonight.  We can do that in the morning before
14   trial starts.  We can get them put up and organized.  And that
15   will make it easier for me to keep up with what you're doing.
16   And I do appreciate having the documents on the screen, but I'm
17   a paper guy.  You can see by my gray beard that I'm really old
18   and I predate the technology age.  And so I'm more comfortable
19   looking at paper.  And it also lets me get a sense of the
20   exhibit as a whole as opposed to what's just on the screen.  So
21   I may look at the exhibits as we're going through them.
22        Do you have a sense of how long you're going to take with
23   your case in chief?
24           MR. DONNELLY:  Four weeks, and that's four to five.
25           THE COURT:  You know -- and I'm going to tell you

1    that, I want us to get all of the proof in that you need, but,

2    at the same time, I don't think that's really -- we have six

3    weeks set aside for this case and if you take four to five,

4    there's no way they can put on their defense in the amount of

5    time that we have left.  And most of the time in trials when

6    the plaintiff gets through, I mean, they use so many of the

7    same witnesses that the cross-examination brings out, and the

8    defendants don't need as much time to put on their case.  But

9    in this instance I don't think that's true.  I think that the

10   defense is going to need as much time as the plaintiffs do.

11       And so I want you to look at your witness lists really

12   hard and the things that you're doing and see if we can get it

13   down to three weeks on a side.  If we don't, we've got a

14   problem.  We may have to go six weeks and break, and it'll be

15   sometime next spring before I can give you more time.  And

16   that's really not a feasible, practical way to try this case.

17   We need to get all of the evidence in in the six weeks.  And if

18   it turns out that we have to go on weekends and have night

19   court, I'm -- I don't like to do that and I don't want to

20   impose that on you, but whatever we need to do in order to get

21   the evidence in.

22       When we had -- when this case was initially transferred to

23   me, we had the pretrial conference and you all told me that you

24   thought the case would take four to six weeks, so we set aside

25   six weeks, and that's how much time we have.  So I very much,

Osgood – Direct

1    very much encourage you to see what you can do to streamline

2    your case and make sure that we can get it all in and both

3    sides have an equal amount of time to put on their case and get

4    it done in six weeks.

5        Is there anything else we should take up, can take up, any

6    organizational housekeeping, pretrial type matters that we did

7    not take up this morning that we ought to take up now?

8            MR. DONNELLY:  I just have a quick question on the

9    summary exhibits that we tried to --

10           THE COURT:  Yeah, the summary exhibits.  What I would

11   like for you to do, Mr. York, apparently the underlying

12   documents are records that have been produced by the defense

13   and then referenced in the report by Ms. Osgood.  And I have a

14   suspicion that all of that is going to come back around as

15   Exhibits 24 through 36.  And I would be grateful if you all

16   would designate someone on your team to review the underlying

17   documents and the summaries, and, sometime between now and say,

18   Monday of next week, let us know whether or not they are

19   accurate.

20           MR. YORK:  I don't think there's any way possible,

21   Your Honor.  I mean, we were already way behind schedule

22   because of all of the motions that had to be filed, and we

23   didn't have any prep time.  It's just impossible.  We're barely

24   keeping up right now to try to come here and present the case

25   today.  I mean, I wish I could, but we're working every waking

Osgood – Direct

1    minute that we can expend to this.

2         THE COURT:  Okay.  At some point in time during the

3    trial, I think they are going to offer them.  And we can either

4    receive the summaries or we can just receive the documents.  I

5    mean -- and I think that it's going to be a lot more efficient

6    to receive the summaries if we can verify that they are

7    accurate.

8         MR. DONNELLY:  Your Honor, I apologize.  My hurry on

9    the summary exhibits is my witness that will help authenticate

10   them is currently staying outside, and she's someone who was

11   helping Ms. Yost from this morning.  She's one of the persons

12   who can lay the foundation for it, if that's necessary, if they

13   have objections.  So I would like to be able to have her come

14   on and use her after that, if that makes sense.

15        THE COURT:  If she comes and testifies and then she's

16   released from the rule, she can stay in.

17        MR. DONNELLY:  That's why I'm interested in having the

18   summary exhibits admitted sooner rather than later so that I

19   can have her in the courtroom.

