5331

1               IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF ARKANSAS
2                      WESTERN DIVISION

3    UNITED STATES OF AMERICA,
               Plaintiff,
4    v.                              No. 4:09CV00033 JLH
     STATE OF ARKANSAS, MIKE BEEBE, Honorable  October 8, 2010
5    Governor of the State of Arkansas; JOHN    Little Rock, Arkansas
     M. SELIG, Director of the Arkansas         8:28 a.m.
6    Department of Human Services; JAMES C.
     GREEN, Ph.D., Director of the Arkansas
7    Division of Developmental Disabilities
     Services; CALVIN PRICE, Superintendent of
8    the Conway Human Development Center,
     in their official capacities only,
9               Defendants.

10                TRANSCRIPT OF COURT TRIAL – VOLUME 24
                  BEFORE THE HONORABLE J. LEON HOLMES,
11                   UNITED STATES DISTRICT JUDGE
     APPEARANCES:
12   On Behalf of the Plaintiff:
          MR. BENJAMIN O. TAYLOE, JR., Special Counsel
13        MR. CHRISTOPHER N. CHENG, Trial Attorney
          MR. MATTHEW J. DONNELLY, Trial Attorney
14        MS. JACQUELINE K. CUNCANNAN, Trial Attorney
          MS. LAURA L. COON, Trial Attorney
15        MR. VINCENT P. HERMAN, Trial Attorney
            U.S. Department of Justice, Civil Rights Division
16          950 Pennsylvania Avenue, N.W., Room 4300
            Washington, D.C. 20530
17
     On Behalf of the Defendants:
18        MR. THOMAS B. YORK, Attorney at Law
          MR. DONALD B. ZAYCOSKY, Attorney at Law
19        MS. CORDELIA ELIAS, Attorney at Law
            York Legal Group, LLC
20          3511 North Front Street
            Harrisburg, Pennsylvania 17110
21
          MS. LORI FRENO-ENGMAN, Senior Assistant Attorney General
22          Arkansas Attorney General's Office
            Catlett-Prien Tower Building
23          323 Center Street, Suite 200
            Little Rock, Arkansas 72201-2610
24
     Proceedings reported by machine stenography; transcript
25   prepared utilizing computer-aided transcription.


                    Judith A. Ammons, RPR, CRR, CCR
                    United States Court Reporter

5332

1                          **I N D E X**

2    WITNESSES FOR THE DEFENDANTS:   DIRECT   CROSS   REDIRECT   RECROSS

3    DOUGLAS CALLAHAN               5333    5351

4    SANDRA GARDNER                 5382

5    CYNTHIA JOHNSON                5386    5399    5443      5446

6    PATRICIA PARMLEY, M.D.         5448    5467    5481      5487

7

8

9

10

11

12

13   **EXHIBITS:**                                    **RECEIVED**

14   Plaintiff's Exhibits D-CA1 through D-CA6 ...............P.5471

15

16

17

18

19

20

21

22

23

24

25

                    Judith A. Ammons, RPR, CRR, CCR
                      United States Court Reporter

Callahan – Direct

1      (Proceedings continuing in open court at 8:28 a.m.)

2          THE COURT:  Everyone be seated.

3      Mr. York.

4          MR. YORK:  Morning, Your Honor.  Your Honor, we call

5   Douglas Callahan, M.D.

6          THE COURT:  Dr. Callahan, come forward and be sworn.

7      **DOUGLAS CALLAHAN, DEFENDANTS' WITNESS, DULY SWORN**

8                     DIRECT EXAMINATION

9   BY MR. YORK:

10  Q.   Good morning, Dr. Callahan.

11  A.   Good morning.

12  Q.   Could you state your full name and spell your last name

13  just for the record?

14  A.   Douglas Glenn Callahan, C-A-L-L-A-H-A-N.

15  Q.   And could you tell us what your role is at CHDC even

16  though I believe everyone in the courtroom probably already

17  knows?

18  A.   I'm the consulting psychiatrist there.

19  Q.   And how long have you served in that capacity?

20  A.   I started seeing some residents from there around 1990.  I

21  started going out on grounds full-time -- well, I was -- became

22  pretty well their exclusive psychiatrist, with some exceptions,

23  starting in 1995 when I began going on grounds to see people.

24  Q.   And can you describe for us your educational background?

25  A.   Well, I went to the University of Arkansas at Little Rock

Callahan – Direct

1    for college from -- Little Rock Central High School graduate,

2    National Merit Scholar.  I went to the University of Arkansas

3    Medical Sciences College of Medicine.  I was in the University

4    of Arkansas Veterans Administration, combined residency and

5    psychiatry.  That's basically my training.  If you want me to

6    go into my subsequent experience, I would be glad to.

7    Q.  Yes, that is my next question, if you would go over your

8    work experience, please.

9    A.  I initially worked on staff at the Veterans

10   Administration.  It was a little bit of an unusual situation

11   because I was actually a resident part of the time, but also on

12   staffs.  And for some reason they thought I was pretty good at

13   what I did.  And then subsequently moved to the Arkansas State

14   Hospital.  Worked there for approximately four years doing

15   inpatient work primarily with adults.  I also did some work

16   with adolescents on their adolescent inpatient unit there.  I

17   was a supervising psychiatrist or what they called a section

18   chief at the time, basically supervising one unit with around a

19   60-patient capacity.

20       At one point slightly under one year, I was the acting

21   medical director for the center supervising the other

22   psychiatrists there.  Did not want the regular position, so I

23   just remained in an acting capacity.  During that time also

24   starting in 1985, I was working on a part-time basis with the

25   mental health center Counseling Associates which is

Callahan – Direct

1      headquartered in Conway, but which has target clinics in

2      various other towns in a six-county area.

3           When I left from the Arkansas State Hospital in the middle

4      of 1989, I went to work full time with Counseling Associates,

5      which is a community mental health center, seeing outpatients

6      there.  The type of folk worked with in those settings both

7      before -- from 1985 on included, you know, children, adults,

8      chronically mentally ill folk, and a variety of different kind

9      of situations.

10          At one time point -- I don't have the date right off the

11     top of my head -- I was their medical director, I believe, for

12     around two years, maybe in '96, '97, somewhere in that neck of

13     the woods, supervising eight other psychiatrists.  I remained

14     with them until 2001 when basically I went out doing full-time

15     work with the developmentally disabled population, human

16     development centers, a couple of community programs, things of

17     that nature.  I still have an affiliation with Counseling

18     Associates, but I do all of my work out -- going to different

19     locations rather than in the office there.

20     Q.   Doctor, how many years of experience do you have working

21     with the developmentally disabled?  Would you describe that for

22     me?

23     A.   Well, I first started seeing developmentally disabled

24     people when I was working at the State Hospital and at the

25     Community Mental Health Center -- probably goes back to 1985.

Callahan - Direct

1    Again, as I mentioned earlier, I started seeing -- there's some

2    folk in a community program that I still see to this day in

3    Conway that I started seeing in 1989.  And then, of course, a

4    little more recent than that is when I started seeing folk from

5    the Conway Human Development Center.  And I've expanded to go

6    to a couple of the other human development centers in the

7    state, plus some other experience; I've had a great deal of

8    experience with the population over the years.

9    Q.   How about, can you describe for me whether you've treated

10   both adults and children and to what extent you've treated

11   children in the past?

12   A.   Well, when you're in a community mental health system, you

13   pretty well -- it's not that common, especially years ago, to

14   have any child psychiatrists.  It's a little -- there's a

15   little bit more of that now than there used to be.  Later on in

16   the time I was with Counseling Associates, we did have a good

17   child psychiatrist that worked with us.  And he would usually

18   see the new child cases, and sometimes we would refer for

19   second opinions older or existing patients to him that --

20   again, I would estimate the kids was probably maybe 10 percent,

21   10 to 15 percent of my caseload in the community mental health

22   setting.  Probably a little smaller percentage, would be my

23   guess, as a general rule, at the CHDC until they consolidated

24   the children all up at Conway, which I believe was

25   around 2004, 2005.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan – Direct

```
 1    Q.   Doctor, have you ever made a referral to a child or
 2    adolescent psychiatrist in your work at CHDC?
 3    A.   Yes, not done it frequently, in part, because of access.
 4    We have had a couple of occasions more recently where we've
 5    done that; someone that had previous experience with a
 6    particular individual both on an inpatient/outpatient basis,
 7    and we requested an opinion from that person after she was
 8    admitted to us.  And then there was -- there's been another
 9    person that we referred to an inpatient specialty treatment
10    program at the Arkansas State Hospital.
11    Q.   Have you recently tried to refer an individual with the
12    initials of CB?
13    A.   Yes.
14    Q.   And what was the experience there?  What happened there?
15    A.   Well, there was some of the delay that tends to happen
16    when you're trying to get a referral in.  But after some issues
17    of coordination on their end, the person was seen.  The
18    physician that had seen her originally that I had hoped -- had
19    seen her as inpatient and outpatient, that was one of the
20    people I was referring to earlier -- apparently was not at the
21    medical center anymore.  One of the things that tends to happen
22    is people tend to move around and change positions a lot.  But
23    she was seen by one of their current child psychiatrists, and I
24    think probably more than one, or maybe a psychologist there,
25    too.  There's been some delay getting the report, even though I
```

Callahan - Direct

1   think that visit was back in August.  But the verbal report --

2   and I think there was sort of a handwritten note basically

3   agreeing with the approach that we were taking in terms of

4   treatment and the care she was getting, part of which was an

5   attempt to taper some of her medications that she was admitted

6   on.

7   Q.   Doctor, how many pediatricians are on staff at CHDC?

8   A.   Two.

9   Q.   And how do you work with them, if at all, to serve the

10  younger clients that you have?

11  A.   Well, when I'm out there, I'm physically in close

12  proximity to their physician's office -- just a few steps away.

13  Dr. Schultz and Dr. Parmley, P-A-R-M-L-E-Y, they both are there

14  most of the time when I'm there.  We communicate verbally, in

15  writing sometimes if there's specific issues, and by telephone

16  when I'm not there.  I see them and talk to them pretty much

17  every day I'm there as is true with the other primary care

18  physicians.

19  Q.   And do you consult with them on some of your psychiatric

20  treatment and care?

21  A.   Yes.  We talk about, you know, a lot of related issues to

22  that type of situation, what -- if there's a need for a

23  medication change, a lot of times even though I may write a

24  note recommending something, I'll hand carry it and explain to

25  them why I'm recommending something, typically based on either

Callahan – Direct

1    some immediate observation from me or information provided by

2    the psychological examiner, nursing staff, or folks of that

3    sort.

4    Q.   Doctor, there were some people who have testified here,

5    some of the plaintiff's experts, that you have some limited

6    contact with the interdisciplinary team.  Could you describe to

7    us what your role is with the interdisciplinary team and how

8    you communicate with them?

9    A.   Well, basically I consider myself, I'm a member of the

10   team, but I consult with them more than I am physically present

11   in the numerous meetings that they have.  Most of my input is

12   in writing.  That's not at all uncommon for consultants.

13   Again, I'm available for direct communication.  We sometimes --

14   we usually have at least a couple of members of the treatment

15   team come with the patient for the visit, typically a

16   psychological examiner and a member of the direct care staff.

17   We have some family members that come pretty much for every

18   visit when I see someone.  Sometimes a nurse or social worker

19   sits in.  I think we've had as many as six different members of

20   the treatment team present sometimes when I've seen patients

21   for a formal visit.

22   Q.   Dr. Holloway's claimed that you had told her you were not

23   a member of the treatment team.  Did you ever say that?

24   A.   I don't recall making that statement.  It doesn't sound

25   like something I would have said without clarification.  I

Callahan - Direct

1    think it might have been her interpretation based on the fact

2    that I don't sit in on every single team meeting.  And, again,

3    and I'm very open that I don't ordinarily attend team -- the

4    routine team meetings.  I did go to a staffing not very long

5    ago on one of the youngsters that lives there.  And I've made

6    it clear that I'm open to doing that if there's a particular

7    request or perception that I'm needed at that meeting.  But,

8    again, most often my input is verbal -- well, written to the

9    formal team process like when they are preparing their

10   individual program plans, but also through verbal interaction

11   with the primary care physicians, psych examiners, nursing

12   staff, and other team members.

13   Q.   Do you make recommendations to the IDT team that you

14   believe are reviewed by them, by the medical staff and by the

15   members of the team?

16   A.   I expect they are reviewed.  I do make those

17   recommendations on a routine basis both in writing as part of a

18   scheduled routine visit, and in writing sometimes in response

19   to a written question that comes up, and also sometimes

20   verbally.  If it's something very significant, usually I'll

21   document it in writing, but, for instance, if I'm called about

22   something, I'm probably not going to document that in writing.

23   But the person that I call may write a note saying, "Discuss

24   with Callahan about" so and so.

25   Q.   Do you discuss with the interdisciplinary team the

Callahan - Direct

1    possibility of decreasing the need for psychotropic drugs for

2    certain individuals?

3    A.    That's an ongoing issue with most of our folk.  We do have

4    a very few people where their past symptoms have been so

5    extreme and severe, or the family's been very firm about

6    preferring no reduction having seen perhaps adverse changes

7    when we have attempted reductions in the past.  But ordinarily

8    that's one of the key issues, especially since many of the folk

9    that are admitted are on multiple medications, especially among

10   the young people.  And typically what we're able to do is

11   reduce the number of medications they are on, and, to some

12   extent, in most cases, the dosages that they take.

13   Q.    Do you discuss differential diagnoses with the members of

14   the team?

15   A.    Yes.  I mean, that's typically something -- I tend to talk

16   about that a little bit more with the psych examiner because

17   that's a little closer to their line.  Again, that's something

18   we discuss.  We don't ordinarily document every little detail

19   of that no more than any other psychiatrist does in the real

20   world of standard medical care.  If I'm refuting or deleting a

21   diagnosis that's preexisting, I'll typically make some comment

22   in my evaluation note or later notes about why I'm doing that.

23   But I don't run through the 20 diagnoses, differential

24   diagnoses, in writing, but I do it in my head, which is what

25   pretty much every physician does.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan – Direct

1    Q.    Do you discuss medication side effects and drug

2    interactions with members of the team?

3    A.    Yes.  That's a routine question at each visit.

4    Q.    Do you discuss policy -- policies and procedures with the

5    CHDC medical staff?

6    A.    Yes.  Again, it's one of those things -- those type of

7    issues don't come up as often as the routine daily stuff, but

8    that does come up when they think there's a significant reason

9    to do something of that sort or make a revision.  And I've had

10   input into a number of the policies or, like, the protocols

11   about what lab to draw for certain medications, things of this

12   nature.

13   Q.    Dr. Callahan, at CHDC, what definition of polypharmacy do

14   you use?

15   A.    CHDC has adopted the most conservative possible

16   definition, which is two psychiatric medications in use at the

17   same time, some -- and, again, there's subcategories such as

18   using some that might be in the same class, some that are in a

19   different class, augmentation, polypharmacy, and things of that

20   nature.  But we're aware of that issue, and I try to document

21   and review -- I usually -- typically I'll review the minutes,

22   of course, at every visit and record the medications,

23   psychiatric medications, in my own consultation note.  And we

24   also do sort of a formal written review as part of the record

25   about every year.

Callahan - Direct                        5343

1    Q.   Can you explain for us how CHDC uses taper criterion in

2    relation to psychotropic medications?

3    A.   Well, pretty much every individual is -- has some type of

4    criteria based on -- usually they are more severe type

5    symptoms.  For instance, there's -- you know, many people may

6    have an issue with self-injury, aggression.  Sometimes it's

7    other type of things like crying episodes, severe compulsive

8    behavior, things of that sort.  The team typically, as part of

9    their annual process of meeting, will meet and agree to

10   specific symptoms to track.  And then that's -- information is

11   recorded and usually summarized on a monthly basis.  When they

12   prepare a specific taper criteria, it might be that someone had

13   no more than a certain amount of aggression in a given

14   six-month period or a given year.

15        If the formal taper criteria is met, then typically I'll

16   discuss it in my progress note that the criteria was met, and

17   make a recommendation to either reduce the medication, which

18   would be the case most often, or if I say that I don't think

19   it's a good idea, I'll document why we would not reduce the

20   medication.  The taper criteria is not the only time when a

21   medication might be reduced, but it acts as sort of a trigger

22   to remind folk to review that issue.

23   Q.   Dr. Holloway claimed that taper criteria should be based

24   on target symptoms relevant to the DSM-IV criteria.  Can you

25   comment on that, please?

Callahan - Direct

1    A.    Only that that's not a widely accepted standard.  I review

2    other psychiatrists' charts and records on a regular basis,

3    even now from Counseling Associates, that's not what's done.  I

4    see many, many records from people that come in from out in the

5    community that have been inpatients or outpatients.  And,

6    again, that's just -- that's not the standard of care.

7    Q.    Could you explain to us why it's not a standard and maybe

8    give us an example like somebody with schizophrenia who is

9    experiencing hallucinations?

10   A.    Well, hallucinations tend to be a more subjective type of

11   thing.  Many of our folk are nonverbal.  They can't tell us

12   they are hearing voices.  We may have some indirect indication

13   if they are looking up at the ceiling or talking to somebody

14   that's not there.  But those are also things that one person

15   may see that kind of behavior and think that they are

16   hallucinating; someone else may interpret it a different way.

17   I tend to prefer -- and I think that's true at the center --

18   that they use something that's a little more definitive and a

19   little bit more measurable.

20         You won't find, for instance, aggression listed in the

21   criteria for schizophrenia.  But we have individuals there who

22   have a track record of -- for no external obvious cause, will

23   suddenly become agitated, may start talking to themselves, and

24   possibly try to become aggressive to someone else.  And when

25   we've identified through other means that that person appears

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Direct

1    to be psychotic, and we treat those symptoms and typically they

2    will improve, it's one of the things that we use to track to

3    help to what extent those symptoms may be under control.

4        The diagnostic system is certainly not perfect in

5    psychiatry in general.  The criteria are revised periodically.

6    In fact, they are fixing to have another published revision in

7    a year or so that's going to change some of the criteria.  But

8    a lot of the core symptoms you might look for, especially a

9    measurable type of symptoms, are not going to be the kind of

10   thing that's going to show up in the diagnostic criteria.

11   Q.  Dr. Callahan, in your experience at CHDC, do the dosages

12   of psychotropic medications increase, or decrease, after an

13   individual is admitted to CHDC?

14   A.  Well, ordinarily they decrease, in some cases, rather

15   dramatically both in terms of number of medications and

16   dosages.  There are exceptions to that.  And, again, that's

17   based on individualized circumstances.  And, you know,

18   typically we like to have someone on as few medications as will

19   control their more prominent symptoms and help them stay

20   comfortable, and also as small of a dosage as possible.  But we

21   have situations where sometimes someone like -- for instance,

22   we may try to taper a medication.  And maybe the first

23   medication we taper, that works fine.  The second medication,

24   it doesn't work so well.  And sometimes you may have a

25   situation in which you've reduced a medication and the person

Callahan - Direct

1    may have an increase in symptoms that simply restoring the

2    medication to its old dosage does not take care of.  So

3    sometimes you may end up with a higher dosage even than you

4    started out with.  That's, sadly, a very common thing in

5    psychiatry because, again, very often, there is not a precise

6    relationship between dosage and efficacy in particular

7    individuals.

8    Q.  Dr. Callahan, could you describe for me how you use

9    polypharmacy and why you use it at CHDC in some cases?

10   A.   Well, in some cases, it's inherited.  People come in on

11   multiple medications, and we just reduce the medications as

12   much as seems possible given the circumstances and, again, the

13   situation.  My inclination is that how much medication they are

14   taking is significant, but someone banging their head on the

15   door or the wall, scratching themselves all of the time,

16   picking at their skin to the point of bleeding, attacking other

17   people or trying to, is of a greater concern than exactly how

18   much or how many medications a person is on.

19       My preference is always for someone to take as few

20   medications as possible, but very often one sees more than one

21   medication is needed.  Sometimes if we add -- a lot of times if

22   we'll add one medication, rather than simply adding it and then

23   continuing to add another medication, which is very common in

24   community type settings -- we'll try to add one medicine and

25   take another medicine off rather than simply continuing to add

Callahan - Direct

1    more and more.  But, again, sometimes people come in and they

2    are on seven medicines, and I think this is horrible, and then

3    you find out why they are on the seven medicines when you start

4    trying to take some of them off.  I don't know that we've got

5    anyone on seven medicines now, but I know we had some that

6    started out on seven medicines.  And, again, the standard of

7    care in psychiatry, polypharmacy is more the norm than not.

8        I read an article this week, I believe it was "Archives of

9    General Psychiatry," talking about people with bipolar

10   disorders that were considered responders to treatment.  They

11   were on an average of 2.98 medications per person, which is --

12   you know, would seem like a lot of medication, but if you

13   consider the morbidity and the negative consequences of

14   uncontrolled serious mental illness, that, for most people,

15   would not be a difficult decision to make.

16   Q.   Doctor, could you explain to me how you assess whether a

17   psychotropic medication should be prescribed to an individual

18   at CHDC?  Would you tell me what process you go through?

19   A.   Well, generally, I mean, if you're referring to the

20   specific issue of prescribing medication, it would be based on

21   a previous evaluation, which would include looking at the

22   available records, the history of, you know, things before they

23   were admitted.  In some cases, I see people that have been

24   admitted new.  Sometimes I'm referred to people who have been

25   there for a considerable period of time that are developing new

Callahan – Direct

1      symptoms.  Because of the fact that many of our folk -- the

2      life expectancy in our population seems to have increased,

3      we're running into a situation where we're having, for

4      instance, more people developing Alzheimer's disease and Down

5      Syndrome.  When I first started practicing, it was rare to see

6      somebody over 40 living with Down Syndrome.  Now we've got, I

7      think, at least one person who is 66 who is out there, quite a

8      few in their 50s.  But unfortunately, they have a much higher

9      rate of Alzheimer's disease than the general population.  And

10     so that's -- you know, that's the kind of thing that might lead

11     to a referral of someone who has been there longer term.

12         Typically what I'll do is basically do an evaluation,

13     direct observation, talk to them if they are able to

14     communicate.  A lot of them are nonverbal.  You can still learn

15     some things by looking and watching as far as how anxious they

16     may appear, whether or not they are real reserved or sad or

17     even crying, although that's not real common to see them

18     actually crying in my office, but it does happen.  Get

19     information from the care givers who have been taking care of

20     them here and the psych examiner who, you know, compiles the

21     behavior reports, records of unusual symptoms or things, sleep

22     issues, things of that nature.  Basically look at all of the

23     information, and then I would formulate a diagnosis.  Not

24     everyone I see gets a psychiatric diagnosis.  Most of them do

25     because I think the screening process that tends to happen is

Callahan – Direct

1    such that most of the people -- they've looked at a lot of

2    other issues before I see them.  Occasionally it's a situation

3    where there's probably other issues going on like maybe there's

4    primarily a medical problem that seems responsible for their

5    symptoms, like someone may be depressed, but they've just had

6    surgery or some other -- or some kind of other event that's

7    been an issue.  Anyway, taking all of that into consideration,

8    looking at what I think the best diagnosis at the time is, then

9    I would make a recommendation of medication based on that

10   particular individual, other health-related issues with that

11   individual, and what, in my experience, is most likely to work

12   best in that type of individual.

