```
 1                IN THE UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
 2                        WESTERN DIVISION

 3   UNITED STATES OF AMERICA,
                 Plaintiff,
 4   v.                                  No. 4:09CV00033 JLH
     STATE OF ARKANSAS, MIKE BEEBE, Honorable  October 9, 2010
 5   Governor of the State of Arkansas; JOHN   Little Rock, Arkansas
     M. SELIG, Director of the Arkansas        9:00 a.m.
 6   Department of Human Services; JAMES C.
     GREEN, Ph.D., Director of the Arkansas
 7   Division of Developmental Disabilities
     Services; CALVIN PRICE, Superintendent of
 8   the Conway Human Development Center,
     in their official capacities only,
 9               Defendants.

10              TRANSCRIPT OF COURT TRIAL – VOLUME 25
                 BEFORE THE HONORABLE J. LEON HOLMES,
11                  UNITED STATES DISTRICT JUDGE
     APPEARANCES:
12   On Behalf of the Plaintiff:
         MR. BENJAMIN O. TAYLOE, JR., Special Counsel
13       MR. CHRISTOPHER N. CHENG, Trial Attorney
         MR. MATTHEW J. DONNELLY, Trial Attorney
14       MS. JACQUELINE K. CUNCANNAN, Trial Attorney
         MS. LAURA L. COON, Trial Attorney
15       MR. VINCENT P. HERMAN, Trial Attorney
           U.S. Department of Justice, Civil Rights Division
16         950 Pennsylvania Avenue, N.W., Room 4300
           Washington, D.C. 20530
17
     On Behalf of the Defendants:
18       MR. THOMAS B. YORK, Attorney at Law
         MR. DONALD B. ZAYCOSKY, Attorney at Law
19       MS. CORDELIA ELIAS, Attorney at Law
           York Legal Group, LLC
20         3511 North Front Street
           Harrisburg, Pennsylvania 17110
21
         MS. LORI FRENO-ENGMAN, Senior Assistant Attorney General
22         Arkansas Attorney General's Office
           Catlett-Prien Tower Building
23         323 Center Street, Suite 200
           Little Rock, Arkansas 72201-2610
24
     Proceedings reported by machine stenography; transcript
25   prepared utilizing computer-aided transcription.
```

Karen Baker, RMR, CRR, CCR
United States Court Reporter

1  **INDEX — VOLUME 25 (October 9, 2010)**

2  **WITNESSES FOR THE DEFENDANTS:  Direct  Cross  Redirect  Recross**

3  Bruce Gale                     5493   5660

4

5

6

7

8

9  **EXHIBITS**                                        **RECEIVED**

10  Defendants' Exhibit 356...................................5494

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings continuing in open court at 9:00 a.m.)

 2                  THE COURT:  Everyone be seated.  Mr. York, call your

 3     next witness.

 4                  MR. YORK:  Good morning, Your Honor.  We call Bruce

 5     Gale, Ph.D.

 6                  THE COURT:  Come forward.

 7          BRUCE GALE, Ph.D., DEFENDANTS' WITNESS, DULY SWORN

 8                            DIRECT EXAMINATION

 9     BY MR. YORK:

10     Q     Good morning, Dr. Gale.

11     A     Morning.

12     Q     Dr. Gale, first of all, state your name and spell your

13     last name for the record, please.

14     A     Bruce, middle name Miles, last name Gale.  B-r-u-c-e

15     M-i-l-e-s G-a-l-e.

16     Q     And, Dr. Gale, we have placed in front of you Exhibit

17     356, which, would you please identify for us?

18     A     Yes.  This is a slightly older version of my curriculum

19     vitae.

20     Q     And that was the version that was in existence around the

21     time of your deposition; is that correct?

22     A     That is correct.

23     Q     So we will do some verbal updates of that in a minute,

24     but, Your Honor, I move the admission of Exhibit 356 into

25     evidence.
```

```
 1              THE COURT:  Received.

 2          (Defendants' Exhibit 356 received in evidence.)

 3              MR. YORK:  I note for Your Honor's reference and

 4   opposing counsel that his report is Exhibit 355.

 5   BY MR. YORK:

 6   Q     Doctor, we're going to go through your qualifications.

 7   First of all, what is your profession?

 8   A     I'm a clinical psychologist.

 9   Q     Where are you licensed?

10   A     I'm licensed in Massachusetts and California.

11   Q     Could you describe for me your current practice, what you

12   do?

13   A     My practice currently is 100 percent in California and I

14   first and foremost do independent educational evaluations for

15   approximately 35 school districts in the California area.

16   Related to that, I also have a fairly well known social skills

17   program called Lunch Groups.  We've been in existence for 15

18   years and currently serve 55 families ranging from 8 years old

19   up through adult.  In this program, students with autism,

20   Asperger's, high functioning autism, mild mental retardation,

21   sometimes moderate mental retardation, things like what are

22   called oppositional defiant disorder or social shyness,

23   selective mutism, are all the kind of diagnoses for children or

24   students or adults who come to my program.

25              I also provide these days a limited amount of individual
```

1    psychotherapy services.  Mostly it's families who have children

2    with either severe behavior problems, self-injury, or perhaps

3    aggression, sometimes obsessional behaviors, and so I provide

4    not so much therapy to the child but rather strategies and

5    information for the families and sometimes going out to the

6    schools privately.  I'm the behavior director for a program

7    called Willing Workers which serves about 35, 40 adults with

8    mostly moderate to severe and occasionally profound mental

9    retardation.  As a day community program, I've done that for

10   about four years.

11        And in addition to that, I have a small company called

12   Behavior Tech Solutions, Inc., and I formed Behavior Tech

13   Solutions back in 1998 to separate it from my clinical

14   practice.  In that regard, Behavior Tech Solutions has

15   developed three software programs.  We have what's called a

16   multirater program that school districts use, we have an

17   on-line data collection system that students log into and it

18   gives them immediate feedback and staff logs in and it gives

19   them feedback.  And then, finally, we have a program that

20   provides for home-based generalization so families who come to

21   our social skills programs, the parents log in and rate their

22   own behavior in between sessions and it gives their children

23   points, which when they come back, it enters them into raffles

24   and some other things happen with that as well.

25        I'm also -- I give continuing education conferences, I'm

1    what's called a sponsoring organization through the American

2    Psychological Association, so I provide continuing education

3    units primarily on diagnosis and technology and the use of

4    technology in assessment and treatment.  And then, finally,

5    about every year and a half, I teach Abnormal Psychology at

6    what is now known as American Jewish University where I've been

7    on the faculty for maybe about 12 years.

8    Q     Could you briefly go over your education and training and

9    your formal degrees that you possess?

10   A     Sure.  Began my education actually at San Diego State

11   University.  I didn't quite have the grades to get into UCLA.

12   And began working in a behavioral science marine laboratory at

13   Sea World as part of my education there, and that resulted in a

14   publication that was presented at Stanford, but what was more

15   important is that learning how to train dolphins actually gave

16   me a lot of insight into human behavior and experimental

17   analysis of behavior and some of the things that I didn't know

18   would come along but would be very useful.  Going to UCLA had

19   been my dream and I transferred to UCLA and had the fortunate

20   opportunity to work with a man named Ivar Lovaas who had a

21   pioneering program called The Young Autism Project, and I got

22   my BA in 1976 from UCLA.

23         When I wasn't sure whether it was going to be psych or

24   what, I went on in speech pathology for a little while and I

25   attained some graduate units, but then I decided to continue on

Gale - Direct

1    in psychology and received my master's and Ph.D. from Florida

2    State University.  I then went to Children's Hospital Boston

3    and did my pre-doctoral internship at the Judge Baker Guidance

4    Center, which is part of children's hospital.  I then did an

5    advanced fellowship in the developmental evaluation clinic at

6    Children's, and during that time was a fellow at Harvard

7    Medical School.  And then subsequently I did a post doctoral

8    training with Alpha Geriatric Services.  And pretty much that

9    completes my formal training.

10   Q     So your doctorate is in clinical psychology; is that

11   correct?

12   A     It is.

13   Q     What's Alpha Geriatric Services that you just referred

14   to?

15   A     It was a program based in Boston where they provided

16   services to well over a hundred nursing homes, boarding cares,

17   various residential facilities, and I was a senior staff member

18   at the time.  Even though, it's kind of strange, but it was

19   because of my knowledge of behavioral interventions, and so

20   that was the area where I was considered more senior and I was

21   supervising master's level people.  At the same time, I was

22   being supervised for the remaining post doc hours, really

23   learning more about how to do assessments in a nursing home

24   environment, how to work with physicians, learning more about

25   medications and CAT scans and things like that, and learning

Gale – Direct

1    how a psychologist could usefully function in that environment.

2    Q    I'm going to go through some of your professional

3    affiliations and appointments.  One of them you've already

4    mentioned, but I'd like you to elaborate a little bit.  You say

5    you teach at the American Jewish University; is that correct?

6    A    Yes.

7    Q    What do you teach there?

8    A    Abnormal psychology.  And what that is is it's a review

9    of all the diagnoses that are in the DSM and then looking at

10   what they -- pretty much the book that I've chosen is based on

11   what's called a biopsychosocial model.  There are different

12   ways that you can learn about human development and human

13   diagnoses, and my feeling is that that most comprehensive view

14   is one that incorporates that theory.  And also one of the

15   individuals who is the co-author simply is somebody who I've

16   known professionally for years and his name's Mark Durram, and

17   the reason that's relevant only is because it's interesting

18   that his chapter on developmental disabilities where he's such

19   an expert is actually one of the shortest chapters in the book.

20        But abnormal psych is where you're looking at assessment

21   methodology, you're looking at reliability and validity, you're

22   looking at what does the test truly measure, what are

23   observational methods that are going to produce useful results,

24   and what kind of treatments can be effective in different kinds

25   of situations for different diagnoses.

Gale – Direct

1    Q     And I note here in your CV a reference to qualified as a

2    sponsoring organization through the American Psychological

3    Association.  What's that referring to?

4    A     It refers to the fact that I'm able to offer continuing

5    education units to other psychologists for their licensure and

6    it's something that we originally or I originally applied for

7    and received provisional status, and then last year, we were

8    given five year approval.

9    Q     And a member of the California Psychological Association,

10   and I believe you're also a division chair there; is that

11   correct?

12   A     That's correct.  I'm division chair for division 6 which

13   is the division having to do with media, technology, and

14   communication.

15   Q     And you're also a member of the American Psychological

16   Association; is that correct?

17   A     Right.  I'm a member and then I belong to several special

18   interest groups within the American Psychological Association,

19   which is really one of the best benefits of why I am a member

20   because what it allows me to do is to contact colleagues who

21   are simply state of the art professionals and I can receive a

22   response back from 10 or 15 individuals who are all published

23   authors.  And in that regard, I belong to several.  It says on

24   my CV that I'm a member of division 5, and I actually dropped

25   my membership from division 5, it just wasn't so useful for me,

Gale – Direct

1    but I am a member of all the other divisions, so being a

2    clinical psychologist, division 12 is kind of a natural, that's

3    the division of clinical psychology.

4        15, educational psychology, keeps me up on the theories

5    of test measurement.  Division 25 is behavior analysis.

6    Division 33 is developmental disabilities and mental

7    retardation.  Division 42 is for psychologists who hold an

8    independent practice.  And division 53 is through the society

9    for child clinical and adolescent psychology.

10   Q    Are you also involved with the Anxiety Disorders

11   Association and the Association for Behavioral and Cognitive

12   Therapies?

13   A    Yes.  And I've been more actively -- ABCT is behavioral

14   and cognitive therapies.  I've published for them, I was their

15   web editor.  I've actually presented at both of those

16   conferences nationally, and they're both organizations that

17   have a lot of good consumer information as well.  So I

18   frequently refer individuals there who might have anxiety

19   disorders or other problems that they need to get some

20   information for.

21   Q    And you're on staff at the Cedars Sinai Medical Center in

22   Los Angeles?

23   A    Yes.  I was recruited from Boston back in the late '80s

24   and took a position initially as a senior staff psychologist.

25   I was actually the first psychologist ever to come into the

Gale - Direct

1    inpatient units and developed a program because a lot of

2    patients with schizophrenia really had mental retardation and

3    they were not getting certain services, so I implemented a free

4    program where we did assessments and I was then promoted to

5    chief psychologist, which is what my position was at the time I

6    left in '93, and I've remained on staff ever since.

7    Q    And the next one, I'd like you to elaborate on more.  You

8    refer to the California Department of Education PENT program,

9    P-E-N-T.  It stands for positive environment network of

10   trainers.  Could you tell us what that is exactly?

11   A    Yeah.  PENT is actually -- PENT is a very enjoyable

12   organization to be a part of.  There's a woman, Diana Browning

13   Wright, who contacted me back in 2000, she had I don't know how

14   but had heard of some clinical work that I was doing and wanted

15   to know if I would become a trainer for a new organization that

16   was a joint project between the California Diagnostic Centers

17   and the California Department of Education.  And having trained

18   at the developmental evaluation clinic, which was just amazing,

19   about 11 disciplines, I mean, you had people there like Melba

20   Dean and T. Berry Brazelton, and here it was we had children

21   from literally around the world who were undiagnoseable, and

22   that's what the California Diagnostic Centers are all about.

23        They provide resources to schools.  There's three of

24   them, and they're a very similar kind of team.  So what PENT

25   became was to look at a real problem that exists throughout

Gale - Direct

1    school districts throughout the United States.  And that is

2    that on the one hand we have research, and I mean, I'm

3    published, I have articles that I have either authored or

4    co-authored, but the question is how do you take that

5    information and bring it pragmatically into the daily life of

6    teachers and psychologists and other individuals, so that's

7    what PENT became about.  We targeted 300 school districts in

8    California, we developed trainings and we did our trainings

9    twice a year up until last year.  And actually there'll be a

10   training this Wednesday which will be -- we're resurrected.

11       We have a multi-thousand page website that has all kind

12   of articles and resources and we've become a nationwide go-to

13   place, and what we do is we look at IDEA, we look at the

14   existing research, and we look at the pragmatics of what needs

15   to happen in daily life.  So I serve three roles within PENT,

16   actually two now.  But I'm a trainer.  There's about a dozen of

17   us who are trainers.  I'm their technology adviser, and from

18   about 2005 to 2009 roughly, I was on the research team and have

19   a few publications that I co-authored with the other people who

20   are part of PENT, but the other thing is PENT is not just

21   California, we've got people like Frank Grisham on board, we've

22   got George Sugai from the University of Oregon, we have people

23   who are working on bullying and looking at all different

24   elements.

25       But within that, looking very much, really there's two

Gale – Direct

```
 1   areas that we focus on:  Functional behavior assessments and
 2   behavior support plans, and it's just been -- it's just been
 3   one of the most enjoyable things I've done professionally in
 4   recent memory.
 5   Q     You also note that you're an editorial board member of
 6   the cyber psychology and behavior.  I think that's a
 7   publication; is that correct?
 8   A     Oh, yeah.  And sorry for the smile, but that's where I
 9   get to read these really dry research studies on using
10   computers in technology with kids and make decisions and
11   recommendations about whether they should be considered for
12   publication or that kind of thing.
13   Q     You also referred to being a member for the autism
14   learning collaborative, which I think deals with local regional
15   centers; is that correct?
16   A     Yeah.  California has a somewhat unique setup in that
17   children are identified through the regional center system.
18   And that was the first thing I looked for when I came to
19   California is who serves people with mental retardation and
20   developmental disabilities.  So I was really quite surprised to
21   find this phenomenal setup of 23 geographically positioned
22   organizations who serve individuals, about three quarters of a
23   million in California.  So the regional center serves people
24   with mental retardation, cerebral palsy, epilepsy, autism, and
25   something called Fifth Category which means if they have
```

1    symptoms similar to mental retardation, they can still receive

2    services.

3          So I've volunteered time as have other people

4    specifically to look at how can we improve the referral

5    process, the identification process, and as people may be

6    aware, there's an explosion of autism in the field, and so

7    looking at some of the factors behind that.  So I've been

8    involved pretty heavily in their presentations and I've also

9    given the use of some of my technology pro bono for the

10   organization to use.

11   Q    What are you referring to when you refer to certified as

12   a nonpublic agency through the California Department of

13   Education?

14   A     In the school districts in California, you have to be

15   certified in order to be able to contract with schools and go

16   in and that's actually somewhat separate from me being

17   designated as what they call an IEE, independent educational

18   evaluator.  So, over the years, I've provided behavioral

19   support, done consultations, in-services with school districts

20   where they've contracted with me.  And so nonpublic agencies is

21   simply a certification process like a licensing process that a

22   board member or someone might go through, but this is something

23   I go through as an individual and I've held that since I think

24   '95 or '96.

25   Q    And certified as a regional center vendor.  What's that

Gale - Direct

1   referring to?

2   A     Similar process actually.  All of my programs are both

3   reimbursable by school districts and regional centers.  When I

4   say my programs, I'm referring to Lunch Groups, those social

5   skills, because the kids don't just come in.  We blog our

6   sessions, we do parent support, we have a number of different

7   things, we have a whole website and write-up, a 15-page

8   detailed write-up of what we do with different kids and all of

9   our behavioral procedures and all that.  So this had to be

10  submitted to regional center, and we were -- it's interesting.

11  The wheel moves slowly.  It took a year to be approved the

12  first time, but then when we added a new program recently, the

13  approval took a day and a half.  But that's what regional

14  center is is a way of contracting to provide for individuals

15  with developmental disabilities primarily.

16  Q     Doctor, I'm going to go through some of these.  Some of

17  them you already touched on, but I want you to emphasize your

18  involvement with special education and the IDEA and IEPs and so

19  on in each of these roles that you have been involved in.

20  A     Sure.

21  Q     I think one you've already mentioned is the PENT program.

22  How does that deal with special education needs and IDEA?

23  A     That's what PENT was designed for.  You have school

24  psychologists throughout California and elsewhere with a

25  varying degree of expertise, and they're pretty well trained in

Gale – Direct

```
 1   assessment.  That comes from their school psychology programs.
 2   Some have practically no experience in behavioral intervention,
 3   others have considerable experience.  So there's a broad range.
 4   And the PENT program was really designed to address that, as I
 5   said earlier.  And so my -- we look at the IEP process, we look
 6   at what are all the components that form a responsible,
 7   ethical, and legally mandated IEP meeting.  So, for example,
 8   there's something known as manifest determination.  If you have
 9   a child with behavior problems, you can't just repeatedly
10   suspend them and send them home.
11        There's federal regulations on how many times that can
12   occur, then you have to look at are you doing it because of the
13   child's disability.  If so, then that may kick in the need for
14   either a functional behavior analysis or that may kick in the
15   need for developing a behavior support plan.  So it really kind
16   of can -- it's all about schools and it's all about promoting
17   how, even how psychologists do training.  You go to your
18   typical inservice, what did people get from that inservice, how
19   are they able to apply that knowledge, so we look at all those
20   factors and that's what some of the publications we developed,
21   that's what they were based on.
22   Q    Have you also served as an independent education
23   evaluator for school districts in California?
24   A    I have.  I've been doing that since 1995.
25   Q    How does that relate to special education and the IDEA?
```

1    I mean, I can assume or I think I could guess.

2    A    Sure.  Within IDEA, there's a component that if a parent

3    receives results from, say, a school psychologist and it was a

4    psychoeducational evaluation or a functional behavior

5    assessment and the parent disagrees with those results, maybe

6    their son or daughter was found not eligible for services and

7    they really feel that they are, they may have hired an advocate

8    or an attorney and there becomes sometimes an adversarial

9    process between the school and the family.  So what happens is

10   that school districts develop lists of people who they are

11   going to recommend to the family that they're willing to

12   jointly agree -- it's almost like an agreed upon examiner, that

13   they're going to agree that this person is independent and

14   neutral, doesn't take sides, and that person will do a

15   comprehensive evaluation and then present their findings either

16   at an IEP or testify at a due process hearing or a mediation

17   hearing, so that's what about 90 percent of my assessments

18   involve these days.

19   Q    Have you also provided training and consultation to the

20   school districts?

21   A    Yes.

22   Q    Would you describe that a little?

23   A    Certainly.  I'm pretty well recognized as knowing about

24   developmental disabilities.  And then most people associate a

25   lot of work that I do with Asperger's, but then also moving

Gale – Direct

```
 1    with more individuals who are more impaired including children
 2    who are missing part of their brain, children who are blind,
 3    children who have significant cognitive deficits, kind of that
 4    distinction at times between profound and severe, and so that's
 5    something that training others on some of the assessment
 6    methods that I've used that have been found to be valid and
 7    reliable, that's something I presented at PENT, for example, is
 8    how to do valid and reliable observations.  That was one of my
 9    main presentations with them.  It's something that I've trained
10    in school districts as well as how to use, I mean, a particular
11    interest is how you can use technology to increase student
12    motivation and how you can use certain technologies to enhance
13    the quality of your assessments.
14    Q    In your normal work, do you attend IEP meetings and
15    review the results of those evaluations?
16    A    Yes, constantly.
17    Q    And I see a note here that you've been an NPA.  Could you
18    tell the Court what an NPA is?
19    A    We talked about that and you asked me about a certified
20    nonpublic agency.  That's what NPA stands for.
21    Q    Do you have training at the developmental evaluation
22    clinic?
23    A    Yes.  That was my advanced fellowship back at children's
24    hospital.  That was between 1983 and '84.
25    Q    I believe you've already referred to this, but I want to
```

1   be clear on the area of special education and the IDEA, haven't

2   you developed on-line software programs?

3   A    It's really something that's an empirically supported

4   research-based method.  That's kind of a mouthful, but what

5   that means is that I looked at the existing literature -- and

6   actually, just to back up for a moment, there's a lot of

7   instruments out there that I really like and use, but also I

8   have always been bothered by the idea that if you have a

9   parent/teacher questionnaire, well, the teacher could be a

10  substitute teacher, a long term sub, the teacher could be a

11  resource room teacher, it could be a child who is at a middle

12  school, and there might really be six different teachers and

13  different subjects, and the parent could be a stepparent, a

14  biological parent, a guardian, a divorced parent, maybe a

15  parent who only sees the child for one day a month or three

16  days a month.  And I really felt that there was needed another

17  way of looking at adaptive and interfering behaviors.

18       I also thought it was extremely important to understand

19  the context in which the rater knows the child.  And so Rapid

20  Screener became -- I think I developed it back in -- I

21  developed the paper version actually around 1990 and used it at

22  the Foundation for the Junior Blind for about ten years in

23  paper form, and then redeveloped it as a computer program in

24  around 2002, 2003.  And what it does is it is an on-line

25  interview of up to ten different individuals and it interviews

Gale - Direct

1    each one of them about how they know the child, how long

2    they've known the child.  In the current version, we're asking

3    about medical problems, sleep patterns, and other things to

4    look at kind of cross-relating different factors that may

5    affect student behavior.

6        And then the instrument is composed of six adaptive

7    scales and six interfering scales.  And then each of those if a

8    parent checks that there's a problem, it'll then branch down

9    and it will ask more questions.  If they say there's no problem

10   in that area, it just leaves them alone and skips on to the

11   next section.  It then also does a validity analysis in that it

12   shows them their own results three times during the procedure

13   and it asks them how accurate that information is.  And they

14   have an opportunity to rate it or make comments or go back and

15   change things, so that's what Rapid Screener is.

16       The other two actually fall from Rapid Screener.  Rapid

17   Screener provides data that allows us to target within school

18   district IEPs, and I actually use Rapid Screener in every

19   evaluation I do.  And the feedback is that it provides very

20   simple but comprehensive information.  The progress

21   communicator program allows schoolteachers to fill out

22   information about a child during the day and then it's e-mailed

23   to the rest of the IEP team.  And the reason that I did that is

24   that a lot of parents don't understand sometimes the progress

25   of their child or their child comes home and says my teacher

Gale - Direct

1    was mean to me and that kicks in an IEP, and when an IEP like

2    that occurs, it actually -- I developed progress communicator

3    come to think of it because of a child who was in resource

4    room, he asked the teacher if he could go to the bathroom and

5    she said sure.

6        He went outside -- he was a 5th grader, and he went

7    outside, he used the pay phone, he called his mother and he

8    said no one knows where I am at school, they all hate me here

9    anyway, and I'm just standing out in the hallway and no one

10   cares.  So you can imagine.  The mother happened to be a

11   computer programmer and was kind of a rigid person, but worried

12   her child was unsupervised, all kinds of things, so she filed a

13   complaint against the school district over this and the

14   principal was involved and there were hours of meetings.  And

15   this happens all around the country all the time, these kind of

16   scenarios.

17       That's when I got the idea to develop the program.  What

18   if the mother knew throughout the day what was going on with

19   their kid and what if the report came from the kid and also

20   came from the teacher.  So that's what Progress Communicator

21   is.  And Lunch Groups is that home-based generalization program

22   I talked about.

23   Q    My next series of questions are focusing on your

24   experience in the area of developmental disabilities.

25   A    Yes.

Gale – Direct

1    Q    We want to explain to the judge what that experience is

2    exactly.  Let's start with your undergrad work.  I believe you

3    already referred to this by referring to the Ph.D. professor

4    that you worked with, but the Young Autism Project, what was

5    that again?

6    A    It was called the Young Autism Project, and Ivar Lovaas,

7    who just passed away recently, was an absolute pioneer in the

8    field.  You think of names like BF Skinner, Lovaas is up there

9    too.  The program was based on his observations that highly

10   self-injurious children -- we're talking about self-injury

11   where a child will bite off part of a finger.  I mean, it was

12   really quite horrific back in the '60s.  And Lovaas found that

13   punishing -- and he was known unfortunately for using electric

14   shock with children, which was very controversial.  But the

15   concept of using punishment, even though it's controversial,

16   pretty much everyone recognizes that as much as you do things

17   in a positive manner whenever you can, there are times when

18   punishment or suppressing a behavior, at the very least, it

19   creates a window of opportunity for an individual to learn.

20   And so that was really the bulk of Lovaas's work was teaching

21   mute children with autism how to communicate, how to interact,

22   and his research looked at how you could have these kids behave

23   in a more normalized manner so they were mainstreamed.

24        I acted as a shadow initially going into a regular

25   nursery school, preschool program with a child with autism.  I

```
 1    also became a shadow camp counselor where I actually was
 2    running a different group of kids but was watching the kid with
 3    autism, and then I was promoted to what's called primary
 4    therapist where I then ran the team where we did intensive
 5    home-based intervention, and there's something known as, I
 6    think it's intensive early -- I always get the acronym wrong,
 7    it's IEDI.  It's basically the idea of intensive early
 8    intervention from the behavioral perspective where you're
 9    coming in, you're teaching families how to do what a functional
10    analysis is with their child so they can understand when to
11    re-enforce, when to ignore, and how to work on behaviors in a
12    very finely tuned manner.
13         So that was really -- between that and Sea World was
14    where I really kind of cut my teeth in terms of understanding
15    behaviorally about working with children and adults.
16    Q    What was your experience at the Sun Land Developmental
17    Training Center?  First tell us where that center's located.
18    A    I think at this point, it's only located on the internet.
19    Every so often I get an e-mail asking, noting that I worked
20    there and asking me if it was haunted.  Sun Land was a state
21    institution in Tallahassee, Florida, where I went to graduate
22    school.  And I actually had no interest or intention to work
23    there, but it was the only way I could get an out of state fee
24    waiver.  Knowing a fair amount about autism, I thought I knew
25    something about mental retardation.  And it turns out I didn't.
```

Gale – Direct

```
 1         So it was really a wake-up call for me because the kids I
 2   worked with, also coming from UCLA to Tallahassee, after they
 3   handed me a screwdriver at a party to open oysters thinking I
 4   wouldn't know what to do, it was to try and sort of make fun of
 5   me at times, but it turned out to be a very useful experience
 6   because I wound up presenting in front of a state committee in
 7   Florida over some work that I wanted to do at Sun Land.  And
 8   what happened is that Sun Land was for children and adolescents
 9   with severe and profound mental retardation.  It was a
10   reasonably horrible place.  And I remember being excited that
11   they were going to paint the walls and then I saw they painted
12   them the exact same horrible green color that it had been
13   before.
14         The kids were on rubber mats out in the hallway, not
15   hallways, but in a very large room.  There were these metallic
16   cribs, there were cloth diapers.  And I noticed one time that
17   the staff actually folded the diapers twice and that seemed to
18   fit with the fact that they never seemed to have time to follow
19   the behavior programs that I was setting up for them and things
20   like that.  And I wound up developing a specialty there where I
21   worked with highly, highly self-injurious clients.  One girl
22   who was deaf and blind, born with Rubella, and she was
23   constantly in restraints and hit herself about 40 times per
24   minute, she was always bloodied.  And even when she wasn't in
25   restraints, she would self-restrain, she would put her arms
```

1   back in her shirt in the same position that they had been in in

2   the straitjacket.

3       It was also the very first time I came across a genetic

4   mental retardation disorder known as Lesch-Nyhan, which to this

5   day, when I hear that diagnosis, I pay special attention

6   because it's one of the most horrific forms of self-injury that

7   exists.  The children will bite themselves down to the bone if

8   given the opportunity.  And I used -- after trying positive

9   techniques that weren't working, I wound up being asked, with

10  15 minutes' preparation, to present in something, in front of

11  something called the peer review committee, which was a group

12  of professionals in Florida who were charged with overseeing

13  the level system that they had developed after certain abuses

14  had occurred there, and the use of punishment of any kind had

15  been prohibited.

16      And I presented data to them, this was back in like my

17  first year of graduate school, 1978 or so, I presented data to

18  them that I collected on this self-injurious client and asked

19  for the permission to try a mild punisher with her.  The mild

20  punisher in this case was going to be a hair blower and I would

21  disconnect the heat component and wire it through an old style

22  clock with a little second hand so every time you turned the

23  hair blower on, it would turn on the clock and we could measure

24  exactly how long during the session we had used it.  What I

25  remember was that they told me that they would get back to us

1    with the decision, and it would be a few weeks.  And I told

2    them at that time that she would hit herself roughly another

3    20,000 times while they made their decision.  And I remember my

4    major professor kind of looking at me very sternly, but they

5    took 30 minutes and they made the decision to approve the

6    program.

7         And within two months, her self-injury had dropped from

8    40 hits per minute to one hit per minute.  I built toys for

9    her, I set up her own room, and then I followed her for one

10   year, and still a year later, her self-injury was only hit per

11   minute.  She would clock herself in the neck one time and then

12   walk away.  She also got into school.  And it was interesting

13   that she couldn't be admitted to school because of her

14   self-injury.  That was what they had claimed.  So Sun Land, I

15   know I'm going on and on about it, but Sun Land is really where

16   I learned a lot about state institutions.

17        I also almost died there.  I developed Shigella, which is

18   just a horrible intestinal disorder and had a fever of 105, and

19   the reason I remember that is because it was an infectious

20   specialist who came in and spoke to me for five minutes after

21   they had run three days of tests and he diagnosed it and then

22   put me on the right medication and frankly saved me.  But that

23   was the first of a few different state institutions I worked

24   in.

25   Q    We'll probably go into another one here, but this is a

1    state hospital.  Chattahoochee?

2    A      Yes, Florida State Hospital.

3    Q      What did you do there?

4    A      I worked on the geriatric pre-release unit.  Individuals

5    would come in with psychiatric but often developmentally

6    disabling conditions.  And I did therapy, I did testing, I also

7    developed behavior programs.  I mean, we had a woman who would

8    fake heart attacks and would be lying down while the shower was

9    running.  We had a man there who came in after being in a car

10   accident who kept asking for Coke and every time the staff

11   would ask (sic) him a Coke, he'd throw it on the ground and

12   everyone would get upset.  And one time while I was talking to

13   him, I just wanted to explore more about why the Coke was a

14   problem and he said that they were giving him the wrong kind.

15          Turns out he had headaches and he wanted the Coke bottle

16   because of the shape of an old Coke bottle kind of fit his

17   forehead.  He was using it as an ice pack.  So I developed a

18   program with him to get him on a better diet where he walked

19   more and was able, within six to eight months, to transition

20   him back into the community.  And took him out for catfish one

21   time as a reward.  First time I'd ever seen anybody eat

22   catfish, thought he was going to choke, but he didn't, a lot of

23   bones.  So that was Florida State Hospital.  There were also

24   people there who had been hospitalized -- there was a woman who

25   had been hospitalized from Tampa, Florida when she was 24 and

1    now was 88 years old and blind.

2        And the facility was being asked to push her, in my

3    opinion, push her back into a community placement.  And I

4    advocated for her to remain in the hospital because it was

5    really horrible that for nothing more than having mild

6    schizophrenia and delusions, she had been hospitalized her

7    whole life.  But this wasn't the point in time to make that

8    kind of a change for someone who had been so delusional.  And I

9    had one case of a woman who had been misdiagnosed, they thought

10   she had paranoid schizophrenia.  Turns out everything she said

11   about her husband being killed and losing her house and people

12   burning her legs was all true, but the records hadn't quite

13   been organized in a way that could help us figure that out.

14       I got the attorney general's office involved and had her

15   re-diagnosed as having post traumatic stress disorder and we

16   got her into community placement.  She also had mild mental

17   retardation and wasn't able to clearly articulate or advocate

18   for herself.  So it was just an experience that taught me a lot

19   about assessment and how you interface between a facility and

20   the community.

21   Q    Did you, Doctor, also serve as a behavioral consultant

22   for a rural community center in Georgia providing services for

23   clients with developmental disabilities?

24   A    Yeah, that was the Early Miller Training Center.

25   Dr. Jack May was my major professor, he was the chairman of the

Gale – Direct

```
 1    southeast region of the national -- what they called at the
 2    time the National Association of Retarded Citizens.  And so he
 3    consulted there and had me start consulting there with him.
 4    And it was just a rural community setting, I drove about an
 5    hour and a half into Georgia to get there, cracked three
 6    windshields along the way during the time I consulted, those
 7    little trucks picking up dirt and rocks.  And what was really
 8    striking though was how basic the training had to be.  Not all
 9    the staff were literate.  They were -- they had a hard time
10    getting jobs for clients.  The main job would be either
11    collecting trash or sometimes cutting grass, I remember those,
12    so I'd go out in the field with them as well.
13         And there were quite a few clients where the families had
14    simply kept them at home for many, many years.  And not only
15    had these clients become -- had they not progressed, but at
16    times, limbs had atrophied because families never taught them
17    to walk.  And there was a woman in a wheelchair for no reason
18    other than the fact that the family had just always kept her in
19    a wheelchair, so it was just sort of a heads up learning about
20    rural environments.
21    Q    What about the developmental evaluation clinic and the
22    children's extended care center.  I think you touched on that
23    briefly before.
24    A    Part of it.  Yeah, the DEC was a children's hospital.
25    That's where I said we saw kids from around the world and that
```

1    was just a wonderful opportunity.  We also did a one-year

2    follow-up, and my supervisors at the time were working on what

3    became a gold standard book called Developmental Behavioral

4    Pediatrics, which was really one of the first of its kind to

5    try and pull together diagnosis and incidence and prevalence

6    and treatments and all that.  And then I was pretty honored to

7    be invited to write a chapter in the update that appeared in

8    1998, but what's significant is the children's extended care

9    center.

10           The hospital got a call one day that the ophthalmologist

11   had written an opinion that a child was poking and possibly

12   reaching his optic nerve by digging, putting his finger into

13   his eye socket.  And they knew about my expertise in

14   self-injury and wanted me to go out there.  And so I went out

15   consulting on this particular case and it was -- Groton, Mass

16   is maybe about an hour from Boston, so a little bit of a rural

17   setting, nice place, and it was basically a pediatric nursing

18   center, and so that began what was initially a relationship

19   that I had through children's hospital and then when I ended my

20   time with children's hospital and went private, the facility

21   contracted with me to continue.

22   Q    The Boston Center for Blind Children, what did you do

23   there?

24   A    Paul Touchette was one of my supervising dissertation

25   advisers, and he had -- he had agreed to be my adviser and then

Gale - Direct

1   Paul had a contract with the Boston Center and just like I had

2   with the Early Miller Training Center.  Then I went in there

3   and began consulting in the school which was primarily children

4   with mental retardation and visual impairments.

5   Q      And the Wrentham, W-r-e-n-t-h-a-m, State Hospital?

6   A      Right.  I was a principal psychologist there, so I

7   supervised other psychologists and was involved simply doing

8   assessment, behavior interventions, looking at restraint

9   policies, anything having to do with what a typical master's

10  level psychologist did at a state facility.  But then they

11  created a new unit of 66 individuals who were elderly and also

12  had severe to profound mental retardation and feeding issues

13  and tubes and medical problems.  And so I was charged with the

14  task of developing a transition plan to move them from the

15  state hospital proper or the state school proper into this new

16  facility and then I continued to work there in that capacity as

17  a member of the interdisciplinary team.

18  Q      The Foundation for the Junior Blind, where was that

19  located?

20  A      It's in Los Angeles.  I was a consultant to them for ten

21  years.  And they're basically a residential program serving

22  children mostly with visual impairments, but visual -- I would

23  probably -- 50 percent of their population is visual impairment

24  and mental retardation.  And I brought a well-known

25  psychiatrist from UCLA on board and then he and I were invited

1  to write a book chapter on mental retardation and visual

2  impairment that appeared in that update.  It was called the

3  Textbook of Pediatric Psychiatry, and really it was based on my

4  ten years of consultation there, plus my work at the Boston

5  Center for Blind Children, plus my work at the Children's

6  Extended Care Center.

7  Q      I believe from 2005 to the present, you've been

8  consulting as the behavioral director to Willing Workers?

9  A      Yeah.

10  Q      Is that a community day program?

11  A      Just a small community day program, some of the same

12  staffing issues that I had in other settings, and so I do

13  behavioral training, do training on how to avoid having to

14  restrain somebody.  We have some older clients there with some

15  medical issues, so just teaching the staff, you know, to make

16  certain they contact the residents in the home and helping them

17  have a reasonable curriculum for their day program for these

18  adults as well as fielding behavior management issues.

19  Q      And then I believe you've done some state consultations

20  with Wisconsin and Arizona about serving people with DD in a

21  less restrictive setting; is that correct?

22  A      Yeah.  Those were both private cases, although the

23  Wisconsin one was interesting.  I went there for about four

24  days, it was a program called Chalita in Wisconsin.  And it was

25  kind of interesting because they didn't do functional behavior

Gale – Direct

1    assessments, they didn't have regular behavior plans, and it

2    took a little while to learn their what I would call culture.

3    And, actually, I can't remember the guy's name, but turns out

4    there's a whole community out there that looks at behavior a

5    little differently than the applied behavior analysis crowd

6    that I usually hang around with.  And he's very popular in

7    small towns.  And this is the philosophy to which they ascribe,

8    it's on their website and so forth.

9         There's nothing bad that they were doing.  And I was out

10   there specifically to evaluate an individual who had elements

11   of autism and certain degree of mental retardation and also had

12   corresponding medical problems to look and see whether he might

13   be able to be served in a less restrictive environment.  And

14   then I came back to Los Angeles and presented on my findings,

15   and the school district and the department of health wound up

16   deciding to pay for my report because they felt that it had

17   been unbiased enough that even though the family had retained

18   me, that it was information that they could find useful.  And

19   so about 12 agencies were involved in trying to coordinate how

20   you brought this person back and how you provided for him in

21   home and school and other environments.

22        Arizona was a similar case but more had to do with

23   looking to see if a person with autism qualified for

24   disability.  He had been denied a few times and he had severe

25   autism.  It was a little bit puzzling to me, but it turns out

Gale - Direct

1    that the kind of tests they had used and the way they'd been

2    interpreted didn't properly reflect the information so it was

3    really just a matter of doing a more valid assessment.

4    Q      Doctor, we're not going to go through all your

5    publications, but could you just sort of generalize what type

6    of publications you've been involved with and what their

7    subject matter has been?

8    A      Sure.  Most recent one is a book chapter I wrote that

9    will come out, it's on oppositional defiant disorder, and I

10   look at oppositional defiant disorder not just being regular

11   refusing to do something, but you also have individuals with

12   autism who will get very stuck on one behavior, and if you try

13   to change them from what they're doing to something else, they

14   will appear to be oppositional.  Similarly, you have

15   individuals with anxiety disorders who are very afraid to

16   transition from one setting to another, and so that will be

17   misinterpreted as being oppositional.

18          And my chapter was looking at the current research,

19   looking at technology, and then a concept known as step care

20   which is continual levels going from self-help all the way up

21   to intensive individual treatment.  I also have a few

22   publications with Frank Grisham and Diana Browning Wright and

23   Roy Mayer, and this was on our PENT work.  And the title is

24   pretty much looking at the link between evidence-based behavior

25   support plans and student outcomes.  Another one is on the

Gale - Direct

1    effects of training.  We developed something called a
2    quality -- it's a rubric, which means that it's just kind of a
3    checklist to help you identify what's a good behavior plan,
4    what's not a good behavior plan, because what we were finding
5    was about 40, 50 percent of the behavior plans out there were
6    really deemed inadequate for these 300 school districts.
7        And we collected data from all these psychologists and
8    that was also a dicey thing because a school district doesn't
9    want to put out there that they're producing substandard
10   information, but also we promised them that we would not
11   identify them individually.  And that was what allowed us to
12   collect that data.  And then we looked at the effects of our
13   trainings and did the effects of our trainings improve the
14   quality of behavior plans and how did that happen, so that was
15   our research in that area.  The other things that I've done, I
16   present a lot on technology, I present a lot on diagnosis.  And
17   so I've given -- I gave a talk at the Anxiety Disorders
18   Association a couple years ago for individuals with Asperger's
19   Syndrome and looking at their social anxiety, how you work with
20   them in a group setting.
21       I've been on some panels where we're looking at the
22   interface again between technology and assessment.  There's
23   some international guidelines when you're using technology on
24   how to properly construct tests, so presenting on that.  Then I
25   just tend to present a lot on pragmatic tips.  Lorman

Gale – Direct

1   Educational Seminars has invited me a few different times to

2   present.  I'll give a presentation this January again on

3   working with difficult and disruptive students and talking

4   about behavior interventions and assessment methodologies and

5   that kind of thing.  So really, I mean, I know there's a lot on

6   here.  This is from 2008.  My CV, it's grown a bit since then,

7   but I would say the thing of all of them that I enjoy the most

8   is when I get with parents and do parent type presentations.

9       I don't consider that a publication, but helping parents

10  understand the diagnosis and helping parents understand what

11  kinds of behavioral interventions can work in their home

12  environment and how to interface with schools, those are the

13  kinds of things that I probably receive the most enjoyment

14  from.  And also I do seminars on teaching clinical

15  psychologists like myself who aren't normally trained in school

16  information how to function effectively in a school

17  environment.

18  Q    Doctor, you noted that the CV that we put into evidence

19  is a little dated.  What would you add to it to make it more

20  current?

21  A    I think I've talked about most of those things now, the

22  book chapter and a couple other presentations.  I gave an

23  ethics talk to the North Carolina Psych Association a couple

24  weeks ago, I was their invited workshop speaker for the day,

25  and then it was also, again, on useful assessment tools and

Gale – Direct

1    ways of incorporating technology into treatment.  But I wrote

2    -- it might already be in the old one, but teleconferencing

3    your IEPs is something that was an article that I was very

4    proud of because a lot of times people travel very long

5    distances or you have consultants who don't show up at IEPs.

6    And teleconferencing is a very simple method that's also now

7    approved in the new IDEA for how you can incorporate those

8    individuals.  I don't know, not so much.

9    Q    Doctor, generally how do you keep current in your field?

10   A    Well, what I mentioned about the special interest groups,

11   those are very important to me.  I attend -- I probably attend

12   two, three conferences every year.  I kind of move from one to

13   another.  There's an organization called Computer-Using

14   Educators where teachers are using various technologies in the

15   classroom, and I've presented to them a few times and really

16   enjoy that organization because going to those meetings, not

17   just that I like going to Palm Springs, but going to those

18   meetings in March really lets me talk to a lot of regular

19   education teachers, see what's going on, see what's happening,

20   because in the schools I tend to go into more special education

21   classes.

22        And it's kind of a mix.  Actually, that's not fair, but I

23   just like talking to lots of teachers and hearing what they

24   have to say.  So the professional conferences, I just went to

25   the American Psychological Association in San Diego, I'll go to

Gale - Direct

1    the Anxiety Disorders Association in New Orleans next month,

2    I'm going to go to San Francisco for the Association for

3    Behavior and Cognitive Therapies.  And all of these have

4    special interest groups in areas such as assessment,

5    developmental disabilities, diagnosis.  So, for example, I went

6    to a talk that was a cutting edge talk on what's coming up in

7    the new diagnostic manual, the DSM-V that will come out in 2012

8    or '13, so I'm getting a peek into that, but also I talk to my

9    colleagues a lot.

10        When you asked about me being on the autism spectrum

11   disorders learning collaborative from the regional center, that

12   puts me in touch with 40 different providers and they're all

13   doing early intervention with autism, they have community

14   schools, so all of these are different ways of simply keeping

15   up in the field.  I had a supervisor, guy named Gerry Koocher,

16   who has written extensively on ethics, and what Dr. Coocher

17   says is that your Ph.D. is good for about 10 to 12 years, and

18   at that point, pretty much you're behind the curve.  And that's

19   kind of funny, I'm at a point in my career where I have to be a

20   little bit selective about what do I want to learn and when am

21   I going to say, you know what, that's for the next generation,

22   I'm not going to take the time.

23   Q    Doctor, we're going to go on to your review that you

24   conducted in this case.  Could you tell us what you understood

25   was the purpose of your review?

Gale - Direct

```
 1    A     Yes.  I had never been to Arkansas, and you and I had a
 2    phone conversation, I'm going to say back in February,
 3    somewhere around there, and you asked if I was an IDEA expert,
 4    and I think I said I wasn't sure if I was.  And we talked for a
 5    bit, and you said no, you're very much an IDEA expert, and it
 6    was kind of funny because I testify, I do a lot of that stuff,
 7    it just wasn't a label that I had thought about for myself.  So
 8    you said that there was this facility in Conway and that there
 9    was a program there, school program, and you explained a little
10    bit about the DOJ versus Arkansas Conway case, and asked if I
11    would be willing to go to the facility to render an opinion
12    about whether or not I thought they were providing a free and
13    appropriate public education and whether or not I felt that
14    they were meeting the guidelines within my understanding of
15    IDEA or IDEIA, which are kind of interchangeable terms.
16    Q     Could you just give us -- I know we'll get into this more
17    specifically as we go through your findings, but could you give
18    us an overview of how you conducted your review?
19    A     Sure.  The interesting thing is that you and I didn't
20    know each other, and when I have a phone conversation with
21    someone, I don't really know if the opinion that I'm going to
22    develop is going to be the opinion that you are looking for,
23    and it's not my -- I can only say it's not my job to win your
24    case, that's your job.  My job is to be an ethical psychologist
25    and to provide independent information.  And so I actually
```

Gale – Direct

1   didn't know when I prepared to come to Arkansas whether or not

2   I would be serving as a witness for you.  I knew I was going to

3   go to the facility and if it looked like what I remember Sun

4   Land or Wrenthem to be, it was going to be a real short visit

5   because I'd be calling you up and saying, I'm not your person.

6        So what I did is, it's kind of funny, I got onto the

7   website.  Definitely they can improve their website.  It's not

8   unique to them, but it could use a little work.  And at the

9   same time, I began reading about the facility, I began learning

10  about the program, I started researching what I could.  I

11  didn't spend a lot of time on the case per se, it's just sort

12  of a habit of mine, because I get a lot of legal documents when

13  I do these IEE evals, and in a way I really don't care what the

14  conflict is, that's not my issue.  I always will say to the

15  families when they grill me, the school district –- the family

16  will assume if the school district is paying for me, I must be

17  in their pocket.

18       So I kind of explain to the family that I kind of have to

19  bend over their side to really make it even, that because --

20  and not because I feel biased, but because they have that

21  perception of my bias.  So it's really important that my work

22  and the way that I approach my work be perceived by each side

23  as having been independent.  People don't have to agree with my

24  results, but I don't want people to feel that I used an

25  ineffective or invalid methodology.

Gale – Direct

1          So I really thought about what was I going to do to

2    observe.  There were like 50, 55 kids out there, there were

3    classrooms, how long would I spend, because I'm used to doing a

4    very intensive evaluation on one student, I'm used to going out

5    to facilities to consult, but this was a little bit different.

6    I had to learn enough about the kids, I had to learn enough

7    about the program and the culture and the staff, and so I kind

8    of thought about that, and then I also realized that some of it

9    I couldn't figure out in advance.  I packed as much technology

10   as I could take on the plane and made -- and came to Conway for

11   a week.

12   Q    Did you conduct observations?

13   A    Yes.

14   Q    Could you tell us how you did that and how many

15   observations you did?

16   A    Yes.  What I'm going to do is look for a little document

17   that I have.  My first day out there, which was on a Monday, I

18   came in, I think, Sunday night or something, and on Monday, I

19   just drove up, parked and went into the facility.  And I

20   remember meeting with Mr. Price and I remember meeting with

21   Ms. Miller and I remember meeting with Ms. Junyor, and they

22   were all nice.  They were stressed.  They offered me a tour.  I

23   just wanted to talk to them first.  I was really very, very

24   worried about how was I, from Los Angeles, because it's best if

25   I don't speak around here because the minute I say something,

Gale - Direct

1    someone says where are you from, and I wanted to blend in.

2    Because if you're going to observe and you're going to learn

3    information, you don't want to make people anxious, so frankly

4    I dressed pretty casually, I dressed in jeans and like a knit

5    shirt, the way I thought staff might have dressed.

6         I had my meeting with the two and they offered to give me

7    a tour and I declined.  I let them walk me around just a little

8    bit to let me learn the lay of the land, but I really didn't

9    want to be seen walking into classrooms.  It's kind of the same

10   thing I do in schools.  Every so often, I go to a school and

11   the school principal wants to go do the observation with me.

12   And I explain to them I'm not going to get the same data if

13   you're sitting there with me and the kids see the school

14   principal in the room, it's going to affect my observation.

15   And some school districts will say we have to have someone

16   there with you.  I say, well, fine, but just be aware that I'm

17   going to report that I believe that probably invalidated my

18   observation.

19        So then at that point, they find a resource specialist,

20   they find another teacher or they just let me go on my own.

21   But that's a really -- it's a problem everywhere.  One side is

22   always worried that the other side is not going to collect

23   accurate information, so in their wanting to check on that,

24   they inadvertently tamper it, like somebody in big boots

25   stamping around an archaeological dig site or something and

1   they've just destroyed everything.  We, as psychologists, have

2   to be very, very aware that our presence in an environment -- I

3   have a term for it, I call us hot fudge sundaes on the wall --

4   and we're not flies on the wall by any means.  We are

5   attractive to the kids, god forbid we pull out a laptop

6   computer.  I like my data recording to be as unobtrusive as

7   possible.  I do things to habituate.

8       But getting back to what you were asking, so this is how

9   I began to craft things.  So I took the tabula rasa approach.

10  I was absolutely ignorant, I did not know what was going to be

11  going on at this facility, and I just wanted to keep an open

12  mind.  So Monday I was there from morning till late afternoon

13  and just observed different classes, recorded some

14  observations, but they probably weren't my best observations

15  because I was dealing with 55 kids, some of them looked alike

16  to me, sometimes I mixed up this child with another child.  And

17  also they have this system where the kids were switched from

18  classroom to classroom, and that kind of irritated me at first

19  because I couldn't keep track of them, you know, they were all

20  showing and shuffling and they all seemed to know what they

21  were doing, but it was making it hard for me to figure it out.

22      And then I very briefly visited one of the residences.

23  And then so I, Monday night, went back to my hotel room and I

24  produced a form that appears in my report, which I've got here

25  as a copy.  And the reason -- I guess I'll kind of talk through

Gale - Direct

```
1    it.  I thought about what would be a good valid way of
2    observing all these kids.  And so interval based recording,
3    it's something I did in my doctoral dissertation, it's
4    something that is well established in the literature, you can
5    do reliability checks, you can observe multiple behaviors in
6    multiple children.  And what interval recording means is that
7    every so often, and in this case, it was going to be every 30
8    seconds, I was going to record the presence or absence of
9    certain behaviors for up to five children at a time.
10         And I could see from my observations Monday that some of
11   the kids had mild mental retardation or moderate and they were
12   working on academics, and that was fine, those kids were easy
13   to observe, I didn't really need an interval observation
14   system.  But the kids who were more severe and more profound,
15   some of them looked to be sleeping at times, some of them
16   looked to be -- I couldn't quite tell at first what their
17   activities were.  Some of them were learning, they weren't
18   learning, and so I wanted to really develop a structured way of
19   viewing this.  And so I looked at things like that they were
20   looking at pictures or educational TV, were they following a
21   direction.  I have a whole list of things that appear on that
22   form of 24 different behaviors and then an 'other' category.
23         I also wanted to take a look at how it aligned with
24   regular educational curriculum.  Were they working on reading,
25   were they working on writing, were they working on spelling, a
```

Gale – Direct

1    functional skill, a developmental skill, were they working on

2    environmental awareness.  Then I also wanted to look at the

3    presence of interfering behaviors, and I took kind of a blend

4    of my own Rapid Screener program, but then also because I

5    wanted something that was standardized, I used the interfering

6    behavior scale from a program called the Scales of Independent

7    Behavior that's published by Riverside Publishing.

8        And so I came up with eight different behavior

9    categories:  Aggression, self-injury, property damage,

10   withdrawal or avoidant behavior, repetitive or unusual

11   behaviors socially, it says office on here, should have been

12   offensive, and then uncooperative behaviors.  I looked at the

13   severity of those behaviors on a five-point scale from not a

14   problem to mild, moderate, severe, extreme.  I looked at

15   reinforcers, were they tangible, were they social, were they

16   physical, such as touching the child.  Did they use something

17   called the Premack Principle which says if there's something I

18   like to do and something I don't like to do, let's make the

19   thing that I like to do act as a reward and have it follow the

20   thing that I don't like to do.

21       Finally, what kind of prompting did they use, did they

22   just wave their hands, sign, or make a gesture, did they say

23   something to a child, did they physically prompt them and then

24   let go, or did they do what they call sometimes a full physical

25   prompt or hand over hand where they guide them through it.

Gale – Direct

1    Finally, two more things.  I wanted to look at the child's

2    mood, so during this time, were they sort of showing neutral,

3    did they seem happy, did they seem upset.  That was a

4    five-point scale.  And then, finally, I just had a yes/maybe/no

5    scale of did they understand the concept at the time.  So I

6    also had a little program device, I had a timer, so it was just

7    a little bud in my ear, I had it up through my shirt so no one

8    could see it, and it would cue me when to record and when to

9    stop recording and when to move on.

10        So I started doing my recording and I was pretty happy,

11   but then a kid had a PT appointment.  So, okay, fine, my system

12   could allow for that because I had 30 intervals and you just X

13   off the remaining intervals so I could still maintain

14   percentages.  But oh, no, a child had to go to the bathroom and

15   I couldn't see him for several intervals, so I couldn't record

16   anything.  And what I was finding is that, yes, I was able to

17   do the data recording, but after doing it for two or three

18   hours, I realized that this was not an effective method for

19   learning about the children and understanding the environment.

20   I was too caught up in my assessment methodology and I wasn't

21   paying enough attention to what was just going on.  And so I

22   didn't use it anymore after that.

23        Instead, I have a very tiny dictation device that looks

24   like a stick of chewing gum and I can conceal it in my hand, I

25   speak very quietly or I step out for a moment, and that was how

Gale – Direct

1    I did what amounted to hundreds of observations.  I observed

2    the students, I just spoke into it quietly, and I actually --

3    and then I would e-mail through a secure connection to my

4    assistant who transcribed them daily, and that was how I did my

5    recordings of my observations.  And I produced about 150 pages

6    of observations.

7    Q    How many days of observations did you do?

8    A    Five.

9    Q    Were they almost exclusively devoted to observations

10   rather than paper review of documents?

11   A    Yes.  I probably spent 30 minutes, maybe an hour the

12   entire week reviewing paper documents.  I wanted things to be

13   sent to me electronically.  Although, as the facility

14   preferred, they sent me boxes of things, so we purchased a

15   high-speed scanner and scanned them in on my side.  But I

16   reviewed thousands and thousands of pages of documents but not

17   at the facility.

18   Q    You chose where to observe and what to observe; is that

19   correct?

20   A    Yes.  That got me into trouble occasionally.  One time,

21   one of the teachers didn't want me in the classroom at that

22   moment in time.  Very, very nice and very dedicated teacher,

23   but someone who I think was just pretty anxious at having a

24   stranger and, you know, that's relevant because the whole

25   process of me being there, and something happened while I was

1    there that was very, very stressful for these folks.  But I had

2    to inform the teacher that I had to stay and I felt very

3    uncomfortable doing that because she was being so polite.  She

4    was just worried because she had to leave the classroom.  There

5    was already a master's level teacher who was taking her place

6    and was already there.  It wasn't an issue, but she was so

7    concerned, kind of like what I said about school principals

8    earlier, she was worried that maybe I would see something that

9    she didn't see and wouldn't have an opportunity to comment on

10   and I simply informed her that I had to be able to observe

11   wherever I wanted when I wanted, that I had Mr. Price's

12   permission to do so, and she could ask me any question she

13   wanted, but I had to make the determination.

14        So that was how I did my observations.  Interestingly, I

15   happened to hear that very same teacher on the phone calling

16   one of the residences inquiring about a student's behavior, and

17   I waited until the next day and then I interviewed her about

18   that.  And it was very useful to see because that was a missing

19   link for me, how school and how residences and how the psych

20   examiners and how the IDT and how the program specialists, how

21   all of these individuals interfaced and were interwoven and

22   created a true interdisciplinary team was something you don't

23   just learn by looking for a day or even two.

24   Q    Doctor, did you also choose who you wanted to interview?

25   A    Yes.

```
 1   Q      Who did you interview and why, if you could sum that up
 2   for me, please?
 3   A      Sure.  I interviewed -- well, I interviewed quite a few
 4   people.  I'll just do it off the top of my head and see how
 5   good I am at remembering.  Aside from interviewing the
 6   administrators who I mentioned, I interviewed a QMRP program
 7   specialist, I think Sarah Murphy.  I interviewed two residence
 8   supervisors, one I want to say Ms. Brennan from residence 26,
 9   and Rebecca, can't think of her last name, I think it was
10   residence 22; it was the boys' residence where one of the
11   students, HB, resides.  I remember him.  I interviewed Kenneth
12   Priest and also a program specialist and one other person along
13   with them.
14          I interviewed the family members of JD and also the
15   family members of HB after I sat in on the IPP and IEP
16   meetings.  I interviewed Lily Eubanks, who was a speech
17   pathologist.  Also, some of the interviews I chose to conduct
18   afterwards by telephone.  So I interviewed one of the
19   occupational therapists, I think I'd have to look up her name,
20   but then I also interviewed the head of PT, Lisa.
21   Q      Hancock?
22   A      Thank you.  Lisa Hancock, and specifically interviewed
23   her about how the papoose boards and things like that were used
24   and other physical therapy interventions.  Had an opportunity
25   to -- let me think about other interviews.  I have transcripts
```

1    of all the interviews that I conducted at least on site.  I

2    audiotaped with permission and I have transcriptions of them.

3    Some of them are eight pages long, some are 15 pages long, some

4    are three pages long.  I also interviewed the head of speech

5    pathology, Cynthia Johnson, and I interviewed the head of

6    social services, I can picture her, I'm blanking on her name,

7    Angela --

8    Q     Green?

9    A     Green, thank you.  And who else did I interview?  I

10   didn't interview a lot with the direct care staff, I felt that

11   that would be too intimidating to them.  I mostly observed them

12   and kind of watched the interactions, but I did ask occasional

13   clarification questions.  And I'm trying to think.  There were

14   some other -- Tamara Hill, interviewed her, and Ms. Esther and

15   Ms. Buck.  I interviewed them all together there at the

16   educational team and supervisors.

17   Q     Did you interview any individuals in the community who

18   are acquainted with CHDC?

19   A     Yeah, thank you.  Where I was going to go next also, I

20   interviewed students.  I interviewed a total of 20 students

21   approximately to find out what they thought of the facility,

22   how they liked it relative to other places they had been, what

23   they thought about restraints, you know, where they planned to

24   live in the future, those kinds of things.  I interviewed

25   people in the community quite by happenstance.  It's probably

Gale – Direct

1    unusual, it appears in my report that there's the Toad Suck Car

2    Club.  I like local places and I like local color and so that

3    Monday night, I was pretty exhausted after my day, I found

4    downtown, and there was this little cafeteria place, nothing

5    personal, but it wasn't the best, and it was kind of empty and

6    then all the sudden people started streaming in.  And someone

7    passes me a yellow pad and asks me to sign in and it turns out

8    it's a private meeting of the Toad Suck Car Club.  I guess it's

9    Toad Suck Pond, and I learned the story behind that.

10        And the minute I spoke, they said, So, what are you doing

11   here?  They first said, Do you own any kind of old car?  I said

12   I have a '92 Miata that I drive sometimes.  They said, That

13   counts, you can stay.  So they then asked me what I was doing

14   there, and I said I'm here to just take a look at the program

15   out at this place called CHDC.  And this man says to me, We

16   know CHDC, we're rebuilding the railroad out there.  And then

17   someone else says, Wait a minute, what are you doing with CHDC,

18   you're not doing anything to our kids, are you?  And I said,

19   No, no, sir, I'm just out here looking at things, you know, and

20   will report on what I see.  He says, 'Cause we care a lot about

21   those kids, they come into the community.  They kind of gave me

22   a good talking to.  That happened a few times and it was fine.

23        I then visited the chamber of commerce, and from the

24   chamber of commerce, I went to the Log Cabin Democrat, this was

25   on a Tuesday, and asked them about newspaper articles just so I

1    could learn more about the facility, and they told me they had

2    a website so I spent a little time on that.  I then learned

3    about some community providers and I spoke with two different

4    community providers about what they knew about CHDC.  And then

5    as far as interviewing other people, I spoke to some experts in

6    the field afterwards.  I don't know if that's relevant, but my

7    feeling is that I'm just one person and I have opinions, and as

8    you'll see in my report, some of my methodologies were to kind

9    of hold my own opinions up to the light of day.  I had already

10   formed them, but would other people come up with contrasting

11   opinions?

12        So I created a professional peer survey and that was a

13   form of interview where different professionals weighed in from

14   across the country who had expertise in developmental

15   disabilities and also with IDEA and behavior support plans and

16   all that.  And, also, it really bothered me that I couldn't

17   interview more parents.  I thought about the logistics of how

18   do you interview 55 families, and I couldn't pull it off, it

19   just was too time intensive.  So I thought about sampling, but

20   then I thought about I have all this expertise in developing

21   surveys, why don't I create a comprehensive survey that mimics

22   what I would want them to fill out.  And, unfortunately, two

23   things happened I related to that which one was that I thought

24   the facility was sending out my introduction letter, they

25   thought I was sending out my introduction letter, so it just

1   languished for about a week.

2        And, secondly, because of how I represented myself to

3   families, they thought that I had been retained by the

4   Department of Justice rather than the state of Arkansas, and

5   they didn't want to talk to me or they didn't want to fill out

6   the survey or they hung up on me or told me off.  All I would

7   say to them was, I'm not here to take sides, I will tell you

8   that I was retained by the state of Arkansas to look at the

9   facility and to form independent conclusions.  And I knew that

10  saying it in that way wasn't very Arkansas-friendly, and some

11  people just yelled at me and hung up on me afterwards, but I

12  was able to get a sampling and I was satisfied that the

13  sampling that I had was reflective.

14  Q    Did you choose the records you wanted to review too?

15  A    By and large.  I mean, I think I'd have to think about

16  that.  Let me think about that for a minute.  I think they

17  asked me what I wanted to see, and I'm pretty familiar with

18  facilities, I'm very familiar with what hospital records look

19  like and nursing home records and obviously school records, so

20  the thing about CHDC that gets a little bit confusing is what

21  is school and what is a skill that is usually worked on in a

22  school, but because they have the kids for 24 hours, they don't

23  have to confine it to the school day.  And, actually, it's more

24  closely aligned to something known as best practice.  If you

25  can work on a certain skill at 9:00 a.m., 3:00 p.m., and

Gale - Direct

1    7:00 p.m., that's really going to promote greater

2    generalization than if you only work on it, say, 9 to 11:30,

3    for example.

4         So, figuring out what records I wanted to maintain my

5    scope of what was a free and appropriate public education.  So

6    I asked for all the IEPs, I asked for all the IPPs, those are

7    the individual education plans and the individual program

8    plans.  And a program plan is really the residential component

9    of what they're looking at in terms of goals and present levels

10   of functioning and things to be aware of.  But then beyond

11   that, they asked me -- it's not like they forced any records on

12   me, but they said, you know, well, would you like to look at

13   medications or would you like to look at this or that.  And I

14   did want to look at medications and I did want to look at

15   diagnoses and I did want to look at functioning levels.

16        I learned at that point some of their -- I absolutely

17   wanted to look at all the restraint data, and that was

18   something that -- what I learned was that some of their

19   analysis procedures were better in some ways, but when you ask

20   them for something that was different from what they thought

21   you wanted or they thought was helpful, they didn't immediately

22   have the technology or know how to use the technology to do

23   that, but I also found that they were just more than gracious,

24   and ultimately every single record that I requested, and I did

25   request quite a bit from them, there's e-mails back and forth,

1    Gail Miller was an absolute records hero in terms of gathering
2    things for me and doing so in a pleasant way always, so I
3    received everything that I wanted.
4    Q    You mentioned in your report the Beyond the Borders.
5    Could you describe to us what that is and what significance
6    that had to your report?
7    A    Yeah.  I was kind of curious and I learned about Beyond
8    the Borders a few different ways.  I learned it from the
9    perspective of individuals who I interviewed, from the
10   perspective of the facility through Mr. Price, and from the
11   perspective of community providers who benefit.  This is a
12   conference they put on yearly, and I think they're in something
13   like their 18th year or something like that now.  And the
14   Beyond the Borders conference is where they invite presenters,
15   they bring in people not just locally but from other states who
16   come and attend, and the Beyond the Borders conference is an
17   opportunity simply to share information about what are
18   effective procedures, state of the art, and interface with the
19   community.  What was so interesting is that it was a community
20   provider who told me how useful it was.
21        And I'm not looking at my report as we're talking, but
22   there was a section I should probably find where she says
23   exactly how -- yep, on page 6, where Jackie Fliss, who's the
24   executive director of independent living, said to me, and I'm
25   just going to read, quote, They still do cross-training.  CHDC

```
 1    does a very good training in that they do a conference called
 2    Beyond the Borders.  We go to their trainings.  Sometimes they
 3    provide a trainer to us.  It's not just their folks presenting,
 4    they bring in speakers.  Then she talked about how that had
 5    been helpful and it had helped some of their community
 6    programs, and then she informed me about the different
 7    community programs that she had on CHDC property and that kind
 8    of thing.
 9    Q    A moment ago you mentioned that you talked to some
10    community providers.  Was one of them independent living
11    program?
12    A    Yes.
13    Q    Did you talk to somebody there, the executive director by
14    the name of Jackie Fliss?
15    A    I mispronounced her name, sorry.  That's who I just
16    referred to, yes.
17    Q    Could you tell me just generally what information she
18    provided to you?
19    A    Well, in addition to talking about the Beyond the
20    Borders, she mentioned that they used to have a teacher in art
21    supplies through a program called Very Special Arts and they
22    had a contract with the Arkansas Department of Education and
23    that was maybe two, three years ago -- so this is back from
24    April when I wrote my report -- and that they don't have that
25    affiliation, so staff hadn't been coming out to CHDC anymore,
```

Gale – Direct

1   but they had been going out there.  And then in addition to

2   what I quoted, she talked about how that her organization's

3   first group home was for eight men who the facility felt didn't

4   belong at CHDC and worked at getting them out into the

5   community.

6          And her program at the time that I spoke to her had three

7   group homes, three apartment complexes, a small ICF/MR, and two

8   residential homes, and she described the land that they

9   received as being on a long term forever lease and they had

10  built a HUD complex out there and she talked about how she had

11  been interviewed by the Department of Justice for about two

12  hours and become very well acquainted.  They had become very

13  well acquainted with her program services.  And she said to me,

14  we think CHDC has a place in our community and we feel it's an

15  appropriate place for some people.  She then also suggested

16  that there might be some information there through a program

17  called Pathfinders.

18  Q    Doctor, I believe you state that you observed three hab

19  classes.  Is that habilitation classes you're referring to when

20  you say hab?

21  A    Yes.

22  Q    What were your general observations or conclusions about

23  those observations?

24  A    Well, in summary form, they frankly look like special

25  education classes.  That's the best way you can sum it up.  The

```
 1   interventions and what I saw going on there was like what I see
 2   in most school districts when I go.
 3   Q     What did you observe about the students switching
 4   classrooms or moving around?
 5   A     That was an interesting thing because as I mentioned, at
 6   first, I found it mildly irritating more for my own reasons
 7   rather than having anything to do with it being a black mark
 8   against the facility, but I quickly saw that, well, first of
 9   all, it kept bothering me, I don't mean the switching bothering
10   me, but it kept bothering me what was familiar about it.  And
11   I've been a consultant kind of long term to the Downey Unified
12   School District back in California and they had approached me
13   about an autism program that they wanted to create.  This was
14   about, I think, five years ago and it was going to be a program
15   where it was elementary school based and the kids were going to
16   switch classes about every 45 minutes or so.  And the idea was
17   to really have them practice their greeting skills, their
18   ending and finishing up skills, transitioning, and working on
19   what's known as executive functioning.  And this is what I saw
20   going on at CHDC.
21         I grew to love the idea of them switching classes and I
22   always found it a little bit curious how everyone knew to show
23   up at the right place at the right time and how it all just
24   kind of worked like a Swiss watch that every so often, there'd
25   be a little glitch here and there, it was always a glitch that
```

1    was handled.  A kid might be left behind for a moment, a staff

2    would show up two minutes late, there was a teacher in the

3    room.  The teacher would pick up the phone and say Johnny's in

4    here, can you get so and so to move him to the next class, and

5    it would happen.  So 99 percent of the time, it worked

6    seamlessly.  And what was nice about it is that some of the

7    kids who I had seen be a little bit more lethargic in one

8    environment all the sudden were perky and doing academics and

9    all kind of things in another environment.

10          Whether it's a different teacher or whether it's just a

11   different time of day or they've had a snack, I couldn't say

12   based on my own assessment, but definitely the kids seemed to

13   enjoy the process of getting their stuff and going and saying

14   good-bye and saying hello.  And so it was really -- and all the

15   teachers have somewhat different personalities, so it kind of

16   approximated in a certain way what you see in certain gifted

17   elementary schools or what you see certainly in middle and high

18   school, but because these kids have difficulty with

19   transitions, I just thought it was a wonderful piece of the

20   program.  And I imagine you'll get to it, but I was really

21   disappointed to learn that the Arkansas Department of Education

22   wants them to stop that.  I just think that that was not

23   properly examined because I think that a lot of thought went

24   into doing that, and I would predict that there's going to be

25   some problems if the ADE is successful and really does make

Gale - Direct

1    them stop.

2    Q     Did you find this switching of classes to be useful for

3    promoting generalization of skills?

4    A     Of course.  Any time you're doing something with

5    different individuals and any time you're doing it across

6    different settings and environments, that's what generalization

7    is all about.

8    Q     Did you refer to this switching of classrooms as being

9    the best practice model in your report?

10   A     Yes, I felt that it was.  And by best practice, just to

11   clarify, best practice doesn't mean that it can only be one

12   way.  But best practice means that you either have a peer

13   reviewed literature base, meaning that a journal from a

14   university or an established journal published articles by

15   individuals saying doing things like this can be pretty

16   appropriate.  Keep in mind that for a facility like CHDC,

17   there's almost no literature on educational implications.

18   There's just a derth of literature articles, and so when you're

19   looking at best practice, you're looking at sometimes taking

20   what might be done in other fields and applying it to a certain

21   environment, but then most importantly, you're looking at

22   student progress, is there student progress occurring with the

23   model.

24        And I also asked parents what they thought about the

25   switching of classes, and the parents were uniformly positive

Gale – Direct

```
 1    about it.  I don't remember, I could look, but I don't remember
 2    anybody saying it's a bad idea, I wish my kid was in the same
 3    class the whole day.  And in my interviews with parents, I
 4    mean, I have transcripts of it, but my recollection is that
 5    they were very supportive of it.
 6    Q      Did you make some observations as to why some of the
 7    students had what was referred to as a shortened school day?
 8    A      Yes.
 9    Q      Why was that?
10    A      That's probably one of the more confusing things about
11    this whole case.  Depending how you do the math, depending on
12    how you calculate the number of days they're in school, you're
13    going to wind up with wildly different data.  And I'm frankly
14    convinced that nobody has yet properly assessed, and that will
15    include me, how long the school day really is if you look at
16    meaningful free and appropriate education-related training that
17    goes on.  Because the school day probably is up until nine
18    o'clock if you really look at all the different activities and
19    all the things that they're doing that get back to the heart of
20    IDEA, which is three areas.
21           You're looking at academics, you're looking at
22    developmental behaviors, you're looking at functional
23    behaviors.  If you're working with a child day and night and
24    having them work on hand washing, you're working with them on
25    manners and working with them on greeting people and
```

Gale – Direct

1    communication skills, you've got a school day and a half every

2    single day.  Now, certainly they did not, at some point along

3    the way, didn't properly document this, and that's one of the

4    failings that certain kinds of documentation are being

5    misperceived as not providing services.  On the one hand you

6    have this old adage if it wasn't written down, it didn't

7    happen.  That's what they teach you in hospitals, that's what

8    they teach you everywhere.

9         But the reality is you also have to balance between how

10   much time you spend writing down and taking your data and how

11   much time you actually spend with the kids.  You asked -- I

12   also went to the Arkansas -- I met with the director of special

13   education from Little Rock and I also met with the Little

14   Rock -- I went to an elementary school, a middle school, and a

15   high school here in Little Rock and I observed five classes.

16   And I didn't interview or interact with kids, I just observed

17   them, but I did interview all the teachers who were available.

18   When a teacher wasn't present, one classroom actually had no

19   teacher, but I also interviewed school principals and others

20   just to learn about their special education services.

21        And in addition to that, I called some residential

22   facilities in Arkansas and Mississippi as well as in

23   Massachusetts, and then I also corresponded with certain

24   notable experts, Marilyn Friend, I think I mentioned was one,

25   someone in Australia who's a PECs expert, I contacted people

Gale - Direct

 1  specifically about PECs from the Pyramid Educational
 2  Consultants group who manufactures and promotes PECs.  So those
 3  are some of the other interviews that I'm sorry I didn't
 4  mention before when you asked.
 5  Q    I appreciate that.  Back to the shortened classroom times
 6  or the shortened school day, I should say.  When you actually
 7  did a review, though, where these people went, was the day
 8  actually shortened or were they involved in other activities?
 9  A    They're involved in a full day.  There is absolutely no
10  difference between the educational experience that the children
11  at CHDC are having and any other of the 35 school districts
12  plus I have been to.  I have been to hundreds of schools, if
13  not more than a thousand, and the special education services
14  that I saw were active, were dynamic, were also developmentally
15  appropriate.  If you have a 14-year-old child who functions at,
16  say, a 2-year-old level, you are not going to be having that
17  child working on math.  You're going to be doing something very
18  different.  And CHDC was properly aware and attuned to what
19  those kids' needs were and that showed and it was reflected.
20  Q    Would one of the reasons maybe why there were multiple
21  shorter sessions and the child was moved, might this be based
22  upon the tolerance of the child to actually engage in these
23  activities in a fruitful manner?
24  A    That's absolutely correct.  If I may, I'd actually like
25  to read a portion of my interview with JD's mother because I

Gale – Direct

```
 1    asked her specifically about that.  And JD is a child who,
 2    interestingly, he was sort of pegged as not participating in an
 3    alternative assessment, which is an area that at some point
 4    bears discussion, but when I interviewed his mother, she was
 5    just very, very clear about that.  So here, I had an
 6    opportunity to sit in on JD's meetings, and I am just going to
 7    use initials, but his grandmother is somebody with the initials
 8    KK and she had someone else with her with the initials LD, and
 9    I don't remember who LD is, but I spoke primarily with KK.
10              MS. COON:  I'm sorry to interrupt.  Could we just
11    clarify what we're reading from, what page of what?
12              THE WITNESS:  What I'm reading from are my dictated
13    transcript of my interview with JD, which is referenced under
14    parent interviews in my report.
15              MS. COON:  What page is that in your report that
16    you're reading from?
17              THE WITNESS:  I'm not reading from my report.
18              MS. COON:  Could we get a copy of what you're
19    reading from?
20              MR. YORK:  You already have copies of his notes.
21    They were provided at deposition, but if you want, we could
22    take time and make a copy.
23              THE COURT:  Usually during the week, we've been
24    going about two hours, which is longer than I normally do
25    actually during trial time, I usually break about every hour
```

```
 1    and a half.  And on Saturday, we've had casual day and we break
 2    every hour and a half.  We've been going about an hour and a
 3    half, so we can take a break, you all can confer and work it
 4    out and make sure that Ms. Coon has an opportunity to see what
 5    Dr. Gale is looking at.  And I do want to say, Dr. Gale, this
 6    has nothing to do with southern culture, but if you'll slow
 7    down a little bit when you talk, it'll help this lady right
 8    here because she's trying to take a good record, and you get
 9    really intense about what you're talking about, and that's not
10    a criticism, it's just that you need to be conscious of the
11    fact we're in court, she's trying to take down what you say and
12    it will help her do her job if you'll slow down just a little
13    bit.  We'll be in recess for 15 minutes.
14           (Recess at 10:32 a.m., until 10:49 a.m.)
15    BY MR. YORK:
16    Q      Thank you, Your Honor.
17           Doctor, you were going to read, I believe, from some of
18    your notes some information from an interview.
19    A      Correct.
20               MS. COON:  Can I clarify just one thing?  This is
21    coming in for the basis of his opinion, not for the truth of
22    the matter asserted?
23               THE COURT:  That's correct.
24               THE WITNESS:  In my dictation, which occurred on
25    March 9th, 2010, after sitting in on JD's IPP and IEP meeting,
```

1    I spoke with those two individuals I mentioned.  I'm not --

2    because they're small towns, I'm not going to say where they

3    say they moved from, but they commented that they had lived in

4    a town in Arkansas and they moved from Arkansas to Louisiana in

5    order to find an appropriate placement for JD, and that he has

6    significant hearing loss.  This was one of his main challenges.

7    Then they moved from Louisiana back, then they moved to

8    Tennessee because they found out about a facility there, and

9    that this was sort of a two-year process trying to find an

10   appropriate facility for him.

11        In Tennessee, she noted that there wasn't a support

12   system available and she described that caring for JD was a

13   24-hour-a-day, 7-day-a-week job.  When he was younger, she

14   could carry him, but she said they were, as she put it, fast

15   getting to the point where she was going to need some kind of

16   significant assistance.  So she began looking at developmental

17   centers around Arkansas.  They moved back to this place in

18   Arkansas which meant she felt torn between having to him in the

19   developmental center because that felt like a failure to her,

20   and at the same time trying to be a responsible parent.  And

21   she said, We toured one in Arkadelphia, we drove to one in

22   Warren, didn't like the looks of it, didn't feel good when I

23   drove there, and that was the closest one.  So when we talked

24   about why it seemed appropriate, what she said to me was,

25   Appropriate to me was some place that I could walk into and

Gale - Direct

1    felt like home.

2         And I don't know if that sounds nuts or not, but I know

3    that when you walk into a place and you're going to leave your

4    8 year old or 7 year old at the time and you know he's not

5    going to be coming home every night, it has to feel a certain

6    way, and I did not find a place like that.  And I, myself, have

7    worked in nursing homes and hospitals.  Then I interrupted her

8    and I said, So you know?  And she talked about her own work for

9    a bit.  But then she said she'd love to be next door to him,

10   but she can't have him in the house, she can't care for him

11   emotionally or financially, she can't take care of him -- and

12   so we talked a little bit more about his judgment skills.  For

13   example, she talked about how the safety was number one and she

14   said, if anything, I was so glad that they put up a certain

15   piece of fence she was talking about near the road, that that

16   had been a problem, and she had described earlier -- and for

17   counsel, I'm up at the top, I'm going backwards a little bit.

18        She said when he was 7, I had to call the police two

19   times because he had escaped our 8-foot fence and he was

20   brought home twice because he was two streets over and I

21   couldn't find him because he had climbed the fence, and escape

22   risk is very scary to me.  Then further down, I commented that

23   he doesn't have the judgment to know, and she said, Right, he

24   has no judgment.  In September, we came -- he wanted to leave,

25   he wanted to go outside, and it was a day like now, and I said

1    to him, okay, well, me and my 80-year-old grandmother will walk

2    him around the facility and he will be fine, but he wanted to

3    go in cars, vehicles, because he thought they were leaving.

4    Then she says, He drug me, I actually had to send for help.

5    And so we talked about how strong he was and she said that was

6    very scary.

7          And then I -- I talked a little bit about my time at Sun

8    Land and then I said, Let's talk about the educational program.

9    I said, Here, they rotate classes.  There are choices, some

10   places have a child all in the same class.  I said, Do you feel

11   like that one would be more appropriate for your son than the

12   other?  Do you have a feeling about that?  She said -- this is

13   KK -- I think that JD gets more out of going from one place to

14   the next and likes changing classes and being able to see

15   different things and different people and working with

16   different people throughout the day.  I guess that's the

17   question you're asking.  And then I commented a little bit

18   about the 45 minutes and snacks and I said, Would it be better

19   for him, for example, to stay in class and get more class time?

20         She said, I think with his attention span, it would

21   probably help him to break it up a little bit.  But I guess

22   that's according to the kid.  If it's a different child, would

23   probably need more.  If another child needs more direct one on

24   one for a longer time, it would be up to the child.  I think it

25   would be a more individual thing.  I think JD would need it

Gale - Direct

1    broke up though.  And we kind of talked a little more about

2    social interaction and things, and then I said, Just a few more

3    questions.  He goes back to lunch for an hour and a half time

4    and then they feed him in the dorm.  Same type of question.

5    Does that seem appropriate to meet his needs?  Does he need

6    that long a down time or maybe he could have less time as far

7    as you're concerned?

8         And she replied, I guess.  With JD that's kind of the

9    individual thing again.  He doesn't need to be rushed.  And I'm

10   sure a lot of these children, even adults, don't need to feel

11   like they are being rushed to perform or even eat, because JD

12   has problems eating anyway.  So I wouldn't think that an hour

13   and a half would be too long of a time.  I don't think it's

14   cutting into his class time or anything like that.  We then

15   talked about the reporting that the facility does to her.  And

16   I asked or I commented on the afternoon and I said, Do you get

17   reports on a regular basis about how he's doing?  I mean, do

18   you feel as though you're kept involved with what's going on

19   with him at school?

20        And she said, Yes, I get the reports.  I don't know how

21   often I get them, but I get them periodically to the point that

22   I know when he's met goals, when he's met certain things that I

23   knew we had been talking about, like when he does anything good

24   with the potty training thing, I know about that.  Especially

25   if he does something really good, they'll call me.  It's like,

1    do you know what he did today?  If it's something that we are

2    really working on, they'll give me even more progress report

3    than actually just sending it.  They have to send it a certain

4    amount of time or after they've evaluated him.  And I say,

5    Right, they have to give periodic reports, and it's generally

6    at the same frequency as regular education students.

7         And since we had just come out of the meeting, I said,

8    What about meetings such as this, the way it runs, do you feel

9    the meeting happened in a way where your needs were taken into

10   account?  She replied, Yes, because they know -- well,

11   Ms. Felicia especially, she knows that there are certain times

12   in the month that's it hard for me to get off work and she

13   always takes that into consideration and she'll call me and

14   say, are you sure this day is good because there's no problem

15   if you need -- she always gives me like a month, you know, to

16   make sure I'm cool with work and can get there in three hours.

17   We always have it a similar time, and they've been wonderful.

18   And I said, So they've been accommodating in that way?  Yes,

19   they are definitely.

20        Then I asked about assistive technology.  Do you bring it

21   up with -- excuse me, Do they bring up with you possible

22   alternative ways that he might either access his curriculum or

23   be able to communicate?  And she replied, Well, that's a little

24   tricky though with JD because he doesn't have the same

25   communication or skills to communicate.  I said, Right, so part

Gale - Direct

1    of alternative ways of communicating is to try and teach

2    someone who is at a very low level, and I understand because of

3    the low level, do you feel that's something they're working on?

4    She replied, Oh, yeah, I feel like they're working at that, I

5    just don't know how easily, how easily it is for him to learn.

6    And I said, So learning basic skills because of his retardation

7    makes it very challenging for him?  She said, Yes, and all of

8    his disabilities were fighting against him when it comes to

9    communication.

10          Then skipping down a little bit, she said, They all start

11   running together, but it's difficult to say.  So we'll show him

12   this and this will work for JD and this board will save us all

13   trouble.  Well, we've gotten a board before.  She's talking

14   about a communication board.  We've done this or that.  That

15   kind of thing is hard to pick with JD.  They say he's maturing.

16   Does that mean he's going to attend more?  When he does attend,

17   she says is he going to absorb the knowledge?  And I said, So

18   they have to keep evaluating?  She said, Yes, we have to change

19   that all the time.  Then I asked, Do you feel like that you

20   re-evaluate him?  She said, Yes, or he wouldn't be here, I do.

21          So finally I asked about the contact between this and

22   outside agencies.  I said, As you understand the involvement in

23   the community here at Conway, do you feel that they are doing

24   that in a way that's adequate or better?  She replied, I think

25   that they involve him with the community as much as he can be

1   involved because, I mean, I don't think that he -- I think that

2   he probably enjoys going and doing some things with his small

3   group or even the larger group of his peers from here, but I

4   think they do exactly what he can do.  I don't think they do

5   less.  You know what I mean?  And we talked a little bit more

6   about facilities and restraint.

7        Just to summarize, she indicated that he'd been

8   restrained to keep himself from hurting others, and that also

9   for medical procedures, he has to be restrained or put to

10  sleep.  And she says sometimes he'll drop to the floor and they

11  have to physically pick him up and get him somewhere because

12  he's not going to be compliant.  So as I continued asking about

13  that, I asked, Are you comfortable with the way that it's done?

14  From your knowledge, do you feel sufficiently informed?  She

15  said, Yes, I do, and I'm always asked every year.  We have to

16  pick what we would like to be notified of or pick what kind of

17  restraints have to be used.  And they keep me fully aware of

18  what's going on.

19       Then finally we just talked about progress.  I said, What

20  kind of progress has he made in the last two years?  She said,

21  That's difficult.  I said I wasn't trying to put her on the

22  spot.  So I gave her some examples.  And then she said he

23  enjoys -- excuse me, she said, Well, he's probably less than 2

24  years old developmentally.  I said, Okay, so in a way, what

25  we're saying is he's currently a teenager, yet, developmentally

Gale - Direct

1    he's less than 2 years old, it might be very hard to find

2    measurable progress.  And she said, And it takes more than two

3    years to get that measurable progress.  It might take more, so

4    let's expand it.  In the last five years, have you seen change?

5    She said, I have.  I said, And what kinds of change have you

6    seen?

7         She said, I know that JD, his attention span has grown

8    because he would not have been able to sit here with us.  I

9    said, I saw that.  She's referring to the meeting.  He was

10   holding a comic book upside down during the meeting sitting

11   quietly.  She said, I don't know how long it was, two hours?  I

12   said, Just about an hour and 45 minutes.  And she said, He sat

13   here the whole time, didn't get up or roam or act out at all,

14   so his attention or at least, I don't know what you call that.

15   I said, He didn't fall asleep, did he?  She said, No, he didn't

16   fall asleep and he was fine.  He didn't have his temper

17   tantrums, he was under control.  But he also has made progress

18   in using his silverware and drinking from a cup rather than

19   only a straw.

20        And then I interrupted, I said, So this kind of straddles

21   the line between his self-care skills and his educational

22   needs, they kind of start to get a little mixed up?  She said,

23   Well, they have to be, because you're not fixing to teach him

24   math.  So I said, Right, so distinguishing between a fork and a

25   spoon might be his equivalent of a reading skill?  She said,

1    Right, or, I don't know, helping assist wash his own hands has

2    to do with -- and I said, Coming, for example, when someone

3    makes a sign?  She said, Yeah, makes a sign, yeah, and then she

4    pats the chair or sit down.  And I said, So at a certain level,

5    we're talking about part of his education that's heavily into

6    social skills, is that accurate from your perspective?  And I'm

7    skipping over a little.  She says, Right.

8         And so we talked a little bit about tantrums and

9    behaviors.  She says that had seen a lot of improvement in that

10   area.  She said he's more easy to redirect, and I said, With

11   easier prompts?  She said, Yes, I can prompt him.  Just

12   earlier, he wanted to leave and I was able to redirect better

13   than last September because I couldn't get in front of him,

14   which it could have been the stimulation from being outside was

15   overwhelming or he just had to go during that time and we were

16   inside, I was able to redirect him a little easier, but that

17   was good.  And then we finished the interview, I turned to LD

18   and I said, Do you have anything to add?  And she said, I think

19   they are doing a superb job on him, myself.

20        So I just kind of highlight that.  Because I realize that

21   I've just covered a lot of information.  How could I do that 55

22   times?  But I should have done it 55 times, I should have taken

23   the 200 hours it would have taken me to really interview

24   everybody, get that information, analyze the information, and

25   that would have given me the most thorough understanding.  But,

Gale - Direct

```
 1   ultimately, that's what a test and a survey is for and that's
 2   why I designed a survey to then be able to sample.
 3        My hope had been to get all 55 families, but to really
 4   sample, covering those very same areas which that interview
 5   became part of then how I developed the survey, and between
 6   that interview and the parents of HB who were similarly
 7   positive, that information informed me along with questions I
 8   had on my own of what I wanted to include to ask the parents.
 9   Q    Doctor, in that narrative that you did, you refer to
10   mechanical restraints; is that correct?
11   A    Yes.
12   Q    Are mechanical restraints sometimes necessary at
13   facilities like Conway or similar facilities?
14   A    Yes.  And if you were to look at, for example, the
15   current policy on the Council for Exceptional Children, you
16   would see that in their position statement, they acknowledge
17   that, and they support it only in the use for emergencies,
18   never as a way of managing behavior.
19   Q    And what did you observe about when CHDC used mechanical
20   restraints?
21   A    I'm trying to think.  I didn't see any -- the entire week
22   I was there, I never saw anyone be restrained.  I've seen many,
23   many people be restrained.  I've participated in restraints on
24   my own, both physical and mechanical.  And the thing that I
25   have to say also is that it's a horrible thing.  I don't know
```

Gale - Direct

```
 1  anybody who restrains somebody and feels good about it.  At the
 2  same time, it's also a horrible thing for someone to become
 3  severely injured.  So what you're doing when you're using
 4  restraint is you're taking the immediacy of the situation,
 5  you're absolutely looking at harm to self and others and the
 6  risk of that and that's why you use restraint.  I saw
 7  situations where staff were doing things and I also interviewed
 8  teachers specifically around restraint to find out what they do
 9  instead of restraining, and I learned quite a bit about that.
10  Q     Doctor, in your review of records, did you see whether or
11  not CHDC was using restraints only when necessary?
12  A     The problem -- I'd love to say yes to your answer, but
13  the problem is that I don't know in any facility what's not
14  documented and what doesn't happen.  So the documentation that
15  I reviewed, yes, the restraints appeared to be warranted and
16  authorized, but I know from my prior experience that you also
17  have to have a good handle on your staff and you have to be
18  supervising your staff to make certain that they're not doing
19  little things.  I mean, I've been in facilities in the past
20  where watching someone get a client out of bed, all they have
21  to do is very slightly pinch that client.  We're not talking
22  about restraint, but we're talking about something that
23  approaches that.  That's abuse.  If you pinch a client to get
24  them up, we call that in the literature 'negative
25  reinforcement'.
```

Gale – Direct

```
 1         It's like a tax return.  Well, maybe some people file
 2    their tax returns because they love to pay their taxes, but
 3    most people do it to avoid a penalty.  So we do it by a certain
 4    date.  When you pinch a child or you threaten to restrain a
 5    child if they don't start behaving, those would both be equally
 6    inappropriate kinds of actions and the problem is those are
 7    rampant in all state facilities and schools I've been to that
 8    are special education programs.  And what I mean by rampant is
 9    that you will have an occasional person every so often that
10    will create problems and you will have to make sure you get rid
11    of that person as quickly as possible.  What I learned in my
12    time at CHDC is that they keep a watchful eye on their
13    employees.
14         Getting back to what you're asking specifically about
15    restraint, the restraint opportunities that occurred appeared
16    to be emergencies, the restraint appeared to be used for the
17    least amount of time necessary to regain control of the
18    situation, which doesn't mean you release the person the moment
19    they're calm, by the way, there's some other things that you
20    have to do in order to make sure that you don't have a repeat
21    restraint episode.  But I saw no problems with that.  In fact,
22    if anything, I think because of some of their own limitations
23    and their certain data analysis, I think some of their progress
24    was actually better than what they realized it was.
25    Q    Doctor, would you see anything wrong with a safety plan,
```

Gale - Direct

```
1    for example, that said release from restraint was conditioned
2    upon them being calm or five minutes of calm or something like
3    that, would that be inappropriate?
4    A      No, that would -- I'm not sure I heard the direction of
5    your question, but I'm just going to answer by saying it would
6    be perfectly appropriate to do so and also it would be standard
7    community practice to do so.
8    Q      There seemed to be an implication by the plaintiff's
9    experts that a mechanical restraint like a papoose board was
10   worse than using a physical hold.  Do you have an opinion on
11   that?
12   A      Yes, I have a very definite opinion on that and it would
13   be based on my personal experience as a professional working in
14   these facilities and it would be based on my review of
15   literature.  And it would be based on my having spoken with
16   other professionals who were similarly qualified.  You need to
17   imagine what is involved in physical restraint.  When you use
18   physical restraint, you are putting your hands on an individual
19   and you are attempting not just to limit their free movement,
20   but you are attempting to immobilize them.  When you -- and the
21   problem with that is that depending upon the number of people
22   involved in the restraint, at Cedars Sinai, we had a patient
23   that we had to what they call take down.
24          They would call a code, and eight to 12 staff would show
25   up for one patient.  I might be the person just to hold the
```

Gale - Direct

```
 1    hand and someone else would hold the forearm and someone else
 2    would hold the upper arm.  And what we would be doing is trying
 3    to transfer the person as quickly as possible to a mechanical
 4    restraint.  Number one, the risk of injury in my opinion is
 5    greater when you have physical restraint.  Children can
 6    certainly be harmed in mechanical restraint, but there are
 7    quick release mechanisms, there are various things that can be
 8    in place to minimize that.  And you also can check airways.
 9    You have somebody struggling, you have several staff pile on
10    top of them, one of them inadvertently puts a knee or something
11    across an airway, you can kill someone, and there have been
12    deaths unfortunately due to those kinds of episodes.
13         In addition to that, it is impossible nearly to
14    completely immobilize the individual and so, therefore, they
15    struggle.  And when they struggle, that prolongs the restraint
16    episode.  And the longer you prolong the active portion of the
17    restraint episode, restraint episodes can be thought of that
18    it's almost like an escalation.  You have the person rapidly
19    escalate and fight because they're not yet ready to give up
20    control.  They then have a kind of refractory period where they
21    give up control, but emotionally and mentally, they're not yet
22    ready to calm down and comply, that's actually your most
23    dangerous period is trying to determine when you properly
24    release someone from restraint because the last thing you would
25    want is to release the person from restraint before they're
```

1   fully ready to kind of be calm and follow the rules and have

2   them go back again.  Because now that second episode is

3   probably going to last even longer.

4       So both forms of restraint are problematic as is chemical

5   restraint.  When you give a medication to someone, you can't

6   immediately take the medication back out of them.  So I

7   remember a case of seeing somebody, very, very well known

8   psychiatrist from UCLA had used chemical restraint on an

9   individual, and when I came to visit him, he was lying on the

10  couch drooling, his body was half on and half off.  He was a

11  young man who had Cornelia de Lange Syndrome, which is a

12  similar genetic mental retardation syndrome as occurs with at

13  least one client at CHDC.  My point is that that was a form of

14  restraint.  The family did eventually have to take that young

15  man and put him in residential treatment, but they were trying

16  to manage him at home in different ways, using a papoose board,

17  and the papoose boards that they use at CHDC are unusual.

18      These are not the manufactured papoose boards that are

19  out there for sale.  These are -- and I spoke with Lisa Hancock

20  directly about this on multiple occasions.  She made it clear

21  to me that she's uncomfortable with the process of having

22  someone be restrained, but as a physical therapist, she's going

23  to do her very best if they do have to be restrained, she's

24  going to try and make certain that it occurs in the best way

25  possible.  And the people who know about our joints and people

Gale - Direct

```
 1   who know about how our bodies move are occupational therapists
 2   and physical therapists, so it makes perfect sense that she
 3   would be the person involved in designing this.  The facility
 4   has their own design shop and they measure kids, not
 5   individually per child, although I'll go out on a limb and say
 6   they would do that.
 7       If they had a child with an unusual physical deformity of
 8   some kind, my guess is they would design an individual
 9   restraint board for that child to be as comfortable and safe
10   for them during that process.  But they do have them for
11   different sizes and they manufacture them on site because she
12   wasn't satisfied with what is out there that is manufactured by
13   someone else.  I also interviewed the kids to find out what
14   they thought of the process of being restrained and how they
15   experienced it, and I received a range of responses, but I was
16   also very impressed that they were willing to talk about the
17   restraint episodes right in front of their staff.  And that was
18   meaningful to me because remember what I said about pinching
19   earlier?
20       If the staff had been using any kind of coercion with the
21   kids, I would have expected them to -- I would have expected to
22   see evidence of a little bit of discomfort or a glance back or
23   anything like that.  But they were very comfortable sitting
24   with their staff and at times talking about everything from
25   that it helped them to be restrained to that it didn't hurt to
```

Gale - Direct

1    be restrained to that it did hurt to be restrained to that it
2    upset them for a very short time, it didn't upset them at all.
3    And in one or two cases, that it upset them for a long time.
4    None of the children looked to me as though they were horrified
5    by it.
6         Clearly it's unpleasant, clearly some of them don't like
7    it, but then a few of them, KH is one child who comes to mind,
8    78163, she was a child who had been restrained and another
9    consultant identified, I believe, that she had been restrained
10   nine or ten times in the month of April 2009, so I spoke to
11   that child to find out what she thought of it.  I can just
12   remember from memory, she said that it helped her and she said
13   that when she was restrained, they treated her well, that it
14   was safe, it didn't hurt her and it helped her regain control.
15   And I would say at least half of the children spoke to me that
16   way.
17        I would be a little bit leery and surprised if all the
18   kids said they loved being retrained or it was great, but I
19   felt that the range of responses that I received satisfied me
20   that nothing abusive or inconsistent with best standards was,
21   in fact, occurring.
22   Q    Doctor, the plaintiff's expert referred to some people,
23   children who are being dangerously aggressive being held back
24   from their classes.  Is that appropriate?
25   A    Yes, it is appropriate.  And it's interesting how we

Gale – Direct

```
 1    professionals come along and with not having all the facts
 2    sometimes, we develop our own opinions but we forget to let
 3    people know that we're developing opinions.  I want you to
 4    imagine for a moment that you have an out of control aggressive
 5    child throwing things, and you tell me how you're getting that
 6    child to school.  I don't see it happening.  And I've had many,
 7    many cases of children who have school refusal who will
 8    tantrum, who will pretend to still be asleep.  You're not going
 9    to drag a child out of bed and dress them in the case of an
10    aggressive child where you asked, it makes sense that you would
11    explain to a child that they need to calm down.
12         What if the child hates going to school?  If you tell
13    them they need to calm down before they go to school, you've
14    actually inadvertently set into place that they might want to
15    act up even more because they'll avoid going to school.  So it
16    turns out that if you tell a child that they have to calm down
17    in order to go to school, you're picking the most meaningful
18    reinforcer in that moment.  You're not using school as a
19    reward, you're not trying to deny them a school opportunity,
20    but just like a parent is not going to take their tantrumming
21    child into the car and drive them to school for regular public
22    school, staff here are using a similar judgment, and that has
23    to be respected.
24         So you have two problems.  One is you don't bring an
25    aggressive child into class, you calm them down first, however
```

```
 1    long it takes.  And number two, it makes sense that if they
 2    like going to school and they're being upset, you're kind of
 3    reminding them you can't go to school until you calm down.  So
 4    remember what I said about the Premack Principle earlier?
 5    They're taking something the child likes to do and they're
 6    putting it out there as a reinforcer.  I don't see anything
 7    wrong with that.  And that's very different than say, for
 8    example, writing into a behavior plan school will be used as a
 9    reward for eating his breakfast or something.  That's not what
10    they're talking about.
11    Q    It would suggest that rather than return the aggressive
12    child back to their living area or keep them in their living
13    area, that there be like a detention room or something like
14    that for these children.  Is that appropriate?
15    A    No.  In fact, on our PENT website, you will see several
16    videos on the inappropriate use of detention rooms and time
17    out.  And those are dangerous places, by the way.  When you
18    take a child who has trouble breathing and a child with medical
19    problems and you put them in a room where staff often are not
20    in the room with them and they have to have checks through a
21    door, it's one of the other things that I asked very thoroughly
22    about.  They have the kids in line of sight supervision when
23    they're in restraints, no five-minute checks or ten-minute
24    checks.  I'm aware of a case in Rhode Island where a child died
25    when he was in restraints, he asphyxiated on his own vomit.  It
```

1    happened in the five minutes in between the time he was

2    checked.

3         They don't do that at CHDC.  They use appropriate medical

4    care and nursing standards.  From my perspective as a

5    psychologist, when I look at these things, I see no problem

6    with that, but I would have an enormous problem with putting a

7    child like that in a detention room.  That would be a step back

8    into the 1970s.

9    Q    Dr. Thibadeau stated that she had observed some students

10   sitting idly in their classrooms.  Did you make any similar

11   observations?

12   A    I guess I would have to question how Dr. Thibadeau

13   developed the knowledge that the student was idle.  I don't

14   know if she assessed that.  I would want her to operationally

15   define what idle meant.  So that would be -- but I'm going to

16   make the assumption that the child was apparently not appearing

17   to engage in an active curriculum in that moment, and the fact

18   is that I've looked at her resume, she's an absolute expert,

19   she has worked in this field, she would have seen hundreds and

20   hundreds of children in similar situations appearing to do

21   nothing at times because that is the nature of what the

22   population who is severely and profoundly retarded does at

23   times.

24        If you think about what it means for a child to function

25   at a two-year-old level, you have to think about a two year old

1    and, yes, two year olds are active and they do things, they get

2    sleepy and they want a nap and they have their down time.

3    These kids are not two year olds, but they are going to have

4    some of those brain limitation components in their attention,

5    in their language understanding.  Just as JD's grandmother was

6    saying that his attention has improved, but he'll have down

7    time, so that is part of the educational process.  You're not

8    going to work these kids to death because there isn't going to

9    be an educational benefit to it, and actually in terms of their

10   overall well-being, it's not beneficial to them.

11   Q    Doctor, I believe you stated in your report that you

12   considered what's referred to as the Arkansas Department of

13   Education surveys?

14   A    Could you repeat what you said, please?

15   Q    Sure.  I believe you refer in your report because you

16   were able to get these prior to your report, that you refer to

17   the Arkansas Department of Education surveys that were

18   conducted in 2003 and the more informal recommendations that

19   were done in 2005; is that correct?

20   A    That is correct.

21   Q    Now, at the time of your report, you did not have

22   available to you the latest report from the Arkansas Department

23   of Education numbers that were released in early June of this

24   year; is that correct?

25   A    No, I did not have the report, but I was aware that a

Gale - Direct

1    site visit had occurred and I spoke with administrative staff

2    to find out some of the summary details about the 2010 report.

3    Q      So even before you wrote your report, you did get a

4    preview of some of the concerns that were expressed by the

5    Arkansas Department of Education; is that correct?

6    A      That is correct.

7    Q      Now, in your work in California and other states, are you

8    familiar with this kind of process where the state agency for

9    education comes in and does these kind of surveys?

10   A      I'm intimately aware of this.  In my role at Cedars

11   Sinai, we were visited one year by what's called the Joint

12   Commission.  And they found quite a few deficits in our

13   functioning on the different inpatient units.  I was charged

14   with the -- and we were also criticized for not having

15   observable measurable goals, they couldn't read the handwriting

16   of the doctors.  Some of the doctors said they liked it that

17   way.  It became a big deal.  And we had to -- we have a period

18   of time where we put things in a correct manner, and I was

19   charged with designing the surveys and the studies that we

20   would then use and I developed a system where nursing staff

21   also tracked, and we implemented certain policies.

22         So for the next couple of years, I presented to our peer

23   review committee on that data.  In addition to that, I probably

24   know of about maybe eight school districts that I've been

25   involved with during that process.  One school district in

Gale – Direct

1    southern California had lost 30 student records and files and

2    couldn't find them and the Department of Ed came in, also a

3    school -- I was running my lunch program at a school and it

4    happened to coincide with a Department of Ed survey and so they

5    wound up using my program as an example of how they were

6    treating special ed students, so I've had quite a few examples

7    of that.

8    Q     In your experience, could you describe to us how this

9    process is supposed to work?  Is it like a collaborative

10   process, is it a quality improvement process, whatever words

11   you feel are appropriate?

12   A     Well, it's actually, and this didn't occur to me until

13   three seconds ago so we'll see if this is appropriate to say.

14   My kids like watching the show Dancing With the Stars, and I

15   think that the process is a little bit like that in the

16   following way.  You have, we'll say, the ADE coming in and one

17   thing that I guess does puzzle me a little bit is the dates of

18   the reviews.  It's 2003, 2005, and 2010.  I don't detect a

19   pattern.  And I'm more used to having reviews occur in a

20   regular basis and then also there are what are called sometimes

21   surprise inspections or interim site inspections, this kind of

22   thing.  So why those particular dates were chosen is something

23   that I'm not aware of, but it does strike me that it's a little

24   inconsistent.

25         But what happens in any of these situations is a

1   Department of Education comes in, visits a school site, does a

2   thorough record review, observes some classes, talks with

3   people, and then they write what you can consider a preliminary

4   report of findings.  They let them know your documentation

5   isn't good in this area, you need to improve this, you need to

6   do this, then a timeline is given by which they have to do

7   that.  And that's how -- you know, it's kind of like with

8   building safety too, if they find a defect in a building, they

9   don't shut the building down that day, they give them a certain

10  amount of time to correct the defect, it's that kind of

11  process.  But the other thing to keep in mind is that the ADE,

12  I am certain, is not eager to close school districts.  And

13  really you can think of CHDC as its own school district.  They

14  really do operate in that kind of parallel environment.

15       So this is all about continuous quality improvement.

16  That's really the concept here, that's where this came from.

17  You constantly want regulations that are changing to be adhered

18  to, you want to have a method of measuring and informing

19  people, you want to have a process by which they can engage in

20  timely corrections.  But what you don't want to do is come in

21  and be threatening or, you know, just close down because it's a

22  needed service.  If they just started closing down school

23  districts every time they saw a goal that wasn't written

24  properly, you wouldn't have any schools left because it's a

25  problem that occurs everywhere.

Gale – Direct

1    Q    Is this process supposed to allow for verbal feedback and

2    provide the opportunity to clarify or augment or even correct

3    any alleged deficiencies?

4    A    It's a process that goes back and forth, and

5    theoretically, you should be able to consult the ADE on certain

6    areas that may be unclear.  Alternative assessment is one that

7    certainly is a very unclear area for my mind as to what the

8    facility should do other than nothing.  My understanding is

9    they should do nothing about alternative assessment.  That's

10   just one example.  There were other areas that I noted when I

11   reviewed the most recent one where there had been a marked

12   change in what the ADE was looking for from CHDC compared to

13   what they were looking for at the time of the last site review,

14   which was 2005.  So in a way, a really nice thing would have

15   been maybe sometime in 2007 or 2009 when they realized they

16   were going to be asking the ADE new questions and holding them

17   to new standards, it would have been so nice if they had sent

18   them a letter letting them know that, phone call, something.

19   Q    Is there a reason, Doctor, that in these documents we

20   received from the ADE they refer to insufficient evidence and

21   concerns, words like that, rather than saying that they make

22   concrete findings in some areas?

23   A    No, there's no reason for concern because insufficient

24   evidence is what you say when you don't plan to say you're

25   being cited with the following deficiency.  There's a very

```
 1   broad gap between those two.  And to say insufficient evidence
 2   is, in my opinion, the ADE's way of saying to the facility we
 3   don't think you're doing this exactly right, you're not doing
 4   it exactly wrong, but you need to bump it up a little bit, get
 5   your act together and do these kinds of things and everything
 6   will be fine.  It's just meant as kind of a gentle
 7   conversation, but whenever you talk about site visits,
 8   facilities go nuts over site visits and they turn themselves
 9   upside down.  I'm speaking more of hospitals and schools.  I
10   don't know what CHDC did, but I mean, they prepare for weeks,
11   they do all kinds of things.  And the problem here is that the
12   criteria changed, so whatever preparations CHDC would have
13   done, they didn't know that they were going to be held to a new
14   set of standards.
15   Q    Based on the information that you were given verbally
16   about the January review that you essentially got a preview of
17   what might be coming as far as their letter, could you describe
18   for me what the deficiencies were, the alleged deficiencies
19   were generally?
20   A    I'm going to reference my report, and in my report, it
21   says that I spoke with Calvin Price, Marilyn, I'm going to get
22   the name wrong, Joiner.
23   Q    Junyor?
24   A    Junyor, I knew it.  I kept doing that backwards.  And
25   Gail Miller.  And Janet Estes from the ADE had provided summary
```

Gale – Direct

1    information.  And kind of like with the teacher who didn't want

2    me observing in the class, as pleasant as all of them were,

3    they didn't initially want to share this information with me,

4    they were kind of anxious about it.  And I explained to them

5    that it really was a check on my own review and that I simply

6    needed to know this information, and they were subsequently

7    cooperative.  It's a process here where what they were told is

8    that certain areas that had not been reported as a problem in

9    2003 and even 2005 were now of concern.

10        And these following areas were covered:  No Child Left

11   Behind, or NCLB, due process, protection and evaluation, the

12   IEP process, FAPE, confidentiality, continuing education,

13   evaluation procedures, and how they use their funds.  The site

14   reviewer noted that some forms and information was missing and

15   the files had been repeatedly disassembled and put back

16   together to provide information.  They also raised concerns

17   about the hab classes and how training was occurring, that it

18   did not seem sufficiently well documented.  They had concerns

19   about the students switching classes, and I made a note, and

20   that they should consider having them with the same teacher all

21   day.  And I wrote in my report that I disagreed with that.

22        And they felt the professional development should involve

23   the increased use of the educational TV network, and they

24   wanted staff training coordinators to broaden beyond this and

25   that service delivery and coordination by related service staff

 1   such as occupational therapists and speech pathologists and how

 2   this was documented between the IEP and the IPP needed to be

 3   clarified.  I have a note here that says staff have changed,

 4   but I don't recall what that means at the moment.  They did not

 5   criticize the actual services being provided in terms of hab,

 6   but they wanted it brought under the auspices of special

 7   education and they felt that shortened days should only be due

 8   to medical needs and they appropriately documented.  This gets

 9   back to my point that they're really not providing a shortened

10   day, they're using -- they're sort of not paying attention to

11   how much they're actually doing with a child during the day and

12   they're not considering that part of the school day.

13          Of course, the special education teacher has to be

14   present or in control of the instructional process when a

15   school -- so that's what makes it a school day in part.  But it

16   seems unfortunate because it's such a unique facility.  I've

17   been to some other residential facilities like this, but they

18   really have nicely integrated the hab and the special ed and it

19   would be kind of nice if the Department of Developmental

20   Services, the Arkansas Department of Education, and the

21   facility could have a collegial conversation about what's

22   really in the best interest of these kids, because they're not

23   doing anything wrong, they're just not putting the right check

24   in the right box on the right form and that's getting them into

25   problems.

1   Q      In fact, won't many of the services stay the same, it's

2   just they'll be listed in the IEPs so that will make them

3   accountable?

4   A      My worry is that the services will stay the same or the

5   services will actually reduce in quality as they try to adhere

6   to what the standards are that are being imposed upon them

7   without the recognition that these standards really are

8   targeting a percentage of the population that is not only less

9   than 1 percent of the population, but approximately 5 percent

10  of the 1 percent of individuals with mental retardation.  We're

11  talking about such a specialized population that the Department

12  of Education in general, if you read through IDEA, you're not

13  going to see in that document a lot of discussion about what

14  should happen with people with severe and profound mental

15  retardation.  It's not that there's no focus, but the guidance

16  and guidelines, it shouldn't just be that the facility has to

17  kowtow to what are regulations for kids who are gifted and

18  regulations for kids in regular ed, and even regulations for

19  kids with moderate disabilities.  This is a very different

20  population and they shouldn't be ignored, they should get

21  active treatment, but the active treatment has to be

22  developmentally appropriate and functionally appropriate.

23         These aren't kids who are going to read books and discuss

24  their books with others, but these are children who will learn

25  to feed themselves and will learn appropriate leisure

Gale – Direct

```
 1   activities and have an enhanced quality of life, which is what
 2   CHDC is trying to provide.  The reason I'm going on about this
 3   is because I really have a concern about this.  They are at a
 4   juncture right now where they're feeling threatened, they're
 5   worried that the ADE has changed criteria.  I haven't spoken
 6   with anyone about this, none of them have told me this, but
 7   it's just obvious.  And so they're going to do what they're
 8   told to do, but the fact is they've done some really good
 9   thinking on their own of what's best for these kids, and better
10   than anybody walking in, including me, and they're not being
11   given their due for being able to voice their opinions and use
12   the considerable expertise that they have at this facility.
13   Q     You have seen the June 2010 letter from the ADE; is that
14   correct?
15   A     Yes, I did.
16   Q     Was there anything in that letter that would cause you to
17   change your opinions that you've rendered in this case?
18   A     Nothing whatsoever.
19   Q     And just to make sure, even though we'll probably touch
20   on this again, what your opinions are, but did you believe that
21   CHDC complies with the IDEA?
22   A     Yes, they completely comply with the IDEA.
23   Q     Do the children at CHDC receive FAPE?
24   A     Yes.
25   Q     Doctor, you go on to review the educational psychological
```

Gale - Direct

```
 1   testing instruments and procedures, I believe, here.  And first
 2   of all, I think you make some observation about how well
 3   informed the teachers were.  Could you tell me what your
 4   observation was there?
 5   A     Yes.  Kind of funny, I think I've lost track in my own
 6   report, but in terms of just interviewing the teachers, which I
 7   did extensively, it was a process, because the first time I
 8   interviewed them, they weren't so comfortable with me.  The
 9   second time, a little more, and so forth.  So it really was an
10   ongoing process.  But what I learned from the teachers is that
11   they do the exact same thing that the teachers in Little Rock
12   told me they do.  They observe the students.  That's what they
13   do first and foremost and that's what the good teachers I know
14   back in California do.  In addition to that, they also make use
15   of a well standardized test known as the Brigance, and they use
16   the Brigance in formulating how students are going to make
17   progress and how they're going to be adhering to educational
18   standards that are appropriate for that student's needs.
19         On top of that, they talk with other people.  And I gave
20   the example of the teacher who picked up the phone and said
21   what's going on with this child.  She -- in other words, they
22   are genuinely interested in their students and they are
23   proactively trying to understand and plan for them.  I have
24   photographs of what the classrooms look like, I put those in my
25   report, and I think that the photographs are illustrative in
```

Gale – Direct

1   showing that these classrooms look just like any classroom or

2   special education classroom you will find in any other school

3   district and, if anything, they're a little bit more spacious.

4   Q     Going back to the Brigance for a minute.  One of the

5   tools that they use is the Brigance Inventory of Early

6   Development II, which is sometimes referred to, I believe, as

7   the IED.  Is that an appropriate instrument to use for the

8   children that are at CHDC?

9   A     Yes, it's completely appropriate.  All schools use it,

10  all teachers use it.  The teachers in Little Rock use it.  I

11  asked teachers in five different special ed classes and all

12  five teachers use the Brigance.

13  Q     And this IED instrument, isn't it for people who are

14  supposedly, I guess, from birth to age 7 or something like

15  that?

16  A     Well, developmentally from birth to age 7.  So remember

17  JD who functions at a two-year-old level, they can keep using

18  that with him until he's 90.

19  Q     I take it that you had this opinion that the Brigance was

20  appropriate even before you contacted any of your peers or

21  other people, but did you also do some follow-up to confirm

22  your opinion?

23  A     Well, yes.  I mean, first of all, my first -- I mean, the

24  Brigance is something -- just to also clarify, I don't give the

25  Brigance.  Most psychologists don't give the Brigance.  It's a

Gale – Direct

1    teacher tool, but I've seen the Brigance in school districts

2    being used for years.  I mean, it's the instrument that

3    teachers use.  I don't love it, but they love it.  There's some

4    interesting and nice, unique things about the Brigance.  You

5    can use the exact same records, but you use a different colored

6    pen or a different shape and you're able to easily track

7    progress from one year to the next.

8         The one thing I know about teachers is they like

9    pragmatic solutions, they like things to be simple, efficient

10   so they can spend time teaching their students.  And in this

11   case, the Brigance was perfectly appropriate.  But what I did

12   is I read Dr. Thibadeau or Thibodeax?  How is it pronounced?

13   Q    I pronounce it Thibadeau.

14   A    Thibadeau, thank you.  I've been saying it differently to

15   myself.  Forgive me if I err.  But in Dr. Thibadeau's report,

16   she referenced the Brigance as the 1991 tool.  That actually

17   set a bias for me against the facility because when I read that

18   in her report, the 1991 tool is outdated, so I was very

19   surprised when I asked the teachers about this, and they said

20   no, we use the 2004 instrument.  I had even contacted

21   Curriculum Associates, who produces the Brigance, and I had

22   them send me an actual manual, which is still sitting in my

23   office, we never opened the box because it turned out to be

24   unnecessary, of the 1991.  I have, on page 12 of my report, I

25   looked at every single Brigance, I photographed every single

Gale – Direct

1    Brigance, and what I determined is that out of all of the

2    students I looked at, one had been given the 1991 version, 38

3    of them had been given the 2004 version, and 13 students

4    probably who had much higher skills were given the higher level

5    version, which would be appropriate.

6        In addition to that, the Brigance, the difference between

7    1991 and 2004 is as follows:  The 1991 is what's called a

8    criterion-referenced version.  And you can think of it like

9    what I said earlier as a rubric.  You're checking off, it's

10   just a checklist, can the child -- if we think about adaptive

11   skills, can I put my shirt on by myself, yes, I can do that,

12   but can I put on the right clothing for the proper weather

13   outside, maybe I need some help with that.  That's how the

14   Brigance is, but from an education perspective, reading,

15   writing and so forth.  So the only difference between the

16   actual academic areas, because kids have been learning to read

17   since the 1990s and they still learn to read, what they did is

18   they standardized the instrument, so for children who

19   chronologically were up to age 7 and developmentally up to age

20   7, you could use standard scores, but nationwide, that's not

21   how the teachers use it.  All the teachers use it as a

22   criterion-referenced measure.

23       I also spoke with a psychologist who I knew who is

24   heavily involved in early education in Los Angeles, a woman

25   named Jan Van Horn.  She happens to be a PENT member and I've

1    gotten to know her over the years and she has considerable

2    expertise in early child development.  And I asked her if she

3    used the Brigance.  I have the transcript with me because she

4    allowed me to tape record her.  Basically she said, Oh, of

5    course, we use the Brigance, all teachers use the Brigance.

6    And basically before I had written my report, that was one of

7    the confirmations of my own opinion that I sought out.  So

8    what's puzzling to me is that I don't understand why in

9    Dr. Thibadeau's report, she referenced it as the 1991 and

10   didn't reference the 2004 or any of the others that I

11   referenced because only one out of all of the students was, in

12   fact, using that one.

13          And there's nothing inappropriate about it, regardless.

14   It wasn't a problem for them to have been using 1991, but

15   certainly it's more appropriate for them to use 2004, and the

16   Brigance has now come out with 2010.  And I was informed when I

17   was there at the facility that they were planning to purchase

18   the 2010 one and to arrange for proper training and

19   in-servicing.  So it's very clear that they do what is

20   necessary to properly assess, in at least this area regarding

21   education, and they're using a well-accepted standardized tool.

22   Q    Doctor, you already commented on that the classrooms were

23   somewhat similar to what you observed in other settings.  But

24   you have a section in here on classroom design and

25   organization.  Could you elaborate a little bit more about the

Gale – Direct

1    appropriateness of the design and organization of the

2    classrooms?

3    A     Well, yeah, it's something that I pay very close

4    attention to when I go into a special education environment.

5    In high school, for example, for special education, the chairs

6    are often arranged in rows and columns.  In middle school,

7    sometimes they'll be in rows and columns for the kids who are

8    in the mild range, but then you'll see it arranged very

9    differently for the kids who are moderate to profound.  In

10   elementary school settings, you will see the classrooms

11   typically arranged in more of a centers almost like what a

12   preschool looks like.  So you'll have a formalized learning

13   area and keeping in mind that some of the kids have orthopedic

14   impairment and other kinds of problems, that area sometimes has

15   to be a little bit modified to accommodate wheelchairs, it has

16   to maybe have a soft surface if a child is going to sit on the

17   floor.  Not every child comfortably sits in a chair.  So that

18   would be one section.

19        You might have another section where there is some

20   audio-visual information that the children can use to interact

21   with the computer, to watch a DVD, any of that kind of thing.

22   Then you'll have another area possibly, not in all special ed

23   environments, but I did see it at CHDC, where you'll have what

24   I call living skills, so you'll have a stove.  And I remember I

25   have one picture where it not only has a stove, but it says the

1  word stove on it, and other cases where there might be an

2  iconic picture of a stove so the child could theoretically take

3  an augmentive communication system, hold up a picture of an

4  icon of a stove, come over and match the picture on the stove,

5  and then maybe help the teacher make something on the stove.

6  That was the environment.

7      Also I liked the use of colors.  It was bright.  They

8  have one classroom called the rainbow room.  The classrooms all

9  reflect their individual personalities.  One has an aquarium.

10 I believe that gets back to what I commented about finch birds

11 being around on the facility, that these are not stark

12 environments, these are inviting environments, these are

13 pleasant classroom environments.

14 Q    I believe you mentioned in your report that you actually

15 talked to somebody using an AAC device.

16 A    Yeah.

17 Q    Do you know what happened there?

18 A    Yes.  I had gone to observe --

19 Q    First of all, I think His Honor already knows what an AAC

20 device is, but if you could describe it briefly.

21 A    Basically, it's an assistive augmentive communication

22 device.  Sometimes the term is used differently, but AAC

23 generally refers to the idea of using anything other than

24 spoken language in order to communicate.  So even sign language

25 could be considered -- the deaf community might take exception

1   to that, but for most people, anything -- so if you have a

2   child with icons and they pass an icon to an adult or show it

3   to them, that's a form of AAC.  Years ago, I had designed an

4   AAC device for a child using an Atari game computer.  He had

5   severe cerebral palsy, and by using his joystick, he could

6   choose different words and letters to make his needs known.

7   Now they have computer systems like that.

8         And what happened is I was going to observe speech

9   pathology because I wanted to see what speech pathology

10  services looked like and how that was set up, and in the course

11  of that, there was a student who had just recently left the

12  program, he was now 22 years old, and he was coming in and he

13  had a really cool computer device and he also was about as

14  constricted in his physical mobility and movements as you could

15  imagine.  And what occurred, and I'll just do it from memory,

16  but I have the transcript of it from my dictation, he told me

17  the story of how he had been hit by a car and was injured at a

18  very young age, he had brain damage and he was using a

19  synthesized voice to tell me.  So he operated a fairly

20  sophisticated computer system to find menus and find his

21  different places, and I do have a picture of it in my report.

22        If you were counting down, it's like picture number 9 on

23  page 16.  And it shows what his computer system looks like and

24  how it is mounted.  Actually, 8, 9, and 10 all show that, and

25  you see a pretty sophisticated file system.  So then one of the

Gale – Direct

1    things that I wanted to do was after he told me the scripted

2    thing of this is how I've been injured and so forth, I tried to

3    throw him off guard and I said, do you know any good jokes.

4    And sure enough, he had a file of jokes that he tells people,

5    and he told me a joke having something to do with lemonade.  So

6    it was really impressive how easily and how well and how facile

7    he was in his communication with me, and it was just a nice

8    piece.  And then I also learned that clearly -- I had them send

9    me a list of how many kids have AAC devices.

10          And keep in mind, it can be computerized or

11   noncomputerized, it can be pieces of paper, anything that gets

12   the job done.  It can be a notebook.  I also noticed as I was

13   walking by another student that his name was not on the outside

14   of the notebook, but was on the inside of the notebook, and I

15   didn't think that was an accident.  I asked staff and staff

16   immediately said to me, that's to maintain HIPAA compliance.

17   HIPAA, which is H-I-P-A-A, which is the Health Information

18   Portability Accounting Act, something like that, I always get

19   it wrong.  It's HIPAA.  It's what is now the federal law for

20   protecting records, and there was some confusion, and schools

21   are still confused about this that I go to about whether or not

22   they can have identifiable student information.

23          CHDC seems to be aware of that.  And in fact, when I went

24   to photograph some of the student information, one of the

25   teachers came over to me and said, You're not getting their

1    names in there, are you?  And I told her that, yes, I was

2    getting the name, but I planned to digitally blur out the name

3    and that I also had obtained Mr. Price's permission and he knew

4    that I would do that and that the facility would see the

5    pictures before I left.  I appreciated that people were

6    concerned.  They weren't being suspicious of me, they were

7    being protective of the kids, and that's appropriate.

8    Q     Doctor, let's move on next to toilet training which I

9    believe Dr. Thibadeau was critical of because she didn't

10   observe it in the classrooms.  Can you tell me how that is done

11   at CHDC and whether or not it's appropriate?

12   A     Yes.  The way that it's done at CHDC from my

13   understanding is that this is a program developed and

14   maintained by the residence or habilitation staff and they take

15   total 24 hour, 7-day-a-week responsibility for teaching the

16   children their toileting skills.  The teachers only have to

17   cooperate and participate, and I saw many examples of that

18   occurring.  I saw kids in the classroom indicate their need to

19   use the bathroom.

20        In one case, I think it was Throndia Smith, I could check

21   in my notes, but she was one of the teachers who was standing,

22   and it bothered me that the door to the restroom was very

23   slightly open and she was standing in front of it, so I asked

24   her about that and she said, oh -- I could look up the child's

25   name -- but she said he doesn't like to be in there alone, he

```
 1   gets very nervous, so it makes him more comfortable that the
 2   door's open and I'm standing in front just so nobody
 3   accidentally walks in and that way he also knows that I'm here.
 4   I appreciated that level of knowledge and caring.
 5        And so when a child has an accident, for example, it's
 6   the hab staff who are called and the hab staff either cleans up
 7   the child in the classroom or they take them back to the
 8   residence.  And if you've ever worked in an environment where
 9   children have accidents, you know, I have kids and it's one
10   thing, I changed a lot of diapers and I've changed a lot of
11   older diapers back from my Sun Land days.  It's a very
12   different experience changing a diaper on a 14 year old than it
13   is changing a diaper on a 2 year old, the size of them, the
14   size of what comes out of them, the consistency and quantity of
15   what you have to deal with, the odor, all of these things make
16   it very reasonable that -- also in terms of the person's
17   dignity, would they rather be changed in a classroom
18   environment or would they rather be changed in an environment
19   that is like their home.  If you have the ability to take the
20   child to feel like back home, change them, clean them up, and
21   then bring them back, I think that that's a very useful and
22   respectful experience for the child.
23        When I was in Little Rock, no criticism, but I saw a
24   bathtub right there in between the classroom and another room.
25   That wasn't my favorite setup.  I don't think that if you have
```

1    a child that gets that messed up, having to bathe them right

2    there in the classroom and take care of it right there in the

3    classroom is the best thing.  It takes teacher time away.  This

4    does not.  So you worry about teacher time by having the hab

5    staff be the ones who are responsible.  They're supporting the

6    teachers.  In addition to that, I just want to say because they

7    take very thorough records and data recording.  Rebecca

8    Lawrence is, I think, from 22, I may have the number wrong, but

9    I have the name right.  She was one of the program supervisors

10   and she and I spent an extensive amount of time going through

11   the toileting program and going through the data they collect.

12       And she showed me all of the notebooks.  It's very, very

13   well organized.  But, yeah, it doesn't occur at school and it

14   doesn't need to.  If it's occurring elsewhere, you don't have

15   to bring it into school.  It's not like school is somehow

16   responsible for all toileting, they're responsible for needs

17   that aren't being handled elsewhere.

18   Q    And indeed, isn't this training addressed in the

19   habilitation programs and data is collected on that in the

20   living areas?

21   A    Would you repeat the question?

22   Q    Isn't data for this type of training collected in the

23   living areas and this training is written into their

24   habilitation plans?

25   A    Based on my review, yes.

Gale – Direct

```
 1   Q     Now, in your report, you go on to say about some of the

 2   students actually being a little bit impacted by your presence.

 3   Do you remember saying that?

 4   A     Yes.

 5   Q     Could you describe that a little bit and describe the

 6   circumstances of the particular timing of your visit that might

 7   have contributed to this?

 8   A     Yes.  As I mentioned when I started off Monday, I was

 9   just trying to be as unobtrusive as possible, but there were

10   times that my walking into a classroom was enough to disrupt or

11   change a student's behavior.  It got better over the next day,

12   and I'll talk about what happened in a moment that affected it

13   again, but these students were very, very sensitive to any

14   changes in their environment.  Certainly they seemed to be

15   aware, even the ones who were very impaired, of the presence of

16   strangers.

17         And the thing is that sometimes that will not result in

18   automatic screaming, but sometimes it will be a stiffening of

19   their limbs or joints or they will go kind of silent.  If you

20   think about what a fear reaction is, we don't necessarily

21   express fear by shouting; sometimes we express fear by becoming

22   very quiet.  So I can't say exactly what the change was, but

23   staff told me that on some times I came in, it affected student

24   behavior and other times that I came in, I had no impact on

25   their behavior.  Fortunately, the majority of times that I came
```

Gale – Direct

1    in, and I asked staff about this, they said the students were

2    behaving just as they normally did.

3          But in terms of what happened, and I almost don't have

4    words to describe how this affected the facility.  I came

5    Monday, I was there through Friday, and what occurred is on

6    Wednesday, March 10th, I showed up at the facility and the Log

7    Cabin Democrat published a front page article, and it said

8    "Justice Department:  CHDC puts children at risk of death."

9    And that was their headline.  And I decided to put it right in

10   my report.  I simply, number one, it made me very nervous and

11   uncomfortable, but even more than that, there was a television

12   truck on site, mind you, parked in the handicapped spot.  There

13   was a television truck at the entrance of the facility parked

14   in a private individual's driveway.  So in other words, I'm

15   used to television trucks, I've been on national TV, it makes

16   anyone, it makes me a little nervous.

17         That was so unfair to do to this facility, and not to the

18   staff even, but to the residents, because that's who was

19   impacted most greatly.  And what happened is staff were on

20   edge, it was palpable tension on that day in the facility.  All

21   of the work that I had done for the last two days to try and

22   get to know the residents and get to know the staff, now the

23   kids wouldn't even speak to me, they thought that I was there

24   from the newspapers.  People were coming up to me and asking

25   who I was and why was I going places.  Everything that I was

Gale – Direct

 1   trying to do to be unobtrusive, to blend in, was difficult, and

 2   it was on that day that the teacher had said please don't come

 3   in here and observe.  I have a feeling she would have not been

 4   so on edge if it had not been for the TV trucks.  So it simply

 5   had a horrible impact.

 6        I think that for a small facility, a small town to put

 7   information up there, and I'm not even sure after reading the

 8   article what some of the information was based on, I couldn't

 9   quite match things up from what I had learned, but I think that

10   that's something that has been pervasive.  I think the level of

11   stress, this was just a pinnacle point.  This was over the top,

12   and even people who normally had been more friendly and

13   comfortable weren't acting that way to me.  I recovered from

14   it.  So Wednesday wasn't a good day.  And, unfortunately,

15   Wednesday -- it was either Wednesday night or Tuesday night,

16   there had been a thunderstorm warning for the area and also

17   those weather conditions had a little bit of an impact on

18   student behavior.

19        So the confluence of the TV trucks, the newspaper

20   article, and the weather simply put a lot of students on edge.

21   One or two students, I believe, did have to be restrained.  And

22   it was, in my mind, very clearly related to all this media

23   attention.  And even though I was able to get my job done on

24   Thursday and Friday, I really had to work at it, and it would

25   have been a lot easier had this come out at a different point

Gale – Direct

```
 1   in time other than in the middle of my visit.

 2   Q    Doctor, moving on to you had already mentioned that you

 3   attended three IPP combination IEP meetings.  You remember

 4   that?

 5   A    That's correct.

 6   Q    You lay out one of these in quite a bit of detail in your

 7   report, but I'd like you to just summarize what happened at

 8   the -- and if this was a typical meeting that you summarize

 9   here.  Could you tell me what happened at this particular IPP

10   slash IEP meeting?

11   A    Yes, and I'd like to refer to my notes from the IEP

12   meeting if that's all right.

13   Q    Actually, Doctor, I think the description's in the

14   report, the one I'm --

15   A    Sorry.  Thank you for that.  I mean, the fact is is that

16   even without looking at my report, I remember the meetings

17   quite well.  They all ran the same way.  They were run very

18   efficiently, there were a number of people in attendance, the

19   families in both of these cases had attended.  And so at a

20   typical IPP or IEP meeting, I attend both, these are national

21   concepts not unique to Arkansas, and certainly not unique to

22   CHDC.  You go around and you do introductions, you then review

23   medical history or nursing.  We're talking more about the IPP,

24   but a certain amount of that happens in an IEP as well, you

25   review history.  And so the nurse will have done a health
```

1   evaluation is what they will call it and so that was reviewed.

2        In this case, for JD, his hearing loss was discussed,

3   they talked about his fracture and pneumonia risks and the

4   results of a swallow study and certain weather precautions.

5   His mother asked the team about how he takes his nose spray and

6   they explained it to him and she agreed to the process.  She

7   felt it was making a difference in his behavior.  And that's

8   one of the things about this population is very seemingly minor

9   medical problems can at times have an enormous impact upon

10  things such as self-injury and other kinds of severely

11  interfering behaviors, and the facility appears quite aware and

12  knowledgeable about that.

13       They talked about his dysphagia, they talked about him

14  having a mold-free diet, his hearing status, the general

15  procedures, discussion occurred about pre-vocational

16  activities, how he could clean his mouth and add condiments to

17  his own food.  Other areas involved his level of motivation.

18  And this is JD, so this is the same person whose interview with

19  the grandmother I already read into my comments.  They talked

20  about reassessing his communication needs to see if sign

21  language was best or whether a different form of an assistive

22  technology such as an AAC device board or pictures or other

23  means might be most helpful.  They noted this was due to his

24  lack of progress, so the team wanted to see what they might do

25  to help him progress more quickly.

Gale – Direct

1      Keep in mind he functions at a two-year-old level based

2  on what his grandmother said.  So they're working actively to

3  try and help him, given that his deficits really border on

4  profanity.  There was an educational evaluation reviewed, he

5  used the Brigance.  They talked about how he matched shapes and

6  how items could be found in the bathroom or home and how he

7  discriminates between bills and coins, that he was working on

8  being able to apply a Band-Aid, hand sanitizer, picking out

9  quarters when he's given four coins.  It was noted that he

10  generally behaves well in class.  So that's a pretty thorough

11  teacher evaluation.

12      There was a vocational evaluation done from the previous

13  year.  And they talked about shredding paper.  And when his

14  mother heard that, she said oh, and she was pleased but then

15  she wanted to make sure he was safe and she said, I like all of

16  his fingers.  And they assured her that it was a safe process

17  and all, but also that they would evaluate that.  They talked

18  about other employment options as well.  And she said, I never

19  think of employment, and then she said it's fine to try that.

20  They talked about him going to Wal-Mart, to Wooster City Park,

21  to McDonalds, the Rave Theater, Fish House, and other areas.

22  It was reported that he goes to class fairly independently and

23  that his activities of daily living, so that's like how he

24  cares for himself, brushing his teeth, getting up on time, his

25  habilitative skills related area and self-help in dining were

1    also reviewed.  His mother said that she doesn't come to visit

2    him often enough.  And he was looking at a magazine upside down

3    during that time.

4          The team talked again about inclement weather and they

5    talked about one of his medications, Trazodone, which is

6    t-r-a -- I don't think this is spelled right in my report.  I'm

7    going to spell it as it is in my report, but I think it's

8    incorrect.  T-r-a-z-a-d-o-n-e.  They talked about Trazodone,

9    that's an antidepressant medication.  They talked about his

10   student rights and whether staying in special ed was the best

11   option for him and what possible alternatives there were.  His

12   mother said she wanted him to stay there as long as possible.

13   They talked about his socialization.  And regarding

14   medications, they brought up human rights and his mother talked

15   about, expressed concerns about his safety.  They reviewed his

16   likes and dislikes as part of a preference assessment.

17         They said that most of the things he liked had remained

18   the same, but a few things had changed, and commented how he

19   was growing up.  For example, he no longer liked to go outside

20   or swing upside down, and in this case, excuse me, I just

21   misspoke, how he no longer liked to go outside barefoot or

22   swing upside down.  What's interesting about that is that those

23   are sensory components.  So if you can imagine the feel of

24   going outside, the vestibular stimulation, how it affects our

25   sense of balance when we're turned upside down.  They talked

1  about his long term goals in the meeting at 3:00 p.m. and then

2  right after that, they began the IEP meeting.  And in a way, it

3  seemed to me this was really unfair because I felt like I had

4  just been through an IEP meeting but it was the IPP meeting.

5  So his mother expressed concerns about his health again.

6       The IEP team meeting only took five minutes, so you would

7  think that would be a problem except they covered everything

8  that would be covered that I could think of in an IEP meeting

9  during the IPP meeting.  So this is something that I wouldn't

10  want to see it occur that way, I don't want to see a five

11  minute IEP, there's something about that that just bothers me.

12  That doesn't mean they did anything wrong.  So one of the

13  recommendations that I had is that there should be a better

14  integration so really the IEP and the IPP meetings occur

15  simultaneously.  There's so much information that goes back and

16  forth that it seems to me, and maybe that's what they did and

17  they were just doing the paperwork, but it's unfair to say that

18  you spent five minutes in an IEP meeting when they just talked

19  about the kid for an hour and 45 minutes and all the things

20  they talked about in the IPP, the majority of them were

21  relevant for his IEP.

22  Q    Doctor, let's move on to the parent survey that you

23  mentioned.  Is my understanding correct that this was an

24  on-line survey that the parents could complete and check boxes

25  to multiple questions and so on?

Gale – Direct

1    A     That's correct.

2    Q     What was the purpose of this?  What were you trying to

3    accomplish by surveying the parents of these children?

4    A     This was a balance between the wish that I had that I

5    could interview 55 families and the reality that that simply

6    wasn't going to be able to happen.  So, there's a good body --

7    as you mentioned earlier, I have developed software that is

8    on-line software, I'm on an editorial board for a journal, I

9    see on-line surveys being used all the time.  There's also an

10   interesting literature base out there that people are often

11   willing to be more disclosing in an on-line survey than they

12   are face to face.  And in areas, for example, such as our

13   personal and sexual habits, which is kind of a sensitive area,

14   researchers are finding that using an on-line survey is a more

15   effective and valid method of gathering information.

16        So it seemed perfectly appropriate.  And really my worry

17   had nothing to do with the survey, but it was would families be

18   willing to go to their local public library if they didn't have

19   a computer, or would they feel comfortable accessing it, and

20   also they didn't really know me, so would they feel -- they

21   didn't have to agree, I didn't care which way they went with

22   the questions, I just wanted to gather the information.  But I

23   was pretty much of an unknown to them.  And so these were

24   things that I considered in designing the survey.

25        And ultimately it was the social workers at CHDC who

1    contacted the family members and asked them if they would be

2    willing to fill it out, and then the families were given my

3    phone number and told that they could call if they had

4    questions, and I did receive questions from maybe about five

5    families.  So that was what went into the survey.  And then the

6    survey design itself was my design based on my review of the

7    literature, based on my recent interviews with families at

8    CHDC, and based on what I thought was appropriate to cover to

9    help determine whether or not FAPE and IDEA were both being

10   adhered to.

11   Q    I know you cite in your report a lot of specifics and

12   even quotes from some of these surveys of what the parents

13   wrote, but I'm going to ask you to try to generalize or give me

14   a summary of what you found or what the survey revealed to you.

15   A    Okay.

16   Q    First of all, what did it reveal to you about why these

17   children were placed at CHDC?  Why did they end up there?

18   A    They were placed there because families had not been able

19   to find, often after extensive searching, as is the case for JD

20   and other families when I reviewed the results, they tried

21   very, very hard to get their children into other settings.

22   They tried them in other settings.  Coincidentally, one of the

23   schools I visited in Arkansas was Chicot Elementary, and that

24   happens to be a school that one of the kids at CHDC had been

25   tried at for a period of time.  It was a nice special education

Gale – Direct

1    classroom for severe and profound, but the kids that I saw at

2    CHDC were much more impaired than the kids that I saw in that

3    classroom.  There was only one child I saw in that classroom

4    who even came close, so when we get back to the survey, I

5    really wanted to understand how did the kids wind up at CHDC.

6         I know what the procedures are, but what did the family,

7    what was the family's experience like, what was their level of

8    stress that may have led them to feel that they had no other

9    choice than to place their child in residential treatment.

10   These were the kinds of factors that I wanted to take into

11   account.  I wanted to find out if the kid's health was better

12   or worse as a result of being at CHDC, was their education

13   progressing, were they gaining skills, making no change, how

14   did families feel about the IEP process, how did they see their

15   children in terms of adaptive behavior skills, and how did they

16   see them in terms of interfering behavior skills, or not

17   skills, interfering behavior problems.  These were all areas

18   that I covered in the survey.

19   Q    Now, back just a moment here and we'll go into some of

20   the other areas, but as to why these children ended up at CHDC,

21   were there reports of severe aggressive behavior and people

22   being hurt and children hurting themselves and so on?

23   A    There were reports of these, there were reports of fire

24   setting, killing dogs, stealing knives, sexual molestation,

25   very severe problems.

1  Q     What about what comments did you receive from the parents

2  about generally whether or not there was improvement to their

3  children at CHDC?

4  A     There's no question that the parents saw improvement

5  nearly across the board.

6  Q     Would that also be in the academic area?

7  A     Yes.

8  Q     And what comments did you receive from the parents about

9  the use of restraints, whether or not they felt it was

10 appropriate for their children?

11 A     Because of the importance of restraint, rather than just

12 summarizing, I'd like to refresh my memory by looking at the

13 actual data for a moment and I do have copies.

14 Q     Absolutely.

15 A     Thank you.  If it should be relevant, it wasn't easy, but

16 I did print out the entire parent survey, and so I've converted

17 it from a computer program to a 38-page document, and I have

18 copies of that if that were something that anybody else wanted

19 to see.

20 Q     If you have a copy, we'll give it to opposing counsel.

21 A     I also have copies of the data which I will distribute to

22 you in a moment.

23         THE COURT:  This might be, since we're going to have

24 a little administrative time here, we might go ahead and

25 take -- we've been going about another hour and a half.  Would

1    it be appropriate to break here?

2              MR. YORK:  Absolutely, Your Honor.

3              THE COURT:  If it's going to interrupt anything, we

4    can go on.

5              MR. YORK:  No, we're fine, Your Honor.  I'm sorry

6    for this little bit of down time here, but that would fit into

7    lunch.

8              THE COURT:  Nothing to apologize for, that'll just

9    give us a little bit of time to put this together and then come

10   back in and have it all distributed and ready to go.  We'll

11   recess for an hour.

12             MR. YORK:  Thank you, Your Honor.

13         (Lunch recess at 12:10 p.m.)

14                   C E R T I F I C A T E

15      I, Karen Baker, Official Court Reporter, do hereby certify

16   that the foregoing is a true and correct transcript of

17   proceedings in the above-entitled case.

18

19

20   /s/ Karen Baker, RMR, CRR, CCR
     --------------------------------       Date: December 22, 2010
21   United States Court Reporter

22

23

24

25

1          (Continuing at 1:14 p.m., as follows:)

2               THE COURT:  Proceed, Mr. York.

3               MR. YORK:  Thank you, your Honor.

4    BY MR. YORK:

5    Q.   We were talking about the survey results, and I believe you

6    had pulled out some of your actual surveys, I believe; is that

7    correct?

8    A.   Yes.  Because the graphs in my report are fairly small, I

9    reproduced them in a little bit larger, better quality.

10              THE WITNESS:  And I have copies of that here, if

11   that's all right to reference.

12              THE COURT:  Certainly.

13              THE WITNESS:  Would you like a copy, your Honor?

14              THE COURT:  You'll have to let the lawyers do that.

15              THE WITNESS:  Sorry.  Sorry.

16              THE COURT:  No, it's okay.  I'm happy to see it, but

17   you and I don't get to carry on a conversation without the

18   lawyers involved about what I get to see.

19              THE WITNESS:  Yes, sir.

20              THE COURT:  Is this going to be an exhibit?

21              MR. YORK:  No, your Honor.  It's for demonstrative

22   purposes.

23              MS. COON:  Are we referring to the 38-page document?

24              MR. YORK:  No, the six-page document.

25              THE WITNESS:  It starts off with initials and numbers.

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

Gale - Direct                                                    5612

 1                  MS. COON:  Says at the top, students whose --

 2                  THE WITNESS:  I'm so sorry.  You're correct.  This is

 3       the rubric.  Thank you for that.  You know what, let me just

 4       refer to the report.  You can all follow along, and the quality

 5       is not -- I think it's sufficient.

 6                  THE COURT:  What page of the report are you on,

 7       Dr. Gale?

 8                  THE WITNESS:  This is page 41 under appendix A.

 9                  THE COURT:  All right.

10                  THE WITNESS:  So just to reference -- and I'll kind of

11       go through and identify the pages.  So the parent survey was

12       pretty much as I described.  After interviewing two of the

13       parents, HB's parents and JD's parents, that I really felt that

14       a more in-depth look was appropriate, and some of what I've

15       already described is highlighted on 41 about how families

16       worried that the surveys were -- that it was biased against the

17       facility and refused to participate.  Now, they had that concern

18       not having actually seen the survey.  There was only one parent,

19       and I believe it was the parent of KH, it was either KH or KF,

20       KH being an African-American child, KF being a Caucasian child,

21       and it really had to do with the fact that they didn't have a

22       computer.  We were doing it by telephone, and I think their cell

23       phone reception kept wigging out and they didn't have an

24       alternate line.  But that was the only survey that I can

25       remember that wasn't completed.  Anyone else who started it did

                        Christa R. Newburg, RDR, CRR, CCR
                        United States Court Reporter

1    finish it.

2         So there's an introductory letter on page 42 where I say

3    that I'm a clinical psychologist in Los Angeles, I've been hired

4    by the State of Arkansas as a subcontractor to conduct an

5    unbiased review of the educational program and related areas of

6    CHDC.  And then I go on to describe a little bit about what I do

7    and how they can access it and how my staff can help them if

8    need be.

9         So what really is here is a very truncated version of the

10   survey because I'm -- in the actual survey, there's quite a bit

11   of information, and I thought that it may be illustrative just

12   to go through one case separate from this to show what kind of

13   data is collected, but in terms of FAPE and IDEA, I felt these

14   were the most pertinent areas.

15        So looking at motor skills, social interaction, community

16   living, play and leisure, communication, and personal living

17   skills, what's notable about these graphs is that nobody says

18   the kids get worse.  The percentage is zero across all of those

19   areas.  In terms of slightly worse, it is zero across all areas,

20   with the exception of one family reporting that motor skills

21   were slightly worse.  In terms of unchanged, if you look, the

22   average varies, but unchanged ranges from 10 percent for

23   community living skills up to about 30 percent for motor skills.

24        So what that means is that when we talk about improvement,

25   this was a seven-point Likert Scale, and Likert is L-i-k-e-r-t.

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    This is an established methodology for being able to create a

2    rating scale, and typically you want a gradation of your

3    results.

4         So, in a way, whether they were slightly improved or

5    significantly improved didn't matter for purposes of me

6    understanding were they making progress.  But the research

7    indicates that if you only give people a couple of choices on

8    the tails of a scale, they tend to avoid putting the most

9    extreme response, either positive or negative.  So this was a

10   way of capturing information in either direction.

11        And the other thing that I tried to do to balance the

12   survey, you run into a problem where you intersect between

13   reading comprehension skills and want to go create a fair and

14   balanced survey.  As much as I would love to have made

15   significantly worse the top score and then go on down, my

16   experience and other individuals' experience are that people

17   will often check the first response and expect it to be the most

18   positive.  And you have a result of your results then being

19   unreliable and you have to try and determine that.

20        So what I did, I only put in a few what you would call

21   reverse scale items.  So, say, for example, how is their

22   education, the first choice might be much too basic, and we'll

23   get to that later.  But I just wanted to mention that was a part

24   of the test construction methodology that I used in creating the

25   survey.


Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1        So here we have how much did the kids improve?  Well, for

2   motor skills, it was reported that 40 percent of them were

3   improved, 5 percent significantly, 20 percent slightly.  And

4   that's kind of how it broke down.  I'm just going to summarize

5   levels of improvement.

6        It was 90 percent for social interaction.  It was

7   approximately 90 percent or 87 percent for community living

8   skills.  Again, 78 percent for play and leisure skills.  We're

9   talking about levels of improvement.  Parents said that there

10  was 75 percent of them agreed that there had been some level of

11  improvement in communication skills, and 79 percent of them felt

12  that personal living skills had improved.

13       Now moving on to academic skills.  I used a different

14  scale, and in this case it was also a five-point -- in this case

15  it was a five-point Likert Scale rather than seven-point, and I

16  wanted to know things like how well did they follow simple

17  directions the first time.  And here what's important to note is

18  that it is broken into two subsections.  So they were asked what

19  the child's functioning level was at the time their child was

20  admitted, and then to rate on the survey how it was currently.

21       So you can see that the choices are consistently,

22  inconsistently, sometimes, rarely, and never.  Again, what we're

23  talking about is how consistently or inconsistently these skills

24  were present, and ranging all the way down to never.  So what we

25  see is that for those children, if I just look at the skill

1   being -- if I just take the top two, for example, it was 5

2   percent was inconsistent to consistent, the two highest ratings

3   when the children came in, and now it was rated as -- looks to

4   me like 34 percent we're showing, so an increase from 5 percent

5   to 34 percent.

6        Following more complex directions the first time, it was

7   zero percent when they came in, and it had risen to 11 percent.

8   And then, just to give a contrast, sometimes was 11 percent, and

9   that rose to 44 percent.  And keep in mind that we're doing this

10  across a range of individuals, some of them functioning at that

11  two-year-old level, even though they're much older.  So not

12  seeing a lot of progress is, in fact, a lot of progress.

13       Pointing to correct pictures upon request, initially, that

14  was noted that that occurred -- I'm just going to read.

15  Consistently was 27 percent.  It increased to 30 -- I'll round

16  off, 39 percent.  So it went really from 28 percent to 39

17  percent.  Inconsistently remained the same.  Unchanged at 16

18  percent.  Sometimes increased just a little, from 27 percent to

19  33 percent.

20       The point is that they're all in a positive direction, and

21  recognizing the alphabet increased from 16 percent or -- yes,

22  from 16 percent to roughly 33 percent for consistent and

23  inconsistent.

24       So in terms of very basic levels of academics, there was no

25  question that families were reporting an increase.

1          Looking at a little bit more advanced skills academically,

2     now we're going to look at reading and comprehending short

3     sentences.  Not a whole lot of change there, and that's going to

4     be reflective in part of the fact that only a small percentage

5     of the students at CHDC are going to likely develop reading

6     comprehension skills.  That's a very small subset.  And

7     completely inconsistent with what the normal pattern of mental

8     retardation is nationwide, it's almost upside down comparing

9     CHDC profiles of levels of retardation to the community at

10    large.  So that's not a surprise that that didn't change much.

11         Understanding concepts such as bigger and smaller.  Some

12    improvement noted.  If we collapse together all three, kind of

13    variable, but consistently demonstrating the skill improved from

14    16.6 percent to 22.2 percent.  The others, inconsistently

15    unchanged, sometimes improved a little bit from 16.6 to 22.2.

16         Notably, rarely declined.  And never declined.  So they

17    both went into the correct direction.

18         And just to move us along a little bit, rather than using

19    the numbers, I'm just going to say whether they improved or not.

20         So recognizing numbers from one to ten improved a little

21    bit and the children who did it rarely, that also declined in

22    the correct direction.  Doing addition using manipulatives, that

23    also -- that improved a fair amount.  I'm going to say the

24    numbers because it's hard to know how to gauge this.

25         It was consistently 11 percent and zero for inconsistent

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    when they arrived, and it increased to 16.6 percent and 5.5

2    percent respectively, so the percentage doubled.

3         Now, doing addition and subtraction, you'll see that there

4    was -- it's kind of interesting here.  There clearly was an

5    improvement, and the improvement is in two forms:  One, no one's

6    changing in terms of being able to do it consistently, and that

7    fits.

8         When I interviewed students like MS, I did a little

9    informal evaluation.  I could go over those results.  But she

10   doesn't have good addition skills.  They're inconsistent.

11   That's the case for many of these kids.  You look at them, and

12   you talk to them a little bit.  You think their skills are going

13   to be at a certain level and then you begin to assess them and

14   you realize that really their social skills have gotten pretty

15   good or are pretty good, but their academic and other skills

16   really do reflect what it is to have mental retardation.

17        So here, looking at doing addition and subtraction, that

18   consistently didn't change, but inconsistently, it improved from

19   5.5 percent to 16.6.  And of the children who never could do it,

20   that decreased from 72 percent to 50 percent.  So children are

21   gaining skills.

22        Being able to do multiplication, practically no change.

23   Being able to show reading skills, let me look at something

24   here.  Reading skills, I think on here it looks like part of my

25   graph is cut off, so I'm going to skip that.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

 1       Division skills, yes, there's a change, actually

 2  surprising.  Sometimes improved from 5 percent to 11 percent,

 3  and of children who could never do division, that was 89 percent

 4  when they came in, and that declined to 72 percent at the

 5  current time.

 6       And I do apologize.  Reading skills isn't cut off.  I just

 7  looked at my own results.  It's been a little while.  It's

 8  asking a different question.  The question would have been, and

 9  I'm paraphrasing, but we could look at the actual survey if need

10  be.  In these different areas such as oral language, reading,

11  math, and then -- yes, in terms of those three skill areas,

12  because that relates to what I've just asked about individually,

13  overall how much did things improve?  And what the results

14  indicate is that 33 percent are saying there was slight to --

15  slight improvement or improved, and 66 percent are showing no

16  change for reading.

17       When it comes to oral language skills, the numbers are

18  that -- oh, I'll just read it.  5.5 for insignificantly

19  improved, 22 percent improved, 27.7 percent slightly improved,

20  here 44.4 percent showed no change.

21       The point is, none of them got worse, and if a child were

22  not receiving their education, you would expect that as their

23  skills remained stagnant, but that they're also beginning to

24  fall behind further, and you're not seeing that.

25       So showing no change, of course, is not optimal at all, but

                      Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1  if we're talking about a child functioning at a two-year-old

2  level and I'm asking about reading skills, they're going to show

3  no change.  That would just be an obvious conclusion.

4      Math skills showed significantly improved, 5.5, no change

5  for improved, but then 38.8 percent slightly improved, and about

6  half unchanged.

7      So in the next part of the -- in the next part of the

8  survey, I'm asking more about academics, and just to give you a

9  sense of where this comes from, I didn't just make up these

10  areas.  I happen to use a test called the Woodcock Johnson III,

11  which is a gold standard instrument, just as the Wechsler scales

12  of -- it would be the Wechsler individualized achievement test

13  is another academic measure.  Both of them look at state

14  standards and they are measuring achievement scores relative to

15  state standards.

16      So there isn't a tool that I could have used to assess

17  someone like JD in either of those instruments, but the program

18  that I said I had developed, Rapid Screener, does have certain

19  academic elements based on our research, and it's also based on

20  things like the Woodcock and the Wechsler.  So that's where I

21  pulled it from, and so all of this information that I'm asking

22  about is what is normally taught in schools of people at

23  different functioning levels.

24      So sequencing stories to tell a picture, how much

25  improvement?  Inconsistent improvement for 5 percent -- excuse

 1   me, how -- yeah, how much were they demonstrating the skill.  So

 2   we're back to consistently and inconsistently.  I'm sorry.  So

 3   consistently, zero.  Inconsistently, 5 percent.  Sometimes, 22

 4   percent.  Rarely, and as it goes down -- and as we look at it

 5   currently -- I'm sorry.  I had to kind of remember what my data

 6   was.  The comparison now is, rather than 5 percent for

 7   inconsistent, it's 11 percent, and sometimes rather than being

 8   22 percent, it's now 39 percent.  So it almost doubled.

 9       And what percentage of the children never are able to

10   sequence pictures?  Excuse me, sequence pictures to tell a

11   story?  That dropped, as you would hope if they're making

12   improvement, from 61 percent down to 33 percent.

13       Recognizing their name when presented with a field of

14   different names, how well could they do that?  And basically let

15   me just say there is significant improvement noted.  It looks to

16   me like the scores were, like, one and a half times what they

17   were at baseline.

18       Writing letters of the alphabet.  Consistently initially

19   was 11 percent.  Improved to 16 percent.  Sometimes was at 5

20   percent and improved to 28 percent.  The number of children who

21   never could write letters of the alphabet when they came in, 61

22   percent.  The percentage of children now who can never write, 39

23   percent.  So that dropped in the expected realm.

24       Writing actual words, notice how we're going up the

25   standards.  How many children could do that consistently?  It

1   improved.  Initially, just collapsing the data, it was 16

2   percent.  Looking at consistently, inconsistently, and

3   sometimes, and that improved to approximately 31 or 32 percent.

4   The number of children who were completely unable, never able to

5   write words, was 66 percent, and that dropped to 50 percent.  So

6   everything is going in the expected direction.

7        I don't think I'm going to continue on with the academics

8   because the data doesn't change.  It really highlights that when

9   you talk about things like writing sentences, that improved.

10  Completing tasks quickly.  So now we're into an area known as

11  executive functioning, how well and quickly a person can

12  sequence, use something called working memory skills.  This is a

13  horrific area of deficit in individuals with developmental

14  disabilities.

15       So here, completing tasks quickly, I do want to highlight

16  that because it improved so much.  It's sometimes improved from

17  22 percent to 33 percent, and inconsistently improved from zero

18  to 5 percent.  So here you're seeing that students are actually

19  doing things more consistently.

20       Distractions was a very, very impressive change, and I'll

21  just summarize briefly by saying the number of students who

22  never could work with distractions was 44 percent.  It reduced

23  to 17 percent.  So what that means is more and more children

24  were able to continue working even when there were distractions

25  in their environment.

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1      Things like organizing their possessions similarly improved

2   from 44 percent to 16 percent in terms of the number of children

3   who attained some level of that skill.  Remembering where their

4   items were was 33 percent upon baseline, 11 percent currently.

5      Students who had memory skills for simple information

6   improved from 27 percent to 16 percent.  And the number of

7   children who could do that consistently and inconsistently

8   really improved, from 22 percent up to almost 40 percent.

9      Memory skills for more complex information, as you might

10  imagine, is less, but it still shows in the same direction.  The

11  number of kids initially was 50 percent for never.  That reduced

12  to 39 percent.

13     So now we look at, okay, overall, how much improvement has

14  occurred in the written language skills, their organization and

15  management skills, their memory skills?  In those three areas,

16  what I saw was that no change was reported in roughly 50 to 60

17  percent of the time; however, improvement was noted for language

18  skills, oh, almost -- the other 50 percent was improvement.  So

19  either no change, but 50 percent also improved.  45 percent

20  improved for organization and management, and 39 percent

21  improved for memory skills.  So there's very clear evidence

22  based on how the parents are viewing their children of active

23  progress.

24     And then I asked if the educational program was appropriate

25  to meet their needs, and this is a big question.  I'm putting it

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

Gale - Direct                                                    5624

1    very much on the line, which I need to do.  And so remember how

2    earlier I said that sometimes I reverse the order to bias

3    against myself?  This is one of those questions.

4        So the question asked about evaluating the child's overall

5    educational curriculum, and the very first choice is that it's

6    much too basic.  Well, that was indicated 5.5 of the time.  The

7    next choice is that it was too basic, and that was also 5.5

8    percent.  Appropriate to meet the child's needs, 88.8 percent.

9    The vast overwhelming majority of parents who were surveyed felt

10   that the educational curriculum was appropriate for their child.

11   No one felt it was too advanced.  And, interestingly, no one

12   said they couldn't rate it.  Because that -- that would have

13   been significant.

14       The final section had to do with those eight areas I

15   mentioned about self-harm.  That had to do with frequency, so I

16   had families analyze how often the behavior occurred when they

17   were admitted, how often it occurred now, and also what the

18   severity was when admitted and what the severity is now.  And

19   the frequency ratings range from five or more times per hour to

20   one to four times per hour to six to ten times per day, one to

21   five times per day.  And in hindsight, I wish I had made it a

22   little easier for them.  This is my own research or breaking it

23   down, and there are certain reasons for doing so.  But the

24   bottom line is that when it came to things like -- it went all

25   the way down to one to three times per month or even less than

1    one time per month.  And then severity ratings were not a

2    problem, and then from mild up to extreme.

3         What I saw, when it came to self-injury, there were -- if

4    we just look at numbers, the percentages help, but it helps

5    almost here to think about how many children.  And what we had

6    was a total of one, two -- seven children were exhibiting this

7    behavior daily or more, and one to five times per day.  When we

8    look at how it is currently, only one child out of seven, I

9    don't know if it's the same seven.  It actually would have to be

10   the same seven.  They're tied.  So only one child out of those

11   seven was currently exhibiting the same level of self-injury.

12        I don't know which one it was, but it was indicated as

13   being six to ten times per day, whereas the number of children

14   also who exhibited the behavior monthly, so one to three times

15   per month or less than one time per month rose from four

16   students to seven students.  So, again, both were going in the

17   correct direction.

18        Equally importantly, the severity dropped.  The severity

19   was, for four children self-injury was listed as being severe or

20   extreme, and currently zero children were listed as being severe

21   or extreme.  So we went from 22 percent to zero.

22        There's other data on here, but I think that that kind of

23   tells the picture because, especially with self-injury, you're

24   concerned about all self-injury, but you're really concerned

25   about the self-injury that is considered severe or extreme.


Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1          Harming others, the data went in the same direction.  We

2     had in terms of the number of people who did it monthly, when

3     they were admitted, we had, oh, it looks like 38 percent were

4     doing it daily or better, and currently it reduced to 5 percent

5     doing it daily or better.

6          So this was the direction, and this was the pattern

7     throughout.  I mean, I can go through the others in detail, but

8     the pattern was exactly the same.  Threatening others reduced.

9     Damaging property reduced.  In terms of, I mean, damaging

10    property was notable in that not a problem was rated zero when

11    the children were admitted.  Currently 44 percent are rated not

12    to have a problem in that area.  So you do want frequency, and

13    you also want to know how intense or how severe the behavior is.

14         Being loud or disruptive declined.  All of these declined.

15    Unusual and self-stimulatory behaviors, according to parents,

16    also improved.  In terms of severity, if we look at that, we can

17    see that -- I'm going to just go with severe and extreme.  And

18    self-stimulatory behavior are repetitive, nonfuncional behavior,

19    such as rocking back and forth, flicking your hands in front of

20    your face, weaving your head back and forth, blinking your eyes

21    rapidly.  All of these are examples of what are called the class

22    of self-stimulatory behaviors.  In terms of severity, 33 percent

23    of children were reported to have moderate -- excuse me, severe

24    to extreme levels of self-stimulatory severity, and that dropped

25    to 11 percent currently.  So that's also a sign that there's

                        Christa R. Newburg, RDR, CRR, CCR
                        United States Court Reporter

 1    active programming because the research shows that self-

 2    stimulatory behavior gets worse in unstructured environments.

 3    And it's a difference between giving a child a break when

 4    they've been working and just letting a child lounge around and

 5    have things on their own.

 6         Related to this and in particular with the self-stimulatory

 7    behavior, I had an opportunity to observe at the residences, and

 8    I know I'm talking about this, but I'd like just to read a

 9    little observation that relates to self-stimulatory behavior, if

10    I may.

11         This was on the 11th of March.  I did an observation that

12    began at 7:20 in the morning in Residence 22.  And what I wanted

13    to see was how the kids had breakfast and get ready for school.

14    And this is a validity check, if you will, on the parent data.

15              THE COURT:  Ms. Coon?

16              MS. COON:  I'm sorry.  I'm just trying to figure out

17    where you're reading from, Dr. Gale.

18              THE WITNESS:  I'm so sorry.  I'm -- oh, my apologies.

19    It's the -- we didn't do anything about that.  Do you remember

20    the notes during lunch?  That's right.  Someone was going to get

21    that copied, and then it never did.

22         Let me paraphrase so I don't read it.  I'm sorry about

23    that.  I thought you were going to get copies of these.

24              THE COURT:  It will take two minutes to make a copy

25    for Ms. Coon, and I think she wants to see what you have up

 1    there with you, whether you read from it or not.

 2                 THE WITNESS:  Sure.  And I'll go through that and

 3    then --

 4                 THE COURT:  Pass it over here and I'll give it to

 5    Mr. Wilkins and get it copied.

 6                 MR. YORK:  Thank you, your Honor.

 7                 MS. COON:  I had one more thing as well.  It looks

 8    like we're moving off the parent survey.  I just want to confirm

 9    for the record that that's coming in for the basis of his

10    opinion rather than the truth of the matter asserted.

11                 THE WITNESS:  It's actually --

12                 MS. COON:  I'm sorry.  That's for the judge.

13                 THE WITNESS:  My apologies.

14                 THE COURT:  What were you going to say?

15                 THE WITNESS:  I was going to say that this is a

16    validity check for the parent survey.  It's part of what gave me

17    confidence that the parent survey, in fact, had merit.

18                 THE COURT:  What you're fixing to tell me now is about

19    the validity?

20                 THE WITNESS:  What I'm going to talk about is an

21    observation that melds with the data from the parents, because

22    whenever you get survey information, you have to carefully

23    consider whether or not it's factual and valid.

24                 THE COURT:  All right.  I've got it.

25                 MS. COON:  Okay.  So just to confirm, the survey

                         Christa R. Newburg, RDR, CRR, CCR
                         United States Court Reporter

1    information that's coming in is a basis for his opinion rather

2    than the truth of the matter asserted?

3              THE COURT:  Yes.  He's entitled to explain his opinion

4    and what the bases of it are, including the parent survey and

5    why he thinks the parent survey is reliable.  All is explaining

6    why -- you know, goes to the basis of his opinion.

7              MS. COON:  Thank you, your Honor.

8              THE WITNESS:  In part because I have approximately 150

9    pages of dictation that I don't think anybody wants to hear me

10   read, all of that did form the basis for my opinion in several

11   areas, being my direct observations, and in this case, the

12   parent survey.

13       What we're talking about here and the reason I paused and

14   diverted just a little bit in the case of self-stimulatory

15   behavior is because when you're talking about individuals with

16   severe and profound deficits, self-stimulatory behavior is one

17   of your greatest concerns, and this is an area that I have both

18   been involved in since the early 1970s, I have done research --

19   this was the title, frankly, of my doctoral dissertation.  It

20   was on self-stimulatory behavior in a residential facility in

21   Massachusetts, plus treating individuals for self-injury.

22   Sometimes you get what's called self-injurious self-stim, and

23   self-injurious self-stim is where a child engages in self-

24   stimulatory behavior that produces injury.

25       An example would be saliva that they produce that they rub

1   their hands with, and the amount of saliva that they put onto

2   their hands simply begins to cause skin breakdown.  It causes

3   rashes.  It's very unsanitary, it's very unslightly, and it's

4   socially offensive to other people.

5        So this particular behavior, when you're talking about

6   mental retardation and developmental disabilities, is one of the

7   most important behaviors to get ahold of.  And so here parents

8   are giving some pretty striking data.  You don't see research

9   studies that show this level of improvement.  And so I looked

10  to, where in my other data did I see confirmatory information?

11  And so what I'm now going to refer to is my observation that

12  began at Residence 22.

13       The reason I'm picking the residential observation, I have

14  plenty of observations I described at school, but this is where

15  the active programming and the reason why I say that absolutely

16  FAPE is being provided.  I saw a level of active programming

17  occurring at the residence, and this was not the only residence

18  where I saw it.  On recollection, three different residences.

19  That was simply notable to me.  And so I'm going to just read

20  for a moment.

21       In the second paragraph:  BR was slightly upset as he

22  waited.  He said, "Can I have some milk?"  And she, meaning the

23  staff, replied that as soon as he calmed down, he could have

24  some.  He immediately calmed, holding his elbows up near his

25  ears, and she brought milk to him.  TX had Trix, scrambled eggs,

1    cocktail fruit, and two slices of buttered toast.  HB -- he's

2    the one whose IEP I had been to -- said he wanted more eggs.

3    She told him he could have more eggs after he had some of what

4    was on his plate.  He then said he wanted some pudding, and she

5    gave him some pudding to eat, which he ate using his left hand

6    with a built-up spoon.

7        Built-up spoon means that there's a specialized grip on

8    there, probably designed by the PT or occupational therapy

9    department or in combination between them, and it helps with

10   adaptive functioning.

11       BR had some kind of Chex cereal with scrambled eggs and

12   cocktail fruit.  Oh, I'm sorry.  And although he had a built-up

13   spoon, he finger fed and was prompted by staff to pick up his

14   spoon.  BB put his cup in his place and then, using his right

15   arm independently, handed it to staff who took it, and another

16   staff commented, "I think BB is done."

17       My point of that is that these were not kids who were just

18   being fed by staff in a dependent manner, which I have seen at

19   other facilities.  These were students who were receiving what I

20   would call an education around mealtime.  I can't imagine a more

21   appropriate way of working with students in a residential

22   environment as part of naturalistic programming.  The problem

23   is, the facility doesn't call it that, and because they don't

24   call it that, it's not being counted as part of education, but

25   certainly in working in terms of developmental and functional

1   skills, this is exactly what JB's mother was referring to, and
2   this is exactly what other parents are noting.
3        Continuing on with the survey.  Socially offensive
4   behaviors had also improved.  The number of behaviors that
5   occurred monthly or less than monthly was zero when students
6   came in and rose to 20 percent at that level.  11 percent
7   engaged in socially offensive behaviors five or more times per
8   hour.  That dropped to zero.  Severity, as you might imagine,
9   also decreased, with it being zero were reported as mild
10  severity or not a problem when they came in, and 27 percent were
11  reported as being zero and not a problem currently.
12       And then avoiding situations, which is a problem associated
13  with anxiety, associated with mental retardation also, you had a
14  similar decline in improvement.  It was notable that in terms of
15  avoiding situations, let me do the math here for a second --
16  about 33 percent had mild -- am I getting that right?  No, had
17  moderate to extreme problems when they were admitted, and only
18  11 percent had mild problems.
19       The number of individuals who had moderate to extreme
20  problems by parents were rated as zero percent currently, and 44
21  percent of them were rated as having mild problems.  So we had a
22  transfer, if you will, of a 30 percent increase, roughly, in the
23  number of mild and simply a reduction.
24       So then, getting into things like not paying attention and
25  uncooperative behavior, the data is very consistent with what

1    I've already described.  Just to give an example, for

2    uncooperative, 27 percent were rated as doing that behavior

3    either one to four times an hour or more, and that dropped to

4    zero percent.

5        And then I switched to a different area.  I asked about

6    restraint.  And in particular, I wanted to know if their child

7    had ever been restrained.  66 percent said yes.  67 percent.

8        Did their child have medical problems?  22 percent had

9    reportedly had medical problems.  And what I need to do, because

10   I don't think that's the exact question, and I did have copies

11   of the parent survey.  I just want to refresh myself by looking

12   at the actual question, because I don't think that that's -- and

13   I do have an extra copy or two if anyone else needs it.

14       That's okay.

15       Okay.  So the actual question said, and I'll just

16   paraphrase:  Has your child been restrained in any manner since

17   he or she has been at CHDC?  And so that's 66.6 percent.

18       Then:  Has your child experienced any significant medical

19   problems since he has been at CHDC?  And that answer is, yes, 22

20   percent.

21       Has your child experienced significant injuries since being

22   at CHDC?  And that answer was, yes, 16.6 percent.

23       Then I went on to ask what kinds of physical restraint have

24   been used in the past two years or as long as your child has

25   been at the facility.  And it's broken down into physical,

1    mechanical, chemical, and then just other.  And I'm not going to

2    read through all of this, but it ranged pretty much from 6

3    percent to 18 percent.  We have, like, 12 percent saying never,

4    18 percent saying rarely, 12 percent occasionally, and it was

5    pretty evenly distributed.

6        And then for mechanical restraint, the highest number was

7    25 percent occasionally, 18 percent -- or 19 percent rarely.  19

8    percent never.  And then one person, which represented 6.2

9    percent of those responding in this question, did say that it

10   happens almost always.

11       So here then -- and chemical restraint was never or rarely,

12   with 12 percent, mostly never or rarely.  And you don't see

13   these averaging up to a hundred because not all kinds were used.

14   In other words, you won't expect this to add up to a hundred.

15       So looking then at duration of restraint -- and, actually,

16   I did also ask to please describe what kinds of restraints had

17   been used in reports, and just to give it an example, and this

18   is consistent with what other families said:  KF has been placed

19   on a papoose board on several occasions -- this is her actual

20   data I'm looking at.  We have received a report of each

21   instance, and the use of the restraints seemed appropriate based

22   on the circumstances and our knowledge of KH -- KF, excuse me,

23   and her aggressive behaviors.  The restraints seem to have been

24   used for the purposes of protecting KF and others from harm.

25       And so now what I ask about is frequency of restraint upon

 1   arrival, and this is page 57 of my report, and frequency of

 2   restraint currently, and upon arrival and currently.  So upon

 3   arrival, what we're seeing is that if we just looked at weekly

 4   and above, we see that 37 -- 43 percent report that, and if we

 5   look at weekly and above, we can see that it dropped to 12

 6   percent in terms of how often restraint was used.

 7        Then I looked at the amount of time spent in restraints,

 8   and if we look at --

 9             THE COURT:  Let me stop you here just a minute.  I

10   think Ms. Coon has something to --

11             MS. COON:  I'm sorry to interrupt.  I just didn't know

12   where you were reading when you were talking about data for KF.

13             THE WITNESS:  I'm sorry.  That's what I was offering

14   to pass out that was the copies.  My apologies.

15             MS. COON:  Could we please get a copy of that?

16             THE WITNESS:  Yes.  Here.  You'll find that what I

17   read is on page 19.

18        I'm trying to balance between providing a useful summary,

19   but also giving individual responses that give a flavor to this.

20   And here's two more copies in case that's needed.

21   BY MR. YORK:

22   Q.   Could you, Doctor, just summarize your observations?  You

23   don't even have to give us the exact numbers for those, but your

24   observations about restraint.

25   A.   In terms of overall, in terms of it being appropriate, the

                    Christa R. Newburg, RDR, CRR, CCR
                    United States Court Reporter

1    amount of time, it's certainly within community acceptable

2    parameters.  It's consistent with IDEA in emergency situations.

3    It's consistent with what the Council for Exceptional Children

4    recommends.  Restraints are only to be used in emergency

5    situations.  The reality is that the more impairment a child

6    has, the greater the number of emergency situations are that

7    will come up, just because of the environment.

8         In my -- the other thing that I did is, I tried to capture

9    a range of what I thought could be parental opinions, and so

10   just using my best judgment, I created a series of statements,

11   and I'll read them and the percentage endorsing.

12        So general opinions about what are your general feelings

13   about the use of restraint?  They could have chosen:  It's

14   really the only thing that can control my child, and it isn't

15   such a big deal anyway.  Well, 16.6 percent endorsed that.

16        We've tried other methods, but they weren't as effective.

17   16.6 percent endorsed that.

18        I don't like that it is used, but there doesn't seem to be

19   a good alternative in emergency situations.  Also 16.6 percent.

20        The use of other techniques have reduced how often

21   restraint is used, but it is still necessary sometimes.  27.7

22   percent endorsed that.

23        I am completely opposed to the use of restraint under any

24   circumstances.  One parent, 5.5 percent, endorsed that, and none

25   of these apply was endorsed by 16.6 percent of parents.


                          Christa R. Newburg, RDR, CRR, CCR
                          United States Court Reporter

1          So what I take from that is that if you have parents who

2     felt that it was inappropriate, the data would have looked

3     different from what I've just described.

4          In terms of families being notified, notice that in my

5     interview, JB's mother was very pleased with how she was

6     notified.  Well, how did other families feel?  And did families

7     want to be notified regardless of the time of day?  Yes, 61

8     percent of them want to be notified at any time.  22 percent

9     want to be notified unless it's very late or during the night.

10    The next day is okay.  Zero families want to be notified via

11    summary report, but not each time it occurs.  One family doesn't

12    want to be notified at all, and two other families picked other.

13         I then looked at things like medical care and how the

14    families felt their children were doing and had scales, like, at

15    CHDC, was it better, was it worse.  And, overwhelmingly, when it

16    came to medical care, shortly after arriving at CHDC, 33 percent

17    of families felt that it was better, and comparing that to the

18    present, it maintained that 33 percent felt that it was better.

19         Quality of care.  Were they satisfied or dissatisfied?  90

20    percent, actually -- yeah.  93 percent of families are satisfied

21    to very satisfied with the quality of care that was provided.

22         Staff's ability to notice and act quickly on problems,

23    again, 90 percent are satisfied to very satisfied.

24         Looking at page 59, the timeliness of providing information

25    to me as a parent, 95 percent were satisfied to very satisfied.

Gale - Direct                                           5638

1          The completeness of information provided to me as a parent,

2     94 percent were satisfied to -- and I should say, 83 percent of

3     families were very satisfied with the completeness of

4     information provided to them.

5          Was the level of injury occurring more at CHDC or more

6     other places?  And 54 percent of families indicated that fewer

7     or significantly fewer injuries were occurring at CHDC compared

8     to previously.

9          What about the medical effects of being restrained?  What

10    kind of injuries are occurring?  Because you do very often get

11    injuries with any form of restraint.  You put your hands on a

12    child, you get a mark even though you intend not to.  You use a

13    belt for restraint -- now, I also inquired about that with Lisa

14    Hancock, and the type of restraint that is used on the papoose

15    board is what is called a cocoon restraint.  And the reason she

16    uses that, and she described it to me in pretty good detail, it

17    really is designed to maintain comfort.  They're not just

18    strapping down doing a five-point restraint.  They have a

19    slightly different design, and the designs, to me, frankly,

20    sound superior, but I will leave it to medical people to make

21    that judgment.

22         Point being, in terms of medical effects of being

23    restrained, no physical injuries, 66 percent.  Minor injuries,

24    scratches and everything else, severe, serious, zero percent.

25         So what we're seeing is that families are reporting that

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    restraint is being done safely.

2        The last area that I looked at in my parent survey had to

3    do with the IPP process.

4    Q.   Right.  Could you summarize that for us?  What was

5    basically the finding, or what did the parents reveal to you

6    about their satisfaction with the IEP process?

7    A.   Overwhelmingly, parents felt that the IEP goals were

8    appropriate and challenging.  95 percent of them -- 94 percent

9    of them attended their child's last IEP.  Goals were created by

10   family members and school staff the majority of the time.  The

11   IEPs were highly individualized by the vast majority of

12   families' report.  The degree to which they were able to be

13   involved felt just about right to them.  Sometimes a school will

14   handle everything.  Sometimes the parents feel like they have to

15   do all the work.

16       Do they receive copies of evaluations before the IEP was

17   held?  88 percent said that they did.  5 percent had no opinion.

18   The quality of assessments are adequate or better to describe my

19   child's functioning accurately.  Nearly 90 -- looks like 94

20   percent said that it was.

21       Members of the IEP team discuss my child's present levels

22   of performance, sometimes known as a P-L-O-P, so PLOP for

23   present levels of perform.  83 percent said highly agree, and 11

24   percent said agree.  So 95 percent again.

25       The goals appeared measurable.  Families said, 94 percent

1    of them said the goals were measurable.

2         I feel that I understand how much progress my child is

3    making, 95 percent again, 94 percent.

4         I'm satisfied that the amount of time my child spends --

5    with the amount of time my child spends in special education, 95

6    percent of them are satisfied.

7         I feel that my comments and opinions are valued by the rest

8    of the IEP team.  Again, 95 percent.

9         Staff describe rewards that appear to be effective.  And

10   that means that they conducted a reinforce or preference

11   sampling.  It can happen any numbers of ways.  90 percent, 89

12   percent, agree that that was occurring.

13        Possible techniques to help my child are discussed at the

14   IEP meeting.  89 percent agreed with that statement.

15        The possibility of moving my child to a less restrictive

16   setting is typically discussed.  And I'll go through this

17   individually.  33 percent highly agree and 27 percent agree.

18   16.6 had no opinion.  11 percent disagreed.  Zero percent highly

19   disagreed.  And 11 percent said they were unable to respond.

20        So what this means if we extract out is, a little bit more

21   than half, about 60 percent of the families are agreeing that

22   that's being discussed.

23        Overall time spent in educational activities, 67 percent of

24   families felt that it was somewhat better or much better at

25   CHDC, and in terms of communication skills development, also the

1    majority, about two-thirds, felt that it was better.

2         Their child's ability to socialize with peers and other

3    students, 78 percent said that that was -- no -- yes, 78 percent

4    said that was better.

5         The ability to socialize with adults and other staff,

6    again, 78 percent said it was better.

7         The general level of physical health during the school day,

8    22 percent said there was no difference between CHDC in the

9    former program.  Zero percent felt it was better at the other

10   program.  And 77 percent felt that it was better at CHDC.

11        In terms of number of behavioral episodes, zero percent

12   felt it was better previously, 11 percent saw no difference, and

13   89 percent said it was better at CHDC.

14        Overall, the comprehensiveness of the IEP plan, the

15   overwhelming majority, 83 percent, felt that it was better.

16   Zero percent felt it was better previously.

17        Communication between the educational program staff and the

18   family, 72 percent felt that it was better at CHDC, and one

19   family did feel it was better at a prior program.

20        Occurrence and severity of behavior problems, 89 percent

21   felt it was better at CHDC.  Comprehensiveness of behavior plans

22   and programs, 89 percent felt it was better at CHDC.

23        And in terms of areas that were not on the IEP being

24   covered elsewhere such as the IPP, my question -- let me look

25   and see what my actual question is, because I think that's

1    relevant.  No, no.  I just -- how satisfied are you that some

2    behaviors or skill needs that are not covered as part of the IEP

3    are covered during other times during your child's day?  And to

4    that question, 100 percent of families agreed that they were

5    satisfied or very satisfied.  And let me just give the

6    percentages.  88.8 percent were very satisfied that areas not on

7    the IEP were covered elsewhere, and 11.1 percent were somewhat

8    satisfied.  No families reported any dissatisfaction and no

9    families reported no opinion.

10        I then asked because I felt it was relevant whether or not

11   there had been any impact as a result of this current lawsuit on

12   families, and tried to just see, was there any stress that was

13   detectable by the community.  And most of them said no.  No

14   noticeable effect, 44 percent.  Only 16 percent felt that there

15   had been a mild negative effect.  And one family felt that there

16   had been a moderate negative effect.  That was the effect on the

17   child.

18        In terms of effect on the staff, they did notice more of an

19   effect.  That was their opinion.  The results just range -- were

20   about 11 percent felt it was an extreme effect, 16 percent a

21   severe effect, 11 percent a moderately negative effect, 16

22   percent felt it was a mildly negative effect, and 33 percent

23   said no effect.  So they felt it was having more effect on the

24   staff than on the kids.

25   Q.   Doctor, let's move on to the -- I think we've got a good

 1    grasp of the data and the numbers, and let's move on to the

 2    analysis of the restraint data that you did.

 3    A.    Yes.

 4    Q.    Now, I think you refer here in your report to what other

 5    experts have referred to as outliers.

 6    A.    Uh-huh.

 7    Q.    That the people who use the majority of the restraint

 8    procedures; is that correct?

 9    A.    Yes.

10    Q.    And, in fact, don't you refer here and give us an example

11    of TC?  This is an individual who had a high degree of self-

12    injury; is that correct?

13    A.    Yes, and I'm looking for my page number.

14    Q.    It's on page 35 of your report.

15    A.    I'm sorry?

16    Q.    35 of your report.

17    A.    Thank you.

18    Q.    Would you tell us --

19    A.    Yes.

20    Q.    You stated in here, but could you tell us, how much of all

21    the restraints for the 29 students that received restraint

22    during that certain time period, how much was that for TC?

23    A.    TC's numbers of restraints could be accounted -- accounted

24    for 88 percent of all restraints for the 29 students during that

25    time period, and so just to put it in plain terms, the other 28

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

 1   students accounted for 12 percent of all student restraints.

 2   And TC's restraints facility wide, so 550 residents, his -- as

 3   one individual, his accounted for 20 percent of all restraints.

 4   Q.   Did you do an analysis of whether or not his level of

 5   frequency of restraint dropped at all?

 6   A.   Yes, I did.

 7   Q.   Can you tell me what happened?

 8   A.   Yes, and just to give it a context, this is based on a

 9   review of approximately 1,400 restraints, episodes that I

10   reviewed, and then what I did is, I converted it into a database

11   and spreadsheet, and then I analyzed the results.

12       So what happened was is that CHDC reportedly had -- excuse

13   me, TC had come to CHDC -- too many initials -- wearing a

14   helmet.  This information came from Gail Miller, who is the QMRP

15   for the facility, which is qualified mental retardation

16   professional.  The family was visiting, and he appeared highly

17   agitated.  This resulted in increased self-injury, which

18   resulted in restraints to prevent harm.

19       Staff had conversations with the family about having them

20   just stop their visits temporarily, and the facility recognized

21   that this was an extreme measure, but I guess what you could say

22   is, they were more concerned about TC's level of self-injury

23   than they were about the family's feelings at that moment.

24       The purpose was so they could have some control over his

25   behavior.


                    Christa R. Newburg, RDR, CRR, CCR
                     United States Court Reporter

1     What happened is that from the period that ended in July

2   2008, his episodes had decreased from 300 episodes in one month

3   to just one episode, and then the graph that continues on up

4   through -- I believe I have here November 2009 shows that it's

5   maintained near zero levels since that time.

6     So here we have one individual responsible for 20 percent

7   of all restraints, but that one individual's level dropped to

8   near zero.

9   Q.   Doctor, I have a few general questions.  One is, if

10  somebody is receiving some kind of training in food preparation

11  and personal grooming and certain other, you know, self-help

12  skills, is that more appropriate to have that in the special

13  education plan or is that more appropriate to have it maybe in a

14  habilitation plan?

15  A.   It's a great question, and the problem with it is that the

16  majority of special education programs don't have that option.

17  It either is in the special education plan or it doesn't exist

18  anywhere.

19     CHDC is fairly unique in that they have a choice of which

20  plan to put it in.  My feeling is that it really doesn't matter.

21  It's a functional skill.  It's a functional skill that the child

22  needs to develop.  This is an administrative problem.  Whether

23  it appears in one document or the other is much less important

24  than whether it's being worked on and whether the child is

25  making progress.

1   Q.   And, Doctor, if you saw in someone's IEP that their

2   objective was first to identify 20 pictures of food and then

3   they move on to maybe 20 more pictures of food, or if they were

4   told, first of all, match five objects and then they'll move to

5   ten objects, would that be inappropriate in someone's IEP?

6   A.   No.  And not only not inappropriate, that's a very common

7   practice in the majority of IEPs that I see every week, every

8   day.

9   Q.   Is it necessary that goals be addressed in the IEP if they

10  are also being addressed in the IPP?  And I think that might go

11  back to my last question, two questions ago.

12  A.   This is kind of a computer thing, I almost think.  I think

13  there should be a way that it could be cross-referenced between

14  one and the other, but I see no reason to do data duplication.

15  You don't need to make more work for the staff, but there should

16  be some way of being able to acknowledge where things are, and

17  so that way the IEP document and the IPP document sort of

18  reflect the total picture of the child.

19  Q.   Doctor, did you take a look at the state-wide assessment

20  that's available for children and determine whether or not it

21  appropriately applied to the students at CHDC?

22  A.   Yes, I did.

23  Q.   Could you tell us what your opinion is?

24  A.   Yes.  My opinion is that the document, which is some 300

25  pages long, seems perfectly adequate for students with mild

1    disabilities.  I think that it is inadequate in an increasingly

2    inadequate manner as the level of disability increases.  So it's

3    somewhat inappropriate for kids with moderate disabilities.  It

4    in many ways is completely inappropriate for students with

5    severe to profound disabilities.

6          And I asked the teachers not at CHDC, but I asked the

7    teachers in Little Rock what they thought of using this

8    assessment.  And I can only tell you that I was met with shrugs,

9    I was told that it takes an inordinately long period of time, I

10   was told that it does not help them in tracking their students'

11   progress, and they wish someone would come along and change it.

12   Q.   Did you remember the reference by Dr. Thibadeau to the PEC

13   or PECS?

14   A.   Yes, I did.

15   Q.   What does that stand for?

16   A.   PECS stands for two things.  It stands for Pyramid

17   Educational Consultants, and they are the company that created

18   the Picture Exchange Communication System.  So you have the PEC

19   and PECS, if you will.  So you're referring to Picture Exchange

20   Communication System, which is a branded product name.

21   Q.   Did Dr. Thibadeau accurately represent the research

22   surrounding the PECS?

23   A.   I do not believe that she did.  In her report, from my

24   memory, I believe she called it a proven beneficial method, and

25   that is not consistent with what the literature is.  That's also

1   not consistent with the research that I did based on that, and I

2   did quite a bit.

3        First and foremost, I contacted the people at PECS and I

4   asked them to send me any studies -- PEC, Pyramid Educational

5   Consultants, and I asked them to send me the articles they had

6   showing me what research they had showing that PECS was a viable

7   teaching method.  And, actually, may I pause for a moment and

8   explain what PECS is?  Is that --

9   Q.   That would be helpful if you could.

10  A.   Okay.  Earlier I was talking about AAC, which is an

11  augmentative communication system.  And then there's what are

12  called AAC devices, but there's also the low-tech version.  And

13  PECS is a wonderful program.  It is useful for children who

14  might have cerebral palsy and mild mental retardation or no

15  mental retardation.  It has been found to be useful for children

16  with autism.  In other words, what PECS allows you to do, and it

17  typically looks like there's a Velcro strip, there's some

18  pictures, and then in a grammatically correct format, the

19  students are putting tooth, I want cookie, and there might be a

20  picture of a person, there might be the want, there might be

21  cookie.  They're asking for things.  They're communicating.

22       Also PECS is used in the form of visual schedules, and that

23  can be helpful in sequencing across a child's day.  But, once

24  again, the population is not specifically children with mental

25  retardation, and according to the people -- so now, to return,

1    when I asked the people from Pyramid Educational Consultants to

2    send me all of the articles they had on PECS's use -- and it's

3    PECS, all upper case -- in mental retardation, they sent me one

4    article for adults.

5        When I contacted a PECS expert in Australia, Dr. Mark

6    Carter -- and I could read his credentials, but he's a PECS

7    expert.  I asked him via e-mail, is PECS usable for individuals

8    with mental retardation?  How would you characterize the

9    research?  Because I'm not a PECS expert.  So what he said is

10   that he thought that there -- he thought that it could be useful

11   and there was some preliminary evidence that it may be useful in

12   mental retardation.  Preliminary evidence and proven beneficial

13   are not the same terms and should not be used in the same -- and

14   should not be used interchangeably.

15       When we talk about evidence-based approaches and

16   empirically supported studies and literature based, there is

17   not, in my opinion based on the research that I have done, an

18   empirically supported literature base, but also in making the

19   recommendation that she did, Dr. Thibadeau in my opinion

20   inadvertently violated one of the mandates of IDEA, and that

21   mandate says that you don't promote individual companies, you

22   look at generic solutions to behavior problems.  And for her to

23   recommend a specific company when there is Boardmaker, there are

24   many other ways of creating picture communication systems that

25   are generic, but are not a trademark product, she inadvertently

1   was promoting a commercial enterprise.  And I want to say I

2   don't think there was any malice or intent on her part, I

3   haven't spoken to her doing so, but still that's not normally

4   something that you do when you make IEP recommendations.

5        To give you an example, when I am put out there as an

6   independent educational evaluator, my name should not appear in

7   an IEP.  But, rather, they will describe credentials or

8   something like that, because if I break my leg and get into a

9   car accident and my name is in the IEP, the school district can

10  be found not to have provided FAPE because they haven't had me

11  show up to do the evaluation.  So there really is an important

12  reason why you don't make this kind of specific company

13  recommendations.

14  Q.   Dr. Thibadeau also made some reference to, I guess, sort of

15  sequential implementation of goals or objectives, where she said

16  you had to achieve one goal first before you can move on to the

17  second goal.  Did you see that in any of the IEPs that you

18  looked at?

19  A.   I did, and I looked at those same documents and I developed

20  a different interpretation.  I also spoke with Sarah Murphy to

21  confirm whether or not my interpretation was, in fact, accurate.

22  Sarah Murphy is the QMRP program coordinator.  I hope I have

23  that right.

24       When you have the IEP process, there was a change in 2004.

25  And the I in IDEIA, that second I stands for improvement.  They

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    did certain things to try and streamline the IEP process, and

2    specific to what you're describing, they removed the requirement

3    that you have quarterly benchmarks or goals in addition to your

4    annual goal.

5         So if a child has a mild mental retardation, if a child

6    has -- and say he's being mainstreamed in English, that English

7    teacher can just say certain standards can be achieved in one

8    year.  But if you have a child who is having a behavior support

9    plan, if you have a child who is taking alternative assessment,

10   any of those kinds of requirements, then it mandates that they

11   use these benchmarks which occur quarterly.  And that's what

12   you're referring to, these short-term objectives or benchmarks,

13   depending upon the label being used, are simply a way of

14   indicating what goal will be worked on in an active way.

15        Nowhere in the actual IEP could I find the word "after."

16   So, therefore, this was Dr. Thibadeau's interpretation, but this

17   is pretty common practice.  You have a child learn his numbers

18   from one to five.  Then he's going to learn from six to ten.

19   You have a child first learn how to make his bed, and then he's

20   going to learn to brush his teeth.  It could have just as easily

21   been the other way around.  Or maybe the staff thought making

22   the bed was easier and they're going to start him off with one

23   thing and then increase that success.

24        But what Dr. Thibadeau implied by using the word "after,"

25   she implied a contingent connection between those two behaviors,

1   and nowhere in any of the 850 pages of IEPs that I reviewed

2   could I find that.

3   Q.   And we've already talked about the toileting plans or

4   training that's done, but are there certain areas like that that

5   should be more appropriately addressed in a habilitation plan

6   rather than in a special education plan?

7   A.   Well, it gets into the problem that, again, the federal law

8   for IDEA does not specifically spell out what to do with this 5

9   percent of 1 percent of the general population individual.   So

10  here we have a student with profound mental retardation, which

11  is maybe 1 to 3 percent of all individuals with mental

12  retardation.   Mental retardation itself is only 1 to 3 percent

13  of the general population.   So they have not concentrated and

14  there isn't very much research in this area.

15       So whether it should be in a habilitative plan or an IEP, I

16  don't think it matters.   The IEP process says you work on

17  functional skills and developmental skills, and here we're

18  saying habilitative skills.   To me, we're talking about pretty

19  close, the same thing.   It just has to be somewhere.

20  Q.   Now, Dr. Thibadeau also talked about treatment integrity,

21  and she, in fact, cited to Gresham, G-r-e-s-h-a-m, Gansle,

22  G-a-n-s-l-e, and Noell, N-o-e-l-l, 1993.   Did she accurately

23  cite that particular treatise?

24  A.   No, she didn't, and it was a coincidence, Frank Gresham and

25  I are coauthors on an article from a few years ago on looking at

 1    behavior plans and the improvement in training.  And I knew

 2    there was something about that '93 article.  The way that I

 3    recall it in Dr. Thibadeau's report, she said that the treatment

 4    integrity should be used when -- treatment integrity measures

 5    need to be considered by CHDC, and also that they should be

 6    doing reliability checks.  And this really gets into the

 7    difference between what I guess you would call ivory tower

 8    syndrome, which is something that UCLA and other places are

 9    accused of, and Cedars Sinai where I've worked, and what happens

10    in real life.

11        So we have two problems:  One is that the suggestion is

12    even being made and that it's being made in the form of a

13    criticism, because in my experience, there isn't a single school

14    district in the United States that is a nonuniversity kind of

15    push; in other words, just a regular school district, they're

16    not doing treatment integrity, they're not doing reliability

17    checks.  That is not the state of practice in the community.

18        But, more importantly, Dr. Thibadeau did not accurately

19    summarize Dr. Gresham's research.  And I have copies here.  I

20    pulled up the article, and the article says the exact opposite.

21    And so if anyone would like -- if you want copies -- I'm going

22    to just read the abstract.  And this is called Treatment

23    Integrity of School-Based Behavioral Intervention Studies from

24    1980 to 1990.  The publication date -- and I'll pause.

25        So what I just read was the title, and now I'm reading the

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    publication date.  The authors were -- and, by the way, does

2    Dr. Thibadeau only have three -- is there an et al.?  I don't

3    think she cited it properly, as I recall, but that's less

4    relevant.

5        Here is what the article said.  It appeared in School

6    Psychology Review, and I'm going to read the abstract:

7    Treatment integrity, the degree to which a treatment is

8    implemented as planned, represents a key component in school-

9    based intervention as it is considered to be a link between use

10   and effectiveness of interventions.  181 experimental studies

11   published between 1980 and 1990 in seven journals known for

12   behaviorally based interventions were reviewed.  Of primary

13   interest was whether or not integrity was assessed.

14       So we're not talking about school districts.  We're talking

15   about journal articles, which is clearly a much, much higher

16   standard.

17       Of primary interest is whether they were assessed.  The

18   degree of integrity, operational definitions of treatment, and

19   effect sizes produced by interventions.

20       Effect sizes refers to how much improvement occurred.

21       Only 14.4 percent or 26 of the 181 studies systematically

22   measured and reported treatment integrity.  Only 34 percent, 65

23   studies, operationally define treatment.

24       And then it goes on to say:  Moderate positive correlations

25   were found between degree of treatment integrity and the level

1   of treatment outcome.

2        So here the article that she is referencing is --

3            THE COURT:  Ms. Coon?

4            MS. COON:  I'm sorry to interrupt, your Honor, but I

5   just don't see where this is in his report.  I've never seen

6   what I was just handed in terms of what he is reading from.  I

7   can't find a reference in his report.  I can't find an opinion

8   in his report with regard to treatment integrity.

9   BY MR. YORK:

10  Q.  I don't know, Doctor.  I believe you did refer to it, but

11  I --

12  A.  I believe so.  I can find it.  May I take a moment to find

13  it?

14  Q.  Sure.

15  A.  Thank you.

16       (Document review.)

17           MS. COON:  Can I just add something?  I checked the

18  references, resources access on page 89, which lists the books,

19  articles, and websites that were visited or used as resources in

20  the preparation of this report, and I couldn't find what was

21  just handed to me as a resource that was used in preparing the

22  report.

23           THE COURT:  Why don't we move on.  I think I've got

24  the gist of what he wanted to say.

25           MR. YORK:  That's fine, your Honor.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1          THE COURT:  I mean, I know this may be -- and I don't

2    want to trivialize an issue, any of these issues, but this is

3    probably not one that the lawsuit is going to hang on.  I mean,

4    I'd like for us to spend more time -- some of the things he's

5    talked about really are significant here.  This particular issue

6    is probably not as big as some of the others.

7          MR. YORK:  I agree, your Honor.  Thank you.

8    BY MR. YORK:

9    Q.   Doctor, do you have any general observations about the

10   methodology used by Dr. Thibadeau and her data analysis that she

11   did?

12   A.   Yes.  I would say that in terms of her methodology, she

13   began her report with her conclusion, and most reports don't

14   begin that way.  At least psychological reports are based on

15   hypotheses, and it's fine that she would have whatever

16   conclusion that she drew and I respect that, but it would have

17   been helpful for me to have seen a foundation for many of the

18   opinions that she laid out in the form of being presented first

19   with the data showing how the data lays out and supports

20   particular conclusions, and then making those conclusions.

21       By Dr. Thibadeau starting off with her conclusions, and

22   then not following it up with data that I could easily follow to

23   understand how she reached that conclusion, it made it difficult

24   for me to follow some of the logic behind how she reached what

25   she did in terms of her formulations.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    Q.   Now, Doctor, in your report, you go on to some of the

2    interdisciplinary services, and you have a number of them

3    mentioned here.  One of them is speech therapy services.  Do you

4    know what I'm referring to when somebody says they discontinued

5    speech therapy services because the person lacked attending

6    skills?  What does that refer to?

7    A.   Attending skills would be a colloquial term for paying

8    attention.

9    Q.   Is that a behavior or is that potentially a problem with

10   their ability to actually stay focused rather than merely a

11   behavior?

12   A.   It's going to depend upon which psychologist you ask.  If

13   you ask an extremely behaviorally analytic psychologist, they

14   will say that any stimulus is, in fact, a behavior.  The way

15   that I think you're referring to behavior is, is it an

16   interfering behavior?  Is it like a child purposely putting

17   their head down or looking away or being oppositional?  In some

18   cases, it could be.  Sometimes children will pretend to be

19   asleep when they're bored or things like that, but, really, it

20   also, if you think about the developmental level of over 50

21   percent of the population at CHDC, it's in the severe to

22   profound range, and these children have what would commonly be

23   referred to as extremely limited and variable attending skills.

24        So what that also means is that you have to craft your

25   interventions to meet the skills, and also within IDEA, what you

1    are looking for is active progress.  I mean, to use a truly

2    ridiculous example, why don't we teach a blind child to read and

3    why don't we make him come and work with a reading specialist

4    every day and show him the materials?  Well, if the child is

5    blind, the chances of them reading are by happenstance.  If a

6    child is profoundly mentally retarded and has a highly impaired

7    level of brain functioning, their attentional scale is going to

8    be at the one- to two-year-old level.

9        I just sent off an evaluation of a seven-and-a-half-

10   year-old child two days ago who the speech pathologist reports

11   that that child functions at approximately the 14-month-old

12   level.  I've seen that child, I've evaluated that child.  And

13   there was no single test that I could do.  Everything was

14   through observation, and sometimes I worked through the staff,

15   who knows him better.

16       My point is this:  It isn't to say that the child doesn't

17   need improvement in communication.  But those who are highly

18   impaired are only able to communicate through grunting and

19   sounds and facial expressions, and that is going to be the

20   extent of their communication.  They may not have the cognitive

21   capacity to learn to associate a picture on a card or even an

22   icon on a key ring or some other -- there's a TEACCH program out

23   of North Carolina, Chapel Hill.  And TEACCH is capital

24   T-E-A-C-C-H, all upper case.  That's a well-established program

25   for working with children with mental retardation, where they

1   use colors as a way of helping the child to sequence through

2   their day and activities.  A child who is very low functioning

3   might be able to learn that, but they're not going to

4   necessarily be able to learn to request things, or, if they do,

5   it's going to take a long time.

6        Speech pathology time is very, very valuable.  I have never

7   seen a facility that provides as much speech services as I have

8   seen at CHDC.  In some cases, they see a child four times a

9   week.  At LAUSD, for example, there were children who went for a

10  year without speech services, and even though it was on their

11  IEP, there just were not enough speech pathologists to go

12  around.  The district offered incentives and Saturday programs.

13       My point is, there's a valuable commodity, and speech

14  therapists and speech pathologists are a critical part of the

15  people, but if a child is not making much progress, they should

16  be working with another child who can, and then the child should

17  be reevaluated at a future IEP to see if at a future date, they

18  might make more progress.

19  Q.   Doctor, going to your conclusions here, can you tell us,

20  does the special education program that you observed at CHDC,

21  does that provide a reasonable, or whatever words you want to

22  use, level of services to meet the needs of these children?  And

23  does it provide FAPE, as described under the IDEA?

24  A.   It meets all of those criteria.

25  Q.   Is CHDC a facility or organization that is integrated into

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    its local community?

2    A.   I don't fully know the answer to that.  I only was able to

3    engage in a limited amount of assessment, but the limited

4    assessment that I did makes me think that, yes, it is

5    integrated.

6              MR. YORK:  I believe that's everything, Doctor.  Thank

7    you.

8              THE WITNESS:  Thank you.

9              THE COURT:  Why don't we take a little recess now, and

10   then we'll hear cross-examination.

11        (Recess from 2:36 p.m. until 2:50 p.m.)

12              THE COURT:  Everyone be seated.

13        Ms. Coon, do you have a question?

14              MS. COON:  Oh, just a few, your Honor.

15                          CROSS-EXAMINATION

16   BY MS. COON:

17   Q.   Good afternoon, Dr. Gale.  How are you?

18   A.   Fine.  Thank you.

19   Q.   I have a few questions for you here today.

20        First of all, what, if anything, were you asked to do in

21   preparation for your testimony today?

22   A.   What was I asked to do to prepare?  My instinct is to say

23   nothing, that there wasn't anything, and I'm just trying to

24   think for a moment.  I was asked to produce four copies of

25   anything that -- such as -- whether it's pictures or graphs or

Gale - Cross                                          5661

1   things like that that I wanted to have available.  I was asked

2   to read two trial transcripts from Dr. Thibadeau and

3   Dr. Harding.  I was asked to look at my report.  I can't think

4   of anything else.

5   Q.   Were you asked to review the trial transcripts of Throndia

6   Smith or Susan Milum?

7   A.   No.

8   Q.   Were you asked to review any Arkansas Department of

9   Education documents from 2010?

10  A.   Oh, thank you for that.  Yes, I was.

11  Q.   And what documents would those be?

12  A.   One was the 2010 site visit, and the second was the CHDC

13  initial plan of correction.

14  Q.   Did you review any of the other ADE monitoring file

15  documents, such as notes of ADE's classroom observations or ADE

16  interviews conducted with teachers?  Anything like that?

17  A.   Not in any great detail, no.  I think I skimmed through

18  them, but, no, I didn't look at it in much detail.

19  Q.   Did you undertake any analysis to critique the Arkansas

20  Department of Education monitor's methodologies?

21  A.   Did I undertake an analysis?  No.

22  Q.   Well, you wouldn't know from the monitoring file whether

23  the Arkansas Department of Education monitor had similar

24  classroom observations as the United States's education expert?

25  A.   No, I wouldn't.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1   Q.   Now, this is the first time that you've been asked to look

2   at an entire school program on a large scale; right?

3   A.   No.  It's the first time I've been asked in federal court

4   to do so.

5   Q.   Your previous experience in reviewing school programs was

6   that as an independent evaluator?

7   A.   It's taken many formats.  I can review that if you like.

8   Q.   Sure, just briefly.

9   A.   Okay.

10  Q.   I'm referring to entire school programs, not for one

11  specific student.

12  A.   I understand.  There's a program called Benhaven in

13  Connecticut, and when I was in private practice in

14  Massachusetts, I was retained as part of -- I think it was --

15  I'm not positive it was a legal proceeding, but I was retained

16  to travel to Connecticut to evaluate the Benhaven program, meet

17  with the staff, and form conclusions about their methodologies,

18  related to questions about whether they were using appropriate

19  behavioral training techniques with their students, and actually

20  also had to do with restraint.

21       In addition to that, I don't remember the name of the state

22  facility, but in Northern Massachusetts, there was a case where

23  I was brought in where there were concerns about whether the

24  facility was providing sufficient active programming.  The

25  father was a general and kept showing up to the meetings in full

1    Army dress, and this case centered around evaluating that

2    program.

3         As part of my work in Los Angeles, program evaluation,

4    certainly the educational program for the Foundation For the

5    Junior Blind, during my ten-year tenure there was an ongoing

6    part of what I did.  And subsequently to then, you know, I was

7    asked by the Simi Valley Unified School District to create a

8    nine-hour certificated discrete trial training for children with

9    autism that I produced.  That's in my resume.

10        So I would say that the idea of reviewing -- and certainly

11   as chief psychologist at Cedars Sinai, I constantly evaluated

12   programs on three different inpatient units as well as the

13   adolescent program.

14        There possibly are more that I could think of.  It's the

15   kind of thing where I'm not in any way unaware of what the

16   important parameters are regarding a program versus an

17   individual, but you're correct that in a federal context, this

18   is the first time that I've testified regarding this.

19   Q.   Right.  What I was getting at is, this is the first time

20   where you can recall being asked to look at things on such a

21   large scale?

22   A.   No, once again, I could review in more detail, if you like,

23   but looking at things on a large scale really isn't -- it's

24   certainly not the first time.

25   Q.   Let's look at your previous testimony in your deposition.

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    A.    Thank you.

2    Q.    If I could direct your attention to page 64, please.

3          There's kind of a lengthy question and answer that was

4    involved here, so I'd like to just direct your attention to line

5    6 where you answered:  So while every single case I do as an

6    independent evaluator entails a review of the educational system

7    where that child resides, this is the first case that I can

8    recall where I've been asked to look at things on such a large

9    scale.

10         Is that what that states?

11         It's also on the screen, too, if you'd prefer to look at it

12   there.

13   A.    What I'm thinking, I'm looking at the second part of an

14   answer.  Should I be looking at the question at all?

15   Q.    I think the question was on page 61, line 20:  And can you

16   describe those other instances?

17   A.    Is it all right if I turn to page 61?

18   Q.    Sure.

19   A.    Thank you.

20   Q.    So would it be accurate to summarize --

21   A.    So the question --

22   Q.    -- that question and answer as:

23         Question:  Can you describe those other instances?

24         And then you listed a number of other instances, and then

25   at the end of your answer, you stated:  This is the first case

1    that I can recall where I've been asked to look at things on

2    such a large scale.

3        Right?

4    A.   Yes.  You said:  And can you describe those other

5    instances?

6        And then, yes, I give an answer.

7    Q.   Okay.  Thank you.

8        Now, you would describe what you did in this case as a

9    cursory evaluation that spanned a number of areas rather than a

10   report that actually collected a set of data; right?

11   A.   I have no idea.  Could you please point to where you're

12   referencing?

13   Q.   Sure.  In your deposition, page 82, line 23.

14   A.   Page, once again, 82, line --

15   Q.   23.

16   A.   Thank you.  So what is your question, please?

17   Q.   Whether you had described your review in this case as a

18   cursory evaluation that spanned a number of areas rather than a

19   report that factually collected a set of data?

20   A.   No, I did not say that.

21   Q.   So that's not what it states at page 82, line --

22   A.   I'd be happy to read it back to you.  That's not what it

23   states.  You've left out some words.

24   Q.   Okay.  Well, it does state that in lines 82 and 83;

25   correct?

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    A.    I don't know.  Do you want me to go there and look?

2    Q.    Sure.

3    A.    You want me to go to line 83?

4    Q.    Page 82, line 23.

5    A.    It does not say what you said.  It says something

6    different, and there's an important difference between what you

7    said and what you're saying it says.  And if you'd like, I will

8    read it.

9    Q.    Well, let's see what it says.

10         "And I would say that I did more of a cursory evaluation

11   that spanned a number of areas.  But, as a report that factually

12   collected a set of data that could be used, I did not do that."

13         Is that what that states?

14   A.    Now you've given me two different statements.  In the first

15   statement, you left out the words "more of," and now, in the

16   second statement, you've included the words "more of," and I

17   would agree that that is what I said.

18   Q.    Thank you.  Going back for a second to the Arkansas

19   Department of Education, you wouldn't know if the Arkansas

20   Department of Education monitor observed classes alone or with

21   escorts, would you?

22   A.    No, I would not.

23   Q.    Now, just to confirm, you don't have a degree in special

24   education; right?

25   A.    I have a degree in psychology.

1  Q.   And you haven't taught special education classes; right?

2  A.   Do you mean as a professor, as a teacher?

3  Q.   As a teacher of students?

4  A.   No, I have not.

5  Q.   And you have not run a school?

6  A.   No.

7  Q.   Do you know why in this case you were not asked to opine on

8  psychology services in general for the facility?

9  A.   No, I don't.

10 Q.   But you'd be qualified to do that?

11 A.   Repeat your question.

12 Q.   Would you be qualified to evaluate psychological services

13 in general for CHDC?

14 A.   I would say that it would depend upon what I was asked to

15 do, and then I would carefully evaluate and determine whether or

16 not the time involved -- because it's not just a matter of

17 having the skills.  It's the matter of having the time necessary

18 to be able to do what is asked.  So in order to form a valid

19 opinion, I'd have to evaluate.  If you wanted to give me

20 particular parameters, I could answer that more effectively.

21 Q.   No, just asking whether you could have been asked to

22 evaluate more than just the educational program as a clinical

23 psychologist.

24 A.   And the answer to that would be, it would depend upon the

25 specific request.

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    Q.    Okay.  Now, you had talked about working at developmental

2    centers in Florida; right?

3    A.    Correct.

4    Q.    And that was in the early 1980s; is that right?

5    A.    The late 1970s to early 1980s, yes.

6    Q.    Okay.  And those were kids with severe and profound

7    disabilities?

8    A.    One center was, yes.

9    Q.    And what was the other one?

10   A.    The other was a state hospital, and that was for adults

11   with psychiatric disorders who also had comorbid or coexisting

12   developmental disabilities in some cases.

13   Q.    Just briefly, I have to ask you if you discussed any

14   aspects of the case at lunchtime with Mr. York.

15   A.    The answer is no, and then there was one thing that -- the

16   answer is no.  There was, like, one sentence of something as we

17   were walking back in that I said, and I'm sorry, I don't recall

18   what it was at the moment.

19   Q.    Well, if you think of it, you can let us know.

20         Now, in terms of what you did for your evaluation in this

21   case, your report didn't include an index of documents that you

22   reviewed; right?

23   A.    No.

24   Q.    And do you recall in your deposition when I asked you to

25   clarify which documents you reviewed, you referred me to page 3,

Gale - Cross                                    5669

1   paragraph 1?

2   A.    Should I be looking --

3   Q.    Let's look at that.  Yes, let's look at that in your

4   report, page 3, paragraph 1.

5   A.    Thank you.  So where I say that I was hired?

6   Q.    I'm sorry.  It's actually the third paragraph of page 3.

7   A.    Page 3, paragraph 3 now?

8   Q.    Yes.

9   A.    Thank you.

10  Q.    Do you recall that I asked you if you had any additional

11  information regarding what you reviewed for your opinion, and

12  what you referred me to is that paragraph which states:

13       As part of my assessment, I conducted multiple

14  observations; interviewed teachers, students, related services

15  staff, parents, program coordinators, program specialists,

16  department heads, and individuals in the community who are

17  acquainted with CHDC and the DHS/ADE liaison; reviewed

18  educational, clinical, and administrative records; and analyzed

19  data provided.

20  A.    And the first part of your question was, do I recall?  And

21  the answer is, no, I do not recall.

22  Q.    Okay.  But you don't have any additional detail in terms of

23  what documents you reviewed besides that in your report; right?

24  A.    You know, my screen just went blank on me, so I'm not

25  sure -- hang on.  I was reading that.  So let me find my spot.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

Gale - Cross                                                  5670

1      And now it's back.

2      Should I just ignore the screen or -- because it keeps

3  going on and off.

4  Q.   Well, you can use it as you like.

5  A.   I'm going to turn it off for the moment because it's a

6  little distracting to me, frankly.

7  Q.   Okay.

8  A.   Okay.  So could you repeat your question, please?

9  Q.   Sure.  I was just asking you to confirm that the

10 description of the documents that you reviewed for your

11 evaluation was contained within the portion of your report that

12 I just read.

13 A.   I'm sure it wasn't.  I think that the description would be

14 contained throughout my entire report.  I think it could be

15 found in part in the overview, but by no means would that be the

16 sum total of documents I reviewed and by no means would that be

17 an encapsulated review of everything that existed.

18     As you can see, there are many other places in my report

19 where I referenced hundreds of pages of other documents, and it

20 would have simply been -- it wouldn't have been possible, that I

21 could think of, without producing a 2- to 3,000-page report to

22 include everything that would be reviewed, so, rather, I tried

23 to provide summaries at different points in my report.

24 Q.   Okay.  But, like you said, there isn't an index of

25 documents that you reviewed, particular documents.


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1   A.   Right.  There is not an index.

2   Q.   And do you also recall previously testifying that your

3   opinions are not fully supported in your report?

4   A.   No, I don't recall that testimony.  Would you like to point

5   me to it?

6   Q.   Sure.  If you look at your deposition, page 129.

7   A.   Page again?

8   Q.   129.

9   A.   Thank you.  Line, please?

10  Q.   If you could, take a look at page 129, starting at line 6,

11  and confirm that it states:

12       Question:  And you don't have any specific examples for

13  specific youths that are not included in the report that you

14  plan to testify about?

15       Answer:  I may testify, if I'm asked, about information

16  that was provided in the document disclosures.  Those would be

17  referenced here in the paragraph of what -- in other words, I

18  wasn't interested in producing a 300-page report.  I could have.

19  But, instead, I felt the purpose was to show my methodology, to

20  indicate that I attempted to do things in an unbiased and valid

21  manner, that I adhered to best standards, and that I was able to

22  collect information to form opinions.  The opinions are not

23  fully supported in the report, but they are fully supported by

24  the photographs, the documentation, and the dictations that

25  accompanied and were produced as part of the disclosure.  So,

1   for example, if you wanted me to spend the time and go through

2   and give you details of every single behavioral observation, I

3   could do that.  It would take me 30 hours.

4        Is that what that states?

5   A.   Yes, it is.

6   Q.   And you talked about your methodology for classroom

7   observations, and it sounds like what you ended up doing is more

8   of a random classroom observations.  Is that right?

9   A.   No.

10  Q.   Can you please look at page 207 of your deposition.

11  A.   Yes.

12  Q.   At line 19, does that state, Question:  So then your

13  methodology changed to random?

14       Answer:  Yes.

15  A.   But these aren't the same thing.  We need to go back and

16  look at the context for what the word "random" means.  It means

17  two different things.

18  Q.   What did you think that random meant when you said that

19  your methodology was random?

20  A.   The methodology that I constructed was by no means at any

21  point random; however, I randomized my observations.  There's a

22  difference between the two.

23  Q.   Okay.  So you randomized your observations; right?

24  A.   Yes.  In other words, if I say one, two, three, four, five,

25  or I say one, four, three, two, five, those represent serial

 1   order observations versus random order.  And what I did is, I

 2   carefully constructed a randomized way of being able to collect

 3   a series of observations.

 4   Q.    Okay.  So that's what you meant by random observations?

 5   A.    Yes.

 6   Q.    And if you had more time, you would have thoroughly

 7   reviewed all the students' records; right?

 8   A.    I did thoroughly review all of the students' records.

 9   Q.    Okay.  Do you recall previously testifying that you did

10   not?

11   A.    No.

12   Q.    Let's look at your deposition again.

13   A.    Okay.  Page?

14   Q.    Page 85.  Starting with line 5.  Does that state, Question:

15   Oh, no.  Any other sources that you would have drawn additional

16   examples from, had you had more time?

17        Answer:  I don't believe that I said that I would have used

18   more examples.  I believe that I said I would have conducted a

19   more -- I didn't use this term before, but a more granular level

20   of data analysis, and that I would have liked to have

21   individually gotten to know every single student and their

22   connection and pathway throughout their program.  I would have

23   also thoroughly reviewed all of their records, and better

24   understood -- I would have in essence done 50 or more

25   assessments.  That would have been inordinately time-consuming,

1    however.

2         Question:  How would you describe the review, if any, that

3    you did of student records?

4         Answer:  I would call it a sampling procedure where I

5    viewed selected records in greater detail and reviewed all

6    records, at least in a cursory manner.

7         Question:  Which records did you review in greater detail?

8         Answer:  The ones that appear in my IEP scoring rubric.

9         Is that what that states?

10   A.   This is a partial response to your question on page 82,

11   line 2, and this is a follow-up from that original question.

12   So, in partial response to your earlier questions, this is part

13   of that formulation.

14   Q.   And when you reviewed records, you were more interested in

15   developing overall impressions and seeing how the records felt

16   to you and whether they hung together versus whether they showed

17   interaction and communication between disciplines; right?

18   A.   Could you please point me to where you're reading?

19   Q.   It was actually on that same page, page 86.

20   A.   I'm sorry.  I was still on 85.  My apologies.  So what line

21   on 86?

22   Q.   Starting with line 2.

23   A.   Okay.

24   Q.   And continuing through line 17.

25   A.   So where I say that I did the dictations, so that was the

1    150 pages where I refer to the several hours, and that was all

2    that was transcribed.

3    Q.   Right.

4    A.   And so --

5    Q.   And with regards to what you did on record review, starting

6    at line 11, does that state:  And even though this sounds

7    unscientific, how a record should feel.  It should hang

8    together.  It should show interaction and communication between

9    different disciplines.

10   A.   Yes.

11   Q.   "It should reflect some level of client progress, and it

12   should be responsive in that when problems occur, those problems

13   should be addressed and a resolution formed."

14        Is that what that states?

15   A.   Yes, that is what it states.

16   Q.   And you believe that Conway records do that well in certain

17   areas and inadequately in other areas; correct?

18   A.   No.

19   Q.   That's not what lines 18 through 20 state?

20   A.    It may be what it states, but I'm saying no to that,

21   because the way that you're using inadequate is not well-defined

22   to me.

23   Q.   Well, what did you mean when you said that you think that

24   Conway records are inadequate in other areas?

25   A.    Well, things like that the IEP might refer to a small

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    amount of toileting being done or toilet training, but extensive

2    records are available in the IPP, that could be a form of

3    inadequate.  Because if you look at the IEP -- and obviously

4    with Dr. Thibadeau, she looked at the IEP and saw that toileting

5    was not being worked on and developed grave concerns over that.

6    My response to that would be that apparently then that is an

7    inadequacy of the facility in not making someone like

8    Dr. Thibadeau who comes along aware that it is being worked on

9    elsewhere, and that really is part of a student's overall

10   progress and program.  And so that's an inadequacy.  That's just

11   one example.  There are others.

12   Q.   You don't know that Dr. Thibadeau based her opinion

13   regarding teaching toileting skills based only on IEP review, do

14   you?

15   A.   No, I don't.

16   Q.   And the IDEA requires educational program components to be

17   set forth in an IEP for all students, whether they have

18   developmental disabilities or not; right?

19   A.   I'm going to say no based on the question I thought I

20   heard.  Could you repeat the question, please?

21   Q.   Doesn't the IDEA require components of a student's

22   educational program to be set forth in an IEP?

23   A.   No.

24   Q.   How is it not the case?

25   A.   Regular education students do not have IEPs, and they are

1    part of all students.

2    Q.   Let's just talk about students with disabilities.

3    A.   We can do that, yes.

4    Q.   If you tailor my question to the IDEA requires students

5    with disabilities to have components of their educational

6    program set forth in an IEP, would you agree with that

7    statement?

8    A.   Yes.

9    Q.   You also believe that there are deficiencies in student

10   progress reporting in terms of the level of progress reporting

11   and the detail of progress reporting in the educational program

12   at CHDC; right?

13   A.   Can you point to an area that -- do you just want me to

14   answer that, or are you pointing to something that --

15   Q.   Yes, if you recall.

16   A.   I don't recall.

17   Q.   Or if you do believe that today.

18   A.   Do I believe today that there are deficiencies?

19   Q.   In student progress reporting in terms of the level of

20   progress reporting and the detail of progress reporting?

21   A.   I would say -- I might have used the word "deficiencies"

22   before, but having reviewed the ADE changes in the 2010 report,

23   that came after I did my report, and so I would be a little more

24   careful about using the word "deficiency" now.  And I would have

25   to change my answer and say that, no, I do not see it as a

1    deficiency, even if I said that before.  And the reason I would

2    have called it a deficiency before was not in the legal term,

3    but, rather, in terms of simply strengths and weaknesses, it

4    would have been a weakness.  In terms of an actual deficiency,

5    absolutely not, in no way is it a deficiency.

6    Q.    Did the Arkansas Department of Education find a deficiency

7    in regard to progress reporting?

8    A.    I don't know.  You'd have to show me.

9    Q.    Sure.  Let's look at Exhibit 1104.

10   A.    Thanks.  Do you want me to read through the document 1104

11   that's in front of me to develop an understanding of it?

12   Q.    I believe you looked at this document already, so what I'd

13   like to do is just point your attention to a specific part of

14   it, if that's okay.

15   A.    No, I would first have to review it carefully to make sure

16   that I fully recollect it.  May I take a moment to do that,

17   please?

18   Q.    Have you reviewed this document before?

19   A.    I have glanced through this document before.  I'm not

20   willing to answer any questions without an opportunity to look

21   at it now.

22   Q.    Sure.  Please take that opportunity.

23   A.    Thank you.

24        (Document review.)

25        Okay.  I've reviewed it.  Thank you.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    Q.   Sure.  Let me ask you this first:  In Exhibit 1104, if you

2    look on the first page just below midway down the page, do you

3    agree with me this states:  Listed below are the areas of

4    noncompliance and the reasons for the corrective actions on the

5    accompanying compliance action plan.

6         Is that what that states?

7    A.   No, I do not, and I don't agree with that terminology.

8    Q.   You disagree that's what this letter states?

9    A.   I disagree that you're mischaracterizing what the letter

10   states.  I would agree that you're mischaracterizing what the

11   letter states.

12   Q.   So you disagree the letter states:  Listed below are the

13   areas of noncompliance and the reasons for the corrective

14   actions on the accompanying compliance action plan?

15   A.   No, that I would agree with that that sentence is what it

16   says.

17   Q.   Okay.  And would you agree that on the next page, the last

18   area of noncompliance under individualized education program is

19   that there is insufficient evidence that parents are being

20   informed of a student's progress toward meeting annual goals --

21   A.   I apologize.  Can you point me to where you're reading,

22   please?

23   Q.   Sure.  I'm sorry.  The last paragraph on the second page

24   under the individualized education program section.

25   A.   It begins with, "There is insufficient evidence"?  Is that

Gale - Cross                                        5680

1    what we're referring to?

2    Q.   Right.  I'm just asking you to confirm that an area of

3    noncompliance found by ADE is that parents are being informed of

4    the student's progress toward meeting annual goals and short-

5    term objectives on a quarterly basis.

6         Is that what that states?

7    A.   I honestly don't know because previously it uses

8    noncompliance and it doesn't use that word.  Here it uses

9    insufficient evidence.  And you'll remember from my previous

10   testimony this is simply a document for CHDC to respond to in

11   this case by, I think, July 14.  So this is a draft, if you

12   will.  This is not an actual finding.  This is a notice of an

13   intentional -- of a potential finding if they don't make certain

14   corrections.  They're not the same.

15   Q.   So do you disagree with anything that I've read on the

16   page?

17   A.   Which part are you referring to?  I can't give such a

18   blanket answer.

19   Q.   Well, the area regarding student progress is under the

20   general heading of areas of noncompliance; right?

21   A.   Student progress.  I apologize.  I don't know where you're

22   referring to in the document.

23   Q.   The last paragraph --

24   A.   I don't see a heading that says student progress.

25   Q.   The fourth paragraph under individualized education

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    program.

2    A.    Fourth paragraph, system of personnel development?  No.

3    Q.    Under individualized education program.

4    A.    Okay.  So which paragraph under -- so the heading would be

5    individualized education program.  Which paragraph?

6    Q.    The fourth paragraph.

7    A.    It says, "There is insufficient evidence that parents are

8    being informed of the student's progress toward meeting annual

9    goals and short-term objectives on a quarterly basis."  It

10   doesn't say it's a deficiency.  It doesn't say it's

11   noncompliance.  It says there is insufficient evidence.

12   Q.    And you would agree with me that prior to listing the

13   headings such as individualized education program, it states,

14   "Listed below are the areas of noncompliance"; right?

15   A.    Yes.  I would agree with that.

16   Q.    Thank you.  Now, you don't know the extent to which

17   Dr. Thibadeau was required to have escorts with her when she

18   toured classrooms at CHDC, do you?

19   A.    That's an interesting question, because I --

20   Q.    It's actually a yes or no question.

21   A.    Well, I was also required to have escorts, and I explained

22   that that would simply reduce validity, and it --

23   Q.    Actually, I'm not asking about your escorts.  I'm asking if

24   you know whether Dr. Thibadeau was required to have an escort.

25   A.    Well, she and I have never spoken.


                        Christa R. Newburg, RDR, CRR, CCR
                          United States Court Reporter

1   Q.   Okay.  So would your answer be no?

2   A.   Whether or not I know that she was required to?  I know the

3   facility told me that she did have escorts, and the teachers

4   told me that she did have escorts.

5   Q.   Okay.  And you believe that -- your observations were

6   somewhat disruptive, too; right?

7   A.   No.  We're talking about the difference between a

8   temperature of 99 and a temperature of 106.  I was there as a

9   single individual and I did literally hundreds, if you were to

10  count individually, of observations.  And of those hundreds, a

11  small number of them were disruptive.  So I wouldn't categorize

12  that in the way that you just did.

13  Q.   So you're saying it wasn't the case that your observations

14  were also disruptive?

15  A.   In other words, disruptiveness would actually have to go to

16  validity.

17  Q.   It's actually a yes or no question.

18  A.   What was the question yes or no?

19  Q.   Isn't it also the case that your observations were

20  disruptive?

21  A.   No then.

22  Q.   Let's look at your prior testimony.

23  A.   Certainly.

24  Q.   Page 137.

25  A.   What page, please?

1    Q.   137.  Line 22.

2    A.   Yes.

3    Q.   Does that state, Question:  Isn't it the case that your

4    observations were also disruptive?

5         Answer:  Yes.

6         Is that what that states?

7    A.   That's what that states.

8    Q.   Thank you.  I think you testified today that you

9    interviewed 20 students; is that right?

10   A.   I interviewed approximately 20 students, yes.

11   Q.   So those 20 students were verbal?

12   A.   Yes.

13   Q.   Can you --

14   A.   Well, actually, not all of them.  Not all of them, as it

15   turned out.

16   Q.   Can you just characterize the extent to which those 20

17   students were verbal, if you know?  How many were, how many were

18   not?

19   A.   I think maybe about 15 of them were verbal.

20   Q.   Okay.  And what about the other five?

21   A.   They appeared to be less verbal.  But they were told to me

22   by staff as individuals who could receptively understand what I

23   was saying.

24   Q.   Now, can you give us any specific examples of how what you

25   think was disruptive in Dr. Thibadeau's observations influenced

Gale - Cross                                                5684

1   any of her conclusions?

2   A.   May I look at a copy of her report for a moment, please?

3   Q.   I actually don't have it in front of me.  I'm just asking

4   if you can think of any that you know that you may have included

5   in your report.

6   A.   Well, I think that in her report, as I recollect, she said

7   something like that throughout my time at CHDC, I was in the

8   company of -- and then she goes on to list individuals she was

9   in the company of.  And so, yes, in my report, I interviewed the

10  teachers who had Dr. Thibadeau looking and interviewing them,

11  and if you look at my appendix, on page -- where will we find

12  it?  There was a teacher interview that I did in April 2010, on

13  April 20, and on page 84 of my report, what I did is, I

14  specifically interviewed the teachers via teleconference to

15  follow up on what they had told me previously.  And I simply

16  wanted to make certain that I understood and structured the

17  information.

18       Anecdotally, the teachers had told me that Dr. Thibadeau

19  was in there with as many as two and three other adults and a

20  note taker and that some of the individuals in there were

21  dressed in suits and that this was something that was highly

22  disruptive to the students.  Additionally, she --

23  Q.   My question is whether you can think of any examples of how

24  that would have impacted her opinions.

25  A.   Yes, I'm getting to that.  In addition to that, they told

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    me that she interrupted their teaching time to ask them to get

2    records for her.  So in terms of how this would have impacted

3    her opinions, if she inadvertently disrupted the educational

4    environment to a significant degree and then based any

5    conclusions on the disruption that she inadvertently created,

6    she would wind up with invalid data.

7        And what you have here in the telephone conference is me

8    asking specifically, how many adults, including Dr. Thibadeau,

9    were present during the classroom observation, not including

10   your staff?  Ms. Clements said there were five.  Ms. Milum said

11   there were five.  Ms. McCallie said there were five.  And

12   Ms. Smith said there were four to five.

13       Then what impact did the arrangement have upon students?

14   If you recall it affecting specific students, please state what

15   occurred that was unusual.

16       And the teachers each go on to name various students, and

17   Ms. Milum said the observation arrangement was very distracting

18   to the majority of our students.  Some would want to watch our

19   visitors rather than pay attention to their classwork.  And she

20   said that the escorts and Dr. Thibadeau tried to conceal

21   themselves behind bookcases, but my students were/are very aware

22   when they were being observed.  CT, 46326, began biting and

23   hitting himself because they were in there.  Ms. McCallie

24   indicated two different students, she said that I looked over my

25   shoulder and saw one of their people had moved up behind me

1    about seven feet away, and this is what DK was looking at.  He

2    just couldn't concentrate on what he was doing.  When I

3    commented on this, the man moved back.

4         Ms. Smith said the students did not hit themselves or

5    engage in unusual actions.  They just couldn't concentrate.  If

6    there is anyone in the room, there's not much work to be done.

7         So the fact that Dr. Thibadeau reported students lying

8    around idly doing nothing and the fact that the teachers were

9    reporting that this level of impact occurred during

10   Dr. Thibadeau's observations I think has a direct connection to

11   one another.

12   Q.   So is this something that you've thought of since you

13   provided your report?

14   A.   No.

15   Q.   Let's look at your deposition, page 138.

16   A.   I'm sorry?

17   Q.   Can we please look at your deposition, page 138.

18   A.   Go ahead.

19   Q.   Did you previously testify at line 15, Question:  Can you

20   think of any examples of how that would have impacted

21   Dr. Thibadeau's opinions?

22        Answer:  Oh, I don't think it would have impacted her

23   opinion.  I think it impacted the information she received that

24   influenced her opinion.

25        Is that how you testified previously?

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    A.    Yes.  To me I'm saying the same thing then and now.

2    Q.    Okay.  Now, you have no specific examples receiving special

3    education -- excuse me, specific examples of students receiving

4    special education services for a full day; right?

5    A.    I believe that I have many examples of students receiving

6    special education services for a full day.

7    Q.    Let's go to your deposition at page 39.

8    A.    Page 39?

9    Q.    Yes.

10   A.    Thank you.

11   Q.    If you look at line 21.  Does that state, Question:  Did

12   you have any specific examples in your report of students who

13   you believed were receiving a full day of special education

14   services?

15   A.    I'm sorry, page -- I'm so sorry.  I'm on -- you said page

16   39?

17   Q.    Yes.

18   A.    I'm on the wrong page.  My apologies.

19   Q.    I'll wait.

20   A.    Okay.  Go ahead.  Thank you.

21   Q.    On page 39, at line 21, does that state, Question:  Did you

22   have any specific examples in your report of students who you

23   believe were receiving a full day of special education services?

24         Answer:  I don't believe I do, no.

25         Is that what that states?


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1   A.   No, this is a follow-up question to your previous question,

2   and it's -- you can't separate them.

3   Q.   Actually, I'm just asking what this states, and if you want

4   to bring something else to the Court's attention, you'll have

5   plenty of opportunity when Mr. York --

6   A.   Is what you read what I said?  Absolutely, yes.

7   Q.   Okay.  Thank you.

8        You previously believed that CHDC students were in special

9   education receiving services for a full day; is that right?

10  A.   I previously believed?

11  Q.   Well, let me ask it this way:  Have you since learned

12  subsequent to your report that the Arkansas Department of

13  Education found that CHDC were not in special education for a

14  full day?

15  A.   Yes, I see that.

16  Q.   I'm not clear on how you interpreted the Arkansas

17  Department of Education saying that students should switch

18  classes more often.  Is there any documentation that they

19  offered that finding or opinion?

20  A.   I believe that I saw some documentation on that.  I don't

21  recall at the moment where it was.

22  Q.   Is it in Exhibit 1104?

23  A.   Good question.  Do you want me to look at 1104?

24  Q.   If you could.  I just couldn't find any documentation about

25  that, and you testified about it.  So I'm just trying to figure

1   out if there's any documentation from the Arkansas Department of

2   Education indicating their opinion that students needed to

3   change classes more often.

4   A.   I'm also going to take a look at my report because I

5   believe it was part of the verbal feedback conversation that I

6   received.

7   Q.   Okay.  And if that's where you got the information, that's

8   fine.  I'm just trying to figure out the source of that

9   information.

10  A.   I believe that was the source, and I don't have a specific

11  recollection, and I don't know whether it appeared in official

12  documents or not.  Without looking, that's my best answer.

13  Q.   Okay.  That's fine.  Thank you.

14       Have you seen any CHDC IEPs from 2010 -- let me ask you

15  that first.  Have you seen any CHDC IEPs from 2010, if you

16  recall?

17  A.   I'd have to look at the records again to refresh my memory.

18  Q.   Have you seen any CHDC IEPs where the number of special

19  education minutes is crossed off in hand and a new number of

20  minutes is written in?

21  A.   Same answer.  I'd like to see whatever it is you'd like me

22  to comment on, and I'd be happy to comment.

23  Q.   I'm just asking if you can recall seeing any IEPs like

24  that.

25  A.   There were 850 pages that I reviewed of IEPs, and so I

1    would say, no, I don't recall.

2    Q.   And when did you review those IEPs, approximately?

3    A.   March, April?

4    Q.   Do you have any knowledge of CHDC taking IEPs and crossing

5    off minutes in special education and adding additional minutes?

6    A.   Once again, I'd really want to look at the specific

7    documents and I'd be happy to comment on them.

8    Q.   But you don't recall off the top of your head?

9    A.   I don't recall off the top of my head.

10   Q.   Now, you don't have any illustrative examples of students

11   who you believe FAPE is being provided to, do you?

12   A.   I don't have any what kind of examples?

13   Q.   Illustrative examples of students to whom you believe FAPE

14   is being provided?

15   A.   Are you saying illustrated?

16   Q.   Shown.

17   A.   I don't have any shown examples?  I don't understand the

18   question.  I'm sorry.

19   Q.   Do you have any examples of students for whom you believe

20   that FAPE is being provided?

21   A.   I believe FAPE is being provided to all of the students

22   that I observed and all of the students whose records I

23   reviewed.

24   Q.   But you don't have any specific examples of individual

25   students?

1    A.    Not at the moment, no.

2    Q.    And you also don't have any specific examples of students

3    who are learning functional academics; right?

4    A.    Could you please define what you mean by functional

5    academics?

6    Q.    Actually, I believe that was a term -- let me ask you

7    because I think that was a term that I got from you previously

8    in your deposition.  How do you define functional academics?

9    A.    That's your question to me?

10   Q.    Yes.

11   A.    I would define functional academics as the necessarily

12   academically related skills to function outside in the real

13   world.

14   Q.    Okay.  And is it the case that you don't have any specific

15   examples of students who are learning functional academics at

16   CHDC?

17   A.    I actually have hundreds of examples.  They're all in my

18   dictations.

19   Q.    But not in your report?

20   A.    I think there are some examples in my report.  I can go

21   through for a moment and look for them, if you like.

22   Q.    Well, none that you've testified about today, though;

23   right?

24   A.    I'm sorry?

25   Q.    None that you've testified to today.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1   A.   Well, no, I think students like KH, KF, JB -- CM, I watched

2   him as he came into the classroom, sat down, began doing math

3   problems.  He's one of the students I interviewed.  I saw him in

4   several different classes.  Every time I saw him, he was active,

5   he was carrying his backpack, he was walking around like a

6   student.  There's a student -- I can't think of her last name

7   and I don't want to say her first name.  It begins with an M.

8   Highly verbal student, reddish hair.  She rides a bicycle often

9   from one class to another and around the facility.  She's a

10  student who I saw many times throughout my experience engaged in

11  functional academics and activities.

12      LW would be another one.  He's a student who was referred

13  to the Arkansas School For the Deaf recently, I believe.  And

14  when I observed this student, he was in several different

15  classes.  I have pictures that I forwarded of him that are in my

16  report of his augmentative communication system, and I saw him

17  using his augmentative communication system with staff.  I saw

18  him in different environments.  He's another one who comes to

19  mind.

20      HB is another one.  He's the one whose IEP I sat in on and

21  I saw him working on functional academics in three different

22  settings.  He worked in functional academics during breakfast

23  time at his residence, No. 22.  He worked in functional

24  academics in his hab class.  And I don't remember the number of

25  the hab class, and then he clearly -- when he was in class, he

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

 1    was handing things, he was doing puzzles, staff were working

 2    with him.  And so even though he functions at a fairly impaired

 3    level, he's another individual that I never saw any downtime for

 4    him.

 5    Q.    And none of these examples were in your report; correct?

 6    A.    I think these examples are in my report.

 7    Q.    Let's look at your deposition for a moment.  Page 169.

 8    A.    Yes.

 9    Q.    At line 10, does that state, Question:  Do you have any

10    examples of specific students learning functional academics?

11         Answer:  No.  But that would be contained in my dictations,

12    and you can find all of the information there.

13         Question:  Well, what I'm just looking for is a basis for

14    your opinions, which should be included in your report.  That's

15    why I wrote, look at your report.  So would there be any

16    examples within the report?

17         Answer:  I don't believe so, no.

18         Is that what that states?

19    A.    That's what that states.

20    Q.    I'd like to move on, talk a bit about time in special

21    education and also habilitation classes.

22         I think that you've testified today that the IDEA requires

23    a child's IEP to address any academic, functional, and

24    developmental needs that results from a child's disability; is

25    that right?

                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1    A.    Not entirely.  That would also be that are not addressed

2    elsewhere.  You have to add that part on, because if it's being

3    addressed elsewhere, it's not necessarily something that has to

4    be addressed in the IEP.

5    Q.    And it would at least need to be documented in the IEP if

6    it was being addressed elsewhere; right?

7    A.    Not necessarily.  That seems to be an area where the law is

8    very vague.  I couldn't find a single reference throughout the

9    entire IDEA document, which is several hundred pages, and what I

10   was specifically looking for was anything that related the

11   notion that an IPP might exist or that a residential facility

12   would have those kinds of functional skills.  And I simply

13   couldn't find a reference.

14   Q.    So you didn't find any reference in the IDEA to IPPs?

15   That's what you said?

16   A.    I'm saying that specifically about how IPPs and IEPs co-

17   documentation should occur.

18   Q.    So would you presume from that search that services for

19   children with disabilities need to be documented in an IEP?

20   A.    Not at all.  I would conclude that part of what would

21   happen in the next revision of the IDEA is that they will

22   address this more satisfactorily.

23   Q.    Actually, I'm asking about the current state of the law.

24   A.    But that's my answer.

25   Q.    So with regard to the current state of the law or the

1    future state of the law?

2    A.    Repeat your question, please.

3    Q.    The IDEA requires a child's IEP to address any functional,

4    academic, or developmental needs that result from a child's

5    disability; right?

6    A.    Not -- I will disagree.  So I'll say no.

7    Q.    Okay.  Now, are you aware that CHDC habilitation

8    instructors have been tasked with teaching functional skills to

9    CHDC students through habilitation classes?

10   A.    Yes.

11   Q.    And CHDC habilitation instructors -- let me start that

12   over.  CHDC habilitation instructors are not certified in

13   special education; correct?

14   A.    Correct.  To my knowledge, yes.

15   Q.    And they are not licensed teachers; correct?

16   A.    Correct.

17   Q.    Nor are habilitation instructors at CHDC under the

18   supervision of special education certified teachers; right?

19   A.    I don't have direct knowledge of that, but I'm going to

20   agree with your statement and say yes.

21   Q.    Because your definition of supervision is that they be in

22   the same room; right?

23   A.    Not necessarily.  That's not really what I said.  It's that

24   they have to be under the instructional control of the teacher.

25   So, for example, in most school districts, you'll have an aide

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    take a child from one building to another, I guarantee you the

2    teacher is not going along and watching.  That would be

3    impractical.  But that aide is still considered to be providing

4    special education services at that point in time.

5    Q.   Let me ask you this:  Do you know if special education

6    certified teachers provide that kind of supervision for the

7    habilitation instructors at Conway?

8    A.   At the point in time that I was there, I don't believe that

9    was happening, no.

10   Q.   And it's your opinion that at the very least, that should

11   be happening; right?

12   A.   No, that's not my opinion.  I think that that was the ADE's

13   opinion that that should be happening.

14   Q.   So you disagree with the ADE on that?

15   A.   I didn't say that I disagree.  You asked whose opinion it

16   was.

17   Q.   Is it your opinion that habilitation classes should be more

18   closely aligned with special education at CHDC?

19   A.   I don't think that I did a sufficiently in-depth analysis

20   of what the habilitation program involves, because that was

21   really a peripheral part of my looking at the FAPE process.  So

22   I would want to do a more thorough examination of what occurs

23   currently, and then my opinion is I could render a more useful

24   answer.

25   Q.   Let's look at your deposition at page 174.


Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

Gale - Cross                                          5697

1   A.   Certainly.

2   Q.   Did you previously testify at line 4 that:  So I

3   formulated --

4        I'm sorry.  I'll wait until you get there.

5   A.   I'm there.

6   Q.   Did you previously testify that:  So I formulated, as one

7   of my recommendations for the facility, that there should be --

8   habilitation classes really should be more closely aligned and

9   there should be communication with special education -- special

10  education services.  I think I put that in my report.  But if I

11  didn't, it was an omission, because I clearly believe that.

12       Is that what that states?

13  A.   Yes, it is what that states.

14  Q.   And at least most CHDC students are in habilitation classes

15  for part of the school day; right?

16  A.   I would have to look at the 24-hour schedules that are

17  available for each student to determine when the students are

18  actually in the habilitation classes to answer your question

19  affirmatively or otherwise that it's part of the school day.  I

20  do know that students attend habilitation classes, but exactly

21  when that's happening, I would have to refresh myself.

22  Q.   So you would agree that most students have some form of

23  habilitation class on their 24-hour schedules?

24  A.   Yes.

25  Q.   And is it also the case that CHDC has acknowledged that

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

Gale - Cross                                        5698

1    subjects that public schools provide in special education

2    classes are provided by CHDC in habilitation classes?

3    A.   And, I'm sorry, you're saying am I aware of that?

4    Q.   Yes.  Has CHDC acknowledged that to you?

5    A.   No, they haven't spoken to me about it.

6    Q.   Do you recall your interview with Kenneth Priest, psych

7    examiner, that he told you that?

8    A.   Not in detail.  I have the transcript if you want me to

9    look at the interview.

10   Q.   Let me do that.  That will be easier for you.  One second.

11   A.   Thank you.

12         MS. COON:  May I approach the witness, your Honor?

13         THE COURT:  You may.

14   BY MS. COON:

15   Q.   I believe it's at page 43.

16   A.   Thank you for numbering them.  That's better than I did.

17         THE COURT:  She has a note.

18   BY MS. COON:

19   Q.   It's not all from memory.

20   A.   So I have two interviews with Kenneth Priest.

21   Q.   I'm going to take you right to where I would like you to

22   look.

23   A.   Okay.

24   Q.   I'd just like you to confirm for me that the dictation of

25   your interview with Kenneth Priest states about two-thirds of

                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

                              Gale - Cross                          5699

1    the way down the page --

2    A.    Yes.

3    Q.    Kenneth:  They don't go to a self-contained classroom like

4    the special ed kids do at public schools and stay in one room

5    for the majority of the day, with a short break to speech once

6    or twice a week, and maybe a trip to the gym, maybe once a day.

7    It's not like that.  They get their academic classes, which we

8    call special ed, but other areas that special ed covers in a

9    public school, we cover in our hab classes.

10        Is that what this states?

11   A.    That's what Mr. Priest states, yes.

12   Q.    And you agree that special education services can only be

13   provided by noncertified individuals if it's under the

14   supervision of a credentialed and certified special education

15   teacher; right?

16   A.    I've seen it both ways.  I know what you're saying should

17   be how it is, but I can think of examples of emergency

18   credentialed teachers, I can think of examples just recently in

19   Little Rock, for example, at Chicot Elementary, where there was

20   no teacher in the room.  So does that mean that the school

21   didn't provide a full day?  I was there in that classroom for 30

22   minutes, and the staff didn't know where the teacher was.

23        So my answer to your question, I don't think that they were

24   necessarily denying FAPE because they didn't have a teacher in

25   the room for 30 minutes.  So I'm going to say that it tends to

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    go both ways in real life.

2    Q.    Let's look at your deposition page 47.

3    A.    My deposition page 47.

4    Q.    Yes, please.

5    A.    Thank you.  Giving me too many papers here.

6          Page 47, line --

7    Q.    If you could just confirm that you previously testified at

8    page 47, line 3, Question:  Let's move on.  Dr. Thibadeau's

9    report.  Are there any other notes on page 2 or later on in the

10   report that you believe have some significance to your

11   evaluation?

12         Answer:  Yes.  And I also want to clarify a misstatement

13   that I just made.  When I answered no, I would qualify that the

14   special education services are typically provided and can be

15   provided by noncertified individuals.  However, it needs to

16   occur under the supervision of a credentialed and certified

17   special education teacher.

18         Is that what that states?

19   A.    That's what that states.  And so my point would be that,

20   yes, it does need to occur, and, yes, it doesn't always happen

21   that way.

22   Q.    I'm just asking about what the requirements are, not what

23   other schools may be doing.

24   A.    Understood.  So, yes, those are the requirements.

25   Q.    Okay.  Thanks.


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1        Now, the 45-minute class periods at Conway, just to

2   confirm, those are 45-minute classes for everyone?  They're not

3   tailored to 45 minutes in an individualized fashion to kids'

4   tolerance levels, are they?

5   A.   Well, actually, I think -- I think that the idea of having

6   45 minutes is to be reasonably individualized.  In other words,

7   a student -- a student who could handle more than 45 minutes

8   won't be penalized because it's 45 minutes, but a student who is

9   incapable of handling, say, a longer period of time would be

10  penalized if they weren't able to make those kinds of changes.

11       So I think that because 53 percent of their kids are much

12  more impaired, that's approaching individualization.  You have

13  only 13 students at the time that I was there who probably would

14  have tolerated -- so 13 out of the 55.  So if you're talking

15  about, in rough math, 42 students out of 55 having the services

16  be appropriate to meet their needs, that's pretty reasonably

17  individualized.

18  Q.   Okay.  I'm going to need you to break that down for me.

19  First of all, can you just confirm that the class periods are

20  all 45 minutes for everybody?

21  A.   No, I can't.  I can only tell you what I observed.

22  Q.   Okay.  So on the master schedule, the increments of time

23  are not 45 minutes?

24  A.   Yes, but that's not your question.

25  Q.   That is my question.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    A.   You asked if I could confirm that the classes are 45

2    minutes.  For me to confirm it, I'd be there with a stopwatch.

3    I would confirm it.  Anything short of that, I couldn't confirm

4    it.

5    Q.   Okay.  Now, you said something about 13 out of 55 students.

6    I'm not sure what you're referring to there.

7    A.   If we look at my report, you'll see that there is a chart

8    on page 7, and in that chart, what I do is, I compare the

9    incidence in the general population of mental retardation to the

10   incidence at CHDC.  And you'll see that the incidence in the

11   general population is 85 percent for mild mental retardation,

12   but only 13 percent of students who have mental retardation are

13   in the mild range at CHDC.  So I misspoke, and I appreciate you

14   correcting me for that.  It shouldn't have been 13 students; it

15   should have been 13 percent.  So, actually, we're only talking

16   about six students, approximately.

17        So about six students would function in the range of mild

18   mental retardation out of 55, based on the data that I reviewed

19   at the time.  So my math is incorrect, and I appreciate the

20   opportunity to make it more correct.

21        If we had 55 students, then we would be talking about 49

22   out of 55 participating in 45-minute classes.  Now, it could be

23   a very easy matter that those students could be further

24   individualized, and maybe they would be in 90-minute blocks or

25   maybe they would be in 75-minute blocks.  I think you make a

1    good point that it should be individualized as much as possible

2    for students.  You probably can't do it for every individual

3    student, but there's something within the literature known as

4    response to intervention which is being used for how you look at

5    the effectiveness of your education, and I think that what

6    you've just implied is a wonderful tier one and tier two

7    approach.  Tier one refers to that idea that you would

8    individualize your program for large groups of students, and

9    then tier two means that you are individualizing for subsets of

10   that.  Tier three is, of course, individualized intervention.

11        So I think that your point about should it be

12   individualized is well-taken, and then it just becomes

13   pragmatics for what is the reality for a school program and what

14   would be necessary to meet a student's needs.

15   Q.   Now, can you explain why you compared level of impairment

16   of CHDC students to level of impairment in the general

17   population?  I don't understand why you're making that

18   comparison.

19   A.   Certainly.  Because it shows that CHDC is the equivalent of

20   an acute care facility, like a hospital, and it's kind of the

21   mental health, developmentally disabled equivalent.  If you were

22   to look at the prevalence of individuals, for example, who were

23   having bypass surgery in the regular population, you would get 1

24   percent, very small.  If you look at the percentage of people

25   getting bypass surgery on a cardiac unit, you would see a very

1   high percentage.  That's what we have here.  You only have 1.5

2   percent or 5 percent of severe and mental retardation in the

3   community.  At CHDC, you've got 53 percent.

4   Q.   Isn't it a requirement of admission to CHDC that students

5   have a level of impairment?

6   A.   That's not what we're talking about.  We're not talking

7   about a level of impairment.  We're talking about the degree of

8   impairment given that they meet criteria for mental retardation.

9   There's a big difference.

10  Q.   And how does level of impairment among the CHDC students

11  compare to the level of impairment among the CHDC population as

12  a whole?

13  A.   I have no idea.

14  Q.   Do you know whether it's been represented that 90 percent

15  of the residents at CHDC have severe or profound disabilities?

16  A.   No, I don't.

17  Q.   That wouldn't be an accurate characterization of the level

18  of disabilities among CHDC students, though, would it?

19  A.   I said that I don't have information about that, so I

20  wouldn't feel comfortable commenting about something that I

21  don't know about.

22  Q.   Okay.  But you'd agree that what you found is, about half

23  of the students have mild or moderate levels of impairment and

24  about half have severe or profound, among the CHDC student

25  population; right?


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1   A.   No, I didn't find that.  You wouldn't normally lump mild

2   and moderate together as half.  Mild is very, very different.

3   Notice that 85 percent of the population has mild.  So the fact

4   that it's only 13 percent at CHDC, that's a big difference.

5   It's upside down.

6   Q.   I'm actually not asking about the significance.  I'm just

7   asking about the numbers.

8   A.   So you're asking me to do math and just repeat back to you

9   that half of them at CHDC have mild or moderate mental

10  retardation and half of them have severe or profound, even

11  though I don't think that's a useful comparison?

12  Q.   Yes.

13  A.   Then you're correct.

14  Q.   Now, to the extent that you talk about students receiving

15  naturalistic or indirect teaching outside the classroom setting,

16  you don't know what credentials or qualifications that any

17  individuals reportedly providing this training would have, do

18  you?

19  A.   Only what I would have learned through either Gail Miller

20  or Calvin Price in my interviews with them.  I did not

21  specifically look at the actual credentials for each individual

22  who works with the students, no.

23  Q.   And you also did not look at attendance records for

24  students in determining how much time they're actually spending

25  in classes; right?


Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    A.    I actually did look at attendance records, but not in any

2    detail.  I kind of looked at them to see, was data being

3    recorded, and data was being recorded, and was there a pattern

4    that looked to me to be an aberrant pattern or something that

5    gave me concern, and I didn't see that.

6    Q.    Did you make any observations as to the extent to which

7    students arrive late or on time for class?

8    A.    Yes, I did.

9    Q.    And did you observe students showing up for class late?

10   A.    Yes.

11   Q.    Now, is it the case that at CHDC, for some students, there

12   are interventions in place where it's part of a child's program

13   where they are told they can't go to school?

14   A.    No, I don't think there are any interventions in place

15   where they're told they can't go to school.

16   Q.    Let's look at the transcription of your interview with

17   psych examiner Kenneth Priest again.

18   A.    Okay.

19   Q.    This time at page 41.

20   A.    Yes.  And I want to thank you for collapsing my dictation,

21   too.  I wish I had done that.  You did a lot of work on this.

22   Q.    Thank you.

23         So if you look on page 41, the seventh line --

24   A.    Yes.

25   Q.    Which is part of your question.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    A.    Read me the first couple words, please.

2    Q.    Oh, sure.  I'll read it on loud.  I just want to confirm

3    that this is the transcription, this is an accurate

4    transcription of your interview, this is what Kenneth Priest

5    told you.

6          Question:  But in the case of school, are there any

7    interventions in place that you're aware of where it's part of a

8    child's program where they are told they can't go to school?

9          Kenneth:  Not in 26 Cedar.  In 27 Cedar, I would say yes.

10         Dr. Gale:  It's helpful that I know the good, the bad, and

11   the in between.  Because if I get surprised, then, in a way, it

12   means that I haven't done a thorough data analysis, and I'm

13   trying to be as thorough as I can.

14         Is that what that states?

15   A.    That's what it states.

16   Q.    Thank you.  Now, you talked a bit about dangerous behavior

17   as being a criteria for the STEP program.  Are you familiar with

18   that program at CHDC?

19   A.    I believe so.  This is the program that Mister -- this is

20   the program that Dr. Thibadeau referenced and that also

21   Mr. Priest and I spoke about, yes.

22   Q.    Okay.  Then --

23   A.    I just want to clarify because it really has been a while

24   since I've looked at that portion.  Are we talking about that

25   program that had to do with reinforcers and levels?

1    Q.    Yes.

2    A.    Thank you.

3    Q.    Are you aware that, well, according to testimony from the

4    defendant's other expert, dangerous behavior is one of four

5    criteria in the STEP program that can result in withholding

6    school?

7    A.    No, I'm not aware of that testimony.

8    Q.    Do you interpret the term in-school suspension to require a

9    student to be alone in a room, like a seclusion room?

10   A.    No.

11   Q.    Now, you found that no CHDC students were taking state-wide

12   or district-wide assessments; right?

13   A.    That's correct.

14   Q.    And I realize that you found some deficiencies with the

15   type of alternative assessment that Arkansas has, but that's not

16   a basis for not doing the assessment; right?

17   A.    I suppose it could be.  I don't think it was the basis in

18   this case.

19   Q.    Now, talking about assessment tools, you said that you

20   don't administer the Brigance; right?  As an educational

21   assessment.

22   A.    Well, to clarify, I'm fully capable of interpreting and I'm

23   fully capable of administering Brigance.  I just don't.

24   Q.    And I didn't mean to suggest that you were not capable of

25   doing it.  I just asked whether you did or did not.

1   A.   Right.  I do not currently give Brigance.

2   Q.   And you felt that at least some of the students at CHDC

3   probably would benefit from using tools other than Brigance;

4   right?

5   A.   Well, I think that they're -- just to give you an example,

6   there's one book by, oh, Dr. Pierangelo, it's entitled 301

7   Diagnostic Tests that meet the criteria -- that's the beginning

8   of it, but these are 301 tests that all meet the criteria for

9   IDEA 2004.  So, yes, there are all kinds.  Now, that's not to

10  say there are 300 academic tests, but there's probably a

11  hundred.  So out of that hundred, Brigance is a fully valid

12  method, and I think there are some other methods that also could

13  be considered.

14  Q.   And, in fact, with regard to CHDC students in particular,

15  you felt that some of the students would benefit from using

16  other tools; right?

17  A.   It was meant in the form of a suggestion.  I didn't have a

18  specific tool in mind, but if you were to come to my office, you

19  would see several thousand dollars worth of tests.  I'm a person

20  who uses quite a large number of tests, and that's not always

21  pragmatic for a school beyond CHDC.  They don't have -- you

22  know, it's one thing for one doctor to decide to be a specialist

23  and to have a number of tools available.  It's another thing --

24  and sometimes it's, frankly, financial.  Many school districts

25  don't have certain tests that I would like to see them have

1   because of the finances involved.  So there's certain pragmatic

2   realities.  But you're right.  Yes, I did suggest that that be

3   reviewed.

4   Q.   CHDC only uses Brigance in terms of developing IEP goals

5   and objectives; right?  Excluding transition goals.

6   A.   Not at all.  That's not even a close characterization of

7   how they do it.

8   Q.   What other formal assessments are you under the impression

9   that they use to develop IEP goals and objectives?

10  A.   Well, I believe in my previous testimony I made it pretty

11  clear that when you're talking about children with significant

12  impairment, formal assessment tools begin to become less useful,

13  and I think I also made it clear that detailed behavioral

14  observation, which is both the cornerstone of functional

15  behavior assessment, which is not a formalized test, and

16  detailed observations by the teachers, which they do, is a very

17  useful way of learning about a student.

18      I think I also testified that just recently, I was working

19  with a seven-and-a-half-year-old child and he functions at about

20  a one-and-a-half-year-old level, and I didn't use formalized

21  tests in my assessment, and yet it's an independent educational

22  evaluation that was accepted by the school district and the

23  parent as being very useful.

24      So your characterization of formalized testing kind of

25  implies more of a general education understanding and less of a

1    special education understanding, especially at the lower levels.

2    Q.   I'm actually asking you what CHDC does specifically, not

3    what you do, not what best practices are.  What I'm asking you

4    is, what other formal assessments does CHDC use in developing

5    IEP goals and objectives?

6    A.   The reason I'm puzzled is, embedded in your question is the

7    implication of the requirement that it be formal, and I'm just

8    puzzled how to respond to that.

9             THE COURT:  Let me -- I think I've got the picture.  I

10   mean, I think they use Brigance as the formal assessment and

11   they use other observations by teachers and other people there

12   as a part of the assessment process.  Is that what your

13   testimony is?

14            THE WITNESS:  Yes, your Honor.

15            THE COURT:  And in terms of formal assessments,

16   Brigance would be the only one, but in terms of the assessment,

17   Brigance is not the only thing they do.  Is that what you're

18   saying?

19            THE WITNESS:  Yes, and they do have some other tests

20   that I suppose you would call formal tests and leisure interest

21   inventories and things like that.  But in terms of documenting

22   for IEP purposes, I would have to say that the formal instrument

23   would be the Brigance.

24            THE COURT:  Okay.  Why don't we take a recess.

25            (Recess from 4:11 p.m. until 4:25 p.m.)


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

 1              THE COURT:  Everyone be seated.

 2   BY MS. COON:

 3   Q.   We left off at a question that I had regarding whether you,

 4   Dr. Gale, have any examples of how CHDC educational assessments

 5   are resulting in appropriate IEP goals and objectives.

 6   A.   That's your question?

 7   Q.   Yes.

 8   A.   Do I have any examples?  I think that, frankly, every IEP I

 9   looked at is an example.

10   Q.   Did you review completed assessments for any particular

11   youth?

12   A.    I reviewed completed assessments -- see, within those I

13   think it was 847 pages, and then there's also, like, another,

14   what is it, 600 pages of IPPs.  So because I had it in

15   electronic form, I was just flipping through them and looking.

16   I mean, I saw plenty of assessments.  I mean, I even have a

17   sample assessment with me of -- that was of a psycho ed, and I

18   happened to glance at it as recently as this morning, and it

19   looked fine.  This happened to be -- you said any assessment, so

20   that would broaden it to cognitive assessments as well.  It was

21   a Wechsler IQ test.

22   Q.   I'm sorry.  I should have said educational assessments.

23   A.   Would you rephrase your question, please?

24   Q.   Do you have any examples how CHDC educational assessments

25   are resulting in appropriate goals and objectives in IEPs?

1   A.   I would say that, yes, I have examples because I have

2   reviewed them, and I can't recall a single case that wouldn't

3   serve as an example.  Do I have an example in front of me that I

4   can pull out in show you?  No, I don't.

5   Q.   And that's because you didn't have any examples in your

6   report, right?

7   A.   No, not at all.  My report, as it states, references the

8   documents that I reviewed.  I believe it would have been --

9   because I saw no deficiencies in that area, it never occurred to

10  me that I would -- in other words, if 1 percent and a hundred

11  percent both are the same, it wouldn't occur to me to just put

12  in examples of something that was true for everyone.

13  Q.   That's fine.  I'm just asking if you have any examples.

14  A.   Okay.  Then no.

15  Q.   And you also did not match up the completed assessments to

16  students' IEP goals and objectives, did you?

17  A.   Which assessments are we talking about?

18  Q.   Educational assessments.  Comparing the educational

19  assessments to IEP goals and objectives for any particular

20  students.

21  A.   Yes, I did.  I did that for many students.  I wouldn't say

22  I did it for all of them, but as I went through, of course, I

23  looked at what the results were of Brigance and what the

24  teachers said, and then I looked at what the goals were, yes.

25  That would be -- that's part of what a record review is.


                    Christa R. Newburg, RDR, CRR, CCR
                     United States Court Reporter

 1   Q.   But you have no examples of that.

 2   A.   Well, when you say examples, are you saying that you'd like

 3   me to take some time and pull something out and --

 4   Q.   No.  I'm asking you if they're in your report.

 5   A.   Are there any examples in my report?  Let me take a look

 6   and see.

 7   Q.   Well, actually, let's just look at your deposition, page

 8   186.

 9   A.   Okay.

10   Q.   Did you previously testify at line 6, Question:  Do you

11   have in your report any examples of how the tests are

12   appropriately resulting in age-appropriate goals and objectives?

13        Answer:  No.

14        Is that what that states?

15   A.   Those are two different questions, and the answer to that

16   question is no.

17   Q.   Okay.  Thank you.

18        Now, moving on to -- well, just to confirm, when you talked

19   to other individuals about use of Brigance, they didn't review

20   any particular CHDC students in regards to the appropriateness

21   of using it; right?

22   A.   Could you repeat your question, please?

23   Q.   Your question to teachers about use of Brigance was about

24   use of Brigance generally?

25   A.   No, it was pretty specific.


                     Christa R. Newburg, RDR, CRR, CCR
                        United States Court Reporter

1    Q.    Did you give them any CHDC educational documents to look

2    at?

3    A.    Yes.

4    Q.    You did?  What CHDC educational documents did you share

5    with individuals that you talked to regarding Brigance?

6    A.    Are we talking about the teachers or other people?

7    Q.    The people that you talked to outside of CHDC.

8    A.    Okay.  So in this case -- and I'm going to go to my report

9    and grab the name of the person.

10   Q.    I'm just asking if you showed them any CHDC educational

11   documents.

12   A.    And the answer again would be yes.

13   Q.    Okay.  Which ones?

14   A.    That's why I'd like to go to my report.  May I?

15   Q.    Sure.

16   A.    Thank you.

17         Okay.  So there's an individual, and her name is Julie

18   Linehan.  She is the Brigance product manager and curriculum

19   associate, and she does in-service training on the use of

20   Brigance.  I redacted the student's name and any identifying

21   information, and I sent her the Brigance to have her confirm

22   whether or not it was being scored properly.  And she confirmed

23   that it was and that it was being filled out properly.

24   Q.    Okay.  So that was in regards to filling it out and scoring

25   it properly?


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    A.    Yes.

2    Q.    I think we can move on.

3          With regard to related services, you testified today about

4    student KH.  Do you recall student KH?

5    A.    Yes, I recall student KH.  78163.  That's her record

6    number.  Correct?

7    Q.    I don't know.

8    A.    You don't know?

9    Q.    No.

10   A.    Okay.

11   Q.    What I would like to ask you about student KH is -- now,

12   you recall finding that she had been restrained repeatedly.  Is

13   that a fair characterization?

14   A.    Not one that I would say, no.  That's your

15   characterization.

16   Q.    Okay.  She'd been restrained nine times in one month.  Is

17   that a fair characterization?

18   A.    Actually, no.  The month I think you're referencing is

19   April 2009, and when I reviewed the data, she had actually been

20   restrained ten times that month.

21   Q.    Okay.  Well, whether she was restrained nine times or ten

22   times, would you expect to see behavioral or psychological

23   services as a related service for this child?

24   A.    Would I expect to see which psychological or behavioral

25   services?

Gale - Cross                                    5717

1   Q.    Any.  As a related service.

2   A.    As a related service.

3   Q.    Yes.

4   A.    Not necessarily.  That would be -- when you're talking

5   about a related service, what you're talking about is on the

6   IEP, that there's been a designation that a certain amount of

7   time needs to be spent to provide for the needs for that child.

8   What I would want to determine was where the restraint occurred.

9   Did it occur at school?  Did it occur in the habilitative

10  environment?  If the restraint is not occurring at school, then,

11  no, that's one of the mandates of IDEA, is that schools really

12  are not required to address the needs that are not present in

13  the school environment.  And so in this case, you can think of

14  the habilitative environment as the equivalent of home and the

15  school environment -- and you raise a good point.  I didn't do a

16  specific analysis to determine of those ten restraints that

17  month -- which represented a reduction, by the way, from 27

18  times per month the previous year, so it already showed that it

19  was getting much better and it lowered then from there -- what

20  you would be looking for is, are the restraint episodes

21  occurring at school or not in school?  That is what you would

22  need to determine to determine whether or not related services

23  are, in fact, necessary.

24  Q.    So it's your testimony that being restrained ten times in

25  one month wouldn't give you any insight into whether behavioral

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    service as a related service would be appropriate?

2    A.    Right.   If they occurred outside the school day, school

3    would not have an obligation to put it on the IEP, correct.

4    Q.    But you didn't see sufficient documentation that

5    psychologists are appropriately training education staff on

6    behavior plans; right?

7    A.    There were a few negatives in your question.   If you could

8    just rephrase it and take a couple of them out, I could figure

9    it out.

10   Q.    Sure.   There was not sufficient documentation that

11   psychologists are appropriately training education staff on

12   behavior plans?

13   A.    I saw documentation that psychologists do in-servicing and

14   I saw signed in-service forms, so I would disagree with that.

15   Q.    So you would disagree that you previously testified the

16   level of in-servicing by the psychologists for behavior plans is

17   something that you think should be better documented?

18   A.    I wouldn't disagree with that because I don't have a

19   recollection at the moment, but if you could please point me to

20   that part of my previous testimony, then I could more properly

21   evaluate and give you a better answer.

22   Q.    Sure.   If you look at your deposition, page 97.

23   A.    Thank you very much.

24   Q.    Sure.

25   A.    Thank you.

1    Q.    And did you previously testify at lines 6 through 8 of page

2    97:  The level of in-servicing by the psychologist for behavior

3    plans is something that I think could be better documented?

4    A.    On line -- I'm sorry.

5    Q.    Lines 6 through 8.

6    A.    Yes.  I mean, again, when you talk about continuous quality

7    improvement --

8    Q.    I'm just asking if that's what you testified to before?

9    A.    Oh, in other words, was that my previous testimony?

10   Q.    Yes.

11   A.    Yes, that's a portion of it.

12   Q.    Okay.  And with regard to the psychologist in-servicing,

13   psych examiner Kenneth Priest told you that in the old days, the

14   psych examiners would schedule in-service sessions, but now they

15   can't get everyone to come together, so they use videos instead;

16   right?

17   A.    I don't know.  Are you pointing me to a specific part of my

18   testimony?

19   Q.    I could, if you don't recall that.

20   A.    I don't recall that.

21   Q.    If you look at Exhibit BG-1, at page 53.

22   A.    I'm sorry.  I don't have that in front of me.

23   Q.    It's your dictations.

24   A.    Oh, thank you.  So what page, please?

25   Q.    53.

1    A.    Thank you.

2    Q.    And if I could direct your attention to the third bullet

3    point from the bottom.

4    A.    Okay.  I see it.

5    Q.    Does that indicate that what I just stated is what he told

6    you?

7    A.    Can you please repeat what you just stated?

8    Q.    Kenneth Priest stated that in the old days, he would

9    schedule seven in-service sessions for all staff, but now he

10   can't get everyone to come together, so he uses video

11   in-services with a test to make sure they pay attention to the

12   video.

13         That's what he stated to you?

14   A.    Yes.  That's what he stated to me.  You're referring to --

15   excuse me.

16   Q.    I'm sorry?

17   A.    I just wanted to clarify.  So the "he" in here is Kenneth

18   Priest referring to someone else and what that person does?  Is

19   that what the point of this was?

20   Q.    Well, this is the interview, it looks like, with Kenneth

21   Priest.

22   A.    Actually, this is not the interview with Kevin Priest, no.

23   This is my summary of the interview with Kevin Priest.

24   Q.    Okay.  Thanks for that correction.

25   A.    Well, because there is a 15-page interview that we could

1   refer to that would actually refer to what he said, so is my

2   summary -- I mean, it may be that that's perfectly accurate, but

3   it may be that I summarized it and there are slight inaccuracies

4   or it's paraphrasing.  I would reference the original interview

5   to determine that.

6   Q.   Do you think you need to do that?

7   A.   I'm not saying I think it or I didn't.  You're asking me to

8   confirm that a summary of what occurred is the same as the

9   original of what occurred, and I'm simply saying I can't do

10  that.

11  Q.   Okay.  Well, thanks for that clarification.

12  A.   You're welcome.

13  Q.   Now, you also didn't do an analysis of how teachers manage

14  behavior and the extent to which they're implementing behavior

15  support plans generated by psychology; right?

16  A.   I would disagree with that.

17  Q.   Let's look at your deposition at page 98.

18  A.   Okay.

19  Q.   Starting at line 2.

20  A.   Yes.

21  Q.   Does that state, Question:  Did you do any analysis of how

22  teachers manage behavior and the extent to which they're

23  implementing behavior support plans generated by psychology?

24       Answer:  No.

25       Is that what that states?


Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

                          Gale - Cross                          5722

1    A.    That's what that states.

2    Q.    I'd like to show you Exhibit 1199, if I could.

3    A.    Of course.

4    Q.    Actually, before I ask you any questions about this

5    exhibit, does CHDC have any school psychologists on staff?

6    A.    To my knowledge, the psychologists are not certified as

7    school psychologists, no.

8    Q.    So it would be the psych examiners who are charged with

9    educational testing and assessments?  Is that your

10   understanding?

11   A.    Yes, that's my understanding.

12   Q.    Have you seen what's been marked as 1199?

13   A.    I'm looking at it in front of me, yes.

14   Q.    Have you seen it before?

15   A.    This particular one, no, I don't recall seeing it before.

16   Q.    Let me give you a minute to look at it then.

17   A.    Thank you.

18         And PD session refers to?

19   Q.    I would presume professional development.  Would that be

20   your understanding?

21   A.    I don't have an understanding of it.  I'm just asking you

22   what it refers to.

23   Q.    Well, I think maybe if you read the e-mail, you might get

24   the context from the e-mail.

25   A.    Okay.  So we don't know what PD session means?


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1    Q.    Why don't you read the whole e-mail and see if you can

2    figure out the context.

3    A.    (Document review.)  Okay.  I see the e-mail.

4    Q.    So this e-mail appears to be an e-mail from Loretta Wallace

5    of the Arkansas Department of Education to Marcia Harding of the

6    Arkansas Department of Education; is that right?

7    A.    That's what it says, yes.

8    Q.    And this e-mail states:  Hello.  I wanted to provide you

9    with feedback from yesterday's PD session at CHDC.  Overall, it

10   was well-received by the supervisors; however, there was a great

11   deal of frustration shown by the LPEs on staff.  Based on my

12   impressions, there continues to be misunderstanding and/or lack

13   of knowledge related to the requirements of IDEA and its

14   implications in the education program.  It appears that they are

15   operating only from the procedural requirements as defined by

16   the Office of Long-Term Care as well as Medicare/Medicaid.  The

17   process of change that will have to occur as they begin to

18   implement their compliance action plan will be challenging, in

19   the least.

20        So you haven't seen this document before?

21   A.    No.

22   Q.    And would you agree that this indicates an issue involving

23   more than just documentation?

24   A.    Well, really, both ways, yes, because I've seen other

25   e-mails from this person, Loretta Wallace, and the facility

1   asked her to recommend a behavioral instrument.  She recommended

2   one that is 50 years old called the Devereux Behavior Rating

3   Scales, and I was very surprised to see that, because it

4   highlights for me a disconnect between the Arkansas Department

5   of Education and what the requirements are of CHDC.  So I

6   appreciate that you've brought this forward because to me it

7   goes both ways.

8          CHDC, I agree, can use more in-service training in

9   understanding the provisions of IDEA, and similarly, the ADE

10  requires significantly more in-service training to understand

11  the unique needs of CHDC.  So I think that you've done a real

12  service here in terms of those children.

13  Q.   Well, thank you.  And don't you also agree that there could

14  be greater integration between psychology and education at CHDC?

15  A.   You know, that's an interesting question.  I think for

16  every school district, including CHDC, there can always be

17  greater integration.  There are some school districts that have

18  a caseload of 150 students to one --

19  Q.   I'm only asking as to CHDC.

20  A.   But we have to look at it in the context of what's out

21  there in the community to be able to let me answer that.  We

22  can't just look at it in isolation.  That wouldn't be fair.  So

23  what I was saying is that you have school psychologists that

24  have caseloads of 150, 200, 400 students for one individual.

25  Here at CHDC, we have a caseload of several individuals for a

1    total of 500; right?  550?  So could there be greater

2    integration?  Yes, there could always be greater integration.

3    Does there need to be greater integration?  I don't know.  My

4    instinct is that there are certain select areas that could be

5    fine-tuned, but I have a feeling from what I've reviewed in

6    total that you actually have a system that's working quite well.

7    Q.   So you can't figure out why you may have recommended that

8    there be greater integration between psychology and education at

9    CHDC?

10   A.   I think I just answered that.

11   Q.   Now, with regard to caseloads, doesn't the caseload -- or

12   isn't the caseload irrelevant if the individuals charged with

13   implementing the IDEA don't even know they're responsible for

14   IDEA compliance?

15   A.   You're asking me if the caseload is irrelevant?

16   Q.   Right, in terms of the caseload of psych examiners or

17   psychologists to students.

18   A.   I don't think the caseload is irrelevant at all.  If you

19   have a psych examiner who only treated adults, for example,

20   their needs for understanding IDEA would be significantly less

21   than psych examiners who treated students.  So I think caseload

22   is very relevant.

23   Q.   Would you agree at least that individuals who are charged

24   with complying with the IDEA can't be doing so if they don't

25   know they're responsible for doing so?


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

Gale - Cross                                    5726

1   A.   But that's not the case.  I think that the psych examiners

2   who I spoke with are fully aware that they are part of the IDEA

3   process.  What we have here is that they may not fully

4   understand all of the components, and that's understandable

5   because the components of IDEA and how that fits with the unique

6   needs of CHDC are not as well matched as it would be for a

7   different kind of facility, particularly a public school.

8   Q.   But you would agree this e-mail indicates that psych

9   examiners at CHDC do not even realize they're supposed to be

10  implementing the IDEA; right?

11  A.   I wouldn't make any comment on this e-mail.  I didn't write

12  it, I haven't looked at it until today.  We don't know what PD

13  session means.  So I have no comment on this e-mail.

14  Q.   Okay.  Now, regarding functional behavior assessments, you

15  did not do any review of whether a functional behavior

16  assessment should have been conducted but was not conducted;

17  right?

18  A.   That is incorrect.

19  Q.   Let's look at your deposition at page 100.

20  A.   And, I'm sorry, could you repeat what you said, please?

21  Q.   Sure.  You did not do --

22  A.   Just the page.

23  Q.   Oh, sure.  Page 100.

24  A.   Thank you.  Okay.  I'm sorry.  Take your time.

25  Q.   So you previously testified --

1    A.    Line number, please?

2    Q.    Page 100, line 21, Question:  Did you do any review of

3    whether a functional behavioral assessment should have been

4    conducted but was not conducted?

5          Answer:  No.

6          That's what that states?

7    A.    I'm so sorry.  Tell me again line number.  I didn't catch

8    it.

9    Q.    21 through 24.

10   A.    Thank you.  Should have been conducted but was not

11   conducted.  No.

12         And I would say that's correct.  I didn't do -- it's tough

13   because I looked at the records and I saw functional behavior

14   assessments where I thought they should be, but in looking at

15   the question, did I review, in other words, was there a problem

16   such as self-injury or restraint or something like that and a

17   behavioral assessment had never been conducted?  No, I didn't do

18   a systematic review of that.

19   Q.    But you were told by a CHDC psych examiner that the trigger

20   for attempting a functional behavior assessment is if an

21   individual is chronically restrained, such as three times in six

22   months; right?

23   A.    Yes, that does sound familiar.

24   Q.    Now, you didn't try to evaluate whether restraint data

25   produced by the facility was accurate; right?

Gale - Cross                                              5728

1    A.    Actually, I did try.  I looked at some of the original

2    records, and I matched them up and I did some sampling.  So I

3    did try to make certain that it was accurate.  Now, to fully

4    confirm if it was accurate, I mean, you know, it gets a little

5    ridiculous, but I'd have to be standing there as the person

6    filled it out, I'd have to follow along to see how it wound up

7    and where it wound up.  And, in fact, in my assessment, to the

8    extent that I could, and you mentioned KH as an example, I tried

9    to follow select students through as many different parts of

10   their day, and I've tried to follow the paperwork trail on

11   several students.  I could name about nine or ten of them, to

12   see if, in fact, things were being done appropriately.

13        Now, what I can tell you is, in all of the instances where

14   I did that, I did see the paper trail wind up where it should.

15   So it's a partial answer.  Did I fully verify that the data was

16   accurate?  No.  I don't see any way that I could have.

17   Q.    Is that an evaluation that you did subsequent to producing

18   your report?

19   A.    No.

20   Q.    Let's look at your deposition at page 152.

21   A.    Okay.

22   Q.    Starting at line 24 of page 152.

23   A.    Okay.

24   Q.    Did you previously testify, Question:  Did you do any

25   evaluation of whether the restraint data at Conway is accurate?


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

Gale - Cross                                                    5729

1        Answer:  I have no reason to think that it's not accurate.

2   I didn't detect any sense from anywhere -- I mean, the other

3   thing -- and, you know, I've spent some time in southern states.

4   I went to school in Tallahassee.  I worked in rural Georgia.  I

5   used to go to Louisiana pretty frequently.  The staff I met at

6   Arkansas were pretty straight players.  There's a strong

7   Christian ethic there.  It's a Bible Belt.  They are going to

8   follow the golden rule.  And they're kind of -- that's part of

9   their culture, is that if they see something -- and the example

10  I gave with LW, I mean, a teacher almost got fired.

11       Is that your previous testimony?

12  A.   Boy, I got pretty far off track, didn't I?  And also,

13  unfortunately, there's an error.  I never said the word "sense,"

14  and I would probably have that noted in my errata sheet.  So

15  what you're reading is unfortunately, and it's not your fault,

16  but an inaccurate characterization, but the gist of it is

17  accurate, but there are certain select words that are not what I

18  said.  But --

19  Q.   And when you were on site at CHDC, you saw a student, KC,

20  being put into a mitten jacket; right?

21  A.   I'm sorry?

22  Q.   When you were on site at CHDC, do you recall seeing student

23  KC being put into a mitten jacket?

24  A.   I don't recall a specific recollection of that.  I'd want

25  to confirm and verify where you're pointing to to make certain

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    of the circumstances and the exact student involved.

2    Q.    Sure.  If you'll look at your dictations at page 34.

3    A.    I'm sorry.  What page?

4    Q.    34.

5    A.    Of my report?

6    Q.    No, I'm sorry.  Your dictations.

7    A.    Thank you.  We've got a few different documents floating

8    around here.

9    Q.    And I would direct your attention to the bottom --

10   A.    Bear with me just one second.  I have misplaced something.

11   Here we go.  Did you say page 34?

12   Q.    Yes.

13   A.    Thank you.

14   Q.    If you could just confirm that starting at the last

15   paragraph of page 34, your dictations include KC, 32 Poplar,

16   5:45 p.m. on the 10th:  K got upset.  She wanted to go home.

17   Tried to tell her that her dad would call when he wanted to come

18   and take her home.  She started biting her right hand and

19   kicking staff.  She also attempted to kick Stacey Meredith.

20   They had to put K in her mitten jacket to keep her from biting

21   her hand.  And she was placed in the mitten jacket from 6 p.m.

22   to 7 p.m. after block and redirection counseling was

23   ineffective.  She was placed in the mitten jacket from 6:10 to 7

24   p.m.

25         Is that what that states?


                    Christa R. Newburg, RDR, CRR, CCR
                    United States Court Reporter

1   A.    Yes, that's what the record stated.

2   Q.    Okay.  And did you also have --

3   A.    But just to clarify it, I'm reading.  You're asking if I

4   saw something, I thought.

5   Q.    And from what I understand, your dictations are a

6   memorialization of what you saw; is that correct?

7   A.    No.  If you look at the top, this is a nurses station

8   record.  And that's why it appears in quotes.

9   Q.    Okay.  So you didn't actually see that.

10  A.    No, I didn't see it.  This is something that I'm -- I mean,

11  let me just clarify here.

12  Q.    Okay.  So to clarify this is something that occurred while

13  you were on site that week, but not necessarily something you

14  saw.

15  A.    I do apologize.  I need you to speak a little more slowly

16  now.

17  Q.    Sure.  Just to clarify, this is something that occurred

18  during the week that you were on site, not necessarily something

19  that you personally observed.

20  A.    Give me a moment, please, because there's quite a few

21  records here.  Please let me figure out the context of this,

22  because you're asking me an important question, but you're not

23  giving me enough information for me to properly answer it.

24  Q.    Sure.  Take your time.

25  A.    Thank you.

1          (Document review.)

2          The problem with this dictation, and it's not your fault --

3     and it is the correct sequential number.  We have dictation

4     7701, and this is dictation 7702.  It did occur on the morning

5     of the 11th at 9:50 in the morning.  It occurred right after I

6     had just observed several classrooms, but what I don't know,

7     and, you know, it's my dictation so we'll say it's my fault, but

8     I didn't use it for anything.  I simply don't know where this

9     came from.  I don't know why I have quotes.  I'm guessing that I

10    was reading from something, but I didn't indicate what I was

11    reading from, so I have -- unfortunately, without further

12    information, I'm unable to confirm for you where this

13    information in my dictation came from, and I apologize for that.

14    Q.    Okay.  But it's in your dictations; right?

15    A.    Yes.  It's in my dictations.

16    Q.    And your dictations also tell you that another student

17    named RC told you that CHDC --

18    A.    Can you tell me where we're referring to so I may follow

19    along?

20    Q.    Sure.

21    A.    Thank you.

22    Q.    Let's go now to page 90.

23    A.    So from 34 to 90?

24    Q.    Yes.

25    A.    Thank you.

Gale - Cross                                          5733

1    Q.   And I'm looking at the top half of this page, which

2    indicates that it's an interview with RC.

3    A.   Okay.   I remember RC quite well.   So go ahead, please.

4    Q.   Okay.   And did she tell you, according to your dictation,

5    about two-thirds of the way down:   They have used restraints on

6    her as punishment when she is bad.

7         Is that what she told you?

8    A.   That's what she told me, yes.

9    Q.   Now, regarding restraint data, from restraint data, you

10   concluded that some have gotten better, some have gotten worse,

11   and some have stayed the same; is that right?

12   A.   I'm sorry.   I was looking at an unfortunate

13   mischaracterization, because there was a sentence after the one

14   you read, so I was distracted by the next sentence where she

15   said something different.   So please repeat your question.   My

16   apologies.   Could you please repeat the question?

17   Q.   Are you referring to where she states, "This is not a bad

18   punishment"?

19   A.    Well, I mean, it's more than that.   I remember RC quite

20   well.   She is the one who sang into my tape-recorder and then at

21   a later date wanted to again sing in my tape-recorder.   She --

22   you know, the essence of it was that she commented that, yes,

23   she absolutely characterized it as punishment when she is bad.

24   She said that it's something that's not a big deal.   She said

25   that it's something that doesn't upset her.   And, actually, what

1   bothered me about it, not anything related to CHDC, but she just

2   kind of implied it's not a big deal.  And I would like when

3   restraint occurs, I would like it to be a big deal for a

4   student.  It should be a big deal.

5   Q.   Does that suggest it's done a lot then?

6   A.   It's not a matter of a lot.  It more goes to her

7   developmental disability and emotional difficulty.  You might

8   remember in my earlier testimony, she is the child who could

9   barely do any math.  So she has some nice verbal skills.  Her

10  mental retardation probably, I'm guessing, is about at a

11  moderate level.  I don't remember specifically.  But the point

12  is that she mentions that staff are pretty nice to her, that

13  they're not hurting her, and what I wouldn't want you to take

14  away from this is that staff are calling it punishment.  She

15  was -- you know, she sang me a Christian song.  That's what she

16  sang into the tape-recorder.

17  Q.   I'm just asking what she told you.

18  A.   It's more than what she told me, though.  We have to go to

19  her state of mind when she told me.

20  Q.   All I'm asking is what she told you.  You can talk about

21  more on redirect.  All I'm asking is what she told you.  And she

22  also told you that she has to agree not to do it again before

23  being taken off the board; right?

24  A.   Well, and that would be appropriate, yes.

25  Q.   That's appropriate.

1    A.    Absolutely.

2    Q.    Okay.  With regard to restraint data, that's what I'd like

3    to talk about next for a moment.  Do you recall previously

4    testifying with regard to restraint data that you found some get

5    better, some get worse, and some stayed the same?

6    A.    I said that today?

7    Q.    Actually, in your prior testimony.  Do you recall that?

8    A.    No.

9    Q.    Well, let's look at your deposition.

10   A.    Thank you.

11   Q.    At page --

12   A.    Page number?

13   Q.    211, the bottom of the page.  Continuing to the top of page

14   212.  Now, did you previously testify starting at the bottom of

15   page 211, Question:  Then we get to your restraint data on page

16   21.

17        Answer:  Yes.

18        Question:  Which we talked about already.  Did you do any

19   kind of analysis like this for anyone else?

20        Answer:  I actually went through everyone.  And I just kind

21   of -- as you can tell from the spreadsheet that you looked at, I

22   set up a series of algorithms and formulas that would allow you

23   to just click up and down, and you can get a graph like this

24   produced for every single child.

25        Question:  Did you draw any conclusions based on that?

1       Answer:  Yeah.  Some get better, some get worse, and some

2  stay the same.

3       That was your testimony, right?

4  A.   Yes, it was.

5  Q.   Now, today you showed -- or you talked about one student,

6  TC, who I believe you testified had reduced restraints.  Is that

7  a fair representation?

8  A.   Yes.

9  Q.   So if he has reduced restraints and he is stabilized,

10  shouldn't CHDC be looking to recommend possible less-restrictive

11  environments?

12  A.   I never said what you just said.

13  Q.   I'm asking you theoretically.

14  A.   Oh, a theoretical question.

15  Q.   Yes.

16  A.   If he were a student who were stabilized, then, yes, it

17  would be important to look at looking at less-restrictive

18  environments.  And by stabilized, we're going to say regression

19  to the mean.  So if he were normal, if he had a normal IQ, if

20  everything about him was normal, it would be a slam dunk, no

21  question.  Anything short of that, the answer is a maybe.  You

22  would have to look at his unique characteristics, you'd have to

23  look at the effect of possible environmental change, you'd have

24  to look at where he came and what was tried previously, and then

25  you would make an informed decision about that.


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1          But I think your general -- it would be incomplete to say

2     that because restraints are reduced, therefore, he should be

3     transferred.

4     Q.   Oh, no, I didn't say that.

5     A.   I understand.  And so if he were improved in his behavior

6     to the point that we could say it's normal, then without me

7     looking at anything else, I'll agree with you.  If his behavior

8     is anything short of normal, I'd want to look at the data.

9     Q.   So you would disagree that dramatic reduction in restraints

10    should trigger an examination of possible less restrictive

11    environments?

12    A.   I wouldn't disagree or agree.  I'd say I want to see the

13    data, and then I would make an informed decision.  We're not

14    just talking about restraint data.  I'd want to see how he's

15    doing in -- I'd want to see how he's sleeping and all kinds of

16    things.  That's too isolated to just pick restraint data and say

17    that's one thing that's going to determine placement change.

18    That would be -- at least I would never do that.

19    Q.   So you would disagree that stabilization of an individual

20    should trigger examination of possible less restrictive

21    environments?

22    A.   That's my problem.  You're using reduction -- this was my

23    point.  You're using reduction of restraint and stabilization as

24    being interchangeable concepts.  They are not.  They may or may

25    not be, but the information you're presenting me with is

1    inadequate for me to form an opinion.

2    Q.    Okay.  Now, moving on to speech and language therapy and

3    communication services, you recommended that CHDC use more of an

4    integrated or consultative model of speech and language therapy

5    services; right?

6    A.    No, I did not at all.  I suggested that that's something

7    that should be looked at, but I never made that suggestion that

8    that should occur.

9    Q.    So you think they should consider it?

10   A.    Yes, I think they should consider it.

11   Q.    Now, you said that you interviewed a Ms. Eubanks; is that

12   right?

13   A.    Correct.  Lillie Eubanks.

14   Q.    And correct me if I'm wrong, but she provides direct speech

15   therapy to 11 school-aged kids?

16   A.    Oh, I don't remember.

17   Q.    Let's look at your dictations.  That might help refresh

18   your memory.

19   A.    Thank you.

20   Q.    Page 90 of your dictations.

21   A.    You said page 90?

22   Q.    Yes.

23   A.    Thank you.

24   Q.    And the interview dictations continue on to page 91 as

25   well.

1  A.    Actually -- just one moment.  The interview starts on page

2  90, and, actually, it ends on page 97.

3  Q.    You're right.  It's long.

4        So let me know when you're on page 90.

5  A.    I'm on page 90.

6  Q.    Okay.  So Ms. Eubanks told you a number of things,

7  including that she stays informed as to special education

8  regulations through Ms. Hill, Ms. Esther, and Ms. Buck; is that

9  right?

10 A.    That's what she stated at that point in the interview, yes.

11 Q.    Do you also recall her indicating to you that

12 communications strategies are not built into students' overall

13 service plans to try to decrease the need for them to go into

14 restraints?

15 A.    I apologize.  Say that -- please repeat your question.

16 Q.    Sure.  She indicated to you that communications strategies

17 are not built into students' overall service plans to try to

18 decrease the need for them to go into restraints?

19 A.    Well, that's -- I don't have any recollection of that.  Is

20 there something -- but I understand the intent of your question.

21 There clearly is something in the literature, a relationship

22 between that the better students can communicate, the fewer

23 behavior problems they generally will have, and my guess is that

24 that's where you're headed on this.  And so, I mean, I do

25 support that notion, of course.


                          Christa R. Newburg, RDR, CRR, CCR
                            United States Court Reporter

Gale - Cross                                               5740

1    Q.    Are you referring to functional communication training?

2    A.    Well, Mark Durand's functional communication training

3    approach would simply be one concrete application.  And let me

4    just take a moment, since you mentioned it, to describe what

5    functional communication training is.

6          Mark Durand, when he was at the University of New York

7    Stony Brook as part of his doctoral dissertation, he put

8    together a series of interventions, specifically, primarily for

9    people with autism, but I think it is useful to a certain degree

10   for people with mental retardation easily down to a level of

11   moderate and then with limited success for severe and profound.

12         What Dr. Durand, who is now in Florida, put together is the

13   following:  When you have a student who hits themselves, it's

14   generally based on a motivation of behavior.  And what he's

15   doing, which Dr. Thibadeau correctly referenced, is, he's

16   building upon Dr. Ted Carr's research on motivational behavior.

17   That was a paper back in, like, 1980, where you have four

18   reasons why kids will engage in these aggressive and

19   self-injurious behaviors.  The main four reasons are, they do it

20   for social attention, they do it for tangible attention -- not

21   tangible attention.  They do it for tangible, like, they want a

22   cookie, so they hit themselves.  They do it to escape what is a

23   behavior.  So you tell them they have to go to school, they

24   don't like school, they start hitting themselves.  It's an

25   avoidance technique.  And then, finally, that they do it for the

Gale - Cross                                          5741

1    sensory consequences that it produces.

2         So what Dr. Durand did, he developed two things.  He

3    developed, as you're correctly referring to, functional

4    communication training, and he also developed something called

5    the Motivational Assessment Scale, which is a 16-question test

6    that is filled out and is used at CHDC, by the way, to be able

7    to look at the motivation of behavior for why students engage in

8    severe problems.

9    Q.   I'm not sure what you're referring to.

10   A.   I'm referring to your use of the term "functional

11   communication training," and I'm --

12   Q.   I mean at CHDC.

13   A.   Oh, the Motivational Assessment Scale?  I saw records where

14   it was indicated that it was used.  I couldn't point to one

15   specifically, but there are references to it.

16   Q.   In the psychology department?

17   A.   I don't remember where.  I just remember seeing it.

18        So in any case, functional communication training is where

19   you teach a child an alternate behavior.  They raise their hand,

20   they make a sound, they do an anything and they get the very

21   same consequence they would have gotten if they had gone ahead

22   and hit themselves.  So if you have a child who would normally

23   hit themselves when you say, time for school, you shape up, and

24   you teach them to raise their hand in the air, and the minute

25   they raise their hand in the air, they don't have to go to

1   school.  And that would be in place of them biting themselves as

2   a form of protest.  Then what you do, obviously, on top of that

3   is, you then try and shape and figure out why school was

4   aversive in the first place.

5        But now what you've done, you've reduced the level of self-

6   injury by teaching the child an alternate response that produces

7   the same consequence as the original interfering behavior would

8   have done.

9        So now, with that, and I apologize, but I don't think

10  people would have known what functional communication training

11  was if you hadn't allowed me to clarify.

12  Q.   Looks like you explained it to Ms. Eubanks of the speech

13  department, and she told you she was not familiar with it;

14  right?

15  A.   I don't know.  Is there a place where we're -- I don't have

16  a recollection of that.

17  Q.   Let me go ahead and read your dictation at the bottom of

18  page 93, starting with, Dr. Gale, and then in brackets,

19  functional communication training:  What can you tell me about

20  what I'm describing?

21       Ms. Eubanks:  I'm not familiar with that.  Our clients have

22  behavior strategies that we all know about and we're well-

23  trained in those strategies, to recognize when a client needs

24  time out or is having trouble expressing themselves.  As far as

25  having another alternate gesture, huh-uh.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1   A.   She doesn't say that.  You're misreading it.

2   Q.   Is that --

3   A.   I don't know what that means.  It says h-u-h u-h.  I'm not

4   going to try and interpret --

5   Q.   Well, let's just keep going then.

6        Dr. Gale:  That would be a collaborative effort between

7   three disciplines, speech, psychology, education, home.  How are

8   communication strategies looked at and built into the client's

9   overall service plan to try and decrease the need for them going

10  into restraints?

11       Ms. Eubanks:  We have a classroom.  I am not the person to

12  specifically give you expert testimony on -- but the individuals

13  over there, it's a Monday through Friday classroom and lots of

14  relaxing leisure activities.

15       Dr. Gale:  School age?

16       Ms. Eubanks:  No.  Sorry.

17       Dr. Gale:  How are communication deficits, as they pertain

18  to then increased behaviors, how is that looked at, from your

19  understanding?

20       Ms. Eubanks:  I don't know.  Typically behavior, unless

21  we're consulted, we don't deal with the behavior component.  We

22  do in therapy, of course, in knowing what we're supposed to do.

23       Dr. Gale:  I have not spoken to a lot of psych examiners

24  yet, but maybe the level of collaboration between psych and

25  speech could be better than it is.

1        Is that what this states?

2   A.    You've read it accurately, yes.

3   Q.    Now, you didn't do any systematic inquiry to see whether

4   students who are supposed to have augmentative communication

5   devices had access to them and were using them; right?

6   A.    Define systematic inquiry, please.

7   Q.    Did you take the list of students who are supposed to have

8   augmentative communication devices and see if they were using

9   them?

10  A.    Yes.

11  Q.    And for which students?

12  A.    I don't recollect at the moment.

13  Q.    So that would be in your report?

14  A.    I'm sorry.  A little too quick for me.  You asked if I

15  looked at a list.  I went -- I did it, I'm going to say, in the

16  reverse.  What I did is, every single time I saw a student, I

17  noted whether or not they had an AAC device when they had one.

18  So, for example, LW had one.  The student who had it under his

19  arm whose name was not on the outside, whose name I can't

20  remember.

21  Q.    Right.  But what I want to see is actually something

22  different.

23  A.    Well, no, you're not.

24  Q.    Actually, I am.  I'm asking whether you looked at a list of

25  people who were supposed to have them and then look to see if

1    they actually did.

2    A.    May I finish my answer, please?

3    Q.    Sure.

4    A.    Thank you.  So what I did is, I looked to see which

5    students had an AAC device under their arm as I described.  Then

6    I contacted Cynthia Johnson after I came back and I asked her to

7    send me a list of the students who had AAC devices.  So what I'm

8    saying is that the order in which I did it is the reverse of

9    what you're implying, but the process is identical.  I looked

10   for the students, and then I got the list afterwards.

11   Q.    And you have no particular examples with regard to that

12   inquiry?

13   A.    I mean, I'd have to look at the list and I'd have to look

14   at my notes, and then, of course, I could give you very detailed

15   answers.

16   Q.    That's not in your report?

17   A.    I'd have to look at my report to see, but I don't recall at

18   the moment whether it's in my report or not.

19   Q.    Well, let's look at your deposition then.

20   A.    Okay.

21   Q.    Page 218.  Starting with line 21.

22   A.    One second.  Wrong booklet.  Page 218?

23   Q.    Yes.

24   A.    Thank you.  And line?

25   Q.    21.  Did you previously testify, Question:  Did you do any

1  systemic inquiry to see whether the students on the list were

2  using the devices that they were supposed to be using?

3       Answer:  No.

4       Is that what you testified to?

5  A.   And that's correct.  I did the opposite of that.  I looked

6  at the students who had communicative devices, and then I looked

7  to see if they were on the list.  But I didn't do what you

8  asked.

9  Q.   So what you previously testified to is still the case.

10 A.   Yes.  I didn't first look at a list and then see if they

11 were supposed to be using it.

12 Q.   Actually, I think the question did not say first.  It said

13 did you do any.  Right?

14 A.   No.  It's very clear:  Did you do any systematic inquiry to

15 see whether the students on the list were using the device that

16 they were supposed to be using?  The answer is no.

17            THE COURT:  I think I've got the facts on this.  I

18 know what happened.

19            MS. COON:  Great.

20            THE COURT:  Move on, please.

21 BY MS. COON:

22 Q.   Moving on to IEPs.  You stated that most IEPs were reviewed

23 informally; right?

24 A.   I don't know.  Where did I say that, please?

25 Q.   On top of page 34 of your report.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

Gale - Cross                                    5747

1   A.   Yeah.  Without looking, I would agree with that.  I was --

2   I only did a systematic review of a subset of the IEPs.

3   Q.   And your opinion is that, by and large, they were filled

4   out correctly; right?

5   A.   Once again, are we referencing somewhere?

6   Q.   Well, I'm asking what your opinion is, and if you don't

7   agree with that characterization, I can show you something.

8   A.   Well, you know, there's places where, like, there was a

9   missing check mark.  There are errors in the IEPs.  What we're

10  talking about, I think, is, are there substantive errors?  Are

11  there errors that go to a lack of a provision of service?  Are

12  there errors that go to documentation not being properly

13  available?

14       So it's kind of mixed for me.  Are there errors?  Yes,

15  there's errors.  Are the errors significant errors?  Not from

16  what I saw.  There might be a couple.  For example, if they

17  didn't indicate -- and I'm not saying they did this, but let's

18  say that they left off whether or not an LEA representative was

19  invited and they didn't say yes or no.  I would consider that to

20  be a significant error.  It's correctable, not a big deal.  I've

21  seen it in other places.  But it would be a more significant

22  error than other missing check boxes and things like that.

23  Q.   And you found that goal writing appears to be the biggest

24  problem, along with the lack of specificity for why students

25  have shortened days; right?


                  Christa R. Newburg, RDR, CRR, CCR
                     United States Court Reporter

Gale - Cross                                    5748

 1    A.    Where are we referencing, please?

 2    Q.    Last paragraph on page 34 of your report.

 3    A.    Thank you.  Let me look at that for a moment.

 4          Okay.  So ask me your question again, please.

 5    Q.    You found that goal writing appears to be the biggest

 6    problem, along with a lack of specificity of why students have

 7    shortened days.

 8    A.    Given the context that we're talking about the rubric of

 9    the 14 IEPs that I reviewed systematically, and within that data

10    that I collected of anything that appeared to be a problem, the

11    biggest problem that I saw was goal writing, yes, that is

12    correct.

13    Q.    And you had an assistant who completed this IEP rubric; is

14    that right?

15    A.    Yes, that's correct.

16    Q.    And do you recall describing her qualifications to evaluate

17    IEPs for IDEA compliance as nonexistent?

18    A.    Yes.

19    Q.    Now, you found that no outside agency representatives ever

20    participated in CHDC IEP meetings; right?

21    A.    I don't recall that it was never.  It's certainly very,

22    very rare.  If you're saying it's never, I'm going to take your

23    word for it.  It's a huge problem, and it's not entirely, by any

24    means, CHDC's problem, but it is an enormous problem that there

25    isn't the form of LEA participation that should be part of the

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    IEP process.

2    Q.   Now, with regard to -- we talked about toileting.  Do you

3    recall telling me the basis for your opinion that CHDC has an

4    adequate toileting problem to be that it didn't smell bad?

5    A.   I do remember saying that, yes.  That isn't the basis.

6    That was simply one -- and, you know, clearly I have my moments

7    where I say things that when you read them back to me, I think

8    to myself, what an idiot you are, Bruce.  How could you say

9    something like that?  But the fact is that it's true.  It

10   smelled nice in that entire facility.  And I've been to so many

11   institutions and hospitals and places where you have all kinds

12   of odors.  The fact that it was clean smelling in the residences

13   and the school and you have so many kids who are wearing various

14   kinds of toileting aids I thought was pretty significant.

15   Q.   Students are taken to the residences for changing; is that

16   right?

17   A.   Well, it turns out that they're sometimes taken to the

18   residence if they've had, like, a big BM accident, but they do

19   have changing facilities in the classroom, and I believe many of

20   the students in their backpacks have a change of clothes

21   necessary.  So, really, it's the judgment call of the hab staff,

22   and if you remember -- I don't think I testified to this

23   previously, but I'm pretty sure the hab staff are in contact

24   with the students every 45 minutes.  That's part of why they do

25   their schedule change, because the hab staff can also check them

1    at that time.  I don't know that CHDC has designed it that way.

2    But they do have bathroom facilities in all of the classrooms.

3    The hab staff are perfectly able to change the students in the

4    classroom or to take them to the toilet, if they haven't already

5    independently indicated the need or were prompted by teacher

6    staff, and then if they've had a bigger accident where they have

7    to do a cleanup, they will sometimes take them to the residence.

8    The frequency of one versus the other, I didn't analyze.

9    Q.   Teaching toilet skills is not part of the special education

10   program at CHDC; right?

11   A.   We get back to that problem between IEPs and IPPs.  CHDC

12   has a robust, thorough, competent, and effective toileting

13   program.  Which department has the responsibility for that?

14   This is a paperwork problem.

15   Q.   So this would be another area where habilitation is not

16   integrated with special education; right?

17   A.   Can you please say that again?  I'm sorry.

18   Q.   Sure.  This would be another area where habilitation is not

19   integrated with special education?

20   A.   That's not an example at all.  Who says that you have to

21   train toileting in a classroom?  There's no mandate for that.

22   Q.   I'm not asking whether there's a mandate.  I'm just asking

23   whether there's integration or not of toileting and habilitation

24   with the special education program.

25   A.   What I'm saying to you is that by taking this one isolated

Gale - Cross                                      5751

1    skill, that is not -- first of all, toileting is integrated in

2    those two, and to suggest otherwise is to not fully understand

3    how the program works.  The teachers are --

4    Q.   Well, I'm asking about teaching toileting skills.

5    A.   I want to finish my answer, please.  The teachers are very

6    well aware of which students are toilet trained and have a need

7    to use the bathroom.  They're very well aware of which students

8    sign to use toileting, and they are very well aware of which

9    students have diapers.  So if they had no knowledge of that,

10   then I would say that it's not integrated.  But the teaching

11   staff is not the staff that is responsible for changing the

12   students and the teaching staff is not where the toileting needs

13   to occur.  It needs to occur 24 hours a day because the last

14   time I checked, kids go to the bathroom 24 hours a day.  The

15   idea that the toileting somehow has to occur in a school

16   environment is a complete misunderstanding of what a residential

17   environment is.  And this really gets back to one of the

18   problems that I see with the entire focus on toileting and

19   special education.  Toileting is a self-care need for a child.

20   Where it happens is irrelevant, so long as it's being carried

21   out effectively, efficiently, and with proper data.  And CHDC

22   100 percent meets all of those criteria.

23   Q.   Special ed teachers don't teach toileting skills; right?

24   That's a yes or no question.

25   A.   Yes, they do teach toileting skills.  I just explained how.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1    I won't bother to repeat it.

2    Q.    I'll move on.

3          With regard to your parents and guardians survey, your

4    sample sizes range somewhere between five and 21 or 22 for the

5    various questions?

6    A.    I'm sorry.  For what for sample sizes?

7    Q.    The parents and guardians who filled out the questions to

8    your survey.

9    A.    And the answer is how many surveys were, in fact,

10   completed?

11   Q.    All I'm asking you to confirm is, if you look at the

12   numbers of the people who responded to the questions, it's

13   somewhere between five and 21 or 22?

14   A.    I couldn't even begin to answer that question because it

15   would depend on the question, and there's also certain logic for

16   certain questions.  Sometimes if you answer no to one question,

17   the follow-up question will not appear.

18   Q.    Okay.  Well, the highest number of participants for any

19   question would have been 21 or 22; is that right?

20   A.    I'll take your word for it, yes.

21   Q.    And you had CHDC social workers call families to get them

22   to fill out the survey; right?

23   A.    I had them do?  No, I didn't have them -- like I ordered

24   them to do it?  No.

25   Q.    Did they do it?

1    A.    I'm sorry?

2    Q.    Did they do that?

3    A.    Actually, I don't know.  I really don't know who did it.  I

4    wasn't there.  I made the request that CHDC contact the families

5    and send the information out to them.  The exact manner in which

6    they did that, I mean, they told me that they either mailed

7    things or that they called, but I don't have any specific

8    knowledge of that.

9    Q.    Okay.  And as to individual survey responses, your survey

10   didn't account for how often parents or guardians see their

11   child at CHDC; right?

12   A.    Yes, it did.  That was one of the questions.

13   Q.    In terms of looking at all of the individual responses to

14   the questions, you can't tell which parents who responded

15   visited their child once a week or once a month, can you?

16   A.    Of course I can.  That's one of the questions.  I have

17   the --

18   Q.    I'm sorry.  Maybe my question isn't clear.  If I look at

19   any particular question in there, I can't tell whether the

20   respondent --

21            THE COURT:  I think I know this one, too.  I think if

22   you go through the survey results at the end of the report, you

23   can't tell, but he can go back to his original questionnaire

24   answers and he can tell.  Is that the answer?

25            THE WITNESS:  Yes, and I provided a spreadsheet as

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    part of my document production that gave all of that

2    information.

3              THE COURT:  Okay.

4              THE WITNESS:  I provided you with what's known as a

5    CVS file, which is a comma separated values file that can be

6    instantly uploaded to any spreadsheet program, and you would

7    have all of the data for exactly which students were being

8    evaluated.

9    BY MS. COON:

10   Q.   You would agree that parents can be really happy with CHDC

11   educational services and the services still could be out of

12   compliance with the IDEA; right?

13   A.   No, I wouldn't agree with that.  I think the parents at

14   CHDC are smarter than that.  I agree that in some cases, parents

15   are not involved in caring for their children.  That has not

16   been my experience at CHDC.

17   Q.   So it's your testimony that if parents are happy with

18   services, that means the IDEA -- that means that CHDC is in

19   compliance with the IDEA?

20   A.   I don't think I ever said that.

21   Q.   That's what I'm asking you.

22   A.   I thought you just said that was my testimony.

23   Q.   Let me just start over.  Would you agree that parental

24   satisfaction is not an indicator of IDEA compliance?

25   A.   Well, I would disagree with that, too, because the IDEA

1    gives parents significant rights.  If a parent disagrees, for

2    example, with the results of a psychological evaluation, did you

3    know that the facility has to then produce an independent

4    examiner who will then do a reevaluation?  So parent opinion

5    carries a great amount of weight.

6    Q.    That's actually not my question.

7    A.    I believe it is your question.

8    Q.    I'll move on.

9          Now, you found that least restrictive environment has not

10   been fully implemented as to CHDC students; right?

11   A.    Where are we referencing, please?

12   Q.    Well, why don't you answer the question first.

13   A.    No, because you just said to me that I found.  So if I

14   found it, it means that it's somewhere in what you have, and I'd

15   like to have the ability to look at what you're referring to so

16   I can properly evaluate the information and determine whether or

17   not I agree with what you're saying or not.

18   Q.    That's fine.  Let's look at your deposition, page 29.

19   A.    Thank you.  I'm on page 29.

20   Q.    Okay.  So did you previously testify:  I think more to the

21   point is that whether or not the least restrictive environment

22   concept is adhered to requires the careful coordination of

23   multiple agencies.  And from what I reviewed and from what I

24   learned in speaking with CHDC staff, I saw no bias toward

25   keeping students at CHDC.  But rather as I learned about the

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

Gale - Cross                                                5756

1    services available through the public school, for example, there

2    is an empty classroom that is reserved for CHDC, but is

3    currently not being used.

4        And as I reviewed some of the documents on the Arkansas

5    Department of Education website, I came to the conclusion that

6    the concept of least restrictive environment has not been fully

7    implemented due to circumstances that likely go beyond the

8    abilities of what the staff at CHDC are able to accomplish.

9        Is that how you testified?

10   A.   That is how I testified.

11   Q.   And your evaluation also revealed that the LEA

12   representative or public agency representative almost never

13   attends IEP meetings; right?

14   A.   That's the information that I learned, yes.

15   Q.   And you think that is a glaring omission that should be

16   corrected; right?

17   A.   Do I think it's a glaring admission?  Did I use the word

18   "glaring" somehow?

19   Q.   Glaring omission.

20   A.   I used the word "glaring"?

21   Q.   Yes.  I can show you if you --

22   A.   That's fine.  I just wanted to be sure.

23   Q.   Yes.

24   A.   Yes, I would agree with that.  I think that it really is

25   important that there be someone for those students for whom it's

1    appropriate be available at the meetings.  When, for example,

2    transition is occurring, that would be appropriate, but at the

3    same time, it has to -- I mean, for example, I called all nine

4    of the Conway schools.  I spoke to the administrators from all

5    nine schools just recently just to learn about what special

6    education services there were.  There was only one school that

7    even had a classroom environment close to what might be

8    necessary for CHDC.  And so as much as I did testify at that

9    point in time, I also learned that the classroom that used to be

10   available for CHDC is no longer even available.  So,

11   unfortunately, circumstances have changed, so my testimony at

12   that time was accurate.

13       But I think that the problem at this point is far more

14   incumbent upon the Arkansas Department of Education to make

15   certain that LEA individuals are available and less incumbent

16   upon CHDC.  So I would say that my testimony at this point has

17   changed as a result of circumstances.

18   Q.   Circumstances being with regard to the Conway Public School

19   classroom you're referring to?

20   A.   Well, the fact that it's no longer available, the fact that

21   the special education services in Arkansas -- as I've continued

22   to delve in, I called a residential facility called Millcreek in

23   Fordyce because I was under the impression that they could be an

24   alternate facility.  They don't serve children with severe and

25   profound disabilities.  That was a misunderstanding on my part.

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

1    But I did speak to someone from that facility.  I also spoke to

2    the facility in Mississippi.  There are --

3    Q.   I will -- I'm sorry.

4    A.   So that changes my testimony, based on new information that

5    I've learned since that time.

6    Q.   How many community providers did you contact?

7    A.   I don't recall exactly.  I could think about it and give

8    you an answer, if you want.  Is that -- do you want me to spend

9    a little time and think about that?

10   Q.   Well, if you could estimate.  Less than five, more than

11   five?

12   A.   I wouldn't estimate.  I would think about it for a moment.

13   Can I do that for just 30 seconds?

14   Q.   Sure.

15   A.   Thanks.

16        Off the top of my head, I'm going to say 15.  And I can

17   name them if you want now.

18   Q.   Sure.  Can you tell me which ones you contacted and what

19   they told you?

20   A.   Yes.

21   Q.   Is that information in your report?

22   A.   No, it's not in my report.  It's information that I looked

23   at subsequent just to try and make certain that I was --

24   frankly, that my previous testimony remained accurate because

25   things in life change.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1   Q.   Well, if it's not in your report, that's all right.  We'll

2   skip it.

3   A.   Okay.

4   Q.   Now, you attended three IEP meetings; is that right?

5   A.   Three IPP or IEP meetings.  I would have to look at my

6   report to refresh my memory.

7   Q.   Okay.  And you described the discussion of least

8   restrictive environment to sometimes include a little bit of

9   detail and sometimes to be a bit too brief for your tastes;

10  right?

11  A.   I don't know.  Are we talking about recollections that I

12  have from April?

13  Q.   I could show you your deposition if you'd like.

14  A.   I'd appreciate that.

15  Q.   Sure.  Page 221.

16  A.   Okay.  I'm there.

17  Q.   Starting with line 2, Question:  And how was it discussed?

18       Answer:  Sometimes in a little bit of detail, and sometimes

19  a little bit too briefly for my tastes.

20  A.   And can we define what it is, please?

21  Q.   I think if we go back to page 220, we can probably figure

22  that out.

23  A.   Okay.  So we're talking about JD's IPP, and you wanted to

24  know back on 220 if there are any other vocational options --

25  Q.   Let's do this:  Why don't I go back to 220, line 23.


                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

1      Question:  Do you recall if there was any discussion

2  regarding least restrictive environment?

3      Answer:  Yes.  I believe at all of the meetings that I was

4  at, least restrictive environment was discussed.

5      Question:  And how was it discussed?

6      Answer:  Sometimes in a little bit of detail, and sometimes

7  a little bit too briefly for my tastes.

8      That's what you previously testified.  Right?

9  A.   Uh-huh.  That's correct.

10  Q.   And you stated today that you found in your parent survey

11  that 61 percent of responding families reported that there is

12  any discussion of the possibility of moving their child to a

13  less restrictive environment; right?

14  A.   I believe that's correct, yes.

15  Q.   And you think that the process by which discussion of a

16  less restrictive environment occurs should be occurring

17  differently at CHDC; right?

18  A.   I think that throughout the educational system, it should

19  be occurring differently, and that includes CHDC.

20  Q.   And what you found at CHDC is that if a parent or guardian

21  is not saying they want their child elsewhere, CHDC is saying

22  okay; right?

23  A.   No.  I think that it's different, and even if I testified

24  to that previously, as I've looked at the data, as I've looked

25  through just my own information, there are times that -- let's

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

Gale - Cross                                    5761

1    say that it's the first IEP after a child has come and he's not

2    fully stabilized.  Discussing placement would be so upsetting to

3    a family that most professionals would know not to do it.  Now,

4    I know that's an extreme example, but yet it is an example.

5         On the other end, you've had someone who has been there

6    five and six years, yes, you would want to at least have a

7    discussion of placement, even after one or two years.

8         And the other thing to keep in mind is that discussion of

9    placement should not be limited.  And I'm not sure when CHDC

10   does this at other times, but I can think of one example where

11   they do.  Discussion of placement should not be limited to the

12   IEP or IPP process.  You shouldn't have to wait nine months.  If

13   a child is ready to move, staff should be coming forward.

14        And in the case of LW, for example, I testified previously

15   today that a referral had been made to the Arkansas School For

16   the Deaf.  I also understand that he was turned down for the

17   Arkansas School For the Deaf.  So let's just put that in

18   context.  Let's say that one someone had decided, oh, I don't

19   know, we have to invite the Arkansas School For the Deaf, for

20   example, because, well, they're going to be at the LEA.  If they

21   hadn't even done their assessment, that would have been a huge

22   waste of time and resources.  So, no, that's not the order.  The

23   order to do things would be to refer him to the Arkansas School

24   For the Deaf, find out if they accept him, and then hold a

25   special IEP meeting.  Because keep in mind you can have a IEP

Christa R. Newburg, RDR, CRR, CCR
United States Court Reporter

Gale - Cross                                                  5762

1   meeting at any time during the year.  Doesn't have to be annual.

2   That would be a more efficient and timely usage of the IEP

3   process.

4        So this is clearly a system that needs fixing, but I think

5   I made my point that it's a systemic problem, it's not CHDC's

6   problem.  They are part of the system, and so from that

7   perspective, they bear some burden, but it goes to at least two

8   other agencies, if not more.

9   Q.   And did you have any examples of referrals to a least

10  restrictive environment besides LW?

11  A.   KH, I believe she left also.  And I don't know how she is

12  faring, but I think she was also somebody who was transitioned

13  out, yes, and we've talked about.  So you mentioned earlier

14  about restraint and I mentioned about the trend downward for

15  restraint and how at one time it was 27 times and then a year

16  later it was nine times.  And I remember her quite well, too.

17  Q.   She is the individual from Louisiana?

18  A.   She is the individual from Louisiana.  She was displaced

19  related to Hurricane Katrina, and she made it very clear to me,

20  for example, she wanted to go live somewhere as an adult

21  someday.  I don't know where she went.  But that would be an

22  example -- even a phone call, by the way, in a case like that,

23  I'm hoping, I don't know, but if for any reason no LEA person

24  participated and she was transferred without that happening, I

25  would think that that would be something that should be looked


                    Christa R. Newburg, RDR, CRR, CCR
                        United States Court Reporter

1    into, but I don't have any specific knowledge.

2    Q.    I think I lost track of my original question, so let me

3    just go back to that.  Do you think there's an obligation for

4    facility staff to raise potential alternative facility placement

5    even if the parents don't request it?

6    A.    Not always, no.

7    Q.    Let's go to your deposition.  Page 114.

8    A.    You're going to say in my deposition I said that, and what

9    I'm saying is they shouldn't always say that.  Your two

10   questions are different.  We can figure out the differences

11   between them.  In principle, should they be thinking about LEA?

12   Absolutely.  Your specific questions had very slight differences

13   between them, and that's why I gave you two different answers.

14   Q.    My question today is, do you think there's an obligation

15   for facilities staff to raise potential alternative placements

16   even if the parents don't request it?

17   A.    And my answer is going to be, it's a professional judgment.

18   Q.    Let's look at your deposition, page 114.  Starting at line

19   17.

20        Does this state, Question:  Do you think there's an

21   obligation for facility staff to raise potential alternative

22   placements even if parents don't request it?

23        Answer:  Absolutely.  And not only that, I think there is

24   an obligation for the facility to disagree with the family if,

25   in their clinical opinion, they feel that a less restrictive

 1    environment can benefit a particular child.

 2         That was your testimony; correct?

 3    A.    Yes.

 4    Q.    Thank you.  And you agree that students' medical needs, for

 5    example, can be met in the community; right?

 6    A.    I'm sorry?

 7    Q.    Would you agree that students' needs can be met in the

 8    community?

 9    A.    No, I don't think that's the same question you said the

10    first time.

11    Q.    Okay.  Let's start with medical needs.  Can students'

12    medical needs be met in the community?

13    A.    How would I know?

14    Q.    Let's go to -- well, actually, let's skip that.

15         You have a clinical practice; right?

16    A.    Yes.

17    Q.    And you actually treat individuals in the community who

18    have similar character to students at CHDC; right?

19    A.    Do I treat individuals who have similar characteristics to

20    CHDC?

21    Q.    Yes.

22    A.    We're talking present tense?

23    Q.    How about as of June 2010.

24    A.    No, I do not treat those individuals.  No.  I assess those

25    individuals.  I consult facilities on those individuals.  I have

Gale - Cross                                    5765

1   been to schools where similar individuals reside.  But, no, I do

2   not treat them.

3   Q.   Let's look at your deposition, page 76.  Starting with line

4   3.

5   A.   Yes.

6   Q.   Question:  Do you treat individuals in the community that

7   have similar characteristics to those at CHDC?

8        Mr. Zaycosky:  Objection.  Speculation.

9        Answer:  Yes.

10  A.   But that's not the same question.  You just said do I treat

11  individuals in my clinical practice, and I do not treat

12  individuals in my clinical practice.  But as a consultant to

13  facilities and as a certified nonpublic agency and as a regional

14  center provider, I do treat individuals.  So we have to be very

15  clear which part we're talking about.

16  Q.   That's fine.  And you believe that the individuals

17  currently at CHDC, and I'm referring to students, could be in

18  less restrictive environments either now or eventually; right?

19  A.   That I believe -- and, I'm sorry, I didn't fully pay

20  attention for a second.  My apologies.

21  Q.   You believe that the students currently at CHDC could be in

22  less restrictive environments either now or eventually; right?

23  A.   I wouldn't -- I'm hoping I didn't testify and say yes to

24  that before because I don't know how I would determine that in

25  such a blanket way.


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

Gale - Cross                                              5766

1    Q.   Well, let's look at your deposition, same page.

2    A.   Go ahead.

3    Q.   Line 8.  Question:  Do you think that any of the

4    individuals who are currently at CHDC could be living in less

5    restrictive environments?

6         Mr. Zaycosky:  Objection.  Speculation.  Please answer, if

7    you are able to.

8         Answer:  Either yes or eventually.

9         That was your testimony, right?

10   A.   Yes, and I do apologize.  I perceive it differently.  For

11   instance, this question back then, they could be living on CHDC

12   grounds but in a less restrictive environment on CHDC grounds.

13   I understood your current question to mean that they would be

14   transferred elsewhere.  So I don't perceive them as the same.

15   And if I'm being a little tired or a little picky, I apologize.

16   I'm not trying to be.  I'm just trying to answer your questions

17   accurately.

18   Q.   You also suggested that CHDC look first at the students who

19   have mild disabilities.

20   A.   I apologize.  Repeat, please.

21   Q.   In terms of transitioning to a less restrictive

22   environment, you suggested looking at individuals who have mild

23   disabilities first; right?

24   A.   Yes, I did do that.

25   Q.   Let me show you what's been marked as Exhibit BG-2.


                    Christa R. Newburg, RDR, CRR, CCR
                     United States Court Reporter

1   A.    Okay.

2              MS. COON:  May I approach the witness, your Honor?

3              THE COURT:  Yes.

4              THE WITNESS:  Thank you very much.

5   BY MS. COON:

6   Q.    Can you identify what Exhibit BG-2 is?

7   A.    This is a list dated April 16, 2010, and I'm going to

8   interpret the abbreviation to say functioning level.

9   Q.    And were the seven students you're referring to the

10  individuals at the top?

11  A.    I don't have a specific recollection, but I do remember CB.

12  I remember ZS.  I remember MW very clearly.  So those would

13  certainly be ones -- I'd have to refresh myself on the others.

14             MS. COON:  United States would move to admit Exhibit

15  BG-2.

16             MR. YORK:  We may not have an objection if she lays

17  some foundation, but we don't recognize this document.  We don't

18  know where it came from.  If the witness can more specifically

19  identify it, we may not have an objection.

20  BY MS. COON:

21  Q.    Can you do that, Dr. Gale?

22  A.    No.  This document was produced ten days before I sent in

23  my report, and I don't believe I've ever seen this specific

24  document before.  I may have seen similar documents from other

25  dates, but I believe that I'm seeing this one for the very first

1    time.

2    Q.   So this is something that you don't recognize as being

3    produced with the documents that you considered for the basis of

4    your report?

5    A.   You know what?  You're right.  I apologize.  It's a little

6    late in the day for me, but --

7    Q.   Sure.

8    A.   This is the format -- I mean, number one, the type style

9    isn't the type style that I normally use.  The answer is, no, I

10   don't recognize it.  Was it a computer document presented to you

11   or something?

12   Q.   Would this be something that you produced electronically to

13   us?

14   A.   I don't -- in other words, what you're doing is presenting

15   me with a document asking if I presented it to you?

16   Q.   I'm asking if you recognize what this document is.

17   A.   The document is a document of functioning levels --

18          THE COURT:  Wait, wait.  Actually, she is actually --

19   she is intending a lawyer question, and you're answering a

20   different question than what she asked.

21          THE WITNESS:  I'm sorry.

22          THE COURT:  Let me do it this way:  Did you prepare

23   this document?

24          THE WITNESS:  I don't know, your Honor.

25          THE COURT:  Okay.  Do you know, was it given to you by

1    CHDC?  And the answer is yes, no, or I don't know.

2              THE WITNESS:  CHDC did provide me with some

3    spreadsheet data, and I may have converted the spreadsheet data

4    into this document, your Honor.  It doesn't look inaccurate to

5    me.  I'm just saying that the document itself isn't familiar.

6              THE COURT:  He doesn't know what it is.  He doesn't

7    know what it is.  So let's go on.

8              MS. COON:  Okay.

9    BY MS. COON:

10   Q.   Do you recall, of the names at the top of this page, not

11   this document in particular, but the individuals who are

12   indicated as having mild disabilities, are those the individuals

13   whom you indicated CHDC should be looking closely at for

14   possible transitioning to a less restrictive environment?

15             THE COURT:  He's told us three of them that he

16   remembered were those three individuals.  He doesn't remember

17   the others without looking at records.

18             MS. COON:  Okay.

19   BY MS. COON:

20   Q.   And in addition to individuals with mild disabilities,

21   there are probably others who should be examined for possible

22   transfer, or for possible education in a less restrictive

23   environment; right?

24   A.   I wouldn't have an opinion about that without you being a

25   little bit more specific.  I don't like to generalize on things

                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

1    as important as that.  I like to talk about specific cases.  So

2    if there's a particular child you want to ask me about, I'll

3    tell you.

4        For example, I developed additional opinions in my head

5    about those three because my recollection of them improved as I

6    thought about them, and while -- I mean, I'll take MW as an

7    example.  She's an extraordinarily emotionally volatile woman,

8    and so whether or not it's time for her to be transitioned

9    without a more careful analysis, I couldn't say.  But I do think

10   that, yes, based on her functioning level, just the fact that

11   she's mild, she is at a higher potential, but it also is very

12   likely because of her tendency to become upset, her

13   misperception of events, and also I would want to take a

14   detailed look at where she had been beforehand.  That would be

15   important considerations.

16       ZW has obsessional behaviors and many autistic

17   characteristics.  Excuse me, ZS.  Even though cognitively he

18   functions in a wide range, his social-emotional functioning is

19   extraordinarily impaired, and that would have to be taken into

20   account.

21       CB is a young blondish-haired girl who has many significant

22   autistic features, and she could become very frightened.  I

23   believe when I interviewed her, she was nice enough, but at the

24   same time, she very quickly lost focus, even though she was

25   interested in interacting with me.  I showed her a video of my

Gale - Cross                                  5771

1    therapy dog interacting and she thought it was very funny, and

2    so she was enjoying the interview.  She still lost focus and

3    wasn't able to attend my interview that only lasted maybe ten

4    minutes.

5         So those kinds of factors would have to be taken into

6    account.  So it's not in any way and should never be a thought

7    that just because there's a community environment, that's

8    automatically less restrictive.  You really have to have a good

9    understanding of the integrative nature of what CHDC is and look

10   at planned, careful transitions.

11   Q.   And another individual who you would suggest to look at a

12   less restrictive educational environment would be CW.  Is that

13   accurate?

14   A.   I would say, you know, again, I may have said yes or no

15   before.  Keep in mind, I'm just a consultant who came in.  I

16   didn't do a thorough evaluation of a single student, and I don't

17   think anybody else who came in did either.  I think what we did

18   is, we looked at records, we looked at as much as we could, and

19   we tried to be ethical.  But what you're asking me is a clinical

20   rendering about an individual case, and I think you've gotten an

21   appreciation of how important I consider that decision to be and

22   how much information I'd want to look at before I would make

23   such a rendering.

24   Q.   Let me just ask you a more simple question about CW, and

25   I'll give you a couple of documents, too.


                    Christa R. Newburg, RDR, CRR, CCR
                       United States Court Reporter

 1            MS. COON:  May I approach, your Honor?
 2   BY MS. COON:
 3   Q.    I just would like to do a real simple comparison with CW.
 4   A.    Okay.
 5   Q.    Would you agree that Exhibit BG-3 appears to be CW's IEP
 6   from CHDC dated 4/23/09, and Exhibit BG-4 is an IEP for CW from
 7   Sheridan School District dated 8/24/07; right?
 8   A.    That's what it says, yes.
 9   Q.    And would you agree that CW at the Sheridan School District
10   was receiving 1,750 minutes of special education per week, and
11   now at CHDC, he's receiving 450 minutes of special education per
12   week?
13   A.    Well, boy, we've got an apple and Bermuda comparison here.
14   You have to do a yearly average.  So is it 450 per week times a
15   year or 1,250 per week times a typical school year?  These
16   aren't comparable.  I understand the numbers look the same, but
17   you have to understand for the total year how many minutes of
18   education are occurring, and I just remembered -- I mean, you
19   know, first of all, I mean, I remember CW.  He is the child who
20   reported to me that he killed animals and he is the child who
21   can't tell time.  And he is the child who has verbal skills but
22   talked about messing up, and messing up means killing animals
23   and fighting with his brother.  And when I looked into more
24   details of that, I remember that his emotional behavior is
25   extraordinarily unstable.  I mean, he's a child who is so sweet,

1    so nice.  Also, he refused to talk to me one time when I spoke

2    to him.  He was one of the most freaked-out kids from that van

3    showing up.  When that newspaper -- when that news van showed up

4    on Wednesday of that week, he refused to talk to me, even though

5    he is the kid who found a yellow tablet -- I had a note pad, and

6    I accidentally left it in one of the classrooms.  When I came

7    back, it wasn't there.  He had turned it in to the office for

8    me.  He found me later that day, on Tuesday, and told me that he

9    had found it for me.  So the same kid who found it for me on

10   Tuesday didn't recognize me on Wednesday.  That's CW.

11   Q.   And you've also become aware that there's no counseling or

12   psychotherapy services available at CHDC; right?

13   A.   No, I've not become aware of that.

14   Q.   Would it help if I showed you the exhibit?

15          THE COURT:  I've seen the exhibits.

16          MS. COON:  Let's move on then.

17          THE COURT:  I actually saw the exhibits that you put

18   on through another witness, and I do remember what they said,

19   so --

20          MS. COON:  Let's move on.

21          THE COURT:  How near are you to finishing with this

22   witness?

23          MS. COON:  I'm very close.  I'm within ten minutes.

24          THE COURT:  Then let's do it.

25          THE WITNESS:  Your Honor, I'm going to beg your

1    indulgence.

2              THE COURT:  Do you need a recess?

3              THE WITNESS:  Just a three-minute break then.

4              THE COURT:  We'll take just a few minutes.  We're

5    going to finish with you tonight and let you be on your way.

6    We'll take a short recess.

7              THE WITNESS:  Thank you.

8         (Recess from 5:57 p.m. until 6:07 p.m.)

9              THE COURT:  Everyone be seated.

10             MS. COON:  I think I have three questions left.

11   BY MS. COON:

12   Q.   Number one, isn't it true that no CHDC student has had any

13   outside educational services since 2005, since at least 2005?

14   A.   I have no knowledge of that.

15   Q.   Let's look for one second at Exhibit BG-1, at page 120.

16   A.   BG-1.  Yes.  Go ahead.  Page 120, you said?

17   Q.   Yes, page 120.

18   A.   Thank you.  Okay.

19   Q.   This appears to be a transcription of your interview with

20   Ms. Hill, the special ed director, and Judy Buck and

21   Ms. Kershner-Mitchell, the teacher.  Is that right?  A long

22   interview.

23   A.   Okay.  How many pages back?  I have certain notes at the

24   very beginning that let me see the context.

25             THE COURT:  Actually, I have a suspicion that Mr. York

                    Christa R. Newburg, RDR, CRR, CCR
                    United States Court Reporter

1    would stipulate to the fact, and he's nodding his head yes, so

2    if you want to take it as established, then you don't have to go

3    through all this.

4              MS. COON:  Oh, to the question?  Okay.

5              THE COURT:  Right.  I think he just agreed that they

6    haven't had any residents at CHDC who were taught off campus

7    since 2005.  Is that right?

8              MR. YORK:  Yes.

9              THE COURT:  I think that's not going to be a contested

10   issue one way or the other.  Records are going to establish it

11   very clearly.

12             MR. YORK:  We're okay with that, your Honor.

13             THE COURT:  That's a fact.

14             MS. COON:  Great.  Moving on.

15   BY MS. COON:

16   Q.   You referred to a number of areas in which students appear

17   to have improved at CHDC, according to your parent-guardian

18   survey; right?

19   A.   Correct, yes.

20   Q.   So if those kids have indeed improved in all those areas,

21   shouldn't CHDC be looking at and suggesting less restrictive

22   environments for those kids?

23   A.   Not necessarily.  It's on a case-by-case basis, again, and

24   the answer could easily be that none of them would be

25   appropriate to transition.  Again, it has to be looked at very

                    Christa R. Newburg, RDR, CRR, CCR
                      United States Court Reporter

 1   carefully.

 2   Q.    I promised three questions.  Question number three:  You

 3   made some recommendations in your dictations.  Right?

 4   A.    I'm sorry?

 5   Q.    You made some recommendations in your dictations at page

 6   124; right?

 7   A.    Do I recollect that?  Let me get to 124.

 8         And just to clarify, in 123 where it says SAPE, that person

 9   no longer works for me.  It's FAPE.

10   Q.    Got you.

11   A.    Anyplace SAPE appears, it's FAPE.

12   Q.    Got you.

13   A.    So you see here a bulleted list.  Is that what you're

14   referring to?

15   Q.    Yes.

16   A.    And so what is your question?

17   Q.    That you listed these as possible recommendations?

18   A.    No.  If you look back and you'll see at the title of this

19   on 123 says:  CHDC conclusions, 4/27/10, 9:30 a.m.

20         This is simply a draft.  This is a draft of information

21   that I put together.  So in order to go to my report, that's

22   what we would reference, but this is a draft.

23   Q.    Okay.  So in your draft from April 27, 2010, you refer to

24   the following, and I'm looking at the bullets starting at:

25   Better documentation of reasons for why students require


                        Christa R. Newburg, RDR, CRR, CCR
                         United States Court Reporter

1    shortened days.  Transfer of habilitation classes fall within

2    special education auspices.  More specific in-service training

3    regarding behavioral assessment methods and other development

4    methods.  Better system advertising of psychiatric diagnoses.

5    Realignment of current databases to promote more robust data

6    analysis more easily.  Exploration of alternative data capture

7    methods.  Training in best practice behavior strategies designed

8    for individuals with intellectual executive functioning and

9    communication deficits.  Closer alliance between education,

10   psychology, and speech services.

11        These were included in your 4/27 draft; right?

12   A.   Well, again, you're looking at a dictation of just thoughts

13   that I was having, just as above that it says Brigance is

14   appropriate, and they don't -- they don't seem aware of how much

15   progress the kids are making, but they're making even more.

16   These are comments that then would have woven their way into

17   pages 37, 38, and 39 of my report.  But, yes, they -- so in

18   terms of are they my notes to myself about things that I thought

19   about?  Yes, they are.  Are they recommendations?  They're

20   recommendations if they appeared in my report.

21             MS. COON:  Thank you.

22             THE WITNESS:  Thank you.

23             MR. YORK:  No redirect, your Honor.

24             THE COURT:  Thank you, Mr. York.

25        You can step down, Dr. Gale.

5778

1          THE WITNESS:  Thank you.

2          THE COURT:  I understand we have Mrs. York with us.  I

3    wanted to recognize that.  I assume that as soon as she heard

4    about the demolition derby, she got on the plane to Little Rock.

5    Didn't want to miss that.

6       Nine o'clock Monday.  Is that an appropriate time to start?

7    What's our lineup for Monday?

8          MR. YORK:  There's been some discussion about that,

9    but our plan at the moment, unless it changes, is to have our

10   expert witness Kevin Walsh, who is a Ph.D. psychologist.

11         THE COURT:  Very good.  We'll be in recess until nine

12   o'clock Monday.

13      (Recess at 6:14 p.m.)

14                  REPORTER'S CERTIFICATE

15      I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

16

17                             Date:  December 21, 2010
     /s/ Christa R. Newburg, RDR, CRR, CCR
18       United States Court Reporter

19

20

21

22

23

24

25


                   Christa R. Newburg, RDR, CRR, CCR
                   United States Court Reporter