```
 1                 IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2                        WESTERN DIVISION

 3   UNITED STATES OF AMERICA,
                Plaintiff,
 4   v.                              No. 4:09CV00033 JLH
     STATE OF ARKANSAS, MIKE BEEBE, Honorable  October 11, 2010
 5   Governor of the State of Arkansas; JOHN   Little Rock, Arkansas
     M. SELIG, Director of the Arkansas        8:57 a.m.
 6   Department of Human Services; JAMES C.
     GREEN, Ph.D., Director of the Arkansas
 7   Division of Developmental Disabilities
     Services; CALVIN PRICE, Superintendent of
 8   the Conway Human Development Center,
     in their official capacities only,
 9               Defendants.

10                 TRANSCRIPT OF COURT TRIAL - VOLUME 26
                  BEFORE THE HONORABLE J. LEON HOLMES,
11                    UNITED STATES DISTRICT JUDGE
     APPEARANCES:
12   On Behalf of the Plaintiff:
            MR. BENJAMIN O. TAYLOE, JR., Special Counsel
13          MR. CHRISTOPHER N. CHENG, Trial Attorney
            MR. MATTHEW J. DONNELLY, Trial Attorney
14          MS. JACQUELINE K. CUNCANNAN, Trial Attorney
            MS. LAURA L. COON, Trial Attorney
15          MR. VINCENT P. HERMAN, Trial Attorney
              U.S. Department of Justice, Civil Rights Division
16            950 Pennsylvania Avenue, N.W., Room 4300
              Washington, D.C. 20530
17
     On Behalf of the Defendants:
18          MR. THOMAS B. YORK, Attorney at Law
            MR. DONALD B. ZAYCOSKY, Attorney at Law
19          MS. CORDELIA ELIAS, Attorney at Law
              York Legal Group, LLC
20            3511 North Front Street
              Harrisburg, Pennsylvania 17110
21
            MS. LORI FRENO-ENGMAN, Senior Assistant Attorney General
22            Arkansas Attorney General's Office
              Catlett-Prien Tower Building
23            323 Center Street, Suite 200
              Little Rock, Arkansas 72201-2610
24
     Proceedings reported by machine stenography; transcript
25   prepared utilizing computer-aided transcription.
```

1          **I N D E X (October 11, 2010 – Volume 26)**

2

3     **WITNESSES FOR DEFENDANTS:**      **Direct  Cross  Redirect  Recross**

4     KEVIN WALSH                         5781   6001

5                        * * * * * * *

6     **EXHIBITS:**                                        **RECEIVED**

7     Defendant's Exhibit 92-A................................P. 5781

8                        * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          (Proceedings continuing at 8:57 p.m.)

 2               THE COURT:  Mr. York, you may proceed.

 3               MR. YORK:  Thank you, Your Honor.  We call Kevin Walsh,

 4     Ph.D.

 5               THE COURT:  Thank you, Mr. Walsh.  Come forward.

 6          KEVIN WALSH, DEFENDANTS' WITNESS, DULY SWORN

 7                         DIRECT EXAMINATION

 8     BY MR. YORK

 9     Q    Good morning, Dr. Walsh.

10     A    Good morning.

11     Q    State your full name and spell your last name for the

12     record, please.

13     A    Kevin K. Walsh, W-A-L-S-H.

14     Q    Doctor, I am going to show you what we have marked as 92-A.

15               MR. YORK:  It's part of Exhibit 92, Your Honor.  This

16     was part -- it was attached to his report.  So we're just

17     breaking it out.  And it starts on page 173 of that report, and

18     92 is the report itself.

19     BY MR. YORK

20     Q    And I just ask you to identify this.

21     A    This is the listing of my expert qualifications and my

22     vita.

23               MR. YORK:  Your Honor, I move the admission of 92-A.

24               THE COURT:  Received.

25          (Defendants' Exhibit 92-A received in evidence.)
```

Walsh – Direct                                                5782

```
 1    BY MR. YORK
 2    Q    Have you always worked in the developmental disabilities
 3    field?
 4    A    Yes.
 5    Q    Will you explain to us a little of that history?
 6    A    From the beginning?
 7    Q    Yes.
 8    A    I started out as a direct care worker in a facility, a
 9    private facility, residential facility, about 250 individuals.
10    I worked there for two years.  I was certified as a PA for --
11    technician at that facility.  I moved to Temple University.
12    They had a center in Philadelphia.  I worked as a shift
13    coordinator there.  It was a direct-care position.
14         At that time I went back to graduate school.  After
15    graduate school, I worked as a psychologist in a facility in New
16    York state for a short time, about a year.  That was an ICF/MR.
17    Then I moved to New Jersey.  I worked at the Vineland Training
18    School for approximately nine years.  And at that time, I moved
19    to Morristown Memorial Hospital and worked in a program, that I
20    believe Dr. Kastner probably described already, with
21    Dr. Kastner.
22         And then at the time that -- there was a time we moved our
23    program outside that hospital to DDHA, and I went with
24    Dr. Kastner at that point and worked there since.
25    Q    And, Doctor, what degrees -- formal degrees do you have?
```

Walsh – Direct                                                     5783

1   A    I have a master's and a Ph.D. in developmental psychology

2   from University of Akron in Ohio.

3   Q    And how does the degree in developmental psychology differ

4   from a clinical psychology degree?

5   A    My degree is primarily a research degree.  It -- I went

6   back to graduate school with the intent to stay in the field of

7   developmental disabilities, and so a developmental degree seemed

8   more appropriate to me than a clinical degree.  My interests

9   were also more research and policy and systems development and

10  whatnot.

11  Q    Why would it be more appropriate in your opinion?

12  A    Because I think it was more appropriate for me.

13  Q    Okay.  Would it be more focused on developmental

14  disabilities?

15  A    You could have a clinical degree that was focused on

16  developmental disabilities, but a developmental degree is all

17  about development.  So, you know, developmental disabilities is

18  a problem in development.  So --

19  Q    Doctor, do you have a license to practice psychology?

20  A    I don't carry a license.  You know, my work is not really

21  clinical in nature for the most part.  I took license --

22  national licensing exam, and I passed it.  I don't retain a

23  license, though.

24  Q    Have you ever worked in -- I believe you said you did, I

25  believe, but what work have you done in an ICF/MR?

Walsh – Direct                                     5784

1    A    I was a standard unit psychologist in an ICF/MR.  I have

2    been involved in a lot of ICF/MR interaction over the years, so

3    when I was working at the facility in Vineland, that facility

4    was actually operated by Elwin, which is a facility in

5    Pennsylvania which was an ICF/MR facility.  And I was pulled

6    from the Vineland facility to help meet their requirements for

7    the ICF/MR surveys.  I have done a fair amount of consulting in

8    ICF/MR settings over the years.

9    Q    Have you published in the field?

10   A    Yes.

11   Q    Will you describe that a little?

12   A    I -- we just got a new publication back last week, so I

13   think we're up to 50.  I have 50 publications.

14   Q    When you say 50 publications, do you mean peer-reviewed

15   publications?

16   A    Yes.  And for about 35 of them, I guess I am either the

17   first or second author.  A good number of those are published

18   jointly with Dr. Kastner and other members of our team.  They

19   span the gamut of things.  There are some clinical publications.

20   There are some systems publications, and some policy

21   publications.

22   Q    And, Doctor, are you an associate of the AAIDD journal,

23   intellectual and developmental disabilities?

24   A    Yes.

25   Q    Tell us what you do.

Walsh – Direct                                              5785

1    A    There are 13 associate editors, and there is maybe 250

2    consulting editors which are really reviewers.  The associate

3    editors manage manuscripts that are submitted to the journal.

4    So what we do is we manage the peer-review process for a

5    manuscript by assigning editors, getting in the reviews, making

6    decision on acceptance or rejection of the publication.  We

7    write those letters.  We help edit the manuscript.  Some

8    manuscripts don't come in in very good shape.  We help edit

9    those, and we manage the whole process.  I do about three to

10   five of those a year.

11   Q    And have you been involved in various developmental

12   disabilities associations in this field?

13   A    Yes.

14   Q    Can you describe some of them?

15   A    I have -- I am on the board of a county ARC -- ARC is --

16   well, the former name of the ARC is the Association for Retarded

17   Citizens.  They don't use that name anymore because it is --

18   because the terms have changed.  So they just use the term ARC.

19   I am on the board of a county ARC in New Jersey that -- I have

20   been on that board since 1991.  I have been president of that

21   board for, I don't know, I think it's about 18 or 19 years.  I

22   have been president for 14 of them.  I have just returned to the

23   presidency a month ago.  I am also on the executive committee of

24   the board of the ARC of New Jersey.  The ARC of New Jersey is

25   sort of the umbrella organization for all the county ARCs in the

1   state.  I have been on that board since the mid '90s, maybe

2   except for one 2-year term.  They won't let me go, and so I do

3   that.

4   Q    Aren't the ARC organizations ones that promote

5   community-based services?

6   A    Yes.  I mean, our -- our county ARC is a service provider

7   that -- the county ARC that I serve on, we provide support

8   services, supportive living, supportive work.  I don't find a

9   conflict between doing the work that I have done relative to

10  CHDC and serving on the board of the ARC.  My view is that we

11  need to find the best setting to serve people for each person.

12  And so my sense is that there are many people who can live fine

13  in -- under the waiver and community settings, and there is many

14  people who need services like you get at Conway Human

15  Development Center.  I don't really have a problem with that.

16      I -- I came up in the field when the researchers at Yale

17  were looking at that, and Dr. Ziegler had a project up there.

18  And, you know, he defined what he called the social address

19  fallacy, that what became more important was where somebody got

20  services than what the nature of the services were.  And when

21  you look at some of the research, you find that, depending on

22  the person, there is good and bad community providers and there

23  is good and bad institutions, and it's relatively independent of

24  size and of type of facility it is.  So that always resonated

25  with me because I see both sides of that coin and I have worked

Walsh – Direct

1    at facilities, institutional facilities and I have worked in the

2    community and I see good and bad in both.

3    Q    How about, have you served on a state-level committee in

4    New Jersey or --

5    A    Yes.  Still do.

6    Q    Can you describe those?

7    A    I am currently on the state-level behavior review

8    committee.  That's the committee that develops behavioral policy

9    for the state of New Jersey and reviews the proposals that come

10   from each provider.  They have to put in a policy proposal for

11   both behavioral intervention and the use of restraints.  We

12   review all of those, and we do the policy.  I am on the state

13   level research committee, the interdisciplinary research

14   committee for the New Jersey regional developmental

15   disabilities.  We just review any research proposals that

16   come -- that are put forward.  That will include people with

17   developmental disabilities as subjects.

18        I am on the -- what's called a restraint working group.

19   That's -- that is a never-ending task.  The state of New Jersey

20   is attempting to rewrite its restraint policies and has been

21   doing that for a number of years, and so this working group

22   won't seem to end.  What we are doing is trying to fashion a

23   policy that makes sense and that is contemporary.  As you know,

24   there is a fair amount of debate in that field, and that work is

25   ongoing.  We have a draft now that's being vetted by, I guess,

Walsh – Direct                                    5788

1    the higher-ups in the state government.  I think it's going out

2    to the Department of Human Services for review.

3         I am also on the ARC's mainstream medical care board,

4    advisory board, and over the years I have been on long-term care

5    work groups and aging work groups and whatnot, a fair smattering

6    of the kinds of things that people in my position, meaning

7    that -- I work in the community, but, you know, I have -- not a

8    direct clinical role, but I get asked to do those things on a

9    fairly regular basis.

10   Q    I also see on the CV a reference to the Olmstead oversight

11   committee.

12   A    Yes.  The state has set -- you know, in conjunction with

13   its Olmstead plan to move people from developmental centers in

14   New Jersey, the state established -- Department of Human

15   Services established in the state an Olmstead oversight

16   committee to ensure that process moved forward.  I think that

17   was really at the behest of advocates, and that has several work

18   groups associated with it.  I am on the quality work group.  We

19   actually have completed our deliberations and have submitted an

20   11-point quality set of recommendations on quality going forward

21   to the larger group.

22   Q    Now, focus a little more on your experience at the training

23   school of Vineland.  Can you tell me what that facility was

24   like, what residents they had?

25   A    That was actually a famous facility, and it is one of the

Walsh – Direct                                    5789

1    early leaders in the field.  I worked there for about nine

2    years.  I started out pretty much as a director of residential

3    services and ended up as the assistant executive director for

4    clinical and professional services.

5    Q    And at one point you were the director of psychology and

6    habilitation too?

7    A    Yes.  I was also a director of psychology on that.  That

8    was a facility that had about 250 to 275 beds.  It was a

9    residential facility; although, it wasn't ICF/MR certified.  It

10   was seeking, always seeking to get ICF/MR certified, and so we

11   used the ICF/MR guidelines to manage that facility.  We -- over

12   the course of the time that I was there, we also developed

13   community based services attached to the facility and moved some

14   of those folks through.  And at the time I left, I think that

15   had gotten up to be about 175 beds in the community.  And I

16   managed both, you know, the -- sort of the psychologists and

17   those professional services in both areas.

18   Q    At Vineland, did you have any duties as far as training on

19   the use of restraints?

20   A    Well, when I had gotten to Vineland, it was in the early

21   1980s -- 1981 -- and it had gone through a -- one of those sort

22   of difficult times that facilities often do.  It had a bad

23   executive director.  Things had gotten not so great.  It was

24   taken over by the Elwin organization.  I came in as part of the

25   management team that Elwin brought in.

Walsh - Direct                                    5790

1          When I got there, a lot of the clinical programs, certainly

2     psychology, had fallen apart and there were -- what we noticed

3     was that there were a lot of punitive and inappropriate

4     restraints being used.  And so at that time in New Jersey, this

5     is in the early '80s, there was a, quote-unquote, hands-off

6     policy.  This predated my coming to New Jersey.  I never could

7     understand how that came about or why, but it was causing some

8     problems and there was a lot of controversy surrounding it.  For

9     example, there was cases where people had gotten beaten up by

10    resident-on-resident abuse in developmental centers and staff

11    members did not intervene basically because of this hands-off

12    policy.  And so there were some challenges to it.

13         I quickly learned that the policy statements of the

14    New Jersey Division of Developmental Disabilities were not --

15    they weren't -- had not made rules which would give them, I

16    guess, the validity of law or -- the New Jersey administrative

17    code.  But once you do them, you sort of have to follow them,

18    but they left them in a space where you could sort of disagree

19    with them.  I represented that disagreement to state people and

20    developed a package of non-aversive physical holds to apply, to

21    replace all the sort of bad stuff that I saw going on.

22         We developed that package.  We trained all of the folks in

23    our local facility at the training school, and we built a

24    train -- the trainers package.  So the basic package was three

25    days.  It went through de-escalation techniques, talking people

Walsh – Direct

1    down, all the sort of rules and regulations you would need to

2    manage a restraint system.  It included physical restraints --

3    bear hugs, basket holds, those kind of things.  We taught them

4    that.  Everybody was trained to competency.  We used videotapes

5    and demonstrations.  That package, once it became -- once we

6    started to train people, folks in the community found out about

7    it and wanted it, and so we went on the road and trained those

8    people.

9        The training school in Vineland, which is now term -- it's

10   changed its name to Elwin, New Jersey, still trains that

11   package.  I think the first training that we had off campus was

12   in 1983 or 1984 in a -- a community provider.  They still train

13   their own people, and they still train in the community

14   providers.  I would estimate that between the time we started

15   and now, that package has trained 15,000 direct care staff and

16   probably 500 trainers.

17       The basic package is a three-day package.  You train, you

18   get certified, and you can do it.  If you go to an additional

19   two-day program, then you can become a trainer in that.  It

20   is -- it would be roughly the equivalent of the CPI package at

21   CHDC; although, I think the CPI package, as it's used in

22   Arkansas, is a little bit more conservative because there are

23   not wrap-ups and take-downs.  We actually included those.

24       So at the time that we did that, that allowed us to stop

25   using any mechanical restraints at that facility, and I don't

1    believe they have ever used a mechanical restraint there since.

2    So --

3    Q    Doctor, I see also that, as noted on your CV, programmatic

4    manuals and some of them are for DDHA.  What is DDHA?

5    A    Developmental Disabilities Health Alliance, that's my

6    current employer.

7    Q    And I see you did a behavioral training manual and

8    community professional support in training program and quality

9    management manuals?

10   A    Yes.  That's generally part of my function in that

11   organization, is I develop those sorts of systems and training

12   manuals and practices.

13   Q    Doctor, when did you first become involved with CHDC?

14   A    2003, I believe.

15   Q    And what did you do back then?

16   A    Subsequent to the first visit of the Department of Justice,

17   I came out and reviewed general things, focusing on areas of my

18   interest and expertise, which would be risk management, quality

19   management, and behavioral supports.  I -- is that what you are

20   asking?  I am not sure.

21   Q    And what kind of work did you eventually do with them as

22   far as helping or assisting them in doing their behavioral

23   programs?

24   A    Well, I mean, I did see fairly high levels of restraint in

25   2003, and that was -- I had some concerns about that.  I had

Walsh - Direct

1    some concerns about how it was -- the system was used to

2    document and manage it.  And so I voiced those concerns and made

3    some recommendations as to how they might make some changes.  I

4    came back in 2005, sort of reviewed the same sort of thing,

5    pushed them a little bit farther along maybe.  I hope I did.  I

6    don't know.

7         In 2008, the facility sort of more formally wanted me to

8    come back in and help the department of psychology refashion

9    some of their approaches.  At that time I took -- I came in and

10   did a visit, worked mostly with Dr. Reddig on developing the

11   behavioral plans, the sort of the layout that we -- that you are

12   probably familiar with in this case so far.  The strategies and

13   the positive behavior support plans and the safety plans was

14   laid out during that consultation.

15        My role really was to sort of lay it out to help them

16   understand that it was really the folks at the facility --

17   Dr. Reddig, his staff, and whoever he got to help him -- that

18   actually worked out the details, wrote up the formats and stuff.

19   Subsequent to that, I did a review of their work.  Late 2008, I

20   believe in the back of my report, I included that review.

21   Q    In 2008, Doctor, did they also put in place a format for

22   functional behavioral assessment?

23   A    Yes.  Part of what we wanted to do, you know, the use of

24   the -- the use of plan restraints and the way behavior plans

25   were structured are really related.  So like this.  If -- if

Walsh - Direct

1    you -- if you do a functional assessment, and a functional

2    assessment is -- again, you have probably heard this in here --

3    is to assess what function that behavior serves for the person.

4    And if you identify the function of behavior, very often you can

5    help to offset the need for the problematic behavior by

6    addressing that function in another way.

7        So functional assessment as has been coming along in the

8    field for a number of years and, you know, it needs to get --

9    now it needs to get into most applied settings.  There is

10   several technologies for doing that.  I am sure we will get into

11   that probably later.  My role was to sort of help -- I wanted to

12   help the facility in general, the psychology department in

13   particular sort of refocus itself from a reliance on restraints

14   to control behaviors when they occur to reducing those

15   restraints and instead putting in place behavioral programs that

16   would teach people more appropriate behaviors.  That's probably

17   easier said than done in a large facility.  You know, it's sort

18   of like turning the battleship, you know.  You want to nudge

19   that bow over a little.

20       And at the same time, then, if you make some expectations

21   that people who are writing plans and the folks in the settings

22   who are implementing those used restraints less, then you can

23   sort of start to reduce those restraints and you can increase

24   the use of plans to -- policy behavior plans to train people.

25   That really is what we have seen, and I am sure we will get into

Walsh - Direct

1      that.

2      Q    I think we're going to touch on it here because my next

3      question is:  What was the purpose of setting up the three types

4      of plans -- the safety plans, the positive behavior support

5      plans, and the strategies the Judge has heard about.  Can you

6      explain why they were set up that way?

7      A    Yes.  In fact, there is a small table that might be

8      helpful.  It's on page 19 of my report.  Can I refer to that?

9      Q    Yes.

10     A     And it sort of gives a brief description of those three

11     types of interventions.  Safety plans are -- what we had decided

12     to do was take any plan that involved some sort of restrictive

13     or restraint program and put it into what's called a safety

14     plan.  We had some differences of opinion as to exactly how that

15     should be structured.  I am happy with the way it got

16     structured.  I mean, I can live with the way it got structured.

17     It builds a behavior plan that involves anything -- restraints,

18     planned restraints, or any kind of restrictive procedures if

19     there is -- there is other kinds of restrictive procedures

20     besides restraints.  And so they went into one type of plan, the

21     safety plan.

22          Positive behavior support plans are plans -- that was the

23     plan that would cover that element that I was discussing a

24     moment ago about teaching people alternative behaviors where you

25     would teach somebody.  So, for example, if you had a situation

Walsh – Direct

1    where a person might act out and cause behavior problems to get

2    attention, then you -- there might be a safety plan that would

3    have some restriction or restraint even if it was -- got

4    dangerous, but you might also build a positive plan to teach

5    that person better social skills or how to manage their anger or

6    whatnot.

7          Strategies was a third class because we -- we recognize and

8    other -- this is not new or peculiar to Conway Human Development

9    Center.  It's happened in all of my settings -- that you like to

10   have a plan that sort of stands and holds some turf in the

11   record and in -- to control, to govern the work of people in the

12   facility relative to how folks should be interacted with.  And

13   so you find lots of times that there.  There are some folks

14   who -- for sake of argument, some folks who might respond well

15   to quiet, you know, very gentle prodding and other folks might

16   need more direct, clearcut, you know, directives to do things.

17         And so, you know, there is a whole -- there is a whole

18   range of sort of behavioral instructions you might want to give

19   to direct-care staff who are working with the residents who live

20   there that are about how you deal with this person on a

21   day-to-day basis.  And they may not rise to the level of either

22   behavior support plans or safety plans, and so they're called

23   strategies.  And some places they're called behavioral

24   guidelines.  A lot of facilities have those kinds of things.

25   And so that's what -- that's what that third type is.

Walsh - Direct                                                5797

1        I mean, I think -- I think that makes a very logical sort

2   of package of things for psych examiners to work with relative

3   to helping staff interact with folks.  It's my understanding,

4   and I could be wrong, but my understanding was the strategies

5   were going to be moved out of being a behavioral intervention

6   plan specifically and maybe be moved into the IPP as a regular

7   part of that.  I am not sure if that's gone forward.  That -- at

8   the time of my last visit there, that was in March.  I think

9   there was some discussion about that.

10  Q    Now, there are elements that are common to all three of

11  these types of plans, correct?

12  A    Yes.  The way they structured them, you can see that at the

13  next table on page 21.  I mean, I won't go through this, but

14  what you can see is that these are sort of the components of

15  each plan, what -- what you would find in those plans.  And if

16  you look across that table, you will see that there is, you

17  know, reason for the plan is in each one.  There is a functional

18  analysis statement in each one.  There is a description of it.

19  And then there are some differences at the end.

20       So, you know, for better or for worse, these plans in

21  visual appearance to a casual observer -- and maybe sometimes

22  not even a casual observer -- they may look similar, may even be

23  confusing, but they do have three very distinct and separate

24  functions.  And those functions, in my opinion, make very good

25  sense for the kind of clientele that exists at CHDC.

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

Walsh - Direct

1    Q    And in your opinion, Doctor, have the development of these

2    plans or has the development of these plans proven beneficial to

3    CHDC?

4    A    I think absolutely so.  I mean, I think that the -- that

5    this is in some sense the mechanism that drives the overview of

6    what I was talking about of moving the ship.  It's a -- it gives

7    the tools to the psych examiners to actually move things into

8    safety plans when they think there is a safety need, but also

9    gives them the opportunity to build positive behavior support

10   plans.  I still think that that, that psych department is -- I

11   think it's in a growth phase.  I think it has been since 2005,

12   at least -- and that -- I think it still needs to grow, and I

13   think we need more emphasis on positive behavior support plans

14   going forward out there.

15       I think that they need to be more directive because a lot

16   of those people are very disabled.  I would say, though, that if

17   you stand back and look at the, what I would consider the single

18   most important outcome of this is that if you look at the number

19   of restraints that have -- the plan restraints from 2005 until

20   now, the plan restraints are down 69 percent and, you know,

21   that's -- that's a remarkable -- that's just a remarkable

22   number.  I mean, my view is that -- I was reading through some

23   of the trial transcripts, and I think Dr. Matson said it was

24   good, but they needed to do more.  You know, good to me is

25   perhaps not quite good enough.  I think it's great.

Walsh – Direct

1       You know, I think people should be cracking open bottles of
2   champagne out at the administration building at CHDC.  That's a
3   real important outcome, and I am sure we're going to
4   characterize that more as we go through.  But, you know, I see
5   all that stuff, those -- the changes in practice out there and
6   to some extent my small interaction out there -- as coming
7   together and producing part of that outcome.
8   Q    Doctor, did you find the staff members at CHDC to be
9   cooperative and assistive in their work?
10  A    Absolutely.  I mean, you know, perhaps I am a little jaded.
11  I am from the east coast and I go through a lot of developmental
12  centers on the east coast and folks -- folks sometimes are a
13  little hard.  I -- I have to say that the folks that work out
14  there, I just find are just wonderful.  I -- they are easy to
15  talk to, easy to understand.  They -- they have the best
16  interests of the residents at heart and they're -- there is in
17  some sense a -- we will probably fight about this later, but in
18  some sense there is a community out there that exists inside
19  that facility.  And I think that's important.  That's an
20  important sense of community for both the staff members and the
21  families and the residents to understand because it supports a
22  lot of good stuff.
23       I -- my reading of some of the reports of the DOJ experts
24  is that they recognize that too, that people don't have problems
25  with -- so much with the people who work out there.  I mean,

Walsh – Direct                                    5800

1   they're great folks.

2   Q    Now, let's turn to your work that was more directly related

3   to your report.  This would be probably in 2009 and 2010.  Did

4   you tell us -- did you make additional visits to the facility

5   prior to your writing your report?

6   A    Yes.  I made two visits, in September of 2009 and in March

7   of 2010.

8   Q    And could you describe those visits a little bit, how much

9   time you spent there and what you did?

10  A    Well, in the -- I toured the facility, but quite frankly,

11  my time was spent on collecting data and documents from which I

12  could extract data because I am a data guy.  And so I wanted to

13  very carefully get all the foundation pieces -- the policies,

14  the procedures, interview the people who are responsible for

15  those, collect the data, collect reports -- so that I could --

16  because I certainly knew what I wanted to do, so I could go back

17  and do that.  I believe I spent -- I think I spent four days

18  there in September and three days in March and that's it.

19  Q    Did you choose the documents you wanted to review?

20  A    I had clear sets of things that I wanted, yes, and I also,

21  I guess, discovered other things through interviews and through

22  discussions with the folks there.  So, let me give you an

23  example of that.  For example, when I was looking at some of the

24  quality elements and I spoke with the quality management nurse

25  and, you know, they have a dysphagia committee and I found out

Walsh - Direct                                                    5801

1    they had a database and they had some statistics and so then I

2    could acquire them too.  So it was both.  I mean, clearly I

3    had -- I wanted to get the things that I needed to produce my

4    sample, which we'll get to, relative to reviewing behavior plans

5    and whatnot, and so, you know, I did both.  I had -- I had

6    documents.  I clearly wanted restraint numbers, human rights

7    committee records, incident reports, incident -- statistical

8    incident reports and whatnot, and I also found other things when

9    I interviewed folks.

10   Q    Did you choose who you wanted to interview?

11   A    Pretty much, yes.

12   Q    Now, this isn't the only type of work that you do, right,

13   evaluating facilities like you did in this case?

14   A    No, no.  This is side linked.  I am a full-time employee at

15   DDHA.

16   Q    And I know you touched on this, but what type of work does

17   DDHA do exactly?

18   A    We do healthcare, primarily healthcare management.  We also

19   have in-home behavioral supports.  Our -- we have eight offices

20   statewide.  They go from southern New Jersey to northern

21   New Jersey.  We are very spread out and, you know, I think you

22   can get to one of our offices in a 30-minute drive from just

23   about anywhere in the state.  We have an eighth office, which is

24   a healthcare management office.  We recently had a little bit of

25   a setback.  We lost one of the HMO contracts.  They're quite

Walsh – Direct

1    difficult to deal with.  And some of our patients -- we have had

2    some patient runoff, but all the offices are still open and

3    still operating.

4    Q    Would it be accurate to say that DDHA actually focuses on

5    developmentally disabled individuals living in the community

6    setting?

7    A    That's all we do.  We provide healthcare, mental

8    healthcare, and healthcare management.  And we also do in-home

9    behavior supports, but that's restricted to certain counties

10   where the contracts are.

11   Q    And I know we already discussed you doing some program

12   development for the DDHA, but what else do you do there?  What

13   other roles do you play?

14   A    I do quality management.  I write grants.  I manage the

15   three buildings in the south, so sometimes I clean gutters.  I

16   work closely with Dr. Kastner.  I -- I do a lot of the sort

17   of -- I don't know what you call it -- senior management work,

18   strategic planning with him.  You know, that means work in

19   Trenton -- that's the state capital -- and whatnot.

20   Q    Doctor, when you started your work now on this report, or

21   this -- this most latest review in 2009 and 2010, did you use

22   some kind of instrument or specific tool to do your work?

23   A    Well, we're getting into behavior management review, right?

24   Q    Right.

25   A    Yes.  Could I describe what I did?

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

Walsh – Direct                                    5803

1    Q    Sure.

2    A    I -- what I wanted to do -- what I did, actually, was to --

3    I took a randomized, stratified, representative sample of people

4    who are on behavioral strategies.  So if you recall the three

5    types of plans, behavioral strategies are the ones that involve

6    folks who have some sort of restrictive element written into

7    their plan.  And so they, they by and large would character --

8    could be characterized -- I hate to do this, but they could be

9    characterized as the more problematic residents at the facility

10   who need that kind of attention.

11        At the time that I did that, there were -- this was in

12   September of 2009.  I got a list from Dr. Reddig of all the

13   plans at the facility.  There were at that time 99 safety plans,

14   there were 33 positive behavioral support plans, and there were

15   295 strategies.

16        I used the people who -- I used the 99 safety plans as a

17   basis for my sample.  I should add to you, though, that if you

18   combined the behavior -- the safety plans and the positive

19   behavior support plans, that would be 132, but they -- there

20   wasn't 132 people who had -- because some had both.  That

21   represented 112 different folks.  So I used -- I used the safety

22   plans to draw -- I said it was a randomized, stratified,

23   representative sample.  Let me describe that for you.

24        My -- my intention was to characterize the behavior plans

25   and their outcomes for the people who were on behavior plans in

Walsh - Direct                                    5804

1   the facility.  And so to do that, I had to establish that group

2   as a subpopulation.  And so the people who were on safety plans,

3   I randomly selected 30 of those people.  And the way I did that

4   was random selection, was -- I went into a big, detailed

5   explanation of that.  But I generated a random number of tables

6   using an Excel spreadsheet, and I selected the people who had

7   safety plans.

8        I decided to review all of the behavior plans that any

9   person who was selected had, and so that means that they

10  would -- we know they would have a safety plan because that was

11  the basis for my selection.  Okay?  And but -- and every single

12  one of them had at least one other plan.  So let me get the

13  right numbers.  7 of them had positive behavior support plans,

14  and 23 also had strategies.  And so the 23 and 7 add to 30.  So

15  there was 60 plans for me to review, but that covered 30 people.

16  And that 30 people represented a 30-percent sample of the people

17  at the facility who were on safety plans because there is 99 of

18  them.  The -- and so that makes it a random sample that's

19  representative of the population.

20       To make the representation of the population even more

21  important, I used a stratification system.  Stratification

22  system is where you build what's called a sampling frame, and so

23  I used age, unit, and functional level, you know, intellectual

24  disability level to sample them.  If you -- that's sort of shown

25  in my, the Appendix B -- no, Appendix C to my report on

Walsh - Direct                                                    5805

1      page 191.  I will just -- I can do this real fast.

2            The importance of this -- the stratification is that it

3      makes the sample more representative so that it makes it truly

4      scientific.  If you -- to just take it outside for a moment,

5      this is what large sampling organizations do.  The Gallup

6      organization, it's the reason you can predict who is going to

7      win the presidency on -- looking at 2000 people, I suppose, to

8      300 million people.  They take a stratified random sample of the

9      voters in the United States.

10           And so if you look at the two tables at the bottom of

11     page 191, one is for age, and that shows -- I grouped that into

12     three stratified levels of under 22, 22 to 50, and over 50.  And

13     you can see that on the left side of that table.  For level, I

14     divided them into two groups -- mild and moderate, severe and

15     profound.  There are way more severe and profound at the

16     facility.  They make up 90 percent of the population at the

17     facility.

18           And so you wanted to make sure that you don't -- you know,

19     that you get the right proportions of all those things, and you

20     will see across the top is each of the units.  And so the cells

21     of those tables show their age and their level and then, if you

22     turn to page 192, you will see the sample I took.  The sample --

23     and this was randomly drawn, okay?  I took the sampling frame, I

24     took a random number, and I filled the cell until I got this

25     number of people.  If you look over at the right-hand column,

Walsh – Direct

1    you will see there is 30 people:  7 who are under 22, 16 who are

2    22 to 50, and 7 who are over 50.  This is in age.  And if you

3    turn back, you will see that that roughly approximates the same

4    percentage that's in the facility and the same is true for the

5    unit and the same is true for the level of disability.

6         So what I had then was a very good sample of people who are

7    on safety plans at the facility.  The reason I went through all

8    that, which is complicated and took a lot of time, but the

9    reason I went through all that was because it was critical for

10   me that when I looked at 30 people, I wanted to be able to say

11   whatever I found for those 30 people also applied to the 99

12   people.  And so that -- I can make a statement based on my

13   sample about how the entire psychology program, i.e. behavioral

14   interventions, was working at the facility.  It's my opinion

15   that, because of the sampling, that whatever I found in my

16   sample equally applies to the facility because it's a very

17   carefully selected representative sample.

18   Q    You reviewed the plaintiff's experts' reports, right?

19   A    I am sorry.  I didn't hear you.

20   Q    You reviewed the plaintiff's experts' reports, correct?

21   A    Yes.

22   Q    And you reviewed their depositions too?

23   A    Yes.

24   Q    And you may have even reviewed some of their trial

25   testimony; is that correct?

1    A    Some, yes.

2    Q    Did you see any evidence at all that they tried to do any

3    kind of stratification of this sample that they claim they

4    pulled?

5    A    Surprisingly, no.  I found their methodology to be

6    relatively nonscientific and, surprisingly so, given who some of

7    the experts were.

8    Q    Now, I believe you stated that you looked at both planning

9    and program implementation processes, but did you also look at

10   outcomes?

11   A    Yes.  I looked at both the plans themselves.  I did a

12   quality review of the plans themselves and I also looked at

13   outcomes and, you know, we should take those separately because

14   there is a fair amount of findings in both.

15   Q    Why would you also look at outcomes?  I know we will get

16   into this in more detail as we go through some of your findings,

17   but --

18   A    Well, outcomes is the sine qua non of what's happening.

19   Despite a lot of assertions by DOJ experts, you can have plans

20   that may not be perfect, but if they're implemented very

21   systematically and correctly, you can get behavioral change.  If

22   you have a fairly good plan, you can even have some

23   implementation problems and still get good outcomes because

24   plans -- behavioral plans are written, developed and implemented

25   in this large team framework.  So not only do such plans -- not

Walsh - Direct                                    5808

1    only are they just a menu of responses for people, for

2    individuals who they're for, but they also form a sort of

3    intercommunication network among staff members about how we're

4    treating this person and where we're going with him or her.

5        And so I think there is a whole context of the way plans

6    work and -- in an ICF/MR facility in that interdisciplinary team

7    structure, and so it's hard to tell exactly whether it's always

8    your plan that's working.  And so -- because you can have people

9    who are aging, getting slower, like certain staff, don't like

10   other staff.  And so you would want to look at outcomes to see

11   how things are going and so, you know, you want to assure

12   yourself that plans are built with the appropriate elements, are

13   appropriately vetted, and have appropriate oversight, and

14   whatever they need.  But you also want to see:  Do they work?

15   In fact, "do they work" might be even a more important question.

16   Q    Did you observe at all whether the plaintiff's experts

17   focused on outcomes?

18   A    I don't -- I think looking for outcomes in their reports,

19   they're very hard to find.  It's like searching for water in a

20   desert.  I think there is plenty of outcomes in my report.  I --

21   you know, I am a quality guy at some level.  That's my job and,

22   you know, I look at quality as structure, process, and outcome.

23       The structure in some sense at CHDC is given by the ICF/MR

24   model.  You don't have to look at structure so much.  Although,

25   looking at staff adequacies, staff ratios, that's a -- that

Walsh – Direct                                                5809

1    would be a structural concern; like, is the structure there to

2    support?  You know, if you had 500 people and you had one psych

3    examiner, that would be a structural problem.  So there is that.

4    I did look at that.  We can probably discuss that later.

5         But the second thing is process.  Process is how things are

6    done, and so that's how plans are written, how they're approved,

7    and whatnot.  This is where I found that most, if not all, of

8    the DOJ experts really focused.  They looked at process.  They

9    only looked at process, and they never looked at outcomes.

10        But the third component there, of that quality triangle, is

11   structure, process, outcomes.  Outcomes is what's really

12   happening and, when you look at outcomes, a very different

13   picture emerges from CHDC than was painted by the DOJ experts.

14   Q    Doctor, I see in some of your writings here, in your

15   calculations, you use a facility size of 503.  How did you come

16   up with that number?

17   A    I -- I was given a list.  I had a couple of lists of the

18   total population.  I think the first one I got had 503 on it,

19   and so I just -- I know that the facility size varies between

20   503 and 510 or 500 and 510.  I -- I don't know if that was the

21   number that was there in September of 2009, but that was what I

22   had on my list.  So I just used that number.  Whenever I figured

23   a percent or anything in the facility, I used 503 as the

24   denominator, knowing that it could be 510, but, you know, it

25   would only move a percent, a relatively small distance.  So I

Walsh – Direct                                          5810

1    wanted to -- you know, I used that to -- because that's the

2    number I had.  I am not really sure where I got it.  I think I

3    got it off the list.

4    Q    And, Doctor, do you know what percentage of the residents

5    at CHDC have either severe or profound disabilities?

6    A    Most.  The -- about 90 percent have severe or profound

7    disabilities, and if you break that down into severe and

8    profound, most of those have profound disabilities.  About 72 --

9    about 72 percent have profound disabilities.  About 18 percent

10   have severe.  And then the other 10 percent is split between

11   mild and moderate, and that's split about 2 percent for mild and

12   maybe 8 percent for moderate.

13   Q    Does this high level of disability have any implication as

14   to how the facility operates?

15   A    Absolutely.  For everything.  I mean, for this whole case.

16   Q    Could you explain that?

17   A    Well, let me take one -- let me take it apart.  Relative to

18   the facility, a facility that deals with a population that --

19   90 percent of which is severe and profound -- and you should

20   also understand that within that population, oh, there is

21   probably -- I don't directly recall the exact percentages, but I

22   am not that far off.  Maybe 140 people, maybe 150 people who are

23   listed as having fragile health.  There is probably 160, 170 who

24   are listed in -- you know, on the -- just a listing of

25   facility -- the facility listing of residents as having some

Walsh – Direct                                                   5811

1    sort of behavioral issue.  About 250 to 275 of those people

2    probably get psychotropic medications.  So this is a relatively

3    complex, relatively low-functioning group.

4         I think 190 maybe -- I would have to check this, but that's

5    my recollection.  A lot of people are not ambulatory.  So it's a

6    very, very disabled population.  The implications of that are

7    important in a lot of ways relative to what is the day-to-day

8    life like at the facility.  It's probably relatively slow and

9    relatively structured because you have all these people who have

10   intense care needs as opposed to -- just for the sake of

11   argument, had you gone into one of these facilities in 1960

12   where you would find that 50, 60 percent of the people were

13   mildly disabled and they would have basketball teams and bands

14   and they would have all sorts of activities that are quite

15   different than what the folks are dealing with at the facility

16   there.

17        So that -- so that has lots of implications for how they

18   manage the facility and how they manage the people and what they

19   have to train the staff to do is a great high number of -- high

20   level of healthcare needs, high level of personal care needs and

21   whatnot.  And I -- I think with a little bit of thought, I mean,

22   it's not hard to project that on to this whole case of like what

23   does that mean relative to movement between the two models,

24   between ICF/MR and waiver models in the facility.  So, you know,

25   I think it has really important bearings on that.

1    Q    Now, Doctor, you already told us how you pulled your random

2    stratified sample.  What did you do next after you got --

3    after --

4    A    Okay.  So I used that sample to review behavior

5    interventions at the facility.  That was a goal of that sample.

6    And so to do that, I wanted to not just read them and make some

7    sort of judgment or extract some partial notes.  That's in some

8    sense what the -- I think the DOJ experts did.  I wanted to do a

9    more formalized process that really told, really could show what

10   that level of intervention -- what the nature of those

11   interventions were.

12        So here is what I did.  I developed what's called -- what I

13   called, just for the sake of anything better, behavior plan

14   quality rating tool.  This is a two-page tool.  I actually show

15   it in Appendix C.  If I refer to appendices, can people get to

16   them?  Is that okay?

17   Q    Yes.  You can refer to it and look at it.

18   A    If you look at page 195 and 196, you will see this tool.

19   This is -- this is a tool that I made for my use.  This is not a

20   commercial tool.  This was, this is -- I have, you know,

21   reviewed behavior plans in other facilities before, and I

22   formalized it into this tool because I actually have been

23   wanting to do that for a while.  And so this is a way to look at

24   it.  This takes a snapshot of the elements of the plans.

25        If you look at this tool, it's divided into Sections A, B

Walsh – Direct

1    and C and D.  A includes nine items that are covered in the

2    administrative elements of the plan, is the information there

3    that needs to be there to actually run it so we know who it is,

4    when was it was approved, blah blah blah.

5        Part B is the behavioral change elements of the plan, and

6    that's sort of the meat and potatoes.  Are the things there that

7    should be in a professional behavior plan?

8        If you look at Part C, it's -- these are the plan

9    management elements.  These are like the things you have to do

10   to make the plan work -- data collection, monitoring, stuff like

11   that.

12       I also included a section for general ratings, and if you

13   look, there is only four items there.  They're down at the

14   bottom.  And the ratings I used are listed:  Unacceptable, poor,

15   average, good, and excellent -- five ratings.  And I rated each

16   of those sections after I -- after I went through and decided on

17   those, yes or no, I rated them for overall quality.

18       And 4 is I rated the plan as a whole.  Okay?

19       So that's the tool I used to look at those, those 60 plans

20   on 30 people.  All right?  And a few things before I get going

21   into that.  I did this in a specific way because there is

22   something called rater drift.  Rater drift is where the mental

23   sort of status that you are -- the mental sort of set that you

24   are using to look at something doesn't -- doesn't stay the same

25   over time.  So if I were to rate those 30 plans -- 10 one week,

Walsh – Direct

1    10 two weeks later, 10 three weeks after that -- it might be

2    that there is some difference in what I was using.

3         So what I did was I set aside time to make sure that I took

4    those 60 plans and rated them start to finish.  I used a -- I

5    used two snow days in February, which we were snowed in.  On the

6    east coast we got 80 inches of snow this year, and so I was

7    snowed in for two days.  And I sat one whole day and rated as

8    many as I could and finished off the rest the next morning.  So

9    those were all rated in close proximity and so I was -- I could

10   assure myself there couldn't be that much rater drift.

11        And prior to doing any of that rating, I did a small

12   reliability study on the behavior plan quality rating tool

13   itself.

14        I think Dr. Matson probably testified to the need for

15   reliability studies of things that you use, and he said that

16   numerous times.  I know he said it in his deposition and his

17   report.  He is likely to have said it in trial too.  I am not

18   sure about that though.  And what that is is this, is that if --

19   if you rate something, if you rate anybody, when you want it to

20   be reliable, reliable in a psychological sense means repeatable

21   in some sense so that if I were to rate somebody on some quality

22   today on -- using some sort of tool and I was -- I would rate

23   that person six months from now on the same tool, would I get

24   roughly the same thing?  Would it be -- would I get the same

25   results?  To the extent that I would get the same results,

1    that's -- that would be considered to be a reliable instrument.

2        If one day you rate the person very high and then six

3    months later you rate them very low on the same instrument, it

4    means the instrument is not good.  If you think about your

5    bathroom scale, you know, your bathroom scale, you wouldn't want

6    it to weigh you one weight one day and then 30 pounds different

7    the next day.  Well, you might want that, but that wouldn't be a

8    good scale.  It would mean the scale is unreliable.  So to the

9    extent that it weighs the same every day, given that you are the

10   same, that is a reliable scale.  That's what Dr. Matson was

11   talking about.  I agree that scales need to be reliable.

12   Q    So how did you do this?  Did you send this instrument to

13   other people in the field?

14   A    Yes, exactly.  I found six people.  I took one set -- one

15   protocol from one person, redacted all the personal information

16   and location information so they couldn't tell who it was.  I

17   sent them that with a copy of the rating scale and said:  Just

18   rate this.  These were people, all of whom worked in behavioral

19   management.  I think I sent them a little sheet to give me their

20   history and whatnot.  And when I got it back, they had a

21   combined 83 years of behavioral experience.  There were two

22   Ph.D.s -- three Ph.D.s, a master's, and a behavior -- I am not

23   sure.  I have it here somewhere.  There were five people.  I'm

24   sorry.  They're listed on page 23.  Half of them were from

25   the -- a behavioral program for people with developmental

Walsh – Direct

1    disabilities at Rutgers University.

2        So this, this -- these are all people I knew who agreed to

3    do this.  And so all they had to do was to take one set of

4    behavior plans, and they had to do a behavior plan quality

5    rating tool, the two-page rating tool I just showed you in my

6    appendix.  That means I got back five of these on one person.

7    So I had five different ratings on one person, and then I could

8    look at how these five raters, experienced raters agreed using

9    this tool.

10       And so the way you do that is you take the responses -- I

11   think there are about 21 or so items on that.  You take those 21

12   items, and you compare one -- you compare that to every single

13   other one, and you compare the next one to every single one of

14   them.  So everybody is compared with everybody else to see if

15   they agree or not agree.  You take the total number of

16   agreements divided by the total number of agreements plus

17   disagreements, gives you a percentage of agreement.  The

18   percentage of agreement for those five people -- and I wasn't

19   part of this because I didn't want to taint those ratings any

20   way -- was found to be 69 percent.

21       So those five independent raters agreed 69 percent of the

22   time.  That level of agreement was perfectly fine for this use,

23   meaning my one-time use -- given that I was going to be one

24   rater, my one-time use of this to rate the behavior plans.  So

25   at that point I had a stratified, randomized representative

Walsh - Direct                                    5817

1    sample of the people who had safety plans, and I had a

2    relatively reliable quality rating tool at my disposal.  And

3    then I proceeded to spend the snow day rating them.

4    Q    Did you --

5    A    All right.  Go ahead.

6    Q    Did you also do a quality rating on each of the functional

7    behavioral assessments?

8    A    Yes.  If you go through A, B, C, and D, those parts, one of

9    the elements in Part B, I believe it is, you know, the important

10   elements for behavior plans is a functional assessment.  Now,

11   because functional assessment had become such a lightning rod

12   for criticism in this case, I -- for each of those, I also did a

13   separate rating for functional assessment based on

14   the information in the plan.

15        Let me just highlight what I looked at there.  That means I

16   was going through and rating each plan.  I stopped when I got to

17   that middle section and went off and rated their functional

18   assessment as well.  And the functional assessment, I didn't

19   have any documents that they used.  What I rated it from was the

20   description of the functional assessment as they provided it in

21   the written behavior plan that I was rating.  And so I wanted to

22   look at, you know, was there notations of any formal tools used;

23   other kinds of functional assessments, the kind Dr. Matson spoke

24   of; the sources of data that they included in their functional

25   assessments and their plan write-up; whether or not a function

Walsh – Direct                              5818

1    was actually identified in the plan; and an overall quality

2    rating of the functional assessment itself based on whether I

3    thought the information in the functional assessment would have

4    been helpful to making the plan better.  So that was the nature

5    of the rating inside the rating if you will.

6         So I had 30 people who I was rating two plans each for,

7    either a safety plan and a positive behavior support plan or a

8    safety plan and a strategy, and within that I also rated

9    everybody on their functional assessment because that was of

10   importance to the case.

11   Q    And now you have that rating of the behavioral intervention

12   plans, the functional assessments.  Now, what were the results

13   of your ratings?

14   A    Okay.  If you look at page 23 of my report, I -- these --

15   the data that are shown in the little write-ups on these couple

16   of pages here are included in the appendix.  You can actually

17   look at my -- my original ratings.  They're all there.  But I

18   did this, I presented these results of the behavior plan ratings

19   section by section.  So if you look at the administrative

20   elements of the plan on page 23, you will see that the first

21   seven of those items -- there were nine items in that section.

22   The first seven were always there, and they were -- they're

23   fairly easy to do because they're probably required to be there

24   by policy, protocol, procedure.

25        So it -- does the plan identify the person, is the

Walsh – Direct

1    information there pertinent to the person, is there a sufficient

2    general description of the plan, is it logical, are there

3    provisions for administrative monitoring, and all those -- I

4    rated all those "yes" because they were standard.  Those plans

5    themselves, the three types of plans, are written in --

6    according to a procedure.  And so you remember that table we

7    looked at before which lays out all those different sections of

8    the plan?  Well, those sections sort of assure that most of

9    these administrative elements will be there.

10        All right.  Moving on, at the bottom of page 23, you will

11    see that there are two items, 8 and 9, and they were not

12    answered in the affirmative.  And so one of them, 8, is:  Are

13    there provisions for making adjustments to changes in the plan?

14    Only 6.7 was at yes, and 93 percent was no.  That -- in an

15    ICF/MR setting, it's really not possible for people to make

16    changes.  It's not appropriate for people to make changes to a

17    plan on the fly.  That might be a reasonable thing to do and --

18    in some cases, and it might be a reasonable thing if you had a

19    one-to-one relationship between a therapist who was doing a plan

20    for somebody.  But -- maybe I will give you a little bit of

21    context there.

22        So, for example, if somebody had an autistic child who had

23    behavior problems and they took him to a psychologist and the

24    psychologist built a little behavior plan for the parents to do

25    to get him on the bus to go to school in the morning -- the

Walsh – Direct                                                          5820

1      parents could call up the psychologist and make changes on the

2      fly to that plan.  And he would say, "Just change this in your

3      plan and do this differently from this day forward," but you

4      really can't do that in an ICF/MR setting because the plan is

5      vetted and developed at really the team level, the

6      interdisciplinary team level and there is too much -- there is

7      too much approval.  And so if you want to make changes to plan,

8      you really take it back to the team because a plan can be done

9      in different places.

10            You could have a recreator doing a plan.  You could have a

11     day program staff member doing a plan or a residential person

12     doing a plan.  You have multiple shifts.  So it's not easy to,

13     nor should you necessarily make changes on the fly.  And so I am

14     not surprised at the results in No. 8, that that's not the case.

15            In No. 9, this only asks are there provisions evident to

16     assure the plan is implemented correctly, often called treatment

17     integrity.  This is a measure of whether there is treatment

18     integrity, and none of the plans had that.  This was clearly an

19     issue raised by Dr. Matson, and I think we need to address that

20     and I think we will because I have a part in my report that

21     addresses that.  But that -- treatment integrity measures are

22     not included in the plans that I removed at the facility.  As a

23     prelude to more discussion of that later, perhaps, it may be

24     reasonable for them to look at that in the future.  That's not a

25     bad idea, but --

Walsh – Direct                                           5821

1   Q     Is it true, Doctor, that treatment integrity measures have

2   long been limited to research applications?

3   A     Well, let me -- let me describe it a little bit now, and

4   then maybe we won't have to get back to it.  I don't know.  The

5   treatment integrity measures are -- what this would be is this,

6   is that you -- you want to have everybody who does a behavior

7   plan, you want to have them do it the same way.  And you want

8   them to do it the same way person to person, and you also want

9   to have them do it the same way over time because the plan could

10  go in and be in for a whole year.  And so you don't want the

11  plan to be implemented differently in December than it was in

12  January.

13       And so you would want to assure yourself the plans are

14  being done.  That's the treatment integrity idea that Dr. Matson

15  brought forth.  In my report, when I said that this is not a new

16  thing, it's that we have seen those kind of things in research

17  for years and years.  They weren't called treatment integrity

18  because in research you weren't doing treatment.  We would call

19  them manipulation checks on the independent variable.  Boy,

20  that's a mouthful that doesn't make sense.  I understand that,

21  but let me just say this.

22       If you were doing a study -- if you were a researcher doing

23  a study on leadership, for example, and you are selecting

24  leaders -- for example, if you had a bunch of managers from a

25  company and you wanted to see whether they could distinguish

Walsh - Direct                          5822

1    between people who were good leaders or bad leaders and so what

2    you would do is you would get two actors and you would -- you

3    would have one act like a very good leadership candidate and one

4    act like a very bad leadership candidate.  You would have

5    these -- these people who you were testing, these junior

6    executives, see if they could distinguish.  So they would have

7    an interview, and they would try to be able to say he is a good

8    candidate, he is not a good candidate.

9         You could have a situation in that study, though, where the

10   actors aren't so good, and so where you wanted them to be very,

11   very different -- one be a very good leadership candidate and

12   the other be a slob, you know, so that would give -- it would

13   give the opportunity to distinguish them -- if they drifted

14   closer together so that they were distinguishable, then you

15   would draw the wrong conclusion if people couldn't distinguish

16   them because it wasn't possible to.  And so there has long been

17   this thing to do, what's called manipulation checks.  Was the

18   manipulation of that variable keeping them separate?  Did it

19   indeed stay separate?  And that's -- leads -- if you think about

20   it, it leads to treatment integrity.  So is what you want it to

21   do staying the same.

22        So I don't quibble with that.  Plain fact of the matter is

23   that it seems disingenuous to criticize CHDC for not having

24   fidelity checks in their behavior plans when it's not at all

25   common in applied practice.  And when you look at the research,

Walsh - Direct                                    5823

1    there is ample research.  I cited some of it in here.  There is

2    ample research there to show that people generally don't do it.

3    It's interesting to me, for example, that one of the studies I

4    cited, a researcher looked at -- let me just not misspeak.  I am

5    not sure I will be able to find it.  It's not that important.

6        They looked at multiple years of the *Journal of Applied*

7    *Behavioral Analysis* and looked at all the studies over, oh, 20

8    years, going back to 2003 -- maybe not 20 years -- 15 years, 12

9    years, something on that order.  And they looked at all the

10   studies of where there should be treatment fidelity and found

11   that -- that treatment fidelity measures were only in 18 percent

12   of them.  That finding, I think the brackets on what I found

13   when I looked in the literature was between 18 and 30 percent.

14   So somewhere, 25 percent are only -- 75 percent of research

15   studies looking at these kind of plans don't have treatment

16   fidelity measures.

17       Now, understand that these are peer-reviewed, published

18   articles.  And so if you look at peer-reviewed, published

19   articles and you only find treatment fidelity measures in 25

20   percent of them -- and these are the ones that are vetted, peer

21   reviewed, and make it into publication, and you only find

22   25 percent of treatment fidelity measures in them, is it really

23   fair to expect to see a treatment fidelity measure in every

24   single day-to-day routine plan at the developmental center?  I

25   am not sure that's a fair criticism.

1        Should CHDC move that way?  Yes.  They probably should.

2   That would be good.  What have they done instead?  Well, if you

3   look at the plans, and we will probably get to this in a moment,

4   you know, psychologists circulate through the units.

5   Psychologists monitor treatment plans on a monthly basis.

6   Psychologists are available to people for questions and answers.

7   Psychologists train everybody on the implementation, and team

8   members generally know how these plans should work.  And so if

9   they're -- it's not a treatment integrity measure, but it is a

10  way to ensure treatment integrity.

11       They also have what are called staffing meetings sometimes.

12  When behavior plans don't work, they have a special meeting of

13  the team, and they might discuss those issues that should come

14  up with those issues.  And so they do it in sort of an

15  administrative way rather than a measurement sort of way.  It's

16  not a bad thing to do, but plain fact of the matter is it's not

17  really common practice.

18       I frankly -- I mean, I have looked at a lot of behavior

19  plans in facilities.  I have not yet seen treatment fidelity

20  measures in them, and I am a little surprised at the fact that

21  all of the people from -- all the DOJ experts who did review

22  behavior supports keyed in on that, but I must say to you that I

23  think two of them did because they come from LSU, you know, and

24  at -- one of the leading authors of, on treatment fidelity

25  measures -- in fact, he is on one of the -- lead author of one

Walsh - Direct                                              5825

1    of the articles that I cited -- is from LSU.  So he is a

2    colleague of Dr. Matson.  In fact, Dr. Matson, I believe, has

3    published a couple of articles with him.  And Dr. Manikam went

4    to LSU.  So in some sense I think both -- at least those two

5    experts were sort of sensitized to treatment integrity measures

6    more so than would other experts they could have gotten.

7          In fact, the first expert they got in 2003 -- I forget his

8    name right now.  But the first, when they did their first -- DOJ

9    did their first tour here, they had a psychologist.  His report

10   did not measure treatment integrity at all.  And so I don't

11   think it's necessarily a bad idea, but I also don't think it's

12   necessarily at this moment in time a really valid criticism.

13   Q    Doctor, did you see any evidence -- and this includes in

14   all your reviews and in the plaintiff's expert's reports.  Did

15   you see any evidence of plan failure because treatment fidelity

16   measures were not included in them?

17   A    No.

18   Q    Now, you were going through -- and I am sorry I interrupted

19   you with some side questions there, but you were going through

20   your ratings.

21   A    So that dispenses with the administrative elements of the

22   plan.  Seven of the nine items were pretty fully met.  Eight and

23   nine were not, and I sort of gave you reasons why they weren't.

24   The second section of the behavior plan rating tool is the

25   behavior change elements, and these are -- these are the sort of

Walsh – Direct                                              5826

1       critical elements that you want to see in the behavior plan.  So

2       is there a description?  100 percent said yes -- of the target

3       behavior.  Is there evidence on functional assessment?

4       100 percent said yes.  And then in a moment I will give you -- I

5       can give you the results of that, the functional assessment

6       ratings that I did.

7           If you look at No. 3, it says:  If specific behavioral

8       techniques are included -- you are not going to know what these

9       are, but DRO stands for differential reinforcement owner

10      behavior -- are there clear descriptions in the plan.  In

11      73 percent, I found them; 23 percent, no; and 3, I guess I

12      couldn't figure it out, and so I called it a "don't know."  You

13      could easily flop that into the 23 percent.  So about 3/4 of the

14      plans had it, and 1/4 did not.

15          No. 4, are instructions for specific plan techniques

16      sufficient to ensure implementation?  So you don't want

17      instructions to be so arcane and complicated that people can't

18      do them, and you want them to be clear.  I found that to be

19      mostly the case.  That probably represents one case no.

20          Are there clear reinforcement or other contingencies

21      evident?  This is an important one.  Reinforcement contingencies

22      are really the meat, the most fundamental piece of meat in a

23      behavior plan.  It's the if-then statement.  If this happens,

24      then this happens.  In a very simple way, if you act

25      appropriately, you are reinforced.  If you act aggressively and

Walsh – Direct

1    hurt somebody, you may be restrained.  It's an if-then

2    contingency statement.

3        These are the things that govern how you reinforce

4    somebody.  You would clearly want to have 100 percent on this.

5    In the plans I reviewed, 60 percent had clear statements, 40

6    percent did not.  So these plans weren't perfect.

7        8, does the plan provide information on reinforcer

8    selection and/or discussion of the same?  They did not.  More

9    did not than did.  It's 43 to 56.  Reinforcer selection is

10   something that probably should be beefed up in the plans.

11       If the plan seeks to reduce or eliminate -- No. 7.  If the

12   plan seeks to reduce or eliminate problem behaviors, are any

13   replacement behaviors specified?  I found that in 86 or

14   87 percent of them, that was -- that was the case, and in about

15   13 percent, no.  This was also an issue raised by Dr. Manikam

16   and Dr. Matson -- I think more Dr. Manikam.  I am not sure,

17   probably both of them -- relative to replacement behaviors.

18       You know, 85 percent of the plans I reviewed all had

19   replacement behaviors.  My impression in thinking of why and

20   looking at the reports of the experts and why they didn't see

21   that is because sometimes you have -- replacement behaviors are

22   listed in, for example, a positive behavior support plan or a

23   strategy as opposed to the safety plan.  And so if you only

24   review a safety plan for somebody, you will miss the replacement

25   behaviors.  And so by reviewing both of the plans for any

Walsh – Direct                                    5828

1    individual, I picked them up, and they're fairly clear.  I mean,

2    later on where I -- I juxtapose some of the statements of

3    Dr. Matson and myself relative to these, and they're clearly

4    there.

5        So that brings us to the separate rating of the functional

6    assessment and how I did that and, if you look at page 27 of my

7    report, you can see the results of that assessment -- that

8    rating of the functional assessments.  So I did 30 of these

9    because functional -- the functional assessment that would be

10   done would go for whatever plans the person had because it's not

11   based on the plan.  It's based on the behaviors.  So there would

12   be 30.  That's the total here.  And if you look down the

13   left-hand side, it says the number and the percent that met

14   these criteria.

15       So 4 percent -- I'm sorry -- 4, 13 percent, reported the

16   use of the motivational assessment scale.  That's an indirect

17   commercial scale for functional assessment.  63 percent used the

18   CHDC functional analysis worksheet.  That's -- I am sure that

19   was discussed here prior.  That's the plan.  That's what -- that

20   is what I sort of helped them to implement in my 2008

21   consultation.  20 percent used some other process in the

22   functional assessments.  96 percent included information from

23   interviews with staff or others in the functional assessment.

24   So if you -- if you think about that -- it's actually

25   96.7 percent.  So it would be 97 percent used information from

Walsh – Direct                          5829

1    interviews.  The kinds of tools that Dr. Matson -- the indirect

2    tools, some of the ones that he developed, that he wanted to be

3    used in this facility, they're -- they are 100-percent

4    interview.  The only way you get information from them is by

5    interview.  You interview staff.

6         And so it's a straight interview instrument, and 97 percent

7    of these behavior plans represent they used -- they interviewed

8    staff or others relative to the behaviors.  100 percent included

9    direct observation.  60 percent included information from

10   records.  100 percent reported some function or hypothesized

11   function for behavior.  The overall ratings that I did are shown

12   at the bottom of that table, and their ratings go from 1,

13   unacceptable, to 5, excellent.  If you look at the ratings, you

14   will find that I rated one of them unacceptable.  I rated none

15   of them excellent.  And I rated 5 as poor, 11 as average, and 13

16   as good.  If you combined average and good, you get about

17   80 percent.

18        So are the functional assessments at CHDC perfect?  No,

19   they're not.  Is it better than not doing them?  Yes, it is.

20   You know, my -- I go back to the statement I said before that

21   says this is a psychology department transition that is moving

22   toward better practice, and to some extent functional assessment

23   is a hard and difficult thing to impart in a facility.  Quite

24   frankly, if I step out of this role for a moment and go back to

25   my consulting role, if I find these results -- and these are

Walsh – Direct

1    actually late 2009 results from a 2008 consult that I did, I

2    would be very happy.  I am very happy with those results because

3    it shows me that the message that functional assessment is

4    important, A, has gotten in because they're in.  It's mentioned

5    in 100 percent of the plans.  And that 80 percent of them are

6    average to good.  They can all be better, of course, but -- so

7    that -- that takes care of the functional assessment ratings

8    that were inside Part B.

9         Should I move on?

10   Q    Yes.  Move on to the next ratings.

11   A    If you look at the plan elements, these -- are there

12   provisions of data collection?  Yes.  100 percent of them had

13   that.  Are there instructions for data collection?  Assistant

14   formats?  Data sheets?  Yes.  For the most part they were

15   specified in -- I guess that would be three plans as they were.

16   Did the plan include any restrictive procedures?  Yes, because

17   you will recall that they were all built on strategies and -- on

18   safety plans, and safety plans by nature have restrictive

19   elements in them.  So that is automatic.

20        If the answer to Item 3 is yes, were they all reviewed?

21   Yes, they were all reviewed.  There is one case in which it was

22   actually -- when I did the review, there was a couple of cases

23   that didn't have the signed cover sheets showing the review.

24   Having the signed cover sheet was what I used as the criterion

25   for answering that yes.  I asked the secretary in psychology to

1    find me the missing four sheets.  She couldn't locate one and so

2    I -- I called it a no.  It may have been actually reviewed

3    appropriately, but the sheet wasn't there.  And so I -- I didn't

4    give credit for it.  And if the answer to No. 3, which it was

5    the restricted procedures, was yes, there were clear

6    instructions for applying the procedure.  In 97 percent, there

7    was.  There was, okay?

8        The last thing on my rating scale was the general ratings,

9    and the easiest way to look at these is on the bottom of page

10   28.  Where I rated the -- there is four items there that are

11   rated.  The first three are -- you take a step back, and you

12   rate each section of the other one.  So I rate the

13   administrative elements, the behavior elements, and how do they

14   hold together on each plan.  And then at the end, I rate the

15   plan as a whole.  Okay?  Is it likely?  Is it a good plan?  Is

16   it likely to make some behavior change?

17       The average ratings are listed because they -- you know, I

18   rated them 1 through 5.  The average ratings are all about 3,

19   which is average.  If you look, 3.7 for the first part, and the

20   second and the third part of the plan is a little higher.  Then

21   3.1 and 3.2 for the overall plan.

22       If there is a weakness there, the weakness is in the

23   critical elements of the plans, and they -- if you recall,

24   that's where we saw a little bit of weakness.  So that would be

25   a good place to focus future efforts.

Walsh - Direct

1       If you look at the range of those, they go from 2 to 5, 2

2   to 4, so I didn't go down and just rate them all 3.  And, you

3   know, one of them in the critical elements was rated as

4   unacceptable; but to offset that, at least one of them was rated

5   excellent.

6       So there is a range of behavior plans and I -- what I

7   conclude from that, from all of that, that whole process, is

8   that the behavioral plan program at the facility is on the whole

9   fairly healthy and fairly representative of other ICF/MRs I have

10  seen.  Actually, better than some.  There is always some room

11  for improvement, but my general sense is that the changes are

12  being made and improvement is coming along.  And the way I think

13  you validate that kind of conclusion is to take the next step

14  and look at outcomes.  And so that's the next thing I did, is to

15  look at outcomes.

16      Should we do that?

17  Q    In one second.  I just have some -- a side question here.

18  I believe that Dr. Matson said that only experimental methods

19  and indirect methods are vital measures of functional

20  assessment.  Is that accurate?

21  A    It's probably accurate that he said that, yes.  I mean,

22  I -- can I just speak to that a little bit?

23  Q    Yes.

24  A    If you look at functional assessment, first thing, it's

25  fairly complicated and I will try to do this quickly.  But

1    functional assessment has two names.  In some of its

2    incarnations, it's called functional analysis, and in some,

3    functional assessment.  And this is what it is.  Prior to the

4    advent of this whole sort of way of thinking, behavioral plans

5    looked at the behaviors and just tried to change them.  This is

6    mostly we're talking about problem behaviors.  So if somebody

7    was aggressive and you just wanted to sort of get that level of

8    aggression down.

9         And as people studied applied behavior analysis,

10   scientists, they determined that, you know, sometimes these

11   behaviors have functions for the person, that there is a

12   functional relationship to the reason that this person is doing

13   the behavior.  Those tend to be -- some of the common ones are

14   for attention.  But think of it -- think of another one.  You

15   know, if you have a student, a disabled student who may be

16   autistic or not even -- doesn't want to be doing his desk work,

17   whatever the task is being presented by a teacher or an aide, a

18   way to get out of doing that is to throw a temper tantrum, pound

19   on the teacher, pound on yourself, do some behavior that sort of

20   allows you to escape from that task.  And so a function of a

21   behavior -- the function this behavior serves, this

22   self-injurious behavior or aggressive behavior, the function it

23   serves to that person is to escape from the task because very

24   often what could happen is the person sits down, present them

25   with a task -- building blocks, doing a puzzle, whatever it

Walsh - Direct                                              5834

1   is -- and he takes the puzzle and starts pounding the person or

2   hurting himself or biting his hand.  And what happens is you

3   have to intervene and take the person out of the situation and

4   you take them over and sit on the side to calm them down.  But

5   he has got out of doing his work, so he escaped.  So that's a

6   function.

7        You can envision people who can't talk who are very

8   frustrated because they can't communicate and they are trying to

9   communicate something and the only way they can communicate is

10  through some aberrant behavior.  And so all these sorts of

11  functions were thought to be important to analyze, to find the

12  function of a behavior prior to building a behavior plan

13  because, if you knew the function, then you could move in on

14  that function, change that function, directly address that

15  function.  So if the function is to communicate, give them an

16  alternative way to communicate and he won't have to pound his

17  head to communicate something like:  I don't like this or I

18  don't like it here.  So that, that's sort of the theory behind

19  it.  It's an excellent theory.  I fully support it.

20       In looking how it's done, functional analysis is

21  experimental, which means that, you know, this is the way they

22  did it in the labs at University of Southern Florida or the

23  people who figured this out.  If you take a person and put them

24  in and if you wanted to determine if something was a function,

25  you would keep on shoving a task at them and you would let the

Walsh – Direct

1    person act out to determine if that's what the function was.

2    That sort of experimental trial functional analysis is, A,

3    difficult to set up, resource intensive, and has not been used

4    very much in the field because it's hard to do.  There are even

5    some folks, probably nonbehaviorists that you find on the team,

6    who aren't keen on doing those sort of challenge trials where

7    you have to sort of let somebody act out to determine the

8    function.

9         And so there is lots of problems relative to making that

10   functional analysis, that scientific functional analysis work in

11   applied settings.  And so one step below that, to back off that,

12   are nonfunctional analysis techniques, and they have come as a

13   group to be called functional assessment techniques where you

14   are assessing it as opposed to experimentally analyzing it.

15   Q    Is that more like an observational approach?

16   A    There is two types of those.  You back off and look at

17   nonexperimental functional analysis, functional assessments.

18   You can do that with a questionnaire where you give a

19   questionnaire to staff.  That's what Dr. Matson advocated for.

20   That's called an indirect functional assessment, and you can do

21   that.  So there is a questionnaire.  It's a couple of pages long

22   and has all these questions about the function, the behavior.

23   Psychologists would interview a staff member, would answer the

24   thing, score it, and get some sort of function.

25        When I said that people who were doing functional analysis

Walsh - Direct                                          5836

1    used the MAS, that was what they were doing.  That was one of

2    those.  That's called an indirect method.

3         There are also what are called descriptive methods, and the

4    worksheet that was adapted from one that I used in DDHA and was

5    made into the Conway Human Development Center worksheet form,

6    eight or nine-page form.  That is what is called a descriptive

7    form where you go through and you do the work and just fill it

8    all out, what's the behavior look like.

9    Q    Is that what is done at CHDC?

10   A    That's what they use, yes.  15 percent of the time they do

11   did use indirect methods, but by and large they're using not the

12   indirect methods meaning a commercial scale.  They're using what

13   are more descriptive methods.  If -- and so if you look at it,

14   though, if you deconstruct that worksheet, their worksheet has

15   staff interviews in it.  Their worksheet has observation in it.

16   Their worksheet has a contingency analysis, which is an ABC

17   analysis.  That's antecedent behavior, consequence analysis,

18   that's a regular part of doing a functional analysis.  It has a

19   communication element review where they look at the person's

20   communication strategies, try to determine if that could be part

21   of the functional behavior.  So it's a catchall.  It's a

22   descriptive worksheet that just helps the psych examiner work

23   through assessing the function of behavior.

24        It is -- is that as good as a functional analysis, the kind

25   of experimental one that was done in the labs?  No, probably

1    not.  Whether or not it's as good as Dr. Matson's advocated

2    scales, though, I think that's an open question.  He said

3    automatically, because these scales have been vetted in the

4    literature and are published, that it makes them better.  I am

5    not so certain of that.

6         But the second point is, when you look at some of the

7    reviews of functional analysis in the literature, there is a

8    rather long and famous review written in 2003 which looked at

9    all the procedures out there and said that functional analysis,

10   experimental function analysis is the best and that's what

11   everybody should do and get to that somehow and that -- it

12   looked at indirect and descriptive measures and put them both in

13   the box and said:  These are secondary measures.  So it looks at

14   them in some sense as equivalents.

15        I think it's very important to look at the functional

16   behaviors when you are doing behavior plans, but I think that in

17   some sense the intensity of the attention of the DOJ experts on

18   this topic is overreaching and it's -- it has gotten more time

19   in all this proceeding than it's worth because they are doing

20   functional assessment.  Could they improve those?  Yes.  My

21   sense is that had this trial perhaps not intervened, they could

22   be farther along, but, I mean, the point being that all of the

23   elements are there.

24        Even Dr. Manikam in his report says that he found

25   functional assessments in the reports, and he actually rated a

1    couple of them as excellent.  So it's a question of relative

2    quality as opposed to there or not there, and I think even a

3    question of relative quality between what Dr. Matson advocates

4    and what they're doing, using their worksheet, is an open

5    question as to which is actually better.

6         My recommendation of the next step for them would be to

7    take that worksheet and augment it with an indirect commercial

8    scale.  That would be a really good way to move to the next

9    level, some of which have done that.  So --

10   Q    Dr. Matson at one point suggested that the psychological

11   examiner should be assessing pain.  How do you react to that?

12   A    Well, you know, I have looked at a lot of places.  I have

13   been a psychologist.  I have never assessed pain.  If I had

14   somebody who I thought was having pain and that pain was

15   interfering with some behavioral intervention practice, I would

16   go to the unit nurse first and start talking to them.  And then

17   I would go to the physician.  We have a structure in which

18   people work in an interdisciplinary team.  They are all there

19   and all on campus and they're all available.  And so I -- I am

20   not sure that you need to have -- first, that there are that

21   many cases where you need to have a pain assessment done.  And

22   if that pain assessment is done, then I think that that would

23   really best be done by a combination of certain team members who

24   could look into that, depending on what the nature of the pain

25   was thought to be.  I think that's a strong hand, quite frankly.

Walsh – Direct                                                5839

1          There are clearly situations in the literature and in

2     people's experience where pain has -- it would be good to assess

3     pain.  And you have people who, for example, have never acted

4     out, don't have a history of it, all of a sudden they start

5     acting out because they're perhaps profoundly disabled.  They

6     can't tell you what's wrong.  It doesn't make sense based on --

7     you think, oh, what's going on here?  And when you look into it

8     after -- a lot of times after a lot of different things have

9     been tried, you find that the guy had an impacted wisdom tooth.

10    And so if there had been some way to assess that early on, you

11    could have resolved it.

12         I don't -- I am not that familiar with pain assessments,

13    but my sense is that pain assessments by and large are going to

14    need some response capability on the part of the consumer and in

15    very large part, some of the folks here, that's a very difficult

16    thing.  And so ascertaining when somebody is in pain and the

17    level of that pain very often is -- I put it in a -- in the area

18    of art.  It's the art of healing as opposed to a pain

19    assessment.  That's not to say that I would completely discount

20    the suggestion from Dr. Matson that pain assessment could be in

21    the armamentarium of the teams.  I am not even sure it belongs

22    to psychologists, but in the teams at the developmental -- at

23    the human development center.  Whether or not that would be

24    widely used or necessarily widespread, I don't see it happening,

25    quite frankly.

Walsh – Direct                                                    5840

1    Q    Doctor, do you know of any psychologists in ICF/MR settings
2    who routinely carry out formalized pain assessments?
3    A    I do not.
4    Q    Doctor, I know you said and you wanted to get to this and I
5    diverted you here a little, but you wanted to get to the
6    outcomes because I believe you stated the outcomes are important
7    in assessing the quality of these plans; is that correct?
8    A    Yes, I think they are.
9    Q    So --
10   A    So we're back to the original sample that I have described
11   now.  We have gotten that sample.  We have drawn it.  I have
12   rated it relative to the elements of the plan on my rating
13   scale, described for you how I did that, also rated their
14   functional assessment.  Now I wanted to look at outcomes, how
15   are the plans doing.
16        So for 24 of those plans, I had -- for 24 of those
17   individuals -- there were 30 individuals.  For 24 of them I had
18   monthly progress notes from June of 2009.  I -- and so what I
19   did was I took those and I wanted to make some effectiveness
20   rating for whether the plan was effective or not.  And so here
21   is how I did that.  A couple of things.  If you look on page 30,
22   you will see the large table where this is all laid out and, I
23   won't necessarily have to go through this table; but it will be
24   clear to you what I do.
25        First thing, some of the plans target more than one

Walsh - Direct

1    behavior; so therefore, more behaviors than plans.  If you

2    looked at -- I only had 24 monthly protocols, and if you looked

3    at the number of behaviors that were covered by those 24

4    protocols, those 24 monthly summaries, it covered 43 behaviors.

5    So if you look down the second column, the number of behaviors

6    is 43.  If you look at the number of cases to the left, you will

7    see it's only 24.  Okay?

8         And so what I did is I took all the target behaviors off

9    the monthly summaries, and the monthly summaries are where you

10   have a record of that person's performance relative to that

11   behavior plan.  Monthly summaries are one-page sheets.  I think

12   there is one in here somewhere.  In another context, I included

13   it.  Is it okay if I take a moment to find you that?

14   Q    Yes.

15   A    Page 100 -- no, 101, I'm sorry.  101, 102.  These are two

16   examples of monthly progress reports for psychology, and so I

17   was working with 24 of these.  I just wanted to show you what

18   that looks like.  It's a data table.  We may get back to this.

19   The reason it's in this report is because the DOJ experts

20   criticized the way psychologists collected data.  So anyway,

21   this is what the form looks like that I was working from.

22        And if you go back to page 30, I took all of the behaviors

23   off, and what you want to do is you want to figure out is

24   behavior changing over time.  Okay?  So I looked on each of

25   those monthly summaries, and those monthly summaries are current

Walsh – Direct                          5842

1    as of some specific month.  But as you look on -- as you saw on

2    page 101 there, they actually show multiple months going back in

3    time.  So you can go back -- for different folks, you can go

4    back in time.

5         And so I took the first three quarters that appear on a

6    monthly summary and the last three quarters, and if -- the first

7    three quarters, the behavior should be higher, should be more

8    problem behavior.  And then if the plan is working, when you

9    look at the last three quarters, the behavior should be lower.

10   There should be less problematic behavior.  The behaviors are

11   getting better.

12        And so I compared that and, for each of those, I subtracted

13   the post from the pre and I got a score as to what kind of

14   change there was.  Those are what's in those columns there:  Pre

15   Q, post Q.  So pre Q is the first quarter, post Q is the second

16   quarter.  Q2 minus Q1 gives you a different score.  Some could

17   go up and some could go down.  The months show you the number of

18   months that that was calculated over.  Okay?

19        If it were fewer than three months, I didn't count it.  And

20   so if you look on the right side of that table, you will see

21   asterisks for nine of those behaviors, and they were all two

22   months or -- maybe it was two quarters.  That's what it was, not

23   two months.  I wanted to have two quarters of behavior, and so

24   that's how I did it.

25        So I took the behaviors that they were targeting and I saw,

Walsh – Direct

1    "Did they change over time, from Time 1 to Time 2?"  And I gave

2    them an effectiveness rating.  If the change that you saw was --

3    if there was more problem behavior, if it wasn't improved, then

4    it would be worse.  It would be listed as worse over in the

5    right-hand column.  If there was up to 33 percent improvement, I

6    called that improved.  If there were 34 to 65 percent

7    improvement, I called that much improved.  If there was 66

8    percent improvement or better than 66 percent improvement, it

9    was greatly improved.  So I divided the possible percentages

10   between 1 and 100 into three sections:  Improved, much improved,

11   and greatly improved.  And that's what is listed down on the

12   right-hand column there.

13        If you turn to the next page in the report, on page 31, I

14   have aggregated those results to make it easy to understand.  So

15   you will see that there were, in 9 behaviors -- remember there

16   is 43 behaviors.  In nine of those, there were too few months,

17   so they were out.  There is no change in 5 -- 14 percent or 15

18   percent.  27 percent of the behaviors became worse over that

19   period of time.  And then 35 percent were greatly improved.

20   5.9 percent were much improved.  And 17.6 percent were improved.

21        If you box up all the improved -- I mean, if you look at

22   greatly improvement, much improved, and improved together,

23   that's 59 percent of the behaviors improved.  Some did get worse

24   because these are problem behaviors, but 60 percent improved.

25   That's rather remarkable given that the time period is only

Walsh – Direct                                    5844

1    about 12 months.

2    Q    What would that tell you overall about the quality of the

3    behavior plans?

4    A    Well, it tells you that -- it tells you that something is

5    going on good there.  I mean, the behavior plans -- this was

6    taken from behavior plan data.  You know, there is other reasons

7    why people could be improving.  This doesn't disentangle them

8    strictly from behavior plans because -- medication, for example.

9    But the point is that whatever the facility is doing in relation

10   to these behavior plans is working.  So they're getting good

11   outcomes, and 60 percent of the outcomes are good.  And so is

12   60 percent enough?  I don't know, but 60 percent is what they

13   got and it's -- that's strong.  I mean, strong.

14       If you were to go back two years as opposed to one year,

15   you know, it might be that that number gets kicked up a little,

16   but in that short period of time for people who are largely,

17   severely, and profoundly disabled to make that kind of behavior

18   change, that's real healthy.

19   Q    Would you expect some people to get worse even if their

20   behavior plans were adequate?

21   A    Well, that's a hard question to answer.  I think sometimes

22   behavior plans may not be perfect.  Because they're not perfect

23   means they may have the function slightly off, they may not have

24   the right schedule, they might not have exactly the right

25   language when they implement the plan.  There is a number of

Walsh – Direct

1    reasons that the plan could fail.  You know, what you would

2    hope -- what you would hope is that the team cycles back in when

3    plans are not showing change and would change them.  I think

4    that's probably what's really happening, why you are getting

5    change in the 60 percent because they're going back in and

6    fixing elements of the plan that are incorrect.

7        And just one thing I would like to say in all of this,

8    going all the way, stretching all the way back to the functional

9    assessment is that when you are doing behavior plans for people

10   who are profoundly disabled in particular, but probably both

11   severely and profoundly disabled, you know, a lot of times you

12   are working in the dark.

13       It's hard to know what the function is because some of

14   those people don't function like we function.  When I gave you

15   the examples of people who didn't want to do their work, you

16   know, sometimes, sometimes you can't even engage the folks in

17   their work.  It's hard to engage them because their functioning

18   level is so low.  I mean, their -- I don't like to say this.

19   They may be adults, but they function in childlike, sometimes

20   infant-like people who it's hard to actually engage them.  You

21   know, it's hard to engage somebody in a communication

22   alternative in a behavior plan -- a communication alternative to

23   a problem behavior if the person has no communication skills at

24   all, doesn't even understand what communication is.  And so, you

25   know, if you look at functional analysis -- even in the research

Walsh - Direct                                                5846

1      studies, you look at functional analysis studies, you find that

2      there is 5 to 7 percent of the people that they test in this

3      kind of range similar to people at, that are at the facility,

4      they can't even discern function because it's too hard to get at

5      a function because sometimes the behaviors are just not clear,

6      it's not -- it could be brain damage, you know, it's not really

7      serving a function for the person, it's just brain damage, this

8      is, I think I noted this in my report, this is a classic

9      finding.

10             You know, people have said in the face of those kinds of

11     things what you could do is you could hypothesize a function.

12     You could start going through and taking a good guess and then

13     doing a plan and seeing if that works and then, if that doesn't,

14     discard that, hypothesize another function.  That's fairly

15     sophisticated stuff, but at some point, with a person who is

16     profoundly disabled, perhaps nonmobile, perhaps very fragile,

17     it's hard to even know what to hypothesize.  And so you -- you

18     know, a lot of times you are just -- you are working with -- you

19     try a thing and you see how it goes and then you sort of fix it

20     and try something else.

21             My general view of this population, the nature of this

22     population and the nature of these aggregate results is that I

23     am really happy to see 60 percent change in a year's period.

24     That to me is impressive.

25             MR. YORK:  Your Honor, we have gone roughly two hours,

1   and I certainly don't want to dictate the schedule to you; but

2   you might be interested in a break.

3          THE COURT:  I think that would be great.  Thank you,

4   Mr. York.

5      We will take 15 minutes.

6      (Recess at 10:55 a.m.)

7                    C E R T I F I C A T E

8      I, Cheryl Bartnett Nelson, Official Court Reporter, do

9   hereby certify that the foregoing is a true and correct

10  transcript of proceedings in the above-entitled case.

11

12  /s/ Cheryl B. Nelson, RPR, CRR, CCR   Date:  December 20, 2010
        United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

1          (Continuing at 11:10 a.m.)

2               THE COURT:  Be seated.

3          Proceed.

4               MR. YORK:  Thank you, Your Honor.

5     BY MR. YORK:

6     Q.   Dr. Walsh, we're going to move on now to the section of

7     your report called "Plan Approval and Psychology Department Peer

8     Review."

9     A.   Yes.

10    Q.   So you know the general area?

11    A.   Yes.

12    Q.   Did you look at how behavioral intervention programs were

13    planned and reviewed?

14    A.   Well, we just discussed how they were planned.  I mean, if

15    you're reading off that section heading, "Plan Approval," it's

16    the approval part.  So, yes, I looked at them.  And, you know,

17    the safety plans are reviewed at the human rights committee, and

18    if you have a safety plan and you have other plans, they're also

19    reviewed there.  So safety plans are the ones that have

20    restrictive or restraint -- restrictive elements of restraint.

21    So when they review a plan like a safety plan, they review all

22    the plans for that person.  So that human rights committee,

23    there's a policy that sets it up, the membership is relatively

24    diverse, it has RNs and Ph.Ds and has people from the community,

25    and that has a policy for how it's reviewed.  It meets ICF/MR

1    regulations.  And when you look at those, the other thing is

2    they have multiple review teams, so the human rights committees

3    are a little bit closer to the residents in CHDC than they are

4    at other facilities because there's one for each unit of the

5    team, and they each have a chair.  The psychologists are

6    assigned to those human rights committees, but they're sort of

7    consultants, they're nonvoting members, because they're very

8    often considering the plans, the direct plans, the

9    psychologists.

10        So, I mean, it meets ICF/MR requirements for plan and

11   review.  The layout of how a plan moves from its development

12   stage -- through its development stage is through education and

13   is outlined on page 33.  The steps are roughly as follows:  The

14   interdisciplinary team establishes an objective and a plan.  The

15   psych examiner -- step 2, the psych examiner formulates and

16   formulizes the behavior intervention plan, and that's the safety

17   plan or the positive behavior support plan.  The team leader

18   reviews the plan.  The chief of psychology reviews the plan.

19   The primary care physician reviews the plan.  And any of those

20   steps, they could be recursive, meaning that the plan could be

21   sent back to the team for changes or review or amendments of

22   some sort.  Written informed consent is obtained from the

23   guardian, if it's not already available.  And I note in the

24   footnote there that, you know, many family members are active

25   parts of the IDTs and are there and so they may have already

1    given consent, so it's not necessarily a separate step, although

2    it could be.  Step 7 is the plan and informed consent are

3    reviewed by the human rights committee.  We just discussed that.

4    And if not approved by the human rights committee, the plan

5    returns to the IDT to fix whatever the problem is.  If it's

6    approved, the plan is -- the HRC forwards it to the

7    superintendent for final review and approval, and then the

8    superintendent approves it and the plan is trained and

9    implemented.  At that point, the psych examiners will train the

10   people.  If it's a strategy, they'll go train the staff and all

11   the residents, as well as in the day program.  And then that

12   plan is implemented.

13       So it's a fairly common -- that's not an uncommon layout of

14   approval steps for a plan.  I think Dr. Matson said that there

15   should be a BIC.  I think that was the acronym he used, was for

16   behavior intervention committee, which I think he wanted for it

17   to be more of a peer review.  There are places, states, that

18   have that.  New Jersey has that, for example.  That's not as --

19   that's not required in the ICF/MR guidelines at this time.

20   Although, there's a peer-review process in the psych department

21   at CHDC, you know, we were discussing that, and I think during

22   my 2008 consultation as to one review body or two, and I didn't

23   -- I just discussed that with some of the staff at the facility

24   at that time, saying that they might want to think about that or

25   look into it or whatever.  And that breakdown -- just if I

1   wasn't clear, the breakdown is that in New Jersey, for example,

2   where there is a separate plan review committee from the human

3   rights committee.  The human rights committee only looks at

4   human rights issues, things that are proper, about whether the

5   plan was developed and went through the right steps and whether

6   it violates any rights.  And another body called the behavior

7   review committee, or BIC, as Dr. Matson noted, would review the

8   technical aspects of the plan.  That's not the case at the

9   moment at CHDC.  It's not required by ICF/MR.

10       And so in our discussions of that, I was very happy to see

11  that after, or right after I left in 2008, that the psychology

12  department initiated a peer-review process.  And so they don't

13  peer review every plan at the time of implementation.  They

14  developed a peer-review process, governed by policy, on a

15  regular basis, meeting minutes, regular presentations, and they

16  do that on a monthly basis.  And they do a peer review of each

17  other's plans.  And so they, in a sense, have that other side of

18  that review now, and that's part of that sort of growth in the

19  psychology department that I'm seeing, and I think they should

20  be commended for that.  You know, at the time of my report in

21  March, I looked at what they did between April 2008 and

22  March 2010 relative to peer reviews.  I had been to the facility

23  where we had that discussion in February of 2008, and so in

24  April 2008 to March 2010, it's almost two years, they had

25  reviewed 22 individual behavior intervention cases, reviewing

1    all the plans, safety plans, positive behavior support plans and

2    strategies for each case.  Twelve psych examiners presented

3    cases; eight of them had presented two cases and two of them had

4    presented three cases.  Those peer-review sessions were all

5    documented, that means that there was an expectation for a set,

6    a specific set of documentations to come from the psychologists,

7    the plans plus -- sometimes I guess they're probably plans plus

8    monthly summaries or whatever else they wanted to put there,

9    maybe their functional analysis.  And then each of those were

10   entered into formalized meeting minutes and maintained.  And so

11   some of the behaviors -- I looked at some of the behaviors they

12   looked at in those 22 cases.  They looked at SIB, aggression,

13   pica, feces smearing, tantrums, refusal, all sorts of behaviors.

14   Okay?  And for each of those, there's a permanent record they

15   can look at relative to peer review.  That's a really good

16   process for the psych department.  It does a number of things.

17   In addition to providing professional review of the plans

18   they're writing, okay, it allows them to come together, because,

19   you know, they're dispersed, they're dispersed out to units.  So

20   it's good for them to come together in a setting where they are

21   not seeking the review of a plan or it's not interdisciplinary

22   where they have to explain to everybody what the plan is about,

23   but it's of their own.  So it's like a departmental-based

24   meeting, a peer review, where they can discuss the pros and cons

25   of doing this and doing that, and then they can share their ways

Walsh - Direct                                                    5853

1    of doing things.  My sense of that kind of process will help

2    offset -- you'll recall when I rated the behavior plans, some

3    were very good and others weren't.  It will tend to have the

4    process of pulling those plans that weren't so good up to a

5    better quality.  So that's a very good development, I think, at

6    the facility.

7    Q.   Doctor, based upon your various reviews, your ratings, your

8    review of outcomes, the peer review that's conducted there, what

9    do you conclude about the behavioral practices at CHDC?

10   A.   Well, I think they're pretty good.  I think they're like

11   anything else in life, they could be better.  But I look at them

12   in the context of where they're coming from.  You know, prior to

13   2004, I believe it was, there was no chief of psychology there,

14   so essentially those psych examiners did not have professional

15   leadership.  I would imagine if you go back a couple of years

16   prior to -- I don't know when the change of the administration

17   really happened there, but a couple of years after that, there

18   may have been no unified sort of approach.  So if you go from

19   2000, or 2003 through 2010, you know, it strikes me there's been

20   a lot of growth, and especially since 2004, 2005, there's been a

21   whole lot of growth.  I mean, I'd like to think that my

22   consultation in 2008 kicked it up a little bit, a notch, maybe,

23   a notch and a half.  And so overall, I mean, I think we should

24   be pleased at the psychology program there.

25        I think there are plenty of challenges for the future.  I

Walsh - Direct                                    5854

1    mean, it can always get better.  And I think the point being

2    that clearly that the bow of that battleship has turned.  I

3    would also like to add that, having that context, knowing what I

4    know about them and how they've changed over time and knowing

5    the outcomes, and as you'll see when we talk about restraints,

6    some of the outcomes there as well, it's hard for me to square

7    that with the sort of onslaught of critical comments by the DOJ

8    experts.  You know, my sense is that at some level they didn't

9    fully understand what was really going on in the psych

10   department.

11   Q.   Do these behavioral plans and practices at CHDC meet

12   accepted professional standards?

13   A.   I would say yes.

14   Q.   Now, we're going to move on, Doctor, to the area of

15   restraint.  Now, in your report, you provided an explanation of

16   the differences in the use of restraints at facilities serving

17   people with developmental disabilities and other types of

18   facilities such as mental hospitals.  Could you elaborate on

19   that here for the Judge?

20   A.   Yes.  Medicaid funds a number of different kinds of

21   settings, nursing homes, mental hospitals, and restraints at one

22   time or another has been used in all of those settings.  And,

23   you know, it's really no longer allowed in mental health

24   settings or nursing homes, and that's not the case with

25   facilities under ICF/MR.  There is, in some sense, a qualitative

1    difference in their policy there which allows the use of

2    programmed restraints, or plan restraints, whatever term you

3    want to use.  The trouble I had with that relative to sort of

4    the DOJ perspective was from two of their experts, anyway, that,

5    you know, Dr. Manikam said restraints are not therapy and that

6    they were potentially traumatic, and he didn't seem, to me, to

7    recognize what's in the ICF/MR regs relative to the programmed

8    use of restraints.  And Dr. Thibadeau, I said, and I quote, she

9    says, "It is my professional opinion, a mechanical restraint is

10   a clear violation of the student's rights."  I think properly

11   vetted and properly used, that use is allowed.  So I would be

12   concerned that there's a misunderstanding of the context in

13   which they were working, meaning the ICF/MR.  I don't know.

14   It's sort of like having the fox determining the security level

15   of the henhouse.  I mean, it's like I have a problem with taking

16   what they say about restraints seriously if they don't really

17   understand the context, if they don't understand what planned

18   restraint is and the whole history of that.  There is a

19   controversy surrounding the use of all kinds of restraints in

20   this field, and, I mean, I understand that, and it's changing.

21   But you would at least expect that those experts had a sense,

22   and could bring that sense to what is the nature of the

23   controversy to the task at hand.  The plain fact of the matter

24   is that you can use restraints under certain circumstances in

25   these facilities; that the use of contingent or programmatic

1    restraints, although it appears less, it still appears in the

2    literature.  I think there's clearly, clearly a movement away

3    from the use of programmatic restraints.  Some of that is

4    scientific and comes from the treatment community.  Some of it

5    is straight out of advocacy, it comes from the advocacy

6    community.  You know, my statement in my report was that I

7    couldn't resolve that issue in my report, and I'm not sure that

8    we can resolve it here today.  But I think we need to at least

9    recognize that that controversy exists, and to make any

10   decisions inside of that controversy, it's important to know

11   what policy statements are, what past practice is, and where we

12   might want to go.

13   Q.   What type of restraints can be used at an ICF/MR setting?

14   A.   Well, you can use mechanical restraints and personal hold

15   restraints, and those two kinds of restraints are things,

16   restraining things, and using your body to hold somebody.  But

17   there's a lot of subcategories of restraints.  So it might be

18   that to draw blood or to pull a tooth, you may have to restrain

19   somebody because they're not going to let you do that easily

20   because it's painful.  Those are medical restraints.  There are

21   restraints that are used for the support of a person where you

22   might -- you don't want somebody to be in an unsafe situation,

23   so there can be safety restraints where you wouldn't want

24   somebody pulling stitches out or falling out of a chair.  You

25   know, I really didn't deal with any of those kinds of

1    restraints.  The restraints that I dealt with were the kinds

2    that psychology deals with, meaning they were planned mechanical

3    restraints, planned personal hold restraints, and to a lesser

4    extent, emergency restraints.

5         Actually, there's a table that might help to figure that

6    out, I guess to help explain that distinction on page 40 of my

7    report.  And, you know, it talks about the two different types

8    or ways you can restrain somebody, mechanical and personal

9    holds.  If you look at the top, it says "Mechanical Restraints

10   or Personal Holds."  So a mechanical restraint is a papoose

11   board.  A personal hold is one of the CPI-controlled positions.

12   They can be either planned or emergency.  You can use them in

13   both.  And an emergency use of either one of those restraints

14   would be, you know, if somebody were running out into the

15   highway that runs along the facility there, I mean, that poses

16   an emergency that a person would get hit, so they might put that

17   person in a physical hold, and that would be an emergency

18   restraint.  A planned restraint would be the kinds that are

19   built into a behavior plan, which we'll clearly talk more about

20   as we go through this section, where they actually write it into

21   a safety plan and use that as a planned restraint.  That, I

22   think, was the kind of restraint that Dr. Manikam was speaking

23   when he said it's not therapy.  And I think that's what the two

24   bottom boxes explain, what I just explained there.

25        So what my review of -- when I say my review of restraint

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    use is, it really talks about behaviorally-based restraint use,

2    not medical restraints and whatnot.

3    Q.    I think you touched on this already, Doctor, but is the

4    appropriateness of a restraint dependent upon the context on

5    which it is used?

6    A.    Well, I really think that the restraint, a lot of the

7    debate has generated more heat than light.  I think that there's

8    a great role for context, context needs to be understood here.

9         First, there's a general context of how restraint might

10   strike the layman, you know.  Putting your hands on somebody,

11   another context could be assault and battery, or whatever the

12   legal term is, assault.  I don't know.  But if you cut into

13   somebody's flesh with a knife, that could be clearly assault,

14   battery, with a deadly weapon, but it can also be surgery.  So

15   context is all important.  And so my sense is that restraints,

16   in the history of the use of restraints in facilities, there's

17   some pretty egregious and horrible things that happen, and

18   that's clearly wrong.  I mean, that's just not appropriate and

19   those things should be stopped, and if they're inappropriately

20   restrained, they should not be.

21        And so a facility has to have things in place to deal with

22   that.  I mean, that's where we first started this morning, I

23   talked to you about how I encountered that in a facility that I

24   came into where they were using all sorts of horrible things,

25   bed sheets, ropes to tie people up in, and that just needed to

Walsh - Direct                                         5859

1    be stopped.  But the planned use of restraint systems has come

2    down in behavioral psychology as a way to, in some sense, stop a

3    person from engaging in dangerous self-injury, and has been

4    built into plans, okay, so that you can actually use it as a

5    behavioral intervention technique.  That is still under debate.

6    For example, the position of the Arc of America, the United

7    States Arc, is that you should not have restraints built into

8    plans, you should not have planned program restraints, but that

9    you could have emergency restraints, meaning if somebody is

10   being very dangerous.  I think that the psychology department at

11   this moment at CHDC maintains that you can have planned

12   restraints.  That debate is currently going on in the literature

13   right now, whether or not we should see that as going forward

14   with or we should strip that out of behavior plans.  I don't

15   think, by any stretch of the imagination, it's out yet.  I mean,

16   there are some facilities in America that tell you that they

17   usually take very, very difficult people, and they don't want

18   those kinds of practices to be removed from them.  They see it

19   as a behavioral tool.  You know, in some cases, you get down to

20   also splitting hairs.  And so, you know, if you have -- if you

21   had -- I mean, we all know about papoose boards and those kinds

22   of things, I'm sure you've heard that in here, and we've read

23   about them in the reports and whatnot.  But you can have a

24   behavioral restraint that's relatively benign.  And so if you're

25   sitting at a table, working with a person who is self-injurious,

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Direct                                                5860

1    bites their hand or does something that could be dangerous to

2    themselves, and you're presenting them with a task and that

3    makes them agitated and they might do some action to hurt

4    themselves, you could take their hands and just put them down on

5    the table, hold their hands on the table, and talk to them

6    quietly, say, "No, I want you to stay on task, I want you to

7    stay on task," blah, blah, blah.  That's technically a physical

8    restraint, you're restraining that person.  But you can see that

9    might be, in the service of getting that lesson taught, might be

10   able to be built into a behavior plan.

11        So that's the nature of the debate.  My general sense is

12   that restraint as part of a behavior plan should be used only

13   when it is necessary, only when you can't find something else,

14   and only on the road to decreasing it so you can get rid of the

15   restraints, which is just about what the ICF/MR regs say.

16        So to answer your question, it still happens, but it's

17   probably undergoing a change in the way the field looks at it.

18   Q.   Does CHDC have reasonable policies and procedures that

19   govern the use of restraints?

20   A.   I believe they do.  I've read them all.  I've read them all

21   more than once.  They're fully vetted.  You know, the problem is

22   -- the problem in some sense is not so much the policy, because

23   I think the policies are fine.  Could they be tweaked?  They can

24   always -- you can always tweak a policy and make it better.  But

25   the point in my mind is practice, is how you practice, the

1   practice pattern of the facility.  Do you rely on it a lot?  And

2   I think that was the exchange we had this morning where

3   Dr. Matson said, you know, "I'm glad they got it down, but it's

4   still not good enough," and my reaction to the same, you know,

5   magnitude of change was great, it's terrific.  So it's really

6   about how the facility practices.  You know, Dr. Matson's

7   original statement was, I quoted it somewhere in my report, but

8   he said the facility, that the -- he said the central defining

9   -- I shouldn't -- I'm paraphrasing.  He said the central program

10  piece was CPI.  That's ridiculous.  And he said that it was --

11  that the intent of restraint at CHDC was for control.  And

12  that's ridiculous.  Control may be narrowly defined to mean that

13  you don't want somebody to hurt themselves or hurt others.  My

14  impression in 2003 was that the restraint levels at the facility

15  were high.  And so in that sense, I guess I agreed with

16  Dr. Matson.  What I think I showed is that they are drastically

17  reduced over the last block of time, and that, I think, is

18  great.  Somehow later we can address that, but --

19  Q.   We will in a minute.  What about emergency restraints, are

20  there policies and procedures in place for that?

21  A.   Yes.

22  Q.   And the fact that you were referring to CPI, is that the

23  Crisis Prevention Institute?

24  A.   Yes.  I'm sorry.

25  Q.   And what is that, exactly?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   A.   That's a commercially available restraint package.  This

2   morning, I described a restraint package that I developed with

3   some colleagues at the facility in Vineland, New Jersey, the one

4   we then trained with around New Jersey.  I think we actually

5   hurt CPI's market in New Jersey, but so be it.  But CPI, they

6   have done that, and they've done it nationally.  The Crisis

7   Prevention Institute tailors it -- it has a lot of packages,

8   tailors it to different kinds of facilities, for schools and

9   whatnot.  They have packages that are not that dissimilar to

10  what I described this morning, although I think at the

11  facilities in Arkansas, they have a relatively limited package,

12  they use a standing control position as a restraint and they

13  have one to move folks.  They're physical restraints in the

14  sense that they're done physically by somebody doing them,

15  they're body-to-body.  Relative to emergency restraints, my

16  preference would be slightly towards physical restraints,

17  because when you're holding onto somebody, you can monitor them;

18  as they start to calm down, you can loosen the restraints and

19  you can try to release them sooner.  On the dis staff side of

20  that, sometimes they're a little more dangerous if you're

21  getting close.  So that's all governed by policy.  And, you

22  know, the policy at least is some practice, and it's my view as

23  to practice, it's more important.  So that's what I tend to look

24  at.  I read all the policies just to make sure that they were

25  appropriate and made sense, and they do, for both behavior and

Walsh - Direct                                          5863

 1  for restraints.  If I had my druthers, I would take the state
 2  policy and update it a little bit relative to behavior.  But I
 3  think the policies that are in force at CHDC are fine.  And now
 4  it's a question of how you make those policies live in practice.
 5  Q.   Doctor, the plaintiff's experts referred to a list of 41
 6  restraints.  Do you have any comment on that?
 7  A.   Yes.  I believe -- in fact, I have that list in my
 8  appendix, Appendix D.  And I just thought that some of their
 9  comments in this regard were gratuitous because this list of
10  restraints was obtained from the facility, I believe, on a DOJ
11  request for information.  And if you analyzed those 41 there,
12  you will find that there really aren't 41, because a lot of them
13  are just combinations.  And so, you know, I did that, and I
14  found that there are about 13 unique kinds of restraints, but it
15  was presented in both DOJ expert reports, Dr. Manikam and
16  Dr. Matson, as a list of 41 types of restraints of this big
17  armamentarium of restraints, and my sense is that that was not
18  really carefully looking at what really happens.  It's
19  interesting to me that even having said that, Dr. Matson did a
20  review of quick reference guides at the facility, and he looked
21  at the restraints included in the quick reference guides and he
22  came up with 13 different types.  He included that in his
23  report.  I believe it's Attachment 3, or Appendix B.  I think
24  it's Appendix 3 or B.  He attached it.  And he has 13 different
25  types.  He has exactly what I got.  And so I don't think that

1    it's fair to say that they have sort of like 41 different

2    restraints and that people are doing all these different sorts

3    of things.  I think the restraints are restricted to those

4    numbers of things, I'd say 13 or 14.

5    Q.    And we've touched on this, but I want to make sure we have

6    in the record what numbers you actually noted as far as the use

7    of restraints.  But I believe you looked at data on the use of

8    restraints.  Is that correct?

9    A.    Yes.

10   Q.    And what did you find?

11   A.    A lot of data.  What did I come up with?

12   Q.    Right.

13   A.    Well, can I go through that stuff?

14   Q.    Yes.

15   A.    Okay.  I didn't know if you wanted me to give you a number

16   right off the bat or explain how I went through that.

17   Q.    Explain how you did it and what number you came up with,

18   please.

19   A.    What I did is, I used the monthly reports from the

20   psychology department on restraint, and I tracked restraint over

21   large blocks of time.  I did a large number of things, which

22   we'll get into.  The predominant findings that I found are on

23   page 43.  They show -- the top graph shows the annual mechanical

24   restraint frequency from 2005 to 2009.  That represents about a

25   56 percent drop.  If you extend that to August of this year,

1    meaning a couple of months ago, restraints, mechanical

2    restraints, annual mechanical restraints have dropped

3    69 percent.  So that line would continue to go down.  If you

4    looked at the personal hold restraints, which are in the bottom

5    graph there, that represents about an 80 percent drop.  Okay?

6    So those are like massive drops in the amount of restraint over

7    a five-year period.  I mean, that means there are 70 and

8    80 percent fewer restraints taking place now than there were in

9    2005.

10            MR. CHENG:  Objection, Your Honor.  Just for a point

11   of clarification.  Dr. Walsh is referring to August data that

12   can't possibly be from his report.  So if it's outside of the

13   discovery period, it's objectionable.  If he's using other

14   materials, we'd like to know what they're using.

15            THE COURT:  Why don't you just find out what he's

16   using.

17            MR. YORK:  Sure.

18            THE WITNESS:  I got the monthly reports from the

19   facility up through August is all.

20            THE COURT:  I don't think it's fundamentally different

21   than the information that I allowed in over Mr. York's

22   objection, where the subject matter was covered in the report

23   but there was data that had been developed since the report,

24   just because the institution is still in existence.  And in this

25   instance, the subject matter, the topic is clearly in his

1   report.  And if there's some information that you don't have

2   that you should have in order to have a fair opportunity for

3   cross-examination, I'll make sure that you get it.

4              MR. CHENG:  Thank you.

5   BY MR. YORK:

6   Q.   Now, Doctor, I don't know if you had finished your answer

7   or whether you were interrupted.

8   A.   Yes.  The only other thing is I also looked at emergency

9   restraints during that period, and, you know, wanted to make

10  sure that if planned restraints were going down, that emergency

11  restraints were not going up, because that could be an effect,

12  or that squeeze of the balloon on this side and it comes out

13  here (indicating).  But emergency restraints over that same 2005

14  to 2009 report, they dropped by 49 percent as well.  Those three

15  facts alone tell me that the facility is clearly looking at

16  reining in the use of restraints, and that goes back to my 2003

17  meeting with them.  And so I'm very happy to see that.

18  Q.   Did you also look, Doctor, at the number of individuals who

19  are restrained?

20  A.   Yes.

21  Q.   What did that reveal?

22  A.   I have a chart on that.  If you look at page 45, you can

23  see that I looked across just the one year, from July 2008 to

24  June 2009.  At the beginning of that time, there had been 55

25  individuals in the facility who would have been restrained, and

1    that had dropped to 44.  And so what you find is that there's a

2    declining trend.  It's almost like no matter how you look at it,

3    there's a declining trend.  The trend drops inside a year, it

4    drops across multiple years, it drops for the number of

5    individuals restrained, it drops -- I'm sure it drops by the

6    number of restraints that are included in behavioral plans.  So

7    there's -- you know, there's not that many people at the

8    facility who are even liable to be restrained by, you know, in

9    planned restraint programs.  You know, if you look at the

10   September 24, 2009 listing -- that's what I used because I went

11   there in September.  So I got that September listing of all the

12   behavior plans.  There were 56 individuals -- this is on page 46

13   of my report.  There were 56 individuals for whom mechanical

14   restraint was in their plan and 32 for whom physical hold was in

15   their plan.  But 26 of these individuals had both.  They had

16   both -- you know, it's the nature of things that the people who

17   need a mechanical restraint in their plan may also have a

18   physical hold restraint as part of it too, because these are the

19   difficult cases.  And so, you know, even though there's 56

20   individuals who are liable to mechanical restraint and 36 who

21   are liable to physical restraint does not alienate the

22   individuals, because some people get both.  The people who get

23   both are listed on that table on the next page, 47, because

24   there are 26 of them.

25          And so what it really comes down to is that in the facility

Walsh - Direct                                    5868

1    in September of 2009, there were only 62 individuals who were

2    liable to have contingent restraint in their plans.  That's only

3    12 percent of the census of the facility.  So it's relatively

4    contained.  It's not what -- you know, people who don't

5    understand these facilities think that everybody's being slapped

6    in restraints.  Most people at the facility, 88 percent of them

7    are not even liable to restraints, for the most part, from their

8    plan.

9         And so that leads to the next point, which is, okay, of

10   those, that small number of people who are liable to be

11   restrained, what do they look like?  Well, when you look at the

12   numbers of people who -- if you look at the restraint numbers

13   and you start breaking it down, what you find is that 88 percent

14   of the restraints in the period of July 2008 to June 2009, in

15   that one-year period, 88 percent of the restraints were

16   attributable to three individuals.  So only 12 percent were

17   spread across the rest of the facility.  So what you begin to

18   see is not this facility where, as Dr. Matson said, the

19   centerpiece is physical restraint and it's a facility that's

20   bent on control of people, rather it's very narrowly drawn, it's

21   people who have problems, have pretty severe problems, and

22   people are addressing those problems, and that relatively small

23   number of people are restrained.

24   Q.   Now, Doctor, you said that 88 percent of the planned

25   restraints were accounted for with just three individuals.  Is

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   that correct?

2   A.    Correct.

3   Q.    Haven't two of those, in fact, now had restraints removed

4   from their plans entirely?

5   A.    Yes, I believe they have.

6   Q.    And isn't it true that some people, even if they have a

7   planned restraint written in their program, they can go a year

8   or more without ever having a restraint put on them?  Is that

9   correct?

10  A.    That's correct.  In fact, when you saw there were 55 people

11  restrained in that year and it dropped to 44, that was the table

12  we looked at on 45, page 45, but we knew that there were more

13  people in 44 who could have been restrained.  So not everybody

14  is restrained, you know, according to the behavior plan,

15  necessarily, every year.

16  Q.    And, indeed, I think you touched on this, but are the

17  number of people with planned restraints declining at CHDC?

18  A.    Yes, I believe it is.  I mean, I would have to go back and

19  look at that.  But my expectation is that they're declining, and

20  they have been declining since 2005.  That's what accounts for

21  that rather precipitous drop-off in restraints during that

22  period.

23  Q.    And what do you conclude from all these analyses of

24  restraint that you've done here?

25  A.    Well, restraints are dropping.  I mean, the behavioral

1   program at CHDC is not relying on restraints the way it did in

2   2005, and it's not relying on it in a big way, 69 percent.  It's

3   big.  And relative to personal holds, it's 80 percent.  So this

4   is not -- this is not marginal change.  This is big change.  And

5   that's important stuff.

6   Q.   Dr. Matson said and he sort of acknowledged there are

7   reductions in restraint, and I think he might have even called

8   them good, but he said the amount of restraints are still too

9   high.  How do you respond to that?

10  A.   I think good should be great.  Like I said this morning,

11  it's good stuff.  I don't know how you can put a bad face on the

12  magnitude of the restraint decreases at that facility.  It's

13  hard for me to think of how you could make that a negative.

14  That only bodes well for them, because all that energy, okay,

15  that would have gone into restraint plans has now shifted over

16  into positive behavioral support plans so we can do more

17  training.  That is precisely what we talked about in our 2008

18  consultation.  I had the whole group in the room -- and I don't

19  know if you ever got a group of 11 psychologists in a room.  I

20  wouldn't wish that on a lot of people.  But, you know, I heard a

21  lot of complaints about the practice and how they worked and

22  this and that, and I said, Okay, fine, I heard what you had to

23  say, and let's figure out what we've got to do here, and that's

24  what we sort of came to.  We came to fewer restraints, more

25  teaching.  And to me, that's what psychologists in these types

1    of places really should do.  And I think that's happening.

2    Q.   Doctor, have you reached a conclusion as to whether or not

3    the use of restraints done by the professionals at CHDC, whether

4    it meets accepted professional standards or not?

5    A.   Well, I think relative to the standards -- I mean, I used

6    the ICF/MR standards to judge their practice.  I don't use the

7    standards, necessarily, that the Arc of U.S.A. might hold.  I

8    look at them against the guidelines they have to meet, and they

9    meet them.  You know, it's hard for me to understand what

10   accepted professional standards are.  I saw that term endlessly

11   in DOJ reports, and I don't really know what they were referring

12   to.  My general sense is they're referring to idiosyncratic

13   views of standards that they held and that they thought was

14   current practice.  But, you know, our experience, for example,

15   in healthcare across America is that standard of practice isn't

16   so standard.  And, in fact, I think that's what's pushed a lot

17   of the healthcare to look at outcomes as opposed to process,

18   because you can't tell from what the standard practice is.  I

19   mean, that gets into the whole issue of evidence-based practice,

20   which I'm sure we'll probably talk about later too.

21   Q.   Doctor, just generally -- I don't want you to go through

22   each one.  But don't you go through a series of individuals and

23   do charts for them, demonstrating their restraint levels have

24   declined too over the last year or two?

25   A.   Yes, because I wanted to -- you know, where we had left

1   restraint just a few moments ago, we left restraints with the

2   levels dropping, and we left it with whatever restraints were

3   there were attributable to three people.  And so I didn't want

4   you to think that you could make an argument that, Well, all

5   they did was change three people, and it's dropped because they

6   were accounting for a lot of restraints, so they dropped all the

7   numbers down.  This is actually something that looks across a

8   number of people.  What I did in this analysis was I looked at

9   the individual restraint patterns of the highest 25 users in the

10  facility -- 24, I think there might have been.  And so I took

11  the people who had the highest levels of restraint, and I looked

12  at a year's worth of data for all of them.  And if you look at

13  -- and these are the most striking eight cases.  It's about

14  30 percent of them.  I didn't characterize the ones I didn't

15  show you, but these here show that, pages 53 through 55, there

16  are -- from 52 through 55, there are eight graphs there, and

17  those graphs show planned mechanical restraint for the period of

18  July 2008 through June 2009, same period for all eight people.

19  And you can just see, if you look down those graphs, that it

20  starts high, moves low, to the right-hand side, for all eight of

21  those people.  And most of those people, if you look at the

22  numbers on the left, they're at zero.  Not all of them, but most

23  of them.  And so these are eight cases that I selected out of

24  the top 25 users.  So it wasn't only the reduction in the

25  restraint in the really high users, those three people that

1   accounted for 88 percent, it was a reduction in a fair size

2   number of other people who were also fairly high users.

3   Q.    Doctor, we're going to go on to some questions that are

4   more directly focused at some of the opinions rendered by

5   Dr. Matson, and one of them was he made a comment about one

6   individual who is a psych examiner supposedly not knowing what

7   the meaning of pica was.  What did your review reveal about that

8   situation?

9   A.    I don't know.  I think this is an unfortunate incident.

10  Dr. Matson, when he was doing his review, he asked psych

11  examiners and, I believe, program coordinators, together, to

12  come bring a case and to discuss the case with him.  One of the

13  psych examiners, who was later named in Dr. Matson's report, was

14  on a case that involved pica, the eating of inedible objects.

15  Dr. Matson, in his report, and he reiterated it in his

16  deposition, he stated that the psychologist who actually brought

17  the case didn't know what pica was, couldn't define it.

18          MR. CHENG:  Objection, Your Honor.  Just for

19  clarification, I take it this is another situation where we're

20  admitting this discussion for the point of forming an opinion,

21  because it's hearsay, it's not coming in as true, or for the

22  truth of the matter asserted?

23          THE COURT:  I'm not sure where we're going.  It seems

24  like we're giving a factual account as opposed to an opinion or

25  a basis for an opinion here.  So maybe you can help me with what

1    we're doing.

2           MR. YORK:  Your Honor, he is going to relate some

3    facts of his review of the records, but also he is going to get

4    into his interview with this gentleman and state what he was

5    told.  So it is not offered for the truth of the matter, but

6    more for the information to form this expert's opinions.

7           THE COURT:  What opinions would this go to?  I mean, I

8    gather that Dr. Matson gave a factual statement and he's going

9    to come in with facts that are based on what this person has

10   told him.  Then it sounds to me, unlike the others where I've

11   generally admitted this, it does sound like it's coming in for

12   the truth of the matter asserted.

13          MR. YORK:  It is more, Your Honor, to explain the

14   circumstances of the interview and interview process that took

15   place and explain how it did not necessarily -- that Dr. Matson

16   did not do a follow-up and get a clear answer like this.

17          THE COURT:  I'm going to sustain the objection on this

18   because I think the context and what happened really is coming

19   in to prove this is what happened at that interview and this is

20   the context in which that happened.  And Dr. Walsh wasn't there.

21   And so I think it's coming in to prove the truth of certain

22   facts, and I do think that this is hearsay, and I'm going to

23   sustain the objection.

24          MR. CHENG:  Thank you.

25   BY MR. YORK:

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Direct                                                      5875

1   Q.   Dr. Walsh, if you would just describe to us what your

2   review of the records revealed about whether or not this

3   individual indeed knew what pica was from reviewing his records

4   and the programs that he did.

5   A.   He told me that.  Is that -- is it okay for me to say that?

6   Q.   No, unless there's another basis other than what he told

7   you.

8   A.   He told me what his experience was.  Is that -- I didn't

9   review records to determine his experience.

10         MR. YORK:  Well, we'll have to call him in as a

11   witness then, Your Honor.

12   Q.   Now, Doctor, how about the credentials of psych examiners?

13   A.   Psych examiners are -- psych examiners are all

14   master's-level psychologists.  They're licensed as psych

15   examiners in the state, and they function as QMRPs at the

16   facility.

17   Q.   And do you agree with Dr. Matson's opinion that they are

18   not qualified to be psychologists or psych examiners?

19   A.   I'm not sure what his opinion is.  I think his opinion was

20   that they weren't sufficiently trained or -- you know, he said

21   that -- he made the statement that psychologists are Ph.Ds.  He

22   said that's a doctoral-level -- he said that the doctoral level

23   is normally needed to practice.  You know, my point in rebutting

24   that was simply to say that the ICF/MR guidelines allow

25   psychologists to practice with a master's as QMRPs.  Their

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    practice is regulated by the State of Arkansas, and, you know,

2    Arkansas has a bi-level practice approval; they have

3    psychologists, and that has to be a doctoral level, and they

4    have psych examiners.  Actually, a number of the psych

5    examiners, perhaps about half of them, can actually practice

6    independently in Arkansas.  You can practice independently with

7    a master's and some of them can not.  Those other ones would

8    need to practice with someone with a full license.  That

9    arrangement is not at all uncommon in ICF/MR settings.  I think

10   it's too expensive to have Ph.D.-level psychologists practice on

11   all of the units.  So almost every ICF/MR I've ever seen has a

12   chief of psychology of some sort, a director of psychology who

13   is at Ph.D. level and a number of people who are at the master's

14   level.  That's not uncommon.

15   Q.   Dr. Matson also discussed what is referred to as cognitive

16   assessment at CHDC.  Do you have any comments on that?

17   A.   Yes, I have lots of comments on that.  I mean, I say all

18   this -- you know, Dr. Matson is a respected researcher in the

19   field of developmental disabilities, but I'm not sure he

20   understands how things work in ICF/MRs all that well, especially

21   in ICF/MRs where 90 percent of the population is at the severe

22   and profound level of disability.

23        So I think this whole thing about cognitive testing comes

24   from two things:  I think it comes from his academic background

25   and I think it comes from a misunderstanding of how ICF/MRs

 1   work.  Cognitive assessment is not a big part of what the psych

 2   examiners do at CHDC, because all the people, to be eligible to

 3   be at that facility, have already been assessed, they've already

 4   been diagnosed, they've already had cognitive assessments.  If

 5   you look in the IPPs, really good IPPs, they give good

 6   histories, you generally find the standardized test that they

 7   took and when, the various psychology.  But that wouldn't be

 8   something that the facility does.  The facility would do that on

 9   a number of bases.  It does it for children because children are

10   still in their developmental phases and, therefore, their IQ may

11   be changing, and I think that's a requirement that they have to

12   fulfill.  It would do it when the IDT team suggests that it

13   might be necessary.  So you could have people who are aging,

14   showing signs of dementia, you might want to look at their

15   cognitive status, and then they would ask the psychologist to do

16   a test and they would do that.

17       Dr. Matson went through a whole process of where he took

18   the scores and he reassigned people, based on their IQ scores,

19   to different levels of disability.  And, quite frankly, I don't

20   think any of that makes any sense at all.  Just makes no sense.

21   If you look at an ICF/MR, an ICF/MR, the role of the cognitive

22   level in a modern-day ICF/MR has been reduced, and it's been

23   reduced in favor of functional capacity.  So when someone comes

24   into an ICF/MR facility, they get a comprehensive functional

25   assessment.  Now, this functional assessment has the same name

                              Walsh - Direct                        5878

1    as the functional assessment that we talked about this morning,

2    but it's different.  One is a comprehensive functional

3    assessment and one is a functional behavioral assessment.  It's

4    very unfortunate that they have the same name, but they do.

5         So a comprehensive functional assessment is an assessment

6    of a person's function.  If you look in the ICF/MR regs, that

7    has to be done 30 days after their admission to the facility and

8    then updated annually.  It's an interdisciplinary functional

9    assessment.  That means that all the different disciplines,

10   medical, nursing, psychology, OT, residential, they all do an

11   assessment of function.  How is this person functioning?  What

12   can they do?  What are their skills?  If you're a doctor:

13   What's their disease state?  If you're a nurse:  What's their

14   nursing needs?  And so forth.  Everybody does their assessments.

15   These assessments are all in the IPP.  You can read them.  And

16   that gives then a global picture of the functional status of

17   this person.  "Functional" meaning how they function.  Okay?

18   Relative to psychologists, they don't have to give a cognitive

19   assessment because they already have that historically.  That's

20   how they get into the facility.  They're already doing that.

21        Dr. Matson then went on to criticize the kinds of tools

22   that are used to do cognitive assessments when they are done.

23   So he criticized Slosson, for example, the Slosson Intelligence

24   Test.  Its acronym is SIT.  He says that's only good for

25   screening, it's not good for diagnosing cognitive disability.  I

1   agree with him.  But that's all they have to do is screen.  They

2   don't need to be diagnosing their level of developmental

3   disability because that's why they're there.  And so it's not

4   that important because you don't program to change someone's

5   cognitive level.  You program to change their functional level.

6   So you program for their skills or their behavior or their

7   health.  And so the ICF model has very wisely downplayed that

8   role of cognitive level for people and, rather, placed emphasis

9   on their functional capabilities.  And if you look at it, that's

10  what an IDT team does.  They take their functional assessment

11  and they sit down, they plan what programs do we have to give to

12  this person to continue increase their function, because an

13  increase of function is likely to lead to a better quality of

14  life.  They don't look at what's their IQ and can we make them

15  smarter ever.

16  Q.   So do the psych examiners need to give IQ tests?

17  A.   Say that again.

18  Q.   Do the psych examiners need to administer IQ tests?

19  A.   On a regular basis, no.  Although, Dr. Matson recommended

20  they do so on some regular basis.  Wasn't annually.  I think he

21  said every five years.  I don't think they need to do that

22  unless there's some reason that they identified, that the team

23  identifies relative to their function.  And even then,

24  Dr. Matson made the argument in his report that you would do a

25  cognitive assessment because you might want to see if the person

1    is becoming demented.  And, you know, my sense is that there are

2    other scales, dementia scales in the field that have been

3    specifically made for people with developmental disabilities, so

4    they would be the first place you should look at, not go through

5    the back door with an IQ test.  And second, 72 percent of the

6    people at that facility are profoundly disabled.  It is highly

7    likely that just about all of them, all 72 percent of them could

8    not even take a regular IQ test.  You couldn't administer it to

9    them.  Because in a regular IQ test, a Wechsler or

10   Stanford-Binet, you have to manipulate blocks, you have to copy

11   patterns, you have to look at pictures and put them in order,

12   you have to copy symbols and digits, you have to do all sorts of

13   things, none of which they can do.  They can't even follow

14   directions most of the times.  A lot of them can't even look at

15   you.

16       So what you do if you're a psychologist and you're told by

17   your team that we should do a cognitive assessment is you're

18   going to look to something like the Slosson Intelligence Test,

19   because it's a rating sort of test, and you'll do some

20   observations and you'll see what they can do, and you'll impute

21   their cognitive level from that.  But that's the best you can

22   do, because you can't sit them down in a room and give them an

23   intelligence test.  If you do get an intelligence -- if you

24   could do that, which I don't even understand why you would, but

25   if you could do that, and you get an IQ score that says this

Walsh - Direct                                              5881

1    person's IQ is 19, well, saying that a person's IQ score is 19

2    has no added value than saying this person is profoundly

3    disabled.  It has no meaning.  If you have an IQ score in the

4    normal level, somebody has an IQ score of a hundred, and that's

5    about what the average is, and somebody has an IQ score of 110,

6    that makes a difference.  That discriminates among people.  If

7    you have an IQ score of 14 or 15 versus 19 or 20 versus 24 or

8    25, it's just about is -- it's what we call a floor effect.  It

9    is so low it doesn't matter.  It's that anything under 40

10   doesn't matter.  It just doesn't matter.  And so at that point,

11   if you look at it from the perspective of a developmentalist,

12   okay, an IQ doesn't make sense if people are profoundly

13   disabled, and, also, to some extent, in people who are severely

14   disabled, so what you will look at is the next best thing,

15   behavior, function, and that's exactly what ICF/MR does.

16       So I think in this case, the ICF/MR guidelines got it

17   right.  And CHDC, following the ICF/MR guidelines, got it right.

18   I think Dr. Matson's wrong about this.

19   Q.   What about Dr. Matson's use of DSM diagnoses as he states,

20   what's your opinion on that?

21   A.   I think it's very related.  I must tell you that I'm a

22   psychologist, I tend towards the behavioral side because -- and

23   so I worry about the DSM diagnoses from right out of the box.

24   And so I tell you that so you understand where I'm coming from.

25   But the literature of people who have practiced in developmental

1   disabilities has been unhappy with the DSM diagnostic layout,

2   relative to people who are severely and profoundly retarded, for

3   a long time, going all the way back to Robert Sovner who started

4   that.  And I think my partner, Dr. Kastner, would tell you the

5   same thing, that there's been -- the fact is that it's very

6   difficult to use the DSM to make firm diagnoses in people who

7   have severe and profoundly -- severe and profound disabilities

8   for the same reason, or similar reasons to what I just told you

9   about in terms of psychological tests.  They can't give you any

10  verbal feedback, they can't tell you anything about their

11  internal states.  So you're guessing as to what's going on

12  there.

13      Recently, people in the NADD, which is the National

14  Association for the Dually Diagnosed, have attempted to -- have

15  published what's called the DMID.  And the DMID is a diagnostic

16  manual for people with intellectual disabilities, and where they

17  have attempted to adapt the DSM categories to people with

18  developmental disabilities.  Dr. Kastner and myself did a review

19  of that book for a report for the journal we serve as associate

20  editors for.  And when you look at that book critically, there's

21  some excellent points in many of the chapters about how people

22  can practice better and make more acute diagnoses in this field.

23  But what is striking to me is when you go through all the

24  chapters -- and the chapters line up with the DSM.  So the

25  chapters in the DMID, they line up with the chapters in the DSM.

Walsh - Direct                                    5883

1    And when you go through, there's tables in each chapter.  And

2    for people with moderate to mild disabilities, they make

3    adjustments, and the tables say, okay, if you see this, then you

4    can use this in this population.  And almost all the chapters,

5    except for just a few, all the chapters for people with severe

6    and profound disabilities, there's no adjustments.  So the same

7    thing that plagues the DSM plagues the DMID.  It's very

8    difficult to fix a firm diagnosis of -- mental health diagnosis

9    on people who are severely and profoundly disabled, especially

10   people who are profoundly disabled.  You know, a lot of it, to

11   me, is a form of art.  You work with it.  But I think that whole

12   idea of going through and changing diagnosis from this diagnosis

13   and that diagnosis and diagnosing IQ scores, I'm sorry, but I

14   think your standard teams of people who work in developmental

15   centers across this nation, they don't care a lot about that.

16   What they care about is how do people function and how can we

17   make them function better.

18   Q.   Dr. Matson had discussed somebody who had microcephaly,

19   which he identified as water on the brain.  Is that accurate?

20   A.   I don't believe it is.  He was referring to hydrocephaly.

21   I think later in his testimony he caught it.  But it made me

22   wonder if he really understood what he was saying there, because

23   I think the issue that they were talking about in that point in

24   the testimony was whether or not the person could have anxiety.

25   And I think clearly a person with microcephaly can have anxiety.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Direct                                    5884

1   Q.   And explain to the Judge what microcephaly really is.

2   A.   Microcephaly is a small circumference of the head.

3   Q.   Do you have any opinions as to whether the caseloads of the

4   psych examiners are too large or whether they're appropriate or

5   not?

6   A.   I think they're appropriate.  I mean, I looked at that --

7   you know, the DOJ experts, Dr. Matson in particular, said that

8   they -- I think he recommended the hiring of seven more

9   Ph.D.-level psychologists.  In my experience, that would make

10  CHDC the best and originally staffed psych program in the nation

11  relative to ICF/MRs.  I don't think you could find them.  I'm

12  just about sure you couldn't find them.  But that's beside the

13  point.  In some sense, when you look at caseloads -- well, if

14  you took all 500 people and divide them among the 11 psych

15  examiners, it comes out to somewhere between 45 and 50 people on

16  a caseload.  When I was an ICF/MR psychologist, I had 48 people

17  on my caseload.  So that's in the ballpark, so to speak,

18  already.  But if you look at that population, you know, there's

19  a good hunk of that population that doesn't really require the

20  direct attention of psych examiners, other than to update their

21  annual functional assessment and to be available, if necessary,

22  meaning that they don't have behavior plans, they don't have

23  strategies, they don't have a mental health diagnosis, they

24  don't take medication.  You know, they don't need those

25  services.

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1        If you look at page 64 of my report, I did what I called an

2   active caseload analysis.  So I looked at the people who would

3   be likely to need psych services, as they're done at the

4   facility.  So people who might have behavioral plans or need

5   behavior plans.  And that comes out to this 428.  In

6   September 2009, there were 428 active plans, or there were 99

7   safety plans, 295 strategies, and the rest positive behavior

8   support plans.  And if you take that number, that 428, because

9   they're the ones that psychology would really need to deal with,

10  and you divide it amongst, and you locate those people who have

11  those plans in their teams with their psych examiner, you'll see

12  that array, that active caseload.  Now, you know, the people

13  between -- the numbers of people between 428 and 510 would still

14  need to go to their IPPs and still need to do an update, but

15  they wouldn't need to develop plans and follow them.  So this

16  becomes their active caseload.  It ranges from 22 people to 60

17  people, because, you know, some units, if you look at, say, the

18  Willow units where there are people who are very, very disabled,

19  they don't have a lot of psychological needs there, so that

20  unit, that caseload would float up.  So it goes from 22 to 60.

21  The average caseload then would be 38, 39 people, based on this

22  analysis.  That is not an onerous caseload for a psych examiner.

23  Q.   Now, Dr. Matson also frequently refers to evidence-based

24  practice.  Do you have any opinion as to how that should be

25  applied to a facility like CHDC?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   A.    Yes.  I think this evidence-based practice notion is very

2   important, and, again, I think it's a straw man.  I think he

3   created a straw man, and I think a lot of this doesn't apply.  I

4   don't know how much testimony there has been on evidence-based

5   practice, so I guess I should go through it a little bit.

6         THE COURT:  It's been talked about a lot, so you might

7   as well go ahead.  Really and truly, and everybody in the

8   courtroom knows, we've heard that term repeatedly from nearly

9   every expert.  So whatever you have to say about it is fair

10  game.  And I'm not encouraging any lengthy or interrogation type

11  testimony.

12        The other thing that everybody in here knows is that I've

13  wanted to shorten things more than the witnesses and lawyers

14  have been able to do.  So I'm not trying to lengthen it.  But I

15  do want you to know that everybody's talked about it.  I say

16  everybody.  Most of the experts have discussed evidence-based

17  practices, and so you should tell me about your opinions.

18        THE WITNESS:  Fair enough.  That helps me.  I don't

19  have to go into a long, detailed explanation.

20        I would say this.  And this can be the shortened version.

21  I think evidence-based practice is a really, really good idea.

22  It's really something that we should aspire to.  It's something

23  that I see professional organizations aspiring to, and I think

24  that's good.  Plain fact of the matter is, in a lot of cases, we

25  don't have any evidence, and so we don't have the evidence to

 1   base practice upon.  You probably heard about the Cochran

 2   collaborative in here, and HRQ, the federal people, and practice

 3   patterns, that they vet all those things.  There are probably

 4   more of those in medicine than there are in psychology.  And

 5   people with developmental disabilities, there's very few.  I

 6   went through and I looked at all those standard ones and you

 7   find just handfuls of them, and most of them are not even

 8   applicable to the context we're talking about at CHDC.

 9   Evidence-based practice in psychology is just starting to come

10   into its own.  The APA -- and Dr. Matson referenced this in his

11   report.  The APA had a study paper done and adopted a resolution

12   in 2005.  If the APA adopted a resolution to start looking at

13   that in 2005, it seems disingenuous to criticize in 2009, to

14   criticize CHDC for not having evidence-based practice going on

15   in their psychology departments.  The first thing, there aren't

16   any evidence-based documents.  And so if you look at that like I

17   think this was, this was a way to structure a criticism.  And I

18   understand that evidence-based practices is really important and

19   we really should move that way, but we have to make sure we can

20   give practitioners the evidence base to practice.  Literature in

21   the field of developmental disabilities hasn't really gotten

22   into evidence-based practices.  It's just starting to come out

23   now.  And there are a few things that people are saying, this

24   might look good, there's some evidence that says this is a good

25   way to go, you know.  But you can't be critical of the people at

 1    a developmental center for using, quote-unquote, "evidence-based

 2    practice."

 3         The second point I would like to make is, evidence-based

 4    practice, as I think he defined it, or if he didn't define it

 5    this way, he clearly implied its definition was that what

 6    practitioners do is they go to the literature and they find the

 7    best literature and they apply it.  My perspective on

 8    evidence-based practice is it is not that, or it used to be that

 9    maybe in its earliest days, but it has moved well beyond that.

10    Evidence-based practice at this day and age or at this moment in

11    psychology is about systems change.  It's about what we've been

12    talking about all day here.  In March of 2009 -- I quoted this

13    in my report -- the lead article in the *American Psychologists*

14    journal was on evidence-based practice in psychology.  What they

15    did is they documented how little of it there was, and they

16    documented this for the entire field of psychology.  The point

17    is that what they were saying is that evidence-based practice is

18    a systems change effort, that what you do is you put together

19    panels of experts who look at the literature, who do

20    meta-analysis of that literature.  And a meta-analysis is when

21    you do studies of studies.  So you take a bunch of studies on a

22    particular topic and you do a study of that to see, if taken

23    together, all that literature makes sense, and if it does, you

24    can actually use that as a basis to build treatments.  So

25    medicine has been doing this -- medicine is a little ahead of

1   other fields because that's where it started, it started in the

2   Institute of Medicine in, I believe, the '90s, and they're

3   ahead.  So they have some of these where they have started to

4   get big studies and put them together and develop practice

5   guidelines so that a practitioner can say, Well, this group of

6   studies and this panel of experts has said that this is the

7   appropriate evidence-based practice for this, and they can start

8   putting that into practice.  That has not yet widely occurred in

9   psychology.  There are references in my report, very

10  contemporary references, 2006, 2007, 2008, that say, by and

11  large, psychologists structure practice based on their

12  experience, not on evidence-based practice, because there's no

13  evidence-based practices that have been properly vetted in the

14  developmental disabilities, and in the subfield of psychology,

15  that's even more true.

16      So I don't understand what -- I don't understand what

17  really all those 40 uses of the term in his report -- he stuck

18  it as an adjective in front of everything, and it, to me,

19  doesn't hold water.  I watch the literature.  And if I were in

20  practice, I would teach people to practice using literature to

21  the extent possible.  But there's no clear-cut evidence-based

22  practice standards that those psychologists, those

23  master's-level psychologists with caseloads, on average, of 39

24  people could go to and say this is how I'm going to practice

25  with these people.  They cannot find that.

1   BY MR. YORK:

2   Q.    In fact, did Dr. Matson cite any clear-cut evidence-based

3   standards in his report or his testimony?

4   A.    I don't believe he did.  I don't think he even looked.  I

5   went looking.  I was especially concerned that, for example,

6   that he was implying that psychologists or psych examiners

7   weren't looking at the literature and applying the literature

8   and, therefore, weren't meeting evidence-based standards.  I

9   think he used the words "evidence-based practice standards" at

10  least once in his report.  I e-mailed the lead author of the

11  *American Psychologists* article and said, "Does that make sense

12  to do that?"

13        Might I read what she said to me?  This is a personal

14  communication.  Can I read that?

15              THE COURT:  Fire away.

16  A.    She says, "I think the data overall on availability of

17  evidence-based care really refute the idea of publishing an

18  academic journal as a dissemination strategy.  They are

19  expensive, often inaccessible, and for the most part don't

20  provide enough information to be clinically relevant.  Even

21  workshops appear to be insufficient.  So the

22  'read the evidence and do your best to incorporate it as you see

23  fit' strategy is quite naive.  Moreover, there is a complete

24  absence of empirical evaluation whether that would work to

25  achieve positive outcomes."

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1        That's the statement from the person who wrote the lead

2   article in the March 2010 *American Psychologists* article on

3   evidence-based practice.  It strikes me that it's not fair to be

4   critical of the psych examiners for not having, quote-unquote,

5   "evidence-based practice."  It strikes me as a straw man.

6   Q.   What should the psych examiners be doing at CHDC?

7   A.   I'm sorry.  I didn't hear you.

8   Q.   What should the psych examiners be doing at CHDC?

9   A.   I think they should be reading the literature as best they

10  can; they should be going to workshops, when they can get them;

11  they should be following the trends in the field; they should be

12  trying to vet whatever they can, based on their own personal

13  needs in their group.  And that's what they do.  You know, I

14  think it's entirely reasonable that over the next decade that we

15  will see more attention in the literature page of evidence-based

16  practice.  The *American Journal on Intellectual Developmental*

17  *Disabilities* just came out this month with a small section on

18  evidence-based practice, and they did a call for papers, and

19  they got eight papers.  They published two.  Neither of them --

20  well, one of them was on behavioral practices in children with

21  autism.  That will be something that will be good for that

22  psychology department to get and to read and to start thinking

23  about that.  But we're at the front edge of that.  We're at the

24  leading edge of what that means for this field.  I think it's

25  unfair to be too critical of those psychologists.

1    Q.    Doctor, we already covered treatment fidelity some earlier

2    in your testimony.  I diverted you in that direction for a

3    period of time.  But I want to make sure you covered everything.

4    Do you at all agree with Dr. Matson and Dr. Manikam that they

5    need to do treatment fidelity?

6    A.    I don't see treatment fidelity as a bad thing.  I mean, I

7    think you want treatments to be implemented the same way, to the

8    extent possible.  I guess what I wanted to do in my report was

9    to again show that there may be some overreaching in the

10   statements of all three people who looked at behavioral

11   practices, Dr. Matson, Dr. Manikam, and Dr. Thibadeau, relative

12   to treatment fidelity.  Treatment fidelity is getting much more

13   play, if you will, in school-based intervention programs that

14   are growing out of sort of the positive behavioral support

15   movement.  And I think that's where some of that treatment

16   fidelity is coming from, at least probably from Dr. Thibadeau,

17   or I stated where I thought some of that emphasis was coming

18   forward from the other two persons.  But, you know, I mean, I

19   reviewed some research in my paper and, you know, those studies

20   are between, like I said this morning, between 18 and

21   30 percent, the ones that I noticed, and a lot of times they're

22   around 20 percent.  Should providers try to get treatment

23   fidelity things into their plans?  Yes.  It would be a good

24   thing, another good topic to look at.  If they have to get some

25   consultants to do that or help them, that would be fine.  The

1    point is that it's not in most -- it's not in most articles that

2    are coming into the literature now, and that's published

3    articles, and so it's not likely that most day-to-day programs

4    have treatment fidelity measures included in them.  They just

5    probably don't.

6    Q.    Doctor, you have a section of your report entitled

7    "Sampling Problems and Problems in Tables in the Matson Report."

8    I think you go in here into the methodologies used by Dr. Matson

9    and Dr. Manikam.  Is that correct?

10   A.    These sections focus on Dr. Matson.

11   Q.    All right.  Can you tell me what your findings were with

12   respect to the methodology of Dr. Matson?

13   A.    Well, I was disappointed in what I saw.  I mean, you know,

14   Dr. Matson -- Dr. Matson, part of his title is he's a

15   distinguished researcher at LSU.  I didn't see the work of a

16   researcher.  You know, I'm a data guy.  I was trained in

17   research.  I expect he was too.  Dr. Manikam, I think, is more

18   directly a clinician and, therefore, you know, perhaps there's

19   more latitude to be given to a clinician in terms of how they

20   review documents.  I, frankly, was quite surprised in what I saw

21   in Dr. Matson's work.  It seems like I want to characterize it

22   as careless, but it almost seems to me it was more than that.

23   It was not so much careless as there was no intent to be

24   scientific.  There was no intent to be objective, which I'm sure

25   he understands relative to doing research.  You know, he took a

1    sample, and he understood he was going to take a sample to

2    review, and when you look at that sample, the sample is not

3    really a sample at all.  It's just a collection of people.  I

4    think he asked people to give him charts.  So he had no planned

5    way to structure the charts, and even when he got the charts, he

6    didn't finish reviewing them all.

7         So, you know, it's like what you get down to is, you get

8    down to, in some sense, you get down to a person who is sort of

9    looking narrowly to find things to criticize, I think.  And

10   that, you know, a lot of times you can't tell whether he read

11   his materials first or did his tours first.  And, you know, you

12   have this sense he went on the tour, saw something, went back to

13   the records, read about it, and criticized it.  And, like, that

14   strikes me as just really bad practice.  It strikes me as

15   especially bad practice for somebody who is a researcher, who

16   should be saying:  How do I objectify this?  How do I take a

17   reasonable sample?  What's the basis I should look upon this so

18   I can make statements about this population from a sample?  I

19   don't understand why that was not done.  I do not understand it.

20   Q.   Did you actually try to chart this or break this down since

21   you show whether or not his sample was at all representative?

22   A.   Yes.  And if you look at page 77, I took his sample, the

23   people he used in Table 1 -- it's hard to even -- it's hard to

24   even figure out how people got into his table, you know, quite

25   frankly.  There was no -- there was no description of what the

1    tables in the appendices, which often were just a list of names,

2    were.  One of the tables doesn't have a title.  It's hard to

3    even tell what qualified getting in there.  When you look at the

4    deposition responses, I think he was even confused about what it

5    was.  When I looked at his Table 1 and said, Well, is this

6    sample representative?  And I think he opined in his deposition

7    that he thought it was representative, because when you asked

8    him that, he said, "Well, it's random, so I assume it is."

9    That's what he said.  And if you look at it, if you analyze it,

10   this is what you find.  That with respect to gender, clinical

11   team membership, that's the unit team, level of intellectual

12   disability, ambulation status, fragile health, aggressive,

13   destructive or self-injurious behaviors in the presence of

14   behavior plans, on none of those variables is his sample

15   representative.  If you look on the right-hand side at the table

16   on page 77, it describes the nature of the deviation.  So in

17   some cases the percents are nearly reversed.  Gender, for

18   example.  The unit teams are either oversampled or undersampled,

19   and some of them by a lot.  One of them by two-thirds, one of

20   them by a half.  If you look at the level of intellectual

21   disability, people with severe behavioral problems, severe

22   disabilities are oversampled, and profound are undersampled.

23       If you go down that chart and you look at all those things

24   and you realize that the collection of documents that he had,

25   you could read every word of them, and if you come to some

Walsh - Direct                                        5896

1    conclusions, those conclusions -- you can't apply those

2    conclusions to the rest of that population.  It's just not

3    scientific.

4         And so I don't know what to say, because it seems like when

5    you looked at his first chart, his first table, and you get

6    that, and then you move on through tables, they go up to 6, and

7    the problems only get worse.

8    Q.   How does it get worse?

9    A.   Well, I mean, you find that you can't figure out what's in

10   the tables, you can't figure out what was reviewed, you can't

11   figure out -- we can go through each of those, if you'd like.

12   Q.   Would you please do so.

13   A.   Okay.  He lists 45 names in Table 2, under the heading of

14   "Individual Support Plans Reviewed," and in Table 3, it's

15   unnamed, there's just cases, they're labeled 1 through 29.  And

16   I believe he said that there was some overlap in those two

17   tables when you questioned him in deposition.  And so there's a

18   lot of problems that appear there.  You know, the representation

19   was only assumed because he doesn't know whether it's

20   representative.  And he thinks he has more representation than

21   he actually has, because if you look at the numbers of people

22   with plans from the September listing, he couldn't have more

23   than 40 percent of those people.  So he doesn't specify which

24   type of plan he reviewed.  That's where I was saying this

25   morning that I don't think he reviewed all the plans for a

1    specific person, and that way he missed things.  You know, he

2    wouldn't necessarily see replacement behaviors if he didn't look

3    at perhaps the strategies in conjunction with a behavior plan or

4    the other plan.  And, you know, he says he looked at 26 of 45

5    positive behavior support plans.  Well, there's three different

6    types of plans for people and you've got to look at them all.

7         So as you go through it, you just find that the tables are

8    not constructed in any sensible way, that he did not look

9    through his -- he did not tabulate his information in any way

10   that makes any sense.  He didn't identify any data coming out of

11   them.  He didn't identify any categories of anything.  He made

12   opinions.  And his opinions -- I think his opinions were guided

13   by a biased selection of people.  And, you know, I think what

14   happened is that he gravitated toward problems and kept on going

15   that way.  I think that's the problem that affected some of the

16   other DOJ experts as well, is that they came in and gravitated

17   toward problems and never got a look at the facility at large to

18   see how it functions.

19   Q.   Doctor, in Table 2, for example, does he list one of the

20   CHDC psych examiners as one of the residents?

21   A.   Yes.  It's like when you get to that point, you have to

22   really ask yourself, How could a psych examiner be listed in a

23   table with consumers?  I suppose it could be a typo.  I suppose

24   it could be something.  But it's not a point that leads you to

25   have a lot of confidence in that table, especially when it's

1    surrounded by -- quite frankly, this is a mess.

2    Q.   In Table 6, does he list some names there that are

3    incorrect, the first names are wrong for the individual?

4    A.   A number of them.  Six or seven of them where the first

5    names are wrong.  And, you know, I tried to go through and

6    identify who they were, but in a population of 500 people, you

7    know, the last name, they often recur, so it's hard to even

8    tell.  Actually, I got to the point with Table 6 that I couldn't

9    even figure out what was in that table to do an analysis of it.

10   I couldn't trust myself to understand what it was, because I

11   think he was using the wrong reference.  I think he used the

12   wrong listing of problem behaviors.  He used a listing off of

13   the client census listing as opposed to the psychology

14   department listing, so he wasn't sure about who had what

15   behavior.  I'm sorry.  It was just a mess.

16   Q.   Doctor, could we go through a couple of specific Matson

17   case examples to review whether or not he got things accurate or

18   whether or not he missed things in the record or not?

19   A.   Well, yeah.  It turned out in a couple of cases, I could

20   find, based on the person, I could figure out who it was, and

21   there were a couple of cases where it was the same case of

22   somebody that I reviewed.  If you look on page 82, there's a

23   case, it's No. 8 from his Table 3, and it's talking about

24   whether there is a behavior function specified in replacement

25   behaviors.  And so if you look at page 83, I reproduced what's

1    in Dr. Matson's case 8 there in the table on page 83.  So he

2    says under "Behavior Function," "None identified," and then he

3    says under "Replacement Behaviors," "None."  And so it turns out

4    that this TH was also reviewed by me with my tool.  Okay?  And

5    if you look at the next page, on page 83, you can see that there

6    is clearly a function stated for TH, and it's clearly a

7    replacement behavior.  And I quote from those two plans.

8         Do I need to read those or --

9    Q.   No.

10   A.   So one of them says the function of the inappropriate

11   behavior, and there's a text, and the other one says in regard

12   -- it talks about the different behaviors of what is expected.

13   It's interesting in this case because this case is the one that

14   uses the term "bridging statements."  If you look at the second

15   line there, he says, "bridging statements will occur."  The use

16   of "bridging statements," Dr. Matson in another case said the

17   replacement behavior's bridging statements actually indicated

18   the presence of replacement behaviors.  So my sense is that he

19   missed that.  And I think he missed that because he wasn't

20   reading the plans all the way through or not all the plans for

21   each person.  And so there was clearly replacement behaviors

22   specified in TH's behavior plan, and there was clearly a

23   function of behavior.

24   Q.   How about case example No. 14 for Matson?  I believe it

25   starts on the bottom of page 83.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    A.    Same thing, that's the case of ZS.  And so Dr. Matson said

2    that he wrote in "none" under "replacement behaviors," and if

3    you look at my review of case ZS, the strategy clearly shows --

4    I had four examples of potential replacement behaviors that

5    could have been counted.  And some of them are quite direct.

6    Playing with toys, building things, taking objects apart.  Just

7    looking at other things, you know, these are replacement

8    behaviors.  It's clear to me that I think what happened here --

9    and then I guess I'm guessing, and I don't know if I'm allowed

10   to guess.  But I think what happened here is he didn't read the

11   strategy, he just read the safety plan.

12   Q.    Was something similar with the Case No. 19, ACJ?

13   A.    I think the same thing happened.  In that case, he entered

14   "none" for "replacement behaviors" again for ACJ.  It actually

15   said, "Appropriate behaviors for ACJ include remaining calm,"

16   and then lists a number of other behaviors.  Those are

17   replacement behaviors.  So, you know, when the psych examiner

18   wrote that in those other two or three cases, they clearly were

19   thinking about replacement behaviors.  These are the kinds of

20   things that when I did my review using my tool, and I looked at

21   was it replacement behaviors when I encountered these kinds of

22   statements that I could say, yes, there was evidence of

23   replacement behaviors.  And so I don't know how many cases that

24   Dr. Matson missed, but he missed those three.  And so I think he

25   was careless in a lot of ways, and I'm, frankly, surprised at

1    that.

2    Q.    Doctor, do you know whether or not at CHDC they include in

3    their restrictive procedures list these one-to-one staffing

4    ratios?

5    A.    I believe they do, as a restrictive procedure.  They treat

6    that with the human rights committee reviewing.

7    Q.    Do you know if Dr. Matson segregated that out or considered

8    that at all when he was doing his review?

9    A.    I don't know.  You know, it's important to understand that

10   those two things exist.  But, you know, if the facility uses

11   them that way, then they should use them that way, but it

12   doesn't mean that restrictive procedure is, for example, a

13   restraint, because a lot of times it could be extra staffing,

14   one-to-one staffing.

15   Q.    When Dr. Matson referred to CHDC as an agency that focuses

16   on control rather than on teaching, did you find that to be

17   true?

18   A.    No.  I think I addressed that this morning, that I don't --

19   I don't understand that quote, other than from somebody who

20   misapprehended how behavioral plans and/or restraint is used at

21   the facility.  You can't possibly have done a good analysis of

22   restraint and come to that conclusion based on the numbers I

23   quoted earlier today of it's in a relatively small population --

24   subpopulation.

25   Q.    Now, do you think Dr. Matson's methodology, or lack of

1    methodology, affected his findings?

2    A.    I think, without doubt, they did.

3    Q.    So what is your conclusion or your summary of your findings

4    as to the methodology used by Dr. Matson?

5    A.    Well, I think I can say that I am not impressed, and I

6    believe that there are fundamental flaws in how he approached

7    his review task.  I think that he's not able to make statements

8    about the entire population with any real credence because I

9    think he did not really take any sort of reasonable scientific

10   look in his work.  He did not generate data.  He did not use the

11   data of the facility in any real quantifiable way that I saw,

12   and a lot of it was available to him.  He could have gotten it.

13   I don't understand it.

14          MR. YORK:  Your Honor, we're going to move on to

15   another topic area, if you might be interested in a break.

16          THE COURT:  Sure.  We usually break at 1 for lunch,

17   and it is five of, so why don't we go ahead and take our lunch

18   hour now.  We'll be in recess.

19       (Recess at 12:53 p.m.)

20                    C E R T I F I C A T E

21    I, Eugenie M. Power, Official Court Reporter, do hereby

22   certify that the foregoing is a true and correct transcript of

23   proceedings in the above-entitled case.

24   /s/ Eugenie M. Power, RMR, CRR, CCR    Date:  December 22, 2010
     United States Court Reporter

25

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Direct                                              5903

1          (Proceedings continuing at 1:55 p.m.)

2     BY MR. YORK

3     Q    Good afternoon, Dr. Walsh.

4     A    Hi.

5     Q    Doctor, quick reference guides referred to by Dr. Matson,

6     do you have any comment on his use of the quick reference guide?

7     A    Quick reference guides are used on each unit.  I found it

8     to be a beneficial document.  They're one-page documents.  Each

9     have a two-by-two photo, a profile of the person.  They include

10    safety issues; weather precautions; special dietary

11    instructions; things about behavior plans, if they have any.

12    And my concern was that Dr. Matson said he reviewed 510 of these

13    things, but there didn't seem to be much content, critical

14    content for a review of 500 pages.

15         And what he said was that there were a couple of

16    instances -- he raised a couple of examples where the behavior

17    plan was not sufficiently fleshed out to be implemented.  And

18    apparently the use for these things are when you have -- or one

19    of perhaps several uses of these things are when you have staff

20    maybe, you know, not familiar with the unit either because

21    they're new staff or because they're pulled from other places

22    and they may use the quick reference guides to locate aspects of

23    the person.

24         You know, his conclusion was that they should either carry

25    more appropriate programmatic information so that you could

Walsh - Direct

1    implement the program or not be used at all.  And that struck me

2    as rather overreaction to the issue of what quick reference

3    guides are.  I think they're a handy quick reference.  I think

4    there is a whole lot of instances where they're beneficial, and

5    they can be used for a lot of reasons.  I used them on my tours.

6    And I don't think they should be there for, you know, touring

7    experts, but, you know, they're -- there are lots of people in

8    the units.  They're looking at different things.  It's a way to

9    get a sense of what that person looks like.

10        So I find -- I find that that is a good thing to have.  I

11   am not sure why he would come to that conclusion other than it

12   was an easy conclusion to come to, but I am also not sure that

13   he did any real good formal analysis of quick reference guides.

14   I mean, you would at least expect that you would want to talk to

15   the staff there about how they use them or how relevant they

16   think they are or -- I mean, I don't think he did any of that.

17   So, you know, my -- I think I am in somewhat disagreement with

18   Dr. Matson's view on quick reference guides.

19   Q    You already discussed CPI, the Crisis Prevention Institute,

20   and the fact that you had done some physical hold techniques at

21   Vineland.  Do you remember discussing that?

22   A    Yes.

23   Q    Was the system you developed a competency-based training

24   package?

25   A    Yes.

Walsh - Direct                                                    5905

1    Q     Is the CPI system a competency-based training program?

2    A     Yes.  I believe so.

3    Q     Could you explain what you mean by that?

4    A     Well, a competency-based training is when you demonstrate

5    competence in whatever you are being trained in.  This was also

6    an issue which I felt was overused by DOJ experts.  In fact,

7    actually I think competency based training is somewhat of a buzz

8    word in our field at the moment and people sort of apply it to

9    everything, but in some cases it makes sense and in some cases

10   it doesn't.  The competency based training means that you should

11   be able to demonstrate at the end of that training what was

12   being trained.  So if you are going to demonstrate something,

13   then it needs to be something that's demonstrable.  So -- you

14   know, or reasonably demonstrable.

15         So, you know, when we train in the physical restraints,

16   they were relatively complex.  They involved getting into and

17   out of bear hugs and basket holds and takedowns, and we did a

18   whole lot of training with videos and taping people and role

19   playing and going in and going out.  And at the end, we gave

20   them a test.  We gave them a written test and we gave them a

21   competency test, could you apply all the holds.  And that would

22   be an example of competency based training.  I believe CPI does

23   the same thing.

24         A very common example of competency based training would be

25   CPR where people learn how to do CPR and they demonstrate that

Walsh – Direct                                    5906

1  competency on those CPR mannequins that are the high-tech ones.

2  They tell you if you are doing it right or wrong.  And, okay,

3  and that makes sense to do that.  But the question -- or how to

4  use a fire extinguisher.  Can you go through the steps of

5  getting this off the wall, turning it upside down, pulling a

6  pin?  I am not saying you should discharge one every time you

7  train somebody, but there is a lot of situations where

8  competency based training doesn't make a lot of sense at all.

9      If you are training people on policies and procedures and,

10  you know, it's relatively straightforward, you say that, for

11  example, you know, we want to lock up all dangerous chemicals in

12  a closet in the chemical -- or locked closet.  Do you then have

13  people get bottles, put them on the shelf, close the door, and

14  lock it to assure yourself that they can do that?  I mean, it

15  seems a little far-fetched, but I think it's -- there are a lot

16  of situations where competency based training is -- doesn't make

17  a lot of sense.

18      My guess is if you look at the behavior plans and you

19  identified the nature of the training that goes along with them,

20  that you would find that there isn't a lot of instances where

21  you would need to have competency based training for a behavior

22  plan.  If the plan involves restraint, they would have been

23  trained in the restraint packages for the facility.  So very

24  often what the plan involves is how you document how you tell

25  the person something, and that can be done in, you know,

1  verbally.  Like I -- so I am at a loss for what is meant

2  sometimes by that, relative to that criticism.

3     And I reviewed all of the training package, the training

4  curriculum of the center, and I looked at where it was stated

5  that there were tests.  And it looked to me like there were

6  competency based tests where there ought to have been a CPI,

7  CPR, things like that.  And so I am not sure that -- I am not

8  sure that that whole competency based training criticism holds a

9  lot of water relative to behavior plans.  I suppose in some

10  particular instance there might be some complicated behavior

11  plan that might take some sort of demonstration of training

12  competence, but I can't see that it's an across-the-board

13  criticism that makes a whole lot of sense.

14  Q    Dr. Matson also criticized adaptive training at CHDC

15  because he said direct care supervisors were developing specific

16  habilitation goals.  Do you remember that allegation?

17  A    Say that again.  He said what?

18  Q    That the direct care supervisors developed the specific

19  habilitation goals.

20  A    To some extent that's true.  And the way that

21  interdisciplinary teams work is that they work by each

22  discipline bringing their updated assessments, and, you know,

23  technically the team sets goals.  I mean, the team has to reach

24  consensus on what goals and objectives are set for a person.  To

25  get stuff on the table, what happens in practice is that the

Walsh - Direct

5908

1    various disciplines will bring proposed goals or objectives to

2    put on the table for discussion.  And in that sense, residential

3    people who have done some sort of assessment of the residential

4    capabilities, or more likely are already doing a program from

5    last year and are going to extend that, will bring the objective

6    forward to the IET team.

7         It was my understanding or sort of reading on what

8    Dr. Matson was saying, though, was that -- I could be wrong on

9    this, but I read that that he was saying that they were not

10   professionally competent to do that.  I could be wrong about

11   that, saying that there needed to be some more sophisticated way

12   to get to goals and training programs for those skills.  My

13   sense is that it's, you know, some -- in some cases there are

14   packages that -- pre-done packages that you can get that show

15   skills and training skills.  There is probably not as many as

16   there should be.  Probably a lot of them are not vetted

17   research-wise the way Dr. Matson would like, but I don't think

18   it's unreasonable for each discipline to bring forth a suggested

19   goal and, when it's adopted, to put together a package of

20   training for that.

21        It is a team process, so they could always get help in

22   training certain things from professionals.  So I think that

23   happens in some contexts, you know.  If -- if somebody has a

24   goal and it's about a swallowing, I am sure there is a speech

25   therapist who is providing some guidance to people who were

Walsh - Direct

1    working with that person during a meal.

2    Q    What did you find as to data collection?

3    A    Tell me where you are.  Are you in my report somewhere?

4    Q    Page 96 of your report.

5    A    Okay.  Well, the data collection concerns, this is an

6    interesting topic.  I -- there is a couple of things.  I think

7    that Dr. Matson was looking for data collection like they do in

8    research.  This is data collection like you do in the real

9    world, and so there is a couple of issues there I think need to

10   be discussed and clarified.

11        One, I think that Dr. Matson was unhappy with the behavior

12   reports as a data collection system.  Well, he wouldn't say they

13   were a system -- data collection form.  I have actually wrestled

14   with this problem in the past in my administrative roles because

15   you do want to collect data on behavior plans.  You can use

16   behavior reports as data collection if you don't have extremely

17   complex behaviors and you don't have very, very frequent

18   behaviors, meaning that you couldn't keep up with them in some

19   sense.  But a lot of behavior plans may be for behaviors that

20   occur eight times, nine times a month, and so it seems to me

21   that you could use a behavior -- standardized behavior plan to

22   collect data.

23        And so, you know, you would want to look at the quality of

24   that data collection system relative to that.  So in my way of

25   thinking, I think there are times when you can use behavior

1    reports to collect -- as a standardized way to collect data,

2    treatment data for behavior plans.  Having said that, then you

3    would want to say like, well, is the behavior report, is it

4    sufficient to do that?  Is it a decent sort of data collection

5    instrument or is it just like a sloppy form?  Well, if you look

6    at the CHDC behavior report form, it's actually fairly

7    sophisticated.  And, you know, it -- you know, it's on NCR

8    paper.  The sheets go out to different places.  You know, one

9    goes to central records, one goes to the psych examiners, and

10   one goes back to the residence.

11       And if you look at it, there is 14 sections, 14 pieces of

12   information, you know, on that form.  There is the resident's

13   name, residence code, start and end time of the incident,

14   location of the behavior, and there is five prelisted check

15   boxes, plus a box where you can put "other."  There is the

16   antecedent conditions with 17 pre-listed check boxes, plus

17   "other."  There is nine different -- there is a behavior, and

18   there is nine pre-listed types that you can choose from.  And

19   also who was the target -- I am reading from page 97.

20       There is 18 pre-listed other behaviors.  There is two

21   pre-listed behaviors about destruction.  There is pre-listed

22   check boxes for verbal expression, for leaving assigned area,

23   for type of restraint used, for staff response, for brief

24   summary -- space for brief summary and a narrative.  You can

25   write in stuff.  And then there is information on the staff

Walsh - Direct

 1    member, the title and, the date.

 2         In addition, at the bottom, there is a space for the psych

 3    examiners to use and that contains information for the incident

 4    review committee, date, identification of the reviewer, spaces

 5    for the psych examiners to assign a function.  There is 7

 6    pre-listed check boxes there as well as to make an

 7    interpretation, 13 pre-listed check boxes, and a space for

 8    miscellaneous.

 9         You know, if you look at that behavior report form in that

10    light, it really is, you know, it's a behavior collection.  It's

11    a behavior data collection system.  You can get a lot of

12    behavior from that, and so I don't have any problem.  If this is

13    the standard form they're using and this form has an agreed-upon

14    route through the facility, which it does because the psych

15    examiners look at it, and if there is an incident it will go to

16    IRC and if it's a behavior plan, it would go to the psychology

17    department, then this is a really good system.  This is not

18    something that should be criticized.

19         Now, you would also want, though, the option, depending on

20    clinical judgment, for psychologists to be able to tailor a

21    behavior collection system for individual residents.  You know,

22    I -- I never really had, when I was working -- some years ago

23    now, when I was working as a psychologist, I always did my own

24    forms because there wasn't such a system there that I could rely

25    on.  I would like to have had this in some cases.

Walsh – Direct                    5912

1        When you tailor your own forms, you have to build a form,

2    you have to train it, and the question is:  Does that happen at

3    the facility?  And it certainly does.

4        You know, there is two occasions that I sought to collect

5    forms and -- or behavior plans, excuse me.  My first visit, I

6    interviewed the psych examiners, a number of them -- not all of

7    them, about half of them.  And on that day I asked them to bring

8    me the standard kinds of behavior forms that they use to collect

9    restraint data, and I got a number of examples.  I put them

10   somewhere.  I put them in here, but I don't remember where.

11   It's like seven or eight or nine.

12       And so in my September visit, because that was still an

13   issue, when I was interviewing then the acting sort of chief of

14   psychology -- psychologist, I said, you know, I would like to

15   get from you some idea of whether or not you people do sort of

16   tailored behavior data collection systems.  And there were two

17   psychologists in the office at that point, and they started to

18   produce these things from files and their computer, printing

19   them off from the computer.  And before long I had a whole pile

20   of them on the desk, and I saved five or six or seven of them as

21   examples.  And there were all -- they were perfectly tailored to

22   the behavior plans.

23       So you have two levels of potential data collection there.

24   You have -- the psych examiner takes the option of creating

25   behavior plans, creating behavior data collection systems

1    tailored to the individual for a specific plan, and they do

2    that.  And you have the option of deferring to the behavior

3    report system, and they do that.

4        And so in either case, you will have treatment data

5    collection.  My sense is that in the few cases in this report,

6    Dr. Matson, I think he also reiterated -- I think he also

7    reiterated this in his deposition.  I think he was confused with

8    the way data are collected.  In his report, he said it's really

9    not possible to collect data on a number of different behaviors

10   because it's -- research shows that it gets to be unreliable.  I

11   would just like to disabuse anybody who read that in his report

12   that -- I think what he was talking about there was research

13   data.  When people are looking through -- you know, research

14   assistants are looking through a two-way, a one-way mirror or

15   glass into a classroom or you're collecting data in a real life

16   situation -- you might be doing an observation in a home for a

17   child or something -- you know, if you have a data collection

18   sheet in your hand doing data, he's right.  You get to about

19   three or four behaviors that you are trying to watch as it goes

20   on, and it gets very hard to collect them.  But that's not what

21   we're talking about.

22       What we're talking about is discrete events.  We're talking

23   about behaviors that happen nowhere near at the level that

24   people would be in real time collecting them.  So I think he

25   misunderstood that, and he applied a wrong research citation

Walsh - Direct                                    5914

1    because that's not what it was.  What they needed to collect was

2    they needed to collect incident behavior relative to their

3    behavior plan, and I think they do that.  But I think the

4    behavior reports work, and so do their tailor-made behavior plan

5    data collection systems.

6    Q    I think both Dr. Matson and Dr. Manikam at least implied

7    that there should be more use of graphs.  Do you have a response

8    to that?

9    A    Yes.  Well, first thing, there are graphs.  Okay?  That's

10   one thing.  And I can -- I will tell you how many there are in a

11   minute, but, you know, the issue is you want to objectify the

12   data.  You want the data to come out some objective way.  You

13   can do that through graphs, and you can do that through tables.

14   I don't have a problem with them calling for graphs, but you

15   don't need them in complicated situations.  And in a lot of

16   situations, if you look at the behavior plans in force at the

17   facility, they are not complicated.

18        What do I mean by that?  If you look on page 99, I took 243

19   monthly progress notes from all of the psych examiners for the

20   month of June 2009 and I looked at them and I determined whether

21   there was a table, which is an objective, you know, layout of

22   data or a graph.  And so the numbers of plans go down the

23   left-hand side.  There were 243.  There were -- 29.5 percent had

24   narrative only.  72 percent had data tabulation and table.  And

25   18 percent had data graph.

Walsh - Direct

1        There are examples of that on the following two -- page 101

2    and 102.  Page 101 is showing data tabulated by table, and those

3    tables are relatively straightforward.  And you will see that

4    the instances of the behavior on those tables is relatively

5    infrequent.  You know, 2s and 3s, and 1s and 2s.  So graphing

6    that data, putting it on a bar graph, would -- you know, unless

7    you have no visual spatial ability at all, you wouldn't add much

8    to that layout of that data.  So you don't really necessarily

9    need a graph for those kinds of data.

10       If you turn the page and you look at one of the monthly

11   summaries that does have a graph, the graph -- there is two

12   things being graphed and they're -- and so you have two things

13   that are varying at the same time and you might want to look how

14   they vary together and that graph does a nice job of doing that.

15       Now, so by and large, the -- you know, the plans have

16   objective data attached to them.  You know, only 23 out of 243

17   had narrative only.  You know, some of those may be appropriate.

18   I mean, I didn't do a quality analysis of those, but leaving

19   those aside, it's only 9 percent of the -- of that 243 for the

20   month of June, 90 percent of them had some sort of objective

21   data layout, a graph or a table.  And that's what you need.

22       There was some -- there was some indication -- I think this

23   was, you know -- I think in the reports that Dr. Manikam and

24   Dr. Matson were focusing on the use of graphs for treatment

25   data, which is what I just described.  But there was some

Walsh - Direct                                            5916

1    indication, I think, in their trial testimony that they were

2    really sort of extending that to mean assessment data, and that

3    means that like you would want to know how does the behavior

4    vary.  Does it vary with weather or place or whatever, time of

5    day, and that sometimes you can graph those.  And I have done

6    that, and that's not a bad thing.  But that's not what they said

7    in their -- I don't think that's what they said in their

8    original reports.  Maybe they did, but the point being that

9    people do track treatment data at the facility and they do track

10   treatment data with objective database means and so I think

11   that -- I think that criticism is somewhat nullified.

12   Q    Doctor, Dr. Matson also referred to three behaviors in

13   particular:  Pica, SIB, and aggression.  For pica he said since

14   the rates were low, they might be underreported.  And for SIB

15   and aggression, he used a basis of comparison.  Could you

16   comment generally on his conclusion that pica might be

17   underreported?

18   A    Well, he said "underreported" because the rates they found

19   there were low, and then he said that the rates of the other

20   behaviors were high because they weren't treated well.  It

21   struck me as illogical.  You know, it could be that they were

22   not underreported, they were well-treated, but that's beside the

23   point.  You can't have it both ways.  I -- what, when I looked

24   at -- you know, I was surprised to see that he would -- he would

25   say that there were underreporting of those rates.  You know,

Walsh – Direct

1    when I looked at -- when I looked at SIB -- and he actually had

2    citations there that he used and I -- when I looked at them, I

3    found that some of the citations were just in error.  And so --

4    excuse me.  You know, he cited a study on SIB -- it's in the

5    middle of page 103 there -- where he found a point prevalence of

6    SIB to be 4.9 percent.  That's in a general community setting.

7    That's not surprising.  If you look at SIB and you compare it to

8    the rates at CHDC, then you have to look at ICF/MR large state

9    developmental center.  And if you look at those, you will find

10   that it's about 30-some percent.

11       And you know actually right in the abstract of that -- the

12   article, that one by Cooper, et al., it says that previous SIB

13   institutional settings has ranged from 1.7 percent to 41 percent

14   and between 1.7 and 23 percent community centers.  So that tells

15   you that there is a big swing in estimates there.

16       The study that I like to use is a very large study.  It was

17   done in California, and it includes 91,000 people in the system.

18   And their institutional rate for SIB is 31.2 percent, and the

19   current rate at CHDC is 34.5 percent.  And so I think it's right

20   in the ballpark.

21       If you look at the same thing for aggressive behavior, if

22   you look at the bottom paragraph there, Dr. Matson cites a study

23   by Crocker, et al. in 2006.  Well, actually he incorrectly cites

24   that study.  On page 46 of his report, he said the prevalence

25   rate was 9.8 for physical aggression.  If you look at the

Walsh – Direct

1     article, however, it says that 9.8 figure is for sexually

2     aggressive behavior.  It's not physical aggression.  It's

3     sexually aggressive behavior.  The rate for physical aggression

4     in that same article is 24.4 percent.

5        And so I don't, I -- I just think that's -- you know, you

6     can't be careless and then make, you know, statements like that.

7     I think the behavior rates at -- there is no reason for me to

8     think that the behavior rates at CHDC are out of line with any

9     other similar population in the ICF/MR setting.  Well, not

10    ICF/MR, but ICF/MR developmental center setting.

11    Q    Doctor, Dr. Manikam attached to his report -- it was notes

12    drawn from QRGs of 153 individuals.  Did you have any

13    observations about that?

14    A    My only observation is that he used 153 QRGs to extract

15    information to put into the back of his report when the other

16    DOJ expert said that they weren't any good.  And so I don't

17    understand what that means.  You know, my sense is that I think

18    they would be good, but, you know, that is when -- it was that

19    review that produced the reduction from 41 to 13 of the number

20    of restraints used, which Dr. Manikam included in his appendices

21    but didn't -- it didn't cause him to change the statement he

22    made on the first page of his report about the armamentarium of

23    41 restraints.

24    Q    Doctor, Dr. Manikam reviewed functional assessments and

25    reached conclusions.  Do you have any comments on that?  Any

Walsh – Direct

1    response?

2    A    Tell me where you are, please.

3    Q    Page 107 of your report.

4    A    Well, you know, I believe what he said was that there

5    needed to be elements included, such as direct observation

6    interviews and ascertaining behavioral functions, and those

7    things are done.  They're part of the worksheet form that they

8    use.  I, you know, I think they do them all.  You know, like I

9    said in my review, they -- 100 percent of them had functional

10   assessments.  I rated the quality.  They range in quality, but

11   they were there.

12        So -- you know, Dr. Manikam when he reviewed -- when he

13   reviewed the plans, he actually said that there were some

14   assessments that had good functional assessments.  I think he

15   even used the word "excellent."  I would have to check that, but

16   I think he said that.  He recognized that there were functional

17   assessments in those plans.  I don't know if he recognized that

18   from -- I doubt he recognized it from the QRGs.  I think he did

19   it whenever he reviewed the number of plans that he did, which I

20   can't figure out how many he reviewed -- either 54 or 74.

21   Q    Doctor, could you tell us some other problems you found

22   with Dr. Manikam's review?  And I am referring specifically to

23   page 109.

24   A    Well, the, let's -- it was hard for me to figure out what

25   he actually was reviewing.  I mean, he claims to have reviewed

Walsh - Direct

1    74 behavior intervention plans, but if you look at that -- I

2    counted them, and in the middle paragraph there, I recount my

3    counting of them.  I mean, there were 19 safety plans, 19

4    positive behavior support plans, 2 strategies, and then there

5    were 14 other types of things, which were hard for me to figure

6    out what they were.  So there was a total of 54 plans reviewed,

7    not 74.  And so I don't know where that other 20 missing plans

8    are.  So nine of the names on that list were repeated and so --

9    and ten of the names have more than one plan.  So you get down

10   to about 46 then.  The number gets down to about 46 of what he

11   looked at, which is, you know, almost 40 percent less than what

12   he said he did.

13         And so, you know, I don't think you can say, "I reviewed 74

14   plans" and then lay out these data and then, when you look at

15   the data closely, you find that it really only represents 46

16   individuals.  Okay.  What happened to the rest?

17   Q    Dr. Manikam seems to refer to positive behavior supports,

18   PBS, as a standard.  Could you explain to us what your opinion

19   is?

20   A    Yes.  Positive behavior supports is -- you know, even

21   though that term is part and parcel of the name of the behavior

22   plans at CHDC, they're called positive behavior support plans,

23   the -- I am not sure that they use that term in the way positive

24   behavior supports has come to be used in the field.  Positive

25   behavior supports is -- it's a movement within the applied

Walsh – Direct

1    behavior analysis field.  I mean, I suppose we could be kind and

2    say that it's a branch of that field, and what that is is it's a

3    value-based sort of application of behavioral -- applied

4    behavioral analysis.

5        The problem is that it is sold more on an advocacy basis

6    than on an evidentiary basis, and it takes some largesse with

7    the typical vetting that we would do for things to become

8    practice.  And so this -- this whole area is, in some sense I

9    think, driven by an underlying feeling of anti-professionalism.

10   So if you look at an ICF/MR, it's built on professional

11   disciplines and professional disciplines bring goals to a table

12   and then they work on those.

13       The, you know, this -- the alternative planning that goes

14   on in people who are strong community advocates is, you know,

15   it's person centered planning and it's positive behavior

16   supports.  Positive behavior supports doesn't do any sort of

17   restrictive or negative based programming.  That has engendered

18   some disagreement in the field.  And, you know, Dr. Manikam,

19   wherever, when you go through his report, whenever he says that

20   psych examiner should have training in ABA, applied behavior

21   analysis, and puts a slash, PBS -- so it looks like he was an

22   advocate of positive behavioral supports as a movement, that

23   sort of movement, and that that sort of viewpoint was supported

24   by the fact that when you looked at his -- his views on

25   restraints, his views on restraints lined up with the kinds of

```
1    views on restraints that somebody who is an adherent of positive

2    behavior supports would have.

3         So it seemed -- it struck me that he was an advocate of

4    opinions.  You asked him in deposition about that, and I believe

5    he -- I think he actually says it's a standard.  You asked him

6    pretty much directly, and then he referenced some internet sites

7    and a Kansas site as standards.  You followed that up by asking

8    him, I guess based on findings in my report, did anybody

9    disagree with that.  And there are some very prominent

10   behaviorists who have a lot of problems with positive behavior

11   supports, and so that debate is still ongoing in the field.

12        And when you -- when you stated it in those -- to them, you

13   said to Dr. Matson:  Are you aware of disagreement with positive

14   behavior supports?  And he said, yes, he was.  And he named Fox

15   and I think you named Jakes and these are the kind of people who

16   had some problems -- I cited a chapter in their book, the Jakes

17   and Mueller book, you know, that the positive behavior supports

18   movement is called by those folks -- these are prominent

19   behaviorists -- a utopian delusion.

20        There is a long chapter explaining what they mean by that,

21   and so it's hard to think of -- it's hard for me to think of

22   that as a standard in the field when you have that kind of

23   disagreement among prominent behaviorists.  When you asked

24   Dr. Manikam whether he thought that those people would agree

25   that PBS was a standard, he said yes, which I don't understand
```

1    how he could possibly think that, knowing that they have current

2    articles out there sitting in the literature now that raise real

3    problems.  I mean, the Fox -- the Fox, et al. article actually

4    raised the potential that PBS has done some damage to the field

5    of applied behavior analysis.

6        So mine -- and the final chapter on that story was that

7    when I was reading some of Dr. Manikam's trial testimony and he

8    seemed to back away from that saying that he was not a proponent

9    of PBS.  Be that as it may, it looked like that in his -- in his

10   report, and he actually sort of said that, I think, in his

11   deposition.  And so I -- I didn't intend to place him in a box

12   that he doesn't belong in and, if he is not a proponent, then I

13   am certainly happy to agree with that, but the point is it's not

14   really a standard.  You can't see it as a standard for

15   application of behavior plans.

16   Q    Dr. Manikam also claimed to have reviewed habilitation at

17   CHDC.  Do you have any comments on that?

18   A    Yes.  I think he actually made a couple of mistakes and,

19   you know, if you -- he says he reviewed 20 IPPs, and the IPPs

20   are the individual program plans.  And that's the centralized

21   programming document of the facility, of all ICF/MR facilities.

22   20 individuals, if you review them, that represents about a

23   3.9 percent sample, a pretty small sample.  But from that

24   sample, Dr. Matson concluded the IPPs at CHDC are not

25   comprehensive and do not meet generally accepted professional

Walsh - Direct

 1    standards.  And he added on page 15 of his report, "Deficits

 2    were noted in all IPPs."

 3         Those statements astound me.  Quite frankly, I think the

 4    IPPs at CHDC are among the best I have ever seen.  They are

 5    fully fleshed out.  They are well written.  They are clear, and

 6    I think they're a really good planning document.  It's hard for

 7    me to grasp why he would find deficiencies until you look.  If

 8    you look at the contents of IPPs -- and I won't read these off,

 9    but on page 112 and 113, I listed the content sections of a

10    typical IPP at the facility.  It's completely comprehensive.

11         Okay.  So if you look at those, those narrative sections --

12    there are several of them there.  They're under social summary,

13    narrative summaries, by discipline, psychology, med nursing,

14    pharmacy, nutrition, dysphagia, assessment summary, physical

15    therapy, speech-language, independent living, and so forth.  And

16    there are subsections under a number of those.  So it's a rather

17    complete document, and I have read a lot of them at the

18    facility.  And when you look at them they're complete.  They're

19    very handy if you are a professional.

20         Immediately following those narrative sections, there are

21    additional sections called the monthly plan review sections.

22    And if you look at page 113 of my report, you can see what those

23    sections look like.  They are calling for exactly what

24    Dr. Manikam said should be in there, said they were deficient

25    because they didn't have this.  And it was right in that

Walsh - Direct

1    section.  I don't think he realized that that document was part

2    of the IPP.  So it shows you the location and the frequency of

3    the training, who does it, and then they collect data under that

4    as we can look at later because I put it -- I put a monthly

5    report in there to show you how that works.  So boxed up with

6    the IPP is the plan and how the plan should work and the data

7    that reviews that plan, exactly what Dr. Manikam said should be

8    in the plans for them not to be deficient.  He missed it.

9    Q    Dr. Manikam also says that he didn't observe much, quote,

10   active treatment, unquote.  Could you first of all tell the

11   Judge what active treatment is?

12   A    Well, I saw -- there was a number of concerns about active

13   treatment in some of the DOJ reports, and that concerned me

14   because it was hard to tell sometimes from the context of --

15   what they were making those statements about.  It struck me that

16   in a number of cases the statements were being made about when

17   they took tours and they went into residences or settings and

18   they weren't seeing a lot of activity going on.  Well, because I

19   think -- I think there is a view out there that people in these

20   facilities should be kept active and they should be humming,

21   buzzing with activity.

22        But if you take into account the functioning level of the

23   individuals where over 90 percent of them are severely or

24   profoundly disabled, it really doesn't make sense that it would

25   be like that.  You know, a lot of activities are one to one or

Cheryl Bartnett Nelson, RPR, CRR, CCR
United States Court Reporter

1    very small group.  And so my impression was that the DOJ people
2    were reporting that there wasn't any active treatment because
3    they would go in to facilities, to residences, and they wouldn't
4    see much going on.  But if you think about it, a lot of times --
5    we don't know how much of their time was there during transition
6    times, during relaxation times, during recreation time, during
7    mealtime, during preparation for things.  So if, you know, if
8    you have a unit where you are showering people or bathing people
9    to put them to bed, there is going to be some people who aren't
10   being attended to at any given moment while other ones are.
11   That doesn't mean that no active treatment is ongoing in that
12   facility.  It's not what active treatment really means.

13        The real meaning of active treatment is an active treatment
14   flow or an active treatment system, if you will.  If you look at
15   page 115 on my report, I subtracted out the -- the essential
16   elements of active treatment from the ICF/MR regs which define
17   active treatment and, you know, that's a comprehensive
18   functional assessment.  So active treatment for them is this.
19   It's a comprehensive functional assessment.  It's an individual
20   program plan which takes the findings from that comprehensive
21   assessment and identifies goals and objectives and then plans,
22   programs to meet those goals and objectives.  Okay?

23        Then you implement those programs.  You actually do what
24   you said you are going to do.  You collect data on those
25   programs.  You make a reassessment and you go back and start --

Walsh - Direct                    5927

1    you read the cycle over.  So active treatment says, okay, that

2    you have to have -- and if you look at the definition in the

3    middle, okay, it says, "Each client must receive a continuous

4    active treatment program which includes aggressive, consistent

5    implementation of a program specified in generic training,

6    treatment, health service, and related services directed toward

7    the acquisitional behaviors, the prevention of deceleration, and

8    whatnot."

9         And I think a lot of times what happens is that people who

10   read that misconstrue that the notion of continuous active

11   treatment program, which is aggressive and consistent

12   implementation of a program, means that people have to be

13   programmed 24 hours a day.  And that's not the case.  What that

14   means is that if you set up a goal for somebody to teach them

15   how to brush their teeth or tie their shoe, that -- and you say

16   you are going to do that three times a week, then you got to do

17   it consistently three times a week.  And you should not set up a

18   goal that you are going to teach tooth brushing to do it one

19   time every other month because then it wouldn't be aggressive.

20   You might be consistent, but not aggressive.  So you want to be

21   aggressive and consistent, and so you set up a time frame that

22   makes sense for the training of that goal, and you do it.

23        And if do you that, you have -- if you have all those

24   elements and you have a functional assessment and you have an

25   individual program plan and you have program implementation and

```
 1    data collection and you close that loop and you do it on a

 2    consistent and continuous basis, okay, in an aggressive manner,

 3    meaning that you don't waste, you know, instances of it, then

 4    you meet the active treatment standard.

 5           MR. CHENG:  Objection, Your Honor.  I believe this is

 6    crossing into legal opinion rather than a professional opinion.

 7           THE COURT:  Well, I am going to overrule the objection.

 8    I think that his testimony has been that he regards the ICF/MR

 9    standards as the profession -- the equivalent of the

10    professional standards that your witnesses relied upon, and he

11    can testify as to whether in his opinion what they're doing

12    there meets those standards.

13           MR. CHENG:  Thank you.

14    BY MR. YORK

15    Q    Would you please continue.

16    A    No.  That's -- I'm done.

17    Q    All right.  Doctor, do you have an overall opinion as to

18    the opinions of Dr. Manikam involved in this case?

19    A    Say again?  I'm sorry.

20    Q    Do you have an overall opinion or conclusion or summary

21    that you can give me of Dr. Manikam's opinions in this case?

22    A    Well, I -- I think Dr. Manikam has suffered from problems

23    with his process in the same way that Dr. Matson did.  I

24    don't -- he -- I don't know what to say exactly.  I don't find

25    as much disagreement with Dr. Manikam as I do with Dr. Matson.
```

Walsh – Direct                                        5929

1    You know, perhaps I am not holding them to an equal standard,

2    but I think in some sense Dr. Manikam was just not as familiar

3    with an ICF/MR setting as he might otherwise have been.

4    Q    Doctor, just a couple -- a few questions on Dr. Thibadeau.

5    Dr. Thibadeau stated that only 48 percent of students who

6    received medications had behavioral support plans.  Did you take

7    a look at it?

8    A    Not exactly in the same way she did.  My reading of that

9    statement was that it showed that only about 50 percent, under

10   50 percent of the people had behavior plans, and that struck me

11   as not correct.  And so what I did was I looked at all the

12   behavior plans.  I think she -- I'm sorry.  I got two sentences

13   going there at once.  I think what she did is she only looked at

14   positive behavior support plans and not any other kind of

15   behavioral intervention.  And so I looked at a listing of all

16   the behavioral interventions active at that time,

17   September 2009, which showed that, you know, of the 52

18   school-age children, 75 percent, 39 of them, had at least one

19   such intervention.  And 40 percent or more had one plan written

20   for them.

21        If you -- taken together, if you look at the entire

22   school-age group of 52 students, there were a total of 59 active

23   behavior plans.  So I think it gives a slightly different

24   picture than what Dr. Thibadeau identified.

25   Q    Dr. Thibadeau also criticized the psychologist report and

Walsh - Direct

1    training in classrooms.  Do you have any response to that?

2    A    Well, you know, she said there was not training in

3    classrooms, meaning I think that a psychologist didn't come to

4    the classrooms -- and, you know, I did not do any count on how

5    often psychologists go to the classrooms.  I believe

6    psychologists go to the classrooms when they're called.  I

7    did -- I think in one of the depositions of a teacher, I think

8    she did mention that they come to the classroom when you call

9    them.  And so I don't know what that means.

10          I think Dr. Thibadeau also had some concerns about the

11   nature of training.  You know, my understanding is that psych

12   examiners, when they have behavior planning, train the program

13   areas as well as the residence staff.  And, you know, the

14   question is like, if they need to cycle back through there, I

15   think a teacher can make that request and they can do that and

16   if -- and as to the use of video, I don't -- you know, video

17   training is in the literature.

18          It's in the literature of prominent applied behavior

19   analysis.  People who say you can train using video.  You know,

20   the question again would be the quality of an individual

21   training program from a video.  I didn't review any video

22   training programs used at the facility, but neither do I believe

23   did Dr. Thibadeau.  And so I think without that, you can only

24   make a statement about whether or not you think the use of video

25   in and of itself is inappropriate, and I don't think the

Walsh - Direct                                                  5931

1    literature supports such a conclusion.

2    Q    Do you have an overall conclusion or summary as to the work

3    performed by the plaintiff's experts in reviewing behavioral

4    issues at CHDC?

5    A    Well, I -- it's probably clear by now that I am not real

6    crazy about it.  I think they missed a lot.  I think they relied

7    on -- I don't know what term to give them, but straw men.  They

8    would identify all these sort of parameters or aspects of

9    psychology or psychological practice, and then they would sort

10   of try to use them as straw men to show that the facility didn't

11   do them.  And so it was overwhelmingly critical, but critical

12   without a reasoned basis for the criticism because they were

13   just sort of grasping at all these things.  Some of those things

14   are parts of -- are parts of good applied behavior analysis

15   practice and some of them are not.  Some of them are gratuitous.

16   I think I have tried to state that today.

17        The overall point, though, is that in no case did they

18   collect organized data to support any of those sort of

19   conclusions, and the worse sin is that they never looked at

20   outcomes.  So they never looked at how these things worked in

21   real life out there on the ground.  They just surmised things.

22   You know, and so -- you know, I don't know on what basis they

23   offer a lot of those positions.  A lot of positions -- they kept

24   on saying, "It doesn't meet standard of practice, doesn't meet

25   standard practice," and I am saying, "Based on what?  You hardly

1    looked and, if you did look, you looked at the wrong stuff.  And

2    half the time your methodology was wanting."

3         And so it's hard for me to see how a lot of those

4    criticisms can hold much water and, you know, and I hope -- I

5    hope that my work relative to the behavioral program in its

6    entirety, you know, including outcomes and including a good look

7    at process, you know, shows the other side of the coin that they

8    didn't show.

9    Q    Dr. Walsh, did you review risk management and quality

10   management elements out at CHDC?

11   A    Some, yes.  You know, I reported -- I wanted to look at the

12   ones that were the main ones that people look at when they look

13   at ICF/MR settings.

14   Q    Let's start with risk management.  What did you do to

15   review risk management?

16   A    I did a number of things, and these are all sort of like

17   smaller studies, smaller targeted sort of studies of each of

18   these areas.  And so, I mean, the general approach would be

19   this.  I took the area.  I looked at the policies and

20   procedures.  I looked at what data sources would be available to

21   make some conclusions on so that it would show what processes

22   were and then organized that to a little study of that area.

23        And so I started with human rights committees.  If you

24   remember, there are five human rights committees at the

25   facility.  And so human rights committees at the facility use a

Walsh - Direct

1    specific reporting format or review report format.  And what

2    I -- if you look at the bottom of page 123, I sort of list what

3    those things are there, and so they're preapproved -- no, I'm

4    sorry.  They're preformatted human rights committee review

5    formats.  It's an interesting system, and it's actually one that

6    I had not seen before.  But actually, I -- there are some

7    aspects of it that I really like.

8         And if you look on page 125 and 126, pages 125 and 126, you

9    will see what constitutes a human rights committee review

10   report.  There is two pages.  The first page is largely

11   databased, and the second page is largely narrative.  If you

12   look at the -- go back to the first page, you will see that it

13   has all the personal documentation and has the medications and

14   then it has the objective that's under review and then it has

15   the data for that objective and then it has monitoring and then

16   the next page is all narrative.

17        There is psychiatric consults in this case, and the

18   interesting part is that the actual HRC minutes for that

19   individual review are right on this form.  So, you know, I think

20   just about all other facility-based reviews that I have looked

21   at in this, you always find -- you find minutes, you find

22   meeting minutes, and so all of their reviews are in the meeting

23   minutes, but those meeting minutes never get out to individual

24   records.  And so this is a really interesting way to get meeting

25   minutes from, you know, an oversight process out into the

Walsh – Direct

1    records by putting the minutes for that individual person right

2    in there.

3        And so that's the structure of these things, a two-page

4    structure, and when -- what I did was I took a number of those.

5    I took all the HRC meeting minutes for two months from March and

6    April 2009 for a single unit at the IAT and I ran them all.

7    Okay?  And so the March meeting, the March meeting reviewed 12

8    individuals, and so that means there were, you know, two pages

9    for each.  There was 24 pages.  And then in the April meeting,

10   there were eight individuals with 16 pages.  And so I read

11   through all those to characterize what they were doing, okay?

12   And that constituted my little study of this.

13       At both of these meetings, there were representatives from

14   the community.  There were a consumer representative.  There was

15   a CHDC staff member representative.  A medical representative

16   was present and the HRC chairperson.  Additionally, the psych

17   examiners were present, but, you know, as provided in the

18   policy, they're not members.  They're not voting members of the

19   group.  They're consultants.

20       All right.  And so it was easy.  It's easy to look at these

21   reports and relate the level of behavior to the narrative level

22   to find out how things are going.  This is a pretty nifty little

23   approach here.  They have -- they review the things and then

24   they make a call back to the committee.  And so, you know, you

25   might, you might call somebody back in three months or six

Walsh - Direct

1    months.  They do a six-month review if the person is on meds

2    anyway, and so what I found interesting is that when I looked at

3    these, there was a couple of cases where they did extra review,

4    meaning that there was one case where the person really didn't

5    have any behavior plans to review.  But the team had noticed an

6    uptick in some problem behaviors, and so they brought it to

7    review.

8        Well, you know, that really is, that's a good thing.  I

9    mean, they saw something in advance and brought things to

10   review.  There was another one where they did a review and they

11   turned around for one of these cases and said bring them back

12   next month.  So in the two months I reviewed, one person was

13   reviewed one month and they wanted to see them again the next

14   month and they didn't wait the six months.  So they're showing

15   caution there.

16       So my view is that there is an active process there that --

17   nobody at that facility knew in advance I was going to look at

18   records, and they certainly didn't know what HRC records I was

19   going to pull.  In fact, I think when I asked people in the

20   central office to pull these records for me, I -- I had decided

21   to do one unit for two months.  And I said like -- somebody

22   said, "What unit do you want?"  And I think I just said, "Well,

23   let's take that one."  So I didn't even know.

24       So but what I found was realized process and good outcomes

25   because all those outcomes go back to those -- those plans.

Walsh – Direct                                    5936

1    So --

2    Q    Did you also look at the incident review committee, the

3    IRCs?

4    A    Yes.

5    Q    And what did you observe in that review?

6    A    So another type of oversight committee is reviewing

7    incidents, and there are two levels of incident review

8    committees at the facility.  There is a unit based IRC, and

9    there is a central IRC.  And the unit based IRC, they meet every

10   day, Monday through Friday, and they review the incidents from

11   the day before or, I guess, on Monday from the weekend.  That

12   provides a rapid review of incidents to see if anything needs to

13   be dealt with immediately.

14        These incidents are then brought forward or sent to the

15   central IRC committee.  They come up to that committee in sort

16   of a statistical compendium, a listing of incidents.  And then

17   monthly there is an incident review meeting at the central level

18   where they look at all those things on a monthly basis.

19        The facility level has sort of -- generally has two types

20   of incidents it looks at:  Maltreatment and incidents that need

21   to be entered into the state's IRIS data basis.  Most of those

22   are -- most of those incidents are probably injuries.  The

23   facility reviews other kinds of incidents as well, the central

24   committee.  If a snowplow ran off the road and smashed into a

25   car in the parking lot, they might -- they will review that

Walsh - Direct

1    incident.  Or workman's comp injuries, I took that out of my

2    analysis because I wanted to focus on the injuries.  I also

3    looked at maltreatment, but I did that another separate little

4    study.

5         In this study of incidents, I really focused on the bulk of

6    incidents which are injuries.  They're clearly the bulk of what

7    the central incident review reviews.

8         So those database documents come up from the unit teams to

9    show all the incidents and you can use those when you get to the

10   central one to compare and cross teams.  So that can look at

11   trends within a team, across teams, and you can do it by

12   different types of incident, you know, different kinds of

13   injuries or whatnot.

14        The membership of that central incident committee is rather

15   extensive.  I put that on page 28.  I won't read it, but if you

16   look at it, it's slightly -- central incident review committee

17   members are listed on the right and the team based incident

18   review committees are listed on the left.  If you look at that,

19   that provides a nice split between, you know, immediate review

20   for identifying immediate problems and then oversight review for

21   identifying trends and policy directions and whatnot.  Those two

22   are sort of inherent in those two levels of incident review.

23        If you look at the way they're processed, okay, they --

24   they provide -- the centralized incident committee produces a

25   quarterly incident report summary.  This is a nice statistical

Walsh – Direct                                          5938

1    report showing all the incidents, and in this case I focused on
2    injuries that occurred in the prior period, prior quarter.
3    The -- a point here that could come up later is that when you
4    look at injuries -- and I have been looking at injuries in a lot
5    of different places over the years.  The literature states
6    fairly unequivocally that you -- that you don't track or record
7    what might be considered minor injuries.  Minor injuries are
8    everyday bumps and bruises because they will skew the data.  And
9    so none of the literature reports them.  And in fact, if you
10   look at the -- what's reportable to the IRIS database in
11   Little Rock, here, from the facilities, it is just that.  It's
12   the incidents that are not minor.
13       The definition of those are given middle of page 129.  So
14   the IRIS database, if you look at the cuts and lacerations are
15   included if they require stitches, Dermabond or steri-strips to
16   close.  Fractures all go to the database.  Bruises are included
17   if an X-ray is ordered even if there is no underlying damage.
18   It's likely that some of those bruises turn out to be minor
19   injuries, but they're still reportable.  Client-to-client bites
20   are reported if there is a skin break or if antibiotic is
21   applied.  Swellings/sprains are included if there is an X-ray.
22   And if there is a fracture found on the X-ray, it's moved to the
23   fracture category.  Abrasions and burns are included if they
24   require the application of a medication or ointment.  Medication
25   errors are included in incidents if they are a serious nature

1    and require some type of medical treatment to correct.

2        So that little paragraph there sort of defines, in and out,

3    the sort of reportable incidents.  And that defines -- and

4    actually, I think that based on the literature, that makes it a

5    very nice, manageable set of data to manage incidents.

6        What I did was I took six quarters -- six quarterly reports

7    stretching from the first quarter of 2008 to the second quarter

8    of 2009.  I looked at all of the injuries in that period.  And

9    so, if you look at page 130, I used the quarterly reports.  The

10   quarterly reports are really a nice breakdown of injuries.  They

11   give you injuries by unit, time, place, type.  You can break

12   them down in almost any way you want to.  You can look, and you

13   can find out if there is trends occurring.

14       I took them -- those reports, and I constructed a table

15   that appears on page 130.  If you look down the left side of the

16   table you see cuts, fractures, bruises, bites, swelling/sprains,

17   abrasions, choking --

18           THE COURT REPORTER:  I'm sorry.

19           THE WITNESS:  Oh, I'm sorry.

20           THE COURT REPORTER:  "Cuts, fractures, bruises,

21   bites" --

22           THE WITNESS:  Cuts, fractures, bruises, bites,

23   swelling/sprains, abrasions, choking, burn, or other.

24       I fully apologize.  I'm sorry.

25       And going across the top of the table are the six

Walsh - Direct

5940

1    quarters -- 2008, half 2009.  I entered the data from the

2    quarterly reports that I obtained from the facility, totaled

3    them, and then I created an annualized total because that's

4    really a six quarter total, you know.  That's -- how many months

5    are in six quarters?  12 and 6, 18.  And so I got an annualized

6    total so that it drops it back to that.  And then I did a rate,

7    and the rate is a per-person per-year rate.  So if you look at

8    the top of page 131, you will see that calculation as to number

9    of events of defined risk, since the injuries, over the total

10   number of individuals exposed to the risk.  And then that gives

11   you the number of adverse events per person per year.

12       All right.  So that means that there is .16 cuts per person

13   per year, and this is a standardized rate that you would use to

14   report injuries in the literature.  All right?

15       So what I have here is I have an individual standardized

16   rate for each type of injury, but I also have a total, which

17   is -- if you go to the bottom right-hand corner of that table

18   it's .41.  And so this is the injury rate at CHDC, the

19   reportable injury rate.  That's something that you can compare

20   to benchmarks in the literature, and so if you return to

21   page 132 in my report, you will see the comparison to a number

22   of other facilities.

23       The Loebl, et al., Konarski, et al., and Slayter, et al.

24   are all published studies.  The Southbury Training School is

25   based on data that we collected in this same type of analysis

Walsh – Direct

5941

1    during our work at Southbury on the Messier case.  And so I

2    described the population in the next column.  So Loebl, et al.,

3    that's Letchworth Village in New York.  It tells you that.  I am

4    not going to read all that.  Same thing; you notice that

5    Konarski is a state-operated ICF/MR.  Southbury is an ICF/MR

6    like CHDC.

7         And Slayter, this is an interesting one because this is

8    children with intellectual disabilities to age 20 with injuries

9    and Medicaid claims data.  So that's 26 states covering 49,000

10   people.  So the size of the facilities vary, but not that far

11   from what's out there in Conway.  The injuries are -- form the

12   enumerator of my rates, are then given -- and then the rate is

13   calculated.  And so if you look at the Loebl, et al., that

14   calculates out to .61.  So that rate is .61 injuries per person

15   per year.  Konarski, .65 per person per year.  Southbury

16   Training School, .36 per person per year.  This is children.

17        Now, the comparison here may not be perfect because it's

18   children with Medicaid and children with intellectual

19   disabilities who are on Medicaid, and so it excludes adults, but

20   it is an interesting statistic because it has so many numbers,

21   .37, and CHDC is .41.  So if you look at that table, you will

22   find it compared to benchmark rates in other facilities.  CHDC

23   is right in there.  Okay.  So, I mean, you know, I don't

24   think -- I don't think given the population there that injuries

25   are at all not what you would expect them to be.

1    Q    And in the next section, you refer to maltreatment

2    investigations.  Is that --

3            THE COURT:  Let me stop you there before -- these are

4    not in the record.  So let's go back to page 130 and give us

5    the -- his testimony about what the rate per person per year is

6    for each of these types of injuries and then the total there.

7    Do you understand what I am saying?

8            THE WITNESS:  You want me to go down the right-hand

9    column?

10           THE COURT:  I do.  Otherwise, the record will never

11   reflect what your testimony is.  I can see it here, but this

12   document that we're looking at is not in evidence.  And I am --

13   I am not going to go through and read all these reports to write

14   an opinion because they're not in evidence.  I will look at the

15   testimony about what is in the reports and so, if you want me to

16   consider this, you need to testify.

17           THE WITNESS:  Okay.  So I am going to then read for you

18   the rates of -- the per-person per-year rates of specific

19   injuries that I found in -- at CHDC in my study of 2008 and the

20   first half of 2009.  So the rate for cuts was .16.  The rate for

21   fractures was .06.  The rate for bruises was .06.  The rate for

22   bites was .02.  The rate for swellings/sprains was .03.

23   Abrasions was .03.  Choking was zero.  Burn was zero.  And other

24   was .05.  And the rate for all injuries combined was .41.

25           MR. YORK:  Thank you, Your Honor.

Walsh - Direct                                                   5943

1    BY MR. YORK

2    Q     Maltreatment investigations, are you referring to abuse and

3    neglect when you say maltreatment?

4    A     Yes.  These are also reportable incidents and they go to

5    that same incident review committee and so this is now another

6    body of data.  I did -- I took the same approach to looking at

7    maltreatment investigations, meaning I wanted to identify some

8    rate and compare it to a benchmark.  There is -- there is a

9    28-page, I think, procedure that incorporates the regulations of

10   the Arkansas Adult Long-Term Care Facility Resident Maltreatment

11   Act, and so there is a long complex investigation process for

12   these things.

13        Now, when an incident occurs, there is a specific stated

14   policy for how you -- how you make those come up.  They are

15   immediately reported to the assistant superintendent or the

16   superintendent.  They are reported by the unit team leaders

17   during the week, and on the weekend by the shift coordinators.

18   The shift coordinators have a form that initiates those

19   investigations.  At the time that an allegation is made, they

20   also call the local police authority and they call the

21   appropriate reporting hot line, adult or child or whatnot.

22        And so at that moment, people who are involved in a

23   maltreatment case are sent home.  They're given an appointment

24   time, I believe the next day, to come back so that they can --

25   they don't -- so days off and vacations and whatnot don't hold

Walsh - Direct                                    5944

1    up investigations.

2        So what I did then is I wanted to review a number of these.

3    These are pretty hard to review because they're fairly

4    extensive.  So I reviewed the investigation packets from two

5    months, June and July of 2009.  That only consisted of 13

6    packets.  So there were 13 maltreatment investigations that took

7    place in those two months.

8        You know, I don't think size is necessarily a valid

9    indicator of the quality of packets, but these were pretty

10   hefty.  The 13 packets -- if you look at the footnote on page

11   134, the 13 packets ranged in size from 48 pages to 128 pages.

12   They were 75 pages long on average.  Taken together, those 13

13   packets, they were stacked, you know, that high (indicating).

14   They constituted 956 pages.  So it's about 1000 pages of

15   documentation in these 13 investigations.  And, you know,

16   because I can't resist, I am a data guy, if you extrapolate that

17   out to 12 months, you get about 6,000 pages of investigation.

18   That would be, you know, a box and a half of one of those file

19   boxes over there.

20       And so, you know, investigation packets are not thin little

21   things that are whitewashing over anything.  There is a lot of

22   stuff in there.  If you, if you look at the -- what's in those

23   packets, I list down at the bottom of page 134, there is a

24   synopsis and a determination report.  That sort of happens after

25   the investigation.  There is an investigator's report with the

Walsh - Direct

1    synopsis, notifications made, interviews conducted, records

2    reviewed, documents reviewed, relevant facts, and list of

3    attachments.

4         The various kinds of attachments are incident reports,

5    correspondence, letters, memos or e-mails, notification of

6    investigative proceedings, witness statements, client documents,

7    and relevant facility documents.  So these are substantial

8    packets that document substantial investigations.

9         CHDC has a full-time -- I think he is full-time.  I don't

10   know if I should say that, but they have a designated

11   individual, independent individual who conducts all

12   investigations.  He is an investigator.

13        I looked at how fast these get done because a complaint has

14   always been, in ICF/MR settings, that investigations draw out

15   for ages, and in some cases they do.  This turnaround here is

16   really good.  On page 135, you will see that the -- there is 13

17   of these packets.  Two of them were held.  I mean, they were

18   completed.  One of the investigations of the 13 was completed in

19   six days, but it was kept open, with the director's approval, as

20   per procedure.  And that is not the director of the facility;

21   that's the director of DDS.  And that's allowed in procedure,

22   while awaiting the results of the investigation of child

23   protective services.  Okay.  After 45 days that was closed.  And

24   so, you know, the investigation, you know, at CHDC was completed

25   in six days.

Walsh – Direct

1          Another one was held up while awaiting X-ray results from a

2     local hospital, I guess, or another organization, but if you

3     take the other 11 investigations on that table, the number of

4     investigations completed in five days was one.  They completed

5     one in five days, in six days was three, in seven days was five,

6     and in eight days was two.  So those 11 investigations, none of

7     them took them more than 8 days to put together on average a

8     75-page investigation packet.  I don't care what standard you

9     use, that's pretty good practice.  That's not something you can

10     complain about.

11          So if you look at those 13 investigation reports that I

12     reviewed, there were 9 cases of adult maltreatment.  There were

13     two cases of child maltreatment, and two cases of administrative

14     review of employee misconduct.  That's what those constituted.

15          The last two investigations, they referred to an incident

16     that the DOJ experts cited when they did their things.  That was

17     about the child who was -- the individual who was left overnight

18     in a residence while the other people moved.  That, that

19     investigation included the development within -- let me see if I

20     have it here -- within a few days of a protocol and the training

21     of over 200 people in that protocol to rectify that situation.

22     And so, I mean, there was an immediate response to that

23     investigation of the -- to resolve the problem.

24          To me that's exactly what these sort of oversight

25     committees are set up to do.  It is to tell administration what

Walsh – Direct                                    5947

1    do I have to do to reduce this risk because that risk you don't

2    want.  You want to reduce it for the next time.  You know,

3    Ms. Osgood in her report about that incident sort of blamed the

4    administration.  My general view was that that was human error

5    and it's not something you can predict and if you don't have

6    protocol for it, then first instance, you build one.  That's

7    exactly what they did.  Not only did they build it, but they

8    trained the whole facility on it.  So that's -- that's what I

9    reviewed.

10        Then I extracted statistics from them in the same way that

11   I did from maltreatment reports.  Not just from those 13.  I

12   took all of 2008, the first two quarters of 2009.  Okay?  And I

13   looked at the numbers of different types of maltreatment

14   incidents that took place in those six quarters and if you look

15   at page 136, you can see them.  And so once again, down the

16   left-hand side are the different types of maltreatment, and

17   across the top of the chart are the six quarters.  And so you

18   will see -- I will do that later because then we can -- I can

19   give you the numbers.

20        And so what this does is it takes all the incidents.  I use

21   substantiated incidents because they do what -- they

22   substantiate them or not.  I took substantiated.  There are 26

23   substantiated incidents on an annualized basis.  That's over on

24   the right there.  And so then what I did is I took those and I

25   made some adjustments to them based on, you know, there was one

Walsh - Direct

1    incident in that period of time that had to do with somebody who

2    abused a person and there was an investigation done, but the

3    person was a family member.  It was done off campus.  So you

4    can't attribute that to CHDC even though they did an

5    investigation.

6         And so when you get right down to it, you look at the

7    bottom right-hand corner, and it's 27.33 is the annualized total

8    for the number of incidents that were found to be -- to occur in

9    that case.  If you take that and you make a per-person per-year

10   rate, again by dividing that with the number of people who are

11   at risk, that's the total population of the facility, and you

12   look at page 137, you see the comparisons to benchmark rates in

13   the literature of abuse and neglect rates.  So again, I took two

14   published studies.  These studies are hard to come by in the

15   literature.  I guess nobody wants to put them in the literature.

16   And then again, it's our rates that we created in Southbury from

17   that facility.

18        To make a long story short, those rates go -- they range

19   from .33 -- I'm sorry.  That's incorrect -- .033 to .04 for the

20   Marchetti and McCartney study.  The rate is .029 for the

21   McCartney and Campbell study.  .025 for the Southbury study, and

22   it's .054 for CHDC.

23        Okay.  So, again, when you look at a comparison of rates of

24   abuse and neglect in CHDC, compared to not a large number, but

25   some benchmark numbers from the literature, you find that CHDC

1    falls in the same range as them.  The -- if you will notice, the

2    rate is ever so slightly larger for -- for CHDC is .05, but I

3    think that you need to take into account there that at these

4    other facilities, it would be my guess -- and I don't know --

5    that enhanced coverage failures are not included as abuse and

6    neglect maltreatment investigations; whereas, that's the case at

7    the CHDC.

8         So if someone has a one-to-one staff person or has direct

9    observation, line-of-sight sort of assignments and that, that

10   is -- fails if the person walks out and has a cigarette and

11   something happens, then that's treated as a maltreatment

12   investigation and done -- and so I think that pushes the numbers

13   up a little bit for CHDC.  I mean, that -- I guess actual

14   verification of that would be empirical.  You would have to do

15   that, but that would be my interpretation.

16        Nonetheless, these rates of abuse and maltreatment are

17   fairly in keeping with the benchmark rates in the literature.

18   So what this tells you about the incident review, you know, the

19   incident management practices and actually about injuries and

20   maltreatment at the facilities is that they are not out of line

21   with other ICF/MR facilities.  They are just about where you

22   would expect them for this facility, and they have -- the fact

23   that it was so relatively easy for me to go in and get those

24   quarterly reports and create those statistics, you know, there

25   is a lot of places where you can't do that, it's pretty hard --

1    it's hard to get all that stuff.  And so my sense is that that's

2    a good thing.

3    Q     Doctor, did you also review quality management processes?

4    A     Yes.  Selective ones.  I don't know if I got them all, but

5    whatever -- whenever they talked to me about quality review, I

6    asked for data on them.

7    Q     Did you look at the monthly plan review?

8    A     Yes.  This is a program review.  This again is a two-level

9    process.  It happens at the unit level, and it happens at the

10   central level.  It's actually, again, a pretty nice system and

11   what program review is it's a reviewing the programs that are

12   part of the IPPs of each individual -- you know, that's part of

13   that active treatment sequence that we talked about.

14        So at the team level, the program coordinators do what's

15   called a monthly plan review and that's a paper review and it's

16   conducted for each individual.  Okay?  There is also a process

17   called monitoring, and what that does is that -- the program

18   coordinators actually observe the training of at least one

19   objective for each client, and so that means that the program

20   coordinators have sort of an ongoing quality review function

21   because they're looking like I said -- they do a monthly paper

22   review for each client, and then they observe the training.

23        So, you know, a person on his IPP could have five goals.

24   He could have a manners goal, a dressing goal, a hand-washing

25   goal, and a shoe-tying goal.  And so the person has -- the

1    monthly plan review, the program coordinator looks at whether

2    that's occurring and looks at the paper process for that, but

3    they also have to take and do one of those goals and go out and

4    actually watch them training somebody to do it.

5         Okay.  So if you look at the sheets that they use, you can

6    see the sheets they use on page 139 and 140, and the sheets

7    again have a nice mix of narrative and data.  The first page is

8    in narrative.  That monthly plan review, that's done by the

9    program coordinator.  So they do that plan and review.

10        Now then if you look at the second page, this is the same

11   page that is on the back of the IPP that I was talking about,

12   referring to when I was talking about what Dr. Manikam missed.

13   This is what he wanted to see, and here it is.  And so this is

14   the monthly plan review and, if you look at it, this takes each

15   objective and it shows you an objective.  Okay?

16        So once that is done, okay, that goes on.  That process

17   goes on and at the same time there is a central program review

18   and this is done by -- it's a review of the actual IPP documents

19   themselves, and this is done by somebody from the quality

20   assurance office.  They do what's called an IPP review check

21   sheet, and that's -- that has 77-item checklist to make sure

22   that that -- that the IPPs have the necessary components and

23   that those components hold together and make sense.

24        If you look on page 141, you will see these are the

25   principal headings that those 77 items fall into.  So they

Walsh – Direct

1    review identifying information, classification, IDT

2    participants, evaluation summaries, interpretive summary,

3    transition plan, competency, rights and self-advocacy

4    considerations, significant strengths, significant needs,

5    problems and/or liabilities, personal long-range goals, behavior

6    objectives, service objectives, and miscellaneous.

7         What you will find is that, if you remember a little bit

8    earlier today, I listed out a list of all the components of an

9    IPP.  Well, these track -- these elements track those components

10   fairly closely, and so there is somebody who looks at these on a

11   regular basis.  The QA specialist completes two of these program

12   checklists per residence per month.  And so there are 35

13   residences at the facility, so she is doing 70 such reviews per

14   month.  She does 70 a month.  That's 840 a year.  And so that's

15   in addition to the 6,000-plus annual team-level based monitor

16   checks.  Okay?

17        So here you have a bilevel, quality review system that

18   looks at the structure and the functioning of the IPP.  It does

19   that to the tune of 840 per year, and you have 6,000 individual

20   checks done by program coordinators out in the units.  When you

21   get to a whole year, everybody has been looked at.  And so it is

22   hard to say that programs are not reviewed at that facility

23   because they are, and they're constantly reviewed.

24   Q    How about -- did you look at the medical quality

25   improvement program?

Walsh - Direct                                                        5953

1    A    Say again?

2    Q    Medical quality improvement program.

3    A    I looked at two specific things there, one a little bit

4    more than the other.

5    Q    You weren't reviewing that for the quality of the medical

6    services, right?  You were looking at it --

7    A    Quality management perspective, yes.

8    Q    Uh-huh.

9    A    You know, it's a very nice system.  It -- you know, what

10   they do is -- well, first thing, they have a regular routine

11   that they have, and that allows them to manage the quality of

12   the care of the -- the patients receive, which is exactly what,

13   you know, modern quality management seeks to do.  It seeks to

14   get the right care to the right person at the right time.  And

15   so this is a really nifty sort of committee and, you know, I am

16   speaking first about the dysphagia committee.  And so what they

17   look at is dysphagia and GI reflux problems.  And you know GI

18   reflux is problems up here with swallowing, and dysphagia is the

19   inability to eat properly and swallowing problems.  You

20   understand, when you have such a high-level of people with

21   severe and profound disabilities, that you have a lot of those

22   sorts of problems.  So there is always some risk of choking;

23   more, for example, than the risk that the general population

24   lives under.

25        And so what they did is for each target area, a listing of

Walsh – Direct                                5954

1    all the CHDC residents who exhibit the problem was created.  So

2    they created a database for everybody who has some sort of

3    dysphagia problem and, you know, anyone with reflux precautions

4    and stuff like that.  So then what they do is they monitor that

5    and they monitor that in relation to the general health of the

6    person, but also they have what is called the -- a reaction to

7    swallowing events or response to swallowing events.  A

8    swallowing event is anytime someone is reported to have choked

9    or not swallowed or coughed something up.  And if you look at

10   page 143 of my report, you can see what happens when a

11   swallowing event takes place.

12       A swallowing event occurs.  It is reported to the unit

13   nurse, reported to the RN supervisor, who decides if the person

14   needs to be seen.  If yes, they're referred to a physician.  If

15   no, it is documented as closed, and they push that on to the

16   dysphagia committee.  If yes, the speech therapist goes out

17   there.  They're notified, and they go to see the next meal -- so

18   that's a real rapid response there that takes place -- and to

19   make recommendations based on their observations and discussions

20   with the staff about any food or consistency change.

21       The incident is then reviewed at the next dysphagia

22   committee, you know, at the monthly committee meeting with a

23   recommendation forwarded to the team and to the physician.  So

24   this is a really nice flow process of oversight, quality

25   monitoring, and actually it has direct implications of

Walsh – Direct                                                         5955

1    treatment.  If you look at Page 144 of my report, you will see

2    that they -- that the data from this committee shows three

3    years -- 2007, 2008, 2009.  In those three years in the same

4    order, 24 choking incidents, 18, and 11.  So choking incidents

5    were reduced by about half, 50 percent.

6         If you look at the -- you can see the percentage change in

7    the year-to-year change.  Overall, it's about a 54-percent

8    reduction.  25 the first year, 54 total.  That's cumulative,

9    that middle column.  And so, you know, they -- that means they

10   sort of did good one year and did better the next and that --

11   this is a really interesting, you know, focused study on

12   dysphagia and, you know, it allows them -- it allows them to

13   make almost immediate program changes to prevent risk.  And so

14   it's really good risk management and quality piece.

15   Q    Are they doing a similar process for the fractures at CHDC?

16   A    Yeah.  You know, and fractures is done pretty much the same

17   way; although, I think fractures is not quite as advanced

18   relative to their quality management process.  I mean, she told

19   me that she is moving -- she is going to move the fracture

20   monitoring system directly in the same way that the dysphagia

21   goes so that they can track those statistics.  She has those

22   statistics for fractures and they're -- they were up and down.

23   And so they haven't gotten that yet.  I think they need to look

24   at that more, but if you look at the fracture rate, it's about

25   the same as other facilities that I could see.  And, you know,

Walsh – Direct                                                    5956

```
 1    they're, they're working to, I think, more clearly define those

 2    fractures and then working with -- because they have a dexa-scan

 3    machine on campus, to refine their database so they know what

 4    the dexa-scan results are for each person.  I wanted to show

 5    these as sort of little studies of quality.

 6    Q    Now, His Honor has already heard about the CHDC

 7    satisfaction survey that was sent to the families and guardians,

 8    so I don't think you need to go into a lot of details about that

 9    process.  But do you summarize the results of that survey on

10    page 145?

11    A    Yes.  Well, there is two ways to look at that.  First, if

12    you look at 145, there is the overall -- there is an overall

13    question about overall satisfaction, and 97 percent are either

14    satisfied or very satisfied, with the "very satisfied" being

15    77 percent of that.  And so that's -- that's a high rate of

16    satisfaction.  If you take what I showed -- on page 145 is all

17    of the items, all of the other items.  There are 16 of them, I

18    believe, and I put all the data there directly from the survey

19    report.  And if you collapse the "strongly agree" and the

20    "agree" on the one hand and you collapse "disagree" and

21    "strongly disagree" on the other hand and then leave "no

22    opinion" alone, you have three categories.

23         And those three categories are -- agreement is 95 percent,

24    no opinion is 4 percent, and disagreement is 1 percent.  And the

25    agreement is relative to positive statements.  So that means
```

1     that the 94-percent refers to high, high satisfaction.

2     Q     Okay.  Did you also review what is referred to as quality

3     of life by looking at on and off-campus activities?

4     A     Yes.

5     Q     What did you discover there?

6     A     I wanted to know -- I always want to know the nature of

7     interaction with the surrounding community of a facility because

8     that tells me something about what -- whether people are really

9     moving through a community.  And so I perceive that to be an

10    aspect of quality of life, and I think that's in keeping with

11    the literature on quality of life in this field.  That sort of

12    was explained on page 146.  Quality of life is made up of both

13    subjective and objective aspects.  So it's what's really there,

14    but also how you feel about it.  And, you know, the how you feel

15    about it part is difficult with people who are largely

16    nonverbal, but --

17         So what I did is I wanted to look at are these people

18    getting activities or are they not.  And so here is what I did

19    to lay that out.  I obtained the listings of both on and

20    off-campus activities for January through June 2009.  And -- I'm

21    sorry, that was on -- sorry.  Let me look at this.  Yes, I got

22    on and off-campus activity recreation reports.  I used January

23    through June of 2009 for off-campus, and I used January through

24    March of 2009 for on-campus.  The numbers got way big and you

25    will see that in a second.  And I created some tables showing

Walsh - Direct                                                    5958

 1    that, and so if you look at page 147, you will see that there is
 2    January through June of 2009, down the left side, and then all
 3    the units across the top, the five units.  And it will show the
 4    number of activities that were reported in those units off --
 5    these are all off-campus activities -- and the number of people
 6    who took part in them.
 7         So if you look at the bottom for the TCT, there were 30
 8    activities in that six-month period and 80 people took part.
 9    And if you go all the way over to the right, you will find that
10    in that six-month period, there were 305 off-campus activities
11    and that that included 1061 residents.  All right.  And so a lot
12    of people are moving off-campus.
13         And then what I did is I went through all those reports and
14    I extracted out the name -- the names of activities from, you
15    know, the description on the form.  And I didn't repeat -- I
16    didn't put any repeats in here.  So this is without repeats
17    because there were a lot of going out to eat.  I didn't list
18    them every time.  These are all the different, unique types of
19    activities.  So there is three different types of ball games --
20    basketball games, baseball games, and games at Hendrix College.
21    I am not sure what they are.  Probably both.  Boy Scout outing,
22    bus ride, church services, Disney on Ice, eat out in a
23    restaurant or fast food, home visits, going to the Lipizzaner
24    Stallions, the local library, the McGehee recreation center -- I
25    think it's a public recreation center in Conway -- the

Walsh – Direct                                          5959

1    Martin Luther King celebration, movies, OT program, the PB

2    plunge –– I am not sure what that is –– pet therapy, picnic,

3    shopping, Special Olympics activity, a sports complex, Toad Suck

4    Park trips, visit local parks, Winter Jams 2009, and wrestling

5    competitions.

6         So in the first six months of 2009, 305 activities, took

7    1,061 people to those kinds of things.  If you look at the total

8    number of trips and the size of trips, it comes out that there

9    are some large trips, but most of those trips are three and four

10   people.  And so they're relatively normalized trips.

11        I did the same thing with on-campus activities.  As you

12   will see here, these get pretty hard to count because there are

13   so many of them.  So I saved myself a little work and only did

14   three months.  In 2009 in the first quarter –– and we will do

15   the same thing.  It lays out the number of activities and the

16   number of clients and if you go all the way to the right you

17   will see that there were 592 totals activities planed and there

18   were 5,886 people involved in those activities.  And that's just

19   a quarter.  If you want to know what happens in a year, you

20   multiply that times 4, so something on the order of 20,000

21   people involved in 2,021 activities.

22        The same will be true for off-campus.  You will double that

23   because that's a six-month number.  So there would be 600

24   off-campus activities and 2,000 people involved.

25        The on-campus activities are what you might think –– arts

1    and crafts, Bingo, chapel, Connect Four, cookouts, decorating,

2    the home, electric Monopoly, fishing, Giant Jenga, Giant

3    Connect, gym activities, holiday programs, movies, mini golf, on

4    and on, pizza parties, I won't even read them all.  There is a

5    large list there.

6         The point I would draw from this is that this might give

7    some new interpretation to what people think of as an

8    institution, that an institution is a place where people just

9    sit and do nothing and vegetate.  You know, there is a fair

10   amount of commerce with these folks going out to the community,

11   and there is a lot of stuff going on inside.  You -- when you

12   have a facility the size of CHDC and you are trying to look at

13   it, I have always thought the sort of tours and document review

14   that DOJ experts did is not able to capture it because it's just

15   too big.  I mean, look at this.  In three months there were 592

16   planned activities.  How do you capture that in a tour that

17   lasts two hours when you walk through residences, a lot of it at

18   meal times?

19        So my sense is that this is only one very small aspect of

20   the quality of life, of course, but at least those activities

21   are there.  And what I do is I take my own mind, I take this

22   level of activities, and I think of that with sort of the people

23   that I met there doing -- meaning that I didn't find

24   lackadaisical, insolent staff.  I mean, I suppose they have some

25   there, but I found a lot of people who were sort of energetic

1    and taking part with the things and you can see a lot happening

2    in these two numbers.

3    Q    Dr. Walsh, you also had some comments on Ms. Osgood's

4    report, and I believe you referred to the nature of human error

5    and risk with respect to that.  Can you explain what you mean?

6    A    Well, I found this report troubling as well.  You know, the

7    Osgood report was sort of, she said her intent was to look at

8    risk management, but I don't understand how she did that.  I

9    think -- I had special problems with that report because she

10   doesn't understand about risk.  She doesn't understand -- seems

11   to me, doesn't understand what risk is.  Doesn't understand how

12   human error and risk are perhaps different.  And so, you know,

13   she did what she called a protection-from-harm review, but I

14   don't see how it made any sense.  I don't know how to go through

15   this efficiently, but I can probably outline a few things and

16   you can ask me questions beyond that if you want.  I don't know.

17   Q    I want to know about her process in particular, how that

18   may have impacted her report.

19   A    Right.  Well, I -- you know, what I did is when I read the

20   report, I found it hard to respond to the report in any sort of

21   normative way from what I consider to be a risk management

22   approach because there wasn't much in there about risk

23   management.  It would seem to me what she was doing was looking

24   for problems.  And so I took one section and I used -- I did an

25   analysis of that section and I -- it seemed to me that that --

Walsh – Direct                                        5962

1    it's a relatively brief section, but it allows you to -- it's a

2    stand-in for the whole report.

3         And so what I did is I looked at her managing environmental

4    risk section, and that appeared on pages 14 and 15 of her

5    report.  It's -- it is a short section, and what she does is she

6    sort of said -- and I will read.  She said:  In recurring

7    fashion, individuals sustained injuries from overcrowding of

8    residential units and the inability of staff to quickly and

9    effectively intervene when spatial issues placed persons at

10   risk.

11        I don't really know what all that means and, you know, when

12   you look at what -- what caused her to write that, it's

13   relatively astounding.  And so I would like to go through that.

14   What she does is she cites 12 instances that appear to be

15   accidental injuries, and in my view logically it's not possible

16   to prevent all accidents.  What you need to do is you need to

17   look at the risk and reduce the possibility, but she looks at

18   them and she found 12 incidents of injuries involving

19   wheelchairs because this is the environment -- this is the

20   environmental problem of the overcrowding and too many

21   wheelchairs -- going back more than two and a half years.

22        So, well, first thing is it struck me if you have to go

23   through 2 and a half years' worth of reports to find 12

24   injuries, some of which could be minor, but to find 12 instances

25   of injuries, 2 and a half years for a facility that has 500

Walsh - Direct

1    people, well, it sounds like a pretty safe place to me.  I don't

2    think that's a very high rate, and she uses that to indict the

3    facility as being unsafe.  If you consider the facts about

4    wheelchairs at CHDC, that -- it even is worse than that.

5    These -- these facts were available to her because, once again,

6    DOJ, in their second request for production, asked for them.

7         They asked for specifically any list, roster, summary, or

8    report of all CHDC residents who use wheelchairs as a primary

9    source of mobility and, 2, any list, roster, summary, or report

10   of all CHDC residents who have transport wheelchairs.  Transport

11   wheelchairs are people who may not use them on the units inside.

12   They may walk from bedroom to dining room to kitchen.  But if

13   they are going to go across campus, they will use a wheelchair

14   because that is less safe.

15        And so the information was available to her.  And the

16   facts -- the facts that come out of that report is that there

17   are 197 individuals who use wheelchairs as their primary source

18   of mobility at the facility.  That's just about 20 percent.

19   There are additional 77 individuals -- 77 individuals who use

20   wheelchairs for transport.  So taken together, there is 274

21   wheelchairs at CHDC.  That is a lot of wheelchairs.  Wheelchairs

22   are in use in 30 of the 35 residences on campus.  And having

23   stated those statistics, it is even more striking that if you

24   want to find 12 incidents -- 12 incidents of injuries involving

25   wheelchairs, you have to review two and a half years of incident

1    reports.  I am sorry.  That is not a dangerous place relative to

2    wheelchairs in places.  She is flat-out wrong.

3         And so, you know, she writes on page 15:  These are not

4    isolated cases.  In my view, it's nothing but isolated cases.

5    She didn't do any statistical extraction of all injuries and

6    look at them.  She went searching for them.  In fact, how do I

7    know or why do I think she went searching for them?  Well, she

8    says so, almost, in her appendix.  On page 154, I show what she

9    reviewed, and I only took this from her appendix.

10        So what I did is I counted the number of documents that

11   were listed in her appendix.  She had a 12-page listing of

12   documents that she reviewed for her report and if you count

13   them -- and I did.  I went through, and I counted them.  Here is

14   what I found.  Okay?  I found that she reviewed 13 various

15   administrative records and external reviews, like Medicaid

16   surveys.  13 of those.  She reviewed eight policy-and-procedure

17   documents.  She reviewed 53 medical charts.  She reviewed 55

18   record folders.  I am not even sure what they are.  I think they

19   might be QRGs, but I am not sure.  She reviewed 16 individual

20   program plans, 16 out of 510 or 503.  And she reviewed two

21   behavior plans.

22        However, if you look at investigations or

23   investigation-related documents, she reviewed 115; meaning that

24   43 percent of the documents she reviewed were investigations.

25   She went hunting for problems.  And so she found very small

Walsh – Direct

1  numbers of problems and then she extracted those out and she

2  wrote criticisms of the facility based on those problems.

3  That -- I -- it would be hard to sway me from that conclusion

4  because you can't -- you can't look at a facility if you are

5  looking at risk, look at CHDC and come up with 2 behavior plans,

6  review 2 behavior plans and 115 investigation reports.  It is

7  almost beyond belief.

8       And so I have a very hard time with all the conclusions in

9  her report almost because I go through and the section that I

10  just described to you was mirrored in almost every section.  She

11  picks some topic, she looks for a small number of cases in this

12  corpus of documents, and she brings them in and says the

13  facility is at fault.

14  Q    Doctor, did you also review Ms. Osgood's use of policies

15  and procedures?

16  A    Well, no.  What is actually here is -- I was shocked to

17  find this statement right at the beginning of her report.  She

18  said:  A great deal of harm occurring at CHDC is due as a result

19  of the facility's lack of formalized policies and procedures.

20  So she said that on page 2.  I think what gave rise to that was

21  the fact that there wasn't a protocol for two sort of sentinel

22  events that occurred there.  One was when the person was left in

23  the unit, and another one was perhaps a Special Olympics trip.

24  And I think she generated this statement on her own because it

25  is not the case.

Walsh – Direct

1    What -- when I first became involved there, I asked for all

2    the policies and procedures that governed the facility from the

3    human services -- Department of Human Services policy manual,

4    the Division of Developmental Disabilities services manual, and

5    the CHDC policies and procedures.  I have not bound them.  I

6    would need a couple of those binders.  I sat them on the end of

7    my desk, a table in my office because they are this fat.  If you

8    just look at the CHDC policies and procedures -- you can look on

9    the next page.  I went through the policy and procedure manual

10   and characterized what's in it.  This is just the CHDC policy

11   and procedure manual.

12       The interesting thing is that there is a 34-page

13   cross-reference with the other two manuals.  There are one, two,

14   three, four, five -- nine sections.  Down on the right-hand side

15   you will see them.  There are all the subsections in the middle

16   of that chart.  I don't know.  That is probably 25 or 30.  And

17   the number of procedures in each of those subsections listed on

18   the right.  You will see then that CHDC policy manual, there are

19   425 procedures -- policies and procedures.  The procedure manual

20   is that thick.  3 inches thick, 4 inches thick, something along

21   that order.  There is probably one in this courtroom someplace.

22       I don't know how you can write "a great deal of harm

23   occurring at CHDC is due to a result of the facility's lack of

24   formalized policies and procedures."  I don't know how you get

25   to that.

Walsh - Direct                                                    5967

1    Q    Doctor, Ms. Osgood was also critical of staff education at

2    CHDC.  Do you have any opinion as to the staff education?

3    A    Well, I think a lot of her concerns there were competency

4    training.  That's what she was saying.  You know, I think she

5    was saying that -- I think she was implying that CHDC should

6    measure the competence of staffs that are trained because of

7    what -- what is stated at W129, Tag 189 in ICF/MR.  And so that

8    talks about competencies, and there is not a requirement in

9    ICF/MR to define measure of competency.  It says that adequacy

10   of training is measured in the demonstrated competencies of

11   staff.  So staff need to be competent.  I don't think there is a

12   regulation, an expectation in the ICF/MR guidelines that you --

13   that everyone has to have their competencies defined and

14   measured.  I think she incorrectly interpreted that.

15   Q    And Ms. Osgood also makes some points about or opinions

16   about quick reference guides.  Do you have a response to that?

17   A    She said the same thing, I think, that -- well, she said it

18   more directly -- that you have float staff and staff that are

19   pulled.  And she was saying, I think, that the quick reference

20   guides are not sufficient to have those people do appropriate

21   interventions.  You know, my general sense of that is that she

22   should know, but, you know, float staff and pulled staff are

23   part of every single long-term care setting in America; not only

24   ICF/MRs, but mental hospitals and nursing homes.  The plain fact

25   of the matter is that people get sick, people take time off,

Walsh – Direct                                    5968

1   people miss work for various reasons, and sometimes you have to

2   float people, pull them from one place and float them in.  It

3   is -- just seems to strike me as completely unreasonable to

4   think that you could train every single staff person on every

5   single person's program and every -- it would be ridiculous.

6   Q    And in another area, the theme of staffing adequacy that

7   she raises and she cites the ICF/MR regulations, could you

8   comment on that?

9   A    Well, I don't -- I don't think she did a staffing study.

10  So, I mean, I think it's not possible to make statements about

11  the staffing levels of the facility without doing a staffing

12  study.  I mean, clearly to me what she was doing is walking -- I

13  think she even said this in some sense.  She was walking into

14  units and counting the number of staff that were there and

15  thinking they were inadequate.

16       My recollection is that she might have said at some point

17  in her report she didn't care what the ICF/MR ratios were, but,

18  I mean, I think if you are going to make critical comments about

19  staffing in a facility as complex at CHDC, I think you really

20  have to do some sort of staffing study.  You have to strike some

21  sort of data from enhanced coverage.  I don't think it's

22  possible for her to make any statements about staffing.  The

23  ICF/MR guidelines are relatively -- I mean, they have ratios and

24  they have ratios for specific kinds of clientele in specific

25  units and -- which I think they're met pretty much across the

Walsh - Direct                                                    5969

1     board at the facility.  But I think that the other important

2     thing is that relative to staffing ICF/MR says you need the

3     staffing, you need to get the job done.

4          By and large I think most ICF/MRs in America now exceed the

5     ICF/MR staffing ratio minimums and, you know, I mean, I would --

6     I would add this.  If you look at the guidance to ICF/MR

7     surveyors, here is what they say to their own surveyors.  It

8     says:  Do not look at numbers alone.  The facility is

9     responsible for organizing and evaluating its individual

10    appointments, programming schedules, activities, materials,

11    equipment, grouping assignments, and available staff in such a

12    way that maximizes benefit to the individual.

13         So it's entirely possible that on her tour you could have a

14    situation where the staffing complement could have been in one

15    of those places.  You know, you could have a situation where

16    there is ten people here at this place and there is two staff

17    with them and there is another staff with two people at a

18    medical appointment and there is another staff person with three

19    people who are coming back from an activity and all those staff

20    are really assigned to that unit.  And so you can't just look at

21    the staff that are walking around at the unit and make any

22    statement about adequacy of staffing.  You just can't do it.

23    You need a staffing study.

24              MR. YORK:  Your Honor, would you like to break?

25              THE COURT:  Unless you are going finish up in a minute

Walsh – Direct                                    5970

1    or two, then I think we probably -- I am following along, and I

2    am guessing that you are winding down, but not within five or

3    ten minutes of finishing.   Is that a fair statement?

4            MR. YORK:   We are nearly finished with his initial

5    report, but he did contribute to another report with

6    Dr. Kastner.   We have to go through part of that.

7            THE COURT:   Let's take a 15-minute recess then.

8        (Recess at 3:56 p.m.)

9                    C E R T I F I C A T E

10       I, Cheryl Bartnett Nelson, Official Court Reporter, do

11   hereby certify that the foregoing is a true and correct

12   transcript of proceedings in the above-entitled case.

13

14   /s/ Cheryl B. Nelson, RPR, CRR, CCR   Date:  December 20, 2010
         United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25

1          (Continuing at 4:13 p.m.)

2              MR. YORK:  Thank you, Your Honor.

3    BY MR. YORK:

4    Q.   Dr. Walsh, Ms. Osgood also talks about managing individual

5    risk.  And I know you covered this in part by talking about the

6    wheelchairs for example, but could you comment on this

7    management of individual risk?

8    A.   I think it's the same issue as I spoke to before.  You

9    know, a lot of the sections of this report were very similar.

10   And, you know, we started tracking through them.  When I was

11   tracking through them, I came upon them, and I found that I had

12   really responded to that.  And in this situation, I mean, this

13   section is called "managing individual risk," but you really --

14   it is really the same issue.  She found ten injury incidents,

15   and then cited all sorts of bodies of regs, some that don't even

16   apply, like JCAHO.  And, you know, she did the same thing.  She

17   searched records to find injuries all involving falls of

18   residents during bathing or dressing or transition from

19   wheelchairs.  And then she again took them from over more than

20   two and a half years and doesn't take into account the context.

21   And the context is the number of people who have physical

22   disabilities in the facility, number of people using

23   wheelchairs.  I don't think if you find ten injuries over two

24   and a half years, again in a facility of 500 people, that that's

25   a problem.

Walsh - Direct                                                          5972

1   Q.   She also takes on or has a comment on quality management,

2   and she argues for functionally autonomous entities to do the

3   quality management.   Could you comment on that, please?

4   A.   Yeah.   I thought that was an odd thing.   I don't think

5   that's in keeping with contemporary quality management

6   approaches.   If you look at current quality management

7   approaches, they're really internal.   It's done more like we

8   looked at the dysphagia committee where you find small number of

9   people who are expert in an area, they set quality standards,

10  they set goals, they work to meet them.   They do focus studies.

11  You know, if you look at the literature on quality and quality

12  management, what you find is it's -- you almost bootstrap it up.

13  I mean, you know, in American factories, production factories

14  now, people who are running the robotic robots welding

15  refrigerators together are doing their own quality management.

16  They have quality indicators that they take out.   This, I think,

17  is clearly -- her view here is clearly a holdover from the old

18  sort of quality assurance things we used to do in the past where

19  they were ostensibly checking.

20       And so I have a sense that Ms. Osgood sort of inherently

21  distrusts institutional facilities.   I think that's reinforced

22  by the fact that she talks about a culture of silence later on

23  in her report.   I think what she wants to see is, she wants to

24  see some kind of external review of them relative to quality.

25  But, you know, I think she's up against a field that doesn't

1    agree with her at this moment in time.

2    Q.   Ms. Osgood also, I think, comments on the psych examiners

3    being members of the HRCs.

4    A.   She saw that as a conflict.  They're not members.  They're

5    nonvoting members.  I think that stems from the fact that she

6    obviously didn't have or look at or know there was a rather

7    extensive manual of CHDC procedures that she could have read

8    that in.

9    Q.   Isn't it important that psych examiners attend HRC

10   meetings?

11   A.   Yes.

12   Q.   There's a section that Osgood comments on restraint

13   injuries and restraints, and I believe to some extent you've

14   covered that already in your comments on restraint.  Is that

15   correct?

16   A.   Well, no, this is about restraint injuries, and I don't

17   have separate data for this.  And the plain fact of the matter

18   is that the facility has said there are no injuries relative to

19   restraint.  And, I mean, I have a sense that both Dr. Manikam

20   and Ms. Osgood don't believe that.  And, you know, the only

21   thing I can say there is this.  I outlined -- when we spoke

22   earlier today when we spoke about injuries, I outlined the

23   nature of injuries as they get reported to the state's IRIS

24   system, and I outlined the criteria for that reporting.  And

25   secondary to that, I note that minor injury -- I noted that

1    minor injuries are generally not reportable or included.  And so

2    if you think about restraints, I mean, I have a sense that Ms.

3    Osgood and Dr. Manikam -- I'm sure I'll be accused of putting

4    words in their mouth.  But I have a feeling that they view that

5    people are sort of slapped into restraints, and I don't think

6    that's the case.  Restraints are applied, but I don't think

7    there's any necessary reason that the application of restraints

8    on a lot of folks would be expected to cause a lot of injuries.

9    My expectation is that in other settings, in mental health

10   settings, juvenile detention settings, you could have that, you

11   could have a lot of fighting.  My sense is that people use

12   probably the CPI control position first and then they move to

13   restraint.  So you might have some bruising, but you may not

14   have lots of major injuries, reportable injuries.

15        And then the last point to be made there is that, once

16   again, if you look at the number of people for whom that could

17   happen in the facility, it's a minority of the number of people.

18   So the fact that there are not reportable injuries generated

19   from restraints is not that surprising to me.

20   Q.   Osgood also comments on abuse and neglect.  Does she

21   provide a balanced view of the level of abuse and neglect at

22   CHDC?

23   A.   Well, you know, my view is that in a lot of cases in her

24   report she used abuse and neglect, incident investigations, and

25   she indicted the facility with them relative to protection from

1    risk and harm.  But if you read the report, you'll find that the

2    people were terminated.  And so, you know, you do have to ask

3    yourself, Well, what is the nature of her criticism there?  If

4    her criticism is that the people are inherently dangerous, I

5    don't understand that.  When you find a staff member who abused

6    people, you terminate them.  And so if the facility did that

7    under its regulations, then that's an appropriate response.

8    That's an appropriate risk management response.  That's what

9    should happen.  And so I have the sense that she ignores the

10   fact that they took the appropriate response and simply says

11   that because that's happening, there's some problem in the

12   facility.  I mean, it's pretty hard to control -- that happens

13   in every facility in America.  I don't care what kind of

14   facility.  From school, to hospital, to any long-term care

15   facility, there are going to be staff members who are abusive

16   and they have to be carefully weeded out, and what you do is you

17   set management systems to do that.  And when you implement those

18   systems correctly and terminate people, that's a positive use of

19   a risk management tool.  That's not an indictment of harm.  But

20   I think she's just wrong about that.

21   Q.   And she also refers to a culture of silence.  Did you see

22   evidence of a culture of silence?

23   A.   Yes.  I mean, this has actually been around the field for a

24   while, people who don't like institutions have said that

25   institutions are insular and they perpetuate a culture of

1    silence, and that people who go into institutions, bad things

2    happen and nobody talks.  I would like to say this.  Across my

3    career in working in this field, I've worked in both community

4    settings and institutional settings, and in one case I've worked

5    in both of them at the same time.  And I don't see any

6    difference.  People are people wherever they are.  If they're

7    bad apples, they're bad apples whether they work in the

8    community or whether they work in the institution.  I think, if

9    anything, there are so many eyes in a modern ICF/MR compared to

10   a group home in a community, there are so many eyes in an

11   ICF/MR, sets of eyes, I mean, that it's almost impossible to

12   have too many things occur.  Can that happen?  Absolutely, it

13   can.  And so what do you do about that?  Well, you have good

14   management and you have risk management and you have quality

15   management.  Can it happen in any facility?  It can happen in a

16   group home, it can happen in supportive living.  It can happen

17   anywhere.  Okay.  It's unfair to indict institutions for having

18   some kind of culture of silence because there's nothing about

19   institutions, per se, I think, that leads to that conclusion,

20   and she certainly didn't produce any documentation that that

21   exists at the facility.

22   Q.   Doctor, can you summarize your opinions as to Osgood's

23   report?

24   A.   You probably know my conclusions already.  I'm sorry.  I

25   don't find this report helpful.  I found it rather off-point,

1    poorly executed, and in plain fact of the matter, I think Ms.

2    Osgood might really believe what she wrote.  I think all she

3    did, or most of what she did was to read bad stories.  She read

4    113 maltreatment investigations, or 115, whatever it is.  I

5    think she convinced herself that it was a dangerous place.  And

6    she never did anything that would allow her to disabuse herself

7    of that notion.  And so she didn't really take the appropriate

8    look at the facility to find out what was right with the

9    facility or the rates of injury or the rates of anything.  And,

10   you know, it's striking to me how somebody could relentlessly go

11   through and find bad incidents and then create a critical point

12   of that without ever looking at the other side.  And, therefore,

13   it is really not objective.  It is really a biased report.  And

14   so I find it very difficult to put much faith in what she said

15   in her report.

16   Q.   Dr. Walsh, in all the areas that you reviewed and commented

17   on today, does CHDC meet accepted professional standards?

18   A.   I think it does, and the standards I'm talking about there

19   is I'm talking about ICF/MR standards, guidelines.  I don't know

20   what else to use.  I mean, I think it's possible to try to

21   exceed those standards, but that's a minimal set of standards

22   and they have to meet them.  And I'm -- I'm of the opinion that

23   that facility does meet those standards.

24   Q.   Doctor, we're next going to refer to what is marked as

25   Defendant's Exhibit 10 and already been commented on about

1    Dr. Kastner, the State of Arkansas compliance with the ADA and

2    the *Olmstead* decision with analyses of reports, and so on.  Do

3    you know what I'm referring to there?

4    A.    Yes.

5    Q.    Did you write that in conjunction with or collaboration

6    with, or whatever words you want to use, with Dr. Kastner?

7    A.    Yes.

8    Q.    Have you reviewed Dr. Kastner's testimony regarding this

9    report?

10   A.    Yes.

11   Q.    Do you agree with his comments on this report?

12   A.    Yes.  Pretty much.

13   Q.    We're going to try not to cover the same areas as

14   Dr. Kastner, but I have a few questions on this report.

15        When someone from Conway Human Development Center wishes to

16   receive services in the community, what happens?

17   A.    My understanding is that they're referred to the waiver and

18   that they get priority for the waiver.

19   Q.    So do they have to wait in line for community services?

20   A.    I don't believe there's much of a waiting list.  I mean, I

21   think there were two people who wanted to leave at the time of

22   our first visit.  There were -- I think we noted in here there

23   were five people sort of in line, that were in process, and two

24   of them were waiting for out-of-state placements or a specific

25   placement.  I don't think that Conway has a waiting list of any

Walsh - Direct                                          5979

1   substance for community placements.

2   Q.   Do you know why the state accords priority status to such

3   individuals that want to leave from Conway?

4   A.   I'm not certain.  My presumption would be that it solves

5   the problem with the ADA for them.

6   Q.   Do you think, Dr. Walsh, that it's possible to determine if

7   there's a reasonable pace, from the record of the discharges

8   from CHDC, as to placement?

9   A.   Well, there are -- you know, we documented admissions and

10  discharges from the facility, both what are called regular

11  admissions and what are called respite admissions, over a number

12  of years.  And, you know, it's an active center that takes

13  people in and puts people out.  I don't know exactly what you're

14  asking me about that.  I mean, that's what it does.  And so

15  there are respite admissions and regular admissions, and they

16  come in and they go.  I think the rate is -- I don't think we

17  calculate rates, but it seemed fairly constant over those

18  numbers of years.

19  Q.   Do people who want to leave CHDC move at a reasonable pace

20  into the community?

21  A.   Well, you know, I think not moving at a reasonable pace

22  means there's a waiting list.  And so, you know, my

23  understanding was that the waiting list is a problem when it

24  doesn't move at a reasonable pace.  And so if there's not really

25  a waiting list at any given time, then the reasonable pace

1   argument is not important.  And the reasonable pace argument, to

2   me, my understanding is that it's because the facility should

3   not be using the waiting list as a way to keep its institution

4   full.  The institution -- our understanding is the institution

5   has a waiting list itself for admission of 65 individuals.

6   There's no -- there's obviously no pressure on the institution

7   to keep itself full because it's got 65 people waiting in line.

8   So that seems to then take away all the issues relative to a

9   wait list and reasonable pace vis-a-vis the *Olmstead* decision.

10  Q.   I'm referring more specifically to page 15 of your report.

11  A.   Page -- I'm sorry?

12  Q.   15.  Did you make some specific findings with respect to

13  placement requests and placements from CHDC?

14  A.   I'm sorry.  Ask that again.

15  Q.   Yes.  Did you make specific findings with respect to

16  placement requests and placements from CHDC?

17  A.   Well, you know, we showed in that Table 1 the five people

18  who were waiting.  I'm not sure if that's what you're asking me.

19  Q.   Yes.

20  A.   So you'll see there the table shows five individuals.  KC

21  was an adult.  The guardian only wants placement in a specific

22  community setting and they're waiting for that.  KH is a minor,

23  the mother moved to Louisiana and they're arranging placement in

24  that state.  That transition planning is ongoing.  KL is an

25  adult, respite admission.  The Medicaid waiver placement is in

Walsh - Direct                                    5981

1   process.  RL is a minor.  Referral submitted to UCP for

2   placement.  And BM is an adult, and the waiver application is

3   being completed.  So they're in process.  You know, to me, if

4   you're in process, you're not really yet on a waiting list.  So

5   I think it's reasonable to say that those people, they could

6   move as soon as their application is finished.  We don't know.

7   May have already moved.  This was March.

8   Q.   Did you look at any other information from CHDC with

9   respect to discharges for the last 26-month period?

10  A.   Yeah, we looked.  And we looked at them since 2006, and,

11  you know, there were two types of data that we had.  There were

12  short-stay admissions like respite, and there were 16 of those,

13  and between February of November -- February 2008 and November

14  of 2009.  That's a 22-month period.  And there were 37 regular

15  admission to the facility in the 26-month period between

16  January 2008 and February 2010.  Similarly, there were

17  discharges.  And in the 20 months between May 2008 and

18  December 2009, there were 18 discharges from the facility.

19       So people are moving in and people are moving out.  If you

20  go back to 2006, there were 72 people discharged from the

21  facility in the 46-month period, that's just under four years,

22  between July 1, 2006 and March 17, 2010.  That's about two

23  people per month, on average.  So people are being discharged

24  from the facility.  And they could be going to one of a number

25  of places.  Some of them are probably going to the waiver.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Direct                                              5982

1   Q.   What conclusions do you reach from that data about the

2   number of discharges?

3   A.   My sense is that there's a waiting list to come in, there's

4   people going out, there's respite admissions and respite

5   discharges going through, and so you wouldn't characterize that

6   facility as sort of static and maintaining status quo.  What you

7   would say is that's an active facility that's taking people in

8   and moving people out.  And so, you know, in some states, any of

9   those people that moved out, there would be people taking credit

10  for them on their *Olmstead* rolls.  So the issue is that I don't

11  see that there's any problems vis-a-vis the *Olmstead* waiting

12  issue there, because when people want to go, they can go.  The

13  facility is responsive to that, or the state is responsive to

14  that.

15  Q.   Dr. Walsh, I have a few questions about the report of

16  Richardson.  Do you know what Ms. Richardson understood her role

17  to be at CHDC?

18  A.   Tell me where you are.  On page 42?

19  Q.   Page 42, 7.0 and 7.1.

20  A.   I think her role that she stated was to support community

21  placement.  I don't know what kind of role that is for an expert

22  in this situation, but, I mean, she really clearly went in to

23  identify people who she believed could be placed into the

24  community.

25  Q.   Do you believe it's possible, Dr. Walsh, for an individual

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1  to come into a facility such as CHDC, even in some cases without

2  ever seeing a person, and determine whether they can be served

3  in the community?

4  A.   That is rather striking, isn't it?  I really think that's

5  not appropriate.  I think, you know, if you look at what I've

6  been talking about all day in terms of the ICF/MR model, the

7  interdisciplinary model, the active treatment model with

8  assessment and programming, the database thing, and you have

9  somebody who comes in who is not even really a treatment

10 professional, per se, and says that they can walk through and

11 looking at records and spending a little bit of time with

12 people, or not spending any time with people, make a

13 determination, low, medium, or high, whether that person can

14 move to the community borders on arrogant, to me.

15 Q.   What would you have to know to make such determination?

16 A.   I think you would have to do the kinds of things that

17 happen in transition teams.  You have to look at the whole

18 person.  You have to look at the person's treatment history.

19 You have to look at the person's functional skills.  I think

20 most of all you have to know what is the nature of the place

21 they're going to be transitioning to.  I mean, you can't just

22 make statements about this person would be a high candidate to

23 go into community settings.  You have no idea whether the

24 community settings are there that can meet the needs.  When you

25 do transition planning, that's what you do, you do both sides of

1    the coin, both sides of the equation.  And it just strikes me as

2    arrogant, strikes me as not motivated by some objective view of

3    what would be good for that person, but motivated by some

4    ideological exigency.  I don't know.

5    Q.    In your report you refer to Ms. Richardson's role as an

6    expert in this case as highly speculative.  Can you tell me what

7    you meant by that?

8    A.    Well, it's hard for me to understand what she was doing.

9    You know, her process isn't clearly stated.  She has a

10   relatively long grid, quote-unquote, grid, on the back of her

11   report.  It's hard to know why or how elements got selected for

12   that grid, or how people got selected to be included in that

13   grid, and yet she comes up with a number, I don't really know

14   how she came up with it, 27 people out of this group of 40 that

15   could be moved to the community.  It seems as if by magic.  And

16   there's no clinical process there, although at one point, I

17   think, in her deposition she claims to be making clinical

18   judgments.  The basis for those clinical judgments are, quite

19   frankly, beyond me.  There's not much help in her 12-page grid.

20   We did a secondary analysis of that, and we can give you the

21   details of that to show you that it doesn't make a whole lot of

22   sense.  And so it seems to me that she was just speculating.

23   She was coming in there and saying, I think this, I think this,

24   I think this, and I don't know what the basis of those opinions

25   are for.  In some cases that I've documented, they are

1    strikingly counterintuitive.  We could go get a couple of those,

2    if you want to look at them.  You know, the person is just --

3    the recommendation that somebody has a high potential for

4    community placement when the person is extremely physically and

5    mentally involved, profoundly disabled, is perhaps not

6    toilet-trained, has all sorts of -- and she says high.  You

7    can't even figure out why.  What are the qualifiers?  What went

8    into that decision?  It's just --

9    Q.   We'll get into that in more detail in a moment.  Does Ms.

10   Richardson mention any standards of care in her report or in her

11   testimony?

12   A.   I know she doesn't like the ICF/MR standards.  She said

13   they're changing, which I don't think they are.  I think she

14   meant people are changing away from them, and I think that's

15   her, not people who are in them.  She had a long exchange with

16   you in her deposition about standards and the vanguard of

17   movements and avant-garde people, and, frankly, that troubles me

18   to no end because it did not look at all like standards.  It

19   looked like ideology to me.  And I don't know if you went -- I

20   think you went through some of that in Dr. Kastner's testimony

21   where she talks about, names people like John O'Brien.  John

22   O'Brien talks about administering psychotropic medication as

23   death-making.  I'm sorry.  That's not a person who has what I

24   would consider to be a very rational view of what mental

25   healthcare in an ICF/MR setting is.  That's an ideologue.  I

Walsh - Direct                                                  5986

1    think, actually, most people in the field would agree he's an

2    ideologue.  I think he might agree he's an ideologue.  And so it

3    troubles me.  And, quite frankly, I know that ideologues have a

4    place in society relative to making societal change.  I don't

5    have a problem with them.  But when you try to say that those

6    people, John O'Brien and people like him, that they create a

7    standard, but by their beliefs -- and it's beyond belief at some

8    level.  If you look at that, if you go through her statements,

9    what she says is that standards are changing, standards are

10   changeable.  You know, it almost belies the meaning of the word

11   "standard."  "Standard" means unchanging, stays the same.

12   That's what makes it standard.  So this whole idea of this

13   moving target of standards is very troubling to me.  And in the

14   long run, I think that kind of moving target of standards, which

15   is really pushed along, in my view, by an ideological

16   persuasion, is actually dangerous to people, because I think

17   what it allows you to say is, it allows you to go into an ICF/MR

18   setting and look at somebody that's profoundly disabled and say,

19   "Yes, that person can live in the community," and we have no

20   conception of what that person's needs are and how that person

21   would fare in the community without clearly knowing what it

22   would be for that person.  And I think that's -- I have lots of

23   problems with that.

24   Q.   What about Dr. Walsh and the people that she identifies as

25   the source of some of her standards, like people like John

1    O'Brien?  What do you know about John O'Brien?

2           THE COURT:  I think we covered that.  I think

3    Dr. Kastner covered it too.  And he's just talked about that at

4    some length, and I was listening, so why don't we go on to the

5    next one.

6    BY MR. YORK:

7    Q.   Do you have some concern as to whether or not Ms.

8    Richardson failed to rely on the ICF/MR standards that she

9    stated?

10   A.   Well, you know, I think she doesn't believe in them.  And,

11   you know, she didn't give you a very good answer in your

12   deposition with her.  But I think what she was saying, in some

13   sense, is those standards don't come up to what community

14   advocates would like, and they're professionally based, as

15   opposed to the model that you see in a lot of waiver settings of

16   a community support model and sometimes a disabilities rights

17   model, if you get right down to it.  That she doesn't understand

18   that there's a proportion of people who very much need the kinds

19   of things you get out of active treatment.  You know, if you

20   looked -- if you looked at the population of the state of

21   Arkansas, it's about 2.8, 2.9 million people, something like

22   that.  I did this calculation at one point.  If you take the

23   regular 3 percent of those people having developmental

24   disabilities, take 2 percent, somehow you come to about 70, 75,

25   80,000 people who have developmental disabilities.  If you look

1    at that population of people who have developmental disabilities

2    in this state, you're going to find that about 88 percent of

3    them are mildly disabled, they have mild cognitive disabilities.

4    And that leaves you 12 percent for moderate, severe, and

5    profound.  And moderate is about, I don't know, 8 percent,

6    something like that.  You get down to when you have -- we have,

7    what, about 1,100 people in this state in developmental centers.

8    You get down to about one -- I don't know.  Between one and one

9    and half percent of the population of people with developmental

10   disabilities set in settings, ICF/MR settings.  That's a

11   relatively small number.  It's the very, very, most disabled

12   people with disabilities.  It's a very selective little

13   population.  Okay?  The rest of the population, the other 75,000

14   people, 80,000 people, they live in the community already.

15        And so, you know, the question is, it's like what is the

16   nature of that push that brings Ms. Richardson into this

17   facility and says I can start picking people out to push that.

18   I mean, these are the most disabled people.  It's striking to

19   me.

20   Q.   Dr. Walsh, you were starting to get into the review of Ms.

21   Richardson's ratings of potential for community placement.  I

22   believe you did a grid or a table that addresses this.  Is that

23   correct?

24   A.   Yes.  I mean, I know -- I remember from reading

25   Dr. Kastner's testimony that you did some of this.  You know,

Walsh - Direct                                                  5989

1    some of the technical elements of this are simply that what we

2    did is we took her table, which is relatively long, I think it's

3    12 pages long, and what she did is puts all her 40 cases into

4    there.

5                THE COURT:  What page is it on, Mr. York?

6                MR. YORK:  Page 51, Your Honor.

7                THE COURT:  51.

8                MR. YORK:  Yes, Your Honor.

9                THE COURT:  Thank you.  Go ahead.

10               THE WITNESS:  If you look at the content of her grid,

11   it goes down the left side of that table there.  So it says

12   name, age, house, that's the residence at the facility, the

13   unit, face sheet, the IPP, the transition, admission, where the

14   person was admitted from, key issues, and then her rating of

15   potential community placement and whether or not she saw the

16   person.  I mean, that's what constitutes her grid for those

17   people.  You know what?  What we did is we said, okay, let's

18   look at those things.  And how many of those provide an

19   indication of the functional status of the person?  Well, you

20   know, name doesn't provide any indication.  So if you go down

21   that, you find that age does, face sheet does, IPP does,

22   transition does, key issues, perhaps.  And the other two are

23   hers.  So maybe half of the content of her table even provides

24   any indication of functional status.

25               And so it doesn't make sense to me that you can take a

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Direct                                                5990

1    table that has half of the information, doesn't give you

2    functional status information, you can start making placement

3    decisions, in some cases without even seeing the person.  And

4    so, you know, and you look down, we made -- some of these things

5    weren't helpful.  Then we took that whole analysis one step

6    further.  So we said, Well, if you have certain characteristics

7    of a person and you're making high, medium, and low

8    distinctions, I mean, that's fairly fine distinctions, even

9    though it may not seem like it.  But, you know, I would love to

10   have Ms. Richardson answer for me how she made a distinction

11   between someone who was medium and high or medium and low.  I

12   mean, how do you make that distinction?  But she did it somehow.

13   So you might say, Well, how did she do it?  So we looked at page

14   52, and you can see what we did is we took characteristics of

15   the people in her table -- now, these are only for people in her

16   table.  And we looked at the people who, for example, if you

17   look at the top, were ambulatory or nonambulatory; 22 were

18   ambulatory, 17 were nonambulatory.  Then we looked at the

19   percentages of people she rated high, medium, and low.  And what

20   you find is they don't differ that much.  And so in some sense,

21   ambulation doesn't matter.  And then we looked at mobility.  And

22   if you go down these things, we looked at fragile health and

23   cognitive level, we looked at adaptive level and aggressive

24   behavior and whether they had -- what type of safety -- what

25   kind of behavior plan they had.  And what you find is that, by

1    and large, there is not much discriminatory power in any of

2    those variables.  And so you really have to wonder, how could

3    she make those distinctions that she was making?  Frankly, I

4    don't know how to answer that question.  But it doesn't seem to

5    be from these variables.  And it would strike me that if you

6    look at what predicts community success, if you look at the

7    literature of what predicts community success, you would find

8    these are the kinds of variables that do predict community

9    success or community failure; behavior problems, aggression,

10   adaptive skill level, and fragile health for sure, and

11   ambulation.  These are the kinds of things that you would want

12   to use to look at placements, and they don't seem to work for

13   her.  The numbers are almost the same, no matter what.

14       And so, you know, if you look at the 17 individuals who

15   were nonambulatory, Ms. Richardson rated ten of them as having

16   high potential for community placement and the rest being medium

17   or low.  Of the 17 individuals who were not ambulatory, 14 of

18   them were also nonmobile, meaning that they were in wheelchairs

19   and very challenged physically.  Okay?  Nonetheless, Ms.

20   Richardson rated half of these individuals, seven of them, as

21   having a high potential for community placement.

22       So you wonder -- you have to wonder, what was it about

23   people that led to her ratings of high, medium, or low potential

24   for the community?  I don't know because I can't tell.  And so

25   they seem to be almost random.  They don't seem to be related to

Walsh - Direct                                    5992

1    anything but perhaps to her feelings at the moment.  I don't

2    know what it was.  But, you know, that 12-page table in the back

3    of her report is not very helpful with respect to the variables

4    that help make the decision.  If you look at the people in the

5    table, how she selected her sample, you find that the sample is

6    a mess, as well.

7         So if you look at page 54, you can see we did the same

8    analysis that I did earlier with Dr. Matson's sample, and we

9    laid out the number sampled, the percent sampled, and she

10   oversampled two units and undersampled three units.  She said to

11   you in your deposition of her that she had talked to some of her

12   colleagues from New Statistics and she had come up with -- I

13   don't want to misquote her -- a technically significant

14   benchmark of 35.  And she selected 40 to be above that.  I,

15   frankly, don't know what that means.  I don't believe that

16   there's any such thing as a technically significant benchmark of

17   35.  I don't know what she means by that.  The plain fact of the

18   matter is -- and she actually, when she did her sample

19   selection, she actually biased it.  She chose people in a biased

20   fashion, and she admitted that in her deposition to you.

21        And so you have a bad sample, you have variables that don't

22   seem to work, and you have these ratings.  And the question is,

23   what are we to think about these ratings?  I don't think the

24   ratings hold water for seven seconds, quite frankly.  And I

25   don't know what to say other than that.


                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

1  BY MR. YORK:

2  Q.   Dr. Walsh, could you comment a little bit on the

3  representations made by Ms. Richardson regarding the individual

4  with the initials of JSR?  This is on page 57 of your report.

5  This is the one that she said craves attention, and if he was

6  out in the community, maybe he would get more attention,

7  essentially.

8  A.   Oh, she said that this person -- she said something, a

9  statement that the person should be moved to the community so he

10  could get the attention he craved and, therefore, the behavior

11  problems would reduce.  I really think that's an old myth that's

12  perpetuated by community advocates that facilities like CHDC

13  cause behavior problems.  That really is not the case.  Nor is

14  it the case that people who move to communities necessarily

15  don't have behavior problems.  I mean, I think there's plenty of

16  research to show that.  You know, there is some sort of

17  advocacy-based research you could find that would show that, and

18  I think that's what gives life to this myth.  The plain fact of

19  the matter is that people who are prone to have behavior

20  problems have them no matter where they live.  And the setting,

21  in and of itself, is not necessarily a behavioral change agent.

22  That's disturbing to see that that still sort of appears in her

23  -- and I think what we also found out is that this person,

24  actually JSR, has been doing quite well and has made a lot of

25  progress.  If you look at by June 2009, JSR achieved ten

Walsh - Direct                                          5994

1   straight months without any aggressive episodes.  You know, by

2   Ms. Richardson's logic, then he should stay where he is.

3        So, to me, statements by experts, they need to be careful

4   and they need to be sort of -- they need to make sense and have

5   some sort of basis.  And I'm sorry, but I don't see a basis

6   here, other than an ideologic basis, quite frankly.

7   Q.   Dr. Walsh, she also makes some statements about the

8   observation methods used by Ms. Richardson.  Could you summarize

9   those for us?

10  A.   The observation methods?

11  Q.   Yes.

12  A.   Well, she clearly doesn't use what might be termed

13  "standard naturalistic observation practices."  And she says it

14  herself.  She says that she injects herself into the situation.

15  And so, you know, the first thing I think about is a severely or

16  profoundly disabled individual who encounters a stranger who

17  sort of pushes himself into interaction with them.  I think that

18  is probably quite disconcerting to some folks, and I don't think

19  that's a good way to do naturalistic observations.  I'm not

20  entirely sure that without sort of deep file review and sort of

21  lengthy naturalistic observations that she should even be making

22  determinations of potential for community placement.  I mean, if

23  you had asked me could I do that, I would have to say no.  I

24  mean, it would be a guess.  And so are they guesses?  I don't

25  know.  But they don't seem to have a rational basis.  And

Walsh - Direct                                                    5995

1    observation, you know, if you go to observe somebody and what

2    you're doing is you're interacting with them, interacting with

3    somebody is different than observing them.  So if they're

4    interacting with a stranger, you're not really getting a

5    behavior sample there that represents what their typical

6    behavior is.  And, you know, that's Developmental Psych 101.

7    And, you know, so it's disturbing to me that you have this sort

8    of line of somebody going in, making a biased sample selection,

9    picking a set of variables that is without much rhyme or reason,

10   going and looking at people with what would be nonnaturalistic

11   observation methods, not even seeing everybody, and then making

12   ratings on their potential for community placement.  And I think

13   expecting that those ratings would generalize to the entire

14   population at CHDC, that's a scary prospect to me.

15   Q.   Doctor, you have a section here on faulty outcomes, but I

16   think you've already covered this, at least in part.  But you

17   give two examples, RSC and CJG.  And would you tell me what

18   you're referring to there by "faulty outcomes."

19   A.   Well, I just wanted to give some examples of the kinds of

20   things we were finding.  These are two good examples, where if

21   you look at page 62, you have RSC, who is a blind 29-year-old

22   woman with profound cognitive disabilities and anxiety disorder

23   and cerebral palsy.  According to her IPP, her overall age

24   equivalent is 17 months.  She's not toilet-trained.  She needs

25   total personal care.  She needs intense supervision.  She's

Walsh - Direct                                              5996

1    nonambulatory, and she uses a wheelchair for movement.  She only

2    expresses her needs and wants through gestures and facial

3    expressions.  She takes psychotropic medications.  She has a

4    behavior plan for agitation.  She has flailing of the arms and

5    legs, high-pitched vocalizations.  She disrobes, tears her

6    disposable briefs, and will sometimes bite herself.  And so Ms.

7    Richardson, okay, has rated her potential for community

8    placement as high.  And you have to wonder why.  This is the

9    kind of person who you would have to find a very, very, very

10   special community provider to manage that kind of person in the

11   community.  My guess would be it's because she's 29.  My fear

12   would be that at 29, if she went into the community, she would

13   end up in a nursing home, because her care requirements are so

14   intense that somebody would refer her to a nursing home, to

15   long-term care.  There are 15 percent of the people who have

16   developmental disabilities that are living in nursing homes in

17   this state, and so you wouldn't want to add her to that at 29

18   years old.

19       And so the question in my mind is, where in the community

20   is a high probability of success for that person?  And I think

21   she's a tough one to place.  And, you know, I think that rating

22   of high is cavalier and wrong.

23       And, you know, if you look on the next page, that's when we

24   compared what the IDT said about that in their transition

25   section of their IPP with what she said in her Appendix D table.

1   I don't want to read all that, but all those kinds of factors

2   that play into the decision, I mean, you know, the team made a

3   decision based on all those factors and that's what's documented

4   there.  And I don't know how you rectify the team, looking at

5   all the factors, looking at all the functional aspects of RSC,

6   and saying that she probably still needs an ICF/MR setting, and

7   Ms. Richardson saying she's high, has a high potential for

8   community placement.  And, you know, this is an example of the

9   kind of decision-making I think that comes out of the kind of

10  work that is shown in her appendix, her 12-page table, and the

11  decision-making process she used.

12  Q.   Now, I believe Ms. Richardson suggested that community is

13  better than the institution, without presenting any evidence.

14  Is that correct?

15  A.   I don't think she should go there.  You know, better is

16  like -- I don't know how you make that qualitative judgment,

17  quite frankly.  I think you have to say that a placement is

18  better or worse in relation to a specific individual.  And so it

19  has to be what that individual needs.  And I think that's what's

20  captured in both the ADA and the *Olmstead* decision, is that the

21  integration mandate is that people need to be placed in the most

22  integrative setting that's appropriate to their needs.  And to

23  me, the phrase "appropriate to their needs" is quite important

24  there.  Because appropriate to their needs leads you to the

25  services you need.  You know, we have two competing service

1    models here.  We have the ICF/MR model, which we've gone over
2    that a number of times today.  It's an inclusive model.
3    Everything is bundled together, it's all on one site, it's very
4    professional.  And then we have a waiver model, and that's an
5    unbundled model of services.  So people have to go out there and
6    you have to link together services.  And so for some people,
7    those 80,000 people who already live in the community, the
8    waiver may be perfectly appropriate, because it's easy to link
9    together the relatively light-duty services they need.  They
10   need some transportation, maybe they need a little bit of
11   healthcare coordination, and they need a job, and they'll be
12   fine.  So the waiver may do that just fine.  And so that waiver
13   model makes sense for that person.  In that case, for a person
14   who's mildly disabled who has those kinds of needs, a community
15   placement, supportive apartment, or group home, probably not
16   even, is better, yes.  It's better for that person than putting
17   that person in an institution.  That would not be appropriate.
18   If you take somebody like RSC who has that panoply of very
19   disabling problems with a very low-functioning level, without
20   any language, without any skills, and nonmobile, with behavior
21   problems, psychotropic medications, it may well be that the
22   model offered by an ICF/MR, which is an interdisciplinary
23   professional model, okay, with active treatment, because you
24   can't get active treatment under the waiver, you can get active
25   treatment in the ICF/MR, but that model represents a better

1   model for RSC.  So you can't say that the community is better or

2   that the institution is better.  Anybody who says that, in my

3   view, is a fool.  You have to say it's better for a particular

4   person.  And I think we started today with me saying something

5   like that, when you asked me why could I be on the board of an

6   Arc.  Well, because the services that we offer at the Arc are

7   appropriate for the people we provide services to.  It's not a

8   problem for me.  Services are appropriate in relation to

9   people's needs.  It's exactly what's stated in the integration

10  mandate of ADA, it's exactly what Justice Ginsburg said in the

11  *Olmstead* decision.

12  Q.   Dr. Walsh, did you find that the state's treating

13  professionals are exercising professional judgment around the

14  question of community placement during the IPP process?

15  A.   I think they are.  I mean, you know, if we go back to page

16  63 where it says, under RSC, on the left-hand part of the

17  transition plan, it says, "All team members agree," "The team

18  agreed," "The treatment team at CHDC has deemed," you know, this

19  is a team.  The team is making decisions.  These are

20  professional judgments.  And professional judgments, I

21  understand, is going to come under some question because people

22  will say these people are, for example, following the wishes of

23  the guardian.  I understand that argument.  Let me just say

24  this.  Professional judgment is probably not -- when you're a

25  professional in an ICF/MR facility, professional judgment is not

Walsh - Direct                                                        6000

1    something that's momentary in time that takes place on Thursday,

2    the 28th of August, during the IPP meeting of John Smith.

3    That's at the transition point.  Professional judgment goes on

4    all the time, so you're always working with this person and

5    you're evaluating them.  You look at this therapist, any

6    therapist doing anything, you're always looking at the person.

7    If you're treated for cancer, the doctor doesn't look at you at

8    the very beginning and say, "Well, you have to go get that and

9    come back after you're done," but they look at you every single

10   day, "What's the problem?"  They're making that professional

11   judgment by being involved with you every day.  So are those

12   teams.  Those teams know those people intimately, work with them

13   on a daily basis.  So a psychologist who is doing monthly

14   summaries, or a nurse who is doing a nursing care plan month

15   after month, they know those people, and that constitutes the

16   body of knowledge that goes to, that speaks to professional

17   judgment.  So when they get to this -- when they get to this

18   meeting here where they make these sort of the team agreed,

19   their professional judgments are already made.  They know what

20   the nature of this person is.  This is, in some sense, the

21   documentation that the process is a team process and has taken

22   place.

23        And so we shouldn't try to boil it down to like whether or

24   not the language in that box there constitutes an adequate

25   professional judgment.  What constitutes an adequate

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                                6001

1    professional judgment is the long-term care of that person and

2    how are they doing and what's going on.  It's all the things I

3    talked about all day long, and the people who are doing them.

4    And so I don't have any problem with this team knows this person

5    intimately, and if that's what they believe and that's what they

6    say in this box, I'm inclined to say that's fine, that

7    constitutes professional judgment.

8    Q.    And in your opinion, Dr. Walsh, are the defendants in

9    compliance with the ADA?

10   A.    I believe they are.  Absolutely.

11   Q.    Thank you.

12                       CROSS-EXAMINATION

13   BY MR. CHENG:

14   Q.    Good afternoon, Dr. Walsh.  It's been a while.  How are you

15   doing?  I'm Christopher Cheng.  I believe we met during your

16   deposition.

17   A.    Yes.

18   Q.    We started speaking too quickly again, I think, even with

19   that intro, so I'll slow it down a little bit.  Let me see if we

20   can actually agree on anything, Dr. Walsh.

21        Do I understand correctly that you basically think that the

22   outcomes at CHDC are so outstanding that there's something

23   really being lost here in this case by the Justice Department 's

24   experts in their evaluation?

25   A.    I don't know what you mean, "lost."

                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

Walsh - Cross                                    6002

1   Q.   Let me put it this way.  You talk about the importance of
2   outcomes.  Right?
3   A.   Yes.
4   Q.   How do you compare outcomes with process, like which one is
5   more important?
6   A.   Well, you know, it depends on the situation.  But, I mean,
7   outcomes have a higher profile.  I think at the moment, people
8   like outcomes better because there's more than one way to get to
9   an outcome, and so if you lock in a process, then you can't get
10  to it.
11  Q.   But I take it you would agree that even if we do focus
12  somewhat on process, that's still important, because process can
13  be relevant determining whether conditions are adequate.  Right?
14  A.   I don't -- I didn't mean to give the impression that
15  process wasn't important.  I don't think I gave that impression.
16  Q.   As a matter of fact, if you focus too much on outcomes,
17  sometimes that can be a little distracting.  You ever hear the
18  expression that something is too good to be true, for example?
19  A.   Well, that may not be an outcome then.  I don't know what
20  you're asking me.
21  Q.   All right.  I'd like to take a quick look at your
22  suggestion that the outcomes at CHDC are doing so very, very
23  well.
24  A.   You're misquoting me.  Am I allowed to correct you or not?
25  I mean --

                        Eugenie M. Power, RMR, CRR, CCR
                        United States Court Reporter

                              Walsh - Cross                         6003

 1   Q.   All right.

 2   A.   I think my statement about outcomes was very qualified in

 3   very specific areas.

 4   Q.   Right.  Let's talk about those areas.

 5   A.   Okay.  Fine.

 6   Q.   Let's talk first about restraints.

 7   A.   Okay.

 8   Q.   And let's talk about some of your exemplars.  One of the

 9   first people you list is MA on page 48 of your report.  Is that

10   right?

11   A.   Yes.

12   Q.   And you indicate that MA is basically a success story for

13   CHDC.  Correct?

14   A.   Yes.

15             MR. CHENG:  May I approach the witness, Your Honor?

16             THE COURT:  You may.

17             MR. CHENG:  This is actually a series of exhibits, and

18   it may be easier if I just bring them all up at once.

19   BY MR. CHENG:

20   Q.   Now, Doctor, Government's Exhibit KW2-A was pulled from

21   your notes.  Do you recognize that document?

22   A.   You said "pulled from"?

23   Q.   Your notes that you turned over, or, rather, your working

24   materials that you turned over.

25   A.   Okay.

                      Eugenie M. Power, RMR, CRR, CCR
                       United States Court Reporter

1   Q.   So you recognize it?

2   A.   No.

3   Q.   All right.  Well, do you recall what safety plan you

4   reviewed as a part of MA's materials?

5   A.   All right.  This is his safety plan, yes.

6   Q.   This is the safety plan.  For whatever reason, when we

7   received it, it seemed to be missing the pages between Section 2

8   and Section 7.  So we had a copy of the safety plan pulled from

9   the other materials, and that's 2-B.  Do you see that?

10  A.   Yes.

11  Q.   Now, if you look at 2-B, and you actually look at the

12  description of the safety plan on CON-US-204400 --

13  A.   I'm sorry.  What's that referring to?

14  Q.   That's the page number at the bottom.

15  A.   Oh, I see.  I'm sorry.  Thank you.  You want me to look at

16  4400?

17  Q.   Yes.  Look at 3-A for conditions of use for safety plans.

18  You see the last line where it says, "The safety plan will be

19  implemented when M displays hand-to-mouth behavior that does not

20  respond to redirection by staff occurring at a frequency greater

21  than two times within five minutes"?  Do you see that?

22  A.   Yes.

23  Q.   Then we also pulled some copies of some of those behavior

24  reports you've talked about.  So if you look at KW2-C, you can

25  see several incidents that occurred on June 30, 2009.  Do you

Walsh - Cross                                          6005

1    see those?

2    A.    Yes.

3    Q.    So in the first incident, which is Bates page number

4    CON-US-204714, the brief summary narrative reads, "M was in

5    dayroom watching television with other residents and began

6    putting his hands in his mouth.  Redirection was tried several

7    times without success."  Do you see that?

8    A.    Yes.

9    Q.    And this individual then ended up in mechanical restraints

10   as well as personal restraints.  Do you see that at the bottom?

11   A.    Point me to it.  Oh, I see it, yes, yes.

12   Q.    Similarly, at about 1:35 p.m., ending at 1:50 p.m., on the

13   next page, the brief summary narrative reads:  "After several

14   attempts to redirect, MA repeatedly put his hands into his

15   mouth."  Do you see that?

16   A.    Yes.

17   Q.    And, again, MA was put in mechanical restraints.  And then

18   on the next page, for the incident occurring around 1:10 p.m.,

19   the brief summary says:  "MA repeatedly put his hands into his

20   mouth after several attempts to redirect him."  And again there

21   were mechanical restraints.

22   A.    Right.

23   Q.    Now, Doctor, you know, it seems as though you've suggested

24   that their reliability, their treatment fidelity measures are

25   perfectly adequate, but isn't there actually a problem here with

1    the treatment fidelity as well as the potential reliability of

2    their data?

3    A.    I have to read what the program says to do.

4    Q.    Well, after all, the safety plan says the moment somebody

5    -- let me see.  Maybe we should go back.  The safety plan says,

6    "Safety plan will be implemented when M displays hand-to-mouth

7    behavior occurring at a frequency greater than two times within

8    five minutes."  But the behavior report suggests they may have

9    actually tried to redirect several times before they finally put

10   him in mechanical restraint.  Do you see the potential problem

11   there?

12   A.    If you look at the description of the safety plan under B

13   on CON-US-4400, it says, "Contingently, if hand-and-mouth

14   behavior occurs at a frequency greater than two times within

15   five minutes, staff will clean and dry M's hand and place M in

16   bilateral long-arm splint restraints."

17   Q.    I don't think you quite understand why there is a data

18   issue, Doctor.  After all, why did they wait several times

19   before they put this person in splints?  Maybe it should have

20   only happened after two times.  Right?

21   A.    You're saying it's two versus several?

22   Q.    Yes.

23   A.    Well, okay.

24   Q.    Possibly.  Right?

25   A.    Yes.

Walsh - Cross                                         6007

1   Q.   Right.  So in this case, you know, maybe it's not a major

2   issue to you, but this just easily could have been two incidents

3   of restraint instead of one, depending on how frequently they

4   redirected for putting this person in restraints.  Right?

5   A.   I guess if you want to have it that way.  Yes, okay.

6   Q.   Okay.  Then if you take a look at Government's Exhibit 2-D,

7   do you see the June 18, 2009, psychiatric consultation with MA?

8   A.   That's the first page.  Right?

9   Q.   Right.

10  A.   Yes.

11  Q.   And it proceeds backwards?

12  A.   Yes.

13  Q.   If you'll look at this individual's psychiatric medication

14  at the top, on June 18, 2009, they were on citalopram at

15  60 milligrams, p.o. q.d.  do you see that?

16  A.   Yes.

17  Q.   I'm probably mispronouncing it, so I hope you bear with me.

18  On March 17, 2009, this individual was on citalopram,

19  60 milligrams, p.o. q.d.  Right?

20  A.   Yes.

21  Q.   On December 11, 2008, this individual was on 50 milligrams

22  p.o. q.d.  Correct?

23  A.   Yes.

24  Q.   September 5, 2008, they were on 40 milligrams p.o. q.d.

25  Correct?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   A.   Yes.

2   Q.   May 22, 2008, 40 milligrams of citalopram, 40 milligrams,

3   p.o. q.d.  Correct?

4   A.   Yes.

5   Q.   February 25, 2008, they were on 30 milligrams p.o. q.d.  Do

6   you see that?

7   A.   Yes.

8   Q.   November 13, 2007, they were on 20 milligrams of

9   citalopram, 20 milligrams, p.o. q.d.  Do you see that?

10  A.   Yes.

11  Q.   August 27, 2007, they were on 20 milligrams p.o. q.d.

12  A.   Yes.

13  Q.   Now, in your report you use MA as an example of how the

14  behavioral program has been a success.  Right?

15  A.   Correct.

16  Q.   Isn't it at least possible that the reason this person's

17  behavior is getting better is because of their medication rather

18  than anything to do with their behavioral program?

19  A.   Well, I don't know.  I mean, I don't know what that

20  medication is, I don't know what that medication is for.

21  Q.   Basically, you didn't do a medication review.  Right?

22  A.   No.

23  Q.   Because you're not a psychiatrist.  Correct?

24  A.   Right.

25  Q.   Let's take a look at one of the other examples.  You also

1   cite CA on page 52 of your report.  Do you see that?

2   A.    Yes.

3           MR. CHENG:  Your Honor, may I approach the witness?

4           THE COURT:  Yes.

5   BY MR. CHENG:

6   Q.    Interestingly, CA is an individual who I think some of the

7   other witnesses, the defendants, brought up as an example of

8   supposedly improved care at Conway.  If you would take a look at

9   this increased supervision list at US-CON-A-26578, and do you

10  see at the top it says first quarter 2008 through 2009?

11  A.    Yes.

12  Q.    So supposedly this is an individual whose restraint use has

13  declined.  Correct?

14  A.    Yes.

15  Q.    If you look here, first quarter 2008 to 2009, it lists CA

16  at the bottom, about six lines from the bottom.  Do you see

17  that?

18  A.    Yes.

19  Q.    At the time, CA was under visual during waking hours.

20  A.    Right.  Yes.

21  Q.    Now, if you turn to page US-CON-A-26580, that would be

22  April, May, June, 2008?

23  A.    Yes.

24  Q.    So this is a little bit before the one we just looked at.

25  Right?

1    A.    Yes.

2    Q.    So if you turn to US-CON-A-26581, CA is only under visual

3    supervision.  Right?

4    A.    Yes.

5    Q.    Now, if you turn to US-CON-A-26694, this would be the third

6    quarter, again, CA is under visual supervision.  Correct?

7    A.    Yes.

8    Q.    And then if you look at US-CON-A-26512, January 27, 2009,

9    CA is now visual during waking hours.  When in bathroom, staff

10   must monitor stall door --

11   A.    I'm sorry.

12   Q.    Sure.  You see where that is?  It's right under the section

13   that says "Individual Assistance."

14   A.    On 512?

15   Q.    Yes.

16   A.    Okay.  This is 6512?

17   Q.    Yes.  It's about one-third of the way from the bottom.

18   A.    Oh, it's below that.  Okay.

19   Q.    So January 27, 2009, the visual supervision is now visual

20   during waking hours.  When in the bathroom, staff must monitor

21   the stall door such that when he exits, C is immediately in

22   staff's eyesight.  Do you see that?

23   A.    Yes.

24   Q.    And then by February 10, 2009, on US-CON-A-26499, do you

25   see CA again under the increased supervision?

1   A.    This is February 2009.

2   Q.    Right.  Now it says, "Visual during waking hours.  If he

3   awakens at night, the visual supervision resumes.  Staff must

4   accompany to bathroom and monitor the stall door such that when

5   he exits, C is immediately in assigned staff's vision."  Do you

6   see that?

7   A.    I'm not sure that's any different.  But go ahead.

8   Q.    One difference is, one talks only about visual supervision

9   during waking hours, the other one includes additional clauses

10  about nighttime supervision.  Do you see the difference there?

11  A.    Okay.  Fine.

12  Q.    Okay.  Then you go to US-CON-A-26485.  For CA, it says,

13  "Visual during waking hours.  If he awakens at night, the visual

14  supervision resumes.  Staff must accompany to bathroom and

15  monitor the stall door such that when he exits, C is immediately

16  in assigned staff's vision."

17  A.    That's the same.

18  Q.    Right.  Then if you turn to US-CON-A-26470 for CA in March,

19  it says, "Visual during waking hours.  If he awakens at night,

20  the visual supervision resumes.  Staff must accompany to

21  bathroom, remain in his proximity."

22  A.    That's no different.

23  Q.    Well, you know, I'm not so sure about that, Doctor,

24  because, you know, the earlier one suggested it was only

25  monitoring the door.  By the time you're in March, it sounds

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

1    like they actually have to be in proximity of this individual.

2    A.    You would have to be in close proximity to monitor the

3    door.

4    Q.    You might not be aware of this, but one of the other

5    witnesses for the state yesterday tried to explain why it's okay

6    for people to be right there when CA is basically doing his

7    business in the bathroom because he likes the company.  There

8    was earlier testimony about this.  Were you aware of that?

9    A.    No.

10   Q.    So maybe that proximity means more than watching the door.

11   A.    Well, I don't know that.  I'm not sure you do either.

12   Q.    Well, you're right.  We don't know for certain.  But let me

13   ask you this.  Certainly just looking at these materials, during

14   the time period when you're looking at restraints declining,

15   this person's level of enhancement supervision is increasing.

16   Right?

17   A.    Yes.

18   Q.    And so when you point to the mechanical restraint

19   indicator, you may be omitting some other factors that may

20   affect the quality of life for that individual as well.  Right?

21   A.    The outcome is the same.  You know, if the facility wants

22   to put more supervision on him, that's fine.  I don't care about

23   that.  You know, the outcome is the same.  There's fewer

24   restraints.  That's the whole point.

25   Q.    We'll still deal with the data, Doctor, but I think it's

1  important to know or perhaps recognize that even with your

2  restraint data there may be other things going on in the

3  facility --

4  A.    I allowed that possibility this morning.  I think I said

5  that.  Did I not?

6  Q.    And I think it's one thing to accept that theoretically,

7  Doctor, but sometimes it's important to look at the individual's

8  outcome as well.  Right?

9  A.    Look at?

10  Q.    It's important to see how this actually affects individual

11  cases as well.  It isn't enough to just look at the gross

12  restraint figures.  One should also ask what's going on with

13  that individual.

14  A.    Wait, wait.  The gross restraint figures, the restraint

15  figures extracted out here for CA -- is that where we are?  Yes.

16  It doesn't change that fact.

17  Q.    Right.

18  A.    You know --

19  Q.    Maybe I misworded that.  When I say "gross restraint

20  figures" in this case, I mean really that individual's restraint

21  figures.  When you create a data chart about that individual's

22  restraint use, it doesn't necessarily capture everything that

23  may be going on with that individual.  Right?

24  A.    No.  I understand that.  But it doesn't negate it either.

25  Q.    Doctor -- and I don't mean to interrupt again, but I think

Walsh - Cross                                              6014

1    it might be helpful if you at least let me finish before you

2    answer.  I know it's tempting to sort of come right in and say

3    so, and I think I know what you're going to say, but, again, at

4    least let me finish the question and it will make the

5    transcription easier.  All right?

6    A.   Yes.  I'm sorry.

7    Q.   All right.  So that's an enhanced supervision, it's just

8    one person.  Let's move on to another example and not hold

9    things up.

10          MR. CHENG:  Your Honor, may I approach?

11          THE COURT:  You may.  If it won't throw you off your

12   rhythm, you can do that without asking.  But if you need to ask

13   in order to stay in rhythm, I'll let you do it that way too.

14   BY MR. CHENG:

15   Q.   Now, you also looked at a case involving RC.  Right?

16   A.   Yes.

17   Q.   That's on page 52 of your report?

18   A.   Yes.

19   Q.   Now, if you would take a look at Government's Exhibit KW-4,

20   CON-US-7597, this is RC's safety plan.  Do you see RC's

21   aggression and restraint data chart in the middle?

22   A.   Yes.

23   Q.   And do you see how it says 2008 to 2009?

24   A.   Yes.

25   Q.   And you see how it lists both the minutes with the personal

                  Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

1    holds, the number of aggression incidents --

2    A.    Yes.

3    Q.    -- the number of mechanical restraint use and the minutes

4    in the mechanical restraint use?

5    A.    Yes.

6    Q.    Do you see all that?

7    A.    Yes.

8    Q.    Okay.  If you can look at July, August, and September, do

9    you see how they have listed for July, 90 minutes in mechanical

10   restraints?

11   A.    Yes.

12   Q.    85 minutes in August?

13   A.    Yes.

14   Q.    And 30 minutes in September?

15   A.    Yes.

16   Q.    If you take a look on page 52 of your report, if you're

17   looking at July 2008, it looks like it's about 300 minutes in

18   mechanical restraints.  Right?

19   A.    Yes.

20   Q.    If you're looking at August, it looks like a hundred

21   minutes in mechanical restraints.  Right?

22   A.    Yes.

23   Q.    If you're looking at September, it might be 200 minutes?

24   A.    Yes.

25   Q.    So would it be fair to say there seems to be some type of

Walsh - Cross                                              6016

1   discrepancy between the data that's listed in the safety plan

2   and the minutes that you pulled from the psych examiner progress

3   notes?

4   A.   Yes, there is.  I can't explain that.

5   Q.   We also included some of this individual's psychiatry

6   consult notes.  If you look at that same exhibit -- and I think

7   we actually combined a few things, so let me walk you through

8   it.  It's page 6 of that package, CON-US-150244.

9   A.   Yes.

10  Q.   So here Dr. Callahan, the psychiatrist, is having a consult

11  on May 5, 2009.  Do you see that?

12  A.   Yes, sir.

13  Q.   And you see the second paragraph?

14  A.   Yes.

15  Q.   It says, "In January, she had three aggression, 60 minutes

16  of mechanical restraint use, and a sleep average of 9.1 hours.

17  In February, she had two aggression, 55 minutes of mechanical

18  restraint use, and a sleep average of 9.2 hours."  Do you see

19  that?

20  A.   Yes.

21  Q.   Now, when you go back again to your chart on page 52 --

22           THE COURT:  Let me stop you, Mr. Cheng.  I'm not quite

23  tracking with you.  Read that again.  I'm not sure I followed

24  where you were there on page 244, where you were reading from.

25           MR. CHENG:  Yes.

                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

Walsh - Cross                                                   6017

1            THE COURT:  It says, "In January, she had three

2    aggression, 60 minutes of mechanical restraint use, and a sleep

3    average of 9.1 hours.  In February, she had two aggression, 30

4    minutes of mechanical restraint, and a sleep average of 9.3

5    hours."

6            MR. CHENG:  Right.

7            THE COURT:  And then it says she also had in March,

8    apparently, two aggression, 55 minutes of mechanical restraint,

9    and a sleep average of 9.2 hours.  Then in April, two

10   aggression, 45 minutes of mechanical restraint, and a 9.3-hour

11   sleep average, to the 21st.  Is that where we are?

12           MR. CHENG:  Yes.

13           THE COURT:  Go ahead.  I'm with you.

14   BY MR. CHENG:

15   Q.   Then when you look at your chart, at least it looks like on

16   January, you do have about 50 minutes of mechanical restraint

17   use.  Do you see that?

18   A.   Yes.

19   Q.   And for February, you have listed, basically, nothing.

20   A.   Right.

21   Q.   Very, very low amounts of mechanical restraint use.

22   A.   Right.

23   Q.   In March, you have nothing again, even though Dr. Callahan

24   refers to 55 minutes of mechanical restraint use.

25   A.   Right.

1   Q.   In April, you don't even graph anything, even though his

2   note mentions 45 minutes.  Do you see all that?

3   A.   Yes.

4   Q.   So again it appears there may be a discrepancy between the

5   information Dr. Callahan is relying on and what may be in those

6   monthly progress notes.  Correct?

7   A.   Yes.  Unless some of those are emergency.  It's possible.

8   And he's not discriminating.  But I don't know that.

9   Q.   Even if it were an emergency restraint use, it wouldn't

10  alter sort of the conclusion you could draw from your graph,

11  because it would mean even though this person's mechanical

12  restraint use might have dropped, they may still be having

13  emergency restraint use?

14  A.   But it's planned mechanical.

15  Q.   But basically, you know, if somebody replaces a planned

16  mechanical restraint with, say, equal amounts of emergency

17  restraints, you may not be able to draw the same conclusions

18  about the effectiveness of the behavioral program.  Right?

19  A.   Well, you would have to look at that.  That's an empirical

20  question.  And the second thing is that emergency restraints

21  also declined, in the aggregate.

22  Q.   An aggregate, but not for this individual.  For this

23  individual, there's some restraints going on that aren't

24  captured in your graph.

25  A.   Correct.

1   Q.   All right.  Now, if you turn to the next page.  Now, in

2   this one, in the second paragraph, it says, "In November, she

3   had 10 aggression reports, 155 minutes of mechanical restraint,

4   and a sleep average of 9.1 hours."

5   A.   I'm sorry.  I thought you were going to the next person.

6   Q.   All right.  "In December, she had seven aggression, 155

7   minutes of mechanical restraint," and I could quote the January

8   figure, but it sounds like it's an incomplete set, so I'm not

9   sure how accurate it is.  But it says in January, so far she has

10  had three aggression, 16 minutes of mechanical restraint use,

11  and a sleep average of 9.1 hours.  Do you see that?

12  A.   Yes.

13  Q.   But, again, if you go back to your grid, it does look like

14  there's a bit of discrepancy again, isn't there?  Because in

15  November --

16  A.   Yes.

17  Q.   -- you list a little over 50 minutes of mechanical

18  restraints.  In December, you list, effectively, no mechanical

19  restraint.  And in January, actually looks like about 50 minutes

20  of mechanical restraint, which in this case is actually higher

21  than Dr. Callahan recognized in his note.  Right?

22  A.   January '09, yes, I am.  Yes.  Well, I mean, I don't know

23  where he got his numbers.  I don't know.

24  Q.   I think that's sort have been one of the questions, about

25  where people are getting their numbers for different components

1   of CHDC.  For example, you used the monthly progress notes, but

2   for all you know, Dr. Callahan is using --

3   A.   I used the monthly psych reports from the psych department.

4   Q.   For all you know, Dr. Callahan is using something

5   completely different.

6   A.   I don't know.  Yes.

7   Q.   And if you look at the last page, CON-US-150248, in this

8   note it says, "In July, she had five aggression, 90 minutes of

9   mechanical restraint, and a sleep average of 9.1 hours.  In

10  August, she had seven aggression, 85 minutes of mechanical

11  restraint, and a sleep average of 9.2 hours.  She has had no

12  mechanical restraint since August 22, 2008."  Do you see that?

13  A.   Yes.

14  Q.   And, again, if you look at the grid, on the grid it shows

15  her as having over 300 minutes, or 300 minutes in July 2008.  On

16  your grid it shows her as having, I guess, maybe a hundred

17  minutes of mechanical restraint in August.  And in September, it

18  shows her as having over 200 minutes, even though at least as of

19  September 17, 2008, Dr. Callahan seemed to think she had had no

20  mechanical restraints since August 22.  Do you see that?

21  A.   Yes.

22  Q.   Again there's a little bit of a discrepancy?

23  A.   Yes.

24  Q.   And the thing about this is, if you were just looking at

25  one set of data at CHDC, it's possible that there could be some

1   distortion or problem with using that data, unless there really

2   were things like reliability and treatment fidelity and those

3   types of safeguards.  Right?

4   A.   Well, it wouldn't be those.  It would be discrepancies.

5   Q.   All right.  You're right.  Because reliability and

6   treatment fidelity are sort of a higher tier of data analysis.

7   This is plain old-fashioned recordkeeping.  Right?

8   A.   Yes.

9   Q.   You also list, on page 51 of your report, TC.  He's one of

10  the kids who is at CHDC.  Right?

11  A.   Yes.

12  Q.   And maybe you can clarify for us, is TC basically

13  restraint-free?

14  A.   I think he's had just a couple at the end --

15  Q.   Just a helmet?

16  A.   The helmet, I am not sure if it's any longer part of his

17  plan or not.  I believe it's not.

18  Q.   So they took the helmet out of his plan is one of the

19  reasons you think it's a success story?

20  A.   No, no.  The helmet was still in his plan as of March.  I

21  think it was after that, because I think he was still carrying

22  the helmet.  They had moved it to being carried.

23  Q.   If you look at page 50, at the top, on your report you

24  write, "In the past, TC had a papoose board/mechanical restraint

25  included in his safety plan, however, because of progress that

Walsh - Cross                                6022

1    he has made, that has been removed in favor of a helmet with a

2    face guard."  So that's what you mean?

3    A.   Yes.  But I think at the time he was beginning to carry

4    that.  He was carrying it in his backpack.  It was still

5    available in his plan, but it wasn't -- he wasn't using it.  He

6    was using it less.

7         MR. CHENG:  If I may approach, Your Honor, even though

8    I don't have to ask.

9    A.   Thanks.

10   Q.   If you would just take a look at U.S. Government's Exhibit

11   KW-5.  I would just like to point you to these different

12   restraint reports that came from Christina Adams, the psych

13   examiner for TC.  Do you see these?

14   A.   Yes.

15   Q.   I'll just walk you through some of them.  So, for example,

16   in September 2009, there was an unplanned restraint with a

17   two-man escort.  Do you see that?

18   A.   Yes.

19   Q.   And September of 2009, there was also programmatic

20   contingent helmet and face guard.  Is that right?

21   A.   Yes.

22   Q.   And then also in September 2009, there was unplanned

23   restraint, the use of a papoose board.  Right?

24   A.   Yes.

25   Q.   Is unplanned restraint the same thing as an emergency

Walsh - Cross                                          6023

1    restraint?

2    A.    I believe so, yes.

3    Q.    August 2009, again there is programmatic contingent helmet

4    and face guard.  On August 11, 2009, he has helmet with face

5    guard, again that's contingent.  And June 2009, there was

6    emergency unplanned restraint papoose board.  Do you see that?

7    A.    Yes.

8    Q.    So even though the restraint information you're looking at

9    talks about how they've been able to take him off the papoose

10   board, during the period when he has this helmet on for

11   contingent purposes, he's still sometimes placed on the papoose

12   board.  Right?

13   A.    Yes.  It was removed from his plan.

14   Q.    Right, right.  But, nonetheless, they still can sometimes

15   use it.  Right?

16   A.    As an emergency, yes.

17   Q.    Because even if something is not in the plan, you can still

18   use the papoose board as long as there's an emergency.  Right?

19   A.    Yes.  If it's been approved for him, yes.  I mean -- well,

20   yes.

21   Q.    Now, Dr. Walsh, let's now talk about some of your

22   cumulative data, sort of the facility-wide data.  You talked

23   about using facility-wide data to come up with your gross

24   figures about overall declines in restraint use at CHDC.  Right?

25   A.    Yes.

1   Q.   So you used the type of data reported in these monthly

2   restraint reports?

3   A.   Yes.

4   Q.   I'd like you to take a look at the one that's 6-A that I

5   just brought up to you.  It says, "Monthly Restraint Reports.

6   Restraint totals by team, July and August, 2007."  See that?

7   A.   2007.

8   Q.   Yes.

9   A.   Yes.

10  Q.   So this is some of the 2007 data.  When we were going

11  through these restraint reports from some of the earlier periods

12  that we actually had during discovery, what we were finding was

13  that you'd have the cover page and then it starts going into the

14  restraint totals.  Do you see that?

15  A.   Yes.

16  Q.   And then it runs all the way to the end where it lists, for

17  example, on this last page of this one, "HTT personal and

18  mechanical restraints per BR, September 2007."  Do you see that?

19  And I'll show you the one that's for the year.  If you look at

20  Government's Exhibit 6-B, "Behavior Report and Restraint Use

21  Summaries," it's very similar.  It has at the front the cover

22  page, then it has a page that says "Behavior Report Summaries,"

23  and then it has a graph that says "Number of Behavior Reports by

24  Team," and it runs all the way to the end where it provides a

25  grand total and various information about individuals.  Do you

1   see that?

2   A.    Yes.

3   Q.    But if you look at 6-C, the format's changed a little bit

4   over time at CHDC, or at least it appears to.  Do you see the

5   second page of this exhibit?

6   A.    Yes.

7   Q.    Do you see how it says "Summary of Safety Plan Use"?

8   A.    Yes.

9   Q.    And you see the top part that says "Behavior Reports"?

10  A.    Yes.

11  Q.    Now, under "Behavior Reports," there's a disclaimer that

12  says, "Each team has a weekday/weekend report of restraint use

13  as indicated on the behavior reports.  These do not include all

14  restraints, only those marked on BRs.  Some programs do not

15  require a BR to accompany restraint use."  Do you see that?

16  A.    Yes.

17  Q.    Now, this case, also at the bottom it says, "The high

18  frequency restraint use greater than 1,500 minutes per month is

19  separated from the team total and adjusted totals (for minutes

20  and frequency) are in the yellow columns."  Do you see that as

21  well?

22  A.    I'm sorry.  Yes.

23  Q.    Is it possible that the way they've been collecting and

24  reporting behavior reports and restraint use has changed during

25  this period that you sampled?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                                    6026

1    A.    I asked them about that, and my understanding was that

2    these summary reports in the back merged those, these mechanical

3    restraint totals merged those.  So they had -- so, I mean, I

4    don't know.

5    Q.    But basically you asked them and they told you this is what

6    they do.

7    A.    Yes.

8    Q.    Right?

9    A.    Yes.

10   Q.    And of course --

11   A.    Because I was aware of that issue of behavior reports

12   versus other things, and I asked them about that.

13   Q.    And, of course, the accuracy even of these summaries is

14   going to depend on the accuracy of the reporting by each psych

15   examiner who's turning in data to the chief psychologist.

16   Correct?

17   A.    Right.

18   Q.    And furthermore, the accuracy of those behavior reports is

19   going to depend in part on whether or not the direct care staff

20   are complying with the safety plans and implementing them the

21   way they're supposed to.  Correct?

22   A.    Well, yes.  But I don't know how that would affect the

23   gross totals though.

24   Q.    Well, remember the first case we talked about MA, and, for

25   example, if the staff were not complying with the safety plan,

1    they might be using restraints --

2    A.   Wait, no.  You don't know that they were not complying with

3    the safety plans.

4    Q.   Oh, that's right.  That's why I framed that as an "if."

5    A.   I would say they were complying.

6    Q.   If you could let me finish first, Dr. Walsh.  If the staff

7    were not complying with the safety plan, and instead of

8    restraining as quickly as they should have, that itself might

9    skew some of the data.  Correct?

10   A.   Not correct.

11   Q.   All right.  And I'm sure Mr. York will help you find an

12   explanation for that.  Let's talk a little bit about the

13   improvements in behavior that came from all of the training that

14   has supposedly been adopted here at CHDC.  If we could turn to

15   page 30 of your report, this is the table that you set up for

16   results of individual behavior change reviews.  Correct?

17   A.   Yes.

18   Q.   Now, you had a category for improved, much improved, and

19   greatly improved.  Correct?

20   A.   Yes.

21   Q.   You only had one category for behavior that had gotten

22   worse.  Correct?

23   A.   Yes.

24   Q.   There's no "much worse" or "greatly worse."  There's just

25   "worse"?

1   A.   Right.

2   Q.   Do you see Case No. 3 for FB?

3   A.   Yes.

4   Q.   FB had 42 behaviors in pre-Q1.  Do you see that?

5   A.   Yes.

6   Q.   And 650 behaviors in post Q2.

7   A.   Yes.

8   Q.   Now, under your scale, 34 to 66 percent improvement was

9   rated as much improved, and for over 66 percent improvement, the

10  behavior was rated as greatly improved.  Correct?

11  A.   Yes.

12  Q.   So for FB, this could arguably be interpreted as somebody

13  who got greatly worse.  Right?

14  A.   Yes, if you'd like.

15  Q.   Okay.  And do you see Case No. 9 for JW?

16  A.   Yes.

17  Q.   Now, JW went from 13.2 to 13.1 incidents of behavior, and

18  you listed them as improved.  Right?

19  A.   Yes.

20  Q.   That's a very small number, though, statistically.

21  Correct?

22  A.   Wait.  You're at Case No. 9?

23  Q.   Yes.  For JW.

24  A.   Right.

25  Q.   And then if you look at case 10 for DB, do you see that?

1    A.    Yes.

2    Q.    Do you see how DB's number of behavior reports went from 62

3    to 20 and that's considered greatly improved?

4    A.    Yes.

5    Q.    But also 21 to zero is also greatly improved?

6    A.    Yes.

7    Q.    And three to zero is greatly improved?

8    A.    Yes.

9    Q.    That's because under the formula you're using, any time you

10   go to zero, it is almost like an infinite improvement versus

11   whatever he's doing.  Right?  So you're always going to say it's

12   greatly improved, even though the actual frequency of behaviors

13   may actually be a very small change.  Right?

14   A.    Yes.  I do have the numbers there though.

15   Q.    Right, right, right.  I'm not saying you're hiding

16   anything.  I'm just saying that's something that could affect

17   the calculation.  Right?

18   A.    No, not the calculation.

19   Q.    Okay.  If you look at ZS, ZS went from 15 to 29 --

20   A.    Can you tell me what number that is?

21   Q.    No. 11.

22   A.    Yes.

23   Q.    So, again, if we were using those percentages, ZS was much

24   worse.  Right?

25   A.    No.  Much worse doesn't make any sense.  This is an outcome

1   of a behavior plan.  And so are you implying that people get

2   worse because of the behavior plan?

3   Q.   I think what we're implying is people are getting much

4   worse despite the behavior plan.  Isn't that fair to say?

5   A.   That's obvious that's what happens, but that has nothing to

6   do with the behavior plan.  This behavior plan needs to be

7   fixed.

8   Q.   Are you aware there's been testimony in this case that

9   because they have so many different components to their

10  behavioral program, sometimes the reinforcers are inconsistent

11  between the documents?

12  A.   I'm sorry.  I didn't understand what your question was.

13  Q.   The question is, are you aware that it's quite possible

14  that at CHDC, their behavior plans sometimes make conditions

15  worse?

16  A.   That's possible at any time.

17  Q.   Especially, for example, if you misapply reinforcers or you

18  have very confusing instructions to staff.  Right?

19  A.   No, no.  No, no, no, no, no.

20  Q.   That never happened?

21  A.   Well, you know, you need to show that.

22  Q.   Right.

23  A.   You know, it's -- I can't accept your assertion that that

24  occurs without you telling me when and how.

25  Q.   You have to look at the individual facts and the individual

1    case.  Correct?

2    A.    Yes.  And my sense is what you'll find is that's probably

3    an incorrect interpretation in most cases.

4    Q.    Okay.  But certainly just looking at it with your rating

5    tool, something might not be picked up because maybe there's

6    something else going on with the individual.  Right?

7    A.    No.  I think you're missing the point of my rating tool.

8    Okay?

9    Q.    Why don't we move on.  Let's take another look at No. 14,

10   HT.  Now, this individual, you claimed there was not enough data

11   or perhaps it's not applicable, too few months, I guess.  Is

12   that what it is?

13   A.    Yes, yes.

14   Q.    Do you have any idea how long HT has been at CHDC?

15   A.    Not exactly.

16   Q.    Would it surprise you that HT has been there for decades?

17   A.    No.

18   Q.    And yet somehow there's no behavior data for HT?

19   A.    This is for that plan.

20   Q.    All right.  If we look at SA, No. 15, when they go from 20

21   to zero aggression, that's greatly improved.  Right?

22   A.    Uh-huh.

23   Q.    I know you don't think it's fair, but when they go from

24   zero to one, one could use your percentages and say they're

25   greatly worse.  Right?

1    A.    If you'd like.

2    Q.    Well, you know, I don't want to be unfair.  But if we're

3    going to use the math and use this type of terminology, I

4    think it's important that we understand --

5    A.    You're missing the point and you won't listen to me.

6    You're missing the point that the only behavior change occurs

7    because of the behavior plan.

8    Q.    Let's take a look at No. 16 for MB who climbs objects.  MB

9    went from zero incidents to 57.  Do you see that?

10   A.    Tell me where you are again.

11   Q.    No. 16.

12   A.    Yes.

13   Q.    So would you at least agree that in this case the behavior

14   program has not been successful at reducing behaviors?

15   A.    Yet.

16   Q.    All right.  Let's take a look at No. 20 for TT.  This is

17   one where they go from three behaviors to one, and they're

18   considered greatly improved, and from two behaviors, of SIB, to

19   zero, they're greatly improved too.  Do you see that?

20   A.    Yes.

21   Q.    Again, it's because you're using percentages rather than

22   frequency.  Right?

23   A.    Yes.

24   Q.    And then look at No. 23, JW goes from 12 to 10 and you list

25   them as greatly improved.  Is that just a math error or typo of

Walsh - Cross                                      6033

1    some sort?

2    A.    Seems to be.

3    Q.    Because, at best, that probably does improve.  Right?

4    A.    By these numbers, it would be just improved, yes.

5              THE COURT:  Mr. Cheng, I have a feeling you're going

6    to be with this witness for a while.  And I've just looked up

7    and realized we're past our normal quitting time.  I don't want

8    to interrupt you if you're in the middle of something, but if

9    this is as good a time as any, we'll go ahead and recess for the

10   evening.

11             MR. CHENG:  I actually think it is a good time, Your

12   Honor.

13             THE COURT:  That's what we'll do.  We'll recess until

14   9:00 in the morning.

15             MR. CHENG:  Thank you.

16        (Overnight recess at 6:05 p.m.)

17                   C E R T I F I C A T E

18        I, Eugenie M. Power, Official Court Reporter, do hereby

19   certify that the foregoing is a true and correct transcript of

20   proceedings in the above-entitled case.

21

22   /s/ Eugenie M. Power, RMR, CRR, CCR       Date:  December 22, 2010
     United States Court Reporter

23

24

25

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter