<pre>
 1                   IN THE UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF ARKANSAS
 2                           WESTERN DIVISION

 3    UNITED STATES OF AMERICA,
                              Plaintiff,
 4         v.                                    No. 4:09CV00033 JLH

 5    STATE OF ARKANSAS; MIKE BEEBE, Honorable   October 12, 2010
      Governor of the State of Arkansas; JOHN    Little Rock, Arkansas
 6    M. SELIG, Director of the Arkansas         9:00 a.m.
      Department of Human Services; JAMES C.
 7    GREEN, Ph.D., Director of the Arkansas
      Division of Developmental Disabilities
 8    Services; CALVIN PRICE, Superintendent of
      the Conway Human Development Center,
 9    in their official capacities only,
                              Defendants.
10
                   TRANSCRIPT OF COURT TRIAL – VOLUME 27
11               BEFORE THE HONORABLE J. LEON HOLMES,
                     UNITED STATES DISTRICT JUDGE
12    APPEARANCES:
      On Behalf of the Plaintiff:
13         MR. BENJAMIN O. TAYLOE, JR., Special Counsel
           MR. CHRISTOPHER N. CHENG, Trial Attorney
14         MR. MATTHEW J. DONNELLY, Trial Attorney
           MS. JACQUELINE K. CUNCANNAN, Trial Attorney
15         MS. LAURA L. COON, Trial Attorney
           MR. VINCENT P. HERMAN, Trial Attorney
16          U.S. Department of Justice, Civil Rights Division
            950 Pennsylvania Avenue, N.W., Room 4300
17          Washington, D.C.  20530

18    On Behalf of the Defendants:
           MR. THOMAS B. YORK, Attorney at Law
19         MR. DONALD B. ZAYCOSKY, Attorney at Law
           MS. CORDELIA ELIAS, Attorney at Law
20          York Legal Group, LLC
            3511 North Front Street
21          Harrisburg, Pennsylvania  17110

22         MS. LORI FRENO-ENGMAN, Senior Assistant Attorney General
            Arkansas Attorney General's Office
23          Catlett-Prien Tower Building, 323 Center Street, Suite 200
            Little Rock, Arkansas  72201-2610

24
            Proceedings reported by machine stenography; transcript
25    prepared utilizing computer-aided transcription.


                         Elaine Hinson, RMR, CRR, CCR
                         United States Court Reporter
</pre>

1                      **I N D E X – VOLUME 27**

2

3   **WITNESSES FOR THE DEFENDANT:    Direct   Cross   Redirect   Recross**

4   KEVIN WALSH CONTINUING                      6036     6172       6173

5   ELDON SCHULZ                        6177     6186

6   LOUIS KRAUS, M.D.                   6195     6228

7

8

9

10  **EXHIBITS:**                                                   **RECEIVED**

11  Plaintiff's Exhibits KW-2 through KW-6 (under seal)......6036
    Defendants' Exhibit 202-A...............................6195
12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings continuing at 8:59 a.m.)

2               THE COURT:  Proceed.  Good morning.

3               MR. CHENG:  Your Honor, if I could move into evidence,

4     as a housekeeping matter, KW-2 through 6.

5               THE COURT:  Received.

6               MR. CHENG:  They do include the individual records, so

7     it should be --

8               THE COURT:  Under seal.

9          (Plaintiff's Exhibits KW-2 through KW-6 received in

10    evidence under seal.)

11         **KEVIN WALSH, DEFENDANTS' WITNESS, PREVIOUSLY SWORN**

12                    CROSS-EXAMINATION CONTINUING

13    BY MR. CHENG:

14    Q.   Morning again, Dr. Walsh.

15    A.   Good morning.

16    Q.   Dr. Walsh, your Ph.D. is in life span developmental

17    psychology.  Correct?

18    A.   Yes.

19    Q.   That's a research-based degree that involves studying human

20    development?

21    A.   Yes.

22    Q.   And you received your graduate degree well before Dr.

23    Wattis' classic paper on functional analysis in 1981.  Correct?

24    A.   I received my degree in 1981.

25    Q.   All right.  But that was before Dr. Wattis published his

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

Walsh - Cross                                6037

1    classic paper on functional analysis.

2    A.    Yes, yes.

3    Q.    And it was also before the concept became apparent in the

4    field.   Correct?

5    A.    Yes.

6    Q.    Now, you have questioned Dr. Matson's knowledge of ICF/MRs,

7    but you have not actually been an employee of an ICF/MR since

8    1991.  Is that right?

9    A.    Yes.

10   Q.    You are currently director of quality management and

11   research at Developmental Disability Health Alliance?

12   A.    Yes.

13   Q.    DDHA is, in your view, a community-based healthcare center?

14   A.    Yes.

15   Q.    But the DDHA deals primarily with medical issues.  Correct?

16   A.    We do in-home supports as well, behavioral supports.

17   Q.    But pretty much all the staff are medical staff.  Correct?

18   A.    Not all the staff, no, not all of the staff.

19   Q.    Most of them, though.

20   A.    Most of the staff are -- well, there's a lot of healthcare

21   managers who are not medical staff.

22   Q.    You don't develop habilitation programs like the kinds they

23   do in an ICF/MR.  Right?

24   A.    No.  Yes, we do.  We do -- under family support grants with

25   the State of New Jersey, we do in-home behavioral supports.  We

Walsh - Cross                                    6038

1  do behavior plans.  We take part in individual planning.  It's

2  not of the type that are in an ICF/MR, because it is in a

3  community-based setting.

4  Q.   But that's something you do occasionally in the in-home

5  setting.  Correct?

6  A.   No.  That's a regular contract.  It's not statewide.  It's

7  in several counties in the north.

8  Q.   Okay.  Well, if we could turn to your deposition at page

9  75.

10      The question was:  "Do you do any of that type of

11  habilitation work currently at your own practice?"

12      It's line 3.

13      And your answer was:  "Well, I mean, sometimes in the

14  in-home behavioral consulting, you may target a social behavior,

15  for example.  And then if you increase that social behavior,

16  then it will decrease whatever problem behaviors caused the

17  referral.  But we don't do that in the way that an ICF/MR would

18  do it."

19      Do you see that?  That was your answer.  Correct?

20  A.   Yes.

21  Q.   You also do not address educational goals at DDHA.  Is that

22  right?

23  A.   For the most part, no.  We do have school-aged children in

24  an in-home behavioral supports program.

25  Q.   But nobody lives or stays in your program.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh – Cross                                      6039

1    A.    No.

2    Q.    They are just coming in for a consult.  Right?

3    A.    When they do in-home behavioral supports, they will go to

4    the person's home or the person's residence and do the work.

5    Q.    Okay.  As a matter of fact, you don't deal specifically

6    with the process of placement from developmental centers to the

7    community.  Correct?

8    A.    Within DDHA?

9    Q.    Yes.

10   A.    That's correct.

11   Q.    And you also don't do a lot of staff training in your

12   current position.  Correct?

13   A.    No.  I do some training.

14   Q.    Right.  But it's not really the major focus.  It's

15   primarily a quality management job.  Right?

16   A.    Correct.

17   Q.    And as director of quality management, your job role does

18   not include tracking adverse incidents.  Correct?

19   A.    Not directly, no.

20   Q.    You also don't track drug side effects?

21   A.    Correct.

22   Q.    And your job at Morristown Memorial Hospital was similar to

23   the current one?

24   A.    Yes.

25   Q.    And you do not consider yourself qualified to discuss

1  chemical restraints.  Correct?

2  A.   Correct.

3  Q.   You indicated you have worked for some ICF/MRs.  And I

4  guess those include Broome Developmental Center?

5  A.   Yes.

6  Q.   At Broome, were you practicing as a psychologist?

7  A.   Yes.

8  Q.   But at the time, you had taken no courses on applied

9  behavior analysis.  Correct?

10  A.   No.  That's incorrect.

11  Q.   Had you completed an internship or externship on applied

12  behavior analysis?

13  A.   No.

14  Q.   If we could turn to your deposition at page 27, line 4.

15       "When you were at Broome Developmental Services, do you

16  recall that there were other psychologists on staff?

17       "Yes, there were.

18       "Question:  And you were an associate staff psychologist

19  there.  Is that right?

20       "Answer:  Yes.

21       "Question:  And you had your Ph.D.?

22       "Answer:  I was ABD at the time.  That's --

23       "Question:  What is an ABD?

24       "Answer:  That was -- I was complete of all my Ph.D.

25  coursework, had not cleared my dissertation yet.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                                    6041

1          "Question:  At the time you were working at Broome

2     Developmental Services, did you have any training in applied

3     behavioral psychology?

4          "Answer:  Training in what sense?

5          "Question:  Let's go with educational training from a

6     college or graduate school.

7          "Answer:  Like a course?

8          "Question:  Yes.

9          "Answer:  No."

10         That was your answer.  Correct?

11    A.   Yes.

12    Q.   Now, when you said that you were a psychologist, was that

13    your actual title at Broome Developmental?

14    A.   It was associate staff psychologist.

15    Q.   Were you considered a licensed psychologist?

16    A.   No.

17    Q.   And at the time, could a person practice as a psychologist

18    without a license?

19    A.   In New York at the time, I don't recall.

20    Q.   Okay.  But some of the licensing standards have changed

21    since then.  Correct?

22    A.   I don't know that either.

23    Q.   Well, for example, today, in New Jersey, you have to have a

24    Ph.D. in psychology to be considered a psychologist.  Correct?

25    A.   Not to practice in a developmental center.

                         Elaine Hinson, RMR, CRR, CCR
                         United States Court Reporter

Walsh - Cross                                    6042

1    Q.    Okay.  But outside a developmental center?

2    A.    Yes.

3    Q.    So, for example, can you hold yourself out to be a

4    psychologist to the public in private practice?

5    A.    Now I don't carry a license.

6    Q.    Right.  And that's why you can't hold yourself out to be a

7    psychologist in private practice.  Correct?

8    A.    Correct.

9    Q.    As a matter of fact, I take it you are not holding yourself

10   out to be a psychologist for purposes of this case either.

11   Correct?

12   A.    Well, there's a difference between being a licensed

13   psychologist and being a psychologist.  I am a psychologist.  I

14   have a Ph.D. in psychology.

15   Q.    You have a degree.  But for purposes of what you can

16   represent to the public, are you representing that you are a

17   psychologist for purposes of this trial?

18   A.    I don't know how to answer that question.

19   Q.    Right.  Because you actually can't do that under New Jersey

20   licensing rules.  Correct?

21   A.    I cannot accept payment for psychological services in New

22   Jersey.

23   Q.    You actually can't even hold yourself out to the public as

24   a psychologist.  Isn't that true?

25   A.    No.  You can hold yourself out to the public as a

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                          6043

1    practicing clinical psychologist.

2    Q.   Are you holding yourself out to be a licensed or practicing

3    clinical psychologist?

4    A.   No.  I'm saying I'm a Ph.D. psychologist.

5    Q.   Right.  I guess I'm not sure you've actually answered the

6    question.  Are you holding yourself out for purposes of this

7    trial to be a psychologist?

8    A.   I don't know how to answer your question, sir.  Sorry.

9            MR. CHENG:  Well, Your Honor, I would ask that the

10   witness be asked to answer the question.  It seems a pretty

11   straightforward question.

12   BY MR. CHENG:

13   Q.   Are you offering an opinion as a psychologist?

14   A.   As a licensed clinical psychologist or as a developmental

15   psychologist?

16   Q.   Just as a psychologist.  Are you offering a psychology

17   opinion in this case?

18   A.   How can I answer the question if I don't know the basis of

19   what I'm answering?  You have an ambiguous question before me,

20   and you are asking me to answer a question which has two

21   possible answers depending on the assumptions of the questions

22   put forward.

23   Q.   Well, let me ask it another way.  Are you offering your

24   opinion in terms of what the standards are for care as a

25   psychologist?

1    A.    I would have to say yes.

2    Q.    And are you offering your opinion about what psychologists

3    should do in terms of their clinical practice?

4    A.    Yes.

5    Q.    All right.  And when you are offering that opinion, are you

6    offering that opinion as a psychologist or just as some other

7    category of expert?

8    A.    I'm offering that as a Ph.D. developmental psychologist.

9    Q.    Why don't we move on.  You would consider Division 33 of

10   the American Psychological Association to be one of the leading

11   national associations in the field.  Correct?

12   A.    Yes.

13   Q.    You would also consider the American Association on

14   Intellectual and Developmental Disabilities to be another

15   leading national association?

16   A.    Yes.  I'm a member of both of those.

17   Q.    You would consider *Intellectual and Developmental*

18   *Disabilities* to be a leading journal in the field?

19   A.    Yes.

20   Q.    And that used to be known as the *Journal of Mental*

21   *Retardation*?

22   A.    Yes.

23   Q.    Now, you mentioned you have been on the editorial boards, I

24   take it?

25   A.    Associate editor, yes.

1   Q.   But you do not actually publish in the area of applied

2   behavioral psychology.  Correct?

3   A.   Not typically, no.

4   Q.   And the articles you have published have mostly been

5   coauthored with Dr. Kastner.  Correct?

6   A.   Yes.

7   Q.   You have never published a textbook.  Correct?

8   A.   No.  Textbook chapters only.

9   Q.   Now, you've talked a bit about some of the quality measures

10  that are used in your field.  For example, I believe you

11  referred to something in your report called the RAND SF-36

12  instrument.  Did you ever hear of that?

13  A.   Yes.

14  Q.   The Quality of Well-Being Scale, did you ever hear of that?

15  A.   Yes.

16  Q.   The NCQA consumer satisfaction survey?

17  A.   Yes.

18  Q.   But you didn't actually use any of those instruments that

19  have been published when you did your assessment.  Correct?

20  A.   For this report?

21  Q.   Yes.

22  A.   No.  They are healthcare quality assessments.

23  Q.   Do you recognize any limits on your ability to offer an

24  expert opinion about behavioral psychology as it applies to

25  people with developmental disabilities?

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1   A.   I'm not sure I understand the question fully.

2   Q.   Well, the fact that you are not a licensed psychologist, is

3   there anything that would, you know, from that that would affect

4   your ability to offer an opinion in this case?

5   A.   Well, the plain fact of the matter is, as I said yesterday,

6   I took the national licensing exam, and I passed it.  What I

7   don't do is I don't maintain a license, because it involves a

8   fee and because the APA dues have tripled.  And so I save that

9   money, because most of my work is not clinical, okay?  But

10  relative to the licensure status conferring some sort of extra

11  knowledge, I don't believe that would change my knowledge base

12  one iota.

13  Q.   Well, it may not affect your knowledge, but it does affect

14  your ability about what you are allowed to do.  Correct?

15  A.   Yes.

16  Q.   I mean, we don't really want people who aren't licensed

17  psychologists dictating clinical practice, for example.

18  Correct?

19  A.   Well, relative to applied behavior analysis is some

20  question of whether it is even psychology practice, because

21  coaches do it, nurses do it, teachers do it.

22  Q.   Except teachers have licenses.  Correct?

23  A.   Coaches don't.

24  Q.   Well, aren't coaches often part of a teaching profession?

25  Don't they have their own rules?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1   A.   Sometimes they are, and sometimes they are not.

2   Q.   And certainly, when they are providing counseling or other

3   services, they are offering it the way a layman does.  They are

4   not offering their opinion as a psychologist.

5   A.   No.  We were talking about applied behavior analysis, not

6   counseling.

7   Q.   So in your opinion, behavioral services aren't really

8   psychological services?

9   A.   I think it is sometimes debatable.

10  Q.   But, for example, assessment and test-giving, that's a role

11  that psychologists have.  Right?

12  A.   What kind of assessment?

13  Q.   I don't know.  Let's say cognitive and adaptive testing.

14  A.   Yes.

15  Q.   And yet, you are offering an opinion about, you know, how

16  assessments should be done, even though you are not a licensed

17  clinical psychologist.

18  A.   The assessments I offered an opinion on were related to the

19  development of applied behavior analysis in the ICF/MR setting.

20  Q.   You mentioned in New Jersey that the psychologists may not

21  do things like practice for money or something like that.  In

22  New Jersey, a master's level psychologist may not practice

23  independently.  Correct?

24  A.   Correct.

25  Q.   And when you were practicing in the ICF/MRs, you had to be

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                                6048

1    under the supervision of a Ph.D. psychologist.  Is that right?

2    A.    Yes.

3    Q.    And when it comes to getting paid, you are being paid for

4    your services in this case.  Correct?

5    A.    Yes.

6    Q.    You are being paid $275 per hour.  Is that right?

7    A.    Yes.

8    Q.    And $300 per hour for deposition and trial testimony?

9    A.    Yes.

10   Q.    You are also on the contract and management team working at

11   Alexander Human Development Center.  Right?

12   A.    Yes.

13   Q.    So you and Dr. Kastner are teamed up on that matter as

14   well?

15   A.    Yes.

16   Q.    And what is the size of the contract to manage Alexander

17   Human Development Center?

18   A.    I'm not certain.  Dr. Kastner handles that.

19   Q.    Right.  You actually team up with Dr. Kastner in other

20   matters as well.  Right?

21   A.    Yes.

22   Q.    For example, you've mentioned *Southbury*.  You worked with

23   him in that case as well?

24   A.    Yes -- well, no.  We worked as independent consultants.

25   Q.    Just like you are independent in this case, operating

1    separately?

2    A.    Yes.

3    Q.    Did you do anything in preparation for your testimony in

4    this case?

5    A.    Yes.  I reread my reports.

6    Q.    And did you do anything last night, for example?

7    A.    No.

8    Q.    Have you talked to anyone about your testimony today?

9    A.    No.

10   Q.    In addition to the *Southbury* case -- well, let me ask you,

11   you did provide expert testimony in the *Southbury* case?

12   A.    Yeah.  The *Messier* case.

13   Q.    That's *Messier*?

14   A.    It was about Southbury, yes.

15   Q.    M-e-s-s-i-e-r, something like that?

16   A.    Yes.

17   Q.    You also testified in the *Long v. Benson* case?

18   A.    At deposition.

19   Q.    And *Rolland v. Celucci*, C-e-l-u-c-c-i?

20   A.    Yes.

21   Q.    And you were retained by defendants in the *Southbury* case?

22   A.    What *Southbury* case are you referring to?

23   Q.    The *Messier* case.

24   A.    Yes.

25   Q.    You were also retained by the defendants, the state, in

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1    *Rolland*.  Right?

2    A.    Yes.

3    Q.    Seven of the 18 consultancies you have engaged in were in

4    the context of litigation.  Correct?

5    A.    I don't know what you are referring to.

6    Q.    Well, you've done about 18 consultancies.

7    A.    Say it again.

8    Q.    You've had about 18 consultancies?

9    A.    Calculated from what?

10   Q.    Well, I believe actually that may come from you.

11   A.    My vita?

12   Q.    Perhaps that's from your vita.  I believe you listed it.

13   You listed 18 consultantships or so.  Right?

14   A.    Yes.  But many of those are not in relation to litigation.

15   Q.    Right.  But let's see.  Some of the ones that were for

16   litigation were in Arkansas?

17   A.    Yes.

18   Q.    Nebraska?

19   A.    No.

20   Q.    Florida?

21   A.    Yes.

22   Q.    Connecticut?

23   A.    Yes.

24   Q.    Massachusetts?

25   A.    Yes.

Walsh - Cross                                    6051

1    Q.    Maryland?

2    A.    Yes.

3    Q.    And Pennsylvania?

4    A.    Yes.

5    Q.    So, for example, Pennsylvania, was that the *Evansburg* case?

6    A.    *Embreeville*.

7    Q.    *Embreeville* case.

8    A.    That's E-m-b-r-e-e-v-i-l-l-e.

9    Q.    And Connecticut would be *Southbury*.  Right?

10   A.    Yes.

11   Q.    And so when you and Dr. Kastner -- I know you say you are

12   independent.  But you were both on these cases.  Right?

13   A.    Yes.

14   Q.    So in a way, you could say you are independent, or you

15   could say this is a team, you know.

16   A.    We don't work as a team.  The only time we have worked as a

17   team is to put together the ancillary report in this case.  We

18   do independent tours, independent consults, independent reports,

19   but typically because our content is quite different.

20   Q.    Except that it's not really.  I mean, after all, you are

21   helping --

22   A.    I misspoke.  We also did a joint report in the *Messier* case

23   for the second time, a second report.

24   Q.    Right.  For example, some of the information Dr. Kastner is

25   using is information you've helped him with.  Right?

1   A.   Yes.  Not a great deal, though.

2   Q.   Right.  And you said you already reviewed some of the

3   depositions in this case.  Right?

4   A.   Yes.

5   Q.   And the trial testimony?

6   A.   Some.

7   Q.   So you are aware of some of the things that other witnesses

8   have already said?

9   A.   Yes.

10  Q.   And so again, even though you say you are independent, I

11  mean, what you have is a potential situation where Dr. Kastner

12  can be the bad cop and you can be the good cop, or you have a

13  situation where we should really treat the two of you as a pair.

14  Right?

15  A.   I really don't know what the legal ramifications are and

16  how to answer that question.  But, you know, relative to my

17  report, meaning the report that I wrote myself, Dr. Kastner has

18  no idea what's in there and took no part in helping to prepare

19  it.

20  Q.   But isn't in some ways the way you handled this case a

21  tactical choice?  You know, Dr. Kastner comes in with a stronger

22  position, and you come in with one that sounds reasonable.  And

23  yet, remarkably, even though Conway used to have problems -- I

24  take it you are not going to admit that they still have problems

25  serious enough to warrant relief.  Right?

Walsh - Cross                                    6053

1   A.   Right.  I would say there are always problems in a

2   facility.  And I would agree with you, not enough to warrant

3   relief.

4   Q.   So a fact-finder trying to judge between the Justice

5   Department and Dr. Kastner, in a way you are just basically

6   offering a middle ground.  But if you are playing the good cop

7   role, it's actually not a middle ground at all.  Right?

8   A.   Okay.  I'm really flummoxed with your good cop/bad cop

9   thing.

10  Q.   That's fine.  Let's move on.  Let me ask you this.  Of the

11  consultancies that we just talked about, in all the cases you

12  were actually retained by the state; right, the litigation

13  consulting?

14  A.   Yes.  Well, I was retained by the State of Washington.

15  That was not litigation.  I'm sorry.

16  Q.   Right.  As a matter of fact, you have never testified for

17  someone who thought they were mistreated by a state.  Correct?

18  A.   In terms of being like an expert --

19  Q.   Right.

20  A.   -- for the plaintiffs?

21  Q.   Right.

22  A.   Correct.

23  Q.   As a matter of fact, you've never even offered oral or

24  written support for someone who thought they were mistreated by

25  the state.  Correct?

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

Walsh - Cross                                    6054

1   A.    Correct, I guess, yes.

2   Q.    You know, we mentioned briefly that Dr. Kastner had you

3   help him a little bit.  You ran something called -- is it a

4   c-h-i or chi square or chi square?

5   A.    Chi square.

6   Q.    A statistical test for Dr. Kastner for his mortality

7   review.  Correct?

8   A.    Yes.

9   Q.    Because Dr. Kastner himself does not know how to do those

10  types of statistical analyses?

11  A.    Well, it's a relatively simple calculation.  It could be

12  done by a high school student.  And Dr. Kastner, whenever he has

13  a statistical calculation, he calls me and asks me to do it for

14  him because I guess he trusts me to do it right.  But he can

15  certainly -- he could certainly take instructions to do a chi

16  square and carry it through.

17  Q.    Let's look at your deposition at page 178.  And I should

18  have mentioned that the court reporter wrote something down as

19  "pie" square, p-i-e, which is one of the interesting

20  transcription issues when we are using technical terms.  But let

21  me take a look at line 8.

22        The question was:  "You talked earlier about doing it.  Was

23  it a pie square, a --

24        "Answer:  Chi square, c-h-i?

25        "Question:  What is the test that you did for Dr. Kastner?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                    6055

1        "Answer:  It's a very simple basic statistical test, and it

2   can be done by college undergraduates in psychology.  It's done

3   by comparing the observed versus the expected numbers of

4   occurrences in a two-by-two category.  So it's just a

5   statistical test.  It can tell you whether or not the observed

6   incidence of something is statistically significant, different

7   than chance.

8        "Question:  And did you do any other statistical analysis

9   for Dr. Kastner?

10       "Answer:  No.  He doesn't know how to do those things.  It

11  took about ten minutes."

12       Do you see that?  That was your answer.  Right?

13  A.   Yes.

14  Q.   So is it a college student can do it or a high school

15  student can do it?  It's easy, though, is the idea.  Right?

16  A.   Yes.

17  Q.   I don't want to be completely unfair about that.  Did you

18  know, though, that Dr. Kastner in his own testimony -- I believe

19  he said he did the chi square analysis.

20  A.   I don't know what he said.

21  Q.   If he did, he would have misspoken?  That's incorrect?

22  A.   Actually, I worked through it with him on the phone.  It

23  was done in ten minutes.

24  Q.   Did I understand correctly that in Vineland they stopped

25  using mechanical restraints?

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                          6056

```
1    A.   At the training school at Vineland?

2    Q.   Yes.

3    A.   Yes.

4    Q.   And you were head of the program at the time?

5    A.   Yes.

6    Q.   Now, were you providing clinical services at the time or

7    overseeing the clinicians?

8    A.   I was overseeing the clinicians.

9    Q.   So these were Ph.D. psychologists and master's level

10   psychologists?

11   A.   Master's level psychologists.

12   Q.   And how many years ago was that, when they got rid of

13   mechanical restraints?

14   A.   That was 1983.

15   Q.   Do you currently have a clinical supervisor?

16   A.   Only if I do clinical work.

17   Q.   But you don't do clinical work.  Right?

18   A.   Rarely.

19   Q.   Dr. Kastner is your supervisor?

20   A.   No.

21   Q.   Isn't he your only supervisor?

22   A.   I'm not sure what you are asking me.  He's my supervisor

23   relative to working within DDHA.  If we have a contract that

24   produces clinical work that is in the southern part of New

25   Jersey -- which we don't at the moment.  But if we do and I do a
```

1    clinical case, then we don't have a person right now, but we

2    will hire a Ph.D. level person to do clinical supervision,

3    because then we hire master's people to do it.

4    Q.   Because if you do clinical work, you have to be supervised

5    by a clinical psychologist.

6    A.   Yes.  And whenever I did clinical work at DDHA, I was

7    supervised by a Ph.D. clinician.

8    Q.   But certainly, for purposes of outside the clinical

9    practice, you are supervised by Dr. Kastner?

10   A.   Yes.

11   Q.   He is the president of your company, the DDHA?

12   A.   Yes.

13   Q.   And do you report to anyone else besides Dr. Kastner?

14   A.   No.

15   Q.   Are you a shareholder or stakeholder in Developmental

16   Disabilities?

17   A.   No.

18   Q.   And it's a not-for-profit.  Correct?

19   A.   It's a for-profit.

20   Q.   It's a for-profit.  Are you a board member?

21   A.   There is not a board.

22   Q.   So it's basically Dr. Kastner's company?

23   A.   Yes.

24   Q.   And you work for Dr. Kastner?

25   A.   Yes.

Walsh - Cross                                                6058

1  Q.   Okay.  Let's talk a little bit about standards.  The ICF/MR
2  regulations have not actually changed substantively since 1988;
3  right?  1988; correct?
4  A.   They changed in the mid-nineties.
5  Q.   There were some revisions, but those weren't specifically
6  dealing with the ICF/MR provisions.  Correct?
7  A.   I don't recall exactly what the scope of all of it was.
8  Q.   But the point is, there haven't been major changes since, I
9  guess, in your testimony, late eighties, sometime in the early
10 nineties?
11 A.   Well, that's your testimony you want me to agree to.
12 Q.   I'm just asking.
13 A.   I'm not sure when it was.  I know it's sometime in the late
14 eighties or nineties.
15 Q.   It's been awhile, though.
16 A.   Yes.
17 Q.   Now, while the ICF/MR standards in your opinion are a
18 source of standards in this field, you do not claim that they
19 are the only source.  Correct?
20 A.   Well, I'm not sure -- when you say "this field," what are
21 you talking about?
22 Q.   I guess maybe I have to be careful.  Are you talking about
23 psychology when you talk about ICF/MR standards being the
24 standard?
25 A.   No.  You know, in the context of this case at CHDC, I

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                    6059

1    believe that the standards that matter are the ICF/MR standards.

2    But, you know, there's a set of standards that come from the

3    CARF association too for CARF accreditation.  And, you know,

4    some people who only have CARF accreditation and don't have

5    other sets of standards treat those as their operating

6    standards.

7         You know, if you have a community-based organization -- in

8    fact, the community-based organization of which I'm a board

9    member is CARF certified.  And we pretty much treat the CARF

10   standards as our basic standards.

11   Q.   Well, let me go back a little bit then.  When we're talking

12   about a source of standards for the practice of psychology,

13   would you agree that professional bodies can help establish

14   those standards?

15   A.   Yes.

16   Q.   Would you agree that in terms of the clinical practice of

17   psychologists the ICF/MR standards are not the only source of

18   standards in the field?

19   A.   Well, I think the American Psychological Association may

20   have sets of clinical standards.

21   Q.   Right.  So the ICF/MR standards are not the only source of

22   standards.  Right?

23   A.   Perhaps not.  But they are the standards that the psych

24   examiners there use.

25   Q.   At Conway.  Right?

Walsh - Cross                                    6060

1    A.    Yes.

2    Q.    But the idea that, you know, those are the only clinical

3    standards, surely you are not claiming those are the only source

4    of clinical standards.

5    A.    No.

6    Q.    As a matter of fact, it's really hard to say there's any

7    cut-and-dried rule for what is a professional standard in your

8    opinion.  Right?

9    A.    Well, no.  You know, "standard" is a word that's difficult

10   for me to use in the field, because generally we're talking

11   about consensus guidelines, treatment guidelines, as opposed to

12   standards.  So if people get outside the treatment guidelines,

13   then maybe they are outside the standard.

14        So the question is a standard to me is a legal term.  And,

15   you know, it has to do with these bodies of codified sort of

16   legal statements.  And then there's this whole other field of

17   nebulous sort of claimed standards, you know.  And there is a

18   very difficult line between those two or a gray area between

19   those two.

20   Q.    But certainly, even when you are trying to define whatever

21   the practice parameters are for a profession, there are things

22   people can look at.  And those include journal articles.  Right?

23   A.    I testified yesterday that that's not a productive way to

24   build such standards, for individuals to use journal articles.

25   That's not how we build evidence-based practice.

Walsh - Cross                                    6061

1    Q.   It is one of the things people can look at, though, for

2    purposes of clinical practice.

3    A.   As a source of knowledge, yes.

4    Q.   And using, you know, standardized tests.  That's another

5    thing people can use for clinical practice.  Correct?

6    A.   To me, the fact that "standardized test" has the word

7    "standard" in it is not relevant to the fact that it's a

8    standard.  It's relative to a quality of the test itself that is

9    standardized across individuals.

10   Q.   Would you consider the DSM-IV to be considered one of the

11   more authoritative documents in the field?

12   A.   Yes.

13   Q.   Now, while you indicate that the ICF/MR standards are a

14   source of standards, you are not suggesting that the clinical

15   practice has not evolved since the nineties.  Right?

16   A.   I'm not suggesting that.  Correct.

17   Q.   It's probably evolved since you were practicing as a

18   psychologist.  Correct?

19   A.   I don't know what you mean by practicing as a psychologist.

20   I practice as being a psychologist every day.

21   Q.   Well, practicing in an ICF/MR.

22   A.   Yes.

23   Q.   And practices that have been subjected to peer review are

24   more likely to be considered authoritative.  Correct?

25   A.   To some extent, yes.

                         Elaine Hinson, RMR, CRR, CCR
                         United States Court Reporter

Walsh - Cross                                           6062

1  Q.   Some states have banned the use of mechanical restraints.

2  Correct?

3  A.   I believe so, yes.

4  Q.   Now, you talked about CHDC and its historical practices.

5  From the start, you recognized that they had very high restraint

6  rates.  Is that right?

7  A.   Yes.

8  Q.   So if we sued them in 2006, would you have agreed that they

9  were unconstitutional?

10  A.   It's not for me to determine necessarily what is

11  unconstitutional.

12  Q.   Did you ever write a report or anything like that saying

13  that their restraints were unacceptably high?

14  A.   I don't believe we did reports in the first two visits, no.

15  Q.   You destroyed your notes in this case.  Correct?

16  A.   No, I did not.  I transcribed them and gave them to you.

17  Q.   But you destroyed your handwritten notes?

18  A.   Right.

19  Q.   Many of the changes that you've observed at CHDC, have

20  those been made in the last two years?

21  A.   I would say the last five years to seven years.

22  Q.   Last five years?

23  A.   Well, I mean, if you look at my report, you will see the

24  decline in restraints started in 2005.

25  Q.   Right.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                                6063

1    A.   And that was only because that's what I went back to.  It's

2    entirely possible if I had gone back to 2004 I would have

3    seen -- my first visit there was in 2003.

4    Q.   So when you went in to give them advice, did you ever

5    recommend that they get additional training in applied

6    behavioral analysis?

7    A.   I don't recall.  I said a lot of things.

8    Q.   Did you make any recommendations about staffing?

9    A.   No.  I never thought their staffing was necessarily a

10   problem, because they had about the same level of staffing

11   throughout the time I was there.  They may have added one or

12   two, but I'm not even sure about that.  I never thought the

13   staffing was a problem vis-a-vis psych examiners.

14   Q.   Why don't we take a look at your deposition at page 228,

15   line 8.

16        The question was:  "Did you ever recommend that any of

17   their psychologists get additional training in applied behavior

18   analysis?"

19        "Answer:  No.  That wasn't the nature of my intervention.

20   My intervention was basically a process change."

21        Is that what you were doing?

22   A.   I think that's what I just said, correct.

23   Q.   I believe you actually said you didn't recall on that

24   recommendation.  But you actually didn't view it as your role.

25   You were here to do process change.  And so as you were

Walsh - Cross                                    6064

1   developing or helping them with process change, effectively much

2   of their current structure for providing psychological services

3   is based on that process change.  Right?

4   A.   Much of their current structure at the time?

5   Q.   Now.  For example, the use of this positive behavior

6   support plan, the strategies, the safety plan, and separate

7   documents.  Some of the ways they handle psychological care now,

8   those are because of that process change that you helped

9   initiate.  Right?

10  A.   Some of it.  It would be -- it would be too much for me to

11  claim that it's a majority of their process.  I mean, their

12  process was -- in a number of ways was intact.  What I did is

13  change some of the formats of how they approached things.  And

14  what I said yesterday was to change the focus of their thrust of

15  their interventions.

16  Q.   So your change in the focus of their interventions was

17  developed by a psychologist.  Correct?

18  A.   Yes.

19  Q.   So, in effect, you are kind of affecting clinical practice

20  through your process change.

21  A.   Yes.  If that's what you are saying, I would accept that,

22  yes.

23  Q.   So when you say, again, that you are an independent

24  reviewer just coming from outside, you actually have a vested

25  interest in this, because whatever setup they have now, in some

Walsh - Cross                                      6065

1   ways it can be attributed to the process you started.  Right?

2   A.   Yes.

3   Q.   As a matter of fact, the reason they bring you and Dr.

4   Kastner in before people get sued is partly to help get them

5   ready so they don't get sued or, you know, survive a suit.

6   Right?

7   A.   I really haven't thought of it that way.  But I suppose you

8   could say so, yes.

9   Q.   In your current practice with DDHA, do you include

10  mechanical restraints as part of any programs in your consulting

11  work?

12  A.   What do you mean in our consulting work?

13  Q.   Well, are there mechanical restraints included as part of

14  the programs that are developed by DDHA?

15  A.   They will -- some of the medical people may use health,

16  medical restraints for, you know, procedures, drawing blood.

17  Q.   Dental care, you might have to be restrained?

18  A.   Yeah.

19  Q.   But not the types of mechanical restraints you see for

20  behavioral purposes.  Right?

21  A.   No, no.

22  Q.   You have not seen papoose boards in use since you worked at

23  Broome Developmental Center.  Correct?

24  A.   That's correct.

25  Q.   And you have not seen restraint chairs in use since you

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1   worked at Broome.  Correct?

2   A.   No.  Restraint chairs were in use at some of the facilities

3   I visited, if my memory serves.

4   Q.   But not in anything where you are actually a practitioner.

5   Perhaps you might have seen it during one of your litigation

6   cases, but not in your own practice.

7   A.   Well, you keep on talking about my practice.  You know, I

8   do quality management, so I don't know what you mean by that.  I

9   don't know if you are talking about DDHA or what.  I'm confused.

10  Q.   Well, how about an ICF/MR?  Have you seen restraint chairs

11  in an ICF/MR since -- other than at Conway?

12  A.   Yes.  I think restraint chairs are in use in some ICF/MRs.

13  Q.   Okay.  Why don't we look at your deposition, page 48, line

14  21.

15       The question was:  "How about restraint chairs in an

16  ICF/MR?  Have you seen them anywhere other than at Conway?"

17       "Answer:  Yeah, same answer as papoose boards."

18       That was your answer.  Correct?

19  A.   Yes.

20  Q.   Now, when I was deposing you, I asked you about

21  intelligence tests and adaptive behavior measures.  Do you

22  remember that?  Vaguely?

23  A.   I guess, yes.

24  Q.   There are literally books filled with different types of

25  intelligence tests and adaptive measures.  Correct?

Walsh - Cross                                    6067

1  A.    Yes.

2  Q.    Now, when you were asked about such tests, you were able to

3  immediately name a number, including the WAIS?

4  A.    Yes.

5  Q.    The Stanford-Binet?

6  A.    Yes.

7  Q.    The Vineland?

8  A.    The Vineland is not an intelligence test.  It's for

9  adaptive skill.

10  Q.    But you have heard of the test?

11  A.    Yes.

12  Q.    I'm sorry.  We're both doing it.  We're both talking over

13  each other.  And I'll try not to.  It's helpful for the court

14  reporter.  You've heard of the ABS?

15  A.    Yes.

16  Q.    There's even an adaption of the Wechsler Adult Intelligence

17  Scale for children.  Right?

18  A.    Yes.

19  Q.    That's the W-A-I-S or WAIS?

20  A.    That's the adult intelligence scale.  I think the child

21  version is called the WISC, Wechsler Intelligence Scale for

22  Children.

23  Q.    And it seems that from your own testimony you are basically

24  assuming that the people at CHDC were properly assessed for

25  their level of function before they got to CHDC.  Correct?

Walsh – Cross                                    6068

1   A.   In general, yes.  When they come there, they are already

2   diagnosed.

3   Q.   Because in your opinion CHDC, it's not their obligation to

4   ensure that such assessments are accurate?

5   A.   No.  It's not their job to assure people are qualified for

6   services.

7   Q.   And actually the staff at CHDC don't spend much time even

8   looking at the assessments.  Is that right?

9   A.   They are reported in all the IPPs.  I don't know what you

10  mean by "looking at."

11  Q.   Well, let me ask you, would it be more accurate to say they

12  don't spend much time looking at the classification or the

13  diagnosis of developmental disabilities?

14  A.   I think that is correct.

15  Q.   Are you aware that the ICF/MR regulations talk about both a

16  preliminary evaluation and evaluations after admission?

17  A.   Evaluation of?

18  Q.   I'm sorry?

19  A.   Evaluation of?

20  Q.   Background information, assessments and reassessments?

21  A.   Right.  It's a functional assessment.  It's a functional

22  assessment was my point yesterday.

23  Q.   Actually, I don't think that is all it says.  For example,

24  483.440(a)(3) says:  "A preliminary evaluation must contain

25  background information as well as currently valid assessments of

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1   functional developmental, behavioral, social, health, and

2   nutritional status to determine if the facility can provide for

3   the client's needs and if the client is likely to benefit from

4   placement in the facility."

5       483.440(c)(3) says:  "Within 30 days after admission, the

6   interdisciplinary team must perform accurate assessments or

7   reassessments as needed to supplement the preliminary evaluation

8   conducted prior to admission.  The comprehensive functional

9   assessment must take into consideration the client's age; for

10  example, child, young adult, elderly person, and the

11  implications for active treatment at each stage, as applicable,

12  and must" -- and there's a series of items that's listed --

13  "include physical development and health, nutritional status,

14  sensorimotor development, affective development, speech and

15  language development and auditory functioning, cognitive

16  development, social development, adaptive behaviors or

17  independent living skills necessary for the client to be able to

18  function in the community and, as applicable, vocational

19  skills."

20      Were you aware that that's also included in the ICF/MR

21  regulations?

22  A.   Yes.  In fact, I think none of that says they need to do IQ

23  tests.

24  Q.   Okay.  So cognitive testing and reassessment, that's not an

25  IQ test?

1    A.   If a person comes in and he was screened at DDS for

2    placement and he has -- a community psychologist, for example,

3    has done a full cognitive battery on him, they don't need to

4    redo that.  They need to review it, and they need to make sure

5    that it's current.

6    Q.   You did not actually attempt to evaluate how the state

7    system determines someone's level of mental retardation before

8    they get into CHDC.  Correct?

9    A.   Correct.  I did not.

10   Q.   So for all we know, the state has a horrible system for

11   doing the preadmission screening for intelligence.  Correct?

12   A.   Well, I would not make that assumption.

13   Q.   Okay.  Well, you certainly didn't evaluate it.  Right?

14   A.   Right.  But I did read IPPs.  And you could look at the

15   history of that, because those psychologists carry that history

16   into their IPPs.

17   Q.   You had heard of the Reiss Screen, R-e-i-s-s, Reiss Screen?

18   A.   Yes.

19   Q.   And that's used as a psychopathology screen?

20   A.   Yes.

21   Q.   You had heard of the aberrant behavior checklist, which is

22   a scale?

23   A.   Yes, yes.

24   Q.   It's used to assess problematic behaviors?

25   A.   Yes.

Walsh - Cross                                           6071

1   Q.   When you worked in developmental centers, you actually used

2   the Reiss Screen and the ABC.  Correct?

3   A.   I have used them at times, yes.

4   Q.   You have also used the Motivational Assessment Scale.

5   Correct?

6   A.   Sometimes, yes.

7   Q.   Now, I believe you indicated that, when we are evaluating

8   the care provided by the clinicians here, as long as their

9   judgment seems reasonable, they are considering journals and

10  conferences and the standards in their field, basically that's

11  enough to meet the standards you've established.  Right?

12  A.   No.  There's good and bad practice.

13  Q.   Uh-huh.  But certainly in terms of -- your deference is to

14  allow that to be the process or the guide stick.  Right?

15  A.   Generally, in relation to an ICF/MR, my deference would be

16  to the team, because I think that's where the deference is

17  placed by the ICF/MR regs.

18  Q.   Okay.  But you are also offering an opinion on

19  psychological services and what the psych examiners do and the

20  psychologists do.  Right?

21  A.   Yes.

22  Q.   So let's take a look at what they do, how they are supposed

23  to exercise their judgment.

24  A.   Okay.

25  Q.   Aren't you fairly deferential to their standards, I mean,

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6072

1    to their practice?  As long as they think about it and they

2    opine on something, as long as it's somehow not a grotesque

3    violation of whatever standard you say is out there, you would

4    defer to them.  Right?

5    A.   I'm not sure what you mean by "defer to them."  When I

6    rated their behavior plans, I rated some of them poorly.  And I

7    recognize that there are some -- perhaps some psych examiners

8    there that could use some work to get better plans.  But I

9    believe I stated that in my direct yesterday.

10   Q.   Now, there's a difference between a psychologist who picks

11   between different types of tools available in their field and

12   one who literally doesn't even know about the processes that are

13   available.  Correct?

14   A.   Again.

15   Q.   There's a difference between a judgment that's made based

16   on professional -- let me put it this way.  There's a difference

17   between a professional who uses their judgment to pick between

18   various different types of instruments or tools available to

19   them and a professional who literally doesn't even know that

20   some of these instruments and tools are available.  Right?

21   A.   I would surmise that that would be a difference, yes.

22   Q.   And while you've defended some of their practices and their

23   knowledge, were you aware that some of these professionals at

24   CHDC have literally never heard of some of the instruments that

25   you were able to recite off the top of your head?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                    6073

1   A.   I don't know that.  I don't know what that means.

2   Q.   Were you aware that some of them have never actually been

3   to a conference except the ones that are held at Conway?

4   A.   Well, then they have been to conferences.

5   Q.   Right.  Are you aware that some of them have, for example,

6   no journal subscription at all?

7   A.   That doesn't surprise me.

8   Q.   Okay.  And yet, somehow, through osmosis, or perhaps

9   through your consulting, you seem to indicate in your report

10  throughout that they have this very sophisticated practice, or

11  they have this understanding of what they are doing that -- are

12  you really sure that --

13  A.   Can you point to me where I said they had a very

14  sophisticated practice?

15  Q.   Well, let me put it this way.  Oh, would you disagree?  Do

16  you think they don't have a sophisticated practice?

17  A.   No.  I think I was clear about that.  I was clear that

18  there was a range of practice, that overall the behavior plans

19  were somewhere between average and good, that there was some

20  very good, and there were some that were poor.

21  Q.   Did you know some of the psychologists literally had never

22  heard of some of the basic terms that are used in applied

23  behavior analysis?

24  A.   Well, you are telling me that.  I don't know that for a

25  fact.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6074

1  Q.   And yet, in your evaluation, you concluded, based on what

2  Glenn Gray told you and so forth, that these psych examiners do

3  understand the concepts.  Right?

4  A.   You know, I met with them on several occasions, and I spoke

5  to them as colleagues.  And I clearly recognize that the 11

6  people that were facing me in the room, that there were

7  differential levels of skill and differential levels of

8  understanding.  Some of them had published articles.  Some of

9  them had not.  That's endemic to any group of people that you

10 go -- any group of professionals that you go meet with.

11      So I don't know what you are asking me, because some of

12 them had perfectly intact, I think, fairly fleshed out and very

13 good skills.  And some of them had skills that could have used

14 some work.  But, you know, there were differences in

15 education -- not education -- experience level.  Some had been

16 there 25 years.  Some had been there for five years.  And you

17 would expect some differences like that.

18 Q.   Right.  But one difference at CHDC, for example, is that

19 when you let the master's level psych examiner operate fairly

20 independently, then the care for an individual is going to vary

21 quite a bit depending on level of skill.  Right?

22 A.   But they operate within a team, a unit team, an IDT

23 structure, that talks about certain things.  And they also have

24 a clinical supervisor.

25 Q.   Are you saying --

Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6075

1    A.    A Ph.D. clinical supervisor.

2    Q.    But surely you recognize the IDT team itself is not

3    exercising clinical supervision over psychological judgment.

4    Right?

5    A.    No.  I think they place limits on what psychologists are

6    able to do or expectations for what they should do.

7    Q.    But the people who are doing this are not themselves

8    clinical psychologists, right, except for Dr. Reddig?

9    A.    Correct.

10   Q.    And so the other part of that clinical supervision relies

11   on Dr. Reddig exercising adequate clinical supervision.

12   Correct?

13   A.    Well, I mean, I think that's part and parcel of the ICF/MR

14   model, is that there's a unit responsibility, and there's a

15   professional responsibility.

16   Q.    You know, leaving aside all of the different instruments or

17   the different higher-end techniques that are used in the field,

18   the principles of applied behavioral analysis existed long

19   before the concept of functional analysis.  Correct?

20   A.    Yes.

21   Q.    The *Journal of Applied Behavioral Analysis* goes back to the

22   1960s?

23   A.    Yes.  I think 1964 exactly.

24   Q.    The concept of positive reinforcement can be traced to the

25   1920s?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                6076

1   A.   Yes.

2   Q.   Shaping goes back to B.F. Skinner?

3   A.   Yes.

4   Q.   I think in your deposition you mention something about his

5   pigeon experiments.  What are his pigeon experiments?

6   A.   They are Skinner box experiments, a demonstration of all

7   sorts of behavioral principles.

8   Q.   The concept of chaining goes back to Professor Skinner?

9   A.   Yes, probably even before.  But Skinner probably

10  popularized them in the field, yes.

11  Q.   So these are pretty basic concepts that go back decades?

12  A.   Yes.

13  Q.   And you would agree that the psychology staff at CHDC

14  should have an understanding of applied behavioral analysis

15  principles.  Correct?

16  A.   Yes.

17  Q.   Would it surprise you to find out that a number of their

18  psychology staff literally had never heard of shaping or

19  chaining?

20  A.   That would surprise me, yes.  I'm not sure that it's true,

21  but --

22  Q.   All right.  And the thing is, the thing that's kind of odd

23  about it is, you know, this facility has been reviewed and

24  toured by Justice Department teams, your teams, a number of

25  times.  Right?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                          6077

1    A.    Yes.

2    Q.    Each time people ask questions, and each time they come

3    back with answers.  And then another round of tours occur, more

4    questions, more answers.  Right?

5    A.    Yes.

6    Q.    Is it possible that somebody like Mr. Gray, when he was

7    first interviewed, bungled the definition for "pica," but maybe

8    got a little better about it as time went along?

9    A.    In my view, he could not have bungled it, no.

10   Q.    Do you know what a pica concern is?

11   A.    At CHDC, yes.

12   Q.    Okay.  Is there such a thing in the DSM-IV as the pica

13   concern?

14   A.    It's an abundance of caution is what it is.

15   Q.    Now, you mentioned the treatment teams.  When treatment

16   teams are trying to habilitate people, there are a number of

17   published training modules available.  Correct?

18   A.    In terms of basic skills?  Is that what you are talking

19   about?

20   Q.    All right, yes.

21   A.    Okay.

22   Q.    Okay.  And the answer is yes?

23   A.    Yes.

24   Q.    Okay.  But you do not know if CHDC uses any of the

25   published training programs.  Correct?

Walsh - Cross                               6078

1   A.   Correct.

2   Q.   You did not evaluate how they actually came up with their

3   habilitation program.  Correct?

4   A.   Correct.

5   Q.   And you pointed to the tables, I believe, is what you

6   referred to them as, and the charts.  You agree that when

7   evaluating the effects of treatment psychologists do graph.

8   Correct?

9   A.   Yes.  Well, a portion of them include graphs.

10  Q.   But they may also use scatter plots?

11  A.   I don't know if they use scatter plots.  Scatter plots for

12  many of the behaviors there, given their frequency, may be not

13  very helpful.

14  Q.   They also graph to see if behaviors are responding to

15  medications.  Right?

16  A.   I think they do sometimes, yes.  I did not analyze the

17  content of many of those graphs.  I was looking at the presence

18  or absence of them.

19  Q.   I think this isn't quite clear.  I'm just talking about

20  psychology in general, not Conway.

21  A.   I'm sorry.

22  Q.   Psychologists use graphs.  Correct?

23  A.   Yes.

24  Q.   They will use scatter plots?

25  A.   Yes.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1  Q.   They can use graphs to try to see if behaviors are

2  responding to medications.  Correct?

3  A.   Yes.

4  Q.   Now, you pointed to the table -- and I don't recall

5  offhand -- of a resident who had relatively low frequency

6  behaviors.

7  A.   Yes.

8  Q.   And you indicated this is really self-evident, there's no

9  reason to do more graphing.  Do you remember that?

10  A.   Yes, yes.

11  Q.   But there are also charts throughout this case where people

12  have very high frequency behaviors.  Did you have an example in

13  your testimony where someone had say -- I don't know -- a

14  trendline through the graph?

15  A.   I don't believe in my testimony I did, no.

16  Q.   Right.  As a matter of fact, in your testimony you didn't

17  actually use any exhibits at all from the records.  Right?

18  A.   No.  I showed sheets.  I showed some examples from the

19  record, right.

20  Q.   But that's from the report.  But otherwise, there are no

21  exhibits in support of your opinion.  Correct?

22  A.   I'm not sure how to answer that.

23  Q.   Okay.  You know, in some ICF/MRs, teams put people on a

24  drug holiday to parse out the effects of medications on

25  behavior.  Right?

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1   A.   Yes.

2   Q.   You did not actually look into whether CHDC uses drug

3   holidays.  Right?

4   A.   I did not.

5   Q.   Again, I probably asked this, but I have to make sure.  You

6   didn't evaluate anything having to do with medications.  Right?

7   A.   Correct.

8   Q.   And even your own data only shows that staff on two of the

9   treatment units are doing these types of tables.  Right?

10  A.   You mean graphs or tables?

11  Q.   Let me put it this way.  Graphs.  I will start with graphs.

12  A.   I think the graphs I identified in those monthly summaries

13  were from two units.

14  Q.   So there are two treatment units where are they doing some

15  graphing?  Right?

16  A.   Correct.

17  Q.   Effectively, though, it was really those two or three of

18  the examiners graphing.  Right?

19  A.   Well, I think because in the other units they have a

20  relatively low rate of behaviors.

21  Q.   But overall at CHDC, only two or three examiners are doing

22  any graphing at all?

23  A.   I don't know that.

24  Q.   If we could look at your deposition, at page 291, line 15.

25       The question was:  "Now, other teams may tabulate the data,

Walsh - Cross                                        6081

1   but only two teams are graphing the data?

2        "Answer:  Yes.

3        "Question:  Did you break it down by psych examiners to see

4   whether it's only one or two psych examiners were actually

5   graphing data?

6        "Answer:  No, I did not.  But, you know, there's psych

7   examiners, there's roughly two to a unit.  There was 11 of them,

8   so there's five units -- probably two, two or three."

9        That was your answer?

10  A.   Yes.

11  Q.   And although you said that those other units have low

12  frequency behaviors, do you know that for an absolute fact?

13  A.   No.

14  Q.   All right.

15  A.   You know, you are asking me questions about an analysis

16  that I did not do, so --

17  Q.   Right.  Okay.  In general, in evaluating whether mechanical

18  restraint use has gone down at CHDC, you basically did not try

19  to determine how much of that was due to successful behavior

20  approaches being used or just some other factors, such as

21  changes in medications.  Right?

22  A.   Say it again.

23  Q.   When evaluating whether mechanical restraint use had gone

24  down at CHDC, you did not try to determine how much of that was

25  due to successful behavioral approaches versus changes in

Walsh – Cross                                        6082

1   medication.  Correct?

2   A.   Those two things only?  I mean, are you implying they are

3   the only two things?

4   Q.   I'm just asking if you tried to --

5   A.   No.  I looked at the general reduction in restraints.

6   Q.   You didn't try to parse out what was causing it.  Right?

7   A.   Correct.

8   Q.   Even though in your report you claim it's because

9   behavioral programs are working.

10  A.   Well, that's clearly one factor.  But, you know, I think

11  you are incorrect in your characterization of the way behaviors

12  change.  There's probably a whole panoply of effects there.  One

13  could be the general refocusing of the facility away from

14  restraints so that restraint use may be reduced not directly

15  because of the behavior plan but also because there is a new

16  understanding of where the facility wants to go.  So a lot of

17  effects -- it could be changes in medication as well.  I'm not

18  sure that's the point.  The point is that behavior plans are

19  ongoing.  They have fairly positive outcomes.  And at the same

20  time, restraint is being drastically reduced.

21  Q.   Let's take a look at your report at page 102, where you

22  again had one of your sample cases, JS.  Now, you've talked

23  about how the behavior reports have all this useful information

24  that you would expect to see, a psychologist would be able to

25  utilize.  Right?

Walsh - Cross                                        6083

1   A.    I don't know what I said about -- I don't know what all

2   this useful information is.

3   Q.    You seem to have a favorable opinion about the behavior

4   reports.  Correct?

5   A.    Behavior reports meaning --

6   Q.    The form.

7   A.    Yes, okay.

8   Q.    For example, here you have JS.  And they have a table of

9   the incidents of all symptoms for her disorders.  There's no

10  breakdown, for example, by the time.  Correct?  It's just the

11  date or the month.

12  A.    Correct.

13  Q.    Actually, it doesn't even go by date.  It says "month."

14  Right?

15  A.    Correct.

16  Q.    There's no breakdown by, you know, what particular unit

17  where any of these incidents occurred.

18  A.    Correct.

19  Q.    There's no breakdown by what staff are present or what

20  other residents are involved.  Right?

21  A.    But the psych examiner has reviewed every single behavior

22  report that produced that.

23  Q.    And yet, in one of the few things you point to as a graph

24  or table, there's nothing here that shows that any of that

25  behavior report information is being graphed or tabled.  Right?

Walsh - Cross                                        6084

1    A.   This graph or table is a representation of a pile of

2    behavior reports --

3    Q.   Right.

4    A.   -- that the psych examiner has reviewed.

5    Q.   But this section here is about the way they track and

6    monitor the behaviors.  I mean, if you are going to have an

7    example of someone doing good graphing or tabling or doing

8    useful things with the BR, you would think it would be in this

9    report.  Right?

10   A.   Not necessarily.  If the psychologist who did this, Ms.

11   Cooper, did this, and she knows that these, whatever they are

12   tracking here, these incidents of SIB, because she's tracked

13   them, that 90 percent of them occur in the morning, then she

14   knows it.

15   Q.   I'm probably going to get rushed, so at this point, you

16   know, let's just move on.  I have probably overdone the graphing

17   issue.

18        The behavior plan quality rating tool you used is of your

19   own making?

20   A.   Yes.

21   Q.   Now, you talked about interrater reliability when you had

22   different raters rate the tool.  Right?

23   A.   Yes.

24   Q.   You basically used -- was it five or six people?

25   A.   Five.

1    Q.   Five raters.  And these were all people whom you either

2    know or who were employees or colleagues of people you know.

3    Right?

4    A.   Yes.  I didn't know all of them, or one of them I did not

5    know -- two of them I did not know.

6    Q.   They included your friends and employees of your company.

7    Right?

8    A.   Yes.

9    Q.   Now, I think you actually volunteered this.  But the

10   interrater reliability in this case turned out to just be

11   69 percent for your tool.  Right?

12   A.   Yes.

13   Q.   Now, if it were to be sold as a commercial tool, you would

14   actually need a significantly higher level of reliability.

15   Correct?

16   A.   Something maybe north of 85 percent.

17   Q.   Right.

18   A.   But that number, 69 percent, would get you an article

19   published on it.

20   Q.   And the bottom line is, in the end, the person who actually

21   walked through the facility with the tool examining things was

22   you.  Right?

23   A.   Yes.

24   Q.   You didn't have one of your five --

25   A.   No.

Walsh - Cross                                    6086

1    Q.    -- friends, colleagues?

2    A.    They saw one protocol.

3    Q.    And at least some of the questions on your tool would be

4    really, really hard for there ever to be disagreement on.  For

5    example, if you list name of the person, that's probably going

6    to come close to a hundred percent between different raters.

7    Right?

8    A.    Well, actually I've seen plans without people's names on

9    them.

10   Q.    Right.  That's always possible.  But certainly between

11   raters -- you know, but it would be truly amazing if they had no

12   names on any of their reports.

13   A.    Fair enough.

14   Q.    And I believe you testified already that there were no

15   treatment fidelity measures for any of the plans reviewed, but

16   you just don't think that's a big problem there.  Right?

17   A.     I think that's a growth point is what I said yesterday.  I

18   said I understand the value of that, but it's not common

19   practice.

20   Q.    It's just not serious enough for it to warrant any type of

21   relief from the Court.  Right?

22   A.    I would think not.

23   Q.    Okay.  You know, I think you may be confusing the

24   difference between a standard and implementation, because I

25   believe you just said that a lot of places don't have treatment

Walsh - Cross                                6087

1   fidelity, therefore it's not required.  Isn't that what you are

2   basically saying?

3   A.   I don't believe I said that.

4   Q.   Okay.

5   A.   Or I didn't mean to say that.

6   Q.   Because, you know, it's like -- I don't know -- a speed

7   limit.  A lot of people ignore the speed limit.  But if anyone

8   asks what the standard is, that's still the standard.

9   Fifty miles per hour is the speed limit.  Right?

10  A.   I don't believe having treatment integrity measures is a

11  standard.  That's your term.  I think it would be a good idea,

12  and it would make for better plans.

13  Q.   Okay.  You actually, for example, cite some articles in

14  your report about why supposedly treatment integrity measures

15  are necessary but not really widespread or something like that.

16  But at best, you are just claiming that they suggest adoption of

17  such measures has been slow.  Right?

18  A.   Yes.

19  Q.   This article doesn't necessarily say you don't have to do

20  it.

21  A.   Correct.

22  Q.   As a matter of fact --

23  A.   That was the point.  That was the point of my including

24  those articles.

25  Q.   As a matter of fact, your citations are to articles where

Walsh - Cross                                        6088

1    the writers actually recommend treatment fidelity measures.

2    Right?

3    A.    Likely they do, yes.

4    Q.    Now, there's one difference between CHDC and other folks,

5    because CHDC has actually been warned by a number of people that

6    they should adopt treatment fidelity measures.  Right?

7    A.    I don't know who warned them, no.

8    Q.    Do you think that matters?  You know, if you get a warning

9    that you should do something and you still ignore it, don't you

10   think that should be telling?

11   A.    From --

12   Q.    Say the Justice Department or Justice Department

13   consultants.

14   A.    I mean, I think that -- if you think the Justice Department

15   consultants should go into facilities and start managing the

16   practices there, I don't know how to respond to that, because

17   I'm not sure if I were a psychologist in that situation that I

18   would listen to you either.  You know, I would go to my boss,

19   and I would go to my clinical supervisor.

20   Q.    All right.

21   A.    You know, you are there.  You are there to review their

22   practices and not to supervise them or to change their practice.

23   I went as a consultant paid to do that.  They pay attention.

24   Q.    Now, even though you don't think it's really something that

25   has to be done, you chose to include this on your assessment

Walsh – Cross                                           6089

1    tool when you went in.  Right?

2    A.    Yes.  I mean, it's probably there because such a big deal

3    was made out of it.

4    Q.    Uh-huh.  The ability to make changes, that was one of the

5    administrative elements of the plans that you looked at under

6    your assessment tool.  Right?

7    A.    Yes.

8    Q.    Now, do you know if anyone has specifically raised that

9    issue, of the ability to make changes, as an issue in this case?

10   A.    No.

11   Q.    And you included that, too, and they don't do it?

12   A.    Well, you know, it's a sign of perhaps a more sophisticated

13   plan in my view, if there's the ability to make changes without

14   having to, say, go back through the team machinery.  So if you

15   can write that into a plan, then it becomes more useful.

16   Q.    So you basically are saying that you included on your

17   rating tool things that are sort of useful but that you didn't

18   really think were required?

19   A.    No.  Things that I thought were important for good plans.

20   Q.    Isn't it more likely that you included these items because

21   they are actually required, but in this particular case CHDC

22   just didn't meet them, and now you have to explain why they

23   didn't meet them?

24   A.    No.  I didn't use a set of standards to write these items.

25   I wrote those items based on my experience and knowledge of

Walsh - Cross                                    6090

1    applied behavior analysis in the field.

2    Q.   You have never run any of the behavioral plans at CHDC by a

3    clinical psychologist to see if they might actually agree with

4    your ratings.  Correct?

5    A.   I'm sorry.  Say it again.

6    Q.   You have never run any of these behavioral plans by a

7    psychologist, by a clinical psychologist, to see if they might

8    agree with your ratings.  Correct?

9    A.   So did I do a post-hoc reliability study?  Is that what you

10   are asking me?  No.

11   Q.   I think the question is very simple.  It's a simple "yes"

12   or "no."  Did you ever do this?

13   A.   You mean a psychologist at the facility or an independent

14   psychologist?

15   Q.   Independent clinical psychologist.

16   A.   No, I did not.

17   Q.   And your own behavior -- I keep forgetting what it's

18   called.  I'm sorry.  The behavior plan quality rating tool has

19   never been validated in a peer-reviewed journal.  Correct?

20   A.   Correct.

21   Q.   And the only other times you've used this tool has been in

22   litigation.

23   A.   Correct.  But it wasn't even in this format.

24   Q.   Right.

25   A.   It was in, you know, pre-format.

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

1   Q.   You used it in *Southbury*?

2   A.   Something similar, yes.

3   Q.   Did Southbury also have, you know, a few things they

4   weren't quite in agreement with, but other things they were

5   doing fine?

6   A.   I don't recall.

7   Q.   Now, although we may disagree on what a functional

8   assessment is, you do agree that a functional assessment is a

9   necessary element of a behavior program.  Correct?

10  A.   Well, it's an important element.  It will become necessary

11  when somebody puts it into a standard.

12  Q.   So didn't you say functional assessments are part of the

13  ICF/MR regulations and that those are part of the standard?

14  A.   No, no, no, no.  That was Dr. Matson that confused

15  functional behavior assessment with the overall comprehensive

16  functional assessment, not me.

17  Q.   I see.

18  A.   The ICF/MR standards do not include functional behavior

19  assessment.  They include an overall comprehensive functional

20  assessment that's interdisciplinary in nature that's done within

21  30 days of admission and then annually updated thereafter.  It's

22  quite different than a functional behavior assessment.

23  Q.   Okay.  And a functional assessment, or functional

24  behavioral assessment, as we're talking about in this case, even

25  though it's something that they should do, that hasn't been

Walsh - Cross                                        6092

1    adopted widely enough for it to be a standard.  Is that your

2    view?

3    A.   It's -- well, I don't know any body of standards that

4    includes it is the problem.  So until there's some body of

5    standards, you have to like go on what most people do.  And

6    functional behavioral assessments are starting to appear in very

7    many behavior plans.  And in the applied world, they are still

8    indirect, and they are still descriptive.

9    Q.   So basically, again, your argument is a lot of people break

10   the speed limit, and so it's not really --

11   A.   No.  You are saying that there is a speed limit, and I'm

12   saying I'm not sure that there is one.  So, you know, it's

13   entirely possible -- it's entirely possible that somebody could

14   do an excellent behavior plan without doing a functional

15   analysis.

16   Q.   Let's take a look at your deposition at page 110, line 14.

17        "Question:  You would agree, however, that having a

18   functional behavioral analysis or functional assessment is a

19   necessary element of a behavioral management program.  Correct?

20        "Question:  It's on this form, so would you agree with it?

21        "Answer:  For the most part, yes.  I mean, I can envision

22   situations where you may not need that if you have -- I have a

23   colleague in New Jersey, for example, who works at a residential

24   setting.  And they do have people -- they do -- they have people

25   who do -- Lesch-Nyhan individuals.  And they have them 24 hours

Walsh - Cross                                    6093

1    a day, 24/7, so they're constantly tracking their behavior.

2    Well, I mean, you can envision there that any given behavior

3    plan, that a functional analysis may have been done in the past,

4    and they know the person so well that they know where they're

5    going.  So, you know, that's a special setting.  It's like in

6    general practice in an ICF, there should be some attempt to

7    identify the function of the behavior, yes."

8         It's a pretty long answer.  But the bottom line is, for the

9    most part, yes.  Right?  That's your answer.

10   A.   Yes.  But without -- you don't have to do a formalized

11   F-A-S-T or M-A-S to get to the function of the behavior.  If you

12   know the person intimately and you've been working with them for

13   25 years, you may very well know the function of the behavior.

14   Q.   But the question at that time wasn't about us, you know,

15   doing a general assessment.  We used very specific language.  I

16   mean, we're talking about functional behavior analysis.  Right?

17   A.   No.  I'm saying that I can envision a behavior, a psych

18   examiner writing a behavior plan and already knowing the

19   function of the behavior, that the function of the behavior is

20   clear.

21   Q.   Assessing the function of the behavior is the foundation of

22   how to respond behaviorally.  Correct?

23   A.   Yes.

24   Q.   And even though you tend to distinguish experimental

25   functional analysis and functional assessments the way they do

                   Elaine Hinson, RMR, CRR, CCR
                   United States Court Reporter

Walsh - Cross                                      6094

1   it at CHDC, you would agree that if they actually did an

2   experimental functional analysis that might be the better

3   practice.  Right?

4   A.   Yes.  Except that there are some problems with that, as I

5   iterated yesterday.

6   Q.   But it's still the better practice potentially.

7   A.   Well, it's the better practice because it produces a less

8   ambiguous answer.  But, you know, in some sense, in some cases

9   it could be an experiment that you really don't want to do

10  because it causes people problems.

11  Q.   All right.  Not only would an experimental function

12  analysis potentially be the better practice, it can actually

13  produce better outcomes.  Correct?

14  A.   Yes.

15  Q.   It could even reduce restraint use.  Correct?

16  A.   Say it again.

17  Q.   It could even reduce restraint use?

18  A.   It's conceivable that it could, yes.

19  Q.   All right.  You know, if we were truly literal about doing

20  least restrictive analysis or doing the least restrictive types

21  of procedures, wouldn't we almost be obligated then to use

22  experimental functional analysis?

23  A.   That's your formulation.  I don't think I can agree with

24  that.

25  Q.   You do realize that neither Dr. Matson nor Dr. Manikam

1  really require an experimental functional analysis.  Correct?

2  A.   I absolutely understand that, yes.

3  Q.   And you do understand many of the tools that they are

4  talking about are used in ICF/MRs around the country?

5  A.   Yes.  What I don't understand is their lack of recognition

6  of the quality of the worksheet that's already in use.

7  Q.   By the way, when you rated the functional assessments at

8  CHDC, were you using the behavior plan quality rating tool?

9  A.   No.  I was using what I described in text, described to you

10 in my testimony.

11 Q.   It's something different?

12 A.   They were ratings.  I was doing ratings of the quality of

13 the functional assessment from the description of the functional

14 assessment in the behavior plan.

15 Q.   So when you were using that tool, or whatever you were

16 using to evaluate functional assessments, did you run it through

17 this five-person agreement check --

18 A.   No.

19 Q.   -- that you used?  And no one else besides yourself

20 assessed the quality of those functional assessments.  Correct?

21 A.   Correct.

22 Q.   Even the ratings of unacceptable, poor, average, good, or

23 excellent are basically scores that you are basing on some

24 internal scale?

25 A.   Well, it's a scale I wrote down in my report.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                    6096

1    Q.   Right.  But it's basically, in the end, what your gut tells

2    you or what you think.  Right?

3    A.   Well, no.  I think when a person develops a set of criteria

4    and writes it down, then it ceases to be what your gut tells you

5    and becomes more of a formalized rating.

6    Q.   All right.  If we could look at page 248 of your

7    deposition, line 22.

8        The question was:  "Did you have a definition for what was

9    considered unacceptable, poor, average, good, or excellent?"

10       "Answer:  It's my internal scale.  I rated all of the

11   reports probably in the course of two -- two days, and did them

12   all at once.  And I, you know, made a judgment so that they were

13   compared to -- among themselves in some sense.  And I made those

14   quality ratings.  They're my ratings."

15       That was your answer.  Correct?

16   A.   Yes.

17            MR. CHENG:  Okay.  May I approach, Your Honor?

18            THE COURT:  You may.

19   BY MR. CHENG:

20   Q.   You cited articles by Hanley, Iwata, and McCord in your

21   report.  Right?

22   A.   Yes.

23   Q.   And I think you were suggesting that this is one of those

24   articles that show that functional analysis isn't really a

25   standard.  It still has to be adopted.  Correct?

1    A.    I don't think that was the intent of it at all.

2    Q.    Okay.  Well, let me ask you this.  Well, let me put it this

3    way.  You tried to clump some of the practices that CHDC uses

4    with Dr. Matson's practices and suggested that CHDC's practices

5    are perfectly fine, given this article from Dr. Iwata.  Right?

6    A.    No.  I think what I said is that this article represented

7    functional assessment as -- their preference was for functional

8    analysis.  And it lumps together indirect and descriptive

9    techniques and actually did not consider them in its review.  So

10   it recognized their existence, because they have a tendency to

11   be in existence in the applied world, because they are doable.

12   And it further said that they aren't optimal techniques.

13        So I guess maybe that's what you meant by clumped together.

14   But my intent was to show that neither of them are function --

15   rise to the level of a functional analysis, but both of them,

16   okay, occupy the same space relative to a functional assessment.

17   Q.    Here's the thing.  You know, I think this is an article

18   that actually suggests that many of the basic concepts that Dr.

19   Matson and Manikam want are purely widely established.  And what

20   you may be arguing is more, you know, something that takes a

21   very confusing, complex, high-end debate, and try to suggest,

22   you know, there's no agreement even on the fundamentals.  Isn't

23   that what you are really trying to say?

24   A.    Absolutely not.

25   Q.    Okay.  Well, let me point you to the very first paragraph.

1  The first paragraph says:  "Functional analysis methodology

2  identifies variables that influence the occurrence of problem

3  behavior and has become a hallmark of behavioral assessment

4  (see the special issue on functional analysis in the *Journal of*

5  *Applied Behavior Analysis*, JABA, 1994, Volume 27).  Prior to the

6  advent of functional analysis approaches to assessment, problem

7  behavior was typically treated by superimposing powerful

8  arbitrary contingencies of reinforcement or punishment over

9  existing but often unknown sources of reinforcement for problem

10 behavior (Mace, 1994).  By contrast, by identifying

11 contingencies that currently maintain problem behavior, relevant

12 consequences and their associated discriminative stimuli (SDs)

13 and establishing operations (EOs) may be altered to reduce

14 problem behavior.  In essence, functional analysis methodology

15 reemphasized the importance of applied research in contributing

16 to an understanding of the determinants of behavior as the basis

17 for identifying effective treatments that produce generalized

18 results."

19      Do you see all that?

20 A.   Yes.  I don't believe I said anything in my testimony

21 against that.

22 Q.   But here's the thing.  A lot of this stuff is very

23 technical.  And a layman looking at it perhaps -- would you

24 agree that a layman might find a lot of it was well over their

25 head?

Walsh - Cross                                    6099

1  A.   Yes.

2  Q.   Okay.  And so you can take this article and claim it says

3  what you say, and a layman is going to have a hard time arguing

4  with you about that.  Right?

5  A.   Well, first thing, I have a Ph.D., so I'm sort of entitled

6  to cite research literature.  And second thing, I think all I

7  did is I took a simple quote out of there.

8  Q.   Right.  You took one quote out of a very complex article

9  that runs -- how many pages was this article?

10 A.   I have tons of these.

11 Q.   Right.  This page (sic) runs, what, 32 pages?  It's talking

12 about very high-end statistical analysis.  It's talking about

13 different ways of approaching functional analysis.  It is not

14 arguing about whether functional analysis is required.  These

15 are researchers who have already made a lot of assumptions about

16 the standard of care when they apply it in research.  Right?

17 A.   I think they are talking about functional analysis.  But I

18 don't know -- I mean, maybe I'm misinterpreting your

19 implication.  But are you saying I'm attempting to obfuscate the

20 nature of what's in that article relative to what happens at

21 CHDC?

22 Q.   Let's take a look at the preface at the very top.

23      "Functional analysis methodology focuses on the

24 identification of variables that influence the occurrence of

25 problem behavior and has become a hallmark of contemporary

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                          6100

1   approaches to behavioral assessment."

2   A.   Yes.

3   Q.   "In light of the widespread use of pretreatment functional

4   analyses in articles published in this and other journals, we

5   reviewed the literature in an attempt to identify best practices

6   and directions for future research."

7   A.   Yes.

8   Q.   Do you see that?

9   A.   This is why I went to the facility and I said, "You need to

10  have a functional assessment piece," and gave them one.

11  Q.   Right.  So seven years ago, they are talking about research

12  that dates back to the mid-nineties.  And even then they are

13  talking about it being widespread and used.  They are talking

14  about it being something that can be applied and be used to

15  generalize results.  Right?

16  A.   Yes.

17  Q.   But in your view, doing a functional analysis is something

18  that people can do or should do?

19  A.   You are mischaracterizing my view, sir, because I also

20  cited the article by Tarbox in 2009 in my report, which says

21  that in the practical world, okay, in applied settings, it is

22  common to find in use indirect functional assessments and

23  descriptive functional assessments, precisely the kind that, A,

24  Dr. Matson recommended and, B, is currently in use at the

25  facility.

Walsh - Cross                                          6101

1   Q.   In the real world, we see people driving five miles over

2   the speed limit and people driving at 50 miles per hour, when

3   the speed limit -- we don't confuse that with what the general

4   practice is, though.  Correct?

5   A.   The general practice --

6              THE COURT:  It's okay.  I've got your point.  Really,

7   I've got the point that you were making, and I think it's really

8   not fruitful to just continue on this line, which is I think

9   destined to degenerate into an argument.  And I don't think

10  that's what you intend, and I don't think it's going to help me

11  decide the case.

12             MR. CHENG:  I apologize.

13             THE COURT:  It's okay.  It happens all the time.  I

14  don't mean to suggest that somehow you've done something

15  inappropriate.

16  BY MR. CHENG:

17  Q.   I think we've dealt with some of the analysis of the plan

18  outcomes.  Let me just ask, you only had data for 24 of the 30

19  individuals.  Is that right?

20  A.   Yes.

21  Q.   And the data came from the monthly progress notes?

22  A.   Yes.

23  Q.   Now, you used age divisions of up to 22, 20 to 50, and 50

24  or over.  Correct?

25  A.   Yes.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6102

1    Q.   Those were just divisions you picked.  Correct?

2    A.   Yes.

3    Q.   And in this case, for example, you didn't specifically

4    focus on people who were 18 or younger, the way the department

5    has.  Right?

6    A.   The department?  Your department?

7    Q.   Our department.

8    A.   No.

9    Q.   Right.  And there's -- it's a little bit arbitrary where

10   the age breakoff is when you pick that type of breakdown.

11   Correct?

12   A.   Yes.  I used that breakdown because it divides children

13   eligible for educational services from adults.

14   Q.   And when you were looking at the levels of restraint use,

15   you did not look at medical restraints.  Correct?

16   A.   No.  For medical reasons, for the kind --

17   Q.   Do you know if Conway has different categories for

18   restraints that categorize the restraints in different ways?

19   A.   I think they do.

20   Q.   Do you know what the categories are?

21   A.   Yes.  I think they have medical, safety restraints, and

22   planned restraints, emergency restraints.

23   Q.   Did you ever hear of something called a protective

24   restraint?

25   A.   I used the term "safety restraint" for that.  That would be

Walsh - Cross                                  6103

1    the same thing, I believe.

2    Q.   And that's different from a planned or programmatic

3    restraint?

4    A.   Well, it's not considered a restraint that's related to

5    behaviors.  It's related to ongoing, keeping the person safe.

6    Q.   So you were focusing on the planned restraints, or did you

7    look at safety restraints too?

8    A.   I looked at emergency restraints and planned restraints.

9    Q.   You did not independently assess whether medical restraints

10   were properly classified as such.  Correct?

11   A.   I did not.

12   Q.   You did not systematically evaluate whether there was a

13   change in one-to-one or enhanced supervision over time at CHDC.

14   Correct?

15   A.   I'm sorry.  I missed that.

16   Q.   You did not evaluate systematically whether there was a

17   change in one-to-one or enhanced supervision over time at CHDC.

18   Correct?

19   A.   Correct.

20   Q.   You did not evaluate whether there was an increase in

21   medication use or chemical restraints.  Correct?

22   A.   Correct.

23   Q.   When you evaluated the injury data, you used the quarterly

24   incident reports.  Correct?

25   A.   Correct.

Walsh - Cross                                      6104

1    Q.   And you do not know if all of the marks reports are

2    incorporated into the incident reports.  Correct?

3    A.   I believe they are.

4    Q.   Actually, at the time of your deposition, you did not know

5    that.  Right?

6    A.   Well, I believe I asked the people during the interview,

7    and she said they were.

8    Q.   So that basically relies on the accuracy of what you were

9    told?

10   A.   Yes.  But I was told that by the person who prepares those

11   reports.

12   Q.   You certainly do not know for certain that all the marks

13   data goes into the IRIS.  Correct?

14   A.   I didn't do an independent assessment of that.  I was told

15   that.

16   Q.   Do you remember we talked about TC yesterday?

17   A.   Yes.

18   Q.   Did you know that to deal with his self-injury staff had

19   him sit as long as he can tolerate in a chair in a back room?

20   A.   To what?  To deal with his injury?  To deal --

21   Q.   Staff had him sit as long as he can tolerate in a chair in

22   a back room -- did you know that -- to deal with his

23   self-injury?

24   A.   No.

25   Q.   Do you recall that I asked you how many hours he was being

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                              6105

1  kept in the chair and that was something that you did not know?

2  A.   Yes.  I'm sorry.  I don't know what you are referring to.

3  Q.   Okay.  Why don't we take a look at page 273, line 5.

4       "Question:  Do you know how much time he was spending in

5  that chair?

6       "Answer:  I think he was spending a lot of time in that

7  chair.

8       "Question:  Did they track how many hours he was spending

9  in the chair?

10       "Answer:  I don't know.  This was sort of an anecdotal

11  narrative, that she was telling me this story."

12       That was your answer at the time.  Right?

13  A.   Yes.  The reason I didn't understand you is because you

14  said that he was sitting in that chair because of his

15  self-injury.

16  Q.   Right.

17  A.   And my recollection of that testimony at my deposition was

18  in relation to the story that RL told me, the staff person, told

19  me about him and how they moved him from being a social isolate

20  to being socially included.

21  Q.   But this was one potentially restrictive measure that was

22  not apparently included in your data.  Right?

23  A.   Well, I wouldn't call that -- it's not a restrictive

24  measure.

25  Q.   I see.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                          6106

1    A.   They were giving him a place to sit.  They were getting him

2    off the floor into a chair, and they were moving the chair

3    closer and closer to other people.

4    Q.   So putting him in a back room with a chair until he can

5    demonstrate -- I don't know -- that he's calm, that's not a

6    restrictive measure?

7    A.   No.  He couldn't tolerate being with other people.

8    Q.   So they put him in a chair?

9    A.   No.  He had a room to himself so that he would become, you

10   know -- if anything, it's what you spoke about before.  It's a

11   shaping and chaining operation to get him to become social.

12   Q.   Did you examine the room?

13   A.   No.

14   Q.   Okay.  Let's talk a little bit about the -- when we talk

15   about the level of staffing at CHDC, you did not actually do a

16   staffing study yourself.  Is that right?

17   A.   Correct.

18   Q.   When it comes to the number of direct care staff, you don't

19   actually know what percentage of the staff are float staff.

20   Correct?

21   A.   Correct.

22   Q.   Or even how many there are?

23   A.   Correct.

24   Q.   And you based your opinion on how the QRGs are used, the

25   quick reference guides are used, based on an interview with

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1   Sarah Murphy.  Is that right?

2   A.   Yes, among other individuals there that I spoke to

3   informally and my own knowledge.

4   Q.   And when you were looking at this consumer satisfaction

5   survey --

6   A.   Yes.

7   Q.   -- the one that's in your report was basically the

8   information you incorporated from the state.  Right?

9   A.   Yes.

10  Q.   This survey is not something they do regularly.  Right?

11  A.   I don't know how regularly they do it.  The data was from

12  2008.

13  Q.   They also don't compare satisfaction with satisfaction in

14  the community.  Right?

15  A.   No.  I would think that would be beyond their scope.

16  Q.   And a survey like this is, at best, going to look at

17  subjective satisfaction, but is not really a measure of the

18  quality of services.  Correct?

19  A.   I think those two parts of your statement don't go

20  together.  I think if something is a measure of satisfaction,

21  then at some level it's a measure of quality.

22  Q.   But it's not a direct measure of quality.  Right?

23  A.   It's a direct measure, yes.  People who have written about

24  quality consider consumer satisfaction as an extremely important

25  measure of quality.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1  Q.   Did CHDC ever separately tabulate whether people who had

2  just left CHDC were more satisfied in the community than CHDC?

3  A.   I don't know.  I have not seen any results, I don't

4  believe, of that.

5  Q.   Let me talk a little bit about clinical supervision.  Did

6  you know that Dr. Reddig at one point left CHDC?

7  A.   Yes.  I was aware of that.

8  Q.   On a day-to-day basis, though, when Dr. Wyrick was at CHDC

9  covering for Dr. Reddig, he was not functioning as a supervisor

10 for the psych examiners.  Correct?

11 A.   I don't know how he was functioning.

12 Q.   He was just handling paperwork?

13 A.   I don't know.  It was after I did my tour.

14 Q.   Okay.  Do you remember we talked about how you destroyed

15 your -- threw away your handwritten notes, but you transcribed

16 them?

17 A.   Yes.

18          MR. CHENG:  May I approach, Your Honor?

19 BY MR. CHENG:

20 Q.   Do you recognize Government Exhibit KW-8?

21 A.   Yes.

22 Q.   Those are your transcribed notes?

23 A.   Yes.

24 Q.   If you can turn to Bates page US-CON-D-10126?

25 A.   26?

Walsh - Cross                                    6109

1   Q.   Yes.  Do you see the third paragraph?

2   A.   Yes.

3   Q.   "Changes in psych examiner complement at CHDC.  Tom

4   Umphress retired, Reddig resigned/moved, and Elizabeth Glenn

5   came on.  She is experienced, having worked before at CHDC and

6   at another developmental center.  The facility has a part-time

7   doctoral level individual coming from another DC.  Dwight is

8   acting chief on campus, and the vacant chief position is being

9   filled."

10       Do you see that?

11  A.   Yes.

12  Q.   When you say there was a part-time doctoral level

13  individual coming from another DC, would that be Dr. Wyrick?

14  A.   Yes.  I imagine it was.

15  Q.   And, as you indicated, during your tour he was not there

16  yet, so you didn't actually know what he was doing.

17  A.   Right.

18  Q.   So at least during your tour, there was no Ph.D.

19  psychologist supervising CHDC.

20  A.   Correct.

21  Q.   Did you know that before the Justice Department or at the

22  very early stages of its investigation -- well, nevermind.  I

23  won't go there.  It's not fair, so I'll move on.

24       Even when Dr. Reddig was at CHDC, wasn't he functioning

25  more as an administrator than as a clinical supervisor?

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6110

1   A.   I think he has an administrative position in which he

2   functions as the clinical supervisor of the psych examiners.  I

3   think that's a common arrangement in facilities like CHDC.

4   Q.   Uh-huh.  There's an ambiguity, but let me ask.

5        If we go to page 267 of your deposition, line 8, the

6   question was:  "He has his own caseload.  He doesn't supervise

7   any of the other examiners clinically.  Correct?

8        "Answer:  No.  Although I think he's acting, though, in the

9   loss of Dr. Reddig.

10       "Question:  I think it's Dr. Wyrick is the acting

11   psychologist?

12       "Answer:  Yes.  But day to day, I don't know if he

13   supervises them.  He probably does the paperwork."

14       So is it Dr. Wyrick or Dr. Reddig that you are indicating

15   just does the paperwork and doesn't really supervise the psych

16   examiners?

17   A.   Repeat your question again.

18   Q.   For that particular answer that you were giving about the

19   person who is doing the paperwork and doesn't supervise the

20   psych examiners, are you talking about Dr. Reddig, or are you

21   talking about Dr. Wyrick, or both?

22   A.   Well, it disappeared off the screen.  So I believe what I

23   was saying is that that person doesn't carry a caseload, but

24   somebody has to sign off on the people who are not licensed to

25   practice independently, the five or so people, psych examiners.

Walsh - Cross                                          6111

1   So Dr. Wyrick would be signing off for those people.  That was

2   my understanding.

3   Q.   You did not actually evaluate the quality of the objectives

4   that were established in the IPPs.  Correct?

5   A.   Correct.

6   Q.   And you did speak with Kenneth Priest.  Is that right?

7   A.   Yes.

8   Q.   And when you did, it concerned you that under the point

9   system he was using kids might be kept from school due to

10  behaviors.  Correct?

11  A.   That's what we were discussing, yes.

12  Q.   But it was actually a concern to you.  Correct?

13  A.   Yes.

14  Q.   You also talked during your testimony about peer review.

15  During the peer-review process that the psychologists use, it is

16  basically the psychologists themselves looking at each other's

17  work.  Right?

18  A.   Yes.

19  Q.   And is Dr. Reddig or Dr. Wyrick ever involved in that

20  process?

21  A.   Dr. Reddig was, yes.

22  Q.   So he attends every peer-review meeting?

23  A.   My understanding is he was the chair.  I don't know how

24  many he attended.

25  Q.   Some of the psych examiners are not licensed to practice

Walsh - Cross                                        6112

1    independently.  Correct?

2    A.    Yes.

3    Q.    When we talk about active treatment, you did not actually

4    evaluate the level of active treatment.  Right?

5    A.    Correct.

6    Q.    If we could take a look at 112 through 113 of your report.

7    Are you suggesting that the categories that are listed under the

8    contents of IPPs are all habilitation?

9    A.    Say it again.

10   Q.    Are you suggesting that because there are these contents in

11   an IPP every single thing listed there counts as habilitation?

12   A.    Well, I mean, typically we don't think of medical services

13   as habilitation or nursing services.  But, you know,

14   habilitation is the development of skills to improve somebody's

15   quality of life.  So whichever of those components would do

16   that, then it would be an element of habilitation.

17   Q.    But you seem to suggest that Dr. Manikam's lack of

18   awareness allegedly of the IPPs means he doesn't realize

19   habilitation is going on.  But isn't Dr. Manikam really looking

20   specifically at sort of the psychological services and the role

21   they play in habilitation?

22   A.    This is in response to Dr. Manikam's statement that they

23   were deficient because they did not have the part of the IPP

24   that I show on page 113.  I think it is specific to that.

25   Q.    I believe you indicated earlier that you were trying to be

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6113

1    fair to Dr. Manikam because he is a clinical psychologist.  Has
2    it occurred to you, because he's a clinical psychologist, he is
3    talking about it in a very technical way compared to the way you
4    are using it?
5    A.    When he says the IPPs at CHDC are not comprehensive and do
6    not meet generally accepted professional standards?
7    Q.    Yes.
8    A.    That's not too hard for me to understand.
9    Q.    Let me move on to a few medical issues.  DDHA actually
10   employs 15 nurse practitioners.  Correct?
11   A.    A few less now after we've had some contract changes.
12   Q.    Right.  That contract change, which HMO was it that
13   terminated services?
14   A.    Fair Choice.
15   Q.    Are they affiliated with providing programs for the New
16   Jersey Division of Developmental Disabilities and Services?
17   A.    They provide services for New Jersey Medicaid.  They are
18   under contract for Medicaid.
19   Q.    And what was the reason they gave for the termination of
20   the contract?
21   A.    We didn't really get much of a reason.  Our view is it was
22   financial.  They didn't want to pay for it.
23   Q.    Uh-huh.  Nurse practitioners can actually function pretty
24   independently.  Right?
25   A.    Yes.  I mean, ours function semi-independently.

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

Walsh - Cross                                        6114

1    Q.    Right.  So if someone was, for example, trying to compare

2    the medical services in the community versus the medical

3    services here at CHDC, having nurse practitioners is going to

4    extend the ability of the physicians to provide treatment.

5    Right?

6    A.    In either setting that could happen.

7    Q.    Are nurse practitioners sometimes referred to as physician

8    extenders?

9    A.    I guess, yes.

10   Q.    For example, they can do health assessments.  Correct?

11   A.    Yes.

12   Q.    An LPN cannot?

13   A.    I don't know the rules that govern the practice of LPNs, so

14   --

15   Q.    Let me move on to your report at page 151 through 165.  Do

16   you consider reading and signing a training sheet or memo to be

17   the same thing as competency training?

18   A.    Those two things are comparing apples and oranges.  I don't

19   know what you are asking me.  If you are saying documentation,

20   that would be documentation of competency training?

21   Q.    Yes.

22   A.    Not necessarily, unless competency training were included

23   in the training that they are signing for.

24   Q.    Uh-huh.  Well, let me put it this way.  If someone signs a

25   training sheet that says they attended training where someone

Walsh - Cross                                        6115

1    gave a lecture, is that the same thing as competency training?

2    A.   No.  I think I described what I understood competency

3    training to be yesterday.

4    Q.   You understand that CMS requires that staff be able to

5    demonstrate competency.  We all agree about that.  Right?

6    A.   Yes.

7    Q.   And the whole point of ensuring competency is to make sure

8    that staff know how to apply what they actually learned in their

9    jobs.  Right?

10   A.   In their training, yes.

11   Q.   Now, even if you attend the training, say a lecture or

12   general training, that's not the same thing as being trained on

13   how to apply what you learned to a particular individual.

14   Right?

15   A.   It may be.

16   Q.   It may be.  But it's not necessarily the same.  Right?

17   A.   My distinction yesterday I made was if there's a

18   demonstration of competence to be included in the nature or the

19   content of the training, then you might need -- you might need

20   to demonstrate that competency to pass the training, therefore

21   you would have competency training de facto.  And if it were

22   just information imparting or, you know, the content of policy

23   or simple work rules, then competency training may not make much

24   sense.

25   Q.   Now, you've also talked about how CHDC has a huge volume of

1  policies and procedures --

2  A.   Yes.

3  Q.   -- covering protecting from harm and things like that.

4  Right?

5  A.   It covers many different things, covers the way they

6  operate their facility.

7  Q.   Right.  Would you agree that an analysis of policies should

8  also look at the quality of those policies?

9  A.   You are referring to my analysis?

10  Q.   Well, this is not just an argument about volume.  Right?

11  This is about the quality of those policies.  Right?

12  A.   What argument?  My argument with Ms. Osgood?

13  Q.   Right.  Your argument with Ms. Osgood or your dispute with

14  Ms. Osgood.

15  A.   My dispute with Ms. Osgood was purely the case that she

16  said there were no such policies, and therefore that harm

17  accrued, implied that harm accrued to people.  And it appeared

18  to me, and from her own appendix, that she had not reviewed the

19  policies.

20  Q.   But when you pointed to the policies, you pointed to the

21  volume.  You didn't actually cite any of the specific policies

22  that you think are of such high quality.  Right?

23  A.   I was only responding to her saying there was none.

24  Q.   Would you agree that implementation of policies also

25  matters?

Walsh - Cross                                    6117

1  A.   Absolutely.

2  Q.   And wouldn't a policy just be a paper exercise if incidents

3  showed that they are not really being followed?

4  A.   I don't know what you mean by that.

5  Q.   Okay.  Well, for example, did you know that there have been

6  patterns of repeated assaults by residents against other

7  residents that aren't addressed by the Incident Review

8  Committees?

9  A.   I don't know that.

10  Q.   If there was a situation like that, would that perhaps

11  suggest that the policies aren't being implemented?

12  A.   Well, the policy could be implemented, and it could be

13  implemented in a number of ways.  If it didn't say in the policy

14  that those incidents are specifically to be included, then it

15  becomes a management decision.  And then it becomes a decision

16  that you make based on the wisdom of management, that maybe we

17  want to look at that because up until this time we have not

18  been, or there's an increasing number of them, so let's take a

19  look at them, and let's include them.  I can't cite for you

20  whether that's included in the policy right now, so I don't know

21  how to answer the question exactly.

22  Q.   But earlier in your testimony, you had indicated that those

23  Incident Review Committees were a demonstration that policies

24  exist and that there are these procedures in place to deal with

25  incidents.  Right?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1  A.   Yes.  I stand by that.

2  Q.   Would you agree that examples of bad outcomes can be

3  illustrative or indicative of inadequate facility policies or

4  practices?

5  A.   Well, if they are coupled with competent analysis, yes.

6  They can be one part of a database, yes.

7  Q.   Did you actually conduct an analysis as to whether bad

8  outcomes reflect on inadequate policies or the implementation of

9  those policies?

10  A.   It's hard for me to understand what that analysis would be.

11  Q.   So is that a, no, you didn't try to analyze whether the bad

12  outcomes at CHDC showed breakdowns in policies?

13  A.   I did not do that analysis, correct.

14  Q.   I would like to take a look at page 130 of your report,

15  where you listed CHDC injuries for six quarters in Table 4.2.

16  And this is in the section of your report that deals with risk

17  management and quality management.  Right?

18  A.   Yes.

19  Q.   And in part, it's your rebuttal to the idea that, you know,

20  CHDC fails to protect people from harm.  Is that right?  Let me

21  rephrase that.  Is it in part a rebuttal to Ms. Osgood?

22  A.   No.  It was something I was going to do anyway.

23  Q.   All right.  You list here, under choking, that there is one

24  incident.  Is that correct?

25  A.   Yes.

1  Q.   Do you know if that incident was the individual who choked

2  to death and died?

3  A.   I do not know.  I took these from the quarterly reports.

4  Q.   You just took this data from whatever incident reporting

5  that they were giving you.  Right?

6  A.   I took this from the quarterly reports of the Central

7  Incident Review Committee.

8  Q.   If you would turn to page 144 of your report, you list CHDC

9  choking incidents.  Correct?

10  A.   Yes.

11  Q.   These are choking incidents that were severe enough to end

12  up in front of the Central Dysphagia Committee?

13  A.   Yes.

14  Q.   And here the numbers show in 2007, 24 incidents; 2008, 18

15  incidents; and 2009, 11 incidents?

16  A.   Yes.

17  Q.   So is there something of a discrepancy between what the

18  Incident Review Committee is looking at and what the Central

19  Dysphagia Committee is looking at?

20  A.   I think they are different.

21  Q.   Okay.  Do you know how -- let me ask, how do you define

22  "choking"?

23  A.   I'm not the one that defined this.  I was using their

24  swallowing -- they have a swallowing incident protocol that they

25  use.  It's defined somehow.  You know, I think that does not

Walsh – Cross                                6120

1    rise to the level of being a reportable IRIS incident of

2    choking, so --

3    Q.   So basically you are relying on however they choose to

4    report or categorize incidents.  Right?

5    A.   Yes.

6    Q.   So, for example, for all we know, some of those choking

7    incidents were situations where people turned blue or required

8    the Heimlich maneuver, but at CHDC perhaps they don't report

9    that as a serious incident.  Right?

10   A.   I don't know that.  It could be that many of the choking

11   incidents in the Dysphagia Committee data were really just

12   swallowing incidents where people had trouble swallowing.

13   Q.   But, for example, if you did include those choking

14   incidents, let's say instead of one incident we included the --

15   I don't want to do the math -- but the 29 or so incidents, it

16   could substantially change the injury rates.  Correct?

17   A.   Yes.  It's not a reportable injury.

18   Q.   Uh-huh.  Do you think there's an acceptable rate of abuse

19   and neglect?

20   A.   Say it again.

21   Q.   Is there a rate of abuse and neglect at which point would

22   be considered acceptable?

23   A.   No.

24   Q.   Isn't really what's important what a facility does to try

25   to prevent abuse and neglect?

1    A.    Is that important?

2    Q.    Yes.

3    A.    Yes.

4    Q.    And in doing your statistical analysis, you did not

5    actually evaluate what they do in response to abuse and neglect.

6    Correct?

7    A.    I looked at that, in the 13 incidents that I reviewed, in

8    detail.  So I discussed, for example, what they did in relation

9    to those incidents.  They terminated people.  They created

10   protocols.

11   Q.    Well, let me take a look at your page 137.  I know you've

12   tried to explain why this is not that significant.  But the data

13   that you found at CHDC shows .054 rates of abuse and neglect per

14   person per year.  Correct?

15   A.    Yes.

16   Q.    Versus Southbury, which is only .025.  Is that right?

17   A.    Yes.

18   Q.    .029 at 23 facilities in six southern states, and .033 to

19   .04 in a study done for four state-operated facilities in

20   Georgia.  Correct?

21   A.    Yes.

22   Q.    Now, if we were applying the standard that you had used

23   before, these percentages of, you know, worse, much worse, or

24   better and much better, CHDC's rate for abuse and neglect is

25   actually twice that of Southbury's.  Right?

1    A.    Yes.  It looks like that.

2    Q.    I mean, another way to put it is it's greatly worse than

3    Southbury's?

4    A.    I would not say it that way.

5    Q.    And it's substantially worse than the Marchetti & Campbell

6    study; correct, for the southern states?

7    A.    They are all pretty small numbers, though.

8    Q.    But basically it's higher than all of them.

9    A.    Right.  Even though you were telling me yesterday that I

10   couldn't use small numbers, and then you are turning around

11   today and using small numbers.

12   Q.    Well, you are right.  But here's the thing.  It's a small

13   percentage.  But abuse and neglect is something ICF/MRs are

14   specifically --

15   A.    Right.

16   Q.    -- supposed to go after.  Right?

17   A.    Right.

18   Q.    It's one of the things, the most egregious things --

19            COURT REPORTER:  One at a time.

20   BY MR. CHENG:

21   Q.    It's one of the worst things that can happen is intentional

22   abuse at a facility.  Correct?

23   A.    Yes.

24            THE COURT:  Mr. Cheng, are you about done?

25            MR. CHENG:  I think it's probably a good time to

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

6123

1   break, Your Honor.

2           THE COURT:  Why don't we do that.  It will be 15

3   minutes.

4       (Recess at 11:00 a.m.)

5                   REPORTER'S CERTIFICATE

6       I certify that the foregoing is a correct excerpted
    transcript from the record of proceedings in the above-entitled
7   matter.

8
    /s/Elaine Hinson, RMR, CRR, CCR     Date:  December 27, 2010.
9   United States Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1        (Continuing at 11:18 a.m.)

2            THE COURT:  Everyone be seated.

3        Let it loose, Mr. Cheng.  Fire away.

4            MR. CHENG:  Okay.

5   BY MR. CHENG:

6   Q.   Dr. Walsh, at page 163 of your report, you talk about

7   restraint and restraint injuries in the context of Ms. Osgood's

8   findings.

9   A.   Yes.

10  Q.   Isn't the point of Ms. Osgood's finding the fact that CHDC

11  does not specifically track restraint injuries as part of this

12  incident review process?

13  A.   I don't know that to be the case.  I don't know.

14  Q.   Okay.  But when you're talking about restraint injuries,

15  you're just basically trying to minimize the restraint injuries

16  as characterizing them as minor bruises.  Isn't there a separate

17  problem of restraint injuries not being clearly identified for

18  purposes of quality management or risk management?

19  A.   I don't know what you're asking me if there are no

20  injuries.

21  Q.   You do risk management and quality assurance.  Right?

22  A.   Yes.

23  Q.   Aren't injuries caused by restraints something that should

24  be broken out from other types of injuries?

25  A.   If there were injuries.

1    Q.   Well, it should exist as a category.  Now, whether or not

2    any injuries are identified in that category, that's a different

3    question.  Right?

4    A.   If there were an injury due to it, it would -- my

5    assumption is that it would appear.

6    Q.   It would appear as an injury, but it wouldn't necessarily

7    be something that could be parsed out as a restraint injury.

8    Right?

9    A.   No.  I think when the data go to the incident review

10   committees and then it gets moved to the central review

11   committee, it gets categorized, it is by injury type.

12   Q.   And you know for certain they list them as restraint

13   injuries?

14   A.   In fact, I -- not if there hasn't been any.

15   Q.   Right.  Did you actually see a category for restraint

16   injuries at CHDC?

17   A.   No.  There wouldn't necessarily be a category if there

18   wasn't any.

19   Q.   I think earlier, before the break, you also talked about

20   how you specifically looked into the response for some of those

21   cases of maltreatment and abuse.  Right?

22   A.   Yes.

23   Q.   Now, you looked at a total of what, 13 cases?

24   A.   Yes.

25   Q.   And that was it?  Of all the maltreatment investigations,

1    you only looked at 13?

2    A.    I read 13.  I looked at six quarters of the data.

3    Q.    For statistical purposes, you looked at six quarters, but,

4    substantively, you only looked at 13?

5    A.    Yes.

6    Q.    One of those was the incident where a child was left

7    behind.  Is that right?

8    A.    Yes.

9    Q.    Are you aware that CMS actually cited CHDC for having a

10   five-month delay in investigating that incident?

11   A.    No, I'm not aware of that.

12   Q.    It's previously been admitted as U.S. Exhibit 4, I believe.

13   And yet that was one of the examples where you thought their

14   response was perfectly fine.  Correct?

15   A.    I didn't see a five-month delay in the report that I looked

16   at.

17   Q.    Uh-huh.  Let me go back.  I know this is probably

18   backpedaling a little bit before I move on to the next subject

19   area.  Well, let me finish with professional harm first.  Let me

20   ask you this.  Did you actually look in the records to see if

21   informed consent was ever obtained for the cameras in the

22   cottages?

23   A.    No, I did not.  I was told that by, I believe, someone in

24   the superintendent's office.

25   Q.    Right.  Did you know that informed consent, or rather the

1   notification to parents and guardians occurred after the cameras

2   were already installed?

3   A.   I believe when I was told about that notification, I was

4   also told that there was some controversy about it, and I don't

5   really recall the particulars of that, though.

6   Q.   When you were looking at the injury rates, this is all,

7   again, trend data.  Right?

8   A.   I don't know what you're asking me.

9   Q.   For the IRC process, you were looking at the injury rates?

10  A.   Yes.

11  Q.   The data you used was from Conway.  Correct?

12  A.   Yes.

13  Q.   You were looking at the quarterly incident summary reports?

14  A.   Yes.

15  Q.   You do not independently evaluate whether individuals were

16  actually showing improvements in their own personal injury

17  rates.  Right?

18  A.   No.  I didn't look at individuals, no.

19  Q.   And in reviewing the process, you did not actually review

20  any of the administrative reviews.  Correct?

21  A.   Administrative reviews of?

22  Q.   Do you know what an administrative review is?

23  A.   Administrative review of maltreatment?

24  Q.   Do you know what an AR is?

25  A.   I'm not sure.  I know that there's an administrative review

Walsh - Cross                                                6128

1    with maltreatments, investigations that take place.  If there's
2    a separate AR, I don't know what it is.
3    Q.   There's a separate document called an AR.  Did you know
4    that?
5    A.   No.
6    Q.   Earlier, before the break, I think we had a little bit of a
7    dispute over Dr. Manikam, what he said in his report.  Do you
8    remember that?  And you said that he basically didn't seem to
9    know that there were IPPs or what constitutes an IPP.  Do you
10   remember that?
11   A.   No, I don't believe I said that at all.  I understand that
12   he knows what an IPP is.  He said they were deficient.
13   Q.   Well, if you look at page 112 of your report, you say at
14   the bottom, "It is possible that Dr. Manikam does not understand
15   what constitutes an IPP."
16   A.   Okay.
17   Q.   And I was arguing with you --
18   A.   At CHDC.
19   Q.   Right.  And I was arguing with you, I guess, I think he's
20   being a little more technical here.  And then you pointed to the
21   top of your report where you had quotes that said, "The IPPs at
22   CHDC are not comprehensive and do not meet generally accepted
23   professional standards.  Deficits were noted on all IPPs."
24   A.   Yes.
25   Q.   You quote from his report, like you did with other experts,

1    to show he doesn't know what he's talking about.

2         Could we bring up Dr. Matson's report, please?

3         Go to page 14.  The full quote under "Habilitation" is,

4    "The IPPs at CHDC are not comprehensive and" -- is this Matson

5    or Manikam?

6              MS. COON:  That's Manikam.

7    BY MR. CHENG:

8    Q.   "The IPPs at CHDC are not comprehensive and do not meet

9    generally accepted professional standards.  Individuals admitted

10   to CHDC receive an individualized program planning (IPP).  The

11   Individual Program Plan is drawn by the interdisciplinary team

12   (IDT) and is a document that establishes the needs, goals,

13   objectives, and criteria to meet the individual needs with the

14   purpose of establishing goals to improve the individual's

15   function with as much independence as possible.  There are four

16   IDT teams," and it continues to the next page.  Bring up the

17   next page, please.

18        "All plans address the necessary domains, including the

19   individual's social, psychological, medical, nutritional,

20   independent living, special education when applicable,

21   habilitation, education, independent living, recreation,

22   transition planning, competency status, and self-advocacy

23   consideration."  And it continues to the quote you have.  Now,

24   it does say, "The IPPs had used data from the

25   discipline-specific assessments (medicine, psychiatry, speech,

1    OT, psychology, dietary, unit evaluation, et cetera).  Deficits

2    were noted in all IPPs."  That's where the next quote was.  And

3    Dr. Manikam continues:  "The IDTs failed to review the status

4    (significant improvement, no improvement, regression) of each

5    objective and offer a rationale and recommendation (for example,

6    change, continue, increase training) for each.  Objectives are

7    not stated in observable/measurable terms with their

8    corresponding indices of performance in a quantifiable manner.

9    For example, Will use good table manners, an 80 percent average

10   accuracy.  Training manuals/script on instructing to the

11   objective (for example, hierarchy of teaching, task analysis,

12   methods of dealing with interfering behaviors, et cetera) was

13   absent.  One residential supervisor reported that she was not

14   trained to competency in such methods and procedures.  One of

15   them had made a good attempt on her own producing a manual to

16   help her with subtasks.  Data collected during these sessions

17   are not trial-based but rather is an overall judgment score by

18   the instructor."

19         That's the full quote.  Right?

20   A.    Yes, which I think reflects exactly what I said.

21   Q.    Actually, what it shows is that he's well aware that your

22   IPPs have a lot of subject areas.  Correct?

23   A.    No.  But he's not aware they contain the section on page

24   113, which is all the stuff he asked for.

25   Q.    He is talking about the quality and the way these IPPs are

1  operated.  The level of detail and analysis he's using is

2  different from the level you're talking about.  Right?

3  A.   No.  Can I just read what you have just read to me or not?

4  Q.   Why don't we move on.  I'm sure Mr. York will be able to

5  talk with you about it, and it's as self-evident as I think it

6  can be.  Let's move to special education.

7       During your deposition you could not name any of the IEPs

8  you reviewed.  Correct?

9  A.   I guess, if you say so.

10 Q.   Nor could you list how many of them you'd actually looked

11 at.  Right?

12 A.   Correct.

13 Q.   Let's move on then to ADA issues.  Is this report that you

14 did with Dr. Kastner on the State of Arkansas's compliance with

15 the ADA the complete statement of all your opinions regarding

16 Arkansas's compliance with the ADA?

17 A.   I don't know.  I have lots of opinions, so --

18 Q.   At your deposition, page 360, line 9, the question was

19 "Does this report contain a complete statement of all the

20 opinions that you will express regarding the State of Arkansas's

21 compliance with the ADA and *Olmstead* decision?"  Answer, "I

22 believe it does."  Question, "Are there any other materials that

23 you relied on in reaching those opinions that you have not

24 already produced in this case?"  Answer, "No."

25       That's your answer at the time.  Correct?

1   A.   Yes.

2   Q.   And has that answer changed?

3   A.   No.  You asked me just a moment ago if these were all my

4   opinions, not that I will express -- well, what I will express

5   here is obviously in the report.

6   Q.   And in this report, at the very beginning of the report,

7   you recite a good deal of case law.  Correct?

8   A.   Yes.

9   Q.   You're not a licensed attorney.  Correct?

10  A.   Correct.

11  Q.   You're not a licensed schoolteacher.  Correct?

12  A.   Correct.

13  Q.   Would you say that your interpretation of the case law did

14  color or inform your analysis?

15  A.   I think we used the case law that's in there as just

16  background information.

17  Q.   So if it's just background, there's really no point in

18  including it.  Correct?

19  A.   No.  I mean, I think it's reasonable to show where our

20  thinking comes from.

21  Q.   You had not actually read all of the ADA cases that you

22  cited in your report.  Correct?

23  A.   Correct.

24  Q.   And your understanding was that Dr. Kastner hasn't really

25  read all of them either.  Correct?

1   A.   I really can't speak for Dr. Kastner.

2   Q.   This is just your understanding, as far as you know.

3   A.   That would be my understanding, perhaps, yes.

4   Q.   And furthermore, the cases that you're citing are actually

5   coming from a secondary source, a treatise of some sort.  Is

6   that right?

7   A.   Yes.

8   Q.   You do not consider yourself an expert in the law.

9   Correct?

10  A.   Correct.

11  Q.   If you turn to page 16 of your report, you were talking

12  about the waiting list at the time.  Now, in deciding or trying

13  to determine who is actually on a waiting list or seeking

14  community placement, you relied on a document provided to you by

15  CHDC.  Correct?

16  A.   The report that's -- the one that's on the screen, I think,

17  is not the correct report.  I don't know if that matters.  But

18  it's a report that we did together.  But --

19  Q.   I'm sorry.  Did we put up the wrong one?

20  A.   It's correct now.

21  Q.   Sometimes I like to look at paper too.  This is the correct

22  section.  Right?

23  A.   Yes.

24  Q.   So, for example, you talk about a list of 65 individuals

25  awaiting admission, but I guess there's a list of, is it 72

Walsh - Cross                                          6134

1    discharged from the facility?  Do you see all that?

2    A.    Yes.

3    Q.    Again, all that stuff is coming from the director of social

4    services?

5    A.    Yes, pretty much.

6    Q.    So it's what they think are people on the waiting list or

7    people waiting to come in.  Right?

8    A.    Yes.  There's no other way for us to get the information

9    but through their staff.

10   Q.    Right.  But there are actually other ways to determine if

11   there's a real waiting list.  For example, instead of just

12   asking the staff who is on the waiting list, you could have

13   looked at the IPPs to see who has expressed an interest in

14   getting out of the facility.  Right?

15   A.    The 65 is a waiting list for admission.

16   Q.    Or the 72 or the five, depending -- let me back up a little

17   bit.  You say there's five, but, in theory, you could have gone

18   to the IPPs to look at who might have actually expressed

19   interest in getting --

20   A.    Right.  My assumption was that those five were drawn from

21   the IPPs.

22   Q.    Yes.  But that's just an assumption, because in the end

23   you're working through --

24   A.    Did we look at all 510?  No.

25   Q.    And, of course, the document has never been introduced as

1    an exhibit, the materials you relied on are not an exhibit in

2    this case.   Correct?

3    A.    I believe they were -- they were submitted as an exhibit

4    with the deposition.

5    Q.    Now, when you were doing your review, you and Kastner

6    divided up the review of ADA compliance.   Is that right?

7    A.    We both wrote sections, yes.

8    Q.    And you took the lead on rebutting Ms. Richardson's report.

9    Correct?

10   A.    Pretty much, yes.

11   Q.    So does that mean you took primary responsibility for the

12   evaluation of Ms. Richardson's analysis of her 40 sample IPPs?

13   A.    Well, I guess I initiated the analysis.   I would not use

14   the term "primary responsibility" with regard to Dr. Kastner and

15   my writing partnership.

16   Q.    But you initiated the evaluation part of that process.

17   Right?

18   A.    Well, I did the technical evaluation of it, yes.

19   Q.    But you did not actually read all 40 of the IPPs in Ms.

20   Richardson's analysis.   Correct?

21   A.    No.

22   Q.    And --

23   A.    I read a number of them.

24   Q.    Right.   When you were reading them, you only read the

25   transition sections and some of the other parts.   You didn't

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1   read them in total.  Correct?

2   A.   Correct.

3   Q.   Your task was effectively a secondary analysis of Ms.

4   Richardson's analysis, meaning that you're performing a rebuttal

5   analysis to find problems with her analysis.  Right?

6   A.   That would be a fair statement, yes.

7   Q.   And, again, this is not a situation where you're trying to

8   perform an independent analysis of those IPPs.  Right?

9   A.   Correct.

10  Q.   You didn't conduct any type of formal assessment of the

11  IPPs?

12  A.   At the facility?

13  Q.   When you were doing this part of your report.

14  A.   No.

15  Q.   You were just informally reading through them as you did

16  your review.  Correct?

17  A.   I don't know what you mean by informally reading through

18  them.

19  Q.   I think that was actually your term during your deposition.

20  Do you recall saying you were just reading through them?

21  A.   I think when we discussed this in my deposition, we had

22  this same discussion about IPPs, that I had read a large number

23  of IPPs over the years, beginning with my involvement there in

24  2003.  I did not read all, cover to cover, of the IPPs that Ms.

25  Richardson used in her table, no.

Walsh - Cross                                          6137

1   Q.   Why don't we take a look at page 467 of your deposition for

2   the full context there.   The line was line 13.   The question

3   was:  "Well, give me a second, please.   I'll strike the

4   question.   Did you find from your interviews or IPP reviews that

5   teams were not recommending community placement because services

6   were not available?"   Answer, "Well, I told you before that we

7   didn't do a formal review of IPPs.   So we were just reading

8   through them.   The only review of that we did was in relation to

9   Ms. Richardson's report.   We found in some cases that there was

10  recommendations and in some cases there wasn't.   I don't think

11  we could say one way or the other whether or not or on what

12  basis they were making those recommendations," unquote.   Do you

13  see that?

14  A.   Yes.

15  Q.   That was your answer at that time?

16  A.   Pretty much just what I said.   Correct.

17  Q.   Right.   You did not attend any IPP annual reviews in

18  preparation for your report.   Correct?

19  A.   Correct.

20  Q.   You did not sit down with staff and talk about any specific

21  IPPs in the course of your review.   Correct?

22  A.   Correct.

23  Q.   And I think this was sort of alluded to already from the

24  quote, but in your informal review of the IPPs, you can't really

25  say what the IDT's recommendation regarding placement is based

1    on.   Correct?

2    A.    In terms of what?   Transition?

3    Q.    Just generally.   I mean, you can't really tell what the IDT

4    team's recommendation regarding placement is based on.   Correct?

5    A.    I really don't know what you're asking me.   In terms of

6    professional judgment?

7    Q.    On the one hand you can talk about whether the IPP on its

8    face to you seems fine, and I take it that you seem to think,

9    for *Olmstead* purposes, they seem fine.   Right?

10   A.    Yes.

11   Q.    That's the analysis you did.

12   A.    Yes.

13   Q.    But there's a different purpose, and that's to look at

14   process, and that's to look at what they take into account when

15   they're coming to these decisions, or the type of analysis that

16   they go into, and that's an area that you really can't say what

17   the IDT team's recommendation is based on.   Right?

18   A.    I presume that to be professional judgment, as I described

19   it yesterday.

20   Q.    But that's a presumption, not something that you just know

21   definitively or that you analyzed specifically.   Correct?

22   A.    Correct.

23   Q.    And even when we're talking about the quality of those

24   transition programs and the transition plans and the discharge

25   decisions, you only gave two examples of how those IPPs are of

                              Walsh - Cross                          6139

1    good quality or perfectly adequate.  Correct?

2    A.    Correct.

3    Q.    So outside of saying that you disagree with Ms.

4    Richardson's analysis, you and Kastner do not reach a conclusion

5    about the adequacy of IPPs regarding the ADA.  Correct?

6    A.    We have no reason to believe they're not adequate.

7    Q.    But you don't draw a conclusion at all.  Correct?

8    A.    I don't know what we draw.  Then I have to look at my

9    report again, but --

10   Q.    You and Dr. Kastner did not reach a conclusion about the

11   adequacy of CHDC's process for evaluating whether a resident is

12   in the most integrated setting appropriate to their needs.

13   Correct?

14   A.    I don't know.  You have to point me to something.

15   Q.    It's just a question.  I mean, did you actually reach a

16   conclusion about the adequacy of CHDC's process for evaluating

17   whether a resident is in the most integrated setting appropriate

18   to his or her needs?

19   A.    Our view is that that is the case, and that's from our

20   reading of the transition sections of IPPs.  And did we do a

21   formal analysis of that?  No.

22   Q.    And in your review, did you identify any IPPs in which the

23   IDT recommendation was that the resident was appropriate for

24   community placement in the guardian objective?

25   A.    No, because we weren't doing that analysis.

                        Eugenie M. Power, RMR, CRR, CCR
                        United States Court Reporter

                              Walsh - Cross                        6140

1   Q.   Even though you took a position against Ms. Richardson, are

2   you saying that community placement is inappropriate for the 40

3   people that Ms. Richardson reviewed?

4   A.   No.  I'm saying her determinations cannot be relied upon.

5   Q.   But it's possible she just got it right through sheer luck,

6   right, some of them might be appropriate for community

7   placement?  Right?

8   A.   I don't operate professionally on luck, sir.

9   Q.   Okay.  You did not interview anyone outside of CHDC

10  regarding ADA issues.  Correct?

11  A.   I did not, no.

12  Q.   Now, you did not visit or tour anyplace outside of CHDC for

13  your ADA report.  Correct?

14  A.   Well, Dr. Kastner did.

15  Q.   But you did not?

16  A.   I did not.

17  Q.   You did not talk to any community providers to determine

18  whether they could or could not serve individuals with needs

19  similar to those at CHDC.  Correct?

20  A.   Dr. Kastner did.  I did not.

21  Q.   And although you sort of criticized Ms. Richardson for not

22  looking at both sides of the coin, did you know that Ms.

23  Richardson actually did visit community providers?

24  A.   Yes, I knew that.

25  Q.   Okay.  Are you aware that there are people with feeding

                        Eugenie M. Power, RMR, CRR, CCR
                          United States Court Reporter

Walsh - Cross                                    6141

1    tubes who are being served in the waiver program?

2    A.    That does not surprise me.

3    Q.    There are people with significant behavioral needs who are

4    being served in the waiver program.  Correct?

5    A.    Does not surprise me.

6    Q.    There are people with severe and profound disabilities

7    being served in the waiver program?

8    A.    Does not surprise me.

9    Q.    Not only does it not surprise you, you probably have some

10   of those same folks in your own practice.  Right?

11   A.    Yes.

12   Q.    In addressing *Olmstead* issues, did you interview anyone

13   from DDS's central office?

14   A.    Not specifically for the report, no.

15   Q.    Now, I believe you testified previously that Ms.

16   Richardson's analysis was flawed because you did not think she

17   knew what community services Arkansas has to meet the needs of

18   individuals.  Correct?

19   A.    I'm not sure that I said that.  Yesterday you're talking

20   about?

21   Q.    Yes.

22   A.    I think I was saying that when you make a determination

23   that somebody's appropriate for the community, you need to make

24   that determination in relation to a specific setting.

25   Q.    So the concern is she's not looking at the specific

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   setting?

2   A.   Correct.

3   Q.   Wouldn't that same concern --

4   A.   Among other concerns that we've expressed.

5   Q.   Wouldn't that same concern apply to Conway staff when

6   they're conducting their annual reviews?  I mean, shouldn't it

7   be necessary for them to know about the specific settings and

8   the services available --

9   A.   No.  Really it's impossible to take somebody and say all

10  the specific settings that are available.  The potential is

11  endless.  You have to find the specific setting.

12  Q.   I don't think Ms. Richardson's asking for that.  I think

13  she's asking that if you're going to look at community placement

14  for an individual, they should consider individual settings when

15  they're making that assessment, and that they have one in

16  mind --

17  A.   I don't think she said that at all.  I think you're saying

18  that now, but I don't think she said that.

19  Q.   Well, let me ask you this then.  Would you agree, though,

20  that if there's a problem with an outside consultant doing these

21  types of assessments without looking at individual settings,

22  isn't it even more of a problem when Conway staff make placement

23  decisions without looking carefully at individual settings?

24  A.   No.  They know the person, they know the state.  You know,

25  a lot of them probably work in community settings.

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6143

1    Q.    That's an assumption.  Right?

2    A.    I don't know.  That's probably a good assumption.

3    Q.    Would it surprise you if it turns out in repeated testimony

4    from a number of witnesses, a lot of staff, and some of the

5    other experts, they don't even think it's an issue, they don't

6    even think it's necessary to do that?

7    A.    Fine.

8    Q.    Okay.  Well, would you agree that the availability of

9    services should not be a bar to being recommended for community

10   placement?

11   A.    Oh, I would agree, yes.  But I think that's what the teams

12   attempt to do, they lay out what people -- they look at some

13   functional characteristics of what they would need, they put

14   that into that transition plan.  And I think that represents

15   some professional judgment, and that's what they're sort of

16   required to do, I believe.

17   Q.    In your report you only specifically critiqued two of the

18   40 IPPs in Ms. Richardson's sample 40.  Correct?

19   A.    We used them as examples.

20   Q.    You used two examples, RSC and CJG.  I believe it's at 62,

21   page 62 through 65 of your report.

22   A.    Yes.

23   Q.    Now, RC, or RSC, is a 30-year-old woman.  Is that right?

24   A.    Yes.

25   Q.    Admitted to CHDC in October of 2000?

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                    6144

1    A.    I don't know when she was admitted.

2    Q.    Ms. Richardson concluded that RC has a high potential for

3    community placement and, quote, "a need of objective evaluation

4    by professionals to determine the unique services required to

5    live in a more integrative setting," unquote.  Is that right?

6    A.    Okay.  I don't know where she said that.  Did I quote her

7    to say that?

8    Q.    Well, let me ask you -- maybe you don't have it right in

9    front of you there.  Ms. Richardson concluded that RC has a high

10   potential for community placement?

11   A.    Yes.

12   Q.    And that's why you went and critiqued it because here's a

13   person who supposedly has a high potential.  Correct?

14   A.    Correct.

15   Q.    In your critique of Ms. Richardson's review, you have this

16   Table 5 here.  Do you see this?

17   A.    Yes.

18   Q.    Where you compare a column titled "RSC's IPP Transition

19   Plan Section (Reproduced Verbatim; with 'RSC' here replacing her

20   first name)"?

21   A.    Yes.

22   Q.    And you compared this column with a second column titled,

23   quote, "RSC Notes on Transition from Richardson Appendix D

24   (Reproduced Verbatim)."  Correct?

25   A.    Yes.

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1   Q.   It's also one of the awkward things about trials.

2   Everything is oral.  And it's a lot easier just to look at the

3   document.

4   A.   Right.

5   Q.   Now, in the last paragraph of the left-hand column, you

6   write that whole section -- and I don't know if Your Honor wants

7   me to read the whole thing or we can just describe it.  But it's

8   basically the line that starts with, quote, "The most

9   appropriate transition plan for RSC at this time," ending with

10  the phrase "and adaptive transportation," end quote.  Do you see

11  that?

12  A.   Yes.

13  Q.   And the second sentence of that section says, "It appears

14  from information from community settings, RSC needs to develop

15  the skills necessary to comprehend the need to evacuate

16  herself."

17  A.   Yes.

18  Q.   And based on this transition plan, you conclude, quote, "It

19  is clear in the left-hand panel of Table 5 that the skill level

20  requirements for community placement (in this case being toilet

21  trained or 'comprehending the need to evacuate herself') were

22  imposed not by CHDC or the IDT but by the community provider."

23  A.   Correct.

24  Q.   We have a copy of RC's transition plan.  If we can bring up

25  Exhibit 173 and go to page 10.  If you look here at the

Walsh - Cross                                                6146

1  transition plan, it says here, "The most appropriate transition

2  plan for RSC at this time would be for her to acquire the

3  independent and communication skills needed to transition

4  through the team hierarchy at CHDC so she could successfully

5  function in a community setting."  See that?

6  A.    Yes.

7  Q.    So in your report, there's an omission of the language

8  about transitioning through the team hierarchy.  Correct?

9  A.    Yes.  Well, that would be my mistake because I typed it.

10 Q.    And so when you draw in your report this conclusion that,

11 quote, "It appears from information from community settings, RSC

12 needs to develop the skills necessary to comprehend the need to

13 evacuate herself," unquote, that supposedly verbatim language is

14 not actually in this particular transition document.  Correct?

15 A.    Correct.

16 Q.    As a matter of fact, that sentence is specifically about

17 information received from community settings regarding what is

18 needed for RC to be appropriate -- well, let me put it this way.

19 Basically that sentence doesn't actually appear in RC's IPP.

20 Correct?

21 A.    The "it appears" statement?

22 Q.    Yes.

23 A.    I don't know where that came from.

24 Q.    Okay.  And yet the heart of your criticism of Ms.

25 Richardson's conclusion that RC has a high potential for

Walsh - Cross                                      6147

1   community placement relates to what you assert are requirements

2   imposed by a community provider and not by the IDT or CHDC.

3   Correct?

4   A.    Yes.  I mean, it still looks that way to me.

5   Q.    When you say "community provider," you don't actually have

6   a specific community provider in mind here.  Correct?

7   A.    No.  The team said they spoke with them though.

8   Q.    You did not attend RC's annual review.  Correct?

9   A.    Correct.

10  Q.    You didn't actually talk to any of the IDT members about

11  specific community providers they spoke to about RC.  Correct?

12  A.    Correct.

13  Q.    Are you aware that two community providers in Arkansas, Pam

14  Bland and Cindy Alberding, after reviewing her redacted IPP,

15  have both testified before this Court that they could provide RC

16  the services needed to support her in the community?

17  A.    I'm not aware of that, no.

18  Q.    Are you aware that they both testified about RC in

19  particular, that they could serve her in the community?

20  A.    No.

21  Q.    And so besides RC and CJG, you don't provide any

22  individualized rebuttal assessment of the other 38 IPPs in Ms.

23  Richardson's sample.  Correct?

24  A.    I think we provided rebuttal to them in aggregate.

25  Q.    Let's talk a little bit about the standards that apply in

1    these ADA situations.  You testified that Ms. Richardson, in

2    your view, thinks that standards are just constantly changing.

3    Correct?

4    A.    That was one of the subthemes I picked up in her work, yes.

5    Q.    That's one of your criticisms because, in your view,

6    standards should be unchanging.  Correct?

7    A.    To some extent, yes.

8    Q.    And you thought that this goes against the very idea of a

9    standard, and I think the actual quote was, quote, "standard

10   means unchanging," dot, dot, dot, "that's what makes it a

11   standard," unquote.  Does that sound right?

12   A.    Yes.

13   Q.    But standards of care can evolve over time.  Right?

14   A.    Yes.

15   Q.    The standards of care for ICF/MRs are not the same as they

16   were back in the 1980s.  Correct?

17   A.    Correct.

18   Q.    You also testified that you had a problem, in your view,

19   with the lack of standards that Ms. Richardson applied.

20   Correct?

21   A.    Yes.  It was hard for us to understand what standard she

22   was applying.

23   Q.    And one of the things you used to demonstrate that was some

24   of her deposition testimony.  Is that right?

25   A.    Yes.  Can you point me to where you are?

                    Eugenie M. Power, RMR, CRR, CCR
                       United States Court Reporter

Walsh - Cross                                                6149

1    Q.    Well, sure.  Well, I may not have the page, but, for

2    example, you testified yesterday that Ms. Richardson had a long

3    exchange with Mr. York, quote, "in her deposition about

4    standards and the vanguard of movements and avant-garde people,"

5    end quote.  Do you see that?

6    A.    Yes.

7    Q.    That's something you referred to, vanguard and avant-garde.

8    Right?

9    A.    Say it again.

10   Q.    You refer to her depiction about standards, and you used

11   the terms "vanguard" or "avant-garde."  Right?

12   A.    Yes.

13   Q.    Ms. Richardson actually never uses the words "vanguard" or

14   "avant-garde" in her deposition.  Correct?

15   A.    I believe they're our words, yes.

16   Q.    Have you met Ms. Richardson?

17   A.    No.

18   Q.    You really think she's an avant-garde person?

19   A.    I have not met her.  I know her through this report.

20   Q.    Right.  Do you know what page she said "vanguard" or

21   "avant-garde" in her deposition?

22   A.    I just said she did not use those words.  I said they were

23   our words.

24   Q.    I thought you said she did.  So she never said it.  Would

25   it change your opinion if Ms. Richardson had supplied the

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1   standards set out in Arkansas's DDS mission statement?

2   A.   I don't know if a mission statement constitutes standards.

3   Q.   So a mission statement the DDS itself establishes for this

4   area is not a definite enough standard?

5   A.   Are you talking about body of standards for transition?

6   I'm not sure what you're talking about.

7   Q.   If DDS says this is their mission, and they have a mission

8   statement, and Ms. Richardson is evaluating the practices at DDS

9   or at CHDC to see if they conform with that mission statement --

10  A.   Is that what she did?

11  Q.   Okay.  Wouldn't that itself be a fairly definite standard?

12  A.   Is that what she did though?

13  Q.   Well, let me ask you first, isn't it a definite standard?

14  A.   I would have to read what the mission statement was and how

15  she applied it.

16  Q.   But if she did do that, would the DDS mission statement

17  itself be a definite enough standard?

18  A.   It depends on what the mission statement said.

19  Q.   Did you actually look at DDS's mission statement for this

20  issue?

21  A.   It's likely that I did, but I don't recall it at the

22  moment.

23  Q.   Did you know that Ms. Richardson did actually specifically

24  reference the DDS mission statement as one of the sources of her

25  standards?

1    A.    I don't recall that.

2    Q.    Would you agree that a facility could be in compliance with

3    the discharge provisions of the ICF/MR regulations but still be

4    violating the Americans with Disabilities Act?

5    A.    I'd have to probably give that more thought than to give

6    you an immediate answer.

7    Q.    All right.  But you understand, for example, that the

8    ICF/MR regulations comes from the Centers for Medicare and

9    Medicaid Services.  Right?

10   A.    Yes.

11   Q.    And the ADA regulations come from the Justice Department.

12   Correct?

13   A.    Yes.

14   Q.    And while the CMS regulations address discharge, there are

15   really two separate bodies of standards.  Right?

16   A.    Yes.

17   Q.    You actually did answer this particular question in the

18   *Southbury* case.  Correct?

19   A.    The question of?

20   Q.    Whether you would agree that a facility could be in

21   compliance with the discharge ICF/MR CMS regulations but be

22   violating the ADA.

23   A.    I don't recall -- I can't recall every question that was

24   asked of me.

25   Q.    Why don't we bring up your deposition to see if that will

                              Walsh - Cross                        6152

1    help refresh your memory.

2    A.    All right.

3             MR. CHENG:   If we could approach, Your Honor?

4    BY MR. CHENG:

5    Q.    Now, this is your deposition from the *Messier v. Southbury*

6    *Training School* case.  I believe this was filed March 2, 2010.

7    And the excerpt, if you go to page 240, which is actually the

8    fourth page of this excerpt --

9    A.    Which page number?

10   Q.    It's --

11   A.    I see it.  Okay.

12   Q.    Line 16.  The question was:  "Is it your opinion that if

13   there are no CMS deficiencies for discharge planning, that

14   there's nothing wrong with the community placement process at

15   Southbury Training School?"

16       Answer:  "I sort of feel that -- yes.  Because there's

17   professional judgment being operated there and that takes care

18   of the *Olmstead* problem with professional judgment

19   requirements."

20       "What are the deficiencies?"

21       "If they identified somebody for community placement and

22   they're doing a transition plan, they're meeting the

23   requirements."

24       Question:  "If you got the ICF/MR teams in place and

25   they're making the kinds of decisions you make in ICF/MR,

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1    complying with the ICF/MR regulations, that, in your view,

2    completely deals with the professional judgment issue?"

3         Answer:  "No.  I just said to you that our assessment shows

4    that they need to meet -- that the professional judgment

5    standards of *Olmstead*, and now in this court case, and we think

6    they're meeting those.  I think there are probably facilities

7    that can meet CMS requirements and not meet that?"

8         See that?

9    A.   Yes.

10   Q.   That was your answer.  Right?

11   A.   Yes.

12   Q.   So it is possible that facilities could meet CMS

13   requirements and not meet the professional judgment standard.

14   Correct?

15   A.   I guess so.

16   Q.   I'd like to talk a little bit about your methodology.  And

17   you've questioned Ms. Richardson's sampling of cases at CHDC.

18   Right?

19   A.   Yes.

20   Q.   For example, you testified that 90 percent of CHDC

21   residents fit into the severe/profound categories.  Correct?

22   A.   Yes.

23   Q.   And some 72 percent --

24   A.   72 percent of them are profound.

25   Q.   And you alleged that Ms. Richardson 's sample was

1    problematic because she oversampled those units with people who

2    required both the most amount of care and the least amount of

3    care.  Correct?

4    A.    Correct.

5    Q.    If people needing the most care were oversampled, that

6    would have meant that the subsample was tilted toward finding

7    people who are less likely for community placement.  Correct?

8    A.    No.  Not sure what you said, but over and undersampling

9    means it's not representative of the population, and, therefore,

10   whatever she finds in that sample cannot be generalized back to

11   the population.

12   Q.    I know that's your general conclusion.  But for the group

13   of people who require the most care, if she included too many of

14   them in her sample because they were oversampled, that would

15   have meant that her subsample was actually tilted towards

16   finding people who are less likely for community placement.

17   Right?

18   A.    Not necessarily.

19   Q.    But it could be.  Right?

20   A.    Right.  Because these units, you have to look at the

21   functioning level of the person.

22   Q.    Right.  Except that you yourself in your analysis, you seem

23   to make it seem real cut-and-dry, they're either high

24   functioning or low functioning, you know.  These are always

25   going to end up being individualized decisions.  Right?

1    A.    Yes.

2    Q.    You're going to have to look at a lot of different

3    things --

4    A.    I don't think I ever said anything was very simple.  That

5    may be your language.  Nothing is cut-and-dry.  I think I said

6    you need to make very careful individualized decisions.

7    Q.    She's going through this facility the way somebody would do

8    this if they were actually on a treatment team.  Right?  She's

9    coming in to look at the individuals and you're looking at it

10   more from the point of view of a statistician.  Correct?

11   A.    Counselor, she didn't even look at some of them.  She never

12   saw them.

13   Q.    Let's talk a bit about functional status and functional

14   needs.  You've testified that Ms. Richardson did not properly

15   consider the functional status or characteristics of the person

16   when determining the potential for community placement.  Is that

17   right?

18   A.    Correct.

19   Q.    Now, you supplemented her table with your own functional

20   characteristics to try to determine the reliability of her

21   determinations.  Right?

22   A.    Correct.

23   Q.    Such as whether a person was ambulatory or not, medically

24   fragile or not, that kind of thing?

25   A.    Correct.

1   Q.   And you implied that these should have been separate

2   columns or considerations.  Is that right?

3   A.   No.  What I was saying was that if these were aspects that

4   she was looking at to make decisions upon, then you should see

5   differential numbers based on those decisions.

6   Q.   Let's take a look at page 51 of your report.  Do you see

7   the Table 2, "Elements of Richardson Grid"?

8   A.   Yes.

9   Q.   And this is what we've been talking about, right, where you

10  have Ms. Richardson's grid columns, the description, and then

11  you indicate whether these potentially provide indication of

12  functional status, and then you have a comments column.

13  Correct?

14  A.   Yes.

15  Q.   And so, for example, you're basically indicating that some

16  of these are only minimally helpful, some are not helpful, some

17  are helpful.  Right?

18  A.   In our judgment, yes.

19  Q.   For example, you put a lot of emphasis on the IPP, but you

20  don't consider a name to be helpful.  Right?

21  A.   Correct.

22  Q.   And this goes to your analysis.  It's your analysis of her

23  analysis, and you're saying she's not looking at the things that

24  are really important.  Right?

25  A.   Yes.  And -- yes.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Walsh - Cross                                              6157

1    Q.   But here's the thing.  On the line that says -- well,

2    actually, let me put it this way.  Have you seen Ms.

3    Richardson's report, Appendix D?  She has a special-needs

4    column.  Did you ever see this?  When you're doing this analysis

5    of Ms. Richardson's grid, did you notice that her grid includes

6    a special-needs column?

7    A.   I don't have it before me.

8    Q.   Can we bring up Ms. Richardson's report, Government's

9    Exhibit 210, at Appendix D?  I'm sorry.  It's called the "Key

10   Issues" column.  Because in your Table 2, you refer to the key

11   issues as narrative text.  You indicate it does potentially

12   provide indication of functional status, but in your comments

13   you say it's only minimally helpful.  Right?

14   A.   Correct.

15   Q.   If you actually look at Ms. Richardson's Appendix D, under

16   "Key Issues," let's take a look, for example, at MDF.  Under

17   "Key Issues," she lists special-needs considerations are, quote,

18   "Health:  Spina bifida, chronic dislocated hip, hydrocephalus,

19   renal failure, G-tube, numerous clinic visits in the past year,"

20   unquote.  Do you see that?

21   A.   Yes.

22   Q.   Although I think she misspelled "hydrocephalus," it is

23   listed there.  Similarly, for RNK, under the special-needs

24   column, under key issues, she writes, "Communication book, CP,

25   max assist to evacuate building."  Do you see that?

1    A.    Yes.

2    Q.    And then under "AOO," key issues include "24-hour nursing,

3    blind, GERD."  Do you see that?

4    A.    Yes.

5    Q.    So it does look like Ms. Richardson used these

6    individualized factors, things like age, health, and behavior,

7    to determine whether residents had a high, medium, or low

8    potential for community placement.  Correct?

9    A.    She says she did.

10   Q.    Right.  She said she did.  It's certainly in her columns.

11   Right?  And in your chart, you attempted to discredit Ms.

12   Richardson's analysis by looking at each one of your

13   characteristics, your function status, in isolation.  Right?

14   A.    I'm not sure what you're asking me.

15   Q.    You're trying to parse out what she did into these grid

16   column headings and trying to emphasize that this shows she only

17   looked at pretty useless things.  Right?

18   A.    You're on Table 2?

19   Q.    Yeah, on your Table 2.

20   A.    We made a judgment as to whether we thought the nature of

21   the information in her columns was helpful or not helpful, or

22   minimally helpful.

23   Q.    Well, didn't you testify that Ms. Richardson's analysis was

24   suspect because, for example, when she's considering ambulatory

25   status by itself -- well, let me put it this way.  Did you

1   testify that her analysis was suspect because when you're

2   considering ambulatory status as a category, ambulatory status

3   did not seem to matter to Ms. Richardson?

4   A.   Does not discriminate, yes.

5   Q.   That would be in Table 3.  Correct?

6   A.   Correct.

7   Q.   So in other words, you think that normally the statistics

8   for the number of people in the high to low for ambulatory

9   versus nonambulatory should have been more opposite from what

10  you actually found in your sampling.  Right?

11  A.   I think what it should be is if she says there's a variable

12  she used to make determinations, then the number should fall

13  into those columns in a differential manner so you can use them

14  to discriminate the subgroups.

15  Q.   Okay.  So, for example, in this case, you have listed

16  ambulatory, 16 are high, five are medium, one is low.

17  Nonambulatory, 10 are high, five are medium, two are low.  And

18  that's based on Ms. Richardson's sampling group of about 40

19  people?

20  A.   Correct.

21  Q.   And in your view, it should actually be sort of flipped

22  around.  Right?  So you would expect to see more people who are

23  nonambulatory -- I'm sorry -- fewer people who are high under

24  nonambulatory and more people who are --

25  A.   All I'm saying is there should be a difference in the

                              Walsh - Cross                    6160

1   layout of those two sets of numbers, because if there's not a
2   difference, then there's no discriminating power and then the
3   variable doesn't make any difference.
4   Q.   But that's only true if you think that, by itself, this
5   type of one-issue variable should be discriminating.  Right?
6   A.   Well, but taken together, it happens just about on all of
7   them.  So I'm saying there's no discriminating power there, and
8   so it resolves almost to guesswork.  I mean, you know --
9   Q.   Another way to put it though, Doctor, is that what you're
10  doing is avoiding the type of individualized decision-making
11  that Ms. Richardson is actually engaged in.  You're hoping that
12  the statistics will show something is going on or these are
13  perfectly determinative factors, whereas what Ms. Richardson is
14  doing is looking at the individual in context.  Right?
15  A.   I'm sorry.  That's a tortured analysis of these data.  Data
16  -- if data -- if you have a logical process, data follow it.
17  Q.   There's another problem with this table.  I mean, even if
18  you take these categories as some type of important given, Ms.
19  Richardson was not basing her determination on one
20  characteristic but rather on a host of characteristics.  Right?
21  A.   Correct.
22  Q.   And you do not have a chart in your report where you take
23  all the variables that she looked at and assign points to them
24  to give an overall rating of a person based on all of their
25  variables.  Correct?

Walsh - Cross                                               6161

1    A.    We do not have a chart that does that, or she does?

2    Q.    You do not have a chart in your report where you take all

3    of the variables and assign points --

4    A.    It wasn't our process.  It was her process.

5    Q.    But you don't do it either?  You don't try to do a

6    comprehensive look at all the variables and rate them.  Correct?

7    A.    Quite frankly, I wouldn't do what she's trying to do.

8    Q.    You try to restrict it to just these particular items that

9    you selected as being determinative?

10   A.    I think those items were the kind of items she stated that

11   she used when Mr. York asked what she used in her deposition.

12   Q.    If we can move on to -- let me ask you another thing.  You

13   also allege problems with Ms. Richardson's consideration of the

14   possibility of community placement as dissipating problem

15   behaviors.  Is that right?

16   A.    Yes.

17   Q.    The idea that community placement might dissipate problem

18   behaviors, you're skeptical about that.  Right?

19   A.    Yes.  Well, in and of itself.

20   Q.    Right.  But, again, Ms. Richardson doesn't say that out of

21   the blue.  She recognizes that behavior is a factor that can

22   work both ways.  Right?

23   A.    I don't know.  You'll have to show me -- when I read her

24   report, I saw the myths stated.

25   Q.    Let's look at your report, at page 57.


                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

                              Walsh - Cross                           6162

 1              MR. CHENG:  If I could have just a moment, Your Honor.
 2         (Mr. Cheng confers with co-counsel.)
 3    BY MR. CHENG:
 4    Q.   You also testified that Ms. Richardson's observation
 5    methods infected [sic] herself into the situation or the
 6    environment.  Is that right?
 7    A.   I'm sorry.  I missed what you said.
 8    Q.   You testified that Ms. Richardson's observation methods --
 9    I guess the term was "infected."  Is that right?  It infected
10    her into the situation or the environment.  Is that right?
11    A.   Oh, infected?
12    Q.   You testified that her observation methods were flawed.  Is
13    that right?
14    A.   All right.  We're not talking about the other thing now?
15    Q.   I'll move on from there.
16    A.   I'm sorry.
17    Q.   But you testified to Ms. Richardson's observation methods
18    were flawed.  Correct?
19    A.   Yes.
20    Q.   Because supposedly the way she did it allowed her to infect
21    the environment or the situation.  Is that right?
22    A.   Well, it may be flawed in the context of what she was
23    doing.  I mean, I'm not going to say that she shouldn't enter an
24    environment like that in certain contexts.  But if she was going
25    to do an observation of the person clinically, they could very

                      Eugenie M. Power, RMR, CRR, CCR
                        United States Court Reporter

Walsh - Cross                                        6163

1   well be flawed.

2   Q.   So if she walked up to a person and talked to them, to you,

3   that sort of damaged her ability to assess the situation.

4   Right?

5   A.   Well, not necessarily in all cases, but she really didn't

6   describe it that way.

7   Q.   Were you saying basically that she's not really getting a

8   behavior sample that represents what their typical behavior is,

9   or the resident's typical behavior is?

10   A.   I think there are sort of approaches to doing naturalistic

11   observations of people, and you might want to call them clinical

12   observations of people, and generally that is to not -- it's to

13   insinuate yourself in the least possible way into the

14   environment so you can look at the person and how they normally

15   interact.  And, you know, Ms. Richardson went on in her

16   deposition about how she goes in and she interacts directly with

17   the person in a way, and I think, you know, it was clear that

18   she even understood that sometimes that controlled the

19   environment she was working in.  And, you know, I'm not sure

20   it's fair to try to say that's an objective observation of

21   what's going on with the person.

22   Q.   But your criticism --

23   A.   Go ahead.

24   Q.   But your criticism was a little more specific.  You're

25   suggesting that because she came up to people and she talked to

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

                          Walsh - Cross                    6164

1   them, you know, how is she really going to gauge that these

2   people are ready for the community.  Right?

3   A.    Right.

4   Q.    Uh-huh.  But there is one element of this that actually

5   benefits the defendants.  Right?  Because if her interacting

6   with people supposedly causes them to act badly, you would think

7   that a casual effort to observe people would actually make them

8   look like they're less appropriate for community placement.

9   Right?

10  A.    I mean, okay.  This is your scenario, but go ahead.  I

11  mean, I'm not sure I would say that, because, you know, I don't

12  think it's just about behavior all the time.  You know, I'm

13  saying she should go in there and she should stand back and she

14  should watch how they take a meal, how they can dress, get up,

15  how they can do skills, how they function, what the nature of

16  their communication is in the natural setting, how people

17  communicate with them, whether they follow orders and commands,

18  whether they follow one step or two step, on and on.  Okay?  But

19  she didn't do any of that.

20  Q.    I'm dealing with a slightly different issue here.

21  A.    Okay.

22  Q.    So do you think when someone walks up to residents and

23  introduces themselves, talks to them, that automatically

24  generates problem behaviors?

25  A.    No.

                            Walsh - Cross                        6165

1    Q.   As a matter of fact, people do that all the time at the

2    facilities.   Correct?

3    A.   Absolutely.

4    Q.   Doesn't taint the observations necessarily.   It could, but

5    it doesn't necessarily?

6    A.   But she's taking this tiny, little sample of behavior that

7    she's injected herself into and she's making transition

8    decisions based on that, or ratings of transition potential for

9    that.

10   Q.   You can't really say how often social workers contact

11   guardians regarding community options.   Correct?

12   A.   I'm sorry.   I don't know where you are.

13   Q.   This has to do generally with the community placement

14   decision and the way the teams work through that process, not a

15   particular part of your report.   But you can't really say how

16   often social workers contact guardians regarding community

17   options.   Is that right?

18   A.   I didn't collect data on that.

19   Q.   Right.   So at least in terms of things like how often

20   guardians are advised about community placement and things like

21   that, you're basically basing your opinions in this matter on

22   what Ms. Green told you?

23   A.   Yes.   We spoke to Ms. Green.

24   Q.   In discussing Ms. Richardson, you also accuse her of bias.

25   Is that right?

Walsh - Cross                                    6166

1    A.    Yes.

2    Q.    She supposedly has allowed pro-community bias to influence

3    her opinions.  Is that right?

4    A.    Yes.

5    Q.    But you do agree that there is an actual integration

6    mandate in the law.  Correct?

7    A.    Yes.

8    Q.    When appropriate services can be identified, a person

9    should be recommended for placement into the community by

10   professionals.  Correct?

11   A.    Yes.

12   Q.    Now, you've suggested that people who advocate community

13   settings are biased.  But it can't be that simple.  Right?  If

14   somebody advocates for a community setting, that doesn't

15   automatically make them biased.  Correct?

16   A.    No, I don't believe so.

17   Q.    Because the actual standard is that people should be in the

18   least restrictive setting appropriate for them.  Correct?

19   A.    The operation of bias is that it reduces objectivity on the

20   part of Mrs. Richardson.

21   Q.    But you've suggested that by hanging out with people or

22   talking with people or acting like people who are looking for

23   community placement, that makes her biased.  Right?

24   A.    No.  Just that she had brought a predetermined set of

25   ideological beliefs into the process and, thereby, reduced

                          Walsh - Cross                          6167

1   objectivity to the process.

2   Q.   Isn't it true if somebody advocates for every opportunity

3   to move someone from the developmental center to the community,

4   that itself does not demonstrate a bias?

5   A.   Correct.  I've done that myself.

6   Q.   And you would agree that none of the United States' experts

7   have actually stated there's a mandate for closing developmental

8   centers.  Correct?

9   A.   Correct.

10  Q.   Are you aware, for example, that most of the United States'

11  experts have or are working in institutions like ICF/MRs?

12  A.   I'm aware of that, yes.  Well, I'm aware of that relative

13  to the experts that I've read the reports of and so forth.

14  Q.   Do you remember before, I, frankly, lost my train of

15  thought and couldn't figure out what I was doing, when we were

16  talking about Ms. Richardson and her supposed bias towards the

17  community when it comes to managing behaviors?

18  A.   Yes.

19  Q.   And you had a quote -- let me see.  I guess it was in your

20  testimony where you talked about how Ms. Richardson's biased

21  because she thinks community placement could dissipate problem

22  behaviors.  Right?

23  A.   Correct.

24  Q.   But if you look at her report at -- I'm sorry.  If we look

25  at your report, at page 56, where you were again quoting from

Walsh - Cross                                               6168

1    her deposition.

2    A.    Yes.

3    Q.    She's talking about the factors that can affect where a

4    placement should be.  Right?  And if you look at the third

5    paragraph, at the top, she says, quote, "Behavior.  And that

6    works both ways as well."  Do you see that?

7    A.    Yes.

8    Q.    So she's recognizing that behavior is something that can

9    work both ways, either for or against the community or for or

10   against the ICF/MR.  Right?

11   A.    At the end of the line, sir, she says, "Sometimes the

12   facility construct exacerbates behavior.  It makes it more

13   difficult to deal with it."

14   Q.    Sometimes.

15   A.    Sometimes.

16   Q.    She's making an individualized decision again, she's making

17   an individualized judgment based on her professional opinion

18   rather than simply relying on simple true/false, yes/no types of

19   things you're using for your statistics.  Right?

20   A.    Well, not when she was talking about the behavior in the

21   case of the person who could have his behavior dissipated.

22              MR. CHENG:  If I could have just one moment, Your

23   Honor?

24              THE COURT:  You may.

25       (Mr. Cheng confers with co-counsel.)

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Walsh - Cross                                        6169

1   BY MR. CHENG:

2   Q.   Do you remember a little bit earlier when we kind of got

3   into that debate about whether you and Dr. Kastner are really

4   all that different in your views about Conway Human Development

5   Center?

6   A.   I don't think we were talking about how different we were.

7   We were talking about whether you thought we were independent,

8   or whether I thought we were independent.  I don't know exactly

9   which.

10  Q.   And certainly in your report and in Dr. Kastner's testimony

11  there's been the suggestion that the Justice Department's

12  consultants are biased, unaware, they've been very critical, and

13  your testimony has been very critical as well.  Correct?

14  A.   Yes.  But if you look at my testimony on balance, my

15  testimony in rebuttal to them is mostly on methodology and

16  practice.

17  Q.   And yet in the end, both you and Dr. Kastner think

18  everything's fine at Conway.  In that sense, there isn't a lot

19  of difference.  Right?

20  A.   We think Conway is fine for people who need active

21  treatment and whose guardians choose it.

22  Q.   And in your deposition, you claim that you and Dr. Kastner

23  occupy a, quote, "relatively vacant middle ground," unquote.  Do

24  you remember that, and that was in regards to community

25  placement?

1   A.    I think you'll have to show me that.  I don't know what

2   you're asking me.

3   Q.    You were basically suggesting that the Justice Department's

4   consultants are anti-institution or somehow biased towards the

5   community, that there's some advocates that are biased toward

6   the institution, but you and Dr. Kastner are right there in the

7   middle.  Right?

8   A.    Well, I mean, if you take a look at the position logically,

9   Dr. Kastner and I believe that you have a broad array of service

10  settings and that you don't favor one over the other, other than

11  in an individual decision basis, that there are two models and

12  they both exist because there are needs for both.  The community

13  advocates, they really want to reduce the reliance on

14  institutional settings, in general.  I don't know if that's part

15  and parcel to all of your experts.  It's parcel to some because

16  they said it.  But, in general, the community advocates would

17  like to do away with institutional settings.  And so it seems to

18  me that's the assertive position.  Our position is that it's

19  what people need and what people want and they should get the

20  ability to go both ways.  And that's what we understand the ADA

21  and *Olmstead* to guarantee them.

22  Q.    This position that you've taken, that you have offered

23  here, it's not really a position taken by a lot of people.

24  Correct?

25  A.    Are you saying that people fall out on one part's side or

1    the other?

2    Q.    There are actually not a lot of people on the noncommunity

3    side or on the poll that you're taking.  Right?

4    A.    I'm not taking a poll.  That's my point to you.  You know,

5    both Dr. Kastner and myself worked in the community for 25

6    years.  I'm on the board of community providers.  I'm on the

7    board of the Arc.

8    Q.    Let me put it this way.  Are there a lot of experts or

9    people in your field who would occupy the position that you

10   take?

11   A.    Perhaps not.  But I'm not sure that makes it any less

12   valuable.

13   Q.    Because professionals have an independent obligation to

14   make assessments in judgment as well.  Right?

15   A.    Yes.  I don't know why people become ideological.  I think

16   Dr. Kastner and I, we are scientific and pragmatic.

17   Q.    Except that you think that even the -- what is it?  The

18   National Association of State Developmental Disabilities

19   Supervisors is itself anti-institutional.  Correct?

20   A.    I think they have tendencies to be anti-institutional.

21   Q.    So there's another group of professionals or colleagues who

22   aren't quite in the same position that you and Dr. Kastner have

23   decided to take?

24   A.    Correct.

25           MR. CHENG:  Thank you, Your Honor.

1       Thank you, Dr. Walsh.

2                      REDIRECT EXAMINATION

3   BY MR. YORK:

4   Q.   Dr. Walsh, I only have one point that I need to clear up

5   here.  And what did I put right in front of you?

6   A.   The name identification code list from my report.

7   Q.   And this indicates who the people are by their initials in

8   your report.  Is that correct?

9   A.   Yes.

10  Q.   Now, you were going through a lengthy, I think it took

11  almost 15 minutes where they did a comparison on page 52 of your

12  report to RC's planned mechanical restraint minutes.  Do you

13  remember that?

14  A.   Yes.

15  Q.   And then that was compared to documents, a number of

16  documents that were pulled together for RC, designated as

17  Government's Exhibit KW-4, and there was some argument that

18  there were certain data that did not compare favorably to your

19  chart.  Is that correct?

20  A.   Correct.

21  Q.   Now, would you look at your name identification code as to

22  who RC is that you're referring to in your report?

23            THE COURT:  You don't have to name them.  Say whether

24  it's the same RC or not.

25            MR. YORK:  Good point.  Thank you, Your Honor.

                    Eugenie M. Power, RMR, CRR, CCR
                       United States Court Reporter

1  BY MR. YORK:

2  Q.   Is it a different RC than what's been referred to in your

3  report?

4  A.   Yes.

5  Q.   So the reference, or the claim that your data on your chart

6  is inaccurate really has no merit, does it, when it's compared

7  to a different RC?

8  A.   Wrong person.  Correct.

9  Q.   And the little speech that Mr. Cheng gave as to this

10  representing a demonstration of how the data at CHDC is flawed

11  will also have no merit based upon this evidence.  Is that

12  correct?

13  A.   Right.  Correct.

14            MR. YORK:  Thank you, Your Honor.

15            THE COURT:  Mr. Cheng may have some more questions.

16                        RECROSS-EXAMINATION

17  BY MR. CHENG:

18  Q.   Did you talk with Mr. York about this?

19  A.   Mr. York brought that to my attention at the end of

20  yesterday.

21  Q.   Right.  So you did actually do some preparation and have

22  discussion before your testimony today?

23  A.   No.

24  Q.   He just brought it to your attention?

25  A.   Just brought it to my attention.  I actually was shocked

Walsh - Recross                                         6174

1    that I didn't pick it up myself.

2    Q.    All right.

3    A.    End of the day, I guess.

4    Q.    Let me take a look.  Is this particular exhibit,

5    Defendant's Exhibit 909, in your report?

6    A.    This was made available to you at our deposition.

7    Q.    Right.  But is it actually in your report?

8    A.    Like an appendix?  I'm not sure that it is.  My report was

9    completed and we were -- we got an e-mail from the law firm that

10   said we were to make up these charts and to supply initials.

11   Q.    Do you see on page 47 of your report we have a table?

12   A.    Yes.

13   Q.    And you list the people with planned mechanical and

14   personal holds?

15   A.    Yes.

16   Q.    And these are the people that you identified for your

17   report?

18   A.    Yes.

19   Q.    And you see RC from Government's Exhibit KW-4 is the first

20   person listed?

21   A.    Right.  This is a list of people who had mechanical and

22   personal holds, that have both.

23   Q.    Okay.  But the RC from Defendant's Exhibit 909 is not

24   listed.  Correct?

25   A.    This is the people that have both.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1  Q.    I'm sorry?

2  A.    The people that have both.

3  Q.    Okay.  But RC from Defendant's Exhibit 909 is not listed

4  there.  Correct?

5  A.    Right.  Because that person may only have one.  This

6  listing was only to -- if you go back a page in my report --

7  because I was determining the differential number of programs

8  versus the number of people who had those programs, and there

9  were 26 people that had both kinds of programs.

10  Q.    And if you turn to page 194, you have another list of

11  people you looked at for behavioral intervention review.  Is

12  that right?

13  A.    Correct.

14  Q.    And here, RC, from your defense exhibit, is not also listed

15  here.  Correct?

16  A.    I'll have to check.

17  Q.    So certainly from your report we're supposed to infer that

18  you had this different list when you were using --

19  A.    The only place I used the initials in my report referred to

20  the person who's named in the name identification code.  In the

21  Table 4 -- in Table 4, the name is there.

22         MR. CHENG:  Your Honor, if this is an error on our

23  part, I apologize.  I'm not absolutely clear that's the case,

24  but it looks like it might be.  However, the fact that the

25  defendant also consulted with Mr. York during the period in the

1    interim, I would ask that this example be stricken or

2    disregarded by the Court completely.

3              MR. YORK:  Your Honor, all I said to him was, "Do you

4    have your identification code?", and he provided it to me.

5    That's it.  So he figured it out as soon as I said that, and he

6    showed it to me.

7              THE COURT:  Yeah.  I don't think that violates the

8    rule and I'm going to deny the request.

9              MR. CHENG:  Okay.  Thank you.

10             MR. YORK:  Nothing further, Your Honor.

11             THE COURT:  You can step down, Doctor.

12             THE WITNESS:  Thank you.

13             THE COURT:  You don't have a 15-minute witness

14   standing by, do you, Mr. York?

15             MR. YORK:  I don't think so.

16             THE COURT:  I kind of had that feeling that maybe the

17   next witness was not going to be a 15-minute witness.  So we'll

18   go ahead and take our noon recess now.  We'll be in recess for

19   an hour.

20        (Lunch recess at 12:44 p.m.; continuing at 1:50 p.m.)

21             THE COURT:  Everyone be seated.

22        Mr. Tayloe, it looks like they've got this down to where

23   you can handle it all by yourself now.  Is that the deal?

24             MR. YORK:  I told him this is the first time we've

25   outnumbered him during this trial.

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

Schulz - Direct                                              6177

1          THE COURT:  Two to one -- three to one, counting Ms.

2    Freno.  And I think Mr. Tayloe can do it.  I have confidence in

3    you, Mr. Tayloe.

4          MR. TAYLOE:  Well, I appreciate your confidence, Your

5    Honor.

6          THE COURT:  Mr. Zaycosky, do you want to call your

7    next witness?

8          MR. ZAYCOSKY:  Thank you, Your Honor.  I'll call

9    Dr. Eldon Schulz.

10          **ELDON SCHULZ, DEFENDANTS' WITNESS, DULY SWORN**

11                          DIRECT EXAMINATION

12   BY MR. ZAYCOSKY:

13   Q.   Good afternoon, Doctor.  Could you identify yourself for

14   the record, and spell your last name, please?

15   A.   Yes.  My name is Eldon G. Schulz, S-c-h-u-l-z.

16   Q.   Dr. Schulz, among other things, you're the medical director

17   for the Arkansas Division of Developmental Disabilities.  Is

18   that right?

19   A.   That's right.

20   Q.   Could you describe your educational background for us?

21   A.   Sure.  I was born and raised in South Dakota.  I did my

22   undergraduate at the University of Idaho in Moscow.  And then my

23   medical school back in my home state, in South Dakota.  And then

24   my residency in pediatrics and an internship at the University

25   of California, San Diego.  And then my fellowship in child

1    development at the University of Massachusetts in Worcester.

2    And I then spent six years with the Army in Germany, and was

3    recruited at the University of Arkansas for Medical Sciences.

4    Q.   How long have you been working in Arkansas?

5    A.   Almost 20 years.

6    Q.   You're currently licensed as a physician.  Is that right?

7    A.   Yes.

8    Q.   Do you hold any board certifications?

9    A.   In pediatrics.

10   Q.   Could you describe the work that you do, your current

11   positions?

12   A.   Sure.  I am the Rockefeller professor for children with

13   special healthcare needs within the department of pediatrics and

14   the college of medicine.  I also have a dual appointment in

15   physical medicine and rehabilitation at the college of medicine.

16   That's my academic role.  My functional role is that of teaching

17   medicine to medical students, residents, and fellows, and other

18   disciplines that touch children with special healthcare needs.

19   I do research.  I write grants.  I do clinical service in many

20   venues around the state, and all with children and young adults

21   with special healthcare needs.

22   Q.   You may have already touched on this, but what's your

23   relationship with the Arkansas Children's Hospital?

24   A.   I am a faculty member that practices at the Children's

25   Hospital.

1   Q.   And do you also serve a role with the Dennis Development

2   Center?

3   A.   Yes.  It's a program of UAMS, and the Dennis Developmental

4   Center is the state diagnostic center for children with special

5   needs, which is pretty much now autism and mental retardation.

6   Q.   What's your position there?

7   A.   Medical director.

8   Q.   You've had several publications, peer-reviewed publications

9   also?

10  A.   Yes.

11  Q.   Could you describe your position as a director, or the

12  medical director for DDS?

13  A.   Yes.  There's four activities that I perform for DDS at the

14  request of Dr. Charlie Green.  The first one is to recruit,

15  educate, and retain physicians for the different programs around

16  the state, including CHDC.  I'm also the physician

17  representative on the DDS death review in which we review all

18  the deaths that occur in all the HDCs around the state.  And

19  also the physician representative on the newly formed committee

20  that reviews all the deaths -- reviews the deaths that come to

21  our committee from the community providers.  I also do special

22  consultations for the developmental centers around difficult

23  cases, trying to come up with diagnostic solutions, management

24  solutions, long-term care solutions.  And then the area that's

25  probably my most active area over the last decade has been in

1    the development of multiple programs for the HDCs, of which most

2    of them started at Conway, and would include things like the

3    bone health program, infection control, dysphagia, pneumonia in

4    children program, and about a dozen others.

5    Q.   With regard to mortality review, what's the purpose of

6    reviewing that material, the committee?

7    A.   There's two levels of review.  The first review occurs at

8    the HDC where the individual resides, and that is to look at the

9    care that's provided at the facility, the nursing care, all the

10   way to the daily living care and medical care.  We correct, if

11   there's corrections needed.  We educate, if that's needed.

12       And then the next level of review is at the state level

13   with a multidisciplinary committee with nurses, a physician, and

14   advocates and parents.

15       And then we look at more systems issues, things that --

16   issues that may impact individuals at other HDCs that need to be

17   addressed, and we recommend to the director policy changes,

18   procedure changes, programmatic changes or development, and then

19   push those out to the other HDCs when they get refined.

20   Q.   With regard to the program development, are there any

21   programs currently going on, or could you explain sort of the

22   systemic process for identifying a program and some of the

23   current projects that are being undertaken?

24   A.   Yeah.  Let me talk about the first one that we did at

25   Conway, and that was to establish the role of the infirmary

1    within the care delivery spectrum.  And we used standards that

2    were developed by the industry and applied them to our clients

3    out there so that when they met a certain level of clinical

4    need, they could legitimately be transferred to a tertiary care

5    center, such as Conway Regional or UAMS or at Children's

6    Hospital.  That program we started eight years ago and it's used

7    every nursing shift, three times a day, if not more, if need be,

8    to evaluate every patient that's sick enough to be in the

9    infirmary.  The idea was not to keep the patients too long so

10   their status became less stable and we could ship them on to

11   definitive care.  And then that was used by the other facilities

12   as well as a standard by which all patients would be judged to

13   see if they need to go to the hospital.  That was the first one.

14   Like I said, we did many other ones similar to that.

15   Q.   Am I correct that the current state of the medical

16   treatment at CHDC has developed over the last several years

17   since you've been involved with it?

18   A.   Yeah.  Even starting further back than that.  Medicine is

19   an evolving science, and with the advent of new drugs, new

20   antiseizure drugs, antibiotics, it's always been improving.

21   However, in the past decade, under the guidance of Mr. Price and

22   Dr. Green, we've made significant strides in improving the care

23   and it's now second to none.

24   Q.   Am I right that at one point you were actually

25   participating as a physician from time to time at CHDC?

1   A.    This is correct.  When myself and my colleague initially

2   became involved in 2001, we were asked to review the status of

3   the medical care there.  We produced a paper with several points

4   and then we rolled up our sleeves and got in there and performed

5   what needed to be done, including seeing the patients on an

6   as-needed basis because they were so severely understaffed with

7   physicians, and I saw patients in sick call several times a week

8   for several months, as I recall, until we could recruit the

9   physicians to take over that role.

10  Q.    Has recruiting been successful?

11  A.    It's been difficult, but pretty much successful.  We've had

12  our ups and downs.  It takes a special physician, it takes

13  special nurses to care for individuals with such intense needs.

14  Q.    And I take it that your role has changed slightly vis-à-vis

15  CHDC?

16  A.    Yes.  I no longer see patients out there because they're

17  now adequately staffed.

18  Q.    Can you describe for us the UAMS contract that is in place

19  to provide specialists?

20  A.    Yeah.  It's a contract that initially started out with

21  Conway, to supply them with the needed services that they

22  needed, and that included, as I recall, an x-ray tech, an

23  infection control nurse, a medical technician, as well as

24  physicians.  And then as we saw that we were developing these

25  programs that could be useful around the state, Dr. Green saw it

1    useful for us to involve the whole system, at which time we

2    started the telemedicine program to push out the programs that

3    we were developing as an incubator, if you will, at Conway, and

4    make sure the whole system rose to the level of the standard of

5    care.

6    Q.    What is the telemedicine program?

7    A.    Telemedicine is one of the great programs we have going on

8    in the state right now.  It's used more and more for direct

9    clinical care.  I think we're going to be moving toward that as

10   well.  We initially used it as a means to push out information

11   to all of the HDCs.  But I think in the near future we may be

12   actually using it in Conway for providing consultation to the

13   docs on an ongoing basis, on a case-by-case basis, because it's

14   done in other disciplines already.

15   Q.    Do you have any supervisory role with regard to the

16   physicians at CHDC?

17   A.    Yes.  There are two faculty that are out there that I

18   supervise.  In fact, I just did their evaluations this week.

19   Q.    Who are they?

20   A.    Dr. Patricia Parmley and Dr. Sam Shultz.

21   Q.    Can you give us any example of your involvement with the

22   particular CHDC residents and how it's been effective or --

23   A.    Like I said, one of my roles is to consult on the difficult

24   cases that come to light, the real head-scratchers.  And Mr.

25   Price asked me a year and a half or two years ago to consult on

1    a case, and there was about a dozen people in the consultation,

2    including the primary care physician, Mr. Price, as I recall,

3    the therapist and several nurses.  And it was around an issue,

4    and it ended up being an ethical issue along with a rehab issue,

5    and the crux of it was, do we take away this individual's right

6    to orally feed because he was at such great risk of aspiration

7    pneumonia.  And the contention was that not allowing him to feed

8    would be, quote, "killing his spirit," unquote.  And it became

9    quite a high-tension situation because the family wanted to keep

10   feeding, several of the therapists wanted to keep feeding, but

11   he was at too high a risk to keep feeding.  He had several

12   gastric operations to place feeding tubes, and that resulted in

13   significant anatomical changes, and we couldn't tell if he was

14   in pain.  We looked for avenues to ameliorate his pain.  Looked

15   at different ways of feeding him.  And we ended up with a

16   half-dozen or a dozen recommendations that the PCP and the

17   nurses would implement.  In follow-up -- it was an informal

18   follow-up with the PCP.  It appeared everything had improved.  I

19   hadn't heard otherwise.  I wasn't asked to come back and

20   reconsult or being asked to relook at the case.

21   Q.   Do you have an understanding about the medical needs of

22   CHDC residents generally?

23   A.   Could you rephrase that?

24   Q.   Do you think the medical needs of CHDC residents -- are

25   there more medical needs for CHDC residents as opposed to the

Schulz - Direct                                    6185

1   general population?

2   A.   Oh, absolutely.

3   Q.   Even compared to other developmentally disabled people in

4   Arkansas?

5   A.   Other than in nursing homes, CHDC has the most fragile of

6   the fragile.  Now, there is equally fragile kids in the

7   hospital, Children's Hospital, long term, but there's a

8   significant group that are extremely fragile.  A cold or a flu

9   could push them over the edge and require significant

10  respiratory support.

11  Q.   Do you know if CHDC residents have better access to medical

12  care than they would if they were not at CHDC?

13  A.   Well, the only better access to care would be in the

14  hospital.  CHDC is uniquely located in Central Arkansas with two

15  medical centers within its proximity.  That is Conway Regional

16  Medical Center and UAMS.  And in addition, they are staffed with

17  a nurse 24/7, and many times there's a physician on grounds

18  24/7.  So if a patient gets sick, they are administered to

19  within minutes and can be at one of the tertiary hospitals

20  within minutes.

21  Q.   Do you know how readily available medical services are in

22  other parts of Arkansas?

23  A.   Well, it depends where you live.

24  Q.   I think you and I had a brief discussion earlier and you

25  mentioned the town, and I think it was Fox, Arkansas, maybe?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    A.    Fox, Arkansas, yeah, I used that as an example.  I mean to

2    offend no one.  It's a beautiful place in north central Arkansas

3    but it is a significant distance from either the medical center

4    in Clinton, Arkansas or the medical center in Mountain Home.

5    And families live there.  Families live there with their

6    special-needs individuals.  And if you're sick, you have about

7    an hour before you have good access to medical care.

8    Q.    I think that's all the questions I have.  Thanks.

9                         CROSS-EXAMINATION

10   BY MR. TAYLOE:

11   Q.    Dr. Schulz, good afternoon.  My name is Bo Tayloe.  I'm an

12   attorney with the Department of Justice.  Nice to see you.

13   A.    Good afternoon.

14   Q.    You were asked about the different responsibilities you

15   have at a macrolevel, if you will, at DDS, and I believe you

16   gave four different categories, one of which was death reviews

17   for the facilities and for community providers.  Do I have that

18   right?

19   A.    Correct.

20   Q.    And you also talked about development of new programs, and

21   you mentioned, I believe, programs around dysphagia, among

22   others.  Do I have that right?

23   A.    Right.

24   Q.    In conjunction with those two activities, are you aware

25   whether -- do you have an opinion whether aspiration pneumonia

1   would normally be a reason for someone to seek hospice care in a

2   DD population?

3   A.   Could you rephrase that question, please?

4   Q.   I'd be glad to try.  Is aspiration pneumonia, in and of

5   itself, normally a terminal condition that would cause someone

6   to seek hospice care?

7   A.   Absolutely not.

8   Q.   Now, in these initiatives that you talked about, would that

9   include the provision of psychiatric care?

10  A.   If asked to get a consultant to look at something, it may,

11  but it never has involved that.

12  Q.   You weren't involved in a decision to discontinue the use

13  of a medication called Depo-Provera at CHDC?

14  A.   I was.

15  Q.   And the decision was made to discontinue the use of that

16  medication.  Is that correct?

17  A.   That is correct.

18  Q.   And what is that medication used for, or what was the

19  concern that led you to reach that decision?

20  A.   It's an estrogen agonist, and it prevents menses in women.

21  However, there is some literature that indicates that it

22  decreases hypersexuality in men, and the injection may help them

23  better transition into the community.  However, there are

24  significant side effects that are hidden side effects that we

25  felt did not raise the level or standard that we wanted to

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   support.

2   Q.    Things like breast cancer in men?

3   A.    You got it.

4   Q.    Testicular cancer?

5   A.    Exactly.

6   Q.    You mentioned telemedicine just now.  Is there any reason

7   why -- I can imagine something like surgery would be difficult

8   to provide through telemedicine.  But what about psychiatric

9   care?  Do you have an opinion about the feasibility of providing

10  psychiatric care through telemedicine?

11  A.    I believe there are several models in the United States

12  that are already doing it, and if I'm not mistaken, my home

13  university is also thinking about, if not doing some test trials

14  with that modality.

15  Q.    So if you're living in a remote area and you don't have

16  immediate access to a psychiatrist or a child psychiatrist, one

17  way to address that problem would be through something like

18  telemedicine.  Correct?

19  A.    That's what -- we're theorizing.  We haven't gotten the

20  full answer on that yet.

21  Q.    You were asked about, in my words, but I think if I'm

22  paraphrasing it incorrectly, please straighten me out, the

23  medical fragility of the population at CHDC.  Do you recall that

24  question and your answer?

25  A.    Yes.

1    Q.    Now, you said outside of nursing homes, these folks would

2    be in the highest category in terms of fragility, medical

3    fragility?

4    A.    Correct.

5    Q.    Does that apply to the children at CHDC?

6    A.    There are some children that meet that criteria.  I have

7    cared for many of them that are there through other programs,

8    and those programs could not meet the needs of those children

9    and we asked the family if they would consider CHDC for care.

10   Q.    You used the word "some."  I want a better understanding of

11   your understanding.  Are you saying the majority of children are

12   medically fragile or is it a minority?

13   A.    I haven't looked at the statistics of each individual

14   center in the past several years since I've gotten out of direct

15   care.  I don't know what percentage that would be, sir.

16   Q.    How is it that you have the opinion you do with regard to

17   the general population at CHDC if you haven't done a statistical

18   review of the individuals?

19   A.    I'm not sure what you're asking me.

20   Q.    I'm coming back to your observation that as a whole, the

21   population at CHDC is one that involves a lot of people with

22   medical fragility, and you made the comparison to nursing homes

23   as the only place you would go where you would encounter, you

24   expect, folks who would have more medical needs.  Am I

25   paraphrasing your testimony accurately or correctly, from your

1    perspective?

2    A.    Or a hospital.

3    Q.    Okay.  Or a hospital.  Thank you.  With those exceptions

4    though, that was where -- that was your assessment.  So I'm

5    asking how you came to that assessment.  Have you done a study

6    of the residents of CHDC to make that determination?

7    A.    Like I said, in the last couple of years I've not done any

8    statistics.  But the population hasn't changed significantly,

9    and the deaths that we review are those of the most fragile.

10   Q.    The deaths that you've reviewed.  And so you're drawing

11   your conclusion based on the mortality review you participate

12   in?

13   A.    And informal discussions with my colleagues.

14   Q.    Now, we were talking earlier about your role occasionally

15   consulting on psychiatric services at CHDC.  Do I have this

16   right that your guidance would be before getting to the point of

17   prescribing medication, you, the clinician, should seek to

18   adjust a patient's environment and use nonpharmacological

19   options?  Is that correct?

20   A.    I understand the last part of your question, but I don't

21   understand the beginning of the question.

22   Q.    The part about adjusting a patient's environment?

23   A.    No.  My role in psychiatric consultation.

24   Q.    Well, is that what you would expect the facility to be

25   doing around psychiatric care, that is, looking to adjust the

1    environment first and looking at nonpharmacological

2    interventions first?

3    A.    I would systematically go about changing one at a time, and

4    if the child came in on a medication, I would probably maintain

5    that medication, adjust the environment, and then begin to wean

6    the medication.  You never want to do two things at once because

7    that violates the scientific method and you can get yourself

8    into more problems not knowing which of the modalities made it

9    change or made it worse.

10   Q.    And one of the reasons -- but coming back to the order of

11   things.  You start first with environmental before going to

12   pharmacological.  Correct?

13   A.    That's standard practice.

14   Q.    And behavioral before going to pharmacological?

15   A.    That is a standard practice.

16   Q.    And one reason for that is with this population, this

17   population, in your opinion, is particularly sensitive to side

18   effects of psychotropic medications.  Correct?

19   A.    Uh-huh, yes.

20   Q.    In fact, I believe you said at your deposition that the

21   typical child with ADHD may have intolerable side effects in

22   about a range of 3 to 5 percent, but if your intellectual status

23   is an IQ below 70, your rate of side effects goes up to

24   30 percent, a ten-fold increase?

25   A.    Very good read.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

                          Schulz - By Court                        6192

1   Q.   And not only am I reading it correctly, but accurately

2   capturing your assessment?

3   A.   Almost to my inflections.

4   Q.   I was impressed by your Boston accent earlier.  I would not

5   be able to pull that off.  Dr. Schulz, thank you very much.  I

6   have no further questions.

7          MR. ZAYCOSKY:  Nothing further.

8          THE COURT:  I have a couple for you, Doctor.  How long

9   have you been working on this committee that reviews the deaths

10  at Conway Human Development Center?

11         THE WITNESS:  I would need to look at my CV, Judge,

12  but I think it's been around 2005 when I assumed that role.

13         THE COURT:  Roughly, five years?

14         THE WITNESS:  Yeah.

15         THE COURT:  We understand it may not be exact.  And do

16  you all review every death that occurs out there?

17         THE WITNESS:  Yes.  And in all the HDCs, right.

18         THE COURT:  And at Conway Human Development Center, do

19  you have any assessment, based on your review of those cases, as

20  to whether the medical practice, or lack thereof, at Conway

21  Human Development Center contributes to unnecessary deaths?

22         THE WITNESS:  We review those deaths in great detail,

23  and I am always a skeptic.  You can ask anyone on the committee.

24  I'm not committed to any bias, and, in fact, I try to keep it

25  very scientific, and I try to look under every stone and look

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1    for every place there could be an error, making the assumption

2    that there was an error in the first place.  And, fortunately,

3    there has never been a situation where the cause of death was

4    due to some medical malpractice or medical endeavor.

5         THE COURT:  All right.  Now, the other thing that you

6    mentioned, you mentioned that you had treated some of the

7    children at Conway Human Development Center in other settings,

8    and then -- I'm not going to try to paraphrase, but you

9    described in cursory form a sequence of events that led someone

10   to recommend that the parents or guardians seek placement at

11   Conway Human Development Center.  I want you to flesh that out,

12   explain what you were talking about.

13        THE WITNESS:  Sure.  I see children as they come out

14   of the pediatric intensive care following catastrophic injury,

15   head injury, spinal cord injury, that changes their life forever

16   in a catastrophic way, and I see them on the rehab unit, get

17   them to the point where hopefully they can integrate back into

18   their community, back into their school.  But there's a small

19   percentage of them that their injuries are so severe and their

20   functional impairments are so great that neither the home nor

21   the school they would return to can manage their needs.  Many of

22   those children move to the Easter Seals Rehabilitation Center

23   where I am the medical director.  We take those children and try

24   to maximize their functional performance and -- and there are

25   instances where these children don't make any gains, they remain

1   pretty much vegetative, responsive to basic stimuli, pinching,

2   poking, but they're nonverbal, they are -- they don't self-feed.

3   They are tube fed.  Some need respiratory support.  If they're

4   not making gains at the Easter Seals program, we typically find

5   placement for them.  We try to get them back home, to their

6   parents, to a provider in their community.  But the needs are so

7   great, they overwhelm the system in that community, overwhelm

8   the school.  One of the considerations in the spectrum of care

9   for children with special healthcare needs and DD individuals

10  are the HDCs, and that's an option that the parents are told

11  about on the front end.  We lay out kind of the whole spectrum

12  in hopes that they'd go home and be typical kids when they leave

13  the ICU and come to us on rehab.  But we know there are going to

14  be some that are very, very involved.

15          THE COURT:  And you've described kind of an extreme

16  situation.  Over the last four or five years, do you have an

17  estimate of how many of those kinds of cases there have been

18  where ultimately you or someone else that you're working with

19  referred the kids to Conway Human Development Center?

20          THE WITNESS:  I would need to ask my colleagues at

21  Easter Seals, but I'm thinking one a year, maybe one and a half

22  a year.

23          THE COURT:  So maybe four or five, maybe six over the

24  last four or five years?

25          THE WITNESS:  Yeah.  And I may be underestimating.

Kraus - Direct                                                    6195

1    Because once a decision is made -- and a lot of things happen

2    behind the scenes because it's not a medical facility at Easter

3    Seals, it's a community-based system.  So it's not

4    physician-driven.  I support the medical care and the decision

5    is made between the facility and the parents.

6            THE COURT:  All right.  Any of you all feel free to

7    follow up on my questions if you have anything you want to ask.

8            MR. ZAYCOSKY:  No, Your Honor.

9            MR. TAYLOE:  Nothing, Your Honor.

10           THE COURT:  Thank you, Dr. Schulz.

11           THE WITNESS:  Thank you.

12           MR. YORK:  Your Honor, we call Louis Kraus, M.D.

13           **LOUIS KRAUS, DEFENDANTS' WITNESS, DULY SWORN**

14                          DIRECT EXAMINATION

15   BY MR. YORK:

16   Q.   Good morning, Dr. Kraus.

17   A.   Good morning.

18   Q.   Or good afternoon, I should say.  Dr. Kraus, I put in front

19   of the Judge, and you've seen it, Exhibit 202-A.  Could you tell

20   us what that is?

21   A.   That's my CV.

22           MR. YORK:  Your Honor, we move the admission of 202-A

23   into evidence.

24           THE COURT:  Received.

25       (Defendants' Exhibit 202-A received in evidence.)

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

1  BY MR. YORK:

2  Q.   Can we go over your qualifications some, Doctor?  Let's go

3  over exactly what your present position is first and then we'll

4  go over some of your history.

5  A.   Woman's Board professor and chief of child and adolescent

6  psychiatry at Rush University Medical Center in Chicago.  And

7  then I have a variety of other positions that I have, both

8  through Rush as well as privately.

9  Q.   And what do you do as the chief of child and adolescent

10  psychiatry?

11  A.   I take care of our fellowship, I oversee that with our

12  training director.  We have four fellows.  We have an inpatient

13  unit.  We have an outpatient facility where we see patients.  We

14  have psychologists and social workers that are there.  We run

15  the clinical services for a residential facility called the

16  Orthogenic School on the South Side of Chicago.  And I'm the

17  medical director for the Easter Seals Therapeutic Schools in

18  Chicago, which are therapeutic day schools for severely

19  developmentally delayed kids, primarily with autism.

20  Q.   Can we go over your academic record a little, please, your

21  degrees?

22  A.   Sure.  Undergraduate at Syracuse.  Chicago Medical School.

23  Internship in surgery at Boston University.  My residency, chief

24  residency at Northwestern, and my child and adolescent

25  fellowship at University of Chicago.

Kraus - Direct                                          6197

1    Q.    When you refer to your child and adolescent psychiatric
2    fellowship, is that what resulted in your certification in the
3    area of child psychiatry?
4    A.    Correct.  After the fellowship, one takes a set of boards,
5    as you do with general psychiatry.
6    Q.    Now, do I understand you worked at the University of
7    Chicago as an assistant professor?
8    A.    After I finished my training there, I stayed on, on their
9    inpatient services, and doing a variety of forensic work.  I
10   continued to work as the psychiatrist at the maximum security
11   youth center in Joliet, where I was at for about nine years.
12   Q.    And before you were the chief of child and adolescent
13   psychiatry and the Woman's Board professor of child and
14   adolescent psychiatry at Rush University, you were the chief of
15   child and adolescent psychiatry at Evanston Northwestern
16   Healthcare.  Is that correct?
17   A.    That's correct.  It's a large community-based hospital on
18   the North Shore of Chicago.  It's associated with Northwestern.
19   Q.    Are you currently an associate professor at the University
20   of Chicago?
21   A.    No longer.
22   Q.    Okay.  And you are board certified in child and adolescent
23   psychiatry.  Is that correct?
24   A.    I am.
25   Q.    And in general psychiatry you're certified too?

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    A.    Yes.

2    Q.    And in forensic psychiatry you're certified?

3    A.    Yes.

4    Q.    You also have some history of working as a consultant for

5    the U.S. Department of Justice.  Is that correct?

6    A.    I do.

7    Q.    Could you tell us what that history is?

8    A.    Sure.  I had worked with a CRIPA evaluation in Maryland,

9    looking at two of the facilities there, Cheltenham, and Hingham

10   I think it was called.  And then worked for about three years

11   with the DOJ in a consent decree for the State of Arizona in

12   helping develop their medical and mental health program for

13   juvenile corrections.  I oversaw that.

14   Q.    And you're a delegate to the American Medical Association

15   for the American Academy of Child and Adolescent Psychiatry.  Is

16   that correct?

17   A.    Correct.  All the major medical societies have a delegate,

18   or some more than one.  We just have one.  But I have an

19   interest in organized medicine.  I also have an elected position

20   with the AMA as well.

21   Q.    Doctor, could you describe for me your clinical background

22   in the treatment of children and adolescents?

23   A.    I have an extensive amount of inpatient work.  I've worked

24   at a number of different residential facilities, several

25   different therapeutic schools.  As I had mentioned, I worked for

Kraus - Direct                                          6199

1    nine years at a maximum security youth center in Joliet.  I
2    currently consult with about 12 to 15 different schools as their
3    consulting psychiatrist.  I have a private practice as well
4    where I do both treatment as well as forensic work.  And through
5    the years, there's a variety of things that I do.  I also do a
6    lot of advocacy work.  I spend about two months a year off of
7    work, sort of advocating to try to get services for kids in
8    Washington and what have you.
9    Q.   Are you also currently the psychiatric director of the
10   Sonia Shankman Orthogenic School?
11   A.   Yes.  That's the residential facility where I go with my
12   fellows, and we have about 50 children that are there, through
13   Rush.
14   Q.   And what are the characteristics of those children as far
15   as any disability or their condition, medical condition?
16   A.   Sure.  These are kids that are primarily placed there
17   through Illinois, although about 15 percent of them are from the
18   state of California.  And these are kids that are
19   high-functioning autistic, have significant mental health issues
20   to the point that they cannot be taken care of on an outpatient
21   basis in a therapeutic day school.  These are kids that are
22   typically of average intelligence, and so that there is a goal
23   to try to get these kids ultimately back into the community.
24   Q.   Are you also currently the medical director for the Chicago
25   Metropolitan Easter Seals Therapeutic Schools?

Kraus - Direct                                      6200

1    A.    I am.

2    Q.    And what do they do, or what type of individuals do they

3    care for?

4    A.    I've been their medical director for about a dozen years,

5    and they take care of severely autistic children.

6    Q.    And, Doctor, do you also consult to various school

7    districts in Illinois as far as clinical work with children and

8    adolescents?

9    A.    I do.

10   Q.    Doctor, could you tell us what your role was in this case,

11   what your goal was in trying to do a review here?

12   A.    My role is to assess the psychiatric services of the

13   children at the facility.

14   Q.    And to do that, did you interview various individuals that

15   you chose at CHDC?

16   A.    I did.

17   Q.    Could you just tell us some of those people that you

18   interviewed just so we get a general list?  It may not be

19   exhaustive, but --

20   A.    Sure.  Mr. Price, Ms. Miller, Ms. Henderson, Dal Burgess,

21   several of the psychologists, dorm staff, one or two of the

22   nurses, as well, come to mind.  There may be a few others, but

23   those are the ones off the top of my head.

24   Q.    And, Doctor, you know your report has been marked as

25   Exhibit 202 --

1   A.    I apologize.  Of course, Dr. Callahan.

2   Q.    Okay.  And if you need to refer to your report, you can do

3   so.  You're doing fine without it, but I just wanted to mention

4   to you that it has been marked as an exhibit and you can refer

5   to it, if you need to refresh your memory.

6   A.    If I can just add a few others.  In looking down at my

7   report, also several of the pediatricians that I had met with,

8   Dr. Schulz, Dr. Parmley, developmental pediatricians, and I also

9   met with Dr. Lea, a board certified family practice physician.

10  Q.    And, Doctor, among the documents you reviewed, did you

11  review the reports and depositions of some of the plaintiff's

12  experts?

13  A.    I did.

14  Q.    And would those include Dr. Holloway, Dr. Mikkelsen,

15  Dr. Manikam, and perhaps some others?

16  A.    Yes.

17  Q.    And what else did you review as far as documents?

18  A.    I attempted to and believe that I've reviewed all of the

19  children's charts who were being treated on sometimes

20  psychotropic medication, that are being seen either on a

21  consulting basis by the psychiatrist or treated by the physician

22  there.  There were a variety of court documents which I

23  reviewed.  I reviewed the depositions of the DOJ experts as

24  well.

25  Q.    And how did you choose which records to review from CHDC?

1    A.    I attempted to review all of them, all of the child records

2    of children that were on psychotropic medication.  I thought

3    that that would give me the best overall sense of the kids'

4    treatment.

5    Q.    And, Doctor, I'm sorry to make you go through this, but

6    without your report in evidence, I think we need to list the

7    rest of the things that you also reviewed.  You've already

8    covered declarations and reports and depositions of plaintiff's

9    experts.  Would you tell us what other documents you reviewed to

10   complete your analysis in this case?

11   A.    It's okay to refer now to my report?

12   Q.    Yes.

13   A.    Thank you.  The CRIPA investigation of the Conway Human

14   Development Center from April of 2004.  The CARF accreditation

15   letter, January 20, 2010.  Conway Human Development Center

16   behavior support programs, safety plans.  CHDC individual

17   programming, behavioral programming, philosophy policies, other

18   policies as well.  Restraint summaries from 2008.  Lab

19   surveillance guidelines.  Restraint summaries for 2005, 2006,

20   2007.  Curriculum vitaes of the DOJ experts.  Reports of

21   findings of the Civil Rights Division investigation of the

22   conditions at Conway from April 21 of 2004.  The list, of

23   course, of all the residents, which I assessed.  The declaration

24   of Jodie Holloway, in addition to her report.  The actual CARF

25   survey report from December of 2009 for Conway.  Pharmacy

1    side-effect sheets that are given to guardians and parents for

2    children on psychotropic medications.  The curriculum vitaes of

3    the current physicians at Conway.  I think that essentially

4    summarizes it, in addition to what I'd already mentioned.

5    Q.    And, Doctor, did you visit CHDC and conduct any

6    observations?

7    A.    I did.

8    Q.    Could you tell us or describe those for us, please?

9    A.    Sure.  I spent two long days there with essentially no

10   breaks.  And so not to jabber on too much, just general

11   observations initially, or the specific --

12   Q.    Just general for right now.

13   A.    I drove up.  It's a large facility with a lot of space.  I

14   found that the staff that I had met with had been there for many

15   years.  I'm not talking just about the senior staff, like Mr.

16   Price who had been there since the mid-1950s, but also many of

17   the cottage staff.  And that they had come -- and they were not

18   clear on exactly what I would be asking for initially.  And when

19   I said I wanted to see all the charts, they were able not only

20   to get me the medical charts, but a second set of charts as well

21   that had a variety of the additional, sort of a master file of

22   information that I was able to look at jointly.  Then I was able

23   to go to the cottages where the children were at and be able to

24   observe them while they're in the cottages.  And if the kids

25   were not in the cottages, they tried to get me to the places

1    where they were so I could have a chance to at least spend some

2    time looking at essentially every child that I reviewed charts

3    of.

4    Q.    And, Doctor, as we go through specific examples later, if

5    you have other observations to fill in, specific observations,

6    you can do so at that time.  All right?

7    A.    The only other, if I could add, is in a general sense.  The

8    facility was remarkably comfortable.  The kids with significant

9    developmental delays in many of the yards were smiling, were

10   surprisingly interactive with the staff.  And it was just a

11   striking process to see.

12   Q.    Doctor, one of the issues that's been raised is whether or

13   not Dr. Callahan can render psychiatric services to children and

14   adolescents because he is a general psychiatrist rather than

15   certified in child and adolescent psychiatry.  I believe you did

16   a review of accepted parameters and standards for children and

17   adolescents in residential facilities for psychiatric services.

18   Is that correct?

19   A.    I have.

20   Q.    Would you describe for me what your review revealed of

21   those parameters that exist?

22   A.    Although it's always a hope that one can get a child and

23   adolescent psychiatrist to treat kids, the most recent parameter

24   of sorts that's out from the Academy of Child and Adolescent

25   Psychiatry, which actually just came out in June, clearly states

1   that because of the work force shortage of child psychiatrists

2   in the areas where child psychiatrists simply aren't available,

3   that one wants to be able to have well-trained and experienced

4   general psychiatrists in lieu of that because there really isn't

5   an option.  For example, in the county where Conway is, there

6   are no child psychiatrists.  Even when one looks around Little

7   Rock, based on the statistics from the Academy of Child and

8   Adolescent Psychiatry, at most, 18 child psychiatrists, although

9   perhaps not all of them practicing.  This would be an area where

10  there is an obvious work force issue.

11  Q.   Do the parameters cited by the American Academy of Child

12  and Adolescent Psychiatrists specifically require that only a

13  child psychiatrist render services to children?

14  A.   No.  As I just stated, in areas where there are work force

15  shortages of child psychiatrists, that they clearly state that a

16  general psychiatrist is acceptable in those situations.

17  Q.   Doctor, are there studies that have shown that there's a

18  substantial variation across states as to the methods used to

19  regulate residential facilities for children with mental

20  illness?

21  A.   There are.

22  Q.   Could you describe that?

23  A.   Yeah.  There are different articles that talk about it,

24  even the parameters.  Even when the Academy tries to put

25  together a group of child psychiatrists to put together these

Kraus - Direct                                          6206

1    types of parameters, there's tremendous variation, and it's not

2    just state by state, but it also has to do with what type of

3    facility the people are coming from.  So if it's a facility with

4    very high-functioning kids, if it's a facility with

5    medically-compromised children, if it's a facility that deals

6    with severely autistic children, if it's a facility that deals

7    with children that are self-mutilators, there's going to be

8    tremendous variation in regards to what the specific needs are

9    for the children; variations, for example, in suicide risk,

10   obviously a major concern, among others.

11   Q.    Doctor, at least one of the plaintiff's experts, maybe more

12   than one, tried to take the requirements for inpatient

13   psychiatric facilities and apply them to a residential setting

14   like CHDC.  Is that appropriate?

15   A.    No.

16   Q.    Why not?

17   A.    Inpatient facilities are the most restrictive mental health

18   interventions that we have.  There are very strict requirements

19   as a result of that, primarily related to Eighth Amendment

20   issues, but other, you know, restriction components as well.

21   And that not only is it my opinion that one should not apply

22   inpatient requirements to this facility, but in all of the other

23   DOJ work -- and this is public knowledge -- that I'd done in

24   regards to the juvenile correctional facilities, it was very

25   clear, and this was discussed repetitively, that inpatient

1    facilities are simply too restrictive to compare to, for

2    example, a juvenile correctional facility, which it was their

3    opinion was most closely related to a residential facility, but

4    not to an inpatient facility.

5    Q.   Did you also review the practice parameter on the use of

6    psychotropic medications in child and adolescents that's

7    published by the American Academy of Child and Adolescent

8    Psychiatry?

9    A.   I did.

10   Q.   How, if at all, does it apply to this circumstance here at

11   CHDC?

12   A.   I simply looked at the parameter to see if there were any

13   obvious areas that weren't being followed in regards to the use

14   of psychotropic medication.  My opinion is that the basis of the

15   parameters were essentially followed.

16   Q.   Did you also review the practice parameters for the

17   prevention and management of aggressive behavior in children and

18   adolescents in psychiatric institutions with special reference

19   to seclusion and restraint?

20   A.   I did.

21   Q.   And what did your observations reveal there?

22   A.   Well, it was -- it's complicated because it doesn't go into

23   the detail of the type of restraints, or what is clarified as

24   restraints that are used in this facility.  So, for example, the

25   more subtle restraints, which were, you know, such as safety

1   restraints, for example, children with seizure disorders that

2   may have a tray in front of them on a chair so that if they have

3   a seizure, they don't fall on their face and knock out a tooth

4   or cause facial damage, or children who are picking at

5   themselves that may have some very light gloves on so they don't

6   pick at themselves, these are seen as a form of restraint.  That

7   type of restraint really is not described in the policies.

8   Sitting restraints are not described in those, and yet these are

9   used widely throughout the country.  In regards to supine

10  restraints, I felt that they're consistent with regards to what

11  they might use, and I think that the proof is in the pudding in

12  that there was essentially no significant morbidity, and

13  certainly no mortality associated in recent time in regards to

14  the use of restraint.

15  Q.   Doctor, if you would jump to page 24 where you have some

16  cottage observations that you made.  In particular, I'm

17  interested in your comments on what you observed about BB.

18  Could you tell us what you observed about him and whether or not

19  he has signs of tardive dyskinesia?

20  A.   One moment, please.  Yes.  I had observed BB in the yard,

21  and in my opinion, BB presented as a child with cerebral palsy,

22  or symptoms consistent with cerebral palsy.  He did not have the

23  choreoathetotic movements.  These are very particular types of

24  movements associated with tardive dyskinesia, a potential side

25  effect of neurologic medication.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    Q.    Doctor, starting on page 25 and running for a number of

2    pages, you have a great deal of information broken down to

3    individual residents.  And we're not going to go through every

4    one of those.  And I think the Judge may be relieved to hear

5    that.  But what I would like you to do is read into the record

6    all the people that you reviewed the charts of by their

7    initials, please, just so we have a record of that.

8    A.    Sure.  LW, BB, TC, JB, CA, MB, KC, HB, JB, DB, AB, MG, KH,

9    CJ, RD, MM, RC, HA, BH, CL, TM, JM, TT, CT, SW, NS, JR, TS, CS,

10   CW, MW.  I think that may be it.

11   Q.   How about at the very end of that section, are these

12   additional charts too that maybe you didn't write a summary of,

13   you said additional charts reviewed included on page 55?

14   A.    There's an overlap of additional children whose charts I

15   didn't review -- I'm sorry -- whose charts I reviewed briefly

16   but there really wasn't anything notable to write.  It totalled,

17   I believe, about 35 children in total whose charts I'd looked

18   at.

19   Q.    And, Doctor, I think there might be a typographical error

20   in your report.  You did refer to, in that group that you've

21   just named, TM, but I think earlier in your report you also

22   referred to a TN.

23   A.    Correct.  It actually -- the typographical error, it's a

24   problem sometimes in just using initials.  I apologize.  Where

25   it says TN, N as in Nicholas, it should actually read TM, as in

1   Mary.

2   Q.   So all the references to TN should be to TM.  Is that

3   correct?

4   A.   Correct.

5   Q.   Now, again, I'm sorry to have you read it into the record,

6   but, first of all, tell me what you mean when you say you looked

7   at diagnostic evaluations, what did you look at, and then we'll

8   actually read into the record the people that you reviewed their

9   diagnostic evaluations.

10  A.   There were comprehensive diagnostic evaluations that were

11  put together of the kids, summarizing their background

12  information, which I had reviewed.  And the point of listing

13  these, and not going through all of them, what was essentially

14  my role was not to evaluate in detail these diagnostic

15  evaluations, which were relatively comprehensive, but simply to

16  make it clear that they're there and a part of the file of the

17  children.

18  Q.   And I hate to make you do this, but could you read those,

19  the initials of those people in so we know in the record who you

20  did review diagnostic evaluations for?

21  A.   Yes.  Here we go.  CA, JB, HB, MB, HA, AB -- oops.  JB, DB,

22  KC, TC, RC, RD, MG, CH, BH, CJ, CL, JM, MM, JR, BR, CS, ZS, TS,

23  NS, CT, CW, SW, BW, MW, LW, and I believe that's IW.  Could be

24  JW.  I'm not sure.

25  Q.   And, Doctor, was it important in reviewing all these

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Direct                                           6211

1    records to look as to why these children were referred to CHDC

2    in the first place?

3    A.    Absolutely.

4    Q.    And can you tell me why?

5    A.    As I began to talk to staff, there was a certain level of

6    low morale when I talked to some, a sort of feeling like a

7    beaten quality.  And as I talked to them, just in kind of a

8    general sense, they were talking about the severity of the kids

9    that they take care of.  This is before I'd gone to the cottages

10   and really had taken a look at the kids.  And as I was talking

11   to them, I started to think, gee, it would be interesting to

12   look at what exactly these kids went through before being

13   referred to CHDC.

14        And so what I did within my report was I summarized the

15   amount of interventions that these poor kids went through before

16   being admitted, the multiple hospitalizations, the involvement

17   of DCFS, multiple home placements of foster families, sometimes

18   specialized foster families, even placements at prior

19   residential facilities that had failed, such as Easter Seals.

20   These kids had been -- these kids had been in, many of them in

21   multiple hospitalizations, with treatment with child and

22   adolescent psychiatrists, such as at the University Hospital

23   here in Little Rock, and still could not be stabilized on an

24   outpatient basis.  And I'm not sure if it could be completely

25   appreciated how complicated the developmental delays, the

1    behavioral difficulties, psychiatric and medical difficulties

2    are of these kids and why they've needed this type of facility

3    so that they can safely, hopefully, grow to as much as they can

4    to their full potential, and in my opinion, having less

5    likelihood of morbidity or mortality, both for themselves as

6    well as others.  Many, many of these kids were actually

7    ultimately placed there because they're so aggressive that even

8    with all of the medications they'd been on could not be

9    stabilized.

10   Q.   Now, are there any other options that you're aware of for

11   these children in the state of Arkansas?

12   A.   At the point when these children were placed at CHDC,

13   there's nothing that I have been made aware of, any other

14   options, short of placing them in a hospitalization, which is

15   considered a significantly more restrictive alternative.

16   Q.   Doctor, do you have an opinion as to whether or not the

17   psychiatric care of the children at CHDC has been reasonable and

18   consistent with the community standards of care and whether it

19   meets accepted professional standards?

20   A.   I do.

21   Q.   What is that opinion?

22   A.   That overall and in general I feel that it has met

23   professional standards and is consistent with community care.  I

24   had made a comment about this in that I felt that -- and it

25   should be understood that the psychiatrist is there as a

1    consultant; that you have a series of other physicians who have

2    tremendous pediatric care experience.  You have developmental

3    pediatricians that are trained in working with kids with

4    developmental disabilities.  You have a family practice

5    physician.  The psychiatrist is coming in there as a consultant

6    to work with them, to help in regards to how they should care

7    for the children, not as the direct treater.  With that in mind,

8    you know, I did think that they could benefit from additional

9    psychiatric care and something they should talk to the

10   University about in regard to their contract.  It's my

11   understanding they are looking at that.

12        But beyond that, and in looking at the kids, I felt that

13   the care was relatively impressive in regards to the level of

14   stability that they've had, the lack of any type of severe

15   morbidity or mortality, the lack of hospitalizations.  These are

16   kids who were having repeated hospitalizations and now are not.

17   And variable attempts, very significant attempts in trying to

18   lower medications on these kids, but for many of these kids, not

19   having that possible and that they would become more aggressive.

20   Q.   Doctor, did you also obtain enough information to have an

21   opinion on whether there was adequate communication among the

22   consulting psychiatrists, Dr. Callahan and the staff and other

23   physicians?

24   A.   I did.  I'd like to comment.  On the one hand, without

25   question, there's adequate communication, and that communication

1    in a variety of ways is documented in the charts.  The

2    difficulty is that -- let me rephrase that.  The communication

3    itself is not as clearly documented in the charts, but the end

4    result of the communication is.  So, for example, in the IPPs,

5    in the treatment summaries, the psychiatric involvement is

6    there; that when you talk to Dr. Callahan, the consulting

7    psychiatrist, he'll explain that he talks to the nurse, to the

8    involved physicians in treatment, he'll talk to the cottage

9    staff.  And when I talked to these individuals separate from

10   Dr. Callahan, they all say the same thing.  What they don't do,

11   they don't document they have these conversations, which gives

12   the impression that perhaps there isn't as much communication.

13   But a consultant needs that kind of communication, and from

14   everybody that I spoke to, he did.  And when it came to the

15   staffings, although Dr. Callahan did not typically attend those

16   staffings, his reports and summaries and communication with the

17   person responsible, the psychologist responsible for those

18   staffings had occurred.

19   Q.   Doctor, some concerns have been raised by the plaintiffs as

20   to tardive dyskinesia and extrapyramidal side effects.  Did you

21   make any observations regarding those?

22   A.   I did.

23   Q.   What did you observe?  First let's do tardive dyskinesia.

24   A.   Tardive dyskinesia, which is potentially a permanent

25   movement disorder, and something that can occur secondary to

Kraus - Direct                                          6215

1    being on a neuroleptic medication, such as Thorazine or

2    Mellaril, much less common on the second generation

3    neuroleptics, I just wanted to point out, for those on

4    medications like Risperdal or Seroquel.  Instead of perhaps a

5    15 percent plus likelihood of developing it, they only have a

6    .3 percent likelihood of developing it.  I took a close look at

7    the kids.  If they had it, they had it.  If I saw it, I would

8    have written it down.  I did not see tardive dyskinesia in any

9    one of the kids that I saw.

10   Q.   What about extrapyramidal side effects?

11   A.   The extrapyramidal side effects, that's talking about a

12   part of the brain, these are sort of like parkinsonian side

13   effects, most notably a resting tremor so that the kids will

14   shake a little bit, they can also have what's called akathisia,

15   kind of an ants-in-the-pants sort of anxiety that can develop

16   from it.  These are reversible issues.  Uncomfortable, but far

17   less of an immediate concern.  Now, in the time that I saw --

18   and it's also variable.  In other words, you may see children at

19   times who may have some extrapyramidal side effects and other

20   times they may not.  At the time I was there, the kids that I

21   observed, I saw nobody that had Parkinsonian or extrapyramidal

22   side effects.

23   Q.   And do you believe you saw all the children or most of the

24   children that are taking some kind of psychotropic drugs?

25   A.   From everything that I was told by staff, and I really had

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    to run around that facility to find some of the kids, I believe

2    that I saw all, and if not all, almost all of the children.

3    Q.    Now, Dr. Kraus, we're going to go to a specific case now,

4    the case of CL.  This is the one that the Judge has already

5    heard a great deal about.  This is the one that had lithium

6    toxicity.

7    A.    Sure.

8    Q.    I don't believe you need to go into great detail on the

9    case, but could you give us a summary of what you observed about

10   this case and whether or not the treatment was adequate?

11   A.    Sure.  I went through this case in great detail, and

12   including observing the child and how he looks at the present

13   time.  And this is a child that had come in from the community

14   and with orders from his community psychiatrist to bring his

15   lithium level up to 600 milligrams twice a day.  They'd gotten

16   an initial -- right off the bat, Dr. Lea got a lithium level,

17   which was .5, and they continued the lithium at the higher dose

18   that they had, that had been ordered by the community

19   psychiatrist.  He followed up a week later with another lithium

20   level.  Now we've got two lithium levels within a week of being

21   in the institution, and seeing the treating physician now

22   several times.  And the lithium level was 1.  It was now a

23   number of months later and the child did not appear well.  He

24   vomited up about 30 cc's of fluids, or small amount of vomit.

25   Didn't seem to have any other obvious stomach upset or anything.

Kraus - Direct                                    6217

```
 1    But then was noted to be unsteady, at which point they'd gotten
 2    another lithium level.  This was elevated, I believe 4.  It was
 3    a statin level they'd gotten.  They sent him to the Conway
 4    Medical Center and then he was sent out to the Little Rock -- to
 5    the University Hospital with significant concerns on his
 6    elevated lithium level.  He also, in association with this, had
 7    a pneumonia, a question of whether or not he may have been
 8    dehydrated.  Something else that had also come up is that
 9    apparently, from what I understand, the statin containers, these
10    green-topped containers, the substance that they use to keep the
11    blood actually has a lithium base to it and may have
12    artificially raised the level of lithium, which is why even once
13    at Little Rock and several rounds of dialysis, the levels still
14    hadn't immediately come down until they changed the tubes that
15    were obtained.  The one obvious concern most likely related to
16    the dilation, of dilating out his blood was that there was
17    flattening of the T wave on his EKG.  That's the last part of
18    the electroconduction -- I don't need to talk as a cardiologist.
19    But as a psychiatrist, you know this part well.  That potassium
20    is involved in the repolarization of the heart, and lithium can
21    substitute it and it can cause cardiac standstill and death.
22    When you see that little peak, there's a little peak of a thing
23    that happens in the EKG at the end of the EKG rhythm, and if
24    that flattens out, it means the potassium is not there and
25    there's a problem with the repolarization, and that's the reason
```

1    they dialyzed him, and successfully.  His EKG came back to

2    normal.  There was no documentation of any kidney damage, and

3    still isn't any, at the time I had seen him.  And within a

4    number of days, he was able to be discharged without any ill

5    sequelae, and has followed up with the psychiatrist since that

6    time.

7    Q.    Did he have any signs of kidney damage or other long-term

8    effects from this?

9    A.    No.

10   Q.    The care of CL, did it meet accepted professional

11   standards?

12   A.    I wrote about this and have also commented about it.  I

13   think not only were they right on top of this and did intervene

14   quickly, but I think if this had happened in a community place,

15   this is a child that could have died.  And then actually as

16   opposed to looking at this as a problem from the center, I think

17   that once you look at this and see how quickly they were able to

18   respond, and having these hospitals and the quick response I

19   think saved this boy's life.

20   Q.    And again I apologize for re-asking the question again,

21   because I think I understand what you mean.  But did it meet

22   accepted professional standards when you say they were on top of

23   this?

24   A.    Yes, it did.

25   Q.    Thank you.  TM we're moving on to.  This is an individual

1   who had -- I'll probably mispronounce this -- an orchiectomy.

2   A.    No, that was good.

3   Q.    Thanks.  At least I got a couple of words right.  Doctor,

4   can you tell me what your observations were about TM?

5   A.    Sure.  TM had an orchiectomy.  In 2005, he had his right

6   testicle removed.  It was undescended, it was avascular, so

7   there was no blood to it.  Basically, it was dead.  So you worry

8   about it getting infected and turning cancerous and things like

9   that, so they removed it.  The left one was still in place.  And

10  in 2009, he was having problems on the left side, and they found

11  that that also was avascular, so it wasn't working, there was no

12  testosterone coming from it, there was no hormonal anythings, so

13  they needed to remove it.  So they removed his left testicle as

14  well.  And this is a child that has significant developmental

15  disabilities and is on a number of different medications.  When

16  I saw him, he was sitting out in the sun, he was calm.  I

17  actually had him lift up his arms.  His hands showed no sign of

18  tremor.  The staff, who had known him since he probably had been

19  there, commented to me, "He's warm.  You should see him when he

20  gets cold, then he starts shaking."  I think him being calm and

21  shaking is more of the shivers than having an extrapyramidal

22  side effect.  What I also noticed with him -- I spent some time

23  and kept some distance from him.  He had some obvious

24  developmental delays.  And I didn't want to invade his space.

25  But as I did this and as he started to make eye contact, I found

1    that you could actually approach him and have some interaction

2    with him, with him remaining relatively calm.  That was pretty

3    much it.

4    Q.    So you saw no evidence of any side effects of medications

5    in this individual.  Is that correct?

6    A.    Absolutely none.

7    Q.    Doctor, did you make enough observations or review enough

8    documents to determine whether Dr. Callahan has a comprehensive

9    understanding of his patients or not?

10   A.    I have.  And I'd like to add to it that not only do I

11   believe he has a comprehensive understanding of his patients,

12   but really what is striking is how many patients he knows

13   without looking at the charts.  You can bring up a name of a

14   child and he can explain to you, he can talk about when he's

15   trying to get the side-effect sheets okayed, how long it took to

16   get a medication started, how he tried to reduce the med or add

17   a med.  And when he wasn't quite sure and didn't know that and

18   you review the chart with him, he could very quickly come up to

19   speed and within a few bits and pieces of direction know exactly

20   who we're talking about and the dosages and the changes in the

21   blood levels, et cetera, that he'd gotten.  And I felt that he's

22   done an overall very comprehensive job with very complicated

23   kids, and very consistently.

24   Q.    Doctor, did you have sufficient information or evidence to

25   determine whether or not there was adequate assessment and

Kraus - Direct                                                6221

1    documentation of side effects of medications at CHDC?

2    A.    In my opinion, there was.  I discussed this with

3    Dr. Callahan because upon initial review, I didn't see a lot.

4    And he looked at me, he goes, "What do you mean you don't see a

5    lot?"  I said, "I don't see the documentation of side effects."

6    And once again I had to turn to a separate section and there

7    were the AIMS, the abnormal involuntary movement scales, and

8    they were completed by the nurse.  And as he points out to me on

9    the bottom of the thing, he said, "Do you see those" -- he would

10   have a signature on the bottom of these, after he'd reviewed

11   them.  But I commented to him that I don't see these on each of

12   your assessments when you do see the kids.  And his response to

13   me was that he doesn't put down negative side effects.  When he

14   sees a positive side effect, when he sees a child with

15   something, he puts it down, but he doesn't typically put

16   negative side effects.  It's nice sometimes to see negative side

17   effects, no side effects is appreciated, so you know at least

18   somebody looked at it.  But his explanation to me at least

19   allowed me to understand what I was looking at.

20   Q.    In your opinion, did Dr. Callahan appropriately assess his

21   patients for side effects?

22   A.    Yes.

23   Q.    And, Doctor, did you notice whether or not there were

24   meetings where drug side-effect sheets are reviewed and sent on

25   to parents for their consent?

                    Eugenie M. Power, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Direct                                          6222

1    A.    There are.  And I had met with Dal Burgess, who is the

2    pharmacist involved with putting together the side-effect

3    sheets, and several different ones are used, and actually was in

4    the process of updating that.  There were meetings where there

5    were side-effect sheets that were gone over, side-effect sheets

6    that were approved by parents.

7    Q.    Doctor, did you have sufficient information to determine

8    whether or not Dr. Callahan has done an adequate job in

9    diagnosis of the children that he serves?

10   A.    Yes.  It's a complicated question, but in my opinion, I

11   believe that he has done a sufficient job.  If I could elaborate

12   a little bit on that?

13   Q.    Yes, please.

14   A.    These kids are very complicated.  These kids have -- most

15   of these kids have significant cognitive deficits.  When we talk

16   about moderate mental retardation, we're talking about kids that

17   at most may have a third-grade level at their highest level of

18   achievement, and many of these kids are below that level.  Many

19   of these kids, they're not working on whether they're going to

20   be able to read at a third-grade level, they're working on will

21   they be able to toilet.  They're working on activities of daily

22   living, the simplest of things with these kids.  And as you get

23   to lower cognitive levels with kids, their behaviors become

24   somewhat more disturbing and variable.  And that whether one is

25   looking at -- when you're looking at a child with an IQ of, say,

1   between 30 and 40, whether you're looking at a child who's

2   severely mentally retarded or a child that's severely mentally

3   retarded and may have autism or may have an inattention problem,

4   might have some anxiety associated with it, it almost doesn't

5   matter.  When we look at the *Diagnostic & Statistical Manual*, it

6   becomes far more complicated in regards to making diagnoses with

7   kids with severe developmental delays and just severe mental

8   retardation, and what becomes much -- you try to do it, you do

9   your best.  I think if you were to take ten psychiatrists and

10  put them in a room with a child with a severe delay, they could

11  all come up with potentially different diagnoses, all of which

12  they probably could find a basis for in the DSM.  What is most

13  important is to look at what the behaviors are of the child, to

14  have something that has some basis diagnostically, and then to

15  look at what the behaviors are of the child so you can justify

16  what the treatment is.

17  Q.   So it would be appropriate, Doctor, for the medications to

18  focus on the behavioral concern of the child?

19  A.   Absolutely.  Medication focus should always focus on the

20  behavioral concern.  You don't treat a diagnosis, you treat the

21  behaviors.

22  Q.   And, Doctor, what is your opinion as to whether or not the

23  assessment of children at CHDC, whether diagnostically it was

24  adequate and consistent with the community norms and medically

25  accepted professional standards or not?

Kraus - Direct                                              6224

1    A.    In my opinion, it was adequate and consistent with

2    community norms.

3    Q.    Now, there was a concern expressed by Dr. Mikkelsen that

4    the behaviors were the result of the facility.  Did your

5    observations and conclusions support that?

6    A.    That is -- again, I apologize.  That's a complex question.

7    Of course, behaviors are going to be related to the environment

8    that you're in.  There's no way that a behavior isn't going to

9    be related to the environment that you're in.  In reading

10   Dr. Mikkelsen's report, he implied that children's behaviors,

11   some of the kids' behaviors were worsening because of this

12   environment.  And the reality is that when you have a

13   therapeutic milieu, when you have a group of kids that are

14   interacting, with developmental delays or not, there are going

15   to be interactions at times that will cause a child to react in

16   a negative context.  That's simply a process of the milieu.

17   You'll see that on an inpatient unit, you'll see that anywhere.

18   Short of keeping a child in a bubble, which certainly is not

19   going to help them, there's no way to avoid that.  If a child is

20   going to have some ability to react to changes in their

21   environment, perhaps these changes in the milieu, although in

22   the short term may have some negative reaction, perhaps causing

23   a child to become aggressive, in the long run may have a

24   positive reaction if the child can learn potentially a better

25   approach to responding to that type of change in their

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Kraus - Direct                                          6225

1    environment.

2    Q.    And, Doctor, do you have an opinion as to whether or not

3    the children's cottages, and the staffing in those cottages,

4    whether they meet accepted professional standards or not?

5    A.    I did not fully evaluate the staffing patterns of the

6    cottages, per se.  In the cottages that I evaluated, in looking

7    at the staffing that was at the cottages at the time I was

8    there, they seemed adequate.

9    Q.    And do you have any opinions as to the care that the

10   cottage personnel were offering?

11   A.    They were amazing.  These are -- I've seen a lot of

12   different facilities over my professional career.  Most of the

13   cottage staff had been there for years, and they were not just

14   there, in my opinion, because it was a job.  They truly loved

15   taking care of these kids.  They would coddle them, they would

16   hold them.  There was a warmth with the staff that I observed

17   during the day and early evening shifts, which I felt was very

18   impressive.  They also, I think it's important, they had an

19   understanding of the kids.  Like, for example, one child that we

20   talked about, TM, that had the orchiectomy, that staff really

21   knew this child.  They knew when people came up to him too

22   quickly, that he'll get anxious.  They knew that when he's cold,

23   he shakes, and he likes it when it's warmer out.  They knew

24   things about this child.  And in each of the cottages and dorms,

25   that's what you found.  That's something refreshing, as opposed

1    to people looking at their watches for the end of their shift.

2    Q.   Doctor, do you have an opinion as to the overall care for

3    the children, including their healthcare and day-to-day

4    activities?

5    A.   In my opinion, it appeared that the overall care of the

6    children was reasonable.  Now, I did not sit and assess their

7    educational -- although I did see the school systems.  I did see

8    not just the cottages, but how their individual sleeping areas

9    were set up.  And it felt more like bedrooms.  A very homey kind

10   of environment to the cottages.  There was nothing which I

11   observed which led me to think their overall care was not being

12   taken care of.

13   Q.   And, Doctor, we touched on this already, but I believe you

14   actually may have some specific numbers for us, the availability

15   of a child psychiatrist in the area of Conway or in Arkansas in

16   general.  Did you make any observations as to that?

17   A.   I did.  And, again, these are based on the numbers

18   identified from the Academy of Child and Adolescent Psychiatry,

19   that in the county where Conway is, there are no current child

20   psychiatrists, and in the counties surrounding Little Rock, a

21   total of 19 child psychiatrists, some of them perhaps not

22   practicing.  Those numbers may be somewhat less than that.

23   Q.   And, Doctor, did you actually make some effort to contact

24   some child psychiatrists at the Arkansas medical center

25   department of psychiatry?

Kraus - Direct                                                6227

1    A.    I did.  And I am -- I am -- I'm on the council at the

2    academy.  We have an assembly where we have all the

3    representatives from the states.  I'm the vice chair of the

4    assembly for the Academy of Child and Adolescent Psychiatry.  I

5    would think if I called up a department, somebody would pick up

6    the phone.  I made three calls over there.  Finally, I had one

7    person ask if I was applying for a position there.  I said,

8    "No."  "Are you applying for a training program?"  I said, "No."

9    I was really trying to talk to their chief of child psychiatry.

10   And the response was they're really busy, but we'll see if they

11   can get a call back.  And I called one more time and didn't

12   reach them.  But I really made as much of an attempt as I could.

13   Q.    Doctor, the care provided by Dr. Callahan to children and

14   adolescents at CHDC, does it meet accepted professional

15   standards?

16   A.    In my opinion, it does.

17   Q.    And, Doctor, I would like you to express this in your own

18   words, but in the very last paragraph of your report you

19   referred to the care and compassion of the staff at CHDC, and I

20   thought maybe you could best describe that for the Judge.

21   A.    Well, as I'd already described, and I put it in there only

22   because it was really quite striking, that when you go through

23   that facility, you see the staff, there's a warmth to these

24   incredibly disabled kids that I don't think I've ever seen

25   before.  And there was just something very touching about it.

                    Eugenie M. Power, RMR, CRR, CCR
                     United States Court Reporter

1    Even though there's no way to quantify that, I just wanted it to

2    be in my report.

3    Q.    Thank you very much, Doctor.

4    A.    Thank you.

5                         CROSS-EXAMINATION

6    BY MR. TAYLOE:

7    Q.    Good afternoon, Dr. Kraus.

8    A.    Good afternoon.

9    Q.    Have you ever worked for an ICF/MR?

10   A.    I've not.

11   Q.    You're not currently working for one now then, are you?

12   A.    No.

13   Q.    And forgive me, I did not introduce myself to you.   I

14   apologize.   My name is Bo Tayloe.   I'm an attorney with the U.S.

15   Department of Justice.

16   A.    I guessed.

17   Q.    You've never published an article in any peer-reviewed

18   publication that dealt specifically with developmental

19   disabilities.   Right?

20   A.    That's correct.

21   Q.    You've never published a book or a chapter that dealt

22   specifically with developmental disabilities.   Right?

23   A.    That's also correct.

24   Q.    And in looking at your CV, there's nothing that

25   specifically focused on the provision of psychiatric care to

Kraus - Cross                                          6229

1   children and adolescents with developmental disabilities.

2   Right?

3   A.   That I've written on or -- I'm not sure what you're --

4   Q.   Your CV does not reflect a particular focus on children and

5   adolescents with developmental disabilities, does it?

6   A.   Except for my work for a dozen years at Easter Seals and

7   the residential facilities that I've worked at.

8   Q.   Those residential facilities you're talking about are a

9   subset of Easter Seals.  Is that what you're referring to?

10  A.   No, no.  Easter Seals is therapeutic day schools, and I

11  have several residential facilities that I work at that have had

12  kids with developmental disabilities.  Also, most of my -- much

13  of my school consultation work deals with children with severe

14  developmental disabilities and whether to place them

15  residentially or not.

16  Q.   Now, you testified earlier that the characteristic of the

17  kids at Easter Seals was severe autism.  Right?

18  A.   Correct.

19  Q.   And your work at the -- forgive me for my

20  mispronunciation -- the Orthogenics School?

21  A.   Orthogenic School.

22  Q.   Those kids didn't have, or don't have significant

23  developmental disabilities.  They're of average intelligence.

24  Right?

25  A.   Average intelligence, and there are a group of kids -- most

                     Eugenie M. Power, RMR, CRR, CCR
                       United States Court Reporter

1   of the ones sent, for example, from California do have some

2   level of autism, but at a higher functioning level.

3   Q.   You mentioned you worked for the Department of Justice, and

4   we were very grateful for that.  You mentioned work you'd done

5   in Maryland.  Do you recall that discussion?

6   A.   Cheltenham and, actually, it's Hicky.

7   Q.   Right.  Cheltenham and Hicky are those two facilities.

8   Those are juvenile correctional facilities.  Right?

9   A.   Correct.

10  Q.   You've never actually consulted with the Department of

11  Justice regarding supports and services for individuals with

12  developmental disabilities or a facility that serves individuals

13  with developmental disabilities.  Right?

14  A.   Other than the isolated child that had DD issues in those

15  facilities, I never --

16  Q.   No.  My question was on the facilities.

17  A.   No.

18  Q.   Your work in Arizona, that's also in the juvenile justice

19  context.  Right?

20  A.   That's correct.

21  Q.   Now, with reference to the Department of Justice, your

22  understanding is discussions that you've had with DOJ have

23  revolved around whether the standards should be correctional

24  versus hospital.  That's your understanding of the debate.  And

25  ultimately the resolution of that was the standards you would be

Kraus - Cross                                          6231

1   using would be the correctional standard of care.  Is that

2   right?  I misstated that.  And I'm going to try to clean it up

3   to make this a little bit cleaner.

4   A.   I know what you want to ask.

5   Q.   I'm glad you can see where we're headed.  That will speed

6   things along.  It was the residential model as opposed to the

7   correctional model.

8   A.   Yes.

9   Q.   Now, in the debate there was whether children were going to

10  be subject to an Eighth Amendment standard or a rehabilitative

11  standard, that is, Eighth Amendment versus Fourteenth Amendment.

12  Correct?  That was the issue.  Right?

13  A.   I don't -- I think that's an interesting concept of how to

14  look at it.  In all honesty, when I was looking at that issue,

15  it had to do with how soon a physician would be looking at

16  somebody in restraints and whether or not we were going to use a

17  model more focused on how residential facilities deal with that

18  or whether we're going to use a model on inpatient units.  And

19  it was decided that the expectations, as you just described,

20  would fall more to residential and not to inpatient, that that

21  was too stringent an issue.  And, yes, it went from an Eighth

22  Amendment issue to more of a Fourteenth.

23  Q.   Inpatient would be more of what you would expect in a

24  prison setting and the standards along those lines?

25  A.   No, no.  It was that the inpatient stood alone, that the

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1    inpatient -- that the juvenile correctional facilities was more

2    consistent with the residential facility.  That the inpatient

3    was simply a higher level of restriction of rights, and with

4    that came a lot more expectations of interventions to protect a

5    person's rights.

6    Q.   Okay.  Now, with regard to the standards, you testified

7    earlier that these kids are -- and I'll paraphrase.  Please use

8    your words.  I'm just taking you to your discussion earlier.

9    These kids who are very significantly involved, and you made a

10   point of reciting the histories, or summarizing the histories of

11   kids who are there at CHDC, to make the point that they're very

12   complex, they have complex psychiatric needs, behavioral needs,

13   they've been in hospital settings before.  Do you recall that

14   discussion?

15   A.   I do.

16   Q.   And notwithstanding that was your sense of these kids, you

17   believe that the correct standard isn't a hospital standard of

18   care or an inpatient standard of care, but rather a

19   correctional, juvenile correctional model.  Correct?

20   A.   Absolutely.

21   Q.   Now, in doing your review, you didn't use the CARF

22   standards at CHDC to determine whether they were meeting your

23   view of generally accepted professional standards.  Right?

24   A.   That would be correct.

25   Q.   Same thing with the ICF/MR standards.  Right?  You didn't

1   use the ICF/MR standards in doing --

2   A.    That would be correct.  I was simply looking at the

3   treatment approach and looking at other standards of care,

4   community standards of care, and all the different areas that we

5   talked about, diagnostic issues, side-effect issues, treatment

6   issues.

7   Q.    You're not actually really familiar with the ICF/MR regs,

8   are you?

9   A.    No.  Even in deposition I had made mention of that.

10  Q.    In your report, you set forth some standards of care

11  expressly, at least that's how they struck me, and I want to

12  confirm whether that's right.  Do you have a copy of your report

13  there still in front of you?

14  A.    I do.

15  Q.    If you would look at page 6 of that, please.  And I just

16  want to read something and ask whether this really does reflect

17  your thinking.  In the middle paragraph, "Adequate time and

18  resources are needed to perform a mental health assessment of

19  incarcerated youth using a biopsychosocial approach," I think

20  that's the word, "with special attention to culture, family,

21  gender, and other relevant youth issues.  Clinicians should work

22  together with medical staff to compare [sic] a complete

23  developmental, social, and medical history is a part of any

24  comprehensive assessment involving adolescents.  Clinicians

25  should use psychotropic medications in incarcerated juveniles in

Kraus - Cross                                                    6234

 1    a safe and clinically appropriate manner and only as a
 2    comprehensive treatment plan."
 3         Now, there's some typos in that, but, substantively, does
 4    that reflect the standard of care that you believe should apply
 5    here to CHDC?
 6    A.    Just for clarification, you actually have to start on page
 7    5 there.  This is dealing with a practice parameter that came
 8    out in 2005 from the Academy of Child and Adolescent Psychiatry,
 9    talking about the treatment of youth in juvenile detention and
10    correctional facilities.  And as I explained in my deposition,
11    because the academy, there was no national standard of care or
12    practice parameter at the time when I did this assessment, that
13    I needed to use what was closest, in my opinion, which was this
14    standard.  Now, I also used other standards.  I pulled out --
15    Q.    That's fine.  I'm not meaning to cut you off, but I just
16    wanted to make clear you answered my question, that this
17    standard is one of the ones you thought was applicable.
18    A.    Yes.
19    Q.    In your deposition, you expanded on that a little bit, and
20    we can put it in front of you, but I can summarize it as well.
21    A.    I'll probably know what it is.
22    Q.    "With regard to the biopsychosocial model, it is kind of a
23    typical model that is used in describing assessments where you
24    look at biologic origins, you look at psychological origins
25    separate from that, you know, mental health issues and social

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

Kraus - Cross                                                6235

1    origins in regard to the impact on the child."

2        So do you recall making that statement in your deposition?

3    A.    I do.

4    Q.    And one of the objectives of this approach is to account

5    for possible biological factors and psychological factors before

6    proceeding with possible psychiatric factors.  Right?

7    A.    Well, it's taking all of them together and trying to

8    understand.  There are certainly many different ways -- this is

9    sort of a simplistic way of describing the different components

10   that need to be looked at in regards to attempting to make a

11   diagnosis.  Take the biological part, you look at social and the

12   impact social might have, and the psychological component,

13   whether or not there's some other dynamic there that may be

14   impacting the child.

15   Q.    You have to account for all of that in order to proceed

16   properly.  Correct?

17   A.    You want to do your best to be able to do that.

18   Q.    Now, still on this topic of standards, would you agree with

19   one of the defendants' other experts who testified to the effect

20   that an applicable basis for assessing whether psychiatric care

21   is adequate is whether individuals are seen by the psychiatrists

22   within one month of admission and at least quarterly thereafter?

23   A.    I think that that is a nice general concept, but one that

24   may have variability to it.  So there are some children that

25   need to be seen far quicker than that.  There are some

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1   facilities that have children that are very high suicide risks

2   and they need to be seen sometimes within 24 to 48 hours.  There

3   are other types of facilities, Conway and others, where you may

4   have children that are more medically unstable where it's more

5   important that they see the general physician, the pediatrician,

6   to stabilize them medically.

7   Q.   Are they exclusive?  You have to choose between a general

8   pediatrician versus a psychiatrist?

9   A.   Not necessarily.  But the point is that the main reason

10  that you want to see a child sooner rather than later is most

11  certainly because of suicide risk, and then separate from that,

12  how unstable they potentially can be.  So, for example, if a

13  child has just been discharged stable from a university-based

14  hospital, they're probably less of an immediate concern to see

15  them as quick as somebody that might be coming in from the

16  community that you don't know how stable or unstable they are.

17  So it's going to depend on the number of kids that you get in.

18  Q.   If a kid comes in on psychotropic meds, is it okay to wait

19  longer than a month before seeing the kid?  Let me state it

20  differently.  Would you accept that in your practice?

21  A.   Each facility is different in regards to the practice.

22  Q.   Now I'm talking about an individual child who is coming in

23  to be treated by a psychiatrist, the psychiatrist is going to be

24  assuming responsibility for that child because that kid is on

25  psychotropic meds.  And so my question is, in that context, is

Kraus - Cross                                    6237

1   it okay to wait longer than a month?

2   A.    If that child has been seen by a developmental pediatrician

3   or another pediatric physician who has had adequate care, the

4   answer would be yes, in some cases it's okay to wait over a

5   month before a consulting psychiatrist sees them.  Ideally, I

6   think it would be nice to be able to see them within that

7   one-month period, and, in fact, it's part of the reason why I

8   suggested perhaps additional psychiatric care might be helpful.

9   But I think having those developmental pediatricians in place

10  has certainly been an option which overall has worked out well

11  in regards to looking at these kids.  You're not going to seem

12  significant morbidity in the kids that I saw because they were

13  seen a week or two later.

14  Q.    In your review of the charts, did you see instances where

15  Dr. Callahan was unavailable for a period of time and so a

16  physician served in the role of psychiatrist in the interim, in

17  your review of the charts?

18  A.    They served in the role of developmental pediatrician.  I

19  think that they would not describe themselves as the

20  psychiatrist.

21  Q.    Doing a psychiatric evaluation in an individual or making

22  changes to the medications, psychiatric medications, or

23  otherwise addressing their psychiatric needs, did you see

24  references like that in the charts that you reviewed?

25  A.    Well, I think that the best example of that, where that

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                    6238

1    occurred, that I saw was probably TN -- I'm sorry -- CL.  CL is

2    the child with the lithium toxicity where Dr. Lea, although,

3    number one, hadn't made a change of the lithium, had followed

4    through with what the initial pediatrician did, had two

5    different sets of lithium levels, and when the child becomes

6    sick, appropriately hospitalized him and perhaps saved his life.

7    Q.   We'll talk further about that later.

8    A.   But that's an example.

9    Q.   Do you have any other examples apart from that one?

10   A.   Certainly there would be examples of the developmental

11   pediatricians seeing the children.  I can't think off the top of

12   my head where they may have had medication changes.

13   Q.   In the instance of CL, whom we'll speak about later, all

14   Dr. Lea was doing was implementing the prescription written by

15   the community psychiatrist before the child entered the

16   facility.  The community psychiatrist, you testified earlier,

17   said up the lithium, and Dr. Lea carried out that instruction.

18   Correct?

19   A.   That would be correct.

20   Q.   Let's move on.

21   A.   But I would like to add --

22   Q.   We can move on, and when we talk about CL further or when

23   Mr. York has an opportunity to redirect, you can elaborate.

24        Now, I'd like to turn to some of the bases for your

25   opinion, moving off of standards.  You didn't use a particular

Kraus - Cross                                6239

1    form or assessment tool in conducting your review, did you?

2    A.    No.

3    Q.    Your methodology was a series of staff interviews, trying

4    to observe all the children and adolescents who were on the

5    psychiatrist's caseload, and the chart review.  Those were the

6    three elements.  Correct?

7    A.    And then reviewing what available parameters there are, you

8    know, obviously, in connecting that.  And assessing the

9    children.  Taking a look at the children as well.  I'm not sure

10   if you mentioned that.

11   Q.    You looked at them.  But I want to be clear, when you used

12   the word "assessment," did you actually perform a formal

13   psychiatric assessment of the children?

14   A.    I did not individually.

15   Q.    You didn't do a mental status exam of the children, did

16   you?

17   A.    I did not.  But I did look at the children very carefully

18   for --

19   Q.    Those are two different things though.

20   A.    For example, side effects, I did look at the children very

21   carefully.  Looking for things like tardive dyskinesia and

22   extrapyramidal side effects are things that can be observed even

23   in group, watching the children.  But I did not do formal mental

24   status exams on the children.

25   Q.    You didn't work up your own diagnosis of the kids either.

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                          6240

1    Right?

2    A.    There were some children from observation of their movement

3    disorders I commented on, or there were some children that were

4    obviously significantly developmentally delayed.  But I did not

5    sit for an extensive period of time to work up specific

6    diagnoses.

7    Q.    And you spent about two days at CHDC.  Correct?

8    A.    I spent two long days.

9    Q.    Your deposition testimony has it that you arrived between 7

10   and 8, I guess, one day, or 8 and 9 one day and stayed about 12

11   hours or so?

12   A.    Correct.

13   Q.    The next day you got in around 7 and you left at 3?

14   A.    Correct.

15   Q.    And on which of those days did you do your chart review?

16   A.    I did the chart reviews on both days, from what I can

17   remember.  The majority of the chart review, I believe, was on

18   the first day, but I definitely did some of the chart review and

19   the follow-up in regards to the charts, getting the second half

20   of the charts and things like that on the second day.

21   Q.    And on the first day, what else did you do that day?

22   A.    The first day I saw some of the cottages, I interviewed

23   some of the staff, and I reviewed some of the charts.

24   Q.    So you did the cottages, staff interviews, and the charts?

25   A.    Right.  When I say "cottages," I mean seeing the children

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

1    in the cottages.

2    Q.    Now, can we agree that every one of the charts that you

3    summarize in your report has a summary of the chart review dated

4    March 25, 2010?  Can we agree every single chart that you

5    reviewed was noted to be March 25, 2010?

6    A.    Right.  If all the charts were brought to me that first

7    day, I didn't finish reviewing them all that first day, and so

8    there probably are charts that I may have looked at on the 26th

9    and not the 25th that I just marked as the 25th.

10   Q.    Now, I counted up 31 charts.  Does that sound about right?

11   A.    There are 31 charts, and then there are a few that were

12   sent to me.  I'm not sure --

13   Q.    I'm talking about 31 charts where you said that the date of

14   the chart review was March 25, 2010.

15   A.    I think 31 sounds about right.

16   Q.    So you were moving at a fast pace to get through all those

17   charts in that period of time, weren't you?

18   A.    I was.

19   Q.    Looking at the documents reviewed, Mr. York asked you some

20   questions about that.  If you could get your report in front of

21   you again.

22   A.    What page would you like me to turn to?

23   Q.    Pages 2 and 3, please.  Just want to clear up some things

24   that are in there.  Now, item 1, the document reviewed is the

25   "Declaration of Jodie Holloway."  Right?

```
 1   A.    Yes.
 2   Q.    And then item 24, the same thing.  Is that right?  That's
 3   not a separate declaration, that's the same declaration?
 4   A.    Same declaration.  I had her report and then I had her
 5   declaration.
 6   Q.    You've listed the declaration there twice?
 7   A.    My mistake.
 8   Q.    Looking at item 4 and 22 and 34.
 9   A.    Hold on.
10   Q.    That's all --
11   A.    Oh, yeah.
12   Q.    That's one single declaration of Dr. Mikkelsen.  Right?
13   A.    Right.  There's only one declaration.
14   Q.    And items 6 and 20, there are -- that's only one CRIPA
15   investigation letter.  We're not talking about two different
16   documents, are we?
17   A.    Just one.
18   Q.    And item 7, "Resident Records," those are the specific
19   resident records that are identified elsewhere by resident
20   initials?
21   A.    Correct.
22   Q.    And item 2, the "DOJ expert claimed spreadsheet," what is
23   that document?
24   A.    I'm trying to remember what that spreadsheet was, as I'm
25   sitting here.
```

Kraus - Cross                                        6243

1   Q.   If you don't remember, you don't remember.  But I was

2   struck by the phrasing "DOJ expert claimed spreadsheet."

3   A.   It may be a typo in "claimed."  I truly -- it may be claims

4   in regards to a list.  But I can't remember.  It should have

5   been in the large amount of information that I supplied.  I

6   mean, I gave everything to you guys.

7   Q.   I appreciate that.  And by the way, apropos of that, did

8   you choose what documents you wanted to look at?  Did you choose

9   these things, or did the defendants send them to you?

10  A.   The defendants sent me a variety of the documents in

11  regards to the expert opinions, your expert opinions.  When I

12  got to the facility, when it came to patient records and the

13  decision whether I was going to look at three or five or ten or

14  try to get through all of them, that was all my decision.

15  Q.   Now --

16  A.   I had also -- there was nobody from the defendants' group,

17  and none of the attorneys or anyone that was with me.

18  Q.   Item 3 of the documents reviewed is the "Current JADC of

19  all children under the age of 18 on psychotropic medication."

20  What is JADC?

21  A.   What am I spelling wrong there?

22  Q.   If you don't recall, that's okay.

23  A.   No, no.  One moment.  Give me just one moment.  I think

24  that that was not JADC.  I think that was CHDC.

25  Q.   And so --

Eugenie M. Power, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                             6244

1    A.    It was a typographical.  The "JA" should be "CH."

2    Q.    You're focusing on the list of kids at CHDC under the age

3    of 18?

4    A.    Exactly.  I asked for a list.  I wanted all kids, you know,

5    so the first thing was I looked at the list, and then I said,

6    "Now I want all the charts," so they gave me a list.  So it was

7    in my list of stuff, so I put it in there in my --

8    Q.    Okay.  And item 9 here, "The Conway Human Development

9    Center Behavioral Support Programs, Safety Plans, and

10   Tragedies."  You mean "strategies" there, don't you?

11   A.    Yes.  Thank you.

12   Q.    Sure.  And on page 17 of your report, you point out, at the

13   top paragraph that begins there with regard to things you looked

14   at, "The behavioral program and philosophy, policy number II-D-9

15   was reviewed, the positive behavioral support programs, safety

16   plans and strategies," those were reviewed.  So you noted you

17   reviewed safety plans and strategies there as well.  Right?

18   A.    Right.

19   Q.    Now, at the time of your deposition, you didn't know what a

20   strategy was.  Correct?

21   A.    He had asked me at some point during the deposition, and I

22   just couldn't remember what it was.  And I told him that.  I

23   said I think I've reviewed it, it's just not popping out as he

24   was asking me.

25   Q.    That was also true of safety plans.  Right?

                    Eugenie M. Power, RMR, CRR, CCR
                      United States Court Reporter

1    A.   Right.

2    Q.   Now, you gave a rough estimate, based on your own

3    observations, that somewhere between 30 percent and 40 percent

4    of the kids at CHDC -- and when I say "kids," I'm talking about

5    children and adolescents.

6    A.   I understand.

7    Q.   That 30 to 40 percent of them would be moderately retarded.

8    Do you recall making that statement?

9    A.   I thought that about -- I was -- on deposition, yeah, we

10   talked about the approximate percentage that were moderately MR,

11   and I was hesitant to give an exact percentage, and I was asked

12   to guesstimate, and I said approximately 30 to 40 percent, in my

13   opinion, had moderate mental retardation, which would mean an IQ

14   somewhere between 40 and 55.

15   Q.   Now, you alluded to this earlier, and I want to make sure

16   I've got it right.  With a decrease in intelligence functioning,

17   that's going to be correlated with a decrease in basic elements

18   of intelligence, such as communication and memory and

19   attentiveness, things like that?

20   A.   Executive functioning as well, functioning to changes in

21   your environment.

22   Q.   I'd like to go through case examples that you noted in your

23   report.  If you could, please, look at page 26, LW.  So as we

24   discussed, the date of the chart review is 3-25, 2010.  Right?

25   A.   Correct.

Kraus - Cross                                          6246

1   Q.   And the date of LW's admission to CHDC is July 1, 2008?

2   A.   That's what I have down.

3   Q.   And as of the time that you did this review, you said,

4   quote, "His most recent evaluation observed was on May 15, '09."

5   Right?

6   A.   Correct.

7   Q.   So at the time of your review, it had been about nine

8   months since LW had last had a psychiatric evaluation.  Right?

9   A.    It appeared that way.  Later on, and perhaps not included

10   there -- apparently they report these -- the medical files had

11   been taken apart and copied a number of times, and as it turned

12   out, completely unknown to me, although it was stated by the

13   staff, although I questioned it until they actually showed me

14   some of the evals that were done, there were a number of missing

15   evals, follow-ups that had actually been done.  So it may not

16   have actually been nine months.  There may still have been a

17   stretch of time.  But I believe that there was at least an eval

18   done between there.

19   Q.   Two things.  You don't have any basis for that.  That's

20   speculation on your part that there might have been one.  Right?

21   A.    I think I -- I can't tell you --

22   Q.   As to LW.

23   A.    I can't tell you with a hundred percent certainty that I

24   got one of LW's sheets.  I believe that I did.  But I had a very

25   limited amount of time to get this report done, and I think that

1    some of that may have come right at the point when I was sending

2    it out and I just didn't add it.

3    Q.   Now, as to that issue, isn't it that the facility's

4    practice is to keep the initial evaluation in the record that

5    you looked at and then keep, from the current point in time, the

6    preceding two years, but to thin out the middle portion because

7    of the volume of paper that causes for the chart?  Isn't that

8    what you're referring to?

9    A.   Yes, it would thin out the charts and put them into the

10   other charts, but this actually was in between two, so this

11   wouldn't have necessarily been, I think, a thinning out, as far

12   as I could tell.  This was a misplaced sheet, which, again, they

13   found.  And I do believe that some of them may have been

14   misfiled or may have been in the other file.  The process of how

15   that occurred, I can't tell you.

16          THE COURT:  Mr. Tayloe, we've been going about two

17   hours now.  We started back at 10 of 2.  I wondered whether this

18   would be a convenient time to interrupt you.

19          MR. TAYLOE:  Your Honor, that would be just fine.

20   Thank you very much.

21          THE COURT:  All right.  We'll take ten minutes.

22      (Recess at 3:49 p.m.)

23

24

25

                        Eugenie M. Power, RMR, CRR, CCR
                        United States Court Reporter

1                          C E R T I F I C A T E

2          I, Eugenie M. Power, official Court Reporter, do hereby

3     certify that the foregoing is a true and correct transcript of

4     proceedings in the above-entitled case.

5

6     /s/ Eugenie M. Power, RMR, CRR, CCR      Date:  December 27, 2010
      United States Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Eugenie M. Power, RMR, CRR, CCR
                          United States Court Reporter

Kraus - Cross                                    6249

1          (Proceedings continuing at 4:07 p.m.)

2              THE COURT:  Proceed.

3    BY MR. TAYLOE:

4    Q.    Dr. Kraus, I would like to take you to another case study

5    that you did involving BB.  I think it's at the bottom of page

6    26 of your report, and then it continues on to 27 and 28.  Are

7    you with me?

8    A.    I am.

9    Q.    BB was admitted on March 20th of 2006.  Right?

10   A.    Yes.

11   Q.    And it looks like you did not make a notation in your

12   summary of the date of his initial psychiatric evaluation, or is

13   it there and I just missed it?

14   A.    I don't have it down there.  I'm not sure why.

15   Q.    Okay.  We went and looked.  I've handed you what's been

16   marked as LK-5.  Does this look like the initial evaluation for

17   BB?

18   A.    It does.

19   Q.    And what is the date of this evaluation?

20   A.    It's 5/8/06.  So it would be about six weeks or so.

21   Q.    On the second page of -- I'm sorry.  On your report, on

22   page 27, in the second paragraph, do you see that the consulting

23   psychiatrist has increased BB's Risperdal and his Depakote?  Do

24   you see those as references there?

25   A.    Yes.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Cross                                    6250

1    Q.    And then the plan is for BB to return in three months.  Do

2    you see that?  I think if you --

3    A.    I'm sorry.  Which paragraph are we looking at?

4    Q.    Well, I'm wondering whether that's going to be laid out

5    there.  Let me come back to that.

6          I want to turn to CA.  In your narrative there --

7    A.    What page is CA?

8    Q.    I think it's 31.  And I believe it actually begins at the

9    very bottom of 30 and then continues on to 31.

10   A.    Yes.

11   Q.    Now, your case note indicates that CA had reports of

12   aggression, had severe mental retardation, a history of Cornelia

13   de Lange Syndrome, and an atrial septal deficit.  I apologize if

14   I'm mispronouncing those.  What was the date of his admission to

15   CHDC?

16   A.    9/21/06.

17   Q.    And what was the date of his initial psychiatric consult?

18   A.    On 10/31/06.

19   Q.    So about five weeks or so; right, after the admission?

20   A.    Correct.

21   Q.    And this -- I've handed you what's been marked as LK-8.

22   And this is a psych consult for CA dated June 16th, 2009?

23   A.    Yes.

24   Q.    And this would have been one that you reviewed as part of

25   your assessment of his care?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                    6251

1    A.   I can't tell you a hundred percent that this particular

2    consult was in the chart.  But if it were in the chart, I looked

3    at it.

4    Q.   And do you see there where the behaviors that are being

5    tracked in the second paragraph are incidents of aggression and

6    destruction?

7    A.   Yes.

8    Q.   And if we can move on to page 33 and your note regarding

9    MB?

10   A.   Yes.

11   Q.   Now, MB had a diagnosis of profound mental retardation, a

12   seizure disorder, Lennox-Gastaut Syndrome, global developmental

13   delays, sleep disorder, and autism.  Right?

14   A.   Yes.

15   Q.   It looks like she was on trazodone and had previously been

16   on several different medications.  Right?

17   A.   Yes.

18   Q.   And her admin date looks to be October 22nd of 2008.

19   Right?

20   A.   Yes.

21   Q.   And when does Dr. Callahan perform his psychiatric

22   evaluation of this person?

23   A.   January 15th, 2009.

24   Q.   So about three months later.  Right?

25   A.   Just under.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1    Q.    It looks like you, if you look at page 34 of your report,

2    you indicate that the last time that MB was seen by Dr. Callahan

3    was on September 22nd, 2009 -- September 22nd, 2009.  Right?

4    A.    Right.

5    Q.    And so that would have been about six months before your

6    review of this chart.  Right?

7    A.    Right.  But again, I think that this was one of the clients

8    where they also essentially -- and the only reason I know

9    this was -- and it's not in the report.  But there are a series

10   of kids that had not been seen in six to nine months, and I

11   brought this up.  And essentially the response was "no way."

12   And as time went on, these isolated follow-up sheets were found.

13   Now, it could be that maybe there were 30 charts.  Maybe this

14   one was one they didn't find a sheet.  But I can't tell you with

15   a hundred percent certainty that this child hadn't been seen in

16   six months.

17   Q.    So this was an issue that you saw and you brought to the

18   attention of CHDC?

19   A.    Yes.

20   Q.    It was of concern to you that there would be these kinds of

21   delays?  That's why you brought it up?

22   A.    Yes.

23   Q.    Now, assuming that this is just a records issue, does it

24   not have any significance in terms of treatment, that there be

25   these kinds of gaps in the medical history?

Kraus - Cross                                6253

1   A.   Again, it's not the typical scenario, in that it's a

2   consulting psychiatrist as opposed to a treating physician.  The

3   treating physician was continuing to assess the child in regards

4   to their level of stability.  Do I think that it would be better

5   treatment for the child to be seen more frequently?  Yes.

6   Q.   Now, in your report, did you identify this as an issue,

7   this gap in time?

8   A.   I think that me simply putting this in my report identifies

9   it as an issue.  And in regards to -- one of my recommendations

10  of getting additional psychiatric services identifies this as an

11  issue.

12  Q.   Now, on page 34 of your report, still on MB, you note that

13  on September 22nd, 2009, the trazodone was discontinued, and she

14  was started on clonidine twice a day, if tolerated could

15  increase the h.s. dose to .2 milligrams.  Do you see that there?

16  A.   Yes.

17  Q.   And Dr. Callahan's plan is that this person should return

18  again in three months.  Do you see that?

19  A.   I do.

20  Q.   And you noted that there were no additional appointments

21  observed after that point.  Right?

22  A.   Correct.

23  Q.   And this is a child who is in the middle of changes in

24  their medication regime.  Right?  We're going to make some

25  changes to trazodone, we're going to start the clonidine.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1   Right?

2   A.    Correct.

3   Q.    And nevertheless, the plan was to wait -- the plan was to

4   wait three months before she's seen again.  Right?

5   A.    That was the plan.  I think it's also important to

6   understand what these medications are.  There are times when

7   there are certain medication changes when it's important to see

8   a child very quickly.  And there are other times, especially

9   when you know the pertinent vital signs are being taken care of,

10  that it may not be so pertinent to see the child so quickly.  So

11  I think it's important to understand what these medications are

12  for before jumping to conclusions that three months may have

13  been too long for a consulting psychiatrist to see her again.

14  Q.    Is clonidine an anticholinergic?

15  A.    No.  Clonidine is actually an Alpha-2 agonist.  It's a high

16  blood pressure medication that is commonly used to treat ADHD

17  symptoms.  It has a mildly sedating effect, so it's also used to

18  help with sleep.  There's now an FDA version of an Alpha-2

19  agonist actually made, guanfacine, which is used.  But its

20  benefit is that it decreases impulsive aggressive behavior, has

21  very few side effects.  It can include possibly sedation.  It

22  might not work.  It may lower blood pressure and cause

23  dizziness, which, you know, the physician or the nurse can see.

24  But that was pretty much it.  It's not an anticholinergic.

25  Q.    Okay.  So this person has a diagnosis of a seizure

Kraus - Cross                                    6255

1    disorder.  Right?  If you go up to -- I don't want to make it
2    hard for you.
3    A.    No.  I see that.
4    Q.    And she has profound mental retardation.  Right?
5    A.    Correct.
6    Q.    So there's some implications with a medication that could
7    cause dizziness and sedation in terms of her ability to function
8    if she's got a seizure disorder and she has profound MR.  She's
9    already behind the eightball quite bit.  So this isn't just a
10   child's aspirin that she is being administered, is it?  It's a
11   different kind of medication than something like baby aspirin
12   that she's getting.  Right?
13   A.    Well, some people might argue that aspirin could cause more
14   side effects than some of these prescribed medicines.  But
15   again, you know, the concept that -- you know, your concept that
16   she was, like Cogentin, on clonidine and an anticholinergic,
17   lowering seizure threshold, that would be one issue.  But
18   clonidine isn't going to impact seizure threshold.  It's a
19   relatively safe medicine.
20        Do I think that the psychiatrist should follow up in less
21   than three months?  Not a bad idea, knowing that there are
22   developmental pediatricians and other experts taking a look at
23   this child.  And one of the things that Dr. Callahan said to me
24   is that if a child is having an adverse reaction that they can
25   be referred back to him sooner than three months, and there's a

1   whole staff of people to assess this.

2   Q.   We were looking at what the plan was, though.  That was the

3   point of our discussion.  And his plan was, see you again in

4   three months.  Right?

5   A.   Correct.

6   Q.   Let's turn to page 35, KC.  Your record indicates that the

7   date of admission is April 1st of '09.  But further on, there's

8   an initial psychiatric eval that was completed on September 17th

9   of '08.  So is it likely then that the date of admission was

10  actually April 1st of '08 instead of '09 since that comes after

11  the psych eval, or is there another explanation for that?

12  A.   Probably '09.  I can't tell you with a hundred percent

13  certainty.

14  Q.   Your guess is the psych eval probably occurred on

15  September 17th of '09?

16  A.   Most likely, because there is one example of one child who

17  was actually at the facility for respite care, and the

18  psychiatric evaluation was actually completed before they came

19  to the facility.  I don't think that was the case here from

20  memory.

21  Q.   So you think this one was -- the initial psychiatric eval

22  was completed in 2009.  That's your memory probably?

23  A.   Probably.

24  Q.   Okay.  Now, you note here that KC came to the institution

25  on Depo Provera, and this has been continued.  Do you see that?

1    A.    I do.

2    Q.    What is Depo Provera?

3    A.    It's an estrogen agonist.  It's given by injection.  It's

4    used for birth control.  It's used for other types of things as

5    well.

6    Q.    It's also known as a chemical castration.  Right?

7    A.    It can be for males.

8    Q.    KC is a male.  Right?

9    A.    As I'm sitting here right now, sure.  No reason to think

10   he's not a male.  He's a male.  I'm looking down my paragraph.

11   Q.    In fact, he has a history of aggressive acts towards his

12   stepmother that you note, and some of these involve sexual

13   assaults.  Right?

14   A.    Right.  So somebody in the community had put him on Depo

15   Provera.

16   Q.    And he was still on it as of the time of your review.

17   Right?

18   A.    My understanding --

19   Q.    I'm just looking at what it says here in your report.

20   A.    Right.  I think so.

21   Q.    Now, you note also that KC has a diagnosis of personality

22   change due to fetal alcohol disorder.  What are the symptoms

23   that support this diagnosis?

24   A.    I spoke with Dr. Callahan about a number of the

25   descriptions of personality change with some type of organic

Kraus - Cross                                6258

1    etiology like fetal -- personality change related to fetal

2    alcohol syndrome or personality change related to microcephaly,

3    for example.  The first part -- so, for example, my

4    understanding is that KC had a prior diagnosis of fetal alcohol

5    syndrome, which would essentially mean that his mother drank

6    alcohol during pregnancy.  And as a result of that, he suffered

7    a level of cognitive deficits and had certain dysmorphologies,

8    you know, facial oddities with how he looked, and probably had

9    some level of ADHD symptomatology, was impulsive, aggressive,

10   and that one of the things that Dr. Callahan would describe,

11   which was essentially, well, you know, his feeling was it's

12   organic etiology that precipitated some of these personality

13   behaviors in a child.  They are their character.

14   Q.   I'm sorry.  I didn't hear the last thing that you said.

15   A.   Their character.

16   Q.   Out of their character?

17   A.   Yeah.  That there are organic etiologies that causes a

18   change in their personalities, so that you can have, for

19   example, a DSM-IV diagnosis is -- actually, there is one,

20   inorganic mood disorder, which is essentially an extrapolation

21   of that.  Here he is trying to give a reason for the organicity

22   and then giving an example of, you know, a personality change as

23   a result of it.

24        It's not -- this is not -- I did talk to him.  This is not

25   a DSM-IV description.  You don't have personality change from

Kraus - Cross                                6259

1    fetal alcohol syndrome.  But he's essentially making a point of

2    talking qualitatively in his assessment was that this child does

3    not act or behave as one would typically, as a result of this

4    fetal alcohol syndrome, that his personality and his character

5    and who he is is different than the average child.  That was

6    pretty much the most that I could get from that.  But there are

7    a variety of other diagnoses that he has that do have DSM-IV

8    criteria.

9    Q.   Have you ever used yourself a diagnosis of personality

10   change due to fetal alcohol disorder?

11   A.   I have not.  Again, it's his qualitative view of looking at

12   it.  It's not a DSM-IV diagnosis.

13   Q.   Are you familiar with the DM-ID?

14   A.   Diagnostic Manual of something disorders -- developmental

15   ID?

16   Q.   Intellectual disabilities?

17   A.   Intellectual disabilities.  Thank you.  I assume -- I know

18   a little bit about it.  I've not looked at it.  It has to do

19   with specifically looking at the diagnostic issues of kids and

20   adults with cognitive deficits and how they essentially are

21   different, because, you know, there's a feeling of many people

22   that the DSM simply doesn't meet all of the criteria in a way

23   that allows us to best understand how these kids present.  Our

24   discussion just a moment ago somewhat describes that a little

25   bit.  I've not really reviewed that significantly.  The

Kraus - Cross                                    6260

1    difficulty with some of these manuals -- and I can't comment

2    specifically about it, because I've not reviewed it -- is what's

3    the research base behind them.  The DSM has field trials and

4    tremendous research behind their diagnostic criteria, even if at

5    times it is imperfect.

6    Q.   Now, KC's diagnoses include mild mental retardation.

7    Right?

8    A.   Correct.

9    Q.   So based on that, this is not someone who is at the other

10   end of the spectrum, where their communication level is so low

11   that you are necessarily stuck with having to use behaviors only

12   to make a diagnosis and reach a treatment decision.  Right?

13   A.   No.  This would be somebody that you would expect would

14   have some reasonable level of communication and some reasonable

15   level of perceptive and expressive language.  Their IQ would

16   fall between 55 and 69.  You would probably expect them to get

17   up to about an eighth-grade reading level.

18   Q.   Now, you also note -- I think we're around page 36 with

19   this.  You may have to hunt a little bit.  I'm looking for your

20   assessment that there were concerns over fetal alcohol spectrum

21   diagnoses, and possibly it goes on to the next page.

22   A.   That's the next child.

23   Q.   Have I moved on?

24   A.   No.  The top part of 36 is still this child, up until HB.

25   Q.   You note in the description here, "There were concerns over

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

Kraus - Cross                                    6261

1    fetal alcohol spectrum diagnoses; a psychotic disorder NOS,

2    possibility of a pervasive developmental disorder; possible

3    posttraumatic stress disorder."  And I wanted to ask you some

4    questions about that.

5    A.    Sure.

6    Q.    Do you recall that?  It's actually on page 36.  It's

7    about -- I don't know -- roughly ten lines down from the top.

8    "He was given a diagnosis of a psychotic disorder NOS because

9    there was a prior history of psychosis, although not presenting

10   with psychotic symptoms."  So he didn't have anything at the

11   moment that would justify a diagnosis of psychotic disorder NOS,

12   but he was given it because there was a prior history of

13   psychosis.  Is that right?

14   A.    Correct.

15   Q.    Okay.  Let's continue on that same page to HB.  It looks

16   like HB has multiple diagnoses, including moderate cerebral

17   palsy, microcephaly, ADHD, seizure disorder, and so forth.  Now,

18   your note indicates that HB was admitted on March 5th of 2005.

19   Is that right?

20   A.    Or March 8th, 2005.

21   Q.    Oh, thank you for catching that.  And it looks like he was

22   not seen by the consulting psychiatrist until May 2nd of 2005;

23   is that right, over on page 37?

24   A.    My suspicion is that's correct.

25   Q.    In fact, you said an initial intake was on May 2nd of '05.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                                     6262

1    Is that right?

2    A.    That's correct.

3    Q.    And so he's got microcephaly, ADHD, seizure disorder,

4    failure to thrive, among other diagnoses.  And it's --

5    A.    Most of these are medical.  Again, there are developmental

6    pediatricians that had seen this child long before that.

7    Q.    But it's still two months, roughly, before he's seen by the

8    consulting psychiatrist.  Right?

9    A.    Correct.

10   Q.    And you also note that there was a significant history of

11   behavioral difficulties.  Right?  In fact, he's had an extensive

12   prior medical history.  He was originally -- this is someone

13   that Easter Seals couldn't take, I think you said?

14   A.    Well, he was actually at Easter Seals, and they couldn't

15   take care of him.

16   Q.    So this is a person with complex psychiatric issues.

17   A.    And medical issues and seizure disorders.

18   Q.    Okay.  Let's briefly talk about JB.  Now, I believe in your

19   deposition -- you mentioned suicide a few times in your

20   testimony today as a concern that's important to be mindful of.

21   Right?  I don't want to mischaracterize what you said.  But that

22   was my understanding anyway of what you said.

23   A.    What I talked about earlier was that in many residential

24   programs it's important to have an early assessment by a

25   qualified mental health professional, not necessarily a

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1   psychiatrist, to assess suicidality as a potential risk factor.

2   Now, children with more significant developmental delays tend to

3   be of far less concern with regard to levels of acute

4   suicidality.  Those aren't typically the risk factors you are

5   concerned about.

6   Q.   Even though you mentioned that as an important risk factor

7   in your testimony earlier today?

8   A.   But that's the construct of how I talked about it.

9   Q.   You talked about it in terms of a different kind of setting

10  than this kind of setting.

11  A.   Correct.

12  Q.   In any event, in your deposition you offer the opinion that

13  there were no residents who were presenting suicidal issues.  I

14  think that's right.  Do you recall that, saying that?

15  A.   To my memory, yes, certainly no residents that had

16  suicided.  And at the time when I had come there, there were no

17  residents that were acutely suicidal or expressing suicidal

18  intent.

19  Q.   Could you explain how a resident could still be a resident

20  and have suicided?  I'm not really sure what that means.  It

21  sounds like they killed themselves and are still there.

22  A.   When I went there, is there a recent history in the past

23  number of years of any suicides?  And the answer was no.  Is

24  there any resident that's currently expressing thoughts of

25  suicide or any intent to plan?  No.  Are there any residents

Kraus - Cross                                    6264

1    that are expressing thoughts of suicide at the present time?

2    And the answer was no.  Now, I can't tell you with a hundred

3    percent certainty that there isn't some resident, in all the

4    charts that I reviewed, that at some point in time expressed

5    thoughts of suicide.  But I can say that that information I just

6    gave you is what was presented to me.

7    Q.   Okay.  So looking at JB, you note that JB's diagnoses

8    include moderate mental retardation and a history of homicidal

9    and suicidal ideations.  Do you see that there?

10   A.   I do.

11   Q.   And he had initially been admitted to Vista Health in

12   Fayetteville on January 22nd, 2009.  Do you see that?

13   A.   Yes.

14   Q.   And there were a variety of concerns regarding

15   suicidal-like behavior.  Right?

16   A.   Yes.

17   Q.   In fact, he had three prior admissions to Vista Health in

18   2004.  Right?

19   A.   Right.  But they don't clarify, or I don't have the

20   information of why the earlier visits to Vista Health.

21   Q.   Okay.  Now, I'm struggling with this.  Maybe this is

22   another instance of respite, and we really don't know the actual

23   admission date.

24   A.   If I could, again, there was no clarification that this

25   child was ever suicidal at the facility.

Kraus - Cross                                6265

1  Q.   Okay.  The date of admission you identified is March 18th

2  of 2009.  Right?

3  A.   Yes.

4  Q.   And initial psychiatric evaluation is on February 24th of

5  2009.  Right?  It's on page 38 at the start of the first

6  paragraph that begins at the top of that page.

7  A.   Right.  So the question is whether or not there was any

8  respite care and he was seen before or whether it was 11 months

9  later.  And in honesty, I would have to look at the charts to

10  tell you for sure.  There's only one student that I know for

11  sure where that's the case.  If I hadn't seen -- there will be

12  one child -- I want to say it's TS, but I would have to

13  double-check -- where the assessment was actually done during

14  the respite period at the facility and not after the child was

15  admitted.  So I'm not sure if this was another one like that or

16  not.

17  Q.   How would you explain it otherwise?  It would be a typo in

18  the dates?

19  A.   Well, otherwise it would have been 2/24/10.  It would have

20  been 11 months later, so I'm not quite sure where the typo -- I

21  mean, the typo could be -- and I apologize, because I truly am

22  not sure of the -- I would need to look at the original chart to

23  tell you exactly when that psychiatric evaluation occurred.

24  Q.   Okay.  Let's look at DB on page 39.  DB has profound MR.

25  You say seizure disorder, Lennox-Gestaut disorder, pervasive

1    developmental disorder.  And pervasive developmental disorder,

2    that's part of the autism spectrum of disorders?

3    A.   Yeah.  It will probably disappear in the DSM-V, you know,

4    kind of the umbrella of autism.  But it is a spectrum diagnoses.

5    It's where -- sometimes when a child, for example, has a

6    significant level of MR, where the behaviors could overlap in a

7    variety of diagnostic categories, but where you see, you know,

8    obvious social deficits and you see deficits in language or

9    perhaps some stereotypic compulsive behaviors, but they don't

10   definitively meet an autism criteria, and they don't meet an

11   Asperger's criteria, but clearly are these deficits of social

12   interactions, they will put some type of PDD/NOS diagnosis.

13   Q.   And that's on one side, if you will, in the autism

14   spectrum.  I think that's the term that's used.  Another side

15   might be something like an anxiety disorder.  That would be

16   something different.  Right?

17   A.   One side of the spectrum would be PDD/NOS.  The other side

18   of the spectrum would be classic autism.  In the middle would be

19   Asperger's.

20   Q.   But apart from that spectrum, another entirely different

21   kind of disorder would be something like anxiety?

22   A.   Anxiety -- well, an anxiety disorder, two different -- you

23   could have -- there are numerous different types of anxiety

24   disorders that one can have, DSM criteria.  Many kids with

25   autistic spectrum diagnoses have varying levels of anxiety

Kraus – Cross                                          6267

1   secondary to their pervasive developmental disorder.  Some
2   people will give it its own separate diagnoses.  Some will just
3   assume that anxiety is secondary to some of the deficits they
4   may have related to their spectrum disorder.
5   Q.   Turning back to DB, DB has the pervasive developmental
6   disorder NOS; ADH -- ADHD features.  Right?  Do you see that on
7   page 39?
8   A.   I do.
9   Q.   And you note in your review that it was described that he
10  was on Seroquel to reduce aggression and improve impulse
11  control, and Strattera was used to try to help with focusing and
12  attention.  Do you see that there?
13  A.   I do.
14  Q.   Now, if someone has profound mental retardation, as DB has
15  been diagnosed with, is there a medication that realistically
16  will help them to focus and pay attention?
17  A.   They are not going to focus and pay attention like an
18  average child.  But many of these kids will have ADHD or ADHD
19  components to their behavior and will respond to stimulant or
20  nonstimulant medication for this.  And if it helps them be able
21  to sit -- when you are in an autism program and you are talking
22  to the teachers, and they say little Johnny can focus for about
23  a minute and a half, until he gets distracted onto something
24  else, and you may put them on a medication like this that can
25  keep them focused for ten minutes, well, you know, that's the

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1    difference between learning some ADLs and activities of daily

2    living and perhaps some other components to teaching and not

3    being able to do that.  So for those who can tolerate it that do

4    have those difficulties, it's not an unreasonable intervention.

5    Q.   Including for someone who has profound MR?

6    A.   Even for somebody with profound MR if it appears that there

7    is some potential benefit to that.  And again, Strattera, which

8    is an FDA-approved nonstimulant medication for ADHD, has the

9    benefit of not only potentially helping for inattention, but may

10   also help with impulsivity and impulsive aggressive behavior.

11   Q.   Okay.  Turn to page 40 and KH.  In the last paragraph

12   there, you note that the psychological consults -- no.  I'm

13   misstating this -- psychiatric consults mention many reports of

14   aggression and mechanical restraint.  Do you see that there on

15   the bottom of page 40?

16   A.   Yes.

17   Q.   And so these are the things that are being used to target

18   or measure behaviors.  These are the behavioral points of

19   measurement, the aggression and the mechanical restraints.

20   Right?

21   A.   This is one component that was being used by the

22   psychiatrist to assess this.  Typically these kids will come in

23   with their psychologist or a cottage person.  There will be

24   additional collateral information beyond that, and you have the

25   observation itself in regards to the assessment of a child.

Kraus - Cross                                                6269

1   Q.   But in terms of actually tracking something, tracking

2   behaviors, the behaviors that are being tracked and reported

3   through data are aggression and mechanical restraints.  Right?

4   A.   Yeah.  For this child, certainly this is one component that

5   the psychiatrist is using in regards to documenting how the

6   child is doing.

7   Q.   Are you aware of any other behavioral components that were

8   being tracked for this child in a systemic way to measure

9   treatment efficacy?

10  A.   I'm not.

11  Q.   Now, looking at CJ on page 41?

12  A.   Yes.

13  Q.   CJ has diagnoses of profound MR, ADHD, disruptive behavior

14  disorder, a couple of other things.  And CJ's date of admission

15  is, what, 4/3/2009?

16  A.   Yes.

17  Q.   And when is the initial psychiatric evaluation done for CJ?

18  A.   On 5/21/2009.

19  Q.   So getting on to seven weeks after admission.  Right?

20  A.   Correct.

21  Q.   Now, you note that on December 10th of '09 Dr. Callahan

22  reported that the Adderall had been tapered and discontinued in

23  November and the distractibility observed may be related to

24  that.  Then you go on to say the last psychiatric assessment was

25  done on 12/10/09.  Right?

Kraus – Cross                                          6270

1    A.    Yes.

2    Q.    So as of your review, it had been over three months since

3    Dr. Callahan had last seen CJ.  Right?

4    A.    I'm not aware of additional psychiatric treatment related

5    to that.  But there's another component here that isn't

6    commented on, and that is that there was a level of disruptive

7    behavior, and that although he had some concern over increased

8    level of distractibility being taken off the Adderall, it seemed

9    as though there may have been some improvement in the level of

10   disruption and behavioral outbursts, which Adderall, just for

11   what it's worth, it's half dextroamphetamine and half

12   amphetamine.  It's something that can reduce disruptive

13   behavior.  It's kind of that balance might help focusing but

14   might cause disruptive behavior, so there may be more to this

15   very brief summary than is actually there.

16   Q.    Are you familiar with that adage, "If it's not documented,

17   it didn't happen"?

18   A.    I am.

19   Q.    Let's turn to page 42.  And if you need a break --

20   A.    No.  I'm just going to get a little more water.  I

21   apologize.

22   Q.    We're looking at MM.  Diagnoses include profound MR and

23   autism.  Right?

24   A.    Yes.

25   Q.    And he was admitted to the facility on January 22nd, 2009?

Kraus - Cross                                      6271

1    A.   Yes.

2    Q.   And when was his initial psychiatric evaluation done?

3    A.   One moment.

4    Q.   If I can find it, I'll --

5    A.   I'm not sure if I know.  I have when there was a follow-up.

6    Oh, there it is.  I'm sorry.  3/20/09.  So about two months

7    later.

8    Q.   So let's turn to, still on page 42, RD.  RD's diagnoses

9    include profound MR, some other things like seizure disorder,

10   tubular sclerosis?

11   A.   Sclerosis.

12   Q.   Thank you.  Thank you.

13   A.   You are welcome.

14   Q.   Now, he comes in on several different medications,

15   including clonidine, Haldol, Seroquel, and Topamax.  Right?

16   A.   And gabapentin.

17   Q.   Okay.  And his date of admission is what?  February 6, '07?

18   A.   Correct.

19   Q.   Now, you don't have in your report, that we can see anyway,

20   the date of his initial psychiatric consultation.  Do you happen

21   to know when that is?

22   A.   I don't.

23        Thank you.

24   Q.   Uh-huh.  I've handed you what's been marked as LK-6.  Do

25   you have that document?

Kraus - Cross                                          6272

1    A.   I do.

2    Q.   And is this the initial psychiatric consultation for RD?

3    A.   Yes, it is.

4    Q.   And what is the date of this?

5    A.   4/5/07.

6    Q.   So that's about two months after he was admitted.  Right?

7    A.   That's correct.

8    Q.   Now, in your review, did you see psychiatric diagnoses that

9    correlated with the clonidine and the Haldol and the Seroquel

10   that this person is receiving?

11   A.   One moment.  The child had come in on pretty much these

12   medications.  And what was described is that there was an

13   attempt to taper the Seroquel, the antipsychotic agent, as well

14   as the clonidine.  And he continued on these three-month

15   reevaluations, Dr. Callahan, in regards to this slow taper, and

16   that in general he felt that the child had actually done well on

17   800 milligrams, which showed that he was at least stable on a

18   third less Seroquel, and that he was also able to lower the dose

19   of the Haldol.

20        As this progressed, Dr. Callahan noted that there were

21   increased tantrums that were reported.  He increased the

22   clonidine back up, which is probably the most benign of the

23   medication, and continued to very slowly try to decrease the

24   Seroquel.  His goal, which I thought was a reasonable goal, was

25   to try to taper the Seroquel and the Haldol, the most potent of

1    the medications that the child was on.  And that's essentially

2    what I have at the time when I summarized the chart.  I think

3    it's also important that he had gotten metabolic panels as well

4    to follow up with how the child was doing in regards to any

5    potential side effects of the neuroleptic such as metabolic

6    syndrome.

7    Q.   I appreciate your answer.  It was a little different than

8    where I was going.  My question was just on whether there was a

9    psychiatric diagnosis to support these things.  I appreciate

10   your observations regarding the decision-making on the

11   medication management, but I was just trying to find out how

12   they linked into a particular psychiatric diagnosis.

13   A.   A lot of times --

14   Q.   If you see the basis, great.  If you don't know, you can

15   just say so, and we'll move on.

16   A.   No, no.  You don't treat the diagnosis.  You treat the

17   behaviors that are related to the diagnosis.  And in this case

18   --

19   Q.   What are the behaviors that relate to the diagnosis?  Let's

20   work backwards.  What is the diagnosis then that we could start

21   with?

22   A.   Well, profound mental retardation.

23   Q.   So we're using psychotropics because this person has

24   profound MR?  Is that what's going on?

25   A.   Well, there are certain behaviors that can be associated

Kraus - Cross                                        6274

1    with profound MR.  The difficulty with profound MR is that you

2    are talking about an IQ below 30 so that you can have all kinds

3    of disruptive behaviors.  In fact, it would be incredibly

4    unusual not to see disruptive behaviors with a child with

5    profound MR.  These are children that often have to have

6    assistance in feeding themselves, tremendous limitations.

7    Q.   Does that translate -- does the need for -- I don't want to

8    belabor this point or this issue.  But you are not drawing a

9    connection between the fact that someone may have feeding

10   difficulties on one hand with maladaptive behaviors on the

11   other.  There's no correlation between those two things by

12   virtue of them having a particular level of disability.

13   A.   No.  I was simply trying to give you a sense of the type of

14   child that would have profound mental retardation and the level

15   of medications which he was on.  But I think the most important

16   part here is that this is a great example of a child that came

17   in on a massive dose of medication in the community and showed

18   me, if anything, his placement in this facility has allowed him,

19   even at the point when I evaluated him, to be on a third less of

20   these potentially, you know, very serious medications, and

21   hopefully, as time goes on, less.

22   Q.   I appreciate your discussion about medication management.

23   I was just -- and I appreciate that Dr. Callahan is working with

24   the hand he's been dealt.  But we began this discussion earlier

25   with noting that there's a need to identify multiple factors

Kraus - Cross                                    6275

1    that can be in play with an individual apart from psychiatric

2    factors, such as behavioral factors, general health factors.  So

3    there's a host of factors that you've identified that come into

4    play in why a person is doing what they are doing.  And I was

5    asking whether you saw evidence that those things had been

6    teased out in any way that was clinically clear.  We can move

7    on.

8    A.   No.  If I could have just one thing is that I think the

9    answer is, you know, in regards to could there be other

10   diagnoses that have been teased out, as you point out.  And in

11   the initial assessment, the answer would be, no, there hasn't

12   been.  But typically, when a child has these level of delays and

13   this much medication, it's not possible to tease out the

14   diagnosis.  The only equivalent, you know, if you had an

15   alcoholic that came into the emergency room that was acutely

16   intoxicated, you really can't do adequate assessment of him

17   until you get the alcohol out of his system.  That's essentially

18   in my opinion what's going on here.

19   Q.   Okay.  Thank you.  Then if we could turn on to page 43 and

20   RC.  First of all, what is RC's gender?  We've got references to

21   "he" and to "she."

22   A.   You will have to excuse me for a moment, as I'm looking

23   down.  I don't recall.  Let me see if I can look at my notes and

24   take a shot at that.

25   Q.   You have notes up there with you?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                          6276

1   A.   No.  My report.  Sorry.  No.  I don't have any notes.  Let

2   me just look.  I believe that RC is a he.

3   Q.   Okay.  And RC's date of admission is when?

4   A.   3/4/08.

5   Q.   And he comes in with diagnoses such as ADHD, predominantly

6   hyperactive type; adjustment disorder with disturbance of

7   conduct; mild MR; and on medication such as DDAVP, Abilify,

8   Zyprexa.

9   A.   You missed nocturnal enuresis, which is what the DDAVP is

10  for.

11  Q.   Okay.  I was curious.  Thank you.  This is a person who had

12  been at Rivendell for the prior month, you note.  So for the

13  prior month, this person has been in Rivendell.  And that's a

14  psychiatric facility.  Right?  It's a psychiatric facility in

15  Benton, Arkansas?

16  A.   I assume it was.  I didn't know a lot about it.

17  Q.   And one of the diagnoses that RC has is adjustment

18  disorder?

19  A.   Yes.

20  Q.   So this is a kid who just came out of a month at a

21  psychiatric facility on multiple psychiatric meds, admitted with

22  one of the diagnoses being adjustment disorder.  And how long

23  after their admission do they have an initial psychiatric

24  evaluation?

25  A.   5/30/08.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Cross                                     6277

1    Q.   So about three months.  Right?

2    A.   Correct.

3    Q.   Now --

4    A.   I think it's also important to notice, though, the

5    improvement that this child has had in regards to the treatment

6    and the interactions --

7    Q.   That's fine.  That's fine.  You will have an opportunity to

8    have that discussion with Mr. York.  But it's useful to point

9    out some concrete things that are very clear that we can all see

10   and agree on, such as these dates.

11   A.   I understand.

12   Q.   I would like you to take a look at an exhibit.  It's 571-8,

13   and we'll get that for you.  I would like you to look at the

14   second paragraph.

15   A.   All right.

16   Q.   And then, unfortunately, I don't have a hard copy here.

17   But I think if you go back -- if you look at the -- this is a

18   compilation of psychiatric consultation notes, I believe?

19   A.   So we will assume that RC is female.

20   Q.   Yes.  I think we have that mystery solved then.  So if you

21   look on the May 5th, 2009, psychiatric consultation, on the

22   second paragraph, once again, what's being tracked in terms of

23   target behaviors are incidents of aggression and mechanical

24   restraint.  Correct?

25   A.   Correct.

Kraus - Cross                                    6278

```
 1   Q.   And --
 2   A.   But those are also the key reasons why this child was
 3   admitted there.
 4   Q.   That's fine.  That's fine.
 5   A.   Okay.
 6   Q.   If you move earlier, turn deeper into the document, the
 7   psychiatric consultation for January 28th, 2009, again what's
 8   being tracked are instances of mechanical restraint, sleep, and
 9   aggression; right, second paragraph?
10   A.   Yeah.  On the 1/28?
11   Q.   Yes.
12   A.   Yes.
13   Q.   And then --
14   A.   In view of the adjustment disorder diagnosis.
15   Q.   Well, I'm just focusing on what's being tracked there.
16   Then if you go to earlier, to 11/18/08, which is Bates stamped
17   247 in the bottom right-hand corner -- are you with me?  The
18   psychiatric consultation is 11/18/08?
19   A.   It might be upside down.
20   Q.   We gave you a special binder then.  11/18/08?  It is going
21   to be Bates stamped 247.
22   A.   I apologize.  Hold on just for a second.
23   Q.   Of course.  I'm sorry if we gave you something upside down.
24   A.   11/18/08, I have it.
25   Q.   So again, in the second paragraph, what's being tracked is
```

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                    6279

1    aggression and mechanical restraint, things like that; right?

2    Second paragraph?

3    A.   And subjective reports of hearing voices, possible

4    paranoia, use of profanity.

5    Q.   But in terms of --

6    A.   Sleep.

7    Q.   Go ahead.  I'm sorry.  I didn't mean to interrupt you.

8    A.   That's all right.  I was just commenting.  It's one

9    paragraph.  Certainly the core component has to do with acting

10   out, externalizing behaviors.  But there are other things that

11   are also documented on there.

12   Q.   Okay.  So if you go over to the September 17th, '08, second

13   paragraph, again the core component, as you said, is mechanical

14   restraint, aggression.  And then they also have sleep.  And we

15   don't need to go through all these.  But that seems to be, as

16   you say, the core component; right, that they are tracking over

17   time?

18   A.   What I said, just for clarification, is that there are key

19   target symptoms of why the kids were admitted.  Most commonly

20   it's due to significant aggressive behavior.  And with that, I

21   think that it's often the core component during the time of

22   stabilization, which can sometimes take years of looking at it.

23   In addition, there are other components that are clearly talked

24   about.

25   Q.   Thank you.  And then if we could turn to page 46.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Cross                                    6280

1    A.    Yes.

2    Q.    It gets a little tricky in here.  But we're talking about

3    HA?

4    A.    Okay.

5    Q.    I said 46, but maybe I don't mean it.  In fact, I don't.

6    Please look at 44, page 44.

7    A.    Yes.

8    Q.    At the bottom of that, you note that the date of his

9    admission is February 3rd, 2009.  Right?

10   A.    Yes.

11   Q.    And you note the date that the initial psychiatric

12   evaluation occurred?

13   A.    The neurology consult is on 12/18/09.  I don't.

14         Thank you.  But now I do.  It would be on 5/15/09, a little

15   over three months.

16   Q.    And it looks like HA has a history of ADHD and had been on

17   Adderall.  Right?

18   A.    Yes.

19   Q.    Okay.  Now let's look at CL.  And that discussion is at the

20   bottom of page 45 of your report, and it continues on from

21   there.  CL was admitted on March 27th, 2008?

22   A.    Yes.

23   Q.    And you were talking about CL earlier today.  Right?

24   A.    Yes.

25   Q.    And in your testimony, when Mr. York asked you to describe

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Kraus – Cross                                        6281

1    this, this incident regarding lithium toxicity -- and we'll not

2    belabor this.  But you said that you studied this case in,

3    quote, great detail, unquote.  Do you remember saying that?

4    A.   I did.

5    Q.   And you said that after the initial lithium level was taken

6    it was some months later that CL vomited while receiving

7    medication.  Do you recall that?  Do you recall that testimony?

8    A.   Right.  Without looking down at the dates, I couldn't tell

9    you, but at some point after the initial lithium levels.  I

10   couldn't tell you whether it was weeks or months.  But I'm sure

11   I can look down now and tell you the exact dates.

12   Q.   That's fine.  Just knowing you had studied the case in

13   great detail, I was curious about that.  Now, again, when CL is

14   admitted, he comes in with a diagnosis of autism and mental --

15   moderate mental retardation; right, looking back at your report?

16   A.   Right.

17   Q.   Now, we didn't see the date of his initial evaluation.  Is

18   it in there and we just missed it?

19   A.   No.  It was -- it's later.  And we talked about it

20   certainly in deposition, when the psychiatrist saw him.  I

21   believe the psychiatrist didn't see him until after he returned

22   back.  I already brought that up in the direct as well.

23   Q.   So April 11th, 2008, we can agree that's when that

24   occurred, or would you like to see a document that would help

25   you refresh your memory about that?

Kraus - Cross                                    6282

1   A.    Actually, it's always nice to have the document in front of

2   me while we're talking, if you could.

3   Q.    That would be fine.  We won't spend much time on it.  It's

4   Exhibit 897.  CL has made an appearance virtually every day in

5   this trial, and we don't want to belabor it.

6   A.    All right.  So the date of the intake is after he's

7   returned from the hospital, which is on 5/11/08.

8   Q.    And while we have the document here in front of us,

9   Exhibit 897, if you look at the second paragraph there, it says,

10  "He has had few behavioral problems since admission.  Some of

11  the problems that he was having that were described early in his

12  stay may have related more to medication side effects and other

13  issues.  He apparently was excessively thirsty."  Thirst is a

14  sign of lithium toxicity.  Right?

15  A.    Thirst can be a sign of simply being on lithium, period.

16  No, I won't agree to that.  Any child that's on lithium could be

17  thirsty.

18  Q.    Whether or not the medication is at a toxic level?

19  A.    Correct.

20  Q.    So is it your view that that's not something that would

21  warrant further inquiry, a thirsty kid on lithium, in and of

22  itself?

23  A.    It depends what else is associated with it.  Having already

24  gotten two lithium levels and now having a child that's thirsty,

25  it may or may not warrant, depending on what else is going on

Kraus - Cross                                          6283

1    with the child.

2    Q.   Well, let's continue with the description then.  We don't

3    have to speculate.

4    A.   Okay.

5    Q.   "He tended not to eat well and had 14 reports of refusing

6    meals.  He was lethargic and tended to sleep a great deal day

7    and night."  Now, one of the side effects of lithium is that it

8    ultimately can bring on a coma -- can bring on a coma.  Correct?

9    A.   Or death.

10   Q.   Or death.  And swallowing difficulties can also be an issue

11   associated with the side effects of lithium.

12   A.   Less commonly, but --

13   Q.   So these are other symptoms that are noted by Dr. Callahan

14   to be showing up early, early in his stay.  Right?  That's what

15   that says there.  Right?  Just one thing at a time.  That's what

16   it says.  Right?

17   A.    It's a description of symptomatology that may or may not be

18   related to lithium.  Refusing a meal is not necessarily a

19   lithium issue.

20   Q.   No.  There are lots of things that aren't necessarily a

21   lithium issue but are also consistent with lithium toxicity.

22   A.   Not necessarily.

23   Q.   Okay.

24   A.   I don't think you are going to see meal refusals in lithium

25   side effects if you open up the PDR.

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

Kraus - Cross                                    6284

1    Q.    Does that mean that meal refusals, swallowing difficulties,

2    are not side effects of lithium?  Is that what your testimony

3    is?

4    A.    Swallowing side effects would be a very uncommon type of

5    side effect.  Meal refusals, if somebody had an ongoing

6    stomach/GI side effect, if they were vomiting all the time, if

7    they had diarrhea and they weren't eating, yes, that could be a

8    side effect of lithium.  If a kid just isn't eating a meal or

9    two meals or 14 meals over a period of time, without those other

10   sequelae, I think that it's less likely related to lithium and

11   more likely related to his level of moderate retardation, his

12   autistic behavior, his stereotypic behavior and --

13   Q.    There's a correlation between mental retardation and meal

14   refusal?  Is that what you are saying?

15   A.    I said there's a correlation -- I didn't say anything about

16   correlation.  You said correlation.  There's an association with

17   being autistic and having peculiarities with regards to what you

18   eat and when you eat it, which can --

19   Q.    And does autism bring on -- and we'll move on.  But autism

20   doesn't cause someone to vomit at a med pass, does it?

21   A.    Some do actually.

22   Q.    Interesting.

23   A.    No.  But his vomit was a one-time thing, 30 cc's, without

24   associated GI distress.

25   Q.    Now, in your deposition, you stated that after reviewing

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

Kraus - Cross                                         6285

1    the record you didn't detect any signs of unconsciousness in CL.

2    Do you remember making that statement?

3    A.    That I didn't recognize any sign of unconsciousness?

4    Q.    We can just get it in front of us.

5    A.    Thank you.

6    Q.    If you could take a look at your deposition -- which we

7    have to locate -- if you would look at page 217, I think that's

8    where we need to be, carrying over to 218, beginning on line --

9    beginning on line 23.

10   A.    Thank you.  Yes.  I was asked if CL ever lost

11   consciousness.  And I said if he did lose consciousness, I was

12   not aware of it.

13   Q.    Okay.  Now, if you look at page 46 of your report, you

14   provide a summary at one point.  You say, "While placed at the

15   Connor Regional Health System" -- I assume you mean Conway?

16   A.    Conway.

17   Q.    -- "they reported that CL appeared to be in a comatose

18   state and did not flinch or respond to very painful stimuli when

19   his IV was being placed."  So your review of the chart somehow

20   --

21   A.    Having lost consciousness at the facility and the

22   presentation at the hospital may be two very different things.

23   I answered that as accurately as I could, and I think it's still

24   accurate.  How he presented at the hospital may be a very

25   different presentation at that point.

Kraus - Cross                                          6286

1   Q.   Now, the other thing that you said about this individual's

2   care, you say it was handled very well, probably saved his life.

3   A.   It definitely saved his life.  He is alive and healthy.

4   Q.   I didn't hear the last thing you said.

5   A.   He is alive and healthy.

6   Q.   He is alive and healthy.  Well, it's all perspective.

7   Right?  Page 62.  You make the statement that:  "His lithium

8   level was obtained and was elevated at a level above 4.0

9   milliequivalents per liter.  He was immediately hospitalized at

10  a local hospital and then sent to the University of Arkansas

11  Medical Center."  Are you aware that the defendants' experts in

12  this case have acknowledged that he wasn't hospitalized until

13  the following day?  Are you aware of that testimony?

14  A.   I can't tell you as I'm sitting here how quickly the

15  lithium level was obtained.

16  Q.   I'm just focusing on your statement, "he was immediately

17  hospitalized at a local hospital."

18  A.   Right.  After the 4.0.

19  Q.   So coming back to this case that you spent, to use your

20  words, a great deal of time -- no, that you reviewed in great

21  detail, your testimony is he was immediately hospitalized at a

22  local hospital after the lithium level of 4.0 was taken.  And

23  that's one of the bases that you identify for the fact that his

24  situation was handled well.  Right?

25  A.   Your point is that they got the level back and he was

1   hospitalized the next day?

2   Q.   Yes.

3   A.   And not immediately.

4   Q.   That's one of my points, yes.

5   A.   Okay.  If he was hospitalized the next day after receiving

6   that, I wasn't aware of that.  I was under the impression that

7   he was hospitalized at the local hospital immediately after

8   getting that very elevated level.

9   Q.   And that would affect your opinion about the quality of

10  care if they waited until the next day following that level of

11  4.0.  Right?

12  A.   I would have explored further the medical care.  But that

13  really wasn't what I was there to look at.  I was there to look

14  at the psychiatric care.

15  Q.   Okay.  All right.  But you offer the opinion?

16  A.   And I'm happy to discuss it.

17  Q.   I'm sorry.  You interrupted me.

18  A.   Sorry.

19  Q.   You offered an opinion that this was a case that was

20  handled well and they saved his life.  So, I mean, this is a

21  fray that you stepped into.  Right?

22  A.   I think that they saved his life.  I think that if he was

23  in a community setting --

24  Q.   We're not talking about hypotheticals.  We're talking about

25  --

1           THE COURT:  Mr. Tayloe, you've been a gentleman

2   throughout this trial.  I want to compliment you on that.  But

3   you have actually interrupted him several times.  Since you

4   called him, I'm going to interrupt.  And I do want to compliment

5   you, because you've been a real gentlemen.  But you cut him off

6   right then, and you've done that before.

7           MR. TAYLOE:  Thank you for your guidance, Your Honor.

8   And I apologize.

9   BY MR. TAYLOE:

10  Q.   I apologize.

11  A.   Apology accepted.

12  Q.   Do you want to finish your answer?

13  A.   Yeah.  My hypothetical, my concern was simply, what I

14  expressed was that this is an example of whether there was a

15  delay or not of getting the child to the hospital and a scenario

16  that could have been missed and a scenario where a child could

17  have died in a placement that offered less supervision than

18  where he was at.

19  Q.   Okay.  And I wanted you to focus not on a theoretical

20  setting, where this individual might have been, but, in fact,

21  where he was.  And the fact is, it would make a difference to

22  you if, after he comes back with a level of 4.0, the decision is

23  not made to hospitalize him, but rather to keep him for another

24  12 hours or so.  That in your mind raises care implications.

25  Correct?

Kraus – Cross                                    6289

1    A.   I would want to ask the physician that made that decision

2    why -- I think it may have been Dr. Lea -- why the decision to

3    hold him for another 12 hours.  There may be additional

4    information that I'm not aware of as I sit here.

5    Q.   Notwithstanding that you reviewed this case in great

6    detail.

7    A.   Well, as you can see, there's a lot more written here than

8    most of the other cases.  I think this case and TM are the ones

9    that I probably focused on the most.

10   Q.   Now, just looking at your notes, since you observed that

11   you focused quite a bit on CL, on page 46 of your report, in the

12   second paragraph, you note that CL's diagnoses include autism

13   and moderate mental retardation.  Do you see that?

14   A.   I do.

15   Q.   Then on the bottom of page 46, you note:  "Based on prior

16   testing, CL falls in a level of severe mental retardation."  Do

17   you see that?

18   A.   Yes.

19   Q.   Then over to page 47, at the top:  "Within an early

20   Department of Human Service evaluation, they reported that CL's

21   function was in the range of mild mental retardation."  Do you

22   see that?

23   A.   I have a sentence after that, though.  "However, this

24   appears that this was an overestimate of his intelligence."

25   Q.   Nonetheless, we have three out of the four major categories

1    of mental retardation assigned to this kid at one point or

2    another.  Right?

3    A.   At an early history, which you can hardly blame the

4    facility for, there was a community-based program that evaluated

5    him with mild MR, which seemed to be, as I described, an

6    overestimate.  I think more appropriate, as I would describe it

7    probably too, he would fall in the severe or moderate in regards

8    to his level of MR.  Now, the most common level of MR with

9    autism is moderate.  If I had a guess, he probably fell in the

10   range of moderate MR and not severe.

11   Q.   Did you see anything in the records to indicate that there

12   was a resolution of these multiple diagnoses?  I mean, it's a

13   pretty fundamental issue.  Right?

14   A.   Give me just one moment.

15   Q.   Sure.

16   A.   According to Dr. Callahan, it was his clinical opinion that

17   he fell in the range of moderate mental retardation.

18   Q.   Now, can you make that diagnosis based on an assessment, or

19   do you actually have to run a series of tests that are really in

20   the domain of a psychologist to do?

21   A.   Until you actually get the numbers, you can't make the

22   definitive diagnosis of what level of MR.  You can look at

23   adaptive behavioral assessments.  You can, if you are really

24   adept at looking at kids, and see what they are able to do

25   adaptively and have a suspicion of where they may fall.  But to

Kraus - Cross                                    6291

1    make a definitive diagnosis of MR, you need both IQ testing and

2    adaptive behavioral testing and putting those together.

3    Q.    And your review just now didn't show that that had been

4    done to say, hey, we have these competing diagnoses, we're going

5    to sort this out.  I mean, just on page 46, at one place he's

6    moderate and another it's severe.

7    A.    As I'm sitting here, I can't tell you how Dr. Callahan came

8    up with the decision that it was on the level of moderate as

9    opposed to severe.  There may be additional information there.

10   Q.    Okay.  Now, you mentioned TM.  So let's turn to TM on page

11   47 of your report.  And as I understand your testimony, you

12   observed TM initially from a distance, and then you were able to

13   get close to TM.  Is that a fair characterization of what you

14   said?

15   A.    It was a combination of observing, getting closer, getting

16   in his range of sight, seeing if he appeared comfortable with

17   me, and then getting closer to him.

18   Q.    Now, you are aware, from reading Dr. Holloway's report,

19   that staff indicated to her -- I think you said it was the same

20   staff person -- that TM is afraid of strangers.  Right?

21   A.    Yes.

22   Q.    And do you have an opinion that you are simply more adept

23   at working with folks who have mental retardation than Dr.

24   Holloway, so that you are able to get close to TM and not fall

25   prey to the afraid-of-strangers problem that apparently,

                         Elaine Hinson, RMR, CRR, CCR
                         United States Court Reporter

Kraus - Cross                                          6292

1    according to the staff person, affected her?

2    A.   I can tell you for myself that most of my professional

3    career I've worked with a significant amount of patients in the

4    autistic spectrum and severe MR, moderate MR.  And I do feel I'm

5    very adept.  Did Dr. Holloway do something different than I that

6    may have caused the patient to react differently?  I wasn't

7    there, so I can't comment on that.  I can just comment on what I

8    did and how the patient reacted.

9    Q.   Okay.  Now, here again, TM is admitted to the facility

10   when?

11   A.   On December 18th, 2008.

12   Q.   And when is the initial psychiatric evaluation performed?

13   A.   I believe it was January 28th, 2009, so a month later.

14   Q.   And at the time of admission, TM was on Risperdal.  Right?

15   A.   Correct.

16   Q.   Getting it twice a day.

17   A.   He was on -- yeah, 6 milligrams a day.

18   Q.   And Dr. Callahan sees him for the first time about six

19   weeks -- I'm sorry -- about five weeks after admission?

20   A.   Yes.

21   Q.   Now, in your report, in your report, you twice made a point

22   of saying that Dr. Holloway made statements based on something

23   that you said didn't happen.  You mention this on page 11.  In

24   particular, on page 47, you say --

25   A.   I'm not sure what you are talking about.

Kraus - Cross                                6293

1    Q.    I'm getting ready to tell you.

2    A.    Sorry.  Sorry.

3    Q.    "There was a concern that TM was catching urine and

4    throwing it.  This was based on what Dr. Holloway wrote in her

5    review."  Are you with me?

6    A.    I am.

7    Q.    "I have reviewed all of TM's medical and central records.

8    I have spoken to the staff that cares for him.  There was no

9    documentation that this ever occurred."  That's what you said

10   there.  Right?

11   A.    I did.

12   Q.    You said also, as part of the documentation you looked at

13   in preparation of your report, that you read Dr. Callahan's

14   deposition.  Right?

15   A.    I did.

16   Q.    Let's take a look at Dr. Callahan's deposition then.  And

17   if you would look at page 131, lines 13 through 20.  And he's

18   discussing his review of the clinical records for TM.

19        "Question:  So turning then back to TM, if you look at the

20   second paragraph on page" -- so-and-so -- I'll read, "He also

21   had a left orchectomy."

22   A.    Orchectomy.

23   Q.    It's misspelled here.  That really puts me at a

24   disadvantage.  "Orchectomy on 3/21/09.  Around the beginning of

25   April, he had a major increase in problems, which included

Kraus – Cross                                        6294

1    aggression, urinating in his hands, and flinging it in staff's

2    faces."

3         Do you see that?

4    A.   I do.

5    Q.   And that's referenced in Dr. Callahan's deposition.  Right?

6    That's what we're looking at now?

7    A.   Correct.

8    Q.   I would like you to look at Exhibit 875.  Do you have that

9    there in front of you?

10   A.   I do.

11   Q.   And this is a compilation of psychiatric consult notes for

12   TM.  Right?

13   A.   Yes.

14   Q.   Okay.  Please look at the psychiatric consult note that's

15   dated May 19th, 2009.  And read the second paragraph, third

16   sentence.

17   A.   "T had four behavior reports in March.  That month he had

18   his risperidone reduced by 1 milligram by my recommendation.  He

19   also had a left orchectomy on 3/21/09.  Around the beginning of

20   April he had a major increase in problems, which included

21   aggression, urinating in his hands and flinging it in staff's

22   face, seeming very fearful."

23   Q.   Thank you.  So Dr. Holloway actually had this right.  True?

24   A.   She did.  I didn't see it, nor did the staff report it to

25   me.  Apparently whatever staff had it flung in their face wasn't

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Cross                                    6295

1    there when I interviewed them.

2    Q.   Apparently not.  Now, back to your report -- well,

3    actually, the exhibit we were just looking at, which I think you

4    will know this from your report as well, he was thought to have

5    a psychosis NOS.  And that was the basis for his medications;

6    right, at the time?

7    A.   I can't tell you if it was the sole basis of his

8    medication.  But certainly that would be a rationale for why you

9    would be on an antipsychotic.

10   Q.   Turning back to your report, at page 48, you state:

11   "Although in the past there was concern over possible psychosis,

12   it appears related to TM's nonverbal behavior and significant

13   mental retardation."  Right?

14   A.   Yes.

15   Q.   Now, TM has a diagnosis of autism.  Right?

16   A.   Yes.

17   Q.   And according to your summary of this report, what

18   medications is he receiving?

19   A.   He was receiving the Risperdal.  There was an attempt to

20   decrease, which may have resulted in increased aggression.  And

21   he's on citalopram, 20 milligrams.  That's Celexa.

22   Q.   Now, do you know whether Celexa has ever been shown to be

23   effective in the treatment of autism in children?

24   A.   Both citalopram and escitalopram have certainly been

25   effective in helping stereotypic behaviors in certain studies.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1    Q.   I'm sorry.  I didn't hear the last thing you said.

2    A.   In certain studies.  And it's not something that is

3    necessarily FDA approved.  Now, the modern version of

4    citalopram, which is escitalopram -- it's an isomer, basically

5    the same substance, is FDA approved for treating mood disorders

6    in children.  And Risperdal, of course, is FDA approved for

7    treating behavioral problems with autistic children, not just

8    psychosis.

9    Q.   I'm asking about citalopram.

10   A.   Right.  So what I can tell you is that is it FDA approved

11   for autism per se?  No.  Is it an SSRI which has been shown to

12   be helpful in the stereotypic behaviors associated and anxiety

13   associated with autism?  Yes.

14   Q.   Okay.  Are you aware of the *Archives of General Psychiatry*?

15   A.   I am.

16   Q.   You would agree that it's pretty much the premiere

17   psychiatric journal in the United States?

18   A.   It's arguable, but it's up there.

19   Q.   Okay.  Dr. Kraus, I've handed you what's been marked as

20   LK-1 and LK-2.  Do you have those documents there in front of

21   you?

22   A.   I do.

23   Q.   Are you aware that the National Institutes of Health

24   underwrote a study last year on the efficacy of Celexa at six

25   academic medical centers around the country?  Were you aware of

Kraus - Cross                                    6297

1    that study?

2    A.    I am.

3    Q.    Well, were you aware of it before I put it in front of you

4    just now?

5    A.    I couldn't tell you the study per se, but I'm aware of the

6    issue with citalopram.

7    Q.    And you were aware of the issue regarding citalopram when

8    you gave the answer earlier that you just gave?

9    A.    I still agree with that.

10   Q.    Well, let's go through this then.  I'm sorry.  I'm not

11   doing what I'm supposed to do.  Please finish.

12   A.    I still agree with what I said, that citalopram as an SSRI

13   can still potentially be helpful in some children with autistic

14   spectrum disorder, regardless of what this individual study or

15   studies may potentially show.

16   Q.    Okay.  Well, let's go through this then, because I think

17   this will be a useful exercise for us.  If you look at the

18   second paragraph on the first page of this -- first of all,

19   let's just give some context.  This was a study that was

20   underwritten by the National Institutes of Health.  And it was

21   conducted by Mount Sinai School of Medicine, North Shore Long

22   Island Jewish Health System, Dartmouth, University of North

23   Carolina, UCLA, and Yale.  Right?  I can point you to the

24   portions of this that will help you establish that.  If you look

25   at the second page of the news release, on the second-to-last

Kraus - Cross                                    6298

1    paragraph, those are the universities that conducted this study.

2    Do you see that?

3    A.    I do.

4    Q.    Okay.  So that's the context for this.  And on the first

5    paragraph, first page rather, second paragraph, it says:  "What

6    we found, much to our surprise, is that there was no significant

7    difference in positive response between kids treated with

8    citalopram and kids who received the placebo."  And this part in

9    particular:  "And the kids treated with citalopram tended to

10   have more side effects."

11        Then:  "At the end of the trial," skipping down to the

12   bottom of the page, and it carries over to the next page, it

13   says, "At the end of the trial, some children in both groups

14   showed a positive response.  However, there was no significant

15   difference between the groups.  The positive response in the

16   citalopram group was 32.9 percent versus 34.2 percent in the

17   placebo group.  In addition, children in the citalopram group

18   were significantly more likely to experience adverse side

19   effects such as increased energy level, impulsiveness, decreased

20   concentration, hyperactivity, increased repetitive movements and

21   behaviors," and some other side effects.  Do you see that?

22   A.    Yes.

23   Q.    Then it goes on to say:  "The researchers concluded that

24   citalopram, quote, is not an effective treatment, unquote, for

25   autistic children with repetitive behaviors.  In addition, they

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1    wrote, this trial shows that the use of SSRIs in autistic

2    children, quote, is not without risk, unquote, and, quote, at

3    present there is insufficient research evidence to merit a clear

4    recommendation regarding the use of SSRIs as a class for the

5    treatment of repetitive behavior in children with autism

6    spectrum disorders."  Do you see that?

7    A.   I do.

8    Q.   And then, finally, this paragraph:  "The obvious short-term

9    message is, this treatment didn't work.  And that surprised us a

10   great deal," says one of the authors of the study.  "But the

11   really important take-home message is that we have to do large

12   scientifically sound comparative studies like this to really

13   know whether a specific treatment works and is safe.  Simply

14   relying on doctors' and families' impressions often leads us to

15   use medications that really don't work and may do more harm than

16   good."

17        Then you see that there too?

18   A.   I hear what you say.

19   Q.   Okay.  Then if you look at the document that's been marked

20   as LK-2, do you recognize this to be the abstract of the report

21   that we've just been describing?

22   A.   Right.

23   Q.   And this is published in the *Archives of General*

24   *Psychiatry*?

25   A.   Correct.

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

Kraus - Cross                                    6300

1    Q.   And it's titled "Lack of Efficacy of Citalopram in Children

2    with Autism Spectrum Disorders and High Levels of Repetitive

3    Behavior"?

4    A.   Correct.

5    Q.   And the principal author there, by the way, is Dr. Bryan

6    King.  Are you familiar with him?

7    A.   I know numerous names in there.

8    Q.   Terrific.  So notwithstanding this study, your opinion

9    still is that it's fine to use this for autism?

10   A.   Two things.  I think it's much better to look at the

11   *Archives* article and not a secondary article that -- I had no

12   idea what *Newswise* is and what their focus is in regards to the

13   use of medications.  Any medication that we use with children,

14   even when they are FDA approved, have potential risks and

15   potential benefits.  There's nobody that I know of who works

16   significantly with autistic kids that will tell you that for

17   certain children SSRIs aren't of potential benefit and that they

18   have seen clinical benefit.  This is an interesting study.  It

19   certainly sparks some areas of concern, as many other studies

20   regarding psychotropic medications as well, including the black

21   box warning for SSRIs, if we want to get into that.  But it does

22   not limit the clinical judgment and the potential usefulness of

23   SSRIs in certain children with autism, depression, and anxiety

24   disorders.

25   Q.   Well, let's just focus on the citalopram for starters.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

1    A.    Well, this article, though, describes SSRIs in general.

2    Q.    Well, the study was conducted regarding citalopram.

3    A.    Yeah.  But you brought up SSRIs as well, so I'm responding

4    to what you told me.

5    Q.    Okay.  So let's come back to citalopram.

6    A.    Okay.

7    Q.    So notwithstanding the study, you still think it's okay to

8    use this drug for kids with autism?  Is that your testimony?

9    A.    The use of citalopram or escitalopram for children with

10   autism is still not contraindicated.  It is not my typical

11   medication of first choice.  But it is not a contraindicated

12   medication for the use of autism by any means.  And many

13   clinicians use it for a variety of reasons, including it is one

14   of the related -- escitalopram is one of the few SSRIs that's

15   FDA approved for anything for kids.

16   Q.    Well, we had testimony earlier in this case that FDA

17   approval really means approval to advertise.  The FDA isn't

18   saying this is good for you to go use it for this purpose.

19   Right?  That's not what you are saying.

20   A.    I understand what FDA approval means.

21   Q.    Well, the point is, you are testifying now, and you are

22   saying certain things about what it means.  And we want to get

23   that clear.  You are not saying, are you, that FDA approval

24   translates to a gold standard, that, for instance, the use of

25   citalopram in treating kids with autism is a good idea?  That's

1    not what FDA approval means.

2    A.    No.  FDA approval means the pharmaceutical company has the

3    right to advertise for that particular use.  What I'm saying is

4    the SSRIs in general are used to treat OCD symptoms, as they are

5    in adults, the stereotypic behaviors, which are just one of the

6    reasons to use SSRIs for autistic children.  And it's also used

7    for anxiety symptoms related to autism and affective symptoms,

8    meaning depression related to having autistic spectrum

9    diagnosis.  So there could be numerous reasons.  This addresses

10   one particular component.  Now, if the question were do I know

11   exactly what the target symptoms were of why the citalopram was

12   being used in this child, I can't tell you for sure what they

13   were.

14   Q.    Well, do you take issue with the notion that the really

15   important take-home message is that we have to do large

16   scientifically sound comparative studies like this to really

17   know whether a specific treatment works and is safe?  Do you

18   take issue with that statement?

19   A.    I think that's a sound statement.

20   Q.    Do you take issue with the next sentence there, "Simply

21   relying on doctors' and families' impressions often leads us to

22   use medications that really don't work and may do more harm than

23   good"?

24   A.    What chart are you looking at right now?

25   Q.    I'm on Exhibit LK-1.

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                6303

1    A.    Okay.  So we're looking at the *Newswise* thing that I don't

2    know what that is.

3    Q.    Right.  That's fine.  I'm asking you whether you disagree

4    with the statement that's in this thing.  So the second sentence

5    that I was asking you about is, "Simply relying on doctors' and

6    families' impressions often leads us to use medications that

7    really don't work and may do more harm than good."  Do you have

8    a problem with that sentence?

9    A.    Yes and no.  Can I respond just a little bit?

10   Q.    Sure.

11   A.    All right.  Actually, what doctors use clinically can be

12   extremely relevant.  What's described clinically even in small

13   clinical trials can be very important and allow us to have some

14   basic understanding.  As child psychiatrists, we don't have a

15   lot of options in regards to how to treat kids.  When a child is

16   really suffering, we may have limitations.  To use those

17   clinical trials, it may be the best that we have.  Without

18   question, a large-scale double-blind multisite placebo

19   controlled, on and on, wonderful study is going to offer us more

20   and better information, which can allow us to give our patients

21   and their guardians better informed consent.  Until then, all we

22   can do is offer the information that we have.

23   Q.    And what you do in making that calculation -- with the

24   study's conclusion that, "In addition, children in the

25   citalopram group were significantly more likely to experience

Kraus - Cross                                     6304

1    adverse side effects such as increased repetitive movements,"

2    what do you do with that information in terms of cost-benefit

3    analysis of using that medication?  Isn't that something you

4    should factor in?

5    A.    Whenever using an SSRI with kids, you are going to have an

6    increased risk of side effects to not using anything.  They are

7    very sensitive to medications.  And although the goal may be to

8    decrease stereotypic behaviors, if that was actually the target

9    symptom to begin with, it may be that you increase the anxiety

10   level and potentially could worsen those symptoms.  That's

11   something that you have to look for.  That's certainly compared

12   to the placebo.  You have some baseline symptoms.  If you give

13   something that might cause increased irritability, it's going to

14   cause more than a placebo.  You are still going to give it a

15   try, because it may have a chance to help them.  There are many

16   medications that are like that.

17              MR. TAYLOE:  Your Honor, I think I can do another case

18   example in the time we have left.

19              THE COURT:  Feel free.

20   BY MR. TAYLOE:

21   Q.    If we could turn to page 49 of your report.  We're looking

22   at JM here?

23   A.    Yes.

24   Q.    And when is JM admitted?

25   A.    On March 11, 2009.

Kraus - Cross                                    6305

1    Q.   And the diagnoses include severe MR, seizure disorder,

2    autistic features, stable brain atrophy.  And JM is on Lamictal?

3    A.   That should be an L in front of the O, lorazepam.

4    Q.   Lorazepam, risperidone.  And when is the psych evaluation

5    completed?

6    A.   5/26/09.

7    Q.   So I didn't do the math here, but a couple of months after

8    the date, two months after the date of admission.  Right?

9    A.   Yes.

10   Q.   Okay.  And you note here that the last evaluation completed

11   was on 12/3/09, approximately four months ago.  Right?

12   A.   Correct.

13   Q.   And then actually, if we could continue on page 50, TT?

14   A.   A bait and switch here.

15   Q.   Sorry.  Just a page.  But we're moving so quickly.  TT is

16   admitted when?

17   A.   On 6/15/07.

18   Q.   And do we know when he was first evaluated?

19   A.   The initial psychiatric was on 6/26/07.

20   Q.   Okay.  So that one, by contrast with the others, is

21   relatively quick.

22   A.   Eleven days.

23   Q.   Yeah.  And you note here that the diagnoses include

24   moderate MR; mood disorder; ADHD, combined type.  You also say

25   he has a history of suicidal threats and plans.  Right?  Do you

1   see that?

2   A.   I do.

3   Q.   Okay.

4   A.   Which could have been related to the eval being done in

5   such a timely manner.

6   Q.   There you go.  But again, at the time of your deposition,

7   you did not identify anybody as having a risk of suicidality at

8   the facility.  Right?

9   A.   Right.  I don't think that this child had it either.  I

10  think this is prior to being at the facility he had a history of

11  this.

12  Q.   You noted in your review that the AIMS test was zero.  The

13  AIMS test was completed by nursing and is signed off by Dr.

14  Callahan.  Do you see that?

15  A.   Yes.

16  Q.   Now, in this note that you reviewed, or these notes for TT

17  that you reviewed, did you see any reference to any testing for

18  other side effects, like akathisia?  Any evidence that they were

19  watching out for akathisia?

20  A.   I think that the AIMS test would have looked at

21  extrapyramidal side effects.

22  Q.   Your understanding is that the AIMS test will capture

23  akathisia?

24  A.   It may.  I can go over it if you want.

25  Q.   If you have an opinion -- I think you've just given it.  It

Kraus - Cross                                    6307

1    may.  That's your opinion, that it may cover akathisia.  Right?

2    A.   It is certainly going to cover extrapyramidal side effects.

3    Can I tell you for sure that somebody may have some uneasiness

4    as they are sitting and that may be picked up by the AIMS?  No,

5    of course not.  That may be missed.

6    Q.   Okay.  We're on a roll here, so I'm going to try to get one

7    more done at least.  Page 51, SW.  He has diagnoses of mild MR,

8    seizure disorder, autism, and anxiety disorder.  Right?

9    A.   Yes.

10   Q.   And what's the date of admission?

11   A.   March 26, 2008.

12   Q.   And when is the initial assessment done?

13   A.   May 19th, 2008.

14   Q.   So about two months.  Right?

15   A.   Correct.  Maybe seven weeks.

16   Q.   Seven weeks.  And then over to page 52, NS.  What's the

17   date of admission for NS?

18   A.   November 23rd, 2005.

19   Q.   And then the initial intake?

20   A.   On November --

21   Q.   Yeah.

22   A.   I'm not sure.  Obviously, there's some error there.  But it

23   says -- I shouldn't say obviously.  Again, I can't tell you for

24   sure.  But I have down November 17, 2005.

25   Q.   Okay.  Which could only be possible if this person was on

1    respite and their formal admission was subsequent to the psych

2    eval.  Right?

3    A.    Correct.

4    Q.    Do you know whether this is the individual who you had in

5    mind earlier?

6    A.    Not to my memory, this wasn't.

7    Q.    Okay.  So we have -- you remember the one person where that

8    would have been the case in the charts that you reviewed.

9    Right?  I'm sorry.  I don't know if you answered me.  I didn't

10   hear it.

11   A.    There's one person that I know for certain that I was able

12   to document it.  And this one, I'm sure we could look at the

13   chart or the initial assessment and find out the answer pretty

14   easily.

15   Q.    Now, in your note regarding the psychiatric consults, you

16   are tracking that at the time of this assessment there were

17   references to attempted elopement and acts of aggression, in

18   this reference to November, a certain number of attempts of

19   elopement and a certain number of aggressive behavior episodes.

20   Do you see that?

21   A.    Correct.  That she had had seven attempted elopements and

22   37 aggressive behavior episodes.

23   Q.    So those are the target behaviors --

24   A.    And five self-injurious behaviors.

25   Q.    Those are the target behaviors that are being tracked?

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                          6309

1    A.    Those are some of the comments.  Self-injurious behaviors,

2    aggressive behaviors to others, elopement behaviors were areas

3    that were described.

4    Q.    Okay.  Just for clarity for the record, is self-injurious

5    behavior defined anywhere in this note, what the actual

6    self-injurious behavior is that's being tracked?

7    A.    Oh, in my summary here?

8    Q.    Yes.

9    A.    No.

10   Q.    And the same thing would be true of aggressive behaviors.

11   That's not defined either?

12   A.    It doesn't mean that they don't exist.  It's just not in my

13   note.

14   Q.    Do you know whether those behaviors are broken out in Dr.

15   Callahan's psychiatric evaluation?

16   A.    I would have to look at this particular child to tell you

17   whether he did that or not.

18   Q.    If we could quickly take a look at JR, who is described on

19   pages 52 to 53 of your report.  Now, this individual has a

20   diagnosis of moderate MR, cerebral palsy, developmental delay,

21   and a gait disorder secondary to his cerebral palsy.  And it

22   says here, if I have this right, there are no current

23   psychiatric symptoms.  Do you see that?

24   A.    Correct.

25   Q.    And he's on no current psychotropic medications.  He is on

Elaine Hinson, RMR, CRR, CCR
United States Court Reporter

Kraus - Cross                                          6310

1    no current psychotropic medication.  Right?

2    A.    Correct.

3    Q.    Now, coming back to your description of the complexity of

4    the kids at CHDC and why that was a relevant factor in the kids

5    being at CHDC, do you have an opinion of why JR is at this

6    facility?

7    A.    I can't tell you for certain, as I'm sitting here, why this

8    child was placed at this facility, if not for behavioral, then

9    for the complexity of his medical condition and developmental

10   deficits.  I'm not sure if there's something else in place there

11   as well.  I would need to review his file again, which I'm happy

12   to do if you want me to do it and then comment.

13   Q.    I don't have it right here.  So I was just asking what,

14   from your review initially, if anything, you could recall would

15   be responsive to that as to why he was here.  If you don't

16   remember, that's fine.

17         Then if you could look at TS on page 53, TS is admitted on

18   what date?

19   A.    He's admitted on March 5th, 2009.

20   Q.    And TS has a history of a psychotic disorder.  Is that

21   right?

22   A.    I would have to look for a moment.  Yes.

23   Q.    And when is his initial psychiatric assessment completed?

24   A.    On March 30th, 2009.

25   Q.    Is it March 30th?

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter

1    A.    I'm sorry.  April 30th.

2    Q.    So it looks like he was not seen by the consulting

3    psychiatrist for well over 30 days after his admission.  Is that

4    right?

5    A.    That would be correct.

6    Q.    And -- yeah.  I don't need to ask you that next question.

7              MR. TAYLOE:  Your Honor, I'm at a good stopping point.

8              THE COURT:  All right.  We'll recess until nine in the

9    morning.  Is there anything anybody needs to bring up before we

10   recess?

11             MR. TAYLOE:  No, Your Honor.

12             THE COURT:  And we're still on track to finish Friday,

13   aren't we, Mr. York?

14             MR. YORK:  Yes, Your Honor.

15             THE COURT:  You all should consult.  Counsel on both

16   sides should consult and let me know in advance how you want to

17   submit this case.  We've talked, sort of assuming that there

18   would be posttrial briefing.  Certainly that's appropriate.  If

19   you want to submit it without oral argument, with an argument at

20   the close of the case, or with or without briefing, let me know.

21   And if you want a briefing schedule, then I think you ought to

22   consult before we adjourn the trial and tell me what you agree

23   on in terms of a briefing schedule, if you can reach an

24   agreement on that.  So that's something you all can discuss

25   among yourselves with counsel on both sides, see how you want to

                    Elaine Hinson, RMR, CRR, CCR
                    United States Court Reporter

1    do that; then if you do want posttrial briefing, then what

2    schedule that you would recommend.  See if you can come up with

3    a joint recommendation for doing that.

4              MR. TAYLOE:  Thank you, Your Honor.

5              THE COURT:  Anything else?

6              MR. TAYLOE:  No, Your Honor.

7              THE COURT:  We're in recess until nine in the morning.

8         (Overnight recess at 5:58 p.m.)

9                       REPORTER'S CERTIFICATE

10        I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

11

12   /s/Elaine Hinson, RMR, CRR, CCR     Date:  December 27, 2010.
     United States Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

                        Elaine Hinson, RMR, CRR, CCR
                        United States Court Reporter