20        THE COURT:  I understand.  And I'm also sympathetic

21   with Mr. York's complaint that they actually only received, I

22   think, the final version of them sometime earlier this week, I

23   think, is what he told me.  Got one set on August 26 and a

24   revised set a few days later, earlier this week.  Is that what

25   you said?

Osgood - Direct

1       MR. YORK:  We got some of them September 1st and we

2  got some even delivered to our hotel room yesterday.

3       THE COURT:  And there's a lot of information in

4  documents and records and they haven't had a chance to go

5  through them and verify them, and I can't really fault him for

6  that.

7       MR. DONNELLY:  Your Honor, I would just say that I

8  flagged this issue for Mr. York a couple of weeks ago.  And the

9  exhibits that we had talked about today have stayed the same

10  since the 26th.  It wasn't anything delivered yesterday with

11  the exception of one -- one of the exhibits.  So I'm not

12  assigning blame here, but I want to say that I did flag the

13  summary exhibits to him earlier.

14       MR. YORK:  Your Honor, I mean, that's just pretty

15  ridiculous.  We get a disc with some of the exhibits on it on

16  August 26.  They are already obviously late.  We get a revision

17  on September 1st.  And we still get more documents yesterday.

18  And we're supposed to drop everything else, all of our

19  preparation, to review their exhibits to cure their lateness.

20  That's not a fair representation or that's not a fair point to

21  make.

22       THE COURT:  Okay.  Well, let me -- I'm not going to

23  deal any more with it right now.  I've said what I've said.

24  And at the appropriate time, we'll try to get those in.  In the

25  morning, we'll have Ms. Osgood on cross-examination.  And then

Osgood – Direct

1    who do you have next after -- can you give us a little outline

2    for tomorrow and Friday?

3           MR. DONNELLY:  It should be -- and I've shared this

4    with defense counsel.  It's Judy Weaver and Sara Murphy, two

5    employees.  And then they should take most of the day tomorrow,

6    I believe.  And then there's a possibility that another expert

7    of ours, Tony Richardson, will come on late tomorrow and take

8    almost, I'm pretty sure, the whole day Friday.

9           THE COURT:  Then we know what the lineup is and we're

10   not going to get to those summaries the rest of this week.  I

11   know you want them in and I think eventually they are going to

12   come in, I do think they are going to come in.  So when you can

13   designate someone to sit down and go through them, I have to

14   think that somebody can do that.  And then verify that they are

15   accurate.  Otherwise, we're just going to receive the whole --

16   you know, we're going to receive a big volume of documents.

17   And I'm going to sit down and read them and try to determine

18   the sequence of events and you won't be there when I sit down

19   to do it to verify whether I got it right or not.

20          MR. YORK:  Your Honor, could they make the same

21   summaries in their posttrial filings and then we would have to

22   respond to it, of course, by then, but that would at least buy

23   us sufficient time for us to respond rather than just having a

24   few days in the middle of trial to respond?

25          THE COURT:  You all may be able to talk about it and

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    work out a way.  And that's a possibility that what we could do

2    is receive the underlying documents which I think everybody

3    agrees are authentic and admissible, and then reserve

4    introducing the summaries until sometime later on, but between,

5    you know, now and the time that I have to write an opinion and

6    rule on this case.  I mean, it seems to me that that proposal

7    from Mr. York is a reasonable one.

8         What do you think?

9         MR. DONNELLY:  That's fine with the United States,

10   Your Honor.

11        THE COURT:  All right.  Let's do it that way then and

12   then you can figure out when you need to introduce the

13   underlying documents, and if you're still going to need

14   Ms. Yost -- is that her name -- if you're going to need to keep

15   her under the rule or bring her in.

16        MR. DONNELLY:  Just to be clear on what I thought --

17   we were moving in all of the underlying exhibits and there's a

18   possibility I may still --

19        THE COURT:  What I understood Mr. York to propose and

20   what I've sort of restated was that he didn't propose admitting

21   the underlying documents, but that's the predicate for what he

22   did propose, which is that the summaries could be provided

23   after and posttrial filings and they could respond to them then

24   because then they'd have time to go through the documents and

25   confirm.  And if there's a dispute about the accuracy, I'll

Osgood – Direct

1    have the underlying documents in the record and so could also

2    see who is right in the event that there is a dispute, although

3    I don't think there will be because it's simply chronology from

4    what I saw.

5            MR. DONNELLY:  So it seems to me, Your Honor, the

6    summary exhibits are something that would be basically a

7    posttrial argument document?  Is that what we're --

8            THE COURT:  Right.

9            MR. YORK:  Right, to be incorporated into the trial

10   brief.

11           MR. DONNELLY:  Then it seems like I can release

12   Ms. Yost from the rule?

13           THE COURT:  You can release Ms. Yost from the rule.

14   We're going to agree that you can provide the summaries in your

15   posttrial filings, and, at some appropriate time, you can move

16   to introduce all of the underlying records so that we have the

17   basis for those summaries in evidence.

18           MR. DONNELLY:  And I'm assuming at some point you can

19   check whether or not you have an objection to the underlying

20   documents?

21           MR. YORK:  I don't believe we do have an objection to

22   the underlying documents.  I think we've already stated that.

23       But our point is, Your Honor, I just want to mention, it's

24   not just a matter of taking a little quote out of context and

25   putting it in there.  That might be accurate on its face, but

                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter

Osgood - Direct

1    it might be out of context.  And also we have -- in past

2    exhibits like this have seen some things that have been

3    misstated.

4            THE COURT:  I understand.

5            MR. YORK:  We're not doing this just to cause trouble.

6    We're doing this because we are deeply concerned that some of

7    this is going to be misinterpreted.

8            THE COURT:  I don't think you're doing anything just

9    to cause trouble, Mr. York, so you can relax about that.  I

10   think you're trying very hard to represent your client, and I

11   think that's what Mr. Donnelly and his team are trying to do,

12   too.  So you needn't apologize for making an objection.  I'm

13   just trying to figure out what's a way to handle it that's fair

14   to everybody and gives me the information that I need to make

15   an intelligent ruling and moves the case along as efficiently

16   as possible.

17           MR. DONNELLY:  So at some point tomorrow we can sort

18   of stand up and I'll say, I move in 26 through --

19           THE COURT:  I think that we have an agreement that

20   you're going to be able to move in 24 through 36, those are the

21   exhibit numbers as I recall, but not the summaries at this

22   time.  The summaries are not going to come into evidence, but

23   the underlying documents will come into evidence and you can

24   attach the summaries or include the summaries in your posttrial

25   filings.  And that gives Mr. York the time he needs to confirm

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Osgood - Direct

1    whether he thinks the summaries are accurate.  And that

2    provides me with the evidence on which I can judge in the event

3    there's a disagreement about the accuracy.

4              MR. DONNELLY:  Thank you.

5              THE COURT:  You're welcome.

6         Thank you, Mr. York.  I appreciate that suggestion.

7         Is there anything else we can do tonight or should do

8    tonight?

9              MR. DONNELLY:  Nothing.

10             MR. YORK:  I don't think so, Your Honor.

11             THE COURT:  We'll be ready to start in the morning

12   with cross-examination of Ms. Osgood at 9 o'clock.  And we'll

13   be here a little early to try to get the exhibits assembled,

14   and we'll have the bookcases in place.

15             MR. DONNELLY:  So you want us to move the boxes --

16             THE COURT:  Move those boxes back out of the way a

17   little bit.  We'll have the bookcases in place.  And I haven't

18   looked at your exhibits, Mr. York, but are they also in

19   binders?

20             MR. YORK:  No.  We just mentioned that among

21   ourselves, if you prefer them in binders --

22             THE COURT:  Well, I don't particularly care how they

23   are.  I just need to be able to access them readily rather than

24   having to go through -- shuffle through boxes that are stacked

25   up six high to find the right document.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

1            MR. YORK:  They are in individual folders, Your Honor.

2            THE COURT:  If so, then I can probably work with that.

3    But don't -- at this time don't go trying to put them in

4    binders.  It's too late in the game to impose that duty.  And

5    if they are in an accessible manner so that I can find them,

6    that's all I want.

7         Anything else?

8         We're adjourned.  See you in the morning.

9         (Proceedings adjourned at 5:25 p.m.)

10                    C E R T I F I C A T E

11      I, Judith A. Ammons, Official Court Reporter, do hereby

12   certify that the foregoing is a true and correct transcript of

13   proceedings in the above-entitled case.

14

15

16

17   /s/  Judith A. Ammons, RPR, CRR, CCR   Date: October 17, 2010
         United States Court Reporter
18

19

20

21

22

23

24

25


                    Judith A. Ammons, RPR, CRR, CCR
                     United States Court Reporter