13   Q.   Do you conduct a medication benefit versus risk assessment

14   before recommending a psychotropic drug for anyone?

15   A.   Yes.  It's in my head, which, again, is what any physician

16   will do.  I don't ordinarily document in a formal way that in

17   the notes, except perhaps in a very general way I may make a

18   reference I'm recommending one particular medication over

19   another because of the seizure risk in a person who has

20   seizures or something of that nature.  But as a general rule,

21   that's something you're going to do with anyone because you're

22   going to try to pick the medication you think is going to be

23   more effective and one that appears the most likely to be

24   tolerated to that individual.

25   Q.   Could you explain to us what your consulting role is at

Callahan – Direct

1    CHDC related to the other doctors there, the primary care

2    physicians?

3    A.   Well, I mean, basically I'm available for them to

4    communicate with, I'm -- by phone or in person.  And like I

5    said, it's -- most days if I'm there and they are there, I

6    probably will be talking to the primary care docs.  I rarely

7    miss an opportunity or not have an occasion to at least stop

8    by or say hi or communicate about a particular person.  Of

9    course, they are the one that ultimately writes the orders for

10   the psychiatric referral also, and the copies of my evaluations

11   and consultation notes go to them.  Typically if I think

12   there's something that needs immediate attention, I'll

13   typically print out an extra copy, hand carry that note to them

14   and explain what the situation is and think maybe they need a

15   medication change preferably ordered that day rather than the

16   next day.  If not, it's distributed by the folk in the -- like,

17   the medical transportation department that does the scheduling

18   the following day.

19   Q.   You mentioned that the primary care physicians actually

20   write the prescription.  Does that mean they can choose not to

21   accept your recommendation?

22   A.   Right.  And one of the reasons that that's -- I think I'm

23   more comfortable with that is they -- even though I have the

24   huge advantage of having the medical record with me that has

25   all of their medical issues, current medications, and things of

Callahan - Cross

1    that sort, which is not what you have out in the community, but

2    still, they are the most up to date about what's going on with

3    the person.  There may be some lab sitting on their desk that

4    was drawn the day before that's not gotten into the record that

5    may make them not want to start a particular medicine at that

6    particular time.  Or they may have just gotten a report of an

7    ultrasound that shows somebody has gallstones.  And maybe I was

8    recommending we reduce somebody's medication because they were

9    throwing up, for instance, where apparently there might be a

10   better explanation for it.  And it seems to work well.  And it

11   also gives them a chance to review and have two physicians

12   involved in the process, which is also helpful in the case, you

13   know, with the kids and everything, too, because it's more --

14   you know, you don't need too many people involved, but a couple

15   of folk, I think, is better than one because that way the one

16   can look at the other's recommendations and make sure

17   everything makes sense in terms of their opinion medically.

18   And usually if they've got a question, they'll come and talk to

19   me or ask, "Is this what you really meant?"  And I say, "Yeah."

20   And once in awhile if there's a typo, I said, "No, that really

21   wasn't quite what I meant."

22   Q.   Thank you, Dr. Callahan.

23                     CROSS-EXAMINATION

24   BY MR. TAYLOE:

25   Q.   Good morning, Dr. Callahan.

Callahan - Cross

1    A.    Good morning.

2    Q.    Mr. York asked you some questions about your training and

3    background.

4    A.    Yes.

5    Q.    Have you received any training, specialized training, with

6    regard to the treatment of individuals with developmental

7    disabilities or intellectual disabilities?

8    A.    Formalized training, no.

9    Q.    What about formal training in the provision of treatment

10   to children or adolescents with psychiatric issues?

11   A.    Part of any accredited psychiatric residency is a rotation

12   in child psychiatry.  So, again, that's part of the training

13   process for any accredited residency.  And having an accredited

14   residency is also a requirement for board certification, which

15   I'm board certified in general psychiatry.

16   Q.    Are you board certified in child and adolescent

17   psychiatry?

18   A.    No.

19   Q.    And so the training that you are referring to that you

20   received was part of your general rotation as -- in getting

21   certified as an adult psychiatrist?

22   A.    Well, again, Dr. Holloway was fond of this term "adult

23   psychiatrist," which was, I think, intentionally disingenuous.

24   I'm not certified as an adult psychiatrist.  I am board

25   certified in general psychiatry, which includes the ability to

Callahan - Cross

1    care for children, adolescents, and adults.  Again, part of

2    your training is to work with different populations during

3    different periods of time during your psychiatric residency,

4    and that includes a block of time with children.  I believe the

5    training or the block -- that particular block was six months

6    in duration, but, again, we're talking 27 to 28 -- probably 28

7    years ago, so --

8    Q.    Some time ago?

9    A.    Right.

10   Q.    So 28 years ago, you had six months or so of training

11   involving --

12   A.    Right.

13   Q.    -- children and adolescents?

14   A.    And since that time have continued to have ongoing --

15   except for probably about the last year of my residency,

16   continued to have ongoing experience with treating adolescents

17   and children continuously since then.

18   Q.    Okay.  I'm going to -- I was limiting my question to

19   actually training, and we'll talk about experience.  So we'll

20   do these things in bits, if you don't mind.

21         Have you completed any training in child and adolescent

22   psychiatry accredited by the Accreditation Council on Graduate

23   Medical Education?

24   A.    I'm not familiar with that exact organization unless I've

25   seen it listed.  As far as attending, like, some kind of a

Callahan - Cross                    5354

1    residency or fellowship, no.  If you're talking about going to

2    a meeting in which there was CME type issues presented that

3    would include child or adolescent issues, I do that type of

4    thing, but I don't know if that would fall under the rubric of

5    what you're referring to.

6    Q.    You were asked some questions about your relationship with

7    Consulting Associates.  And I believe you mentioned that you're

8    providing services not only to CHDC, but also to some other

9    HDCs?

10   A.    Right.

11   Q.    What are those other HDCs?

12   A.    The Arkadelphia Human Development Center and the

13   Booneville Human Development Center.

14   Q.    And those are all under the same contract, the vehicle

15   which you provide services at CHDC?

16   A.    That's correct.

17   Q.    And I believe at the time of your deposition, that was for

18   a thousand hours a year; is that right?

19   A.    Slightly under, again, doing the math, but close --

20   approaching a thousand hours.

21   Q.    In your testimony just now, Mr. York asked you about

22   whether you had ever made a referral to a child or adolescent

23   psychiatrist.  Do you recall that question and discussion?

24   A.    Yes.

25   Q.    I'd like you to look at your deposition, please.

Callahan - Cross

1    A.   I actually --

2    Q.   Wait for a question.

3    A.   I'm sorry.

4    Q.   That's okay.  This is how I would like us to have our

5    conversation.  I'll ask you a question, and if you would answer

6    the question that's posed, and then if there's something more

7    that you want to say, Mr. York can help you bring that side

8    out.  But I think it's going to be more efficient if you wait

9    for my question and then answer that.

10       So if you would turn -- your deposition was taken on

11   December 15, 2009, correct?

12   A.   I believe so.

13   Q.   And if you would look at page, I guess, 37 of that.  At

14   the top of that, the question that is posed to you is, "Have

15   you ever made a referral to a child psychiatrist of any of the

16   -- strike that.  Have you ever made a referral to any child

17   psychiatrist for any child or adolescent whom you've treated or

18   consulted for at CHDC?"

19       And your answer there was, "No, at the CHDC -- not at the

20   CHDC, no."

21       Do you recall making that statement?

22   A.   Yes, I was -- I had read that yesterday, so I was going to

23   mention recalling that.  At the time, that was an accurate

24   statement as best I could recall.  The people that we discussed

25   earlier, if you want me to elaborate on that, since that

Callahan - Cross

1    time --

2    Q.   So since that time you have made a referral?

3    A.   Yes.

4    Q.   And you said that you talk periodically with Drs. Schultz

5    and Parmley.  They are pediatricians who work at CHDC; is that

6    correct?

7    A.   Yes.

8    Q.   You were asked about your role on the IDT.  And you made a

9    point of saying you were a member of the team.  Do you recall

10   that?

11   A.   This morning, yes.

12   Q.   Yes.  And Mr. York brought up the conversation that Dr.

13   Holloway recalls having with you in which you said you were not

14   a member of the IDT as she heard you say it.  And you don't

15   recall actually making that statement or saying it the way she

16   apparently heard it?

17   A.   That doesn't sound like the sort of statement I would have

18   made baldly or without qualification.

19   Q.   Let's look at some portions of your deposition.  If you

20   would turn to page 25, please.  And on line 12, we were having

21   a discussion about medication differences, whether maybe you

22   and the family don't see it exactly the same way.  And you

23   said, "Basically there's a team meeting in which that's

24   discussed."  Do you recall making that statement?  I'm looking

25   at roughly line 12 on page 25.  Are you with me?

Callahan - Cross

1    A.   Yes, I'm looking at it.

2    Q.   And then down on line 19, "Sometimes if a team member

3    feels strongly about it, they may request another meeting to

4    try to encourage someone to consider a medication change."

5    Now, you're referring to the team as "they" in that context,

6    correct, as opposed to "we"?

7    A.   Right, because, again, I'm not ordinarily the one that's

8    doing that particular function.  I mean, there's all members of

9    the team, but, again, I'm thinking about other team members as

10   opposed to me in that context.

11   Q.   Let's turn over to page 50, and this may be more of the

12   same point.  So on line 5, you give the answer of, "Well, if

13   it's a new medication, then they again have to go through the

14   consent process, which means that the team would have to meet

15   and they would have to get the formal consent from the guardian

16   or family member."  Now, you're not part of that meeting,

17   right, in which the team meets and then goes on to get formal

18   consent from the guardian?  You're not at that meeting?

19   A.   Not typically, no.

20   Q.   And let's go --

21   A.   I'm --

22   Q.   I'm sorry.

23   A.   I'm sorry.

24   Q.   Let's go to page 61.  And this is a long paragraph.  I may

25   need a minute here.  Well, here we go.  On line 7, you say,

Callahan – Cross

1    "Sometimes it may be when they have their annual staffing that

2    the team is discussing and, well, someone's memory isn't quite

3    as good as it used to be" -- I think this may tie into the

4    fact, as people age, they may develop issues that they didn't

5    have at first, and then they may wind up being seen by you, the

6    example of someone who's got Downs, for instance?

7    A.    Correct.

8    Q.    But the substantive point here is what you said is,

9    "Sometimes it may be when they have their annual staffing that

10   the team is discussing" -- and that, again, would be another

11   instance where you're not participating in the team function,

12   correct?

13   A.    Well, the "they" would be referring to the individual.

14   The "team" would be referring to the team for that individual.

15   If a person has not had a psychiatric referral, then I would

16   not be a member of their team, no.

17   Q.    Well, my question is a little different, but thanks for

18   that clarification.  You're not actually at annual staffings as

19   a routine matter, are you?

20   A.    As a routine matter, no.

21   Q.    And over to page 62, I think -- and I need again another

22   minute because this is a full page of text here and I may not

23   be able to find it and don't want to waste our time.  I might

24   skip that one.

25         If we go to 63, and over on line 7 there, the discussion

Callahan - Cross

1    is, "So basically it's a team process where they try to look at

2    the various factors."  And then down to line 22, you give an

3    answer -- did you see that?  And that was your statement right

4    there back on line 7, "So basically it's a team process where

5    they try to look at the various factors."  And, again, you're

6    describing the interdisciplinary team at that point, correct?

7    A.    Right.  Well, different team members would have different

8    disciplines.  And, for instance, a psych examiner might look

9    for certain trends.  The primary care physician would look for

10   medical issues.  The occupational therapist might look for

11   areas of their particular concerns.  So it's a variety of

12   people.

13   Q.    Okay.  But I was just asking whether that was referring to

14   the team.  And I appreciate your clarification.  That's

15   something you can do with Mr. York.  But in that instance, we

16   are talking about the team, right?  That's what you're

17   referring to?

18   A.    Yes.

19   Q.    And then down on line 22, let's see if I can -- maybe -- I

20   think I've got it there.  You give the answer -- the question

21   is, "Administrative mechanism is" -- I'm sorry -- I can't read

22   the question.  I'll try again.  "Administrative mechanism, in

23   any event, is going to be a referral from the primary care

24   physician?

25        "Answer:  Right.  They are the ones that write the order.

Callahan - Cross

1    And, again, typically, the team, as I understand it, has to

2    make the recommendations to the primary care physician that

3    they do that."

4         So that would be another instance in which the team is

5    involved.  And this is all about medication, recommendations

6    about psychotropic medications.  That's what this discussion is

7    -- relates to.  Orders that you've written or recommendations

8    that you've made and how that process flows through, that's the

9    discussion we're having, I believe, and you can correct me if

10   I'm wrong.

11   A.  Well, I'm not sure -- that may speak to more of the

12   process of a referral rather than a specific medication.  In

13   fact, it looks to me like it would be talking about making a

14   psychiatric referral rather than the specific issue of a

15   particular medication being used or not used.

16   Q.  Okay, but -- thank you for that clarification.  But the

17   point though of your answer is, you're not part of that

18   process?  Typically the team, as you understand it, has to make

19   the recommendation, correct?

20   A.  That's correct.

21   Q.  Okay.  And then if we go over to page 76 of your

22   deposition, and I asked you the question on line 4, "Okay.

23   What information does the treatment team provide to you to

24   assist in making your assessment?"  And then you go on to

25   provide the answer to what they provide you.  But the point I

Callahan - Cross

1   would want to draw your attention here to is, in this

2   discussion, anyway, you didn't say, "I'm a member of the team,"

3   correct?

4   A.   Well, in that case, I'm not a member of the team of the

5   people who are not receiving psychiatric care essentially.

6   Q.   Is that what we're talking about here in this instance?

7   A.   Right.  It's talking about the referral process and

8   talking about information the team provides assisting in making

9   your assessment, things of that nature.  And on line 7, it

10  says, "A reason or cause for the referral."

11  Q.   Okay.  Let's turn over to page 82.  And I may not be able

12  to find it on the fly here.  Apparently I can't.  We'll do one

13  more of these and I think we can move on.

14       Page 161.  And the question that I posed to you is, "Where

15  do you set out the risks and benefits of treatment?  Is that

16  set out in your consult notes?"

17  A.   I'm sorry.  Do you have a line number for me?

18  Q.   I'm sorry.  I apologize.  It's line -- 15 is where I start

19  my question.  Are you with me?

20  A.   Yes.

21  Q.   And the question -- there's some preparatory stuff that

22  you can look at.  But, in any event, the substance of it is,

23  "Where do you set out the risks and benefits of treatment?  Is

24  that set out in your consult notes?  That would be the place to

25  look for that?

Callahan - Cross

1      "Answer:  Well, since we're in a situation where basically

2  I'm working as a consultant for the primary care physician and

3  the team, I don't typically document all of the side effects

4  that might happen."

5      Do you recall making that statement?

6  A.   It seems reasonable.

7  Q.   And then we go on, "Where would that be set out?  Who sets

8  that out?"

9      And your answer is, "I think that's part of the team

10  consent process."  Right?  That's what you said there?

11  A.   Right.

12  Q.   Okay.  Now, you were asked some questions about discussing

13  the differential diagnosis with the team.  You're talking in

14  that instance about the psych examiner and the one direct care

15  staff who is present with you in your office during that

16  meeting, correct?

17  A.   Or whoever might be present, possibly family, but

18  basically who comes for the appointments.

19  Q.   But those are typically the two people from the team?

20  A.   That's usually the minimum ordinarily.

21  Q.   Well, I'm asking, that's usually who is there, right, from

22  the team?  It's the psych examiner and one person from the

23  direct care staff who brings the individual who is also there?

24  That's typically who is coming from the team, right?

25  A.   Probably around half or three-fourths or two-thirds of the

Callahan - Cross

5363

1    time, that would be who is there.  It's not uncommon to have

2    someone else there also from the team or possibly a family

3    member.

4    Q.   You were asked about policies and procedures.  And

5    Mr. York -- I don't have the details here.  I couldn't write

6    fast enough.  But the impression I had from that discussion

7    was, you rely on policies and procedures regularly to do what

8    you're doing.  Is that a fair characterization of what you were

9    trying to convey to Mr. York in response to his question?

10   A.   Well, I can't claim that I recall that specific question

11   perhaps much better than you do.  There are policies and

12   procedures in place.  Basically I do what I've done there for

13   years in terms of the basic approach to things and work within

14   the context of the policies and procedures that are in place at

15   the Human Development Center.

16   Q.   Do you recall at your deposition you were asked to bring

17   the policies and procedures that you regularly rely on, and

18   that you brought none?

19   A.   I believe the request was that I regularly referred to or

20   something of that nature.  And, again, I don't regularly pick

21   up and look at those things on a daily basis.  And we had a

22   discussion about what "regularly" means to one person might

23   mean "regularly" to someone else --

24   Q.   Did you bring any policies and procedures to the

25   deposition?

Callahan - Cross

1    A.    No.

2    Q.    You were asked about taper criteria.  Do you recall that

3    discussion?

4    A.    Yes.

5    Q.    And you said the team is part of the annual meeting --

6    meet and agree with what the symptoms are to track.  Is that

7    the case?  Is that how it works in your mind?

8    A.    Basically.

9    Q.    And you're not part of that discussion, are you?

10   A.    Not the discussion in the team meeting.  I may have verbal

11   input and sometimes do to the psych examiner who usually is

12   most involved in preparing the specific symptoms to track.

13   Q.    And apropos of that -- in fact, you rely primarily on what

14   the psych examiners come and tell you about with regard to a

15   person's behavior, right?

16   A.    Well, that's basically their job as part of the team is to

17   help provide me information about behavior reports, unusual

18   changes, sleep changes, things of that nature.  So they are a

19   very important part of that process of providing information to

20   me.

21   Q.    But to be clear, the ultimate answer to my question is

22   "yes"?

23   A.    Well, it's probably not quite as simple as you would like

24   me to make it, but that's essentially correct --

25   Q.    Well, let's take a look --

Callahan – Cross

1    A.   -- with some additional elements.

2    Q.   Let's take a look at your deposition then, page 128.  And

3    I'm looking around line 11, I think.

4    A.   128.

5    Q.   Yes.  I'm sorry.  It's page 128.  I'm being told it's 127.

6    Let me see.  It is 127.

7    A.   Right.

8    Q.   So on line 11:  "Question:  So in an instance like this,

9    you're relying primarily on what the psych examiners come and

10   tell you about this person's behavior?"

11   A.   "Primarily" I think would be a reasonable

12   characterization.

13   Q.   Okay.  Okay.  And the psych examiners identify the target

14   symptoms and will bring those to your attention, correct?

15   A.   Correct.  I get a report about the target symptoms, how

16   often they've been observed, as well as any other noteworthy

17   things that are written up on observation reports or other

18   things.  But particularly, I'll get totals for, like, target --

19   specific target behavior such as aggression, self-injury, sleep

20   hours, that type of thing.

21   Q.   And apropos of that, we were talking about what you rely

22   on to identify or make taper criteria, and I believe you're

23   making the point that you can't just necessarily lift them out

24   of a DSM-IV, and that that, in your view, is not a standard of

25   care?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross

1    A.    That's correct.

2    Q.    And instead, you wanted to use something that's more

3    measurable.  I believe that was the word you used.  Is that

4    right?

5    A.    That's -- basically that's true.  And that's based on

6    years of dealing with outside regulators like CARF and things

7    who want a measurable target, ideally something that's less

8    subjective.

9    Q.    And the less subjective, more measurable target symptom

10   that is usually identified is aggression, correct?

11   A.    In the case where that's appropriate.

12   Q.    In fact, aggression is almost -- is the predominant target

13   symptom that's being tracked with regard to individuals at CHDC

14   who are receiving psychiatric care, right?

15   A.    I don't know that I could say that for a fact.  Again, in

16   the cases where that occurs, that is obviously of concern.  And

17   so that would be a very important type of symptom to track.  I

18   don't know if that necessarily -- what percentage of that would

19   be among all of the different symptoms that are tracked.

20   Q.    And you also use instances of mechanical restraint.  That

21   would be another way to track how an individual is doing,

22   right?

23   A.    Yes, frequency and duration.

24   Q.    In fact, I'd like to show you an exhibit, Exhibit 824,

25   which relates to this discussion.  And the very first page of

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross

1    that we talked about this during your deposition.

2    A.    Thank you.

3    Q.    And you've got that there in front of you?

4    A.    Yes.

5    Q.    Excuse me just a second.

6          And I believe that you said during your deposition that

7    the examples there of behaviors in the second paragraph were

8    typical of what you would be looking at.  Do you think that

9    makes sense?

10   A.    I'm not exactly sure -- maybe you could give me a little

11   more clarification, please -- a little more clarification?

12   Q.    Sure.  That would be fine.  I'm just going to go right

13   back to the deposition itself on page 161.  And, actually, if

14   we go to the bottom of 160, just to pick up our discussion

15   there, you give the answer of, "I think you're saying that the

16   psych examiners give me a report."  And then over to 161, "And

17   so many reports of this, so many reports of that."

18         "Question:  And that's a typical example of the count of

19   aggression and things like that identified at the bottom of the

20   first page of the consult note for GB?  That's a typical

21   example of the kinds of information you received?

22         "Answer:  Right.

23         "Question:  Okay.

24         "Answer:  Certain types of symptoms and use of mechanical

25   restraints."

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan – Cross

1           And just to be clear for the record, we're talking about

2       the page Bates 0126032.  And if you go back to Exhibit 824,

3       that was the page we were referring to, right?

4       A.   It appears to be.  Would you like a response?

5       Q.   I just want you to confirm that that is -- whether or not

6       what you said in your deposition?

7       A.   It appears to be what I said in the deposition.  I would

8       be glad to offer some clarification if requested.

9       Q.   Okay.  I think Mr. York may give you that opportunity.

10          Now, aggression in and of itself is a nonspecific target

11      behavior, correct?

12      A.   Generally speaking, yes.

13      Q.   Now, at one point in your testimony today I believe you

14      noted that most -- a lot of the folks you see are nonverbal.

15      Is that right?

16      A.   That's correct.

17      Q.   A good number of them are verbal, correct?

18      A.   Are verbal?

19      Q.   Are verbal?

20      A.   There are a significant portion who are verbal.  And,

21      again, some single word users from -- and some that are

22      fairly -- fairly good and relatively articulate.

23      Q.   And I believe in your deposition you made the point that

24      the category of severe mental retardation is quite broad.  And

25      you agree with that still?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross                          5369

1    A.   Yes.

2    Q.   And you see folks who are severe as well as profound on

3    your caseload, right?

4    A.   Yes.

5    Q.   And mild to moderate, right?

6    A.   Yes.

7    Q.   Now, your treatment approach as to the target symptoms

8    that you identify and the methods that you use to make a

9    diagnosis is uniform across the individuals with those

10   different levels of disability and different communication

11   levels, correct?

12   A.   I wouldn't necessarily characterize that because, again,

13   you have different sources of information when someone can

14   verbalize.  It affects your diagnosis when you can get some

15   subjective input from people.  We have one individual who is

16   able to actually request extra medication when he's feeling

17   agitated before there is a correction or something.

18   Q.   Let me clarify my question.  What I was trying to get to

19   was, the target symptoms that you use is pretty consistently --

20   as you said here with regard to the exhibit we were just

21   looking at in GB, are things like time and restraints, acts of

22   aggression.  And you use that approach, and if we look at your

23   records, we can see that, it's pretty much uniform regardless

24   of the individual's level of disability or their ability to

25   communicate?  That's true, right?

Callahan - Cross

1    A.   Well, we're going to track the most severe symptoms as a

2    priority.  And so aggression and self-injury, things of that

3    sort, are going to be top priority symptoms to monitor and

4    track.  That does not necessarily mean that the treatment may

5    not be different for a particular individual.

6    Q.   I'm not talking about the treatment.  I'm talking about

7    how you identify what someone's mental illness or disorder can

8    be on one end, and then how you measure the efficacy of your

9    treatment on the other.  And typically you're looking at raw

10   behavioral symptoms like aggression, correct?

11   A.   That's part of the consideration, yes.

12   Q.   You talked earlier about the screening process.  And I

13   think you made the point that not everybody who comes and sees

14   you winds up with a psychiatric diagnosis, but most do -- I'm

15   paraphrasing, and correct me if I've got this wrong -- because

16   there's a screening process at the front end that dictates who

17   comes to you.  Is that a fair characterization?

18   A.   I would think that would be a fair characterization.

19   Q.   I'm sorry.  I need just a minute.  I apologize for the

20   delay.

21       Okay.  If we could look at page 60 of your deposition.

22   And the question I asked at line 7 is, "What is the practice at

23   CHDC regarding the screening of persons for psychiatric issues

24   upon admission?"  And feel free to read or show anything from

25   this answer that you would like, but I wanted to draw your

Callahan - Cross

1    attention in particular to the portion that's beginning around

2    line 23.  Well, actually I can pick it up where the sentence

3    begins at line 20.

4         "And, for instance, if someone were to be physically

5    aggressive or self-injurious, in the process of trying to get

6    them examined at the clinic, then the primary care physician

7    might well write a referral just based on what he's seen right

8    there and not simply the record that they are already on

9    medication."  Right?  You said that in your deposition,

10   correct?

11   A.   Right.  I would be glad to provide clarification at the

12   appropriate time.

13   Q.   All right.  Now, you talked a little bit about the

14   risk-benefit analysis that's undertaken when making a decision

15   about medications with Mr. York earlier today.  I wanted to

16   come back -- I wanted to come back to that.  I think if we look

17   at page 161 again of your deposition, and around line 13 -- and

18   actually it's line 15 where the question is posed.  "We were

19   talking about this earlier.  And where do you set out the risks

20   and benefits of treatment?  Is that set out in your consult

21   notes?  That would be the place to look for that?"

22        And then your answer is, "Well, since we're in a situation

23   where basically I'm working as a consultant for the primary

24   care physician and the team, I don't typically document all of

25   the side effects that might happen.

Callahan - Cross

1      "Question:  Where would that be set out?  Who sets that

2   out?

3      "Answer:  I think that's part of the team consent process.

4   And typically the actual consent is done with discussion from

5   the team which would include the primary care physician."

6      Do you recall making -- you made those statements?

7   A.   Yes.

8   Q.   And so the risk-benefit analysis is actually something

9   that's set out by the team with the PCP.  You're not part of

10  that discussion, are you?

11  A.   I was referring to any sort of documentation of specific

12  recording of potential side effects and things of that nature.

13  Q.   But the laying out of the risks and benefits, that's done

14  by the team.  The PCP may be involved in it, but you're not,

15  right?

16  A.   Again, I'm referring specifically in this situation to

17  what's written because you were asking about, "Is that set out

18  in your consultation note?"  "That would be the place to look

19  for that."

20  Q.   Well --

21  A.   That process is done verbally.  It's also done in my head.

22  I do not typically document all of that type of stuff in every

23  note and, again, nor do hardly any other psychiatrists whose

24  records I review.

25  Q.   I understand.  I appreciate that clarification.  I'm

Callahan - Cross

1    simply focusing on the way the process works at CHDC.  And the

2    actual formal recitation of the risks and benefits is something

3    that you do not participate in when it's laid out in this

4    individual's records, right?

5    A.   In terms of the written record, that's correct.

6    Q.   And you're not actually communicating with the team as a

7    whole about risks and benefits.  You may speak with the psych

8    examiner and whoever comes with the individual to the consult

9    in your office, but you're not actually meeting with the team

10   as a whole to say, "Here's my perception of the risks and

11   benefits," and engaging with the team in that fashion, are you?

12   A.   In general terms, no.  In more specific terms, it would

13   depend on the situation, again, keeping in mind that the

14   primary care physician is involved in that process and is

15   perfectly competent to consider those issues, particularly with

16   regard to side effects as well.

17   Q.   Now, do you know that the primary care physician is

18   actually at the meetings when those are discussed -- when these

19   things are discussed?

20   A.   Again, not being typically present, I would not know that

21   they were always present.  Again, I think they ordinarily are

22   involved in some capacity, either being there part of the

23   meeting, the whole meeting, possibly telephone consultation.

24   Q.   But just to be clear, you're speculating about that?  You

25   don't have personal knowledge of it, right?


Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan – Cross

5374

1    A.    I don't have firsthand knowledge of that.

2    Q.    You were asked about communication with regard to you and

3    other physicians and the process as part of that of getting

4    your recommendations approved.  Do you recall that

5    discussion -- or the process through which your recommendations

6    are considered -- I should phrase it that way -- in your

7    discussion with Mr. York earlier today?

8    A.    Yes.  Yes.

9    Q.    It's true, isn't it, that virtually every time you

10   recommend a medication change or a change in dosage, that it's

11   approved by the primary care physicians?

12   A.    Ordinarily, yes, it is.

13   Q.    And I just wanted to come back to your -- you talked about

14   that you work at CHDC and also at the two other HDCs.  That's

15   all under the same contract.  That's for about 18 hours a week;

16   is that correct, roughly?

17   A.    You'd have to get a calculator out.

18   Q.    So how many hours a year?

19   A.    You're saying a little under a thousand and dividing that

20   by 50-something.  Again, you'd probably come out somewhere in

21   that neck of the woods of 18 or 19, I assume.

22   Q.    And that contract has been increased over time.  And the

23   last time we talked about it, I believe it was at $242,000 a

24   year; is that correct?

25   A.    That's correct.

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross                           5375

1    Q.   And with regard to communication with other physicians, we

2    talked about this during your deposition as well.  If you could

3    please look at page 184.  And, in particular, I think we're at

4    line 5 where I asked, "What about your communications with

5    other consultant clinicians such as -- Dr. Wilson is a

6    neurologist?

7         "Uh-huh.

8         "How do these communications happen?

9         "Most often by referring to each other's notes."

10        That was your answer, right?

11   A.   "Reviewing each other's notes."

12   Q.   I'm sorry.  "Most often by reviewing each other's notes"?

13        MR. TAYLOE:  Your Honor, may I have just a minute to

14   see if I'm done?  Thank you.

15   BY MR. TAYLOE:

16   Q.   Thank you for your patience, Dr. Callahan.

17        Just a few more questions.  I'm just about done.

18        Now, in terms of your work at CHDC, during your

19   deposition, I think you said the person who keeps track of you

20   in terms of the medical issues would be Dr. Thomas.  Would that

21   be correct?

22   A.   Yes.  She's the medical director of the Conway Human

23   Development Center.

24   Q.   So she's the closest thing you have to clinical

25   supervision at CHDC?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross

1    A.   Again, in terms of the general functioning such as the

2    chief of staff in the hospital, medical directors oversee the

3    physicians there.  Again, that's my interpretation of the

4    situation, although there are other supervisors higher up the

5    chain, Dr. Schultz and, of course, Calvin for administrative

6    type.

7    Q.   But in terms of actual clinical oversight, the closest

8    person would be Dr. Thomas, correct?

9    A.   That's correct.

10   Q.   Now, earlier in your discussion with Mr. York, you were

11   asked some questions about what Dr. Holloway thinks and what

12   she thinks the standard of care would be and her opinion that

13   you didn't, at the time she spoke with you, consider yourself

14   to be part of the IDT.  How do you know?  How do you have this

15   knowledge about what she thinks?

16   A.   Well, I'm referring to statements that she made in some of

17   her report where I stated -- where she says I stated that I was

18   not a member of the treatment team or interdisciplinary team or

19   something of that sort.  That was from her -- the written

20   report that she had prepared.

21   Q.   And then what about the discussion of the taper criteria?

22   A.   Perhaps you could clarify that a little more for me,

23   please.

24   Q.   How do you know what Dr. Holloway's opinion is about taper

25   criteria?

Callahan - Cross

1    A.   Well, I would only know that to the extent of having

2    looked at her report and her characterizations of it, the

3    specific issue being mentioned that taper criteria should

4    always include criteria from the diagnostic manual.

5         MR. TAYLOE:  Thank you.

6         Your Honor, I have no further questions at this time.

7                     REDIRECT EXAMINATION

8    BY MR. YORK:

9    Q.   Hello again, Dr. Callahan.  Could you turn to Plaintiff's

10   Exhibit 824 that was referred to earlier?

11   A.   I've got it here.

12   Q.   And there was some reference from your deposition

13   testimony that this was a typical example of the account of

14   aggression or something along those lines.  Could you explain

15   to me what this represents?

16   A.   Well, again, as I mentioned several times, the priority is

17   to target the most severe symptom.  And so this -- basically

18   the psychological examiner gives me a report, I summarize what

19   I think are the most relevant parts of that report, again, with

20   not going into massive detail which, as you know, can be very

21   time consuming and not terribly helpful.  And, again, in that

22   particular case, this is an individual which aggression has

23   been part of his long-term symptoms, and so we track that

24   particular symptom as part of his treatment plan.

25   Q.   Do you see the reference there under "Assessment" to "mild

Callahan - Cross

5378

1    escalation probably due to situational factors"?

2    A.   Yes.

3    Q.   And down below, it says, "Although situational factors

4    probably contribute to the increase of mechanical restraint

5    use, he also is still frequently aggressive and often without

6    warning.  And in view of this, it would seem appropriate to

7    increase Seroquel."  Do you know that the allegation was that

8    Seroquel was increased because you were treating environmental

9    causes of his behavior?

10   A.   Well, I don't know -- I don't recall about that specific

11   situation, but I'm not terribly surprised.

12   Q.   Is that an accurate description of what you did here?

13   Were you treating his situational factors there that caused his

14   behavior, or were you treating something else?

15   A.   Well, I'm treating the underlying disorder.  The

16   situational factors may exacerbate the underlying disorder.  We

17   can come down and be called to federal court and be

18   uncomfortable, but we're probably not going to be aggressive.

19   If we take some of these folk and change their environment, or,

20   in the case of Arkansas, the recent heat wave, some things that

21   people can't deal with -- and, again, that's a problem that

22   they can't handle those situational issues.  If it's something

23   that looks like it's going to be a shorter-term phenomenon,

24   then we might just let it ride out.  Again, in some cases where

25   we have someone like this particular individual where there's a

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross

1    long track record of aggression that has simply gotten worse,

2    even the baseline was not within what I would consider an ideal

3    range.  And so I was hoping to both improve his response to

4    certain situational stressors as well as the longer term

5    tendency toward aggression.

6    Q.   So were you treating the underlying psychiatric diagnosis?

7    A.   Yes.

8    Q.   Doctor, you referred to on page 60 of your deposition to

9    part of your answer, and it said -- just to clue you in here

10   what I'm referring to on line 20 -- "And, for instance, if

11   someone were to be physically aggressive or self-injurious in

12   the process of trying to get them examined at the clinic, then

13   the primary care physician might well write a referral just

14   based on what he's seen right there and not simply the record

15   that they are already on medication.  Again, I think this is

16   along the same lines.  The implication here is that you're

17   treating behavior."  Can you explain to me what you meant here?

18   A.   Well, there are certain circumstances -- I mean, ideally

19   we prefer to give a period of observation, see people's

20   baselines and how they are doing.  But if you have a situation

21   where a person is unable to cooperate with getting a physical

22   examination or getting lab work done or something you really

23   need, then sometimes you may need to consider a more rapid

24   short-term solution.  You might give someone like that

25   short-term anxiety medications to help them make the adjustment

Callahan - Cross

1    because then you're dealing with an issue involving the safety

2    of the individual where you're trying to find out if some of

3    their electrolytes may be out of whack or if they've got some

4    physical ailment that is making them more agitated.  The same

5    thing would happen in any hospital setting where you had

6    someone becoming agitated.  They would not wait to see what

7    happened in two weeks.  They would deal with the immediate

8    situation and then proceed from there.

9    Q.   And just because somebody is referred to you, does that

10   mean you're going to make a psychiatric diagnosis of them and

11   prescribe meds to them?

12   A.   No.

13   Q.   And, in fact, would you prescribe medication to somebody

14   like this without a psychiatric diagnosis?

15   A.   Probably not.  Although, again, it would be difficult like

16   in the particular situation where somebody first comes in the

17   door, the only thing we knew was that person was agitated.  I

18   would not necessarily make a psychiatric diagnosis other than

19   the fact that they were currently agitated.  Again, the same

20   things you would see in any emergency room, hospital setting,

21   things of that sort.  But ordinarily there's more of a process

22   that goes on.

23   Q.   All right.  Thank you, Doctor.

24   A.   Sure.

25            THE COURT:  Recross?

Judith A. Ammons, RPR, CRR, CCR
United States Court Reporter

Callahan - Cross                    5381

1          MR. TAYLOE:  No further questions, Your Honor.

2          THE COURT:  Thank you for coming.  You're excused.

3      Why don't we go ahead and take 15 minutes now?

4          (Recess at 9:46 a.m.)

5                  C E R T I F I C A T E

6      I, Judith A. Ammons, Official Court Reporter, do hereby

7  certify that the foregoing is a true and correct transcript of

8  proceedings in the above-entitled case.

9

10

11

12  /s/  Judith A. Ammons, RPR, CRR, CCR   Date: November 2, 2010
         United States Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25

                  Judith A. Ammons, RPR, CRR, CCR
                   United States Court Reporter

Gardner – Direct                                   5382

```
 1              (Proceedings continuing at 10:04 a.m.)

 2                  MR. ZAYCOSKY:  The defendants call Sandra Gardner.

 3              SANDRA GARDNER, DEFENDANTS' WITNESS, DULY SWORN

 4                            DIRECT EXAMINATION

 5   BY MR. ZAYCOSKY

 6   Q    Please state your name for the record, please.

 7   A    Sandra Gail Gardner.

 8   Q    What's your current position?

 9   A    I am a nurse manager at Conway Human Development Center.

10   Q    Could you tell us about your educational background?

11   A    I have an associate degree in nursing.  I am licensed as a

12   registered nurse with the state of Arkansas.

13   Q    Tell us about your prior work experience before your

14   current position.

15   A    I worked at CHDC in the capacity as an LPN and then I

16   worked as an RN for about three years and then I worked in a

17   hospital for three years and then come back to CHDC.

18   Q    Could you tell us what your responsibilities are in your

19   current position?

20   A    I supervise 20 RNs and oversee the clinical nursing of

21   LPNs.  I oversee the infirmary, the clinic, medical

22   transportation, and employee health.

23   Q    Does the Conway Human Development Center provide preventive

24   care for pneumonia?

25   A    Yes, we do.
```

Gardner – Direct

5383

1    Q      What kind of preventive care is provided?

2    A      The clients get a yearly pneumonia risk assessment done on

3    them by the RN that looks at their age.  If they're over 40, if

4    they have a dysphagia diagnosis, if they receive their nutrition

5    through a feeding tube in their belly, or if they need

6    assistance in eating -- someone to help feed them, if they have

7    a history of smoking or if they're a present smoker, if they

8    have oral disorders like gingivitis, and if they have excessive

9    secretions or dry mouth -- we use that form.  It was -- we

10   received that from Joan Sheppard.

11          We use that and we look at that and then the preventive

12   measures we do are reflux precautions, which is where they're --

13   the head of their bed is elevated 30 degrees.  At all times, if

14   they're laying down in bed, the head of their bed is at

15   30 degrees.  They stay up after meals for 30 minutes to an hour.

16   We do -- oral care would consist of, like, Listerine or Peridex.

17   It's -- it helps kill the bacteria in your mouth.  We give

18   them -- the doctors order what's called PPIs.  It's a

19   medication.  It's a protein pump inhibiter that decreases the

20   secretions in your stomach to keep them from having reflux.

21   We -- let me see.  They get a pneumonia shot.  Pneumovax is what

22   it's called.  And then they get a yearly flu shot if their

23   guardian or parent consents to it.

24   Q      Are there other risk indicators for pneumonia?

25   A      Excuse me?

Gardner – Direct                                    5384

1    Q    Do you know if there are risk indicators for pneumonia?

2    A    Yes.  Those are some of the ones I went over, like the

3    dysphagia.  If they have a dysphagia issue, if they have poor

4    oral care, if they're having problems with their gingivitis, if

5    they receive their nutrition via gastrostomy tube, if they have

6    dry mouth or excessive secretions, if they have had a history of

7    pneumonia in the last five years -- that's an indicator.  If

8    they're over the age of 40.

9    Q    Do you know who makes the diagnosis of pneumonia?

10   A    The physician.

11   Q    And do you know how the diagnosis is made?

12   A    The physician will assess the client.  They'll order labs

13   and chest X-rays and look at those, and they can make the

14   diagnosis from that.

15   Q    Once a diagnosis is made, do you know what steps might

16   occur to treat pneumonia?

17   A    There is several different steps.  It depends on the

18   condition.  If the resident is having problems breathing at the

19   time and requires oxygen, they could be put in our infirmary or

20   if it's -- if their condition worsens, they can be transported

21   to the hospital for treatment.  They usually receive a oral

22   antibiotic or IV antibiotic, updrafts, breathing treatments.

23   Q    Do you know who makes the decision on where the pneumonia

24   is to be treated?

25   A    The physician does.

Gardner – Direct                                                5385

1    Q    If the individual is admitted to the hospital for

2    pneumonia, how is treatment continued when he or she returns to

3    CHDC?

4    A    They're followed up once they come back to the center.  If

5    they were admitted to the infirmary before they left to go to

6    the hospital, they return back to the infirmary, and the

7    physician looks at them.  And they will -- most of the time they

8    will stay a couple of days in the infirmary for follow-up.  If

9    they were admitted from their unit or from the sick call, they

10   will come back to sick call and be seen by the physician.  And

11   the physician will determine whether they need to go to the

12   infirmary for any further treatment, and then they're followed

13   back up in the clinic after they have completed a cycle of

14   antibiotics in their treatment.  Or if their condition was to

15   worsen, they would be seen by the physician again.

16   Q    Is there any follow-up done to monitor the recovery of

17   pneumonia?

18   A    They -- they follow up in the clinic.  The physician sees

19   them to make sure that the pneumonia is clear.  There could be a

20   follow-up chest X-ray and lab draw.

21   Q    Thanks.  That's all I have.

22        MR. TAYLOE:  No questions, Your Honor.

23        THE COURT:  I have a couple.  You have 20 RNs that you

24   supervise?

25        THE WITNESS:  Yes.

Johnson – Direct                                    5386

1            THE COURT:  And you supervise LPNs?

2            THE WITNESS:  Yes.

3            THE COURT:  How many LPNs do you supervise?

4            THE WITNESS:  There is 86.

5            THE COURT:  I have heard the name Linda Henderson.

6    Where is she in this?

7            THE WITNESS:  She is the QI nurse.  She used to be the

8    director of nursing before I took her position, and she is the

9    quality RN that we have.

10           THE COURT:  All right.  Thank you.

11           MR. ZAYCOSKY:  The defendants call Cynthia Johnson.

12           **CYNTHIA JOHNSON, DEFENDANTS' WITNESS, DULY SWORN**

13                        DIRECT EXAMINATION

14   BY MR. ZAYCOSKY

15   Q    Would you identify your name for the record, please?

16   A    Cynthia Johnson.

17   Q    What is your business address?

18   A    150 East Siebenmorgan Road, Conway, Arkansas.

19   Q    What is your current position?

20   A    Clinical speech pathologist.

21   Q    Is that at the Conway Human Development Center?

22   A    Correct.

23   Q    Could you tell us about your educational background,

24   please?

25   A    I have an undergraduate degree in speech pathology from the

Johnson – Direct                                    5387

1    University of Central Arkansas, and that included a minor in

2    special education.  I have a teaching certificate in special

3    education.  I have a graduate degree in speech pathology.  At

4    that time it was Memphis State University.  And I also have

5    post-graduate hours in special education from Vanderbilt

6    University.

7    Q    Are you currently licensed or certified?

8    A    Yes.  I am licensed by the state of Arkansas, and I have a

9    certificate of clinical competence from the American

10   Speech-Language and Hearing Association.

11   Q    Tell us about your work experience prior to your current

12   position.

13   A    Basically, I have had this position since I have got out of

14   school.  My original intent as a young graduate was to work

15   there long enough to pay off my car, and I am on my fourth one

16   now.  So I found a place that I really enjoy.  So I have been

17   there for 29 years now.

18   Q    What are the responsibilities that you have in your current

19   position?

20   A    I do clinical work, clinical therapy.  I have a

21   speech-language case load and also a dysphagia case load.  I do

22   assessments, speech-language, augmentative communication in

23   dysphagia, do in-service training, participate in special

24   projects.  I represent the speech services administration --

25   administratively and also in other different types of meetings.

Johnson – Direct                                    5388

1    Q    Do you know which school-age residents have access to

2    speech-language therapy services?

3    A    All residents, regardless of their age, have access to

4    speech-language therapy services.

5    Q    And when are, particularly, school-age residents evaluated

6    by CHDC to determine whether speech-language therapy services

7    are necessary?

8    A    They're evaluated within 30 days of admission, and then

9    they're evaluated every three years.  And they can be evaluated

10   at any time at the request of the interdisciplinary team.

11   Q    Do you know among the school-age children at CHDC now how

12   many of them receive direct speech therapy?

13   A    29.

14   Q    And are you aware of how many total school-age children are

15   at CHDC?

16   A    I believe there are 50 currently.

17   Q    Do you know in public schools, are all special education

18   students enrolled in speech therapy?

19   A    No, they are not.

20   Q    And which school-age residents at CHDC receive formal

21   augmentative or alternative communication assessments?

22   A    All of our school-age population has received a formal

23   assessment.

24   Q    All right.  Generic communication boards available at

25   various locations at CHDC?

Johnson – Direct                                    5389

1   A      Yes.  We have approximately 60 boards that are scattered

2   all throughout campus.  Then we have health or medical related

3   boards that are in each of the nurses stations in the residence.

4   Those boards are also at 25 other locations across campus.

5   Q      Who is able to access those communication boards?

6   A      Any resident.

7   Q      Do you know how many school-age residents are nonverbal?

8   A      21.

9   Q      Do any of those individuals have augmentative communication

10  systems?

11  A      Yes.  Right now approximately seven.

12  Q      And have they been trained to use them?

13  A      They're being trained.

14  Q      Do they take those devices with them across the campus?

15  A      I believe that six of them do.

16  Q      Do the verbal school-age residents require augmentative or

17  alternative communication systems?

18  A      No.  Simply because they are verbal.

19  Q      What type of training is it -- speech conducted for staff?

20  A      We do in-service training on augmentative communication and

21  dysphagia.  We do training -- our speech aide does training in

22  Phase 1 and Phase 2, and she, in conjunction with speech

23  pathologists, do training on dysphagia and augmentative

24  communication.

25  Q      Do you know if any of the staff ever receive training in

Johnson – Direct                                          5390

1    sign language?

2    A    All our clinicians have at least one college-level course

3    in sign language.

4    Q    Do you know if CHDC uses the PECS, the picture exchange

5    communication system?

6    A    We do not.

7    Q    What's the reason for that?

8    A    Well, of course that is just one of many programs that are

9    available, and we look at each program to see if that may be

10   something we would want to pursue.  But we feel like our therapy

11   is more person centered than product driven.  So we feel like

12   the kind of therapy they're receiving currently is appropriate.

13   Q    With respect to developing communications skills, can you

14   describe what practice is used at CHDC?

15   A    To develop communication skills?

16   Q    You are not using the PEC system.  Is there a methodology

17   or --

18   A    The programs our clinician designed, they're individualized

19   specifically for that student or resident.

20   Q    Do you know if that -- that system is used in other parts

21   of the country?

22   A    Yes.  It is used extensively in other parts of the country,

23   and we do what's known as traditional therapy.  And that is used

24   still across the United States.  And also, last fall, I did some

25   clinical work in England actually at the Peace Children's Center

Johnson – Direct                              5391

1    that's in Wofford right outside of London.  And all the therapy

2    I participated in at the center and in the public schools was

3    traditional therapy.

4    Q    Do you know if the students on your case load are meeting

5    their objectives?

6    A    Yes, they're meeting their objectives.  If they're not,

7    then a plan of action is developed to assist them in meeting

8    those objectives.

9    Q    Does each child receive its -- his or her own assessment

10   for speech?

11   A    Yes, that's correct.

12   Q    Can you describe the plan of action that might occur if

13   someone is not meeting their objectives?

14   A    Okay.  It would be specific for that individual.  It may be

15   to offer them more trials during the session.  It might be to

16   train their program first, maybe to put them in a smaller group

17   situation.  So there are many things that we might look at.

18   Q    Does the CHDC staff provide instructions to staff after

19   reviewing choking incidents?

20   A    Yes.

21   Q    What kind of instructions or staffings are done, if you

22   know?

23   A    Okay.  We may revise the eating plan.  There is a special

24   staffing that the team has that they could develop special

25   instructions for that individual, but I have a list here that I

Johnson – Direct

1    can go through, steps that happen after someone has a choking

2    incident.

3        There is immediate medical management, as indicated by the

4    circumstances, with a follow-up by speech.  There may be a

5    special staffing.  The follow-up by speech could include

6    updating the choking risk assessment if the level changes,

7    updating the dysphagia disorder survey, modifying the diet or

8    liquids with a referral to dietetics, changing adaptive eating

9    equipment with referral to occupational therapy, altering

10   positioning with referral to physical therapy, revising the

11   eating plan, referring for a swallow study by referral to a

12   physician, staff in-service training.  It could be a

13   recommendation for increased supervision that would be referral

14   to the team.  It could be referral to the physician for

15   additional medical assessment or intervention or it could be a

16   referral to the psychological examiner.

17   Q    Do you know who completes pneumonia risk assessments?

18   A    Nursing staff.

19   Q    What type of routine observations are done by professional

20   staff to document concerns for choking, if you know?

21   A    That would be dysphagia disorder survey and choking risk

22   assessment that's done at least annually, monitoring by speech,

23   food service audit reports, mealtime monitoring forms, program

24   coordinator to monitor objectives.  There can be a request from

25   medical to monitor an individual.  It can be done at the

Johnson - Direct                                          5393

1    discretion of the clinician or it can be done at the request of

2    the team.

3    Q    I think we have heard testimony from one of plaintiff's

4    experts suggesting that CHDC staff wait for a choking event to

5    occur before they will document concerns -- assessments for

6    choking risk.  Are you able to respond to that?

7    A    Basically, all of our techniques are proactive in the

8    prevention of choking.  We would have individualized diets and

9    diet textures, proper positioning during mealtimes and all

10   instances of oral intake, the use of adaptive eating equipment

11   to facilitate intake in a safe manner, nutrition by tube when

12   oral intake is unsafe or inadequate, implementation of eating

13   plans with procedures that are individual specific, in-service

14   training of staff regarding eating plans, diet consistencies,

15   choking prevention, and other pertinent topics.

16        Identification of choking and pneumonia risks to increase

17   staff awareness, medical management of rumination, reflux, and

18   other conditions impacting oral intake, and referrals for

19   medical tests and procedures including, but not limited to,

20   swallow studies, upper GIs, and esophagrams.

21   Q    What kind of information does the food service audits and

22   mealtime monitoring forms contain, if you know?

23   A    Yes.  Food service audits can cover the manner in which the

24   food is served.  It also looks at the positioning of the staff

25   person when feeding that individual.  So it covers a wide

1    variety of areas.  The mealtime monitoring form checks for signs

2    of silent aspiration, such as coughing, watery eyes, things of

3    that nature, use of adaptive equipment, meal refusals are just

4    some examples.

5    Q    Can you respond to plaintiff's allegation that the

6    monitoring does not accurately address interventions?

7    A    Well, we can follow an individual by their outcomes, their

8    functional outcomes.  So the monitoring would let us know about

9    quality-of-life issues.  Had there been choking instances,

10   pneumonias, things of that nature.  Also, now that we have

11   implemented the current dysphagia disorder survey for

12   approximately five years, we do trending.  So we can look at

13   scores across individuals or units to determine if their scores

14   are increasing or decreasing.

15   Q    What kind of guidelines are available for staff to guide

16   them on how to address individuals with a high risk of choking?

17   A    We have eating plans that are individualized for each

18   client.

19   Q    Are all eating plans consistent with concerns for risk of

20   choking?

21   A    I believe you're referring to the manner in which the high

22   risk is noted on the plan.  Is that what you are referring to?

23   Q    I think it was one format that was previously used and in

24   another format it's being used now.

25   A    At one point in time, it was at clinician discretion.  They

Johnson – Direct                                    5395

1    might capitalize the H in hive or high risk or it could be maybe

2    in red or different size fonts.  So now we all use bold font,

3    all capitalized letters.

4    Q    So now or even in the recent past, how was -- how were

5    staff alerted if someone was high risk?

6    A    Well, there are several different ways.  First of all,

7    there is the choking risk assessment, and that goes to the

8    individuals' residences, the program coordinator, nurse, and

9    other team members as indicated.  It's in the IPP, which is

10   available to all staff.  It's on the individual's 24-hour

11   schedules.  It's in the quick reference guide.  It's indicated

12   on the diet sheets and also the eating plans.

13   Q    Are staff monitored on how they feed individuals?

14   A    They're monitored, at the time that the speech pathologist

15   is in the unit, by the clinician.  They're also monitored

16   through the food audits.

17   Q    Are they also monitored by the dysphagia disorder surveys,

18   the mealtime monitoring forms?

19   A    Yes.

20   Q    The -- is there any other monitoring done routinely by

21   speech pathologists?

22   A    With regard to the dysphagia?

23   Q    Yes.

24   A    Well, we're basically in the unit.  Probably we see

25   individuals an average of 15 times a year.

Johnson – Direct                                        5396

1   Q    Is it possible that documentation may conflict with one
2   document listing a low risk and another listing a high risk?
3   A    Yes.  And there are times when that occurs.  And the
4   situation is that once the speech pathologist completes the
5   choking risk assessment, then that individual's risk level could
6   change.  So it takes a small amount of time then for the quick
7   reference guide and other documentation to reflect that
8   changes -- those changes.  So it is very possible that one
9   document might conflict with another.
10  Q    You may have already touched on this, but are speech
11  pathologists involved with new employee training?
12  A    Yes.  Our speech aid conducts training in Phase 1 and
13  Phase 2.  And at this point in time, there is a certified
14  clinician that attends training with her, and then they're able
15  to answer any specific questions that a student may have
16  following her presentation.
17  Q    Is dysphagia training provided to new employees also?
18  A    Yes.
19  Q    Are you able to briefly describe it?
20  A    The dysphagia training covers silent signs of aspiration,
21  thickening of liquids, use of adaptive equipment.  It notifies
22  the new employees that each individual has an eating plan and
23  that they should check that eating plan prior to assisting that
24  individual at mealtimes.
25  Q    Can you describe the qualifications of the staff that are

Johnson – Direct

1   providing the training?

2   A    Currently it's the speech aide, and she is certified by the

3   Arkansas Department of Human Services.  She has 33 years of

4   experience in developmental disabilities and a number of years

5   working under the supervision of speech-language pathologists.

6   Q    Can you describe for us the -- how a communication device

7   is developed at CHDC?

8   A    Well, the first thing we want to do is get input from the

9   individual and staff members as much as possible.  So we send

10  out surveys to staff, and I also, as much as possible, work with

11  that individual to get a list of things that they might want on

12  their board.  We also communicate with the parents, and then

13  there are standard lists of words -- they're most frequently

14  included on communication boards.  That would be the pictures

15  and symbols.  And then that kind of gives a nucleus of how we

16  start development of a particular board.

17  Q    How does CHDC ensure that floaters and staff are receiving

18  sufficient information training for individuals at mealtime?

19  A    We do in-service training with the supervisors of each

20  unit, and it is then their responsibility to ensure that any

21  staff assisting with that individual is in-serviced.

22  Q    If a resident has multiple choking incidents in one year,

23  do they have more than one assessment of choking risks?

24  A    They are followed up by speech pathology after each choking

25  event, and if their choking level changes, a new risk assessment

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

1    can be completed.

2    Q    And I apologize if this is a little out of sequence, but do

3    you know, are supervisors provided competence-based training for

4    teaching others as well as with the skills that they are

5    teaching to supervisees?

6    A    In the past it's been a procedure review, and currently

7    we're implementing competency-based training.

8    Q    An issue has been raised by the plaintiffs about a notation

9    in the central dysphagia committee meeting minutes subsequent to

10   the death of AR and -- I am able to characterize their

11   representation that it looked like there was a one-line entry on

12   the meeting minutes of the central dysphagia committee.  Are you

13   aware of the document that I am referring -- or the

14   circumstances I am referring to?

15   A    I am somewhat aware, and I believe that the dysphagia

16   committee felt that that was being handled through an

17   administrative review.

18   Q    Are you able to describe briefly what the administration

19   did in response to that?

20   A    No, I am not.

21   Q    Are you able to tell us why the description of the meeting

22   minutes was so brief?

23   A    Because that individual was deceased, so there were no

24   longer any supports that could be offered at that time.  And

25   other issues were being handled administratively.

```
 1              MR. CHENG:  Objection, Your Honor.  Can we get more of
 2     a foundation?  She only indicated she is somewhat aware, and
 3     it's not clear what the basis is of this information.
 4     BY MR. ZAYCOSKY
 5     Q    Are you on the central dysphagia committee?
 6     A    Correct.
 7     Q    So you are familiar with the meeting minutes as part of
 8     that?
 9     A    Correct.
10              MR. ZAYCOSKY:  That's all I have.  Thanks.
11                        CROSS-EXAMINATION
12     BY MR. CHENG
13     Q    Good afternoon, Ms. Johnson.  My name is Christopher Cheng.
14     I will be doing the examination.  I believe you met my
15     colleague, Ms. Dean, during the original deposition?
16     A    Correct.
17     Q    Ms. Johnson, just in terms of the services that you provide
18     as a speech-language pathologist, you offer many of these same
19     services in the community setting, correct?
20     A    Yes.  I also work at Cottonwood Place.  It's a small,
21     ten-bed ICF/MR facility in Morrilton, Arkansas.
22     Q    There are about ten residents there?
23     A    Correct.  Ten-bed.
24     Q    So for example, you can provide training on aphagia when
25     you are in the community?
```

Johnson – Cross                                    5400

1    A    Are you speaking of aphagia or dysphagia?

2    Q    Aphagia.

3    A    I currently do not do any work with aphagia.

4    Q    You did at one point in the community?

5    A    I don't know what you are referring to.

6    Q    Let me ask you this.  You can provide in-service training

7    for staff in the ICF/MR in the community in areas of therapeutic

8    feeding?

9    A    Yes.

10   Q    You can provide in-service on augmentative communication?

11   A    Correct.

12   Q    You can provide in-service on alternative communication?

13   A    Correct.

14   Q    And you even include six hours of basic American sign

15   language in your practice in the private sector, correct?

16   A    Now, are you asking if I currently teach sign language in

17   the private sector?

18   Q    That was what you used to provide when you were, you know,

19   providing services at the ICF/MR in Morrilton, correct?

20   A    Correct.  I would say that in the past that I have provided

21   some sign language training.

22   Q    And you were able to provide direct therapy out in the

23   community as well, correct?

24   A    Correct.

25   Q    So all those types of services that you provide, you can

Johnson - Cross

1    provide them in the community as well as what you provide at

2    Conway, right?

3    A    Correct.

4    Q    Now, I do want to just -- just a clarification about a

5    document that was given to us right before you started

6    testifying.  It looks like it's a handwritten copy of the notes

7    that you brought up with you.

8    A    Uh-huh.

9    Q    Did you prepare these notes yourself?

10   A    Yes.

11   Q    So this is your handwritten copy of what you brought up as

12   well?

13   A    Correct.

14   Q    So your copy is about five pages long as well?

15   A    Correct.

16   Q    And for example, when you were testifying about the

17   precautions once choking occurs, you listed a series of things.

18   That's basically what you have listed on your notes, right?

19   A    Yes.

20   Q    You just memorized what you had written and read off your

21   notes and that's what you do?

22   A    Correct.

23   Q    And when you were talking about all the different ways you

24   monitor and made observations, again, you were just basically

25   reading off your notes?

Johnson – Cross

1    A    Correct.

2    Q    And when you were talking about how staff were notified

3    about people at high risk of choking, again it's what you read

4    off your notes?

5    A    Yes.

6    Q    And when you are talking about your proactive procedures,

7    again it's what you read off your notes?

8    A    Correct.

9    Q    And in coming to this information, did you ever talk to

10   anyone else at CHDC about how these processes work or talk to

11   anyone else about your testimony today?

12   A    No.  But these processes were developed at CHDC.

13   Q    Ms. Johnson, your case load is about 100 residents; is that

14   right?

15   A    Not currently.

16   Q    But it used to be about 100 residents?

17   A    Correct.

18   Q    You mentioned a couple of times that things were, you know,

19   "at present" or, you know, "currently."  You used language like

20   that.  A number of the practices you are talking about in your

21   testimony were only recently changed, correct?

22   A    Some were.

23   Q    Well, let's take a look, for example, at the number of

24   children who are now receiving speech-language services.  Is

25   that a change?

Johnson – Cross                                    5403

1    A    That changes frequently because we could get a request from

2    the team and an individual could be picked up for therapy or

3    someone could be dismissed from therapy.  So that number would

4    always be fluctuating.

5    Q    But, for example, you talked about how there is now a

6    clinician as part of the Phase 1 and Phase 2 training to answer

7    questions.  Is that new?

8    A    Well, there had only been -- the training only started

9    recently.

10   Q    Okay.  Similarly, when you talked about how you started

11   competency training --

12   A    Yes.

13   Q    -- that's, that's -- and it used to be, in the past,

14   procedure based; is that right?

15   A    Correct.

16   Q    So that's also something that's very recent?

17   A    To the degree that it is now, yes.

18   Q    And when you say "competency based," are you talking

19   about -- well, let me move on.  I guess -- you also talk about

20   including silent aspiration on the mealtime monitoring forms,

21   right?

22   A    Yes.

23   Q    Is that recent?

24   A    No.  I would have to review the records, but those have

25   been in place for quite some time.

Johnson - Cross                                    5404

1   Q    What is silent aspiration?

2   A    Where food or liquids may be going into the lungs without

3   any overt signs.

4   Q    Okay.  And so for example, there are some people who maybe

5   aspirate, but they don't necessarily choke, correct?

6   A    Correct.

7   Q    They may not even cough?

8   A    Correct.

9   Q    But their eyes might water and their face might turn red;

10  is that right?

11  A    Yes.

12  Q    Were you aware that Dr. Sheppard seemed to make a big

13  difference between what should go to the dysphagia committee --

14  she seems to distinguish between choking events versus

15  swallowing events.

16  A    I am not sure that I follow you, Mr. Cheng.

17  Q    I am just asking if you are aware that Dr. Sheppard seems

18  to think there is a difference between what really needs to be

19  brought to the attention of the central dysphagia committee.

20  A    Are you referring to the difference of choking versus a

21  difficult swallowing event?

22  Q    Yes.

23  A    We define choking as block of airway, blockage of airway,

24  and a difficult swallowing event would not necessarily block the

25  airway.  And what we discovered happening was that our staff was

Johnson - Cross

1    reporting a number of instances that were not in fact choking

2    instances.

3    Q     But in terms of aspiration or increased risk of things like

4    aspiration pneumonia, whether you are choking or having

5    swallowing events or silent aspiration, in many ways that

6    doesn't matter, correct?  You may still be at risk?

7    A     You could still be at risk, yes.

8    Q     Okay.  Let me talk a bit about your own -- your own job

9    function.  You used to be responsible for supervising all of the

10   speech-language pathologists until about 1997; is that right?

11   A     Correct.

12   Q     Now, even though -- I guess you have been described as a

13   speech-language supervisor.  It's actually Mr. Price who has

14   authority over speech-language services over the whole facility?

15   A     He has the final say as the superintendent.

16   Q     And the other speech-language pathologists are actually

17   individuals supervised by team leaders; is that right?

18   A     And the program coordinator.

19   Q     And you do not review their assessments or plans, correct?

20   A     Correct.

21   Q     And no one reviews their work clinically, correct?

22   A     Correct.  But I would like to speak to that supervision

23   aspect if I may.

24   Q     If you don't mind, I think this is one of the things that

25   is unusual about court process versus when people are having

1    discussion.  We will ask our questions to get our point clear,

2    and then Mr. York will take that opportunity to elaborate.

3    A    Thank you for that clarification.

4    Q    We have been giving that same explanation throughout the

5    trial.

6    A    Well, I am a speech person, so I want to talk.

7    Q    I understand.  I am a lawyer.  I do too.

8    A    I can empathize.

9    Q    So basically, though, each of you functions independently

10   in your case load?

11   A    Essentially.

12   Q    And there is also no formal system to ensure coverage when

13   one of you is absent for a significant period of time; is that

14   right?

15   A    I don't know that I would call it "formal" because the case

16   load changes so much, but our general rule of thumb is, if

17   someone is out for less than two weeks, their partner covers

18   their case load.  And if it's going to be more than two weeks,

19   then we have a meeting to redistribute their responsibilities.

20   Q    But it's not a formal system; this is just something you do

21   as a matter of course or as a rule of thumb?

22   A    That's correct.

23   Q    Now, how would you define sort of the core mission of

24   speech-language pathology?  Would it be accurate to say that

25   your department tries to determine the level of function of the

Johnson – Cross                                                    5407

1   individuals and see if they'll benefit from therapy?

2   A    That -- yes.  That would definitely be included.

3   Q    Now, even though you talked about how frequently the

4   assessments are done, there is actually no standard on how to

5   perform assessments on those receiving direct therapy at Conway;

6   is that right?

7   A    If they're school age, they're assessed every three years.

8   If they're over school age, then it's at the discretion of the

9   interdisciplinary team.

10  Q    So it's more accurate to say there is no standard on how

11  often those assessments are done on people who are above school

12  age?

13  A    It's done at the discretion of the team.

14  Q    As for the choking risk assessments, those are usually done

15  once each year at the resident's annual staffing; is that right?

16  A    That's when they're most frequently done, yes.

17  Q    And if someone chokes, they are not necessarily reassessed,

18  correct?

19  A    That is no longer correct.  In the new form that we have

20  developed, if they're -- because of their choking, the risk

21  level could change, and that would entail a new choking risk

22  assessment.

23  Q    And that's another one of these very recent changes?

24  A    Yes.

25  Q    So were these changes in the last couple of months?

Johnson - Cross

1    A    Well, they have actually been in process for about a year,

2    but we had to go through review by the committee, review by the

3    speech pathologists.  It had to go through a forms committee.

4    So it's actually been in process for a bit.

5    Q    But actually in terms of implementation, it's fairly

6    recent, right?

7    A    Correct.

8    Q    How many weeks has it been in place?

9    A    I would say months.

10   Q    A couple of months?

11   A    Uh-huh.

12   Q    I'm sorry.  That's a yes?

13   A    Oh, I'm sorry.  Yes.

14   Q    Thank you.  And until, I guess, these recent changes, do

15   you recall you were asked if these were ever done at any time of

16   the year besides annual staffing, and you indicated they are

17   not?

18   A    At that time, that was correct.

19   Q    I think you may have already addressed this, but I want to

20   make sure it's clear.  You defined choking to be an obstruction

21   of the airway?

22   A    Correct.

23   Q    And an extreme swallowing event is where someone has

24   difficulty swallowing, but there is no obstruction of the

25   airway, correct?

```
 1    A    Correct.
 2    Q    In the terms of terminology at CHDC, the terms "difficult
 3    swallowing event" and "extreme swallowing event" are basically
 4    the same?
 5    A    Yes.
 6    Q    Now, you talked about those mealtime monitoring sheets.
 7    Those sheets are for the entire unit, correct?
 8    A    Could you clarify that?
 9    Q    Right.  It's not as though you have a particular sheet for
10    each person.  It's here is a mealtime monitoring sheet people
11    are tracking for that unit, for everyone on that unit; is that
12    right?
13    A    Every client is listed on the monitoring form, yes.
14    Q    So for example, if someone wanted to track if there is
15    something going on with a particular individual, someone has to
16    manually go back through those sheets and pull the information
17    out; is that right?
18    A    That's correct.
19    Q    Those sheets are then sent to the speech-language
20    pathologist?
21    A    Yes.  And also to the dietician.
22    Q    Now, if someone starts to choke on their food, but they
23    cough it up and clear their own throat, is that considered a
24    choking event or a swallowing event?
25    A    If the airway is not obstructed, it would be considered a
```

Johnson – Cross

5410

1    difficult swallowing event.

2    Q    But the person who makes that determination is usually a

3    nurse, right?

4    A    It can be.

5    Q    At the time of your deposition, I believe you indicated it

6    normally was a nurse, right?

7    A    That sounds correct.

8    Q    Okay.  And the thing about that is, whoever is making that

9    determination -- I assume the nurse is not actually on the unit

10   when someone is having trouble swallowing, right?

11   A    That would be variable.  She could very well be there.  She

12   could be present.

13   Q    That's pretty unusual, though, right?  The swallowing

14   event -- people have swallowing difficulties all the time at

15   Conway, right?

16   A    No, I wouldn't say all the time.  And also, nurses are in

17   the unit, so it would be very likely that a nurse would be

18   present.

19   Q    All right.  Now, there are no specific guidelines at CHDC

20   as to when the staff are supposed to notify the nurse of signs

21   of distress or struggle when the resident has a meal, correct?

22   A    The staff do notify the nurse if a resident is having

23   difficulty.

24   Q    Right.  I am sure some of them might, but there are no

25   specific guidelines to staff on when they're supposed to notify

Johnson – Cross                                  5411

1   a nurse when there is a swallowing incident, right?

2   A    No.  Not specifically in the manner in which you are

3   referring.

4   Q    And I guess maybe this is the problem with double

5   negatives.  So are there specific guidelines for notifying the

6   nurse when there are signs of distress or struggle?

7   A    They are instructed to notify the nurse.

8   Q    But they don't have guidelines of when that is supposed to

9   happen, right?

10  A    As soon as possible.

11  Q    Well, let me clarify it a little more then.  If we could

12  take a look at your deposition on page 74.  On line 14, question

13  was:  "How would nursing staff be aware of something like an

14  individual who coughs during meals?

15       "Answer:  Residence staff could report it to the nurse.

16       "Question:  Are there any guidelines for residence staff as

17  to when they're supposed to report signs of distress or struggle

18  to the nurse with a meal?

19       "Answer:  Not specifically."

20       That was your answer, correct?

21  A    Correct.

22  Q    All right.  Besides choking, certainly at the time of your

23  deposition, you were not aware if the other staff are monitoring

24  for other indicators of aspiration, correct?

25  A    Correct.

Johnson – Cross

5412

1    Q    For example, at the time when you were asked, you did not

2    know if staff were tracking coughing during medication passes?

3    A    Correct.

4    Q    Or during tooth brushing?

5    A    Correct.

6    Q    Or if they tracked to see if someone has watery eyes, for

7    example?

8    A    They did that with monitoring forms.

9    Q    But at the time of your deposition, you were not

10   specifically aware if that was going on?

11   A    Correct.

12   Q    Similarly, at the time of your deposition, you were not

13   aware if they were tracking whether someone's face keeps getting

14   red?

15   A    Correct.

16   Q    Besides choking and pneumonia, there are other indicators

17   of health risks that are associated with physical and

18   nutritional management, correct?

19   A    Yes.

20   Q    For example, dehydration?

21   A    Yes.

22   Q    Constipation?

23   A    Yes.

24   Q    Bowel impaction or obstruction?

25   A    Correct.

Johnson - Cross                                                5413

```
 1   Q     Recurrent upper-respiratory infection?

 2   A     Correct.

 3   Q     And at the time of your deposition, you were not personally

 4   tracking such indicators, correct?

 5   A     Correct.

 6   Q     And the way the mealtime monitoring sheets, the way they're

 7   used varies somewhat by unit, right?

 8   A     It has the same information, only with different clients'

 9   names.

10   Q     But, for example, some of the units still fill out the

11   sheets once a month for everyone on the unit, while others will

12   just note for everybody if they see something unusual, right?

13   A     Correct.

14   Q     And is that the case still?

15   A     As far as I am aware, it is.

16   Q     Now, you have talked about some of the screening

17   instruments that are used.  The dysphagia screening instrument

18   is the one that was provided by Dr. Sheppard, correct?

19   A     Correct.

20   Q     It has a numerical rating scale?

21   A     Yes.

22   Q     And you gather information through her survey instrument

23   and then you score people for their risk; is that right?

24   A     Correct.

25   Q     You will identify whether someone has no disorder, mild,
```

Johnson – Cross

1    moderate, severe, or profound?

2    A    Yes.

3    Q    And that's their level of risk?

4    A    Correct.

5    Q    And once you get a score, you do not have particular

6    protocols that would automatically go into place depending on

7    the score risk factor, correct?

8    A    Correct.

9    Q    And so someone who scores more poorly is not necessarily

10   someone who is monitored more frequently, right?

11   A    Yes.

12   Q    So there is no requirement that the speech-language

13   pathology staff more frequently assess staff work with that

14   resident, right?

15   A    Correct.

16   Q    As a matter of fact, you were not aware of any system in

17   place to ensure a higher level of monitoring for individuals

18   with a higher level of risk, right?

19   A    Correct.

20   Q    At the time also of your deposition, you had no involvement

21   with pneumonia risk assessments, correct?

22   A    Correct.  That's completed by nursing staff.

23   Q    And you were not reviewing them as part of an annual

24   review, right?

25   A    Correct.

Johnson - Cross                                          5415

1    Q    But you thought that these types of things are viewed in

2    the central dysphagia committee?

3    A    Yes.

4    Q    And I think you talked about that earlier.  You are a

5    member of that committee?

6    A    Yes.

7    Q    So, for example, earlier when we were talking about your

8    notes and you are talking about monitoring and your proactive

9    efforts, you're including this committee as part of that effort,

10   the monitoring effort?

11   A    Including the committee?

12   Q    The work of the committee.

13   A    Well, as members of that committee, we do that work.

14   Q    Okay.  For people who develop pneumonia at the time of your

15   deposition, you could not say whether they were monitored more

16   frequently, correct?

17   A    Correct.

18   Q    You also could not say whether the staff's work with a

19   resident would be reassessed.

20   A    Correct.

21   Q    And whether any specific guidelines or protocols go into

22   place for the follow-up after a person has pneumonia; is that

23   correct?

24   A    Correct.

25   Q    And although I guess there have been some changes to what

Johnson - Cross                                          5416

1   happens after swallow studies -- have there been changes to what

2   happens after a swallow study?

3   A     Other than a distribution list on the wall on the study

4   itself?  Is that what you are referring to?

5   Q     Is that the change?

6   A     I'm not sure if that's what you are referring to.

7   Q     Okay.  Well, let me ask you this.  Is there a formal

8   reassessment or team meeting after the swallow study?

9   A     Not necessarily.

10  Q     And I guess there was some discussion about the

11  low-risk/high-risk classification.  I take it there is a list of

12  people who are considered at risk of choking or aspiration,

13  correct?

14  A     Correct.

15  Q     And it lists more than half of residents of CHDC?

16  A     I would think that would be accurate.

17  Q     But as a group, there is no difference between the level of

18  treatment for those who are on the list and those who are not?

19  A     We try to treat everyone with the same high level.

20  Q     All right.  Now, you do not typically receive feedback from

21  the team leaders on the speech pathologists that they supervise,

22  correct?

23  A     Correct.  I can provide them with feedback at any time.

24  Q     I guess -- this may have been addressed already, but you

25  have five speech therapists.  And I think you described a speech

Johnson - Cross

1    aide; is that right?

2    A    There are currently, including myself, seven clinicians and

3    one speech aide.

4    Q    When you say "clinicians," what do you mean by a clinician?

5    A    Speech-language pathologists.

6    Q    Would these be certified?

7    A    All are certified except one that's in her clinical

8    fellowship year.

9    Q    And a speech aide is not considered a clinician?

10   A    Correct.  But she is certified.

11   Q    And the speech-language pathologists or clinicians would

12   provide therapy evaluations and staff training?

13   A    Correct.

14   Q    Now, this speech aide is Sylvia Wooley?

15   A    Yes.

16   Q    She has a high school degree?

17   A    Correct.

18   Q    Now, one of her jobs is to deal with this communication

19   board issue, correct?

20   A    Correct.

21   Q    Her duties include things like training staff on where the

22   boards are located?

23   A    Yes.

24   Q    Or what to do if the boards are damaged or missing?

25   A    Correct.

Johnson - Cross

5418

1   Q    And she provides this training for the staff areas in

2   training areas?

3   A    Correct.

4   Q    And for the nursing staff?

5   A    Yes.

6   Q    Does she provide such training for residential staff?

7   A    Yes.  She can.

8   Q    And she actually provides a majority of this training,

9   right?

10  A    Yes.

11  Q    But she does not generally monitor whether the individuals

12  are using the words, right?

13  A    Correct.

14  Q    So this is more general training and not intended to be

15  person specific?

16  A    It could be person specific in some instances.

17  Q    But not generally, right?

18  A    Well, we have more general communication boards in use than

19  specific.

20  Q    I meant more in terms of the training.  It's not general

21  training -- or rather, it is general training, not meant to

22  be --

23  A    More general training, yes.

24  Q    And there is no quality assurance checks to make sure

25  people are attending the training, correct?

Johnson - Cross                                    5419

1    A    In what manner are you speaking?

2    Q    For example, even though people have Phase 1 and Phase 2

3    training and even though there is all this training on how to do

4    the different things you do, there is no actual check from a

5    quality assurance standpoint to make sure everyone has gotten

6    the training, correct?

7    A    Correct.

8    Q    You give it a couple of times a year and you hope everyone

9    attends, but we don't actually make sure they're doing it,

10   right?

11   A    We give it three times a year.

12   Q    Does that basically accurately describe how that process

13   works?

14   A    Yes.

15   Q    All right.  Even the speech-language training that is

16   included in Phase 1, that really started about three months

17   before your deposition, correct?

18   A    Correct.  Because most of the training had been in the

19   units itself.

20   Q    Okay.  And that training is still mostly provided by

21   Ms. Wheeler, right?

22   A    With a clinical speech pathologist in attendance.

23   Q    That's a relatively new thing, having the provider --

24   clinician in attendance, right?

25   A    She only provided in-service training one time before

Johnson – Cross

5420

1    clinicians were assigned to observe her.

2    Q    And although you have talked about competency training now,

3    at the time of your deposition, your department was not provided

4    competency training, correct?

5    A    Correct.

6    Q    And at the time, staff were not formally trained to watch

7    out for signs of silent aspiration, right?

8    A    Correct.  Not by my department specifically.

9    Q    Okay.  And there was no formal monitoring to make sure that

10   the staff training was actually effective, correct?

11   A    We do that through functional outcomes.

12   Q    But that's just trying to look at the outcomes informally.

13   There was nothing formal to go back and see is the staff

14   training helping things out in a more constructive way, right?

15   A    I think functional outcomes would be the desired outcome.

16   Q    If we can just take a look at your deposition at 101.  The

17   line was line 10.  The question was:  "Do you do any formal

18   monitoring to make sure that staff training is actually being

19   effective?

20       "Answer:  No."

21       That's what it says, right?  That was your answer?

22   A    Correct.

23   Q    Let's talk a little about direct therapy generally.  Across

24   the facility about 65 people receive direct therapy; is that

25   right?

Johnson – Cross

1   A    I think currently it's probably closer to 80.

2   Q    And that's because many of the children were added to the

3   direct therapy list?

4   A    No.  Not necessarily.

5   Q    Okay.  But there has been an increase since your

6   deposition?

7   A    In school-age children, I would have to review the record

8   to answer.

9   Q    Okay.  And going through the different lists, there was a

10  list of people who received direct therapy services; do you

11  recall that?

12  A    Yes.

13  Q    And at the time of your deposition at least, you were asked

14  if any of the people who had been added to the list in the past

15  few years were adults.  Do you remember that?

16  A    That does sound familiar.

17  Q    And you cannot point to any adult on the list who had been

18  added in the last few years, right?

19  A    For my case load, I could, but not for the other

20  clinicians.

21  Q    But certainly at the time of your deposition, that was true

22  for everybody, right?

23  A    True.

24  Q    Okay.  And to get on that list, you typically need a team

25  recommendation or evaluation; is that right?

Johnson – Cross                                    5422

1    A    Yes.

2    Q    And you mentioned that for adults earlier -- you indicated

3    that, I guess, if there is an assessment or team evaluation,

4    someone can still get speech-language therapy services if

5    they're an adult, right?

6    A    A team evaluation?  Are you speaking of a referral from the

7    team for an evaluation?

8    Q    I guess if someone -- I guess if the team -- well, let me

9    put it this way.  I guess for adults, they might be able to get

10   therapy services if there is a referral from the team, right?

11   A    That's one way, yes.

12   Q    Okay.  And if there is some kind of evaluation that's done

13   that shows maybe they should benefit from the services?

14   A    An evaluation is done to show if they would benefit from

15   services, yes.

16   Q    But there is no threshold trigger from when these types of

17   additional assessments should be done, right?

18   A    Correct.

19   Q    And do you recall when you were asked how many of these

20   types of referrals or assessments are done each year, you could

21   not recall any or could not answer that question?

22   A    That question related to how many referrals came from the

23   team, and we did not track that information.  So I didn't know

24   the answer.

25   Q    But it was also a memory issue.  You couldn't recall it

Johnson – Cross

1    ever happening recently, right?

2    A    For my case load, it hadn't, but I wasn't aware of anyone

3    else's.

4    Q    Let's talk a little about the diet sheets and eating plans.

5    Do I understand that diet sheets are sort of for each unit?

6    A    Correct.

7    Q    And what are diet sheets?

8    A    List the individualized diets and adaptive feeding

9    equipment and choking risks.

10   Q    And then eating plans are individual?

11   A    Yes.

12   Q    What are eating plans?

13   A    Eating plans would give instructions to staff for that

14   individual during mealtimes.

15   Q    So it incorporates the information from the diet sheets?

16   A    Possibly.

17   Q    And then it incorporates other information from other

18   departments affecting that person's eating, right?

19   A    It can.

20   Q    So let me ask you, suppose someone eats too quickly and

21   they're supposed to slow down their eating.  Would that be

22   located in the diet sheets or eating plans?

23   A    Eating plans.

24   Q    Versus if someone needs a special spoon, is that in the

25   diet sheet or eating plan?

Johnson - Cross                                        5424

1    A    Most often in the diet sheet.

2    Q    Sometimes in the eating plans?

3    A    It could be.

4    Q    So is there any specific guideline on what should be in

5    each of these documents?

6    A    Recently, we have eliminated the type of diet, the

7    thickening of liquids, adaptive feeding equipment, and

8    positioning from the eating plan to make them more streamlined.

9    Q    Where are those located, the items now?

10   A    Each unit has an eating plan notebook, and it would be in

11   that notebook or in the diet sheets.

12   Q    So now the thickening of liquid is in the third document?

13   A    No.  That's on the diet sheet also.

14   Q    So it would be in the book as well as on the diet sheets?

15   A    It is on the diet sheet.  The book would list adaptive

16   eating equipment and eating plans.

17   Q    Okay.  All right.  Well, let me ask you this.  This book,

18   is it separate from the diet sheets or does it include the diet

19   sheets?

20   A    It's separate from the diet sheets.

21   Q    And staff are supposed to be aware of all these other

22   documents, right?

23   A    Yes.

24   Q    Would the eating plans still specify sometimes what

25   adaptive equipment a person should have during meals?

Johnson - Cross                                        5425

1    A    It may.

2    Q    And it would reference diet sheets and tell the staff to

3    look at the diet sheets?

4    A    It could.

5    Q    It could?  You do not actually -- well, let me ask you

6    this.  When the unit supervisors and personnel development are

7    training the staff on how to implement the different programs --

8    speech-language pathology development -- they have things like

9    training sheets or sign-in sheets that people fill out, right?

10   A    Yes.

11   Q    You do not review the sign-in sheets that personnel

12   development receives, correct?

13   A    We receive those before we forward them to our staff

14   development office.

15   Q    Well, let me put it this way.  You do not review personnel

16   development's records, right?

17   A    Correct.

18   Q    You do not review the training the unit supervisors are

19   providing?

20   A    Correct.

21   Q    And you do not specifically make sure that each staff who

22   is working with the resident has been trained on their plan,

23   right?

24   A    They are to be trained on the plan prior to assisting that

25   individual.

Johnson – Cross                           5426

1    Q    By who, R-2?

2    A    Pardon?

3    Q    Trained by who?

4    A    By the resident supervisor.

5    Q    You are not specifically making sure yourselves that the

6    staff who are working with the resident has been trained on

7    their plan, right?

8    A    Correct.

9    Q    So that's again left up to the resident supervisor?

10   A    Yes.

11   Q    Now, the training you are talking about out in the unit, is

12   that competency based training?

13   A    I have started competency based training for this year, but

14   it's been procedural review prior.

15   Q    Okay.  You are not regularly notified if a resident is not

16   getting a meal of the right consistency or texture, correct?

17   A    Define "regularly."  I am not sure where you are coming

18   from with that question.

19   Q    Well, if a resident, for example, does not get a meal of

20   the right consistency or texture, there is no process in place

21   where you are automatically notified, right?

22   A    It would most likely be the dietetics department who would

23   be notified initially.

24   Q    But you would not?

25   A    Not necessarily.

Johnson – Cross                                          5427

1    Q    And you would not specifically assess whether diet plans

2    are working correctly, right?

3    A    Diet plans?  Are you talking about --

4    Q    I guess --

5    A    -- the eating plan or the individualized diet?

6    Q    Maybe it's the individualized eating plan.

7    A    By functional outcomes?

8    Q    This is looking at the outcome.  If someone gets the

9    pneumonia --

10   A    Correct.

11   Q    But until someone gets the pneumonia or some outcome like

12   that, you are not going out there to assess whether the plans

13   are working, right?

14   A    When we are in the unit to monitor, we can determine

15   whether or not they are being implemented correctly.

16   Q    That's just to monitor implementation, not whether that

17   particular diet seems to be working well for the individual,

18   right?

19   A    There are certain signs that let us know whether or not the

20   diet may or may not be working.

21   Q    If you could turn to page 49 of your deposition, the

22   question at the bottom was, "How do you assess if an eating plan

23   is working?"  And your answer was, "we don't specifically

24   assess."

25   A    Correct.

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

Johnson – Cross                                    5428

1    Q    You do not review any of the LST notes in the units?

2    A    Do I specifically review LST notes?

3    Q    Yes.

4    A    No.

5    Q    You also do not specifically review the logs on the units;

6    is that right?

7    A    Correct.

8    Q    And at the time of your deposition, you did not know if any

9    of the clinicians in your department actually do these types of

10   checks, right?

11   A    Correct.

12   Q    So, for example, if somebody choked, then it shows up in

13   the log.  That's not something you would know about, right?

14   A    I would not know if it showed up in the log, but I would be

15   notified by nursing staff.

16   Q    Let me go back to communication devices a little bit.  Are

17   you aware that the Arkansas Department of Education concluded in

18   early 2010 that there were no formal AAC evaluations?

19   A    That is incorrect.  No one ever came to speak with us about

20   that.

21   Q    So while they may have made that finding, you would dispute

22   that finding?

23   A    Correct.  We feel like it was because those plans were not

24   in the special education records, but were rather in the speech

25   records.

Johnson - Cross                                         5429

1    Q    I see.  But, you know, let's -- you talked about how some

2    of your clinicians have sign language training, right?

3    A    Correct.

4    Q    But those are your clinicians.  The special education

5    teachers don't have that sign language training, right?

6    A    I would not be able to answer that.  I am not aware of

7    their qualifications.

8    Q    So you can only comment on the training of your own staff,

9    correct?

10   A    Correct.

11   Q    Even if you have evaluation in your own documents, if it is

12   not incorporated into the education documents, isn't it possible

13   that on the education side they are not aware of some of those

14   assessments?

15   A    Okay.  Go through that one more time, Mr. Cheng.

16   Q    Even if there are assessments of some form in your own

17   records, if they're not in the educational records, isn't it

18   possible the education staff may not be fully aware of your

19   assessments or the assessments that you have done?

20   A    That is a possibility, and that's why we have taken steps

21   to correct that.  They now have copies of all of our

22   assessments.

23   Q    And that's also a very recent change, right?

24   A    Correct.

25   Q    Most of the communication devices, these boards, most of

Johnson – Cross

1    them are considered low-tech devices; is that right?

2    A    The majority, yes.

3    Q    Now, when someone is in your training area, you will

4    monitor that individual resident's use of the devices, correct?

5    A    Correct.

6    Q    But outside of the training area, when they're in the

7    residences or training areas outside of speech-language, there

8    is no formal system to monitor board use, correct?

9    A    Correct.

10   Q    Nor is there formal monitoring of use of the devices in

11   habilitation in training and education areas, correct?

12   A    Correct.

13   Q    And in terms of the training that the direct care staff or

14   others receive, they're supposed to know that these boards are

15   available for client use, right?

16   A    Correct.

17   Q    And so there is a type of training facility, which is

18   general training on where these boards are and where you can

19   report damaged boards, right?

20   A    Yes.  And that notification is also given in annual

21   retraining and quarterly in-service training.

22   Q    But the staff aren't trained specifically on how to use the

23   general communication boards, right?

24   A    Correct.

25   Q    And when we talk about the boards and what's available, if

Johnson – Cross                                    5431

1    somebody can benefit from communication programs, you have

2    training objectives for them if they're in direct therapy,

3    correct?

4    A    Okay.  Say that one more time, please.

5    Q    If you think someone can benefit from patient programs, you

6    will have training objectives for them related to communication

7    when they're in direct therapy, right?

8    A    Correct.

9    Q    But if they're not in direct therapy, it's pretty much

10   using the generic low-tech communication boards for their

11   communication issues, right?

12   A    We also have individuals who have been trained to use their

13   devices, and they can do so.  And they're no longer in direct

14   therapy.

15   Q    Right.  But that's only for the individuals who

16   specifically have the boards.  For everyone else, it's just the

17   generic boards if they need communication assistance of that

18   sort?

19   A    Correct.

20   Q    And even for people who have specific communication

21   devices, at least at your deposition, you indicated there is no

22   specification that the specific device they were trained on is

23   actually with them at all times, right?

24   A    Well, the expectation would be that they would have their

25   device.  If that's what -- if I am understanding you correctly.

Johnson – Cross                                      5432

1    Q    Isn't the expectation really just that they have some

2    communication board available?  There is no requirement they

3    actually have their personal device?

4    A    Well, we would hope that they would have their personal

5    device.

6    Q    And training on these communication devices is not

7    competency based, correct?

8    A    Correct.

9    Q    If you could turn to your deposition on page 132, line 6,

10   "Question:  When should a resident use his or her communication

11   device?

12        "Answer:  As far as in therapy and any time they have

13   something that they want to express to the ones that are

14   available to them.

15        "Question:  For residents on this list who have

16   communication devices, would the expectation be that the device

17   be available to the resident at all times?

18        "Answer:  I think that question would require

19   qualifications because we do have some type of device available

20   to them.  It might not be the specific device that they are

21   being trained on at that time.

22        "Question:  What types of devices would a resident have

23   with them at all times?

24        "Answer:  A low-tech board."

25        That was your answer at that time?

Johnson - Cross                                    5433

1    A    Yes.  Because sometimes the high-tech boards, the battery

2    may go out or something of that nature.  So someone would have a

3    low-tech board available.

4    Q    All right.  You do not regularly work with the psych

5    examiners for people on your caseload, right?

6    A    Could you clarify "regularly"?

7    Q    Well, just generally or would it be fair to say that you

8    don't regularly deal with psych examiners, right?

9    A    Not on a routine basis.  Just for specific consultation.

10   Q    But even on consultation, there is no formal process of

11   consultation.  It just sometimes happens and sometimes doesn't,

12   right?

13   A    Correct.

14   Q    And even though some of your staff have had some training

15   in sign language, no one at CHDC is fluent in sign language,

16   right?

17   A    I can't speak for all of CHDC, but I can speak for the

18   speech clinicians.  No one is fluent in sign language.

19   Q    And as far as you know, if you needed someone to do sign

20   language with a resident, you are not aware of anyone at CHDC

21   who is fluent, right?

22   A    We do teach sign language, but I am not aware of anyone

23   that's fluent.

24   Q    Okay.  Do you recall a child named -- I guess the initials

25   are BR, who is about 11 years old?

Johnson – Cross                          5434

1    A     I do not have anyone on my direct case load, so I would not

2    be able to comment on that.

3    Q     So would you know, for example, that Arkansas Department of

4    Education questioned why this individual was not getting speech

5    therapy?

6    A     I do not have any knowledge of that.

7    Q     Okay.  In terms of taking corrective measures and some of

8    the more recent things that have been done, in January of 2009,

9    the speech-language pathology services committee actually

10   discussed working with the staff to help develop protocols in

11   relation to pneumonia, aspiration, rumination, and reflux,

12   right?

13   A     That was in relation to a clinical fellowship year training

14   for two individuals.

15   Q     But the committee was talking about developing some

16   protocols relating to these subjects, right?

17   A     Correct.

18   Q     But certainly by the time your deposition was taken almost

19   a year later, those had not been actually implemented or

20   developed, right?

21   A     We had actually abandoned that because that was a special

22   project for their clinical fellowship year.

23   Q     Right.

24   A     And we didn't find the type of research that we had been

25   looking for.

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

Johnson – Cross                                    5435

1    Q    Okay.  And in terms of trying to figure out whether or not

2    your program is working, you do not set goals regarding the

3    number of aspiration or choking events in a particular

4    individual, correct?

5    A    Correct.

6    Q    And there is no peer review in your department, right?

7    A    Currently, there is.

8    Q    And that's new?

9    A    Relatively new.

10   Q    And who does the peer review?

11   A    The clinicians.  We review one speech-language case and one

12   dysphagia case.

13   Q    And that's once a month?

14   A    Correct.

15   Q    And during these reviews, how many of these have you had?

16   A    I would have to check the records.

17   Q    Maybe two or three, a couple of months' worth?

18   A    Probably more likely a year's worth.

19   Q    And during those reviews, were there any cases where you

20   found that there were significant issues regarding services

21   being provided or things that needed to be improved?

22   A    We could make suggestions to the presenting clinicians.

23   Q    I am asking specifically, do you recall any cases where

24   during the peer review something did come up and they said this

25   is something we should do to fix things or this could be done

Johnson - Cross                                                    5436

1    better?

2    A    I am sure there probably were.  I could not give you a

3    specific example.

4    Q    And in terms of formal quality assurance process, your

5    department does not have its own quality assurance process.  It

6    just relies on Conway's general quality assurance process,

7    right?

8    A    Correct.

9    Q    And you yourself do not attend the facility-wide quality

10   assurance meetings, right?

11   A    Yes, correct.

12   Q    Do you know which residents are deaf at CHDC?

13   A    I could not name them, no.

14   Q    How many kids are actually on your case load?

15   A    I do not have -- if you are defining kids as 21 and

16   under --

17   Q    Uh-huh.

18   A    -- I have no children.

19   Q    Now, are you aware that Office of Long-Term Care cited your

20   facility when six of six cases showed that staff were failing to

21   assure that thickened liquids were provided as ordered by the

22   physicians?

23   A    Yes.

24   Q    Now, the plan of correction developed at that time required

25   more observation by your department or staff when thickening

Johnson - Cross                                              5437

1    liquids, right?

2    A    If I recall.

3    Q    During the deposition you were asked, was there a

4    particular speech-language pathologist assigned to carry out the

5    plan of correction; do you remember that?

6    A    Can you refer me to that?

7    Q    Sure.  Well, let me ask you, were you doing this type of

8    additional observation as part of the plan of correction?

9    A    No.

10   Q    I guess it's actually page 121, line 24.  The question was:

11   "On the plan of correction side of the page, it mentions that

12   speech-language pathologists observed staff correctly thicken

13   liquids to prescribed consistency.  Do you know which

14   speech-language pathologist that was?

15        "Answer:  I do not."

16        Do you remember that was your answer at the time?

17   A    Correct.

18   Q    So even though the plan of correction said these things are

19   supposed to be done now, at the time you were not really sure

20   who was actually doing it, right?

21   A    I am sure that quality assurance contacted the appropriate

22   clinician.

23   Q    Uh-huh.  And this issue of thickening liquids has come up

24   before.  In 2008, CHDC was also cited when two residents weren't

25   given thickened liquids as directed, right?

Johnson - Cross                                    5438

```
 1    A    Correct.
 2    Q    When there are deficiencies with mealtime issues, basically
 3    Gail Miller is writing the plan of correction, right?
 4    A    Correct.
 5    Q    Now, I want to ask you to -- just one or two more quick
 6    things.  When you talked about your credentials, since
 7    December 1980 to present, you have been working at CHDC, right?
 8    A    Correct.
 9              MR. CHENG:  May I approach the witness, Your Honor?
10              THE COURT:  You may.
11    BY MR. CHENG
12    Q    Is Dawn Durham one of your speech-language pathologists?
13    A    Yes.
14    Q    She is one of the clinicians?
15    A    Correct.
16    Q    Now, this particular individual here, it's HCT.  I think
17    she normally goes by CT; is that right?
18    A    Yes, I believe so.
19    Q    Okay.  Now, CT, when described in paragraph 3 as part of
20    the evaluation summary, the summary says, quote:  Expressively,
21    C verbalized in complete sentences of five or more words to
22    include such grammatical structures as noun phrase, verb phrase,
23    past tense, present tense, future tense, negatives, adjectives,
24    adverbs, prepositions, personal pronouns, and WH question forms.
25    She was also capable of making verbal requests for leisure
```

Johnson - Cross                                    5439

1    activities, for wants and needs --

2             THE COURT REPORTER:  I'm sorry.  You lost me.  Start

3    with "She was also capable."

4    BY MR. CHENG

5    Q    She was also capable of making verbal requests for leisure

6    activities, for wants and needs, as well as refusing unwanted

7    items, back slash, activities.  C also demonstrated the ability

8    to verbally count one to ten, answer functional yes/no

9    questions, identify most familiar items and activities, define

10   several words, and initiate social interaction with certain

11   staff.  Right?

12   A    Yes.  That's what the report says.

13   Q    And, for example, this particular individual's mouth and

14   surrounding areas, they're adequate for speech purposes, right?

15   A    According to the report.

16   Q    And yet when it went to page 2, according to this document:

17   Based on the above review, the prognosis for the further

18   development of C's speech and language skills was considered

19   poor.  C does not appear to benefit from the social interaction

20   as she frequently either refuses to attend speech or requests to

21   leave after only a few minutes; therefore, it is recommended

22   that the team discontinue C's enrollment in direct speech and

23   language therapy services at this time.

24             Do you see that?

25   A    Yes.

Johnson – Cross                           5440

1    Q    So in this case, this is an individual who basically it's

2    their behavior that's getting them booted from the service,

3    right?  They're refusing, and that's why they're not going to

4    get any more therapy services?

5    A    I am not sure if that was the entire reason.

6    Q    But certainly behavior came up as one of the reasons?

7    A    I can only read what you have just stated.

8    Q    Okay.

9    A    I really can't comment further.

10   Q    Well, let me ask you, another individual who is attached is

11   TJF or TGF, I guess is the person's full name, but they go by a

12   different acronym.  And Michelle Stratton is also one of your

13   speech pathologists?

14   A    Correct.

15   Q    Now, in this case they describe TJ as, "Receptively, TJ

16   responded to his name and "no," searched for and localized a

17   sound source, and demonstrated awareness of conversational

18   speech at a distance of 3 feet.  Evaluation findings indicated

19   TJ is nonverbal and does not use any consistent mode of

20   communication; for example, gestures to directly express his

21   wants/needs.  However, staff report that some of TJ's

22   wants/needs can be anticipated by observing his readiness to

23   receive items and participate in activities.  TJ expresses

24   feelings differentially by facial/vocal movements.  An

25   assessment of augmentative alternative communication systems,

Johnson – Cross                                    5441

1    for example manual signs or picture board, was not conducted due

2    to lack of attending skills."

3         Do you see that part?

4    A    Yes.

5    Q    So in this case there is again some type of behavioral

6    issue, this person doesn't attend well, and so the assessment

7    wasn't even done, right?

8    A    I can only read what you have just written.

9    Q    Okay.  And this person also, the structure of their mouth

10   and surrounding areas appeared adequate for speech production,

11   but it could not be thoroughly assessed due to a lack of

12   verbalizations, right?

13   A    That's what it states.

14   Q    And then on the next page again it says:  Based on the

15   above review, prognosis for the further development of TJ's

16   communication skills is considered poor; therefore, there are no

17   recommendations for speech services at this time.

18   A    It says what you have just read.

19   Q    Okay.  And in both of these cases, they can get their

20   communications skills training for programming in other areas,

21   right?

22   A    That's what the report states.

23   Q    I guess the question I have is, even if somebody gets

24   assessed where you go through this process of assessment, that

25   doesn't necessarily mean that the person is going to receive

Johnson – Cross                                5442

1    direct language therapy services, right?

2    A    Correct.

3    Q    It doesn't necessarily mean that the services themselves

4    are going to meet their needs, right?

5    A    We would hope that speech services would meet their needs.

6    Q    Let me point one more thing out to you just real quickly.

7    At the bottom of CT's speech-language pathology services

8    evaluation summary, it actually says:  Between the last

9    staffing, 4/12/07, and the current date, March, 5, '08, C has

10   attended 30/53, 45-minute direct speech and language therapy

11   sessions.  Absences were due to illness, weather, off-grounds

12   appointments, refusal.

13   A    Yes.

14   Q    So assuming this document was accurate on its face, C was

15   actually attending most of their speech-language classes, right?

16   A    30 of 53 sessions.

17   Q    And even the ones they missed, some of them may have been

18   due to illness, weather, or other appointments, right?

19   A    That's what this statement reads.

20   Q    Is there a specific standard or guideline in your

21   department as to when someone's behavior or refusals trigger the

22   end of direct language therapy services?

23   A    No.

24   Q    And when people make that decision, they're basically

25   relying on the reports from other people, such as the psych

1   examiners or direct care staff?

2   A    That decision would be determined at the time of the

3   interdisciplinary team meeting for that person's staffing.

4   Q    So that's done once a year?

5   A    There could be special staffings that are held more

6   frequently, but the annual staffing is once a year.

7   Q    Okay.

8        MR. CHENG:  If I could just have a minute, Your Honor?

9        Thank you.  All set, Your Honor.  Thank you.

10       MR. ZAYCOSKY:  Just briefly, Your Honor.

11       THE WITNESS:  Mr. Cheng, do you need this?

12       MR. CHENG:  It's your copy.

13       THE WITNESS:  Okay.

14       MR. CHENG:  Thank you.

15                    REDIRECT EXAMINATION

16  BY MR. ZAYCOSKY:

17  Q    Ms. Johnson, could you explain why the plaintiffs got the

18  copy of your note that's actually handwritten?  Could you

19  explain why it's handwritten?

20  A    Yes.  Technology.  Printer problems.

21  Q    And why did you prepare the notes that you did that you

22  took up there with you?

23  A    Because I wanted to give an accurate answer, and I felt

24  like that I might be nervous on the stand and feel that I might

25  not remember all the response -- the entire response.

Johnson – Redirect                                    5444

1   Q     You prepared those notes for yourself, right?

2   A     Yes.

3   Q     With regard to supervision of speech-language pathologists,

4   who does the speech-language pathologist go to if they have a

5   clinical question at CHDC?

6   A     That would be me.

7   Q     I think you kind of -- he may have cut off a response that

8   you wanted to give about supervision.

9   A     I just wanted to point out that our profession acknowledges

10  that clinicians are supervised less and less by other clinicians

11  and that actually, in 2001, Spitz did a research that said there

12  was little to no empirical knowledge about the impact on

13  clinical outcomes of clinical supervision.  So there is really

14  not much documentation there to show that clinical supervision

15  does indeed have a great impact on client outcomes.  Also,

16  the -- our American speech-language hearing association adheres

17  to kind of a supervision process that was developed by Anderson

18  in 1988 and in which it goes through evaluation and feedback,

19  then transition and self-evaluation.

20        And because at least three of the other clinicians, in

21  addition to myself, have been there in excess of 20 years,

22  they're definitely in the self-evaluation stage and would need

23  little to no supervision.

24  Q     Thanks.  Could you also explain exactly what the low-tech

25  boards are and the other communication devices?

Johnson - Redirect                              5445

1     A     Sure.  Low-tech boards are generally clinician generated,

2     and they can be on poster board, in notebooks, picture rings.

3     And they have different pictures and symbols on the board or

4     ring that that individual can point to.  High-tech boards are

5     considered to be electronic boards.

6     Q     Could you also explain, if you are able, what the diet

7     sheets are and the eating plans are and how they may relate?

8     A     Well, the diet sheets contain information related to an

9     individual's specific diet order.  It also lists adaptive eating

10    equipment.  And then the eating plans would list specific

11    instructions to the staff regarding assisting an individual at

12    mealtimes times.

13    Q     And I don't want to put you on the spot with the math, but

14    I was thinking about plaintiff's expert, Carly Crawford's

15    comment either in her testimony or in her report that somehow

16    the number of choking events at CHDC was shocking.  And I was

17    considering the possible number of times that that -- a choking

18    event could happen at CHDC.  And am I right there are about 500

19    residents there?

20    A     Yes.  There are 500 residents, and actually you wouldn't be

21    putting me on the spot, even though my math skills could be

22    questioned.  But there was no research that I saw in the expert

23    consultant report regarding how many choking events would be an

24    average for a facility such as ours.  So to say "shocking," I

25    thought maybe needed some clarification.  So what I did was

1    tried to put that a little bit in context.  If you have 500

2    individuals and they have 3 meals a day, that's going to be

3    1500.  Then if you multiply those 1500 meals by 365 days a year,

4    that will put you at 547,500.  Then if we just add one

5    medication pass for each of those individuals, that's going to

6    put the number at 548,000, and that doesn't include the other

7    medication passes or snacks or anything like that.

8          So in 2009, there were eight choking incidences at CHDC.

9    So when you compare those 8 incidences with over 548,000

10   potential choking opportunities, I think the shock is that there

11   were not more.  I think that speaks well that the number is so

12   low, considering all the opportunities there would be to choke,

13   especially if you counted each bite per meal that an individual

14   might take.

15                MR. ZAYCOSKY:  Thanks.  That's all I have.

16                          RECROSS-EXAMINATION

17   BY MR. CHENG

18   Q    I am sorry, Ms. Johnson.  I do have to follow up real

19   quickly.  When Mr. Zaycosky says he is not putting you on the

20   spot about these figures you are giving about the choking, they

21   are listed on the first page of your notes, right?

22   A    Correct.

23   Q    So that's why really no one is on the spot?

24   A    And that's what I said that.  You are not putting me on the

25   spot.  So thank you for pointing that out.

1    Q    Thank you.

2         THE COURT:  Let's take about ten minutes, and then we

3    will come back and finish our day.

4         (Recess at 11:39 a.m.)

5                   C E R T I F I C A T E

6         I, Cheryl Bartnett Nelson, Official Court Reporter, do

7    hereby certify that the foregoing is a true and correct

8    transcript of proceedings in the above-entitled case.

9

10   /s/ Cheryl B. Nelson, RPR, CRR, CCR   Date:  December 7, 2010
         United States Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        (Continuing at 11:50 a.m.)

2              THE COURT:  Be seated.

3              MR. YORK:  Your Honor, we're going to be calling

4    Patricia Parmley, M.D.

5              THE COURT:  All right.

6              MR. ZAYCOSKY:  Sorry for the delay, Your Honor.  The

7    next witness will be Patricia Parmley.

8          **PATRICIA PARMLEY, DEFENDANTS' WITNESS, DULY SWORN**

9                       DIRECT EXAMINATION

10   BY MR. ZAYCOSKY:

11   Q.    Good morning.  Could you identify yourself for the record,

12   please?

13   A.    I'm sorry?

14   Q.    Could you identify your name for the record?

15   A.    My name is Patricia Parmley.

16   Q.    What is your role at CHDC?

17   A.    I'm a primary care physician.

18   Q.    Dr. Parmley, what's your educational background?

19   A.    I have a bachelor of science in education from the

20   University of Missouri at Columbia.  I have a master of arts in

21   educational research psychology and statistics from the

22   University of Missouri at Kansas City, and I have an M.D. degree

23   from the University of Arkansas for Medical Sciences.

24   Q.    Could you walk us through your professional background?

25   A.    I started off life as a high school English teacher.  I was

1   then the managing editor for *The Bulletin of the Menninger*

2   *Clinic*, which is a private psychiatric hospital previously

3   located Topeka, Kansas.  I then was an author's editor, writing

4   articles for publication for physicians.  And then worked for a

5   company that did submissions to the European Economic Union for

6   the same sort of thing as the Food & Drug Administration here.

7   They had to relicense all their drugs, and we wrote those

8   submissions.  And then I went to medical school.

9   Q.   And subsequent to medical school?

10  A.   I completed medical school in 1998.  Did a residency in

11  pediatrics at Arkansas Children's Hospital, and then did a

12  fellowship in developmental behavioral pediatrics.

13  Q.   How long have you been at Conway Human Development Center?

14  A.   I started immediately after completing my fellowship in

15  2003, but not full time, and came on full time in late 2004.

16  Q.   Can you describe the patients that you treat at CHDC?

17  A.   I have children, starting from, you know, some at age six

18  are admitted, and I also have adult patients.

19  Q.   Do you consult with a psychiatrist to provide services to

20  children at CHDC?

21  A.   For the children?

22  Q.   Yes.

23  A.   Yes.  When a child is admitted, their medical history is

24  reviewed, and if a psychiatric diagnosis is part of that

25  history, they're immediately referred to our consulting

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    psychiatrist for review.  Many of the children come in on

2    psychiatric or psychotropic medications already, and those are

3    reviewed and continued or discontinued, or whatever, depending

4    upon the circumstances.

5    Q.    Is the psychiatrist that you're referring to generally

6    Dr. Callahan?

7    A.    That's correct.

8    Q.    Can you describe for us, or can you explain your

9    understanding of the phrase "professional standards"?

10   A.    Professional standards are those practices that a

11   reasonable person in a similar position with similar education

12   would do in normal -- under normal circumstances.

13   Q.    Do you know, or do you believe that your prescription of

14   medications to treat psychiatric disorders is within the

15   professional standards?

16   A.    Yes.

17   Q.    Are you able to elaborate on why you believe that?

18   A.    Well, my subspecialty training in developmental behavioral

19   pediatrics is on the border between pediatrics and psychiatry,

20   sort of the -- well, I'm not a child psychiatrist, but we work

21   closely with the child psychiatrists, we treat the same kinds of

22   illnesses, diagnose the same kinds of things, and use the same

23   medications to treat those various illnesses.  So when

24   Dr. Callahan sees a child and makes a recommendation, it is me

25   who reviews that, looks at the appropriateness of the

1   medication, read the diagnosis and observations made of the

2   child's behavior and interactions with the world, and determine

3   if that dose is appropriate for his size, age, and weight.

4   Children are small adults, and the dose for an adult might be a

5   standard dosage of, say, a hundred milligrams once a day,

6   whereas a child it would be 1 to 2 milligrams per kilogram per

7   day.  And so it's based on age, weight.

8   Q.   How do you communicate with Dr. Callahan?

9   A.   A variety of ways.  Personally, through written

10  communication from him to me, from me to him, and I guess that's

11  -- those two.

12  Q.   So it's a two-way street, you communicate similarly?

13  A.   Yes.  There isn't a day he's there that I'm not getting

14  into his office for something or other.

15  Q.   Do you know if there's a similar communication relationship

16  with other treating physicians at CHDC?

17  A.   Yes.

18  Q.   In your opinion, does that communication meet professional

19  standards?

20  A.   Yes.

21  Q.   How is a diagnosis of OCD made at Conway Human Development

22  Center?

23  A.   All psychiatric diagnoses are based on the American

24  Psychiatric Association's *Diagnostic & Statistical Manual of*

25  *Mental Disorders*, which is published by the American Psychiatric

Case 4:09-cv-00033-JLH   Document 197   Filed 12/23/10   Page 122 of 160

Parmley - Direct                                    5452

1    Association, and outlines what you look for to be able to

2    diagnose an illness, and you have to be able to meet all of

3    those criteria.  The criteria differ, depending upon what the

4    diagnosis is that you're looking at.  Some have a specific list

5    of you have to meet A, B, and C to be able to have this

6    diagnosis.  Some provide you with options, like you have to

7    have, you know, like a Chinese restaurant, one from column A,

8    one from column B, and two from column C to be able to meet the

9    diagnosis.  You have more leeway with some than others.  The

10   diagnosis of OCD is based on that, that you have obsessions and

11   the corresponding compulsions that relieve the stress caused by

12   the compulsions -- the obsessions.  I said that backwards.  The

13   obsessions are the thoughts and intrusive things that are

14   interfering with your life and making you nonfunctional.  The

15   compulsions are the things that relieve the anxiety caused by

16   the other.  Those are repetitive things that are pretty obvious

17   to see, like turning the light switch off and on, and off and

18   on, and off and on, and off and on, so that it's interfering

19   with your daily life.  You can't stop turning the light switch

20   off and on.  You just stay there, you're stuck, because the

21   anxiety comes back as soon as you stop flipping the light

22   switch.

23   Q.   Is it difficult to diagnose obsessive-compulsive disorder

24   in people who are cognitively impaired?

25   A.   Because they can't describe to you what the obsession is,

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    cognitively intact people can't tell you what that is, in many

2    cases it's based on observation, what would drive this person to

3    continually flip the light switch off and on and become

4    hysterical when pulled away from that activity, other than

5    something driving them.

6    Q.   Does a diagnosis of obsessive-compulsive disorder impair

7    the diagnosis of any other disorders --

8    A.   No, but it's often comorbid with others, attention

9    deficit-hyperactivity disorder, ADHD.

10   Q.   Do you know if pneumonia or aspiration pneumonia are

11   considered terminal illnesses at CHDC in particular?

12   A.   Well, they can result in -- they can be, but, I mean,

13   that's a treatable condition.  We know what the foreign object

14   is that has gone down the wrong way in your throat, it's gotten

15   into your lungs where it shouldn't be.  It's supposed to be

16   sterile there.  Your body has a typical response to that, and

17   there are ways of treating it.  If it were not caught early or

18   wasn't treated appropriately, I suppose it could.  We have had

19   some cases whereas aspiration pneumonia was the admitting

20   diagnosis and because of other circumstances, families have

21   withdrawn support or withdrawn the antibiotics or taken them off

22   a ventilator, whereas they could have been -- you know, life

23   could have continued had that not occurred.  I mean, I guess

24   that's the time that it is most often fatal.  But typically not.

25   Q.   Are you familiar with the case of a resident with the

1    initials KF?

2    A.    Yes.

3    Q.    Can you explain briefly what her medical diagnoses were, or

4    his?

5    A.    She.

6    Q.    Thanks.

7    A.    She was born with a chromosome 18q deletion.  That's one

8    arm of the 18 chromosomes that was not there.  The prognosis for

9    people born with that particular deletion is less than 24 hours.

10   They do not survive extrauterine life.  KF died a few days

11   before her 21st birthday, and her case was so unusual that a

12   study group at the University of Texas Southwestern in Dallas

13   had been in touch with the family and agreed to do a -- the

14   family agreed with them to do an autopsy and save all parts and

15   pieces so that it could be studied since she had lived so much

16   longer -- I mean, incredibly so much longer than anyone else

17   with that particular diagnosis that she is and will be a subject

18   for study for many years.

19   Q.    Do you believe her death was untimely?

20   A.    She lived 20 years and 11 months longer than she should

21   have.  I don't have the exact numbers.  But, you know, like I

22   said, average age -- I spoke with the physician at UT Dallas

23   that said that the longest living person prior to this

24   individual had been less than a year.

25   Q.    Are you also familiar with a resident with the initials LW?

Parmley - Direct                                    5455

1    A.    Yes.

2    Q.    Are you able to explain generally what his medical

3    conditions are?

4    A.    He is deaf, and I don't have his list of diagnoses.  I'm

5    sorry.

6    Q.    Do you know if he was ever on a drug called trazodone?

7    A.    Yes.  He was admitted to the CHDC on trazodone,

8    50 milligrams, three times a day.  That had been prescribed for

9    him by a colleague of mine, Dr. Tyra Reid at the Dennis,

10   D-e-n-n-i-s, Developmental Center at Arkansas Children's

11   Hospital.  She is also a developmental behavioral pediatrician.

12   This was diagnosed for his behavior disorder.  And when he came

13   to our center, part of his complaint was that he was up all

14   night and slept all day.  Trazodone has a side effect of

15   drowsiness, and so I stopped the medication -- I didn't stop the

16   medication.  I changed it to just 50 milligrams once a day, at

17   bedtime.  And his mother was uncomfortable with that and let me

18   know it, and so I spoke with Dr. Reid and told her about -- she

19   already knew about the sleep disorder for which he's on another

20   medication prescribed by Dr. Reid.  But agreed that the daytime

21   sleepiness and the nighttime awakeness was interfering with his

22   life, and so he is now and continues on a dose at noon and a

23   dose at bedtime.  These are not for sleep.  They are for

24   behavior.

25   Q.    Are you also familiar with a resident by the name of CL?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

A.    Yes.

Q.    Do you know if this was a case where CHDC failed to detect
signs of evolving medication side effects of lithium toxicity?

A.    CL was admitted to CHDC the end of March, and I don't
remember the year.  But he was admitted the end of March, and he
had -- he was seen by a psychiatrist in the community who had
prescribed lithium for him in the past, and the report had been
to him, this outside psychiatrist, that there was no effect to
the medication.  And so he recommended an increase in the
lithium, but because of circumstances prior to his admission,
that prescription was not filled, but that was the last dose
that the psychiatrist had prescribed.  So when they come to us,
you know, we don't change their medication, but we ask for a
review.  And we were suspicious that he had not been receiving
the lithium at home, and so we started him on the dose that the
outside psychiatrist had prescribed.  And five days later, a
lithium level was drawn, and it was in the normal range, the
dosage that he was on, again, in the milligrams per kilogram
range.  The range for a child that you can give, depending upon
symptoms, ranges from 15 milligrams per kilogram to
60 milligrams per kilogram.  The new dose that he had been put
on by the outside psychiatrist worked out to 17 milligrams per
kilogram, which is, obviously, on the very low end of that range
scale.  Because he was on lithium, he gets -- those levels are
tested routinely, every three months, but because he had reached

1    steady state within a week of arriving, we knew he was getting

2    the medicine on time and the dose that was prescribed, we were

3    comfortable with that.

4        A little more than a month later, the living unit personnel

5    called, it was at night, on a weekend, called the infirmary

6    nurse to say that this young person was not acting right.  He

7    was -- his gait was a little bit abnormal, and she had listened

8    to his lungs and his lung sounds were abnormal.  The child was

9    sent to the infirmary and assessed there.  Dr. Stewart, who is

10   the physician on call at night and weekends, was consulted, and

11   he asked that a lithium level be drawn, along with other things,

12   complete blood count, basic metabolic profile, those kinds of

13   things.  Those results came back, and there were a couple of

14   things that were obvious.  One, he was dehydrated, and, two, the

15   lithium level was at what's called a critical level.  But

16   because he was dehydrated, well, the first thing you do is you

17   stop the drug, and the second thing that you do is hydrate the

18   person.  A lot of your electrolytes will be out of balance when

19   you are dehydrated, there's not enough fluid to dilute things,

20   and he was, when he got to the infirmary, acting normally.  His

21   abnormal gait was described from someone who knew him well as

22   normal for him, so the gait wasn't an issue, actually.  But it

23   was a random level, and random is not always as careful as you

24   want, so Dr. Stewart requested a lithium trough be drawn in the

25   morning.  A trough is, you haven't had the drug given to you in

1    a certain period of time and that gives you a true level of what

2    the lowest point in your blood would be at any one time.   And

3    that was still in the toxic range.   Patient was admitted to the

4    closest hospital, which was Conway Regional Medical Center.

5    Before he left the Conway center, he was awake, alert, and

6    talking to people.   When he got to the Conway Regional Medical

7    Center, he was evaluated by a nephrologist, a kidney doctor, and

8    a neurologist, and was found to be unresponsive and was

9    transferred immediately to Arkansas Children's Hospital where he

10   was described as awake, alert, playing, and following

11   directions.   So nothing had happened to him in the meanwhile.

12   He was just observed by those people at Conway Regional before

13   they sent him on to Children's Hospital.   He was there, a

14   lithium level was checked, it was in the toxic range, and he

15   received dialysis, which is taking your blood out of your body,

16   clearing it of, you know, toxic items, and putting it back.

17   After that, they checked it again.   It was still in the toxic

18   level.   And so he went through dialysis a second time.   At that

19   point, it was discovered that the tubes in which they were

20   drawing the lithium levels had lithium in them.   Lithium is an

21   anticoagulant and is part of some of the tubes that you draw

22   samples in.   When that error was noted, a blood was drawn in a

23   correct tube and it was well within the normal range.   So did he

24   need that dialysis?   Maybe, maybe not.

25        The other thing that you worry about with lithium toxicity

Parmley - Direct                                        5459

1    is kidney damage.  Lithium is processed almost exclusively by

2    the kidneys and can zap your kidneys if in the toxic level for

3    too long.  All of the laboratory work that was done when he was

4    admitted to the infirmary at the Conway Regional Medical Center

5    and at Arkansas Children's Hospital were all within the normal

6    range.  Those had been monitored since that time and they have

7    remained within the normal range.  So while kidney damage was

8    potential, he came to no harm that way as a result of this

9    episode.

10        He was diagnosed with pneumonia at the time and treated for

11   that, and that's when you have an intercurrent illness and

12   you're on a drug like lithium that has a very narrow window of

13   active range, without getting over or under, would throw that

14   off.  And the dehydration would have accounted for that.

15   Q.   Do you know if any follow-up was done to monitor his kidney

16   condition?

17   A.   Yes.  It's still being done every six months, was done more

18   frequently when he came back.  Again, I don't remember the year.

19   But it was always within the normal range.

20   Q.   I think some implications have been made just in the last

21   day or two of CHDC not providing psychotherapy.  Are you able to

22   tell us what psychotherapy is?

23   A.   Psychotherapy, as I understand it, is what's called talking

24   therapy, and with specific goals in mind, depending upon what

25   type of psychotherapy the practitioner uses.  We don't provide

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    that in a formal way because of the communication limitations

2    that most of our clients have.  However, there's an informal

3    system where our higher functioning clients know that they can

4    talk to the psych examiner or the social worker.  I have one of

5    the little girls who is there who believes I am her counselor,

6    and she stops by my office every day to talk about what's going

7    on.  And she doesn't stay long.  She just, you know, wants to

8    check in.  So it's not psychotherapy, it's not goal directed in,

9    you know, making people self aware of what their problems and

10   issues are.

11   Q.    Do you participate, or are you familiar with the

12   interdisciplinary team process?

13   A.    Yes.

14   Q.    And do you participate in that?

15   A.    Yes.

16   Q.    Can you describe for us what your role is?

17   A.    I represent the medical service and attend team meetings to

18   provide that perspective on the patient's care.  Team meetings

19   include everybody in the place who has something to do with that

20   person so that everybody knows how they're functioning in

21   different areas.  How you're feeling, health-wise, can affect

22   everything that you do.  If you feel lousy, you don't want to

23   participate, you don't want to talk, you don't want to see

24   anybody.  And so reviewing people's illnesses.  Some people have

25   chronic medical conditions that one always has to be aware of in

1    any kind of programming, and so I represent that aspect.  I'm

2    there to answer questions.  One of the things that I really

3    appreciate about practicing there is that my clients, guardians,

4    loved ones, have access to me any time.  When a new patient

5    comes in, I like to talk to the family and say, "You know, you

6    can call me any time and we will talk about, you know, your

7    concerns, about what we're doing," not that they weren't

8    consulted about what we were doing before we did it.  "But if

9    you didn't get a question answered, you know, during a large

10   group meeting or maybe you'd rather talk about it in private,

11   you know, my door's always open, you can reach me by phone."

12   Not too many people in this room can call their doctor up on a

13   moment's notice and talk to them personally about what their

14   medical concerns are.  And I appreciate that, and I think so do

15   our parents.

16   Q.   What is your caseload of patients?

17   A.   At the moment, I have approximately 150 patients that I am

18   responsible for as a primary care physician.  That doesn't mean

19   that I don't know most everybody in the place, and that when I

20   am working in the clinic, which is sort of like a little

21   mini-ER, somebody has fallen, hurt themselves, or somebody has

22   some concerns about something that's going on with them today,

23   they can see a physician immediately.  And if I'm the clinic

24   doctor that day, I will see the other primary care physicians'

25   patients there.  But if I have a question about what's going on

1    or, you know, where this is, you know, all I do is walk across

2    the hall and talk to their primary care doctor, who often comes

3    in and examines them as well and makes recommendations about how

4    to follow through.  It's a very -- for a physician, it's a great

5    way of being able to treat patients.

6    Q.    The physician offices are located at CHDC though.  Right?

7    A.    Yeah.  Yeah.  Sort of all together in one hall, right

8    across the hall from the clinic where we see patients on that

9    sort of daily emergent basis -- not emergent, because it's not

10   really emergency, but things that people have concerns about

11   that they would like the doctor to look at.  A lot of the things

12   are things that I would call, you know, mom concerns, you know,

13   that if it had been my child coming in with that kind of thing,

14   I would have kissed it and made it well and sent them on their

15   way.  But, you know, they need to be seen by a physician, and we

16   do that.  And then the infirmary is just, you know, another few

17   steps down the hall.

18   Q.    Can you explain to us how you interact with the infirmary?

19   That's probably not a good way to phrase the question.

20   A.    If we have a client who is there, they're ill, they -- I

21   think that it would be better if they were watched by RNs 24

22   hours, they're not sick enough or the condition isn't to the

23   point that they need to go to the hospital, but something that

24   requires more than, you know, handing somebody a pill and

25   sending them home.  I mean, they may need IV fluids.  For

1    example, I have a patient in the infirmary right now who is

2    refusing to eat, and so, you know, she's receiving artificial

3    hydration through an IV and feeding through a tube down her nose

4    until she gets over her current illness.  And we hope she will

5    go back to eating again.

6    Q.    Do you believe that the infirmary has ever served as an

7    impediment to proper care for CHDC residents?

8    A.    Oh, heavens no.  It's a wonderful asset to have registered

9    nurses and LPNs available 24 hours a day.  They're our eyes and

10   ears.  I know that Dr. Stewart, at night, is often on campus,

11   and I've been there some nights myself.  And if I feel like I

12   need to see a client myself, I can go.  But the nurses that we

13   have there have been there forever.  They are very highly

14   skilled.  I trust their observations, and they are smart enough

15   to say, "Doctor, I need you to come and look at this patient."

16   If I have any concerns, I'll go see them myself.  So it's a

17   wonderful asset to have.

18   Q.    We spoke briefly about the consulting relationship with

19   Dr. Callahan and yourself and the other treating professionals.

20   Do you also receive consultations from other specialists?

21   A.    Yes.  We have an endocrinologist, a pediatric

22   endocrinologist.  But diabetes is diabetes, and it is just

23   treated a little differently in children.  But he has training

24   over both.  We have an infectious disease specialist.  We have a

25   pediatric cardiologist, pediatric pulmonologist, all of those

```
 1   people.  And, plus, I am on the faculty of Arkansas Children's
 2   Hospital, UAMS, and I know all those people, and I just call
 3   them up as colleagues and either curbside them, you know,
 4   present the case, and "Have you got a thought?"  If I need to
 5   get somebody in to see somebody sooner rather than later, I can
 6   pull strings.  I'm faculty, I guess, and have a real good
 7   working relationship with UAMS and Arkansas Children's Hospital.
 8   Q.   Are you able to give us an example of how that's been
 9   effective for any particular resident at CHDC?
10   A.   Nothing comes to mind instantly.  Well, here we go.  I have
11   a young man who is a client of mine who has experienced a
12   traumatic brain injury over a year ago.  He is nonresponsive and
13   has made no indications that he is aware of the world around
14   him.  One of the things that I have pulled a string to get is
15   there are -- and it is often done with babies to find out
16   whether they can hear or see.  But you can do what's called
17   brainstem evoked response tests, which is to see if the wiring
18   between the eyes and the brain is hooked up, or the ears and the
19   brain or between your skin, your muscles, if that's hooked up to
20   your brain.  Those are kind of hard to come by, those particular
21   tests, and this young man has received those tests.  We got
22   enough of an indication that in one area, somebody might be
23   home, and he is going to go for what's called a functional MRI.
24   It's a research tool.  UAMS happens to have one of those.  And
25   to find out if he is, even though his body is not giving us any
```

1    indication, if he has any thought process at all, be able to

2    tell whether or not his brain lights up at certain stimuli.  And

3    that is in the works of being arranged for.  Those kinds of

4    things are not available to, you know, most people, I guess.

5    Q.   Do you know if they're available to a general primary care

6    physician in the community, which is sort of --

7    A.   They would have to pass the patient off to a subspecialist.

8    They would -- had he been in the community, his primary care

9    doctor would have had to send him to the neurology department to

10   discuss whether or not this is a viable sort of thing rather

11   than the curbside of me talking.  The child had been in

12   Children's Hospital, so they did have access to his medical

13   records and know what the past was and that this was a

14   reasonable request.  Knowing that those kinds of things exist,

15   you know, was -- I mean, I assume some of my colleagues in

16   private practice know about that.  And the University is an

17   asset for all physicians.  So maybe I'm characterizing that and

18   making myself sound more important, that connection more

19   important than it is.

20   Q.    If I'm not mistaken, your explanation of the process would

21   be that outside of CHDC, a pediatric patient would be referred

22   to a subspecialist, whereas in your work, you've actually been

23   the variable, so to speak, in that process?

24   A.    One of my duties besides being a primary care doctor is

25   that I am an attending physician at Arkansas Children's Hospital

1    for the pediatric rehabilitation division.  So I actually met

2    this young man with the traumatic brain injury in the hospital.

3    And so like I said, I'm faculty, but I'm also an attending

4    physician there as well as primary care physician at CHDC.

5    Q.    Do you have an opinion about the medical care at CHDC?

6    A.    Yes.  I think it's exemplary.

7              MR. TAYLOE:  Your Honor, she's not here to offer an

8    expert opinion.

9              THE COURT:  Overruled.

10   A.    I think because we are watching out for our clients' best

11   interests, that all of the tests and consultations that are

12   available to people aren't always followed through, and we do

13   follow through.  For example, people over 50, when you reach

14   your fiftieth birthday, everybody should go for a colonoscopy,

15   and the gastroenterologist who does that will recommend how far

16   out you need to repeat that.  How many in this room over 50 have

17   even had a colonoscopy, let alone one on your fiftieth birthday?

18   Well, our clients do.  Because of concerns about bone health,

19   our clients receive an evaluation of their bones, you know,

20   whether they're developing osteoporosis or not, every two years

21   with a consultation with an endocrinologist.  That's every

22   person in the place.  And that kind of thing just doesn't happen

23   out in the real world.

24   Q.    Thank you.  Those are all the questions I have.

25             THE COURT:  You may.

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1                        CROSS-EXAMINATION

2    BY MR. TAYLOE:

3    Q.    Good afternoon, Dr. Parmley.  I'm Bo Tayloe.  I don't

4    believe we've met before.

5    A.    No.

6    Q.    I believe in your testimony just now you indicated that if

7    a child comes in with a psychiatric diagnosis or psychiatric

8    medications, they're referred immediately.  Did I get that

9    right?

10   A.    That's correct.

11   Q.    And then we talked, or rather you spoke earlier about the

12   process through which medication prescriptions are actually

13   written.  And as I understand it, Dr. Callahan makes a

14   recommendation, and then it will come to you, or another primary

15   care physician, and you review it and make your own

16   determination and then issue the order where you think

17   appropriate.  Is that a fair summary?

18   A.    A couple of steps left out.  When Dr. Callahan makes his

19   recommendation, I review it and determine whether or not I think

20   it's appropriate.  At that point, it's referred to the team for

21   any psychotropic medication.  That's reviewed by the team of

22   professionals who take care of the client there, as well as the

23   guardian.

24   Q.    It goes through the consent process, the team is

25   involved --

1    A.    Correct.

2    Q.    -- in terms of the medical pieces --

3    A.    Right, right.  And when those consents are in place, then

4    if I've even sent it on to that point, then I've already made

5    the commitment that I'm going to prescribe it, if they agree.

6    Q.    Okay.  I have some documents I would like to show you.

7    A.    Okay.

8    Q.    I've handed you a document that's marked as D-CA1.  Do you

9    have that there?

10   A.    Yes, sir.

11   Q.    And it's actually a compilation.  If you flip over a couple

12   of pages, we'll refer to people by their initials.  And this is

13   for someone whose initials are TC.  Correct?

14   A.    Correct.

15   Q.    And the top page is the psychiatric consultation note, and

16   the next page is a practitioner progress note.

17   A.    That's correct.

18   Q.    And the recommendation here on the psychiatric consultation

19   note is then picked up on the progress note on the second page.

20   A.    Correct.

21   Q.    Is that right?

22   A.    Yes.

23   Q.    Then over here on the right-hand side is the physician

24   order, same medication, and that's your signature at the bottom.

25   Correct?

1    A.    That's correct.

2    Q.    And so in this instance, the psych note was written on

3    5-15-09, and then you signed the order for this med on 5-20,

4    without any changes.  Right?

5    A.    That's correct, because it was a medication that had

6    already been approved.

7    Q.    I understand the caveat to what you said before was you

8    don't have to go through the consent process, the human

9    rights committee --

10   A.    Right.

11   Q.    -- once the meds are in place?

12   A.    Right.

13   Q.    And if we go on to the next -- the next -- the third and

14   fourth page of this document, this exhibit, it's the same basic

15   mechanism in place.  The first of those two pages, it's Bates

16   stamped 98 at the bottom, the last two digits, psychiatric

17   consult for January 28.  He proposes a medication -- well, here

18   we're not making a medication change, I don't believe.

19   A.    Right.

20   Q.    Not on this particular one.  Okay.  Let's do another couple

21   of these.  And I'll see if I can't keep my papers organized to

22   the point where I can give you all of them at one time and avoid

23   multiple trips.

24   A.    Okay.  New patient.  I thought it was going to be more on

25   the same person.

1          THE COURT:  Why don't you give me one instead of two.

2    I know we previously asked for two, but I don't really think I

3    need two.

4          MR. TAYLOE:  Thank you, Your Honor.

5    BY MR. TAYLOE:

6    Q.   Just looking at -- do you have the document marked D-CA2

7    there?

8    A.   Uh-huh.

9    Q.   Okay.  And the proposal there is that -- that's a

10   psychiatric consult note from Dr. Callahan.  And at the bottom,

11   he proposes to reduce the thioridazine, and it is picked up on

12   the practitioner's progress note on the following page, and you

13   implement that order.  Is that right?

14   A.   That's correct.

15   Q.   You issued that as your order?

16   A.   That's correct.

17   Q.   And it's just a couple of days later.  And if we go through

18   others of these, I think we're going to see this same thing, but

19   you can correct me, that if it doesn't make a treatment, as in

20   D-CA3, he's not making a treatment change in the first of those

21   changes, but he may propose a medication change there, that's

22   also picked up right in the progress note.  So if you look on

23   D-CA3, on pages 34, one is marked 34, the last two digits, and

24   one is marked 18, there you see his recommendation is picked up

25   directly into the progress note.  Correct?

1    A.    That's correct.

2    Q.    And then if you go to the next page, which is Bates stamped

3    33, it's a psychiatric consultation note, dated 4-27-09.  He's

4    proposing reduction in the clonidine.  You turn the page, and

5    the progress note recommends reducing the clonidine, and you

6    sign that order to do so.

7    A.    That's correct.  But you need an explanation for why the

8    progress note that I signed personally has exactly the same

9    thing as his assessment and plan?

10   Q.    No, no.  Actually, the point I was coming to was that in

11   virtually every instance you're going to do what Dr. Callahan

12   recommends.  Correct?

13   A.    Pretty much.  He's a consultant.  I'm not a psychiatrist.

14         MR. TAYLOE:  Your Honor, we move for the admission

15   into evidence of D-CA1 through -6.

16         THE COURT:  Received without objection.

17      (Plaintiff's Exhibits D-CA1 through D-CA6 received in

18   evidence.)

19   BY MR. TAYLOE:

20   Q.    You just said you're not a psychiatrist.  Right?

21   A.    That's correct.

22   Q.    And you were talking, however, earlier about psychiatric

23   care at CHDC.  You were asked about OCD in particular.

24   A.    Uh-huh.

25   Q.    You made the point that all the diagnoses need to be

1    consistent with the DSM-IV, you've got to be able to meet those

2    criteria.   That was your testimony?

3    A.   Yes.

4    Q.   And apropos the discussion about OCD, you made the point

5    that if someone is so disabled by their obsessive-compulsive

6    disorder that it gets to the point where it interferes with

7    their daily life skills, that's the point where you want to

8    intervene.

9    A.   That's correct, uh-huh.

10   Q.   So do you believe that over one-quarter of the entire

11   population of CHDC has OCD to the point where they're obsessing

12   and that without psychiatric treatment, that OCD is interfering

13   with their daily life?

14   A.   If they meet criteria, yes.

15   Q.   So one-fourth of the entire population at CHDC, you used

16   the example of switching a light, switching a light, switching a

17   light, they're all engaging in that behavior, or behavior like

18   that, absent psychotropic medications?

19   A.   Yes, sir.

20   Q.   Now, you were talking about OCD and the difficulty of

21   making that diagnosis as a subset of an anxiety disorder.

22   Correct?   OCD?

23   A.   Uh-huh.

24   Q.   That's distinct from autism.   Right?

25   A.   Yes.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Parmley - Cross                                    5473

1    Q.   And the treatments for OCD and autism should be different.

2    Correct?  The psychotropic medications that might be used, or

3    the interventions that may be appropriate for someone who has

4    actually got autism would be different than for someone with an

5    anxiety disorder?

6    A.   Not necessarily.

7    Q.   You don't agree with that?

8    A.   Not necessarily.

9    Q.   You don't agree with the proposition that if you were to

10   give someone who was autistic medications that could amplify

11   their behavior because they're based on someone actually

12   being -- someone being diagnosed as having OCD, that that would

13   be a problem?

14   A.   I'm sorry.  I don't get the drift here to your question.

15   Q.   That wasn't a very good question.

16   A.   I'm sorry.

17   Q.   Let me see if I can do better.

18   A.   Okay.  Well, autism precludes some diagnoses.  For example,

19   if you are diagnosed with autism, you, according to the DSM-IV,

20   do not -- you cannot, should not also have a diagnosis of

21   attention deficit-hyperactivity disorder.  Many of the symptoms

22   of autism are similar to those with ADHD, but autism has a more

23   extensive definition, and so that subset of symptoms is subsumed

24   under the autism diagnosis.  I don't know whether or not OCD is

25   that way or not, but I know that many of the drugs that are used

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Parmley - Cross                                        5474

1    to treat OCD are also considered antidepressants, particularly

2    of the SSRI, selective serotonin reuptake inhibitor class.  And

3    those have been approved by studies that they have found that

4    they, you know, reduce that anxiety that's in OCD.  Now, an

5    antidepressant might also be appropriate for an autistic person,

6    child, so in which case the same drug would be treating both

7    things, or maybe two different ones.  Sort of -- it's -- I'm

8    sure it's more art, actually, than science at some point.

9    Q.   You're not aware of instances where medications that are

10   used for anxiety can actually cause mania in someone who is

11   actually autistic?

12   A.   I'm sure there are.

13   Q.   You were talking about KL -- I'm going to come back to

14   KL -- in your discussions earlier with Mr. Zaycosky.

15   A.   KL?

16   Q.   I'm sorry.  I can't read my own writing.

17   A.   CL?

18   Q.   I mean CL.

19   A.   Okay.

20   Q.   We're on the same page, so to speak, right now.

21   A.   KL and CL.

22   Q.   And you indicated that he was admitted to CHDC, I believe

23   it was in March --

24   A.   The end of March.  And the incident -- I don't have the

25   dates.  But the incident of the lithium toxicity and when he was

                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

1  admitted to Children's Hospital was in May, first part of May, I

2  believe.

3  Q.    Okay.  Now, do you know how long it was between the time

4  that he was admitted to CHDC and first seen by the consulting

5  psychiatrist at CHDC?

6  A.    No.

7  Q.    Would it surprise you that it was five weeks?

8  A.    No.

9  Q.    That's a little inconsistent with being seen immediately

10 though, isn't it?

11 A.    We request -- on admission, if someone has a psychiatric

12 diagnosis, on the admission orders, a psychiatric consult is

13 requested.  So the day of admission, a consult is requested.  If

14 for some reason -- so I guess that's what I meant by

15 "immediately."  It's ordered immediately.  When it happens is

16 sort of out of my control at that point.  But if I am under the

17 -- or have the concern that what has happened with this

18 particular person just doesn't jibe, that I need him seen by the

19 psychiatrist right away, first of all, I can pick up the phone

20 and talk to Dr. Callahan at any point, present a case, and ask

21 for his guidance.  He has at least on one occasion that I know

22 of, I can't think of others right away, but on one particular

23 one, he came out especially to see that particular person.  Now,

24 he saw them, I believe it was, the day after admission.

25 Q.    That can happen, but in this instance, it --

1    A.    It didn't, that's right.

2    Q.    All right.  Now, CL, at the time this event that you

3    described occurred, when he came into CHDC, and for the

4    subsequent five weeks or so, he wasn't on your caseload, was he?

5    A.    He was not.

6    Q.    Uh-huh.  So this testimony that you offered today is not

7    based on your personal experience, it is based on you looking

8    back at the records.  Right?

9    A.    I was consulted by his primary care doctor, being the

10   pediatrician, and his primary care doctor is a family practice

11   doctor who is perfectly capable and trained to be able to take

12   care of children as well as adults.  But it was an unusual case,

13   and both myself and Dr. Sam Schultz, who is the other

14   pediatrician out at CHDC, were part of sort of a round table

15   discussion about, you know, what to do and what to follow up.

16   Q.    This was a retrospective look back?

17   A.    No, no, at the time.  And he, in fact --

18   Q.    I'm sorry.  Just so we're clear.  At what time?

19   A.    It would have been while he was still at Children's

20   Hospital.  So, okay, what do we do, and in discussing that, made

21   sure that he was being followed afterwards by a nephrologist

22   that we -- how often do you think we need to check his

23   electrolytes and that kind of thing.

24   Q.    I understand.  But that is kind of, in my understanding,

25   consistent with it being a retrospective look, because up until

1   the point of time when he was hospitalized, he wasn't on your

2   caseload, and that retrospective look, that look you just

3   described started as of that point, when he was hospitalized.

4   A.   That's correct.  And he subsequently became part of my

5   caseload.

6   Q.   You commented on the labs.  And is this something that's

7   actually been established, that the lab results were off because

8   of -- in my words, you correct me -- some kind of lithium

9   residual in the tubes?  Has that been established?

10  A.   The levels that were drawn at CHDC were accurate and in the

11  correct tubes.  We do not have even on the premises the kind of

12  tubes that have the lithium anticoagulant in them.  So those

13  initial blood draws with the toxic levels were accurate.

14  Q.   Just so I'm clear, when the results came back of, quote,

15  greater than 4, that was an accurate reading?

16  A.   Yes, sir, that's correct.

17  Q.   Now --

18  A.   Well, I have to assume it was, and it was repeated in the

19  morning, and it was the same level in the morning.

20  Q.   And greater than 4, we're well into the toxic range?

21  A.   That's correct.  I believe that's probably the upper limit

22  of the test, so --

23  Q.   That's why it's captioned as greater than 4 because it's

24  kind of off the scale?

25  A.   Yeah.

Parmley - Cross                                    5478

1    Q.   And so then he goes to the local hospital in Conway and

2    they draw the lab, they do the lab work there, and it's --

3    A.   I don't --

4    Q.   -- at least 4.  Right?

5            THE COURT:  6.8.  6.8.

6    BY MR. TAYLOE:

7    Q.   And is that the point in time where there was concern about

8    the tainting of the result, the 6.8?

9    A.   I don't know about what happened at the local hospital.  I

10   know about what happened at Arkansas Children's Hospital when he

11   was there and the impact that that had on the dialysis.

12   Q.   So two different labs are pointing off the chart, one is

13   off the chart, so to speak, and the other is 6.8, and that's

14   pretty much incompatible with life, he's at risk of dying at

15   this point?

16   A.   I don't know that.

17   Q.   Okay.  Do you know how much fluid a person would have to

18   lose for their lithium level to go from a steady state of 1 to

19   greater than 4?  Do you have any sense for that?

20   A.   I don't.  And what I would look at were the other labs that

21   were drawn at the same time, the sodium, potassium.  Those labs

22   were done at the same time, and that would give you the degree

23   of dehydration.

24   Q.   And your point earlier about the steady state, but he had

25   to wait a few days --

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    A.    Five half lives.

2    Q.    Because it's a gradual thing, this lithium change,

3    normally.  Right?

4    A.    Well, you have to take it every day to get a certain level

5    in your blood for it to work.  You can't, you know, take it one

6    day and then not another, and that kind of thing.  You need to

7    be able to reach this small therapeutic window, they call it,

8    for it to be effective.

9    Q.    My point, though, is that the expectation was we draw it,

10   it's .5, we wait a few days and it's up to -- it's doubled, it's

11   gone from .5 to 1, it takes a few days for that kind of a change

12   to happen.  Right?

13   A.    Yeah.  Our assumption, like I said, had been -- I don't

14   know at this point whether, you know -- I probably shouldn't say

15   it.  But our assumption was that he was not receiving the

16   lithium at home, so the .5 was -- I mean, that's why we drew it

17   five days later.  Now that we know he's getting it and on

18   schedule and on time and the correct dose, we need to look and

19   see what it looks like.

20   Q.    But my point is to the changes.  I mean, you're not

21   supposing that he went from .1 to .4 -- I'm sorry -- from 1 to 4

22   overnight.  I mean, that kind of a change just doesn't happen.

23   Right?

24   A.    I don't know that.

25   Q.    Have you ever heard of that happening before?

1    A.    No.

2    Q.    Ever seen it happen before?

3    A.    I -- not -- I don't have very much experience in that area.

4    Q.    Okay.

5    A.    Because lithium has such a narrow therapeutic window, it's

6    not used very much.  It has an antimanic effect, and for some

7    people, that is probably the drug of choice.  The client is not

8    on it anymore.  I don't know that we have anybody on it anymore.

9    Again, being one of those drugs that -- as in this case, you

10   know, he got a pneumonia that sort of sent him over the edge

11   with the lithium.

12   Q.    Now, just apropos to that, I didn't see a diagnosis of

13   pneumonia in the records.  Do we just miss that?

14   A.    No.  He was diagnosed with that at Arkansas Children's

15   Hospital and started on a broad spectrum antibiotic.

16   Q.    So when he left CHDC, did he go into the hospital because

17   he'd been -- did CHDC say he's got pneumonia, is that why he was

18   admitted to the hospital?

19   A.    One of his admitting diagnoses to the infirmary the night

20   that he came in with the lithium toxicity.

21   Q.    Pneumonia?

22   A.    It was gait disturbance and --

23   Q.    How about upper airway --

24   A.    Yeah.

25   Q.    That's a little different from pneumonia.  That could be a

1   cold.

2   A.    Sure.

3   Q.    I might have it right now.

4   A.    Sure.

5   Q.    Okay.

6   A.    But abnormal lung sounds were part of his presentation, so

7   that is down in the lungs, not the upper airway.  So --

8   Q.    You were asked some questions about psychotherapy, or you

9   called it, I believe, talk therapy.

10  A.    Uh-huh.

11  Q.    There's no set schedule, is there, for talk therapy or

12  psychotherapy for any of the people under 21 at CHDC?  They're

13  not on a set schedule?

14  A.    No.

15  Q.    Do you know how many of these -- I'm going to call them

16  kids, under 21 -- how many of the kids are verbal at CHDC?

17  A.    No.  Not many.

18  Q.    Not many?

19  A.    (Witness nods head.)

20  Q.    I don't think I have any more questions right now,

21  Dr. Parmley.  Thank you.

22          MR. ZAYCOSKY:  Very briefly, Your Honor.

23          THE COURT:  All right.

24                    REDIRECT EXAMINATION

25  BY MR. ZAYCOSKY:

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Parmley - By Court                                    5482

1    Q.   Dr. Parmley, do you exercise independent professional

2    judgment before prescribing medication or changing the dose of a

3    medication?

4    A.   Yes.

5    Q.   Thanks.

6         THE COURT:  I have a few questions for you.  How many

7    doctors do you have on staff there at Conway Human Development

8    Center, talking about the primary care physicians?

9         THE WITNESS:  There are four.

10        THE COURT:  And tell me who they are and what their

11   backgrounds are.

12        THE WITNESS:  Dr. Sam Schultz, S-c-h-u-l-t-z, is a

13   pediatrician who had, prior to coming to CHDC, been a community

14   pediatrician, seeing children that are taken into foster care,

15   children being placed in Kids First kind of programs, that kind

16   of thing.  Did a lot of work around the state.  Had worked

17   previously for the State Health Department.

18        Dr. Denise Thomas, who I believe has been here, is a doctor

19   of osteopathy.  I don't know what her background was prior to

20   coming to CHDC, but she has been there for many years.

21        Dr. Jarrett Lee -- I'm sorry.

22        Dr. Thomas is a family practice doctor.  That's her

23   training.

24        Dr. Jarrett Lee is also a family practice doctor.  He was

25   in the military, the Air Force, for a number of years, and

1    practiced there, and recently moved back to his home, which is

2    Conway, and had gone into private practice but was offered this

3    position.  And me.

4             THE COURT:  So how are the residents assigned as

5    patients?  How is it determined that someone is going to be on

6    your caseload as opposed to Dr. Lee or Dr. Thomas or

7    Dr. Schultz?

8             THE WITNESS:  Prior to, just lately, it was -- there's

9    a clinic schedule.  And when you work in the clinic, it's hard

10   to keep up with the caseload, so it was divided fairly equally.

11   Prior to the Alexander HDC closing, there were six physicians.

12   One of those went to Alexander and one of them has moved to

13   Fayetteville with her husband.  So we had a lighter caseload at

14   that point.  All of the children, if that's the concern, were --

15   I had -- most of the children were on my caseload, Dr. Schultz

16   had the rest of them.  And at the moment, because we only had

17   four, Dr. Schultz is doing the clinic all the time and he has

18   all the children.  And the other three of us sort of divided up

19   all the other patients.  Units that I had had in the past where

20   I knew the people well, I kept.  And the two physicians that

21   left, the units were divided between the three of us.

22            THE COURT:  There are some questions -- and this has

23   been covered, but just so it will help me make sure I have it

24   right in my memory.  If you'll tell me what's the process that

25   the CHDC goes through in implementing, prescribing, and

                        Parmley - By Court                        5484

 1    administering psychotropic medications, starting with the

 2    consult with Dr. Callahan, from there until the patient gets --

 3    we talked about a new prescription, not one already preexisting,

 4    not one that he comes in with, not a change from this level to

 5    that level.  But a new prescription for psychotropic medication,

 6    what's the process from the time of the consult with

 7    Dr. Callahan until the resident actually starts receiving their

 8    medication?

 9              THE WITNESS:  Dr. Callahan's consult is given to me

10    within a day or two of him seeing the patient.  On some

11    occasions, he stops by my office to talk about other aspects of

12    the individual's life before I assume he made his

13    recommendation.  But I get the recommendation.  I look at it in

14    terms of all the other medications that the patient is taking,

15    all of the various reports that I received about that person

16    over the last six weeks or so, does it seem reasonable, and at

17    that point refer the recommendation to the team, which includes

18    the parent or guardian.  The team meets.  They are -- they spend

19    a lot of time discussing side effects, risks and benefits.  By

20    starting this new medication, what do we expect to see as a

21    result of the medication, what are the things that we need to

22    watch for that can be a side effect.  And those are tempered,

23    because a lot of the side effects that are listed are things

24    that if you actually look at the package insert that comes with

25    the drug that nobody ever looks at, the drug company has to

Parmley - By Court                                          5485

1    report anything that was seen in a patient getting the studied

2    drug, and sometimes that amount, or that number is equal to, or

3    even less than the number of people who receive the placebo.

4    Like headache, for example.  Well, if five people on the studied

5    drug got headaches and ten people on the placebo got headaches,

6    they still have to report that as a side effect of the drug,

7    even though that doesn't make sense, looking at those numbers.

8    So if it's a drug they're not really familiar with, I have gone

9    to some staffings where, you know, we talk about those risks and

10   benefits.

11        During that meeting, they already set up -- when we talk

12   about it, we talk about what our goals are, what we expect to

13   see, how long we expect them to be on that medication, and what

14   the, quote-unquote, taper criteria is, how long, or what kind of

15   benefits do we need to see before we start backing off and see

16   maybe if we can maintain that without the medication.  So that

17   goes to the team.  The team either approves, disapproves.  The

18   guardian either approves or disapproves.  At that point, it goes

19   to the human rights committee, who reviews all of that

20   information from all parties.  And then I'm told whether or not

21   the consents are in place, in which case I will order the drug.

22   If I don't refer it on, and I'm sure there would be a

23   question -- I don't think there has been an instance where I

24   haven't sent it on.  But there have been a couple of times where

25   I've questioned what the starting dosage would be or talked with

Parmley - By Court                                5486

1    the laboratory people about how we need to monitor this and how

2    closely because of potential problems.  And at that point, it's

3    ordered.

4         Then prior to starting any medication, there are certain

5    laboratory parameters that need to be evaluated before starting

6    the medication.  Like, for example, someone starting on

7    anticholesterol medication, one of the things, anticholesterol

8    medications are processed in your liver, and your liver enzymes

9    can go up as a result of taking that medication, so you want to

10   know what the number was of whatever that might affect

11   beforehand, before you ever start the medication.  And then

12   there's a prescribed set of how often you monitor it, and that's

13   -- there's a set of guidelines put out by the United States

14   Government that says what those guidelines are for laboratory

15   follow-up.  And if we have any -- if, at one of those

16   evaluations, say the numbers come back out of the ordinary, at

17   that point we look at whether or not, you know, again, is the

18   benefit the person's deriving from this outweighing the risk.

19   And it depends upon the number.  You know, if the normal range

20   is, you know, 10 to 20, and the number is 21, well, it depends

21   upon the drug of whether that's really a significant number or

22   not.  Sometimes you go up to four or five times the upper limit

23   of normal before you really see any damage.  So it sort of

24   depends upon what the drug is and how it's metabolized by the

25   body and broken down and excreted.  And that's always listed on

1    any medication, they have to do those kinds of studies, how it's

2    administered.  They call them ADME studies.  They're four

3    letters that stand for administration, dosage, metabolism, and

4    excretion.  All those things have to be in place for the FDA

5    before a drug is ever approved so we know where a drug has

6    metabolized.  We don't know always how it works, and that's part

7    of the package insert, that we don't know the mechanism of

8    action, but this is the chemical makeup and so forth.

9              THE COURT:  All right.  Follow-up on my questions?

10             MR. ZAYCOSKY:  Just one question.

11             THE COURT:  Ask it from there.

12                   CONTINUED REDIRECT EXAMINATION

13   BY MR. ZAYCOSKY:

14   Q.   Doctor, do you know if there's a vacancy among positions

15   currently?

16   A.   Yes, there is.

17                       RECROSS-EXAMINATION

18             MR. TAYLOE:  I think one, maybe two.

19             THE COURT:  Ask it from there.

20   BY MR. TAYLOE:

21   Q.   You were talking about taper criteria just now with the

22   Court, and you talked about the process that the team is

23   involved in that.  And you had mentioned in your earlier

24   testimony LW and the fact that he's on trazodone.  Do you recall

25   participating in a decision for his taper criteria?  Were you

1   involved in that?

2   A.    No.

3           MR. ZAYCOSKY:  Objection.  Goes beyond the scope of

4   redirect.

5           MR. TAYLOE:  She talked about LW and she spoke with

6   the Court about the taper criteria.

7           THE COURT:  Go ahead.

8       What was the question again?

9           MR. TAYLOE:  She answered "no," I think, to the

10  question.

11          THE COURT:  That's fine.  Then move on.

12          MR. TAYLOE:  That's it.

13          THE COURT:  All right.  You can step down.  Thank you.

14          THE WITNESS:  Thank you very much.

15          THE COURT:  All right.  We'll be in recess until

16  9:00 in the morning.  You can go ahead and move them.  Just give

17  it back to them.

18      I probably asked for more copies of exhibits than we

19  needed, and you may want to start thinking about, since we have

20  some spare time this afternoon, starting to move boxes out that

21  you don't need.  Next Friday, when we finish, you'll need to be

22  able to get your boxes out, because we have a trial starting on

23  Monday morning, as you know.  And Saturday may be a difficult

24  day in Little Rock.  It will be the Race for the Cure for the

25  Susan G. Komen Foundation.  Usually you get around 40,000

1    runners in downtown Little Rock, so it gets to be difficult.

2    Ms. Freno can tell you about it.  It gets difficult to get in

3    and out.  If you want to take this opportunity to move boxes out

4    that you don't need, feel free.  We'll make sure the courtroom

5    is available.  And if you can see during the week opportunities

6    to start emptying out, then, you know, it would probably be good

7    to keep that in mind.

8         The other thing is, for those of you who are looking for a

9    cultural experience, I want you to know that the Arkansas State

10   Fair starts today, and tomorrow night there is the Demolition

11   Derby at Barton Coliseum.  And one of my law clerks offered to

12   get you group tickets to the Demolition Derby, if anyone is

13   interested.  If you're not interested in that, there is a

14   professional bull riding event tomorrow evening.  So after we

15   finish court tomorrow evening, if you're interested in that.  On

16   a bipartisan basis, equally to both sides, she'll make those

17   arrangements and get tickets to see those events.

18        Is there anything else?

19             MR. DONNELLY:  Your Honor, I hate to ask -- well, we

20   gave three copies of our exhibits to the Court.  Are you keeping

21   those?

22             THE COURT:  No.  I think just what I've got up here is

23   going to be enough.  I haven't had a case where we had -- this

24   is my first time in a bench trial for six weeks and, between the

25   parties, something over 2,000 exhibits identified, probably 3-.

5490

1    I'm guessing.  I haven't actually counted it up.  Be that as it

2    may, we're learning.  I think the one set from each side is

3    really all I'm ever going to use.  So anything else you want to

4    move out -- and I apologize for the extra work that it required,

5    for the expense, for whatever damage to the environment that we

6    did.  I'm not saying it facetiously.  If I had to do it over

7    again, I would not have asked for that, and I apologize.  But

8    we're learning as we go on how to conduct a trial like this.

9    And that was one of the mistakes that we made in the

10   administration.

11          MR. DONNELLY:  So these boxes up here can start

12   disappearing?

13          THE COURT:  You can take them out.  We'll be in recess

14   until in the morning.

15       (Overnight recess at 1:10 p.m.)

16                C E R T I F I C A T E

17     I, Eugenie M. Power, Official Court Reporter, do hereby

18   certify that the foregoing is a true and correct transcript of

19   proceedings in the above-entitled case.

20

21   /s/ Eugenie M. Power, RMR, CRR, CCR      Date:  December 10, 2010
     United States Court Reporter

22

23

24

25

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter