**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

UNITED STATES OF AMERICA                                                      PLAINTIFF

v.                                    Case No. 4:09CV00033 JLH

STATE OF ARKANSAS; MIKE BEEBE,
Governor of the State of Arkansas, in his official
capacity only; JOHN M. SELIG, Director of the
Arkansas Department of Human Services, in his official
capacity only; JAMES C. GREEN, Ph.D., Director
of the Arkansas Division of Developmental
Disabilities Services, in his official capacity only;
and CALVIN PRICE, Superintendent of the
Conway Human Development Center, in his
official capacity only                                                       DEFENDANTS

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

Most lawsuits are brought by persons who believe that their rights have been violated.  Not

this one.  The Civil Rights Division of the Department of Justice brings this action on behalf of the

United States of America against the State of Arkansas and four state officials in their official

capacities alleging that practices at Conway Human Development Center violate the rights of its

residents guaranteed by the Fourteenth Amendment, the Americans with Disabilities Act, and the

Individuals with Disabilities Education Act.  All or nearly all of those residents have parents or

guardians who have the power to assert the legal rights of their children or wards.  Those parents and

guardians, so far as the record shows, oppose the claims of the United States.  Thus, the United

States is in the odd position of asserting that certain persons' rights have been and are being violated

while those persons—through their parents and guardians—disagree.

For its first claim for relief, the plaintiff alleges that patterns and practices at Conway Human

Development Center violate the constitutional rights of its residents by failing to provide reasonably

safe conditions; by failing to provide the level of habilitation and training necessary to protect the

residents' liberty interests and to ensure their rights and freedom; and by substantially departing from generally accepted standards of care in the medical, psychological, and other services provided by the Center. *Cf. Youngberg v. Romeo*, 457 U.S. 307, 322, 102 S. Ct. 2452, 2461, 73 L. Ed. 2d 28 (1982) (finding that individuals involuntarily committed to a state institution must be assured adequate or reasonable training to ensure safety and freedom from undue restraint). Over the course of a six-week bench trial, the plaintiff examined witness after witness and introduced exhibit after exhibit in an effort to prove that many policies and practices of Conway Human Development Center substantially depart from generally accepted professional standards. *See id.* at 323, 102 S. Ct. at 2462 (recognizing that decisions of professionals are considered valid unless they constitute a substantial departure from accepted professional judgment, practice, or standards). The plaintiff makes allegations of abuse and neglect; takes issue with the Center's use of restraints, psychological services, and medical services; and argues that the procedures used to prevent choking, aspiration pneumonia, fractures, decubitis ulcers, and other injuries are subpar. Finally, the plaintiff alleges that, because of the Center's deficiencies, residents die prematurely. These allegations certainly are serious. They are not, however, supported by the weight of the evidence presented at trial.

For its second claim for relief, the plaintiff alleges that Conway Human Development Center violates the integration mandate of the Americans with Disabilities Act. Under the Act, a public entity must administer services, programs, and activities in the most integrated, least restrictive setting appropriate to the needs of qualified individuals with disabilities. *Olmstead v. Zimring*, 527 U.S. 581, 591-92, 119 S. Ct. 2176, 2183, 144 L. Ed. 2d 540 (1999). In the context of this case, the terms "restrictive" and "integrated" refer to the level of interaction with nondisabled persons. An integrated setting is a "setting that enables individuals with disabilities to interact with nondisabled

persons to the fullest extent possible," while a restrictive setting is one in which disabled persons have less interaction with nondisabled persons. *See* 28 C.F.R. pt. 35, app. B (Mar. 15, 2011). The plaintiff alleges that Conway Human Development Center is not the most integrated setting appropriate for many of its residents; that the Center's employees fail to provide parents and guardians with adequate information about other services that the plaintiff considers more integrated; and that the Center's staff does not exercise professional judgment in determining the most integrated setting appropriate for residents. The weight of the evidence, however, indicates otherwise. The plaintiff has not met its burden under the Americans with Disabilities Act.

For its third claim for relief, the plaintiff alleges that Conway Human Development Center violates the rights of children at the Center under the Individuals with Disability Education Act by failing to provide them with free appropriate public education in the least restrictive environment. *See* 20 U.S.C. § 1412(a) (2006). The plaintiff offers evidence showing that children at the Center do not spend enough time in school; that special education teachers at the Center are not trained on the most advanced teaching methods and tools; that the education plans of the students are inadequate; and that the ratio of teachers to students does not meet state requirements. While the evidence supports the plaintiff's allegation that Conway Human Development Center does not provide free appropriate public education, the evidence also establishes that the Center has submitted a corrective action plan to the Arkansas Department of Education, which is the state agency responsible for supervising special education programs and monitoring their compliance. At the time of trial, the Department had yet to determine whether the corrective measures proposed in the plan would bring Conway Human Development Center into full compliance with the Individuals with Disabilities Education Act.

The Court conducted its bench trial from September 8, 2010, through October 15, 2010.  At the conclusion of the trial, the parties requested that the filing period for post-trial briefs be delayed until completion of the official transcripts.  The transcripts have been prepared, and briefs have been filed.  Having received all of the evidence, the Court makes the following specific findings and conclusions.

## I.
## FINDINGS OF FACT

### A.  <u>INTRODUCTORY FINDINGS OF FACT</u>

Conway Human Development Center is a residential facility providing a variety of services for persons with developmental disabilities.  It is one of six human development centers operated by the Division of Developmental Disability Services of the Arkansas Department of Human Services.  Tr. 749-50, 764 (J. Green).  The six human development centers have a total capacity of 1100 persons.  Tr. 4332 (T. Kastner).  One of the six, Alexander Human Development Center, was in the process of closing at the time of trial.  Tr. 751 (J. Green).  Alexander Human Development Center had 109 residents.  Tr. 4332 (T. Kastner).

Conway Human Development Center is certified by the Centers for Medicare and Medicaid Services as an intermediate care facility for the mentally retarded,[1] Tr. 4044 (T. Kastner), which means that it is eligible for and receives federal funds through Medicaid.[2]  It is licensed by the

---

[1] See 42 C.F.R. § 440.150 and 42 C.F.R. §§ 483.400-483.480 for the definition of and regulations pertaining to an intermediate care facility for the mentally retarded.

[2] It is another oddity of this case that the institution at issue is funded and regulated by one department of the executive branch of the federal government while another department of the executive branch contends that its conditions are so deplorable as to violate rights guaranteed to the institution's residents by the United States Constitution.  More pointedly, the United States simultaneously funds Conway Human Development Center, certifies it as eligible for those federal funds, and contends that the conditions there are so deplorable as to be unconstitutional.

Arkansas Office of Long-Term Care[3] for 539 beds.  Tr. 533 (A. Richardson); Tr. 845 (A. Green); Pl.'s Ex. 229.  Conway Human Development Center provides medical care, dental care, physical therapy, speech therapy, occupational therapy, special education, habilitation, and recreational services.  Tr. 535, 642 (A. Richardson).  It employs approximately 1200 persons on a 409-acre campus that includes thirty-two cottages, school buildings, a chapel, a gymnasium, a pool, an infirmary, and other buildings.  Tr. 533 (A. Richardson); Pl.'s Ex. 229.  The Center serves individuals with a wide range of disabilities through its various programs and has a number of procedures and policies in place to ensure that it is meeting the needs of its residents effectively.

### 1.    The Residents of Conway Human Development Center

Residents of Conway Human Development Center are impaired in a number of ways.  The large majority of those residents are classified as profoundly or severely mentally retarded.[4]  Tr. 5810 (K. Walsh).  Most of them also have psychiatric disorders as well as additional impairments or disorders.  On July 31, 2009, 509 persons ranging in age from seven to seventy-two resided at the Center.  Pl.'s Ex. 229.  Of those 509 residents, 399 were classified as profoundly mentally retarded; 77 were classified as severely mentally retarded; 25 were classified as moderately mentally retarded; 7 were classified as mildly mentally retarded; and 1 resident, pursuant to a respite, or short-term, admission, was described as functioning at a borderline level.  Pl.'s Ex. 229.  Fifty-two of the

---

[3] The Office of Long-Term Care is a state agency that, among other things, regulates intermediate care facilities for the mentally retarded.

[4] Mental retardation is significantly subaverage general intellectual functioning accompanied by significant limitations in adaptive functioning.  *Diagnostic and Statistical Manual of Mental Disorders* 39-49 (4th ed. 2000 Text Revision).  "Mild mental retardation" refers to an intellectual quotient level of 50-55 to approximately 70; "moderate mental retardation" refers to an intellectual quotient level of 35-40 to 50-55; "severe mental retardation" refers to an intellectual quotient level of 20-25 to 35-40; and "profound mental retardation" refers to an intellectual quotient level below 20 or 25.  *Id.* at 42-44.

residents had autism; 171 had aggressive, destructive, or self-injurious behaviors; 319 had dual diagnoses (i.e., developmental disabilities and psychiatric diagnoses); 137 had fragile health; 307 had seizure disorders; 229 had cerebral palsy; 190 were non-ambulatory; 35 were hearing impaired; 21 were deaf; 129 were vision impaired; 36 were blind; 277 of the residents required devices (e.g., wheelchairs, braces, or orthotic devices) to maintain body alignment; and 484 required modified diets.  Pl.'s Ex. 229.

Conway Human Development Center is the only human development center operated by the State of Arkansas that provides services to children.  Tr. 764-66 (J. Green).  In July of 2009, fifty-two of the residents at the Center were school-aged children, Pl.'s Ex. 229, and at the time of trial, forty-eight of the residents were under the age of twenty-one, Tr. 846 (A. Green).  Many of these children came to Conway Human Development Center as a result of maladaptive behaviors.[5]  Tr. 846 (A. Green); Tr. 2272 (S. Thibadeau).  They previously lived at home, in foster care, in group homes, or in other such settings and may have attended public schools.  Unfortunately, their maladaptive behaviors proved to be more than their caregivers and school officials could manage, so their parents or guardians sought to have them admitted to Conway Human Development Center.  Tr. 2272 (S. Thibadeau); Tr. 3263-65 (M. Catron); Tr. 4055-57 (T. Kastner); Tr. 5145-49 (D. Nye); Tr. 5607-08 (B. Gale); Tr. 6212 (L. Kraus); Tr. 6616-18 (K. Priest); Tr. 6724-25 (B. Brewer).  Some of the children are in the custody of the Division of Child and Family Services due to neglect, physical maltreatment, or sexual maltreatment.  Tr. 6724 (B. Brewer).

---

[5] Here and in many places in this opinion, the Court uses the terminology commonly used by witnesses at trial.

2.      Admission to and Discharge from Conway Human Development Center

Admission to Conway Human Development Center occurs only after certain requirements are met.  Generally, a parent or guardian applies for admission to the Center on behalf of the child or ward and retains the right to withdraw the child or ward.[6]  Before a person can be admitted to Conway Human Development Center, a determination must be made that the Center is the least restrictive, most integrated environment in which the services needed by that person can be provided appropriately.  Tr. 4310 (T. Kastner); Tr. 5145 (D. Nye); Defs.' Ex. 912, Division of Developmental Disability Services Policy No. 1086 § II(d)1.

In the twenty-six month period between January of 2008 and February of 2010, thirty-seven persons were admitted to Conway Human Development Center.  Tr. 4335 (T. Kastner).  Also during that time period, forty-four persons entered the Center for respite, or short-term, care rather than admission.  Tr. 4336 (T. Kastner).  Over a forty-six month period—between July 1, 2006, and March 17, 2010—seventy-two persons were discharged from Conway Human Development Center, which represents an average of almost two discharges per month.  Tr. 5981 (K. Walsh).  From July of 2009 through mid-October of 2010, six residents of the Center were discharged, as were fifteen persons who had entered for respite care.  Tr. 6768 (A. Green).  At the time of trial, sixty-five persons were on a waiting list for admission to Conway Human Development Center.  Tr. 647

---

[6] The Division of Developmental Disability Services has procedures for court-ordered admissions, but no evidence was presented that any resident of Conway Human Development Center has been admitted pursuant to court order.  If the Division of Developmental Disability Services or the superintendent of Conway Human Development Center determines that voluntary discharge presents a danger to the individual or others, either may initiate legal proceedings.  No evidence was presented that legal proceedings have been instituted to prevent a parent or guardian from removing a child or ward.  *Cf. Porter v. Knickrehm*, 457 F.3d 794, 798-99 (8th Cir. 2006) (holding that a guardian's decision to admit the ward, a moderately retarded adult, to a human development center in Arkansas was a "voluntary" admission).

(A. Richardson); Tr. 4310 (T. Kastner); Tr. 5980 (K. Walsh).

> **3.      Parents and Guardians of Residents of Conway Human Development Center**

Many, if not most, of the parents and guardians of the residents of Conway Human Development Center keep themselves informed regarding the Center.  They have formed the Conway Human Development Center Parents' Association, which is comprised of parents and guardians who are concerned about the Center, its residents, its staff, and what is happening in human development centers around the state.   Tr. 5055 (L. Taylor).   The association meets quarterly.   Tr. 5056 (L. Taylor).  Many of the same parents and guardians are also members of a statewide organization, Families and Friends of Care Facility Residents, which is an umbrella group for all of the parent and guardian groups of the human development centers in the State of Arkansas.  Some of the members of the statewide group have developmentally disabled family members who receive services in the community rather than in facilities like Conway Human Development Center.  Tr. 5058 (L. Taylor). Together, the two parent organizations filed an amicus brief in opposition to the plaintiff's claims in this action.

According to the individual program plans and other evidence introduced at trial, the parents and guardians of residents of Conway Human Development Center are overwhelmingly satisfied with the services there and believe that the Center is the least restrictive, most integrated placement appropriate for their children and wards.  Tr. 482 (S. Murphy); Tr. 4328-29 (T. Kastner).  Ninety-seven percent of the parents and guardians of residents at Conway Human Development Center who responded to a survey stated that they were satisfied or very satisfied with the services that their children and wards receive.  Tr. 4328 (T. Kastner); Tr. 5956-57 (K. Walsh).  Six persons who were parents or guardians of residents of Conway Human Development Center testified at trial.  Two of

the six were nurses.  All six of them testified that they were pleased with the services offered by Conway Human Development Center.  Tr. 1502 (A. Fortney); Tr. 3249 (E. Stoddard); Tr. 3273-74 (M. Catron); Tr. 5069-70 (L. Taylor); Tr. 6832-34 (M. Black); Tr. 6850-52 (B. Landen).  None of the six had any criticism of Conway Human Development Center.

####    4.      Teams at Conway Human Development Center

The residents of Conway Human Development Center are divided into five "teams," which are groups of residents assigned to a designated area with a specific group of employees responsible for their training and care.  Defs.' Ex. 910, Conway Human Development Center Policy No. II-A-1. The teams are, in order from the highest functioning residents to the residents with the greatest developmental disabilities, as follows: the Habilitation and Training Team, the Sheltered Living Team, the Individual Assistance Team, the Intensive Training Team, and the Total Care Team.

The Habilitation and Training Team consists of the residents at Conway Human Development Center who function at the highest intellectual level of those admitted to the facility. Their level of intellectual function ranges from the higher profound level of intellectual disability to the moderate level of intellectual disability, with some school-aged children functioning at the mild level.  The majority of them are placed at Conway Human Development Center because of maladaptive behaviors.  Tr. 1663 (C. Price); Tr. 6723-26 (B. Brewer).

The Sheltered Living Team consists of residents who function at the profound to mild or moderate level of intellectual disability.  A large number of them have seizure disorders, issues related to swallowing, and maladaptive behaviors.  Tr. 1663 (C. Price).

The Individual Assistance Team consists of residents who function in the lower profound to upper profound level of intellectual disability.  Many of them have maladaptive behaviors and

seizure disorders. They have low self-help skills and require manipulation in almost everything that they do. Tr. 1663-64 (C. Price).

The Intensive Training Team consists of residents in the lower profound level of intellectual disability. They have many maladaptive behaviors and seizure disorders. Their skill level is below that of the residents on the Individual Assistance Team. They require total assistance with self-help and daily living skills. Tr. 1664 (C. Price).

The Total Care Team consists of residents who are in the profound level of intellectual disability and have severe medical conditions. They are the most medically fragile residents at Conway Human Development Center. They typically are non-ambulatory. Many of them have major swallowing issues, and most of them are fed by a tube. They require total assistance with everything that they do. Tr. 1664 (C. Price).

Each of the five teams has a manager who is known as the team leader. The team leader is responsible for reviewing, monitoring, and approving programs and supervising the staff that is responsible for the residents on that team. Tr. 6722-23 (B. Brewer); Pl.'s Ex. 279.

### 5. Interdisciplinary Teams and Individual Program Plans

Each resident at Conway Human Development Center is served by an interdisciplinary team (which should not be confused with the teams into which residents are placed). A resident's interdisciplinary team consists of persons from various disciplines who provide services to that resident. Each interdisciplinary team includes a program specialist[7] who is a qualified mental

---

[7] The current title for this position is "program specialist," but the position was formerly known as "social service worker" or "social worker." Conway Human Development Center employs twelve program specialists.

retardation professional;[8] the resident's parent or guardian; a member of the direct care staff; the psychological examiner assigned to that resident; and other professionals who provide service for that particular resident, such as a physical therapist, an occupational therapist, a speech language pathologist, or a primary care physician.  Tr. 636 (A. Richardson); Tr. 4860, 4901-03 (S. Murphy); Tr. 5017 (G. Miller).

Each resident's interdisciplinary team prepares an individual program plan for that resident describing the resident's needs as well as a program for addressing those needs.[9]  Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-1.  An individual program plan includes information submitted by the various professionals and direct care staff who provide services to that resident.   The plan includes information about the resident's social history, psychological assessment, medical care, dental care, medications, auditory assessment, nutritional status, dysphagia assessment, speech assessment, physical therapy assessment, occupational therapy assessment, special education, residential assessment, recreational interests, and other assessments as specified by the interdisciplinary team.  Tr. 4901-07 (S. Murphy); Defs.' Ex. SM-5; Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-1 at 5.  Each individual program plan includes a transition plan and takes into consideration the resident's rights, the strengths of the resident, the needs of the resident, the problems and liabilities of the resident, and the resident's personal, long-

---

[8] A qualified mental retardation professional is a person who has at least one year of experience working directly with persons with mental retardation or other developmental disabilities and is either a doctor of medicine or osteopathy, a registered nurse, or a person who holds at least a bachelor's degree in one of several fields identified in the applicable regulation, 42 C.F.R. § 483.430.  Those fields include psychology, social work, pathology, special education, and rehabilitation counseling.

[9] A large number of individual program plans were introduced into evidence.  *See* Pl.'s Exs. 101-1 through 206.

range goals.  Pl.'s Ex. 101-1 through 206.

Each resident's interdisciplinary team meets at least annually to review the resident's individual program plan.  In addition to the annual meeting, the interdisciplinary team may meet as needed for what Conway Human Development Center calls "special staffing."  Tr. 4860, 4866, 4869-70 (S. Murphy).  Special staffing occurs when a resident has significant maladaptive behaviors, medical issues, or other indications that some aspect of the individual program plan should be reconsidered.

### 6.     Behavior Plans

In addition to their individual program plans, residents at Conway Human Development Center who have maladaptive behaviors usually have a safety plan, a positive behavior support plan, and a separate description of strategies to be used by staff in dealing with them.[10]  A safety plan is a plan for restraints, restrictions, or both.  Tr. 5795 (K. Walsh); Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-16.   A positive behavior support plan is a plan to identify, develop, and support positive behavior.  Tr. 5795-96 (K. Walsh); Tr. 6562 (K. Priest).  Strategies direct staff as to how to best work with the residents.  Tr. 5795-96 (K. Walsh); Tr. 6561-62 (K. Priest); Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-16.  In September of 2009, 99 residents of Conway Human Development Center had safety plans, 33 had positive behavior support plans, and 295 had strategies.  Tr. 5803 (K. Walsh).

### 7.     Human Rights Committees

Conway Human Development Center has five human rights committees, one for each team,

---

[10] Conway Human Development Center policy considers behaviors as "maladaptive" "if they present a danger to self or others, to property, or interfere with habilitation and inclusion in the community."  Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-9.

which review and approve specific treatment and behavioral interventions.  Tr. 5010 (G. Miller).

The human rights committees are comprised of a chairperson; a vice chairperson; center

representatives; consumer representatives; and non-affiliated, community representatives.  Tr. 5009

(G. Miller); Tr. 5934 (K. Walsh); Defs.' Ex. 910, Conway Human Development Center Policy No. I-

F-4.  Conway Human Development Center psychological examiners are assigned to each of the

human rights committees in a nonvoting role to provide information and consultation to the voting

committee members.  Tr. 5009 (G. Miller); Tr. 5934 (K. Walsh).

The human rights committees review issues of residents' rights (such as the right to privacy),

medical diagnoses, medications, behavior plans, safety plans, and individual program plans.  They

also review and decide whether to approve behavior plans that involve the use of restrictive or

intrusive procedures.  Defs.' Ex. 910, Conway Human Development Center Policy No. I-F-4.  Prior

to submission to a human rights committee, behavior plans are developed as follows: the

interdisciplinary team establishes an objective and a plan; the psychological examiner formulates the

behavior intervention plan; and the team leader, chief of psychology, and primary care physician

review the plan.  Then, written and informed consent is obtained from the parent or guardian.

Tr. 5849 (K. Walsh).  If the human rights committee does not approve a behavior plan, the

interdisciplinary team must correct any impediment to approval that is identified.  Tr. 5850

(K. Walsh).  If the human rights committee approves a behavior plan, it is sent to the superintendent

for his approval, and then staff and other Conway Human Development Center personnel are

instructed on how to implement the plan.  Tr. 5850 (K. Walsh).  The psychological examiners train

the staff as to how to implement the plan.  Tr. 6589-90, 6599-6600 (K. Priest); Tr. 6677-78 (E.

Glenn); Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-16 at 4, 11, 14.

### 8.      Incident Review Committees

In addition to the human rights committees, Conway Human Development Center has another group of oversight committees called "incident review committees." Each of the five teams has an incident review committee, and there is also a central incident review committee. Tr. 5936 (K. Walsh). The team incident review committees meet Monday through Friday, Tr. 5014-15 (G. Miller); Tr. 5936 (K. Walsh), while the central incident review committee meets monthly, Tr. 5936 (K. Walsh); Pl.'s Ex. GM-1.  The incident review committees review reports of injuries, deaths, disruption of services to clients, patterns and trends, safety concerns, property damage, and workman's compensation-related issues.   Pl.'s Ex. GM-1; Defs.' Ex. 910, Conway Human Development Center Policy No. I-F-15.

Conway Human Development Center is required to report to a State of Arkansas database incidents of maltreatment of residents by staff, fractures, cuts and lacerations that require stitches, bruises that require x-rays, client-to-client bites if there is a skin break or if an antibiotic is required, swellings, sprains if there are x-rays, abrasions and burns that require the application of medication or ointment, medication errors that require medical treatment, and certain other types of incidents. Tr. 5938-39, 5943 (K. Walsh); Defs.' Ex. 910, Conway Human Development Center Policy No. I-E-12; Defs.' Ex. 911, Arkansas Department of Human Services Policy Manual §§ 1090 *et seq*.; Defs.' Ex. 912, Division of Developmental Disability Services Policy No. 1027.  Minor bumps and bruises are not reportable.  Tr. 5938 (K. Walsh).  The incident review committees review the incidents that must be reported to the state database.  Tr. 5936-37 (K. Walsh).

The central incident review committee at Conway Human Development Center performs a second review of incidents that were reviewed by the team incident review committees.  The central

14

committee also provides oversight review for identifying trends and policy directions. It produces a quarterly incident report summary, which is a statistical report showing all incidents that occurred in the prior quarter. Tr. 5937-38 (K. Walsh).

### 9. Physical Therapy

Conway Human Development Center employs a staff of physical therapists who are licensed by the State of Arkansas, are assisted by physical therapy aides and assistants, and perform a number of functions at the Center. Tr. 5251-52 (L. Hancock). The physical therapy department performs assessments of new residents upon admission and reassesses them periodically during their residency. Tr. 5251 (L. Hancock). The department also provides wheelchair modifications, power wheelchair training, and wound care. In addition, the department hosts an orthopedic clinic each month. Tr. 5251 (L. Hancock). The department trains direct care staff in proper positioning and lifting and performs spot checks to determine whether direct care staff are complying with the training. Tr. 5254-55 (L. Hancock). The physical therapy department also prepares positioning programs for each resident in need of positioning services. Tr. 5263-64 (L. Hancock). Among other things, the positioning services are designed to avoid decubitus ulcers, also known as pressure ulcers, and to help prevent choking during mealtime. Tr. 5277-81 (L. Hancock).

Conway Human Development Center operates a physical therapy orthotics shop at which it constructs custom-made wheelchairs and other orthotics devices for the residents. Each device is form-fitted to the resident who will use it. Tr. 5265-69 (L. Hancock). Very few residential facilities have on-site orthotics shops. Tr. 3469 (M. Schmeler). A resident at Conway Human Development Center who needs a custom-made wheelchair can have one constructed and properly fitted to that resident's specific needs within approximately two days. Tr. 5269 (L. Hancock). Mark R. Schmeler,

Ph.D., an expert in occupational therapy specializing in assistive technology, described the turn-around rate at Conway Human Development Center's orthotics shop as "lightning speed." Tr. 3474-76 (M. Schmeler).  When such a custom-made wheelchair or other device is ordered from a commercial vendor, the process may take four to six months.  Tr. 5271 (L. Hancock).

## B.  FINDINGS OF FACT REGARDING ALLEGED VIOLATIONS OF THE FOURTEENTH AMENDMENT

The plaintiff's first claim for relief is that many of the conditions at Conway Human Development Center violate the constitutional rights of the Center's residents.  Specifically, the plaintiff alleges that Conway Human Development Center's efforts to keep its residents safe and free from undue restraint substantially depart from generally accepted practices.  The greater weight of the evidence is to the contrary.

### 1.  Allegations that a Pattern and Practice of Abuse and Neglect and a "Culture Of Silence" Exist at Conway Human Development Center

The plaintiff alleges that Conway Human Development Center has a pattern and practice of abusing and neglecting its residents and that a "culture of silence" exists permitting abuse and neglect.  That allegation is contrary to the greater weight of the evidence.

Carla Jo Osgood, called as an expert witness for the plaintiff, provided unconvincing testimony that  abuse and neglect of residents is rampant at Conway Human Development Center and that a "culture of silence" prevails such that employees over time become reticent to report abuse and neglect.  Osgood had no formal education in any field relevant to her testimony,[11] nor is it

---

[11] Osgood has a bachelor's degree in political science.  She has taken graduate courses at the Cincinnati Bible Seminary and also has studied pastoral counseling.  Tr. 41 (C. Osgood).  Her curriculum vitae provides no information about her education, thus tacitly admitting that she has no formal education in the field of her purported expertise.  Pl.'s Ex. 1-1.

evident that she has any experience that would qualify her to give expert testimony under Rule 702 of the Federal Rules of Evidence. *See* Tr. 37-41, 204-12 (C. Osgood); Pl.'s Ex. 1-1.

In her testimony, Osgood made mention of "generally accepted standards" but did not identify any source where such standards could be found other than the regulations that govern intermediate care facilities for the mentally retarded, which she regarded as outdated. Tr. 279-80 (C. Osgood). She testified that "the standards of practice are fluid over time and could have changed at any time in the last four months, twelve months, what have you." Tr. 222 (C. Osgood). She did not refer to texts, journals, or other sources that would reflect shared knowledge among people who would qualify as experts in a particular field. Her testimony did not seem to connect to any identifiable body of knowledge or any identifiable discipline from which generally accepted standards might be ascertained. She stated that she had toured approximately thirty facilities in fifteen states, but she neither identified the facilities nor gave any description of them from which the Court could determine whether those facilities were comparable to Conway Human Development Center. She also provided no quantitative analysis comparing rates of abuse and neglect at Conway Human Development Center to rates at similar facilities or to any benchmarks. Tr. 269-72 (C. Osgood). Osgood leaped to the conclusion that a "culture of silence" exists at Conway Human Development Center based on the fact that, in a few instances, the staff member reporting maltreatment had worked at the facility less than six months and based on the fact the Center disciplines employees who fail to report maltreatment immediately, as the Center's policy requires. Tr. 156-61, 168, 181, 183 (C. Osgood).

Even disregarding the issues relating to Osgood's credibility, her testimony is contradicted by the greater weight of the evidence, which demonstrates that no pattern and practice of abuse and

neglect exists at Conway Human Development Center.

To begin with, Conway Human Development Center has specific policies in place designed to protect its residents from maltreatment.  Defs.' Ex. 910, Conway Human Development Center Policy No. I-E-10.  Conway Human Development Center policy defines "maltreatment" as including but not limited to "physical, verbal, psychological, or sexual abuse, neglect, exploitation, misappropriation of property, and violation of rights of individuals requiring services."  *Id.* § I.4. Potential employees are screened for a history of maltreatment, and employees are trained on issues relating to maltreatment.  Tr. 4872 (S. Murphy); Tr. 4990-94 (G. Miller); Tr. 6534-38 (J. Buck); Defs.' Ex. 910, Conway Human Development Center Policy No. I-E-10 §§ A.1 and A.2.  Conway Human Development Center policy requires that employees make an immediate report of any instance of maltreatment to the administration. Defs.' Ex. 910, Conway Human Development Center Policy No. I-E-10 § B.  The Center enforces this policy.  Tr. 158-59, 179 (C. Osgood); Tr. 4872-73 (S. Murphy).

Conway Human Development Center also adheres to the Arkansas reporting laws, which require that state officials be notified of instances of abuse.  If the victim of the alleged abuse is a child, the child abuse hotline[12] is called, and if the victim of the alleged abuse is an adult, the adult abuse hotline is called.[13]  Tr. 4995 (G. Miller); Tr. 6873 (C. Price).  The police are notified, as are the Office of Long-Term Care and the Arkansas Attorney General's Office.  Tr. 4995 (G. Miller); Tr. 6873 (C. Price).

In addition, Conway Human Development Center has procedures in place for reporting and

[12] *See* Child Maltreatment Act, Ark. Code Ann. §§ 12-18-101 to 12-18-1108.

[13] *See* Adult and Long-Term Care Facility Resident Maltreatment Act, Ark. Code Ann. §§ 12-12-1701 to 12-12-1721.

investigating allegations of maltreatment.   Maltreatment incidents are reported to the shift coordinator if they occur after hours or to the team leader if they occur during business hours. Tr. 4994 (G. Miller).  When a report is made, the resident who suffered the alleged maltreatment is checked medically, the staff member is suspended, and an investigation is conducted by a person whose sole job is to investigate maltreatment allegations.  Tr. 6873 (C. Price).  At the time of trial, the investigator at Conway Human Development Center was an attorney.  Tr. 4992 (G. Miller).  The investigations are thorough and prompt.  Tr. 5944-46 (K. Walsh); Tr. 6740 (B. Brewer).  After the investigative report is completed, it is forwarded to the superintendent's office for executive review. Tr. 4996 (G. Miller); Tr. 6874 (C. Price).  The superintendent makes the final determination of whether credible evidence supports the allegation of maltreatment and forwards that determination to the team, along with written directives for the team to carry out.  Tr. 4996 (G. Miller); Tr. 6874 (C. Price).  If credible evidence supports the charge of maltreatment, the employee responsible for the maltreatment is immediately terminated.   Tr. 232 (C. Osgood); Tr. 6740-42 (B. Brewer); Tr. 6875 (C. Price); Defs.' Ex. 910, Conway Human Development Center Policy No. I-E-10 § F.

The annualized rate of substantiated instances of maltreatment at Conway Human Development Center is .054, which is comparable to published rates for other facilities.  Tr. 5948-49 (K. Walsh).  This fact supports the finding that there is no pattern and practice of abuse and neglect at the Center.

Moreover, the testimony of parents and guardians of residents at Conway Human Development Center also supports the finding that there is no pattern and practice of abuse and neglect at the Center.  When a resident is involved in an incident of aggression, maltreatment, or injury, the Center notifies the parent or guardian unless the parent or guardian has specifically

directed otherwise.  Tr. 3236 (E. Stoddard); Tr. 3269, 3282 (M. Catron); Tr. 4868-69 (S. Murphy);

Tr. 5033-34 (G. Miller); Tr. 5059 (L. Taylor).  Parents and guardians are permitted to visit the Center

unannounced.  Tr. 3232 (E. Stoddard); Tr. 3270 (M. Catron); Tr. 5059 (L. Taylor).  Even though they

are permitted to visit unannounced, no parent or guardian of any resident, past or present, testified

that he or she had reason to believe that Conway Human Development Center has a pattern or

practice of permitting residents to be abused or neglected.

To the contrary, parents and guardians testified that the staff at Conway Human Development

Center genuinely care about the residents and immediately report any issues that arise.

The first witness called for the defense was Earline Stoddard, whose forty-four-year-old son

is a resident of Conway Human Development Center.  Tr. 3230 (E. Stoddard).  At the time of trial,

Ms. Stoddard was an adjunct instructor for the School of Nursing at Baptist Health.  She has worked

in the nursing field for more than forty years.  Tr. 3230 (E. Stoddard).  Ms. Stoddard often makes

unannounced visits to the Center to visit her son, and she has never seen anything that would cause

her to be alarmed or upset.  "I can tell you when he was in a school in Kansas, we were never

allowed to go back to the cottage to see him.  They always brought him to us.  That's one thing I like

about Conway [Human Development Center], is you can go see your child any time you want to."

Tr. 3233 (E. Stoddard).  Ms. Stoddard testified, "[I]t's so important to me to know that the people

who are caring for [my son] love him and will take care of him and are held responsible for it."

Tr. 3247 (E. Stoddard).

Melissa Catron's son also is a resident of Conway Human Development Center.  He was

nineteen years old at the time of trial and had been a resident for more than four years.  Tr. 3261-62

(M. Catron).  Ms. Catron is a registered nurse.  She testified that the Center works with her son on

everything she could possibly want. She believes that he is loved there. "I don't feel like anybody is there against their will to work with him. I've just not seen that. Everyone I've seen there that works with him wants to be there, that's what they want to do, and they seem to care about the kids. I'm thrilled." Tr. 3274 (M. Catron).

The defendants also called as a witness Larry Taylor, who is the guardian of his fifty-eight-year-old younger sister. "Tests show that [my sister] functions at about two years and nine months." She was fourteen years old when she was admitted. Tr. 5050 (L. Taylor). Mr. Taylor has lunch with his sister on a weekly basis. "I can rely on them to call me any time there's an injury. And that means a bruise of 2 inches, a scratch, a fall from bed." Mr. Taylor could not recall a time when he noticed that his sister had suffered an injury that he did not already know about. Tr. 5059 (L. Taylor).

Michael Black's fourteen-year-old son was admitted to Conway Human Development Center when he was eight or nine. Tr. 6824 (M. Black). "They call if he gets a bruise or a bump or has an incident. They call and let us know that he fell and scraped his knee . . . . They call and tell us that he's fine, you know, we put a Band-Aid on it, we gave him a hug and a kiss, and he's back to being a normal little child." Tr. 6833 (M. Black). "All the workers there . . . most of them that we know of have children of their own. . . . We're happy that he's in an environment where we know he's safe and he's going to get good sound medical care while he is there." Tr. 6833-34 (M. Black).

Barry Landen is the guardian of his brother, who is fifty-five years old and has been a resident of Conway Human Development Center for more than forty years. Tr. 6842 (B. Landen). Landen's brother was born blind.

> [My brother] is an extraordinarily fragile individual. His balance, as I said, it's just terrible, and it's very easy for him to fall and hurt himself. . . . he doesn't understand

21

the concept of putting your fingers over the door when you slam will cause you a huge amount of injury.  So the fact that nothing serious has happened to [my brother] in 40 years of living there is extraordinarily significant to me.

Tr. 6851 (B. Landon).

The testimony that staff members at Conway Human Development Center genuinely love and care for the residents is inconsistent with the allegation that there is a pattern and practice of abuse and neglect of residents at the Center.

Just as no parent or guardian testified to facts that would indicate a pattern or practice of abuse and neglect at Conway Human Development Center, similarly, no past or present employee offered any testimony indicating that such a pattern or practice of abuse or neglect exists.  If a pattern or practice of abuse or neglect exists at Conway Human Development Center, some past or present employee would know of it and would have testified about it.  Tr. 4873-74 (S. Murphy).  If a "culture of silence" prevails such that present employees are disinclined to report abuse and neglect, some former employee would know of it and would have testified about it.  No past or present employee testified that Conway Human Development Center has or has had a pattern or practice of permitting residents to be abused or neglected.  No past or present employee testified that a "culture of silence" exists at Conway Human Development Center or that employees of the Center are reluctant to report abuse or neglect.

In fact, Johnny Lee Matson, Ph.D., who was called by the plaintiff as an expert witness in the field of psychology, testified that the psychology staff at Conway Human Development Center consists of "very nice people" who "were trying very hard" and "doing the best they could." Tr. 1072 (J. Matson).  Even though Dr. Matson believes that the technical skills of the psychology staff at the Center are deficient, he did not hesitate to say that they are good people who are doing

their best, an observation that cannot be reconciled with the allegation that a pattern of abuse and

neglect prevails.

Other witnesses described the staff at Conway Human Development Center as consisting of

people who genuinely care for the residents and exhibit a loving attitude toward them.  For example,

Louis Kraus, M.D., who testified as an expert in child psychiatry, described the cottage personnel

at Conway Human Development Center as follows:

> They were amazing. . . . I've seen a lot of different facilities over my professional
> career.  Most of the cottage staff had been there for years, and they were not just
> there, in my opinion, because it was a job.  They truly loved taking care of these kids.
> They would coddle them, they would hold them.  There was a warmth with the staff
> that I observed during the day and early evening shifts, which I felt was very
> impressive.  They also, I think it's important, they had an understanding of the kids.
> Like, for example, one child that we talked about, TM, that had the orchiectomy, that
> staff really knew this child.  They knew when people came up to him too quickly,
> that he'll get anxious.  They knew that when he's cold, he shakes, and he likes it
> when it's warmer out.  They knew things about this child.  And in each of the
> cottages and dorms, that's what you found.  That's something refreshing, as opposed
> to people looking at their watches for the end of their shift.

Tr. 6225-26 (L. Kraus).  Derek Nye, Ph.D., an expert in special education, testified:

> I'm from New Jersey.  There seems to be in my experience an edginess that exists all
> along the shoreline from Boston to Baltimore.  And I see that edginess sometimes in
> our field, and it disappoints me on the east coast where staff have perhaps lost their
> focus as to why they are doing what they are doing.  And I have seen it, quite frankly,
> in facilities I've worked at . . . .  And I saw it in some of the developmental centers
> in New York and New Jersey specifically.  And I had a fear that I would . . . see it
> here, too.  Why not?  And I was – pleasantly surprised is an understatement.  I was
> overwhelmed by the caring attitude, by the compassion . . . and not just the special
> educators.  People from the boardroom to the washroom, they place these individuals
> at the center of everything.  They understood that they were there because these
> individuals needed their assistance.   And they never violated that trust.   My
> experience is they didn't violate that trust.  And it was very impressive.  And I saw
> that throughout in the classroom.
>
> *  *  *
>
> [T]here was a relationship, there was trust, there were students that were comfortable.
> Without being able to cite specifics, I believe certainly in my mind it's a given that
> students who feel they are safe, they are comfortable, that they are loved, are going

to have a greater capacity to learn and to love and to trust back.  And I saw that given.
People may argue that's an intangible and perhaps it is, but when you've taught and
you've been involved in as many places as I have in 36 years, you know it when you
see it, and I saw it every day.

Tr. 5120-21 (D. Nye). Even if some of those who testified believe that the technical skills of the staff

at Conway Human Development Center are deficient—as Dr. Matson does—it is not plausible to

say that employees at the Center genuinely care for the residents and exercise their best efforts to

attend to the residents' needs while tolerating a pattern and practice of abuse and neglect about which

they remain silent.

The greater weight of the evidence proves that no pattern and practice of abuse, neglect, or

maltreatment of residents exists at Conway Human Development Center, and no "culture of silence"

exists there.  The evidence proves that Conway Human Development Center exercises reasonable

care to prevent and to stop abuse, neglect, and maltreatment.

### 2.	Allegations that Conway Human Development Center's Use of Restraints Violates Residents' Rights

Contrary to the plaintiff's allegations, and for the reasons that follow, the Court also finds

from the greater weight of the evidence that Conway Human Development Center's use of restraints

does not violate the constitutional rights of its residents.

Residents of Conway Human Development Center engage in aggression toward others, self-

injurious behavior, tantrums, destruction of property, ingestion of non-edible objects, and the like,

which can be dangerous to the resident engaging in the behavior as well as to other residents and

staff or property.  The Center sometimes uses mechanical restraints including papoose boards,

restraint chairs, restraint jackets, mittens, and helmets to contain dangerous behavior.  Defs.' Ex.

910, Conway Human Development Center Policy No. II-D-12 at 2-3.

If the use of restraints is to be a part of the program for a resident at Conway Human Development Center, the interdisciplinary team must prepare a safety plan and a positive behavior support plan.  Tr. 6652 (K. Priest).  Pursuant to the Center's written statement of residents' rights, mechanical restraints may be used when less restrictive interventions have failed and when "absolutely necessary to prevent the individual from injury to himself/herself and to others."  Defs.' Ex. 910, Conway Human Development Center Policy No. I-D-5 at 4.  Conway Human Development Center's policy on the use of planned restraints provides, "An individual may require the use of emergency or planned restraint . . . to contain behavior that is dangerous to self, others, or property. Unless clinically contraindicated, the use of restraint is a last resort containment measure preceded by less restrictive measures."  Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-12 at 1.  The policy also provides:

> **Containment Restraint: Orders for restraint are time limited and shall not exceed one hour and 50 minutes for an adult or one hour for a child or adolescent**.  The individual is *immobilized* until calm by an approved device or devices which prevent movement of the body or parts of the body and/or normal function, <u>not to exceed 15 minutes without an extension approved and documented by the QMRP[14]/designee, preferably after face-to-face attention</u>.  Unless otherwise determined by the IDT,[15] QMRP/designee, extensions will be obtained every 15 minutes until the individual is calm.  The IDT should define what constitutes calm behavior for this individual when used in a behavior program.  Unless determined clinically contraindicated by the QMRP/designee, should time in restraint reach 55 minutes, the individual <u>must</u> be released for five minutes for the opportunity for motion, liquid intake, or toileting.  Should time restraint reach 1 hour and 50 minutes, the individual <u>must</u> be released for at least 10 minutes for the previously listed activities.  If this 10-minute release is judged to be a danger to the individual and/others, additional staff should be called to ensure safety for all concerned. Constant supervision is required.

*Id*. at 3 (bold, italics, and underlining in the original).  The planned use of mechanical restraints must

---

[14] Qualified Mental Retardation Professional.

[15] Interdisciplinary Team.

be reviewed and approved by the chief psychologist, the human rights committee, the primary care physician, the superintendent, and the parent or guardian.  Tr. 6563-64 (K. Priest); Defs.' Ex. 910, Conway Human Development Center Policy No. I-D-5 at 7.

In addition to the use of mechanical restraints as a part of a safety plan, Conway Human Development Center permits the use of mechanical restraints as an emergency measure to protect the resident or other residents from injury.  The incident must be documented, and notice must be given to the interdisciplinary team, the child psychologist, the superintendent, the human rights committee, and others.  An individual placed in a mechanical restraint must be monitored at least every fifteen minutes and must be given an opportunity for motion and exercise for at least five minutes during each hour.  The unplanned use of mechanical restraints must be reviewed by the chief psychologist, the human rights committee, the primary care physician, the superintendent, and the parent or guardian.  Defs.' Ex. 910, Conway Human Development Center Policy No. II-D-13.

While the use of mechanical restraints is troubling, psychologists called by both the plaintiff and the defendants agreed that it is sometimes necessary to use mechanical restraints when providing care for persons with the disabilities and psychiatric disorders found at Conway Human Development Center.  Tr. 1180, 1248-49 (J. Matson); Tr. 5565 (B. Gale); Tr. 5855-56 (K. Walsh).  The regulations that govern intermediate care facilities for the mentally retarded provide for the use of restraints within certain limits and with specified controls.  *See* 42 C.F.R. § 483.420(a)(6) (2011) (requiring facilities to ensure that residents are free from unnecessary restraints and are provided active treatment to reduce the need for physical restraints); 42 C.F.R. § 483.440(f)(3)(iii) (requiring a facility to have a committee consisting of staff, parents and guardians, and unaffiliated persons to review, monitor, and make suggestions regarding the use of physical restraints, among other things);

26

42 C.F.R. § 483.450(b)(1)(iv)(B) (requiring a facility to adapt and implement policies and procedures regarding the use of physical restraints for the management of inappropriate behavior); *cf.* 42 U.S.C. § 290ii (2006) (governing the use of restraints in facilities that receive federal funds). The policies of Conway Human Development Center comply with these regulations. The Center's use of mechanical restraints is consistent with the regulations that govern intermediate care facilities for the mentally retarded and is not a substantial departure from generally accepted professional standards.[16] Tr. 5565-72 (B. Gale); Tr. 5854-60, 5871 (K. Walsh).

Conway Human Development Center has made and is making a conscientious effort to reduce the use of mechanical restraints. Implementation of a program of safety plans, positive behavior support plans, and strategies is part of that effort. From 2005 until the time of trial, the use of mechanical restraints at the Center declined by sixty-nine percent. Tr. 5798, 5865 (K. Walsh). In September of 2009, sixty-two residents had contingent restraints in their plans, which is approximately twelve percent of the residents. Tr. 5868 (K. Walsh). In other words, eighty-eight percent had no restraints whatsoever in their plans. From July of 2008 through July of 2009, eighty-eight percent of the incidents of restraints involved three individuals. Tr. 5868 (K. Walsh). At the time of trial, restraints had been removed from the plans of two of those three individuals. Tr. 5869

---

[16] Carla Jo Osgood testified for the plaintiff that the use of restraints at Conway Human Development Center substantially departs from generally accepted standards. As with her testimony regarding abuse and neglect, her testimony regarding the use of restraints was unpersuasive. Osgood performed no quantitative analysis comparing rates of injury at Conway Human Development Center to rates of injury at similar facilities or to any other benchmarks. Tr. 247-48 (C. Osgood). Nor did she provide any evidence that she was qualified to testify as an expert regarding restraint use. More credible testimony criticizing the Center's use of restraints was offered by psychologists called as expert witnesses for the plaintiff, but for the reasons stated in this section and in the succeeding section of these findings, that testimony was insufficient to meet the plaintiff's burden of proof.

(K. Walsh).

Based on the greater weight of the evidence, the Court finds that no pattern and practice exists at Conway Human Development Center of using restraints without sufficient safeguards and supervision to ensure that the safety, welfare, and civil and human rights of residents are adequately protected; and the Court finds that the use of restraints at the Center does not represent a substantial departure from generally accepted standards applicable to intermediate care facilities for the mentally retarded.

   **3.     Allegations that Psychological Services at Conway Human Development
           Center Substantially Depart from Generally Accepted Standards**

Although the plaintiff alleges that the psychological services at Conway Human Development Center substantially depart from generally accepted standards, that allegation was not proven by the greater weight of the evidence.

Johnny Lee Matson, Ph.D., and Ramasamy Manikam, Ph.D., testified for the plaintiff that the psychological services offered at the Center depart substantially from generally accepted standards in a number of ways, but the Court had difficulty in ascertaining to what standards they referred and what they meant when they testified that a practice was a substantial departure from those standards.  It appeared that when they used terms such as "departures from generally accepted standards," they meant that the practices at Conway Human Development Center were not the best. That interpretation of their testimony was confirmed to some extent by Dr. Matson.  On cross-examination, Dr. Matson testified that a substantial departure is the same thing as failing to meet best practices.  Tr. 1219 (J. Matson).  Although he modified that statement on redirect examination, Tr. 1301, 1327 (J. Matson), it still appeared to be an accurate description of the opinions offered by himself and Dr. Manikam, i.e., that the practices at Conway Human Development Center were not

the best practices.   For example, at one point Dr. Matson criticized one of the psychological examiners for using bar charts rather than graphs to record behavioral incidents of residents who have behavior plans.  Tr. 1145-46 (J. Matson).   Dr. Matson also said that something could be a standard even if only ten percent of the professionals in his field were doing it.   Dr. Manikam testified, "In this field, [the] standards are fluid.   It's not a body that is setting the standard." Tr. 3155 (R. Manikam).   In the end, the Court concluded that Drs. Matson and Manikam were correct that the provision of psychology services at Conway Human Development Center could be improved, nor is it likely that anyone would argue to the contrary.   The fact that psychology services at Conway Human Development Center could be improved does not mean, however, that the professionals who provide those services have departed so substantially from generally accepted standards that it cannot be said that they are exercising professional judgment.

The Court finds from the greater weight of the evidence that the professionals who are providing psychological services at Conway Human Development Center are exercising professional judgment and that their practices are within the boundaries of generally accepted professional standards.   Psychological services are provided at Conway Human Development Center by ten psychological examiners licensed by the State of Arkansas.  Tr. 1936-37 (C. Reddig).   The chief psychologist, Dr. Carl Reddig, has an Ed.D. in psychology.  Tr. 1938-39 (C. Reddig); Pl.'s Ex. 557. The licensed psychological examiners have master's degrees in psychology, Tr. 1937 (C. Reddig); Tr. 6550 (K. Priest); Tr. 6672 (E. Glenn); Tr. 6712 (W. McKindra), and six of them are licensed to practice independently, Tr. 6689 (E. Glenn).   Their qualifications meet the standards imposed by the regulations that govern intermediate care facilities for the mentally retarded.   *See* 42 C.F.R. § 483.430(b)(5)(v).   Conway Human Development Center's practice of hiring master's level,

licensed psychological examiners is within the bounds of generally accepted practice at intermediate care facilities for the mentally retarded.  Tr. 5875-76 (K. Walsh).

The evidence established that some and perhaps all of the psychological examiners at Conway Human Development Center lack formal training in applied behavioral analysis.  The regulations that govern intermediate care facilities for the mentally retarded, however, do not require psychologists to have formal training in applied behavioral analysis.  *See* 42 C.F.R. § 483.430(b)(5)(v).  The evidence fails to show that it is a substantial departure from generally accepted practice for psychological services at such a facility to be provided by psychological examiners who do not have formal training in applied behavioral analysis.

The evidence also fails to prove that the practices followed and procedures used by the psychological examiners at Conway Human Development Center substantially depart from generally accepted professional standards. Much of the testimony at trial focused on functional behavior assessments, which are designed to determine the function that is served by maladaptive behaviors. Tr. 5794 (K. Walsh).  The theory is that if the function of a maladaptive behavior can be determined, then that function can be served in another way so that the individual will not feel the need to engage in the maladaptive behavior.  Tr. 6563 (K. Priest).  These functional behavior assessments are used in formulating positive behavior support plans and strategies.  Tr. 6562-63 (K. Priest).  The psychological examiners at Conway Human Development Center exercise professional judgment in performing functional behavior assessments and in performing their other duties.  Tr. 5828-30, 5836-37 (K. Walsh); Tr. 6566-70 (K. Priest); Tr. 6673-77 (E. Glenn).  While it seems likely that Drs. Matson and Manikam could perform functional behavioral assessments and other duties of psychological examiners better than some of Conway Human Development Center's psychological

examiners, the evidence failed to establish that the functional behavior assessments or other work of the psychological examiners at the Center substantially depart from generally accepted professional standards.  Tr. 5853-54 (K. Walsh).

### 4.    Allegations that Conway Human Development Center Fails to Provide Adequate Medical Care

Although the plaintiff alleges that Conway Human Development Center has a pattern and practice of providing inadequate medical care to its residents, the greater weight of the evidence disproves that allegation.

At the time of trial, Conway Human Development Center had a staff of four full-time primary care physicians: Denise Thomas, D.O., who serves as the medical director; Patricia Parmley, M.D.; Jarrett Lea, M.D.; and Sam Schultz, M.D.  Tr. 1724 (D. Thomas); Tr. 5482 (P. Parmley). Drs. Thomas and Lea are family doctors, and Drs. Parmley and Schultz are pediatricians.[17]  Tr. 5449, 5482 (P. Parmley).  There was one vacancy on the medical staff at the time of trial.  Tr. 6880 (C. Price).  After-hours care is provided by another primary care physician, Dr. Gary Stewart, who resides at the facility.  Tr. 1725 (D. Thomas).  These primary care physicians are available to provide medical care to residents of Conway Human Development Center twenty-four hours per day, 365 days per year.  Additional physician services, including those of a neurologist, an epidemiologist, and an infectious disease physician, are provided through a contract with the University of Arkansas for Medical Sciences.  Tr. 6880 (C. Price).  In addition to its physicians, Conway Human Development Center employs approximately twenty registered nurses and eighty-six licensed practical nurses.  Tr. 5382, 5386 (S. Gardner).  Not only is the Center sufficiently staffed with

---

[17] Dr. Parmley has completed a fellowship in developmental behavioral pediatrics.  Tr. 5449 (P. Parmley).

31

medical personnel to meet the needs of its residents, but it also provides psychiatric services in a manner that complies with generally accepted practices, uses and monitors medications appropriately, and provides medical services that are adequate to protect its residents.

In making findings related to medical care, particularly psychiatric care, at Conway Human Development Center, the Court must judge the credibility of the plaintiff's expert witnesses.  Jodie Holloway, M.D., and Edwin J. Mikkelsen, M.D., who testified for the plaintiff, are board certified in general psychiatry and in child and adolescent psychiatry.  Dr. Holloway is also board certified in forensic psychiatry.  Both Drs. Holloway and Mikkelsen are qualified to give expert testimony in the field of psychiatry under Rule 702 of the Federal Rules of Evidence.  Both are impressive individuals.  Ultimately, however, they were not more believable than the experts called by the defendants, in part because in some notable instances their conclusions went beyond the scope of the support offered for those conclusions.

For instance, Dr. Holloway testified that psychiatric services at Conway Human Development Center are substandard with respect to children because the Center does not employ a psychiatrist who is board certified in child and adolescent psychiatry.  Tr. 2514-16 (J. Holloway).  In support of that opinion, she cited and read from a policy statement of the American Academy of Child and Adolescent Psychiatry, which was received into evidence as Plaintiff's Exhibit 870.  Tr. 2516 (J. Holloway).  That policy statement on its face applies to hospitals, not to intermediate care facilities.  Tr. 6206-07 (L. Kraus); Pl.'s Ex. 870.  Moreover, Dr. Holloway admitted on cross-examination that the American Academy of Child and Adolescent Psychiatry refers to its policy statement as "a voice on the issues" and states that the policy is not intended to define a standard of care.  Tr. 2635 (J. Holloway).

Dr. Holloway also testified that Conway Human Development Center does not adequately assess individuals for tardive dyskinesia, a disorder that sometimes develops as a side effect of psychotropic medications.  The percentage of individuals at Conway Human Development Center with a diagnosis of tardive dyskinesia is low.  Tr. 3979 (T. Kastner).  Even though Conway Human Development Center uses the Abnormal Involuntary Movement Scale to assess residents for tardive dyskinesia, Dr. Holloway testified that the incidents of tardive dyskinesia at the Center must be greater than the number of persons who have that diagnosis.  Tr. 2606-07 (J. Holloway).  She concluded, therefore, that Conway Human Development Center does not adequately assess individuals for tardive dyskinesia as a side effect of the psychotropic medications used there.  That the percentage of residents at Conway Human Development Center who have a diagnosis of tardive dyskinesia is low could mean either that the Center fails to identify the individuals with tardive dyskinesia or that the Center manages psychotropic medications in a manner that minimizes side effects such as tardive dyskinesia.  The evidence failed to show that any resident at Conway Human Development Center has tardive dyskinesia but has not been diagnosed.  Tr. 4701-02 (A. Warren); Tr. 6214-15 (L. Kraus).  Nevertheless, Dr. Holloway insisted that the Center does not adequately assess residents for tardive dyskinesia.

Dr. Mikkelsen testified that the overall medical services offered at Conway Human Development Center are substandard and cited as evidence the fact that the average age of death of residents at the Center is lower than the average age of death of residents at certain facilities in Massachusetts and Connecticut.  Tr. 3772 (E. Mikkelsen).  The evidence established, however, that those facilities serve a substantially older population than does Conway Human Development Center, so the facilities are not comparable as to the average age at which residents might die.

33

Tr. 3847-48 (E. Mikkelsen); Tr. 4096-97 (T. Kastner).  Dr. Mikkelsen also testified that the rate of

deaths due to aspiration pneumonia at Conway Human Development Center supports his opinion

that medical care at the Center is substandard, Tr. 3776-77, 3918 (E. Mikkelsen), but there is no

statistically significant difference between the death rate due to pneumonia at the Center and the rate

at the facilities in Massachusetts to which Dr. Mikkelsen was comparing the Center.  Tr. 4100-01

(T. Kastner).

Dr. Mikkelsen pointed to several examples of Conway Human Development Center's alleged

failure to monitor the side effects of psychotropic medications, one of which concerned CL, a nine-

year-old boy who was admitted to the Center with a preexisting prescription for Lithium.[18] Lithium

is a psychotropic medication with a narrow therapeutic range and severe toxic consequences.

Tr. 5480 (P. Parmley). When CL was admitted into Conway Human Development Center, the

medical staff had some doubt as to whether he had received his Lithium consistently.  Tr. 5456

(P. Parmley).  They drew blood to ascertain the Lithium level and found that the level was 0.5.

Tr. 4118 (T. Kastner). Staff at the Center then administered the Lithium in accordance with the

prescription that had been written before CL came to the Center.  After allowing sufficient time for

the Lithium to reach a stable level, another lab test was conducted and the Lithium level was

determined to be 1.0, which is within what Dr. Mikkelsen called the therapeutic range.  Tr. 4118

(T. Kastner); Tr. 5456-57 (P. Parmley).  Over the following month, CL had one incident of difficulty

in swallowing, but there was no other record of anything out of the ordinary.  Tr. 4119 (T. Kastner).

Approximately one month later, staff observed one evening that CL had an altered gait and took him

to the infirmary.  Tr. 5457 (P. Parmley).  At the infirmary it was found that he had some upper

---

[18] See Tr. 3660-88 for Dr. Mikkelsen's direct testimony regarding CL.

respiratory distress.  Dr. Stewart, who provides after-hours care in the infirmary, ordered that a check be taken of the Lithium level.  The Lithium level was found to be in excess of 4.0, which is a toxic level.  Tr. 4119 (T. Kastner).  CL was kept in the infirmary overnight, and on the following morning Dr. Stewart ordered a "trough level" test be taken to determine the level of Lithium.  The level again exceeded 4.0, and Dr. Stewart admitted CL to Conway Regional Medical Center.  Tr. 4121 (T. Kastner); Tr. 5458 (P. Parmley).  At Conway Regional Medical Center, the Lithium level was again determined to be at a toxic level, and CL was transferred to Arkansas Children's Hospital in Little Rock, Arkansas.  Tr. 5458 (P. Parmley).  His Lithium level was stabilized, and he was found to have pneumonia.  Tr. 4123 (T. Kastner).  CL was later discharged and has suffered no ongoing effects of Lithium toxicity.  Tr. 5459 (P. Parmley).  According to Dr. Mikkelsen, CL's Lithium level continued to increase during the month between CL's admission into Conway Human Development Center and the evening when he was first taken to the infirmary.  Dr. Mikkelsen believed that the swallowing incident was probably due to nausea and vomiting, which are signs of Lithium toxicity. Tr. 3665-66 (E. Mikkelsen).  He also testified that CL necessarily had other symptoms of Lithium toxicity that were not recorded because the staff failed to observe them.  Tr. 3678-79 (E. Mikkelsen).

In contrast, Theodore Kastner, M.D., testified that there was no basis for believing that CL had Lithium toxicity during the month between his admission to Conway Human Development Center and the evening when he was taken to the infirmary.  Tr. 4125 (T. Kastner). According to Dr. Kastner, the elevation in CL's Lithium level likely was the result of pneumonia and dehydration. Tr. 4123-24 (T. Kastner).  Dr. Kastner did not believe that the single incident of difficulty in swallowing was caused by Lithium toxicity, nor did he find any evidence that CL had symptoms of Lithium toxicity during that month.  Tr. 4126 (T. Kastner).  Dr. Kastner, along with another expert,

Louis Kraus, M.D., concluded that Conway Human Development Center staff carefully monitored potential side effects of the Lithium and saved CL's life by quick response to the sudden onset of Lithium toxicity secondary to pneumonia and dehydration.   Tr. 4530 (T. Kastner); Tr. 6218 (L. Kraus). After it was called to Dr. Mikkelsen's attention that CL had pneumonia, he testified that the pneumonia was due to aspiration of fluids during the swallowing incident. Nothing in the medical records indicates that CL aspirated fluids.

Dr. Mikkelsen's opinion regarding CL depends upon findings for which there is no evidence and blames the staff at Conway Human Development Center for failing to record evidence that would have supported those findings.   The evidence at trial established that the staff of Conway Human Development Center appropriately monitored CL and responded to changes in his medical condition—they  saved his life.   Yet, Dr. Mikkelsen criticized the medical care given to CL based on an assumption that CL had Lithium toxicity for a month before anyone noticed, which is an assumption unsupported by evidence.

There were two more examples of a similar nature in the testimony of Dr. Mikkelsen.   One of them involved TN, who had a dramatic decrease in his platelet count after having been on Depakote for several years.[19]   Dr. Mikkelsen testified that the dramatic decrease in platelets was secondary to Depakote, which had been prescribed for TN by a neurologist as a means of controlling TN's seizures.   According to Dr. Mikkelsen, this was another instance in which Conway Human Development Center failed to monitor the side effects of psychotropic medication.   The evidence established, however, that the dramatic decrease in platelet count was secondary to an acute infection, and the platelet count rebounded with treatment of the infection and administration of

---

[19] See Tr. 3736-52 for Dr. Mikkelsen's direct testimony regarding TN.

steroid medication even though TN continued to receive Depakote.   Tr. 4179 (T. Kastner). Dr. Mikkelsen recognized that the drop in TN's platelet count could be attributed to the infection but said that whether the dramatic decrease in platelet count "was solely related to the Depakote or the Depakote plus the acute illness would be hard to sort out."   Tr. 3752 (E. Mikkelsen).   Still, Dr. Mikkelsen admitted that TN's platelet count recovered to its baseline level in the face of ongoing treatment with Depakote.   Tr. 3866 (E. Mikkelsen); *cf.* Tr. 4694-95 (A. Warren).   TN thereafter continued taking Depakote, and yet he did well.   Tr. 4179 (T. Kastner).   Common sense suggests that if TN's platelet count recovered to its baseline level and remained stable thereafter while TN was taking Depakote, Depakote was not the cause of the dramatic decrease in the platelet count.

Another example from Dr. Mikkelsen's testimony concerned CJ, a fifty-nine-year-old woman who Dr. Mikkelsen testified died from neuroleptic malignant syndrome caused by an increase in her Haldol prescription.[20]   Dr. Mikkelsen testified that CJ died from neuroleptic malignant syndrome even though the medical records do not reflect that she had symptoms typical of that syndrome.   One of the classic symptoms, as Dr. Mikkelsen admitted, is high fever.   Although there are a few instances in the literature of a diagnosis of neuroleptic malignant syndrome without high fever, it is exceedingly rare.   Tr. 3874-75 (E. Mikkelsen); Tr. 4199, 4203 (T. Kastner).   CJ's temperature was normal or below.   Pl.'s Ex. 791-1 to -5.   Another symptom is rigidity.   Dr. Mikkelsen testified that the fact that CJ had her knees bent meant that her legs were rigid, which is hardly convincing. Tr. 3706-08 (E. Mikkelsen); Tr. 4193 (T. Kastner).   Another symptom of neuroleptic malignant syndrome is an oculogyric crisis, which is a spasmodic attack marked by a fixation of the eyes in one position—usually upward.   Tr. 3875-76 (E. Mikkelsen).   Nothing in the medical records indicated

---

[20] For Dr. Mikkelsen's testimony regarding CJ, see Tr. 3690-3718.

that CJ's eyes were fixated.  Tr. 4697 (A. Warren).  Dr. Mikkelsen testified that the medical record failed to state that CJ's eyes were fixated because the treating physician failed to look at CJ's eyes. Tr. 3718, 3876 (E. Mikkelsen).  Dr. Mikkelsen was not present when the physician examined CJ, so he cannot possibly know whether the physician examined her eyes.

Although Drs. Holloway and Mikkelsen are highly qualified expert psychiatrists, the Court has concluded that their opinions are not as reliable as the contrary opinions offered by experts called by the defendants.

### a.    *Allegations that Psychiatric Services for Children at Conway Human Development Center Are Inadequate*

The greater weight of the evidence establishes that psychiatric services for children at Conway Human Development Center comply with generally accepted professional standards.

Douglas Callahan, M.D., is the consulting psychiatrist at Conway Human Development Center.  Tr. 1729 (D. Thomas).  Dr. Callahan is licensed to practice medicine in the State of Arkansas and is board certified in general psychiatry.  The core competency of a board-certified psychiatrist includes the care of children.  Tr. 4224 (T. Kastner).  Dr. Callahan has provided psychiatric services to persons with intellectual and developmental disabilities for more than twenty years.  Tr. 5335-36 (D. Callahan).  He serves as a consultant to the primary care physicians.  The residents at Conway Human Development Center who need psychiatric services are referred to Dr. Callahan, who sees them on campus.  Direct care staff and psychological examiners accompany residents when they are seen by Dr. Callahan, and they provide information to him regarding the residents' behavioral symptoms.  Tr. 5364-65 (D. Callahan); Tr. 6556-57 (K. Priest).  Dr. Callahan makes diagnoses and recommendations regarding medication and other psychiatric care.  His diagnoses and recommendations are recorded in progress notes, which are forwarded to the primary

care physicians for review.  The primary care physicians then decide whether to implement the recommendations from Dr. Callahan.  Tr. 5484 (P. Parmley).  Dr. Callahan is on campus approximately two days each week.  He has an office in the same suite of offices as the primary care physicians.  When he is on campus, he regularly sees the primary care physicians, and when he is not on campus, he is available for consultation by telephone.

There is a shortage of child psychiatrists in the United States and specifically in the State of Arkansas.  Tr. 4616-18 (D. Fassler); Tr. 6204-05 (L. Kraus).  Moreover, very few child psychiatrists have specific training in dealing with children with developmental disabilities.  Tr. 4623-24 (D. Fassler).  Psychiatric services are provided to children in the United States most often through pediatricians or general practitioners.  Tr. 4621-22 (D. Fassler).

The model of care at Conway Human Development Center by which psychiatric services are provided to children, through the use of a board-certified pediatrician consulting with a physician who is board certified in general psychiatry, is permitted by the regulations that govern intermediate care facilities for the mentally retarded, 42 C.F.R. § 483.430(b)(5), and is within the bounds of generally accepted practice for such facilities.  Tr. 4222 (T. Kastner); Tr. 4624-25 (D. Fassler); Tr. 6212 (L. Kraus).  Psychiatric services provided to children at Conway Human Development Center are consistent with generally accepted professional standards.  Tr. 6212-13 (L. Kraus).

### b.   *Allegations that Psychotropic Medications Are Inappropriately Prescribed to Control Behavior*

Although the plaintiff alleges that Conway Human Development Center overprescribes psychotropic medications to control behavior, the greater weight of the evidence does not support that allegation.  Psychiatric diagnoses generally are made following the criteria of the fourth edition of the Diagnostic and Statistical Manual of Mental Disorders.  Those criteria often rely upon patient

reports that persons with mental retardation are unable to give. The reliability of diagnoses of psychiatric disorders in persons with mental retardation, therefore, is in inverse proportion to the level of disability. Tr. 3818-19 (E. Mikkelsen); Tr. 4645-46 (A. Warren). In other words, the greater the level of mental retardation, the less reliable the psychiatric diagnoses. While in general it may be inappropriate to use medication simply to suppress bad behavior, it is not a substantial departure from generally accepted professional standards to use medication to treat specific behavioral symptoms in psychiatric patients with mental retardation, whether or not an identifiable psychiatric diagnosis can be made. Tr. 3828 (E. Mikkelsen); Tr. 4646, 4679, 4682-83, 4693-94 (A. Warren); Tr. 6222-24, 6275 (L. Kraus). The regulations that govern intermediate care facilities for the mentally retarded authorize the use of medication to control inappropriate behavior. 42 C.F.R. § 483.450(e). So far as the evidence showed, the use of psychotropic medications at Conway Human Development Center is consistent with those regulations.[21] The use of psychotropic medications at Conway Human Development Center is not a substantial departure from generally accepted professional standards. Tr. 4703-04 (A. Warren); Tr. 5450 (P. Parmley); Tr. 6207, 6223-24, 6227 (L. Kraus).

  c.  *Allegations that Conway Human Development Center Fails to Monitor Side Effects of Psychotropic Medications*

In addition to allegations of overuse, the plaintiff alleges that Conway Human Development Center fails to monitor the side effects of the psychotropic medications it prescribes. The greater weight of the evidence does not support that allegation.

All medications have potential side effects. In the case of psychotropic medications, those

---

  [21] The caveat to this statement is that no evidence was presented regarding 42 C.F.R. § 483.450(e)(4)(ii).

side effects can be serious.  Reasonably careful physicians weigh the risks of the side effects of a particular medication against the benefits that the patient may obtain from the use of that medication. Dr. Callahan testified, and the Court believes, that at Conway Human Development Center the risk versus benefit calculation often is done mentally but not recorded in the practicing physician's notes. Tr. 5349, 5372 (D. Callahan).

The use of psychotropic medications at Conway Human Development Center typically is initiated by a recommendation from Dr. Callahan (unless a client comes to Conway Human Development Center with preexisting prescriptions for psychotropic medications) and then is forwarded to the primary care physician who writes the order.  Before the prescription is filled, the use of the psychotropic medication must be reviewed by the interdisciplinary team and the human rights committee, and it must be approved by the parent or guardian of the resident.   The interdisciplinary team, which includes the primary care physician, discusses what the medication is expected to accomplish, what the potential side effects are, and the relationship between the potential risks and the potential benefits.  Every resident on psychotropic medication will have taper criteria which the psychological examiners monitor.  Tr. 6614 (K. Priest).  After all of the consents are in place, the primary care physician orders the drug and establishes a laboratory protocol for monitoring potential problems.  Tr. 508-09 (S. Murphy); Tr. 5484-87 (P. Parmley).  These safeguards are reasonably prudent safeguards designed to ensure that the risks of psychotropic medications are accurately and adequately assessed and weighed against the potential benefits.  Tr. 4163-64 (T. Kastner); Tr. 6221 (L. Kraus).

The potential side effects of each psychotropic medication are listed in the individual program plan for each resident to whom psychotropic medications are administered.  Tr. 4925

(S. Murphy).  Staff at Conway Human Development Center are trained to watch for symptoms that may be associated with side effects of psychotropic medications.  Tr. 509, 4871-72, 4924-25 (S. Murphy).  In addition, when psychotropic medications may result in consequences measurable through laboratory analyses, monitoring is conducted through laboratory analyses.  Tr. 5486-87 (P. Parmley).

Conway Human Development Center also uses the Abnormal Involuntary Movement Scale to measure involuntary movements known as tardive dyskinesia.  The Abnormal Involuntary Movement Scale is the most widely used instrument for the screening of tardive dyskinesia. Tr. 4231 (T. Kastner).

The monitoring of potential side effects of psychotropic medications at the Center complies with generally accepted professional standards.  No pattern or practice exists at Conway Human Development Center of failing to monitor for side effects of psychotropic medications.  Tr. 4171-73 (T. Kastner).

#### d.  *Allegations Regarding Polypharmacy*

The plaintiff also takes issue with Conway Human Development Center's use of polypharmacy, that is, prescribing two or more psychotropic medications to a resident.  Tr. 5342 (D. Callahan).  Many of the residents at Conway Human Development Center come to the Center with psychiatric diagnoses and with prescriptions for multiple psychotropic medications.  Tr. 5346 (D. Callahan).  The practice at Conway Human Development Center is to attempt to reduce the number of psychotropic medications as well as the dosage, but that is not always possible.  Tr. 5345-46 (D. Callahan).  An effort is made to avoid polypharmacy, but in some instances, in the professional judgment of the physicians at Conway Human Development Center, the benefits of

polypharmacy to individual residents outweigh the risks to those residents, and in those instances polypharmacy is used.  Tr. 5346-47 (D. Callahan).  In 2010, 278 of the residents at Conway Human Development Center were prescribed psychotropic medications.  Forty-three percent of those residents were prescribed one psychotropic medication; 33% were prescribed two psychotropic medications; 17% were prescribed three psychotropic medications; 4.7% were prescribed four psychotropic medications; and 2 residents (fewer than 1%) were prescribed five psychotropic medications.  Tr. 4153 (T. Kastner).

The greater weight of the evidence fails to establish that the use of polypharmacy at Conway Human Development Center is excessive and fails to establish a pattern and practice of inappropriate or unreasonable use of polypharmacy at the Center.

e.   ***Allegations that Inadequate Medical Care Causes Unnecessary Deaths at Conway Human Development Center***

The plaintiff also alleges that many unnecessary deaths have occurred at Conway Human Development Center due to inadequate medical care, but, again, the greater weight of the evidence is to the contrary.

Eldon Schulz, M.D., is the medical director for the Division of Developmental Disability Services for the State of Arkansas.  Tr. 6177 (E. Schulz).  He is the Rockefeller Professor for Children with Special Healthcare Needs, Director of the Dennis Development Center at the University of Arkansas for Medical Sciences, and a faculty member practicing at Arkansas Children's Hospital.  Tr. 6178-79 (E. Schulz).  Since 2005 he has served as the physician representative on a committee that reviews all of the deaths of residents of the human development centers in Arkansas.  Tr. 6179, 6192 (E. Schulz).  As a member of that committee, he reviewed in

depth the records pertaining to each death at Conway Human Development Center between 2005 and the time of trial.  In his opinion, which the Court credits and adopts, during that time none of the deaths of residents at Conway Human Development Center was due to medical malpractice. Tr. 6192-93 (E. Schulz).

> ### f.      *Conclusion as to Adequacy of Medical Care*

The greater weight of the evidence establishes that Conway Human Development Center provides adequate medical care, including psychiatric care, to its residents.  Tr. 4083-84, 4218 (T. Kastner); Tr. 4649 (A. Warren); Tr. 5456 (P. Parmley).  No pattern or practice of medical negligence or inadequate medical care exists at the Center.

> ### 5.      Allegations that Conway Human Development Center Fails to Exercise Care to Prevent Choking

The plaintiff alleges that Conway Human Development Center fails to take proper steps to prevent choking incidents among its residents.  The greater weight of the evidence, however, proves that the Center exercises reasonable care to prevent choking.

First, Conway Human Development Center employs seven speech language pathologists who work full-time at the center.  Tr. 5386, 5417 (C. Johnson).  The speech language pathologists are licensed by the State of Arkansas and have a number of duties, including providing speech-language therapy services, providing augmentative communication systems, assessing residents for dysphagia, identifying choking risks, and assisting in issues related to swallowing.  Tr. 5387, 5391-92, 5417 (C. Johnson).

Second, new employees of Conway Human Development Center are given dysphagia training in which they are taught to observe silent signs of aspiration, to thicken liquids properly, and to use adaptive equipment properly.  Tr. 5396 (C. Johnson).  New employees are taught that each resident's

eating plan should be reviewed before assisting that resident at mealtime.  Tr. 5396 (C. Johnson).

Third, Conway Human Development Center takes a number of steps to avoid choking incidents during mealtime.  The Center employs a dietician who is licensed by the State of Arkansas.  Tr. 5316-17 (A. Holbrook).  Each resident of Conway Human Development Center has a nutritional and eating plan that is designed, among other things, to avoid choking incidents.  Tr. 5317-18 (A. Holbrook); Tr. 5393-94 (C. Johnson).  The Center also uses food service audits and mealtime monitoring to check for proper positioning, silent aspiration, use of adaptive equipment, and other factors related to choking and aspiration.  Tr. 5393-94 (C. Johnson).

Fourth, Conway Human Development Center assesses residents for risk of choking using an assessment tool that has been statistically validated on individuals with developmental disabilities residing in congregate facilities.  Tr. 3304 (J. Sheppard).  A choking risk assessment is done each year in preparation for the annual meeting of the residents' interdisciplinary teams.  Tr. 5407 (C. Johnson).  If a resident chokes, that person is reassessed.  Tr. 5407 (C. Johnson).  In the assessment, the resident is identified as either low risk or high risk for pneumonia and choking.  Tr. 6395 (L. Henderson).  If a resident scores fifty percent or greater on the assessment for either the choking or the pneumonia risk, that person is placed in a high risk category.  Tr. 6395 (L. Henderson).  Also, if a resident has a choking history, has x-ray evidence of aspiration, or is fed by a tube, those factors could place the person in a high risk category.  Tr. 6395-96 (L. Henderson).  The information regarding a resident's risk factors is communicated to the program coordinator so that it can be taken into account on that resident's twenty-four-hour schedule and the individual program plan by the interdisciplinary team.  Tr. 6396 (L. Henderson).  The information is also placed on the dietary sheet that is used in the living unit and is part of the feeding plan.  Tr. 6396 (L. Henderson).

Finally, Conway Human Development Center has a central dysphagia committee, which acts as a consultant and an advisory to the interdisciplinary teams regarding dysphagia and swallowing disorders. Tr. 6389 (L. Henderson). The committee serves to support and make recommendations to the teams as well as the primary care physicians. Tr. 6389 (L. Henderson). The central dysphagia committee reviews all airway events, such as changes in risk factors for choking; choking events;[22] difficult swallowing events;[23] and cases that are referred by any member of the committee, the incident review committees, the interdisciplinary teams, or the physicians. Tr. 6389 (L. Henderson). The committee also reviews cases of pneumonia. Tr. 6389 (L. Henderson). The head of the central dysphagia committee is Linda Henderson, R.N., whose title at Conway Human Development Center is "Quality Improvement Nurse." Tr. 6387-89 (L. Henderson). Other members of the committee include a staff development nurse, primary care physicians, four speech therapists, three clinical therapists, a clinic supervisor, an occupational therapist, a physical therapist, a dietician, a human rights committee chairperson, a living unit supervisor representative, an infection control nurse, an administrative representative, Conway Human Development Center's dentist and dental hygienist, a program coordinator representative, and the director of nursing. Tr. 6402 (L. Henderson). The central dysphagia committee meets monthly but will sometimes meet more often than once a month

---

[22] Conway Human Development Center defines "choking" as a partial or complete obstruction of the airway due to a foreign body, such as food or non-edibles. The onset of respiratory distress may be sudden with coughing; there may be agitation in the early stages of airway obstruction. The signs of respiratory distress include labored, ineffectual breathing until a person can no longer breathe; loss of consciousness will occur if the obstruction is not relieved. Tr. 6402 (L. Henderson).

[23] Conway Human Development Center defines a "difficult swallowing event" as an event in which no intervention is required; no acute change in vital signs occurs; and there are no symptoms of airway obstruction, such as change in skin color, eyes protruding, dizziness, change in level of consciousness, or inability to speak or make a sound. Tr. 6390 (L. Henderson).

46

if necessary.  Tr. 6392-93 (L. Henderson).

Prior to a committee meeting, Henderson reviews the clinical record and gathers reportable information that is used by the central dysphagia committee.  Tr. 6391 (L. Henderson).  The report for any particular resident includes a history of choking events; a history of difficult swallowing events; yearly choking and pneumonia assessment risks; any x-ray studies or diagnoses of swallowing abnormalities; and any types of follow-through studies, such as an esophagogastroduodenoscopy[24] or x-rays of the upper gastrointestinal region.  Tr. 6391 (L. Henderson).  The committee then reviews the resident's respiratory diagnoses, such as asthma or chronic rhinitis, and the resident's history of respiratory disease or distress.  Tr. 6391 (L. Henderson).  The committee also reviews spinal issues, such as curvature of the spine, rod or metal implants, and the like.  Tr. 6391 (L. Henderson).  The committee looks at the resident's past history of pneumonia and aspiration; other gastrointestinal and oral disorders, such as gastrointestinal reflux disease or gastritis; esophagitis; constipation; ileus or hiatal hernia; gastric ulcers; or H. pylori infection. Tr. 6391-92 (L. Henderson).  The committee also looks for strictures of the esophagus and gingivitis. Tr. 6392 (L. Henderson).  It then considers what precautions and interventions are already in place and reviews the resident's food and fluid consistencies and whether the person has altered means of nutrition, such as a feeding tube.  Tr. 6392 (L. Henderson).  The committee also reviews the resident's oral hygiene care.  Tr. 6392 (L. Henderson).

When a difficult swallowing event occurs, the resident is evaluated by a speech therapist, usually at the next meal or the next snack after the swallowing event.  Tr. 6393-94 (L. Henderson).

---

[24] An esophagogastroduodenoscopy is an endoscopic examination of the esophagus, stomach, and duodenum. *Dorland's Illustrated Medical Dictionary* 643 (30th ed. 2003).

The speech therapist determines whether it is safe for the resident to eat and, if so, what type of diet is needed and then communicates that information to the dietician. Tr. 6393 (L. Henderson). If the physician, the dietician, or the speech therapist believes that a swallow study is needed, then it is ordered. Tr. 6393 (L. Henderson). In 2009, thirty-three percent of the residents of Conway Human Development Center were referred for a modified barium study, and ninety-one percent of the studies revealed abnormal swallowing. Tr. 3305 (J. Sheppard).

Members of the staff at Conway Human Development Center are trained in methods of clearing a resident's airway when a choking incident does occur. If a choking event occurs, staff will immediately provide first aid and make any necessary dietary changes. Tr. 6397 (L. Henderson). The speech therapist will evaluate and report her findings to the physician as well as to a core meeting of some of the central dysphagia committee members. Tr. 6397-98 (L. Henderson). Sometimes a doctor will be called to the scene of a choking event. At other times, the resident will go to the infirmary after a choking event to be evaluated by a physician. The interdisciplinary team will have a special staffing to make any necessary changes in the resident's twenty-four-hour schedule or treatment plan. The central dysphagia committee will review the incident, and a swallow study may be conducted. A gastrointestinal physician may be consulted to evaluate the case. Reflux precautions may be added if they have not yet been instituted.

Carly Crawford, an expert witness for the plaintiff, testified that members of the staff at Conway Human Development Center do not exercise generally accepted minimum professional judgment regarding choking. Tr. 2756-57 (C. Crawford). The Court, however, is not convinced that Crawford is qualified to testify as an expert regarding professional standards for the prevention of choking by developmentally disabled persons. Crawford is an occupational therapist with an

undergraduate degree in deaf education and a master's degree in occupational therapy.  She is

licensed as an occupational therapist in the State of Oklahoma.  Tr. 2743 (C. Crawford).  She

described occupational therapy as looking "at how an individual uses their hands for daily activities"

and at positions such as sitting or standing for daily activities.  Tr. 2741 (C. Crawford).  On direct

examination, she said that she was qualified to testify about services other than occupational therapy

because "I have had education relative to health systems, body systems, understand health risks, and

understand anatomy, physiology, and then have been working shoulder to shoulder with speech

pathologists and physical therapists."  Tr. 2742-43 (C. Crawford).  Crawford presented no evidence

that convinced the Court that she was qualified to testify as an expert in any area other than

occupational therapy.

Apart from her lack of qualifications, Crawford's credibility was called into question by a

lack of care in the manner in which she wrote her report.  Cross-examination revealed that

Crawford's report in this case identified the subject of her report as Beatrice State Development

Center, which is the name of a facility in another state about which she had previously written a

report.  She also referred in her report to sections where recommendations would be made and

methodology would be described, but no recommendation section appeared in the report, nor was

her methodology described anywhere in the report.  Tr. 2905-07 (C. Crawford).

Even if the Court disregarded these discrepancies, Crawford's testimony on choking events

at Conway Human Development Center is unpersuasive.  She testified that Conway Human

Development Center has an excessive number of choking episodes, but the only benchmark that she

offered for comparison was that she had recently been to a facility with 250 to 300 residents that had

no choking incidents over a six-month period.  Tr. 2768 (C. Crawford).  During the 2009 calendar

year, Conway Human Development Center had eleven incidents of choking.   Tr. 6439-40 (L. Henderson).  The fact that one facility, with a population of 250 to 300 persons, had no episodes of choking in a six-month period, while some 500 residents of Conway Human Development Center had eleven episodes of choking in a twelve-month period is insufficient to establish that Conway Human Development Center fails to exercise reasonable care to prevent choking events. Crawford's testimony was inadequate to form the basis for any reliable conclusions.

Other than Crawford's testimony that one facility with 250 to 300 residents had no choking episodes in a six-month period, the plaintiff presented no evidence to establish a benchmark from other facilities across the United States by which one could determine that the rate of choking at Conway Human Development Center was unreasonably or unusually large.

The weight of the evidence suggests that it is not.  Cynthia Johnson, a speech language pathologist employed by Conway Human Development Center, calculated that there are approximately 548,000 occasions each year when a resident might have a choking event,[25] so the number of choking events is quite small compared to the occasions in which choking is a possibility. Tr. 5446 (C. Johnson).  Justine Joan Sheppard, Ph.D., called by the defendants as an expert in speech pathology, testified that in 2009 seventy-four percent of the residents of Conway Human Development Center had a high risk of choking, but only 2.17% experienced a choking event. Tr. 3304 (J. Sheppard).

In the past several years, Conway Human Development Center has had one death as a result of choking.  That death occurred in 2008 when a profoundly retarded, fifty-eight-year-old resident

---

[25] The calculation was accomplished by multiplying the number of residents by the number of mealtimes per year and adding one daily medication pass per day per resident.

went unnoticed into the kitchen and stuffed food into her mouth.  Tr. 6440-42 (L. Henderson).  At 11:30 p.m., members of the direct care staff working the night shift noticed the resident asleep on a couch in the day room, went into the bedrooms to check other residents, and then returned to the day room at 11:35 p.m., by which time the resident had gone into the kitchen and stuffed food into her mouth.  Pl.'s Ex. 6-3.  Staff attempted to remove the food from the resident's mouth, clear the airway by abdominal thrusts, and administer cardiopulmonary resuscitation.  An ambulance arrived at 11:57 p.m. and took the resident to the nearest hospital where she died of aspiration pneumonia several days later.  Pl.'s Ex. 6-3.  While that incident is certainly tragic, no evidence was presented sufficient to show it is part of a pattern or practice of failing to take precautions to minimize choking risks.

Ultimately, the evidence fails to establish a pattern or practice at Conway Human Development Center of failing to take appropriate and reasonable steps to prevent choking.

### 6.	Allegations that Conway Human Development Center Fails to Exercise Reasonable Care to Prevent Aspiration Pneumonia

Similarly, the plaintiff alleges that Conway Human Development Center fails to exercise reasonable care to prevent aspiration pneumonia, but, yet again, the greater weight of the evidence is to the contrary.

Conway Human Development Center provides preventive care for pneumonia by taking an annual pneumonia risk assessment; by taking reflux precautions, such as keeping residents up for a period of time after they eat and elevating the head of the bed; by providing oral care; and by administering a pneumonia vaccination annually.  Tr. 5383 (S. Gardner).

If a resident is suspected of having pneumonia, that person is assessed by a physician who makes a diagnosis.  Tr. 5384 (S. Gardner).  If a resident is diagnosed with pneumonia, treatment may

51

include an oral or intravenous antibiotic, updrafts, and breathing treatments.  Tr. 5384 (S. Gardner). The resident may be moved into the on-site infirmary or transported to the hospital.  Tr. 5385 (S. Gardner).

Data regarding pneumonia is maintained by Conway Human Development Center's infection control nurse, who is a member of the central dysphagia committee.  The infection control nurse gives Linda Henderson, the head of the central dysphagia committee, a list of every resident who has had a diagnosis, has had an x-ray, or has been in the infirmary or hospital for pneumonia during that month.  Tr. 6413-14 (L. Henderson).  The central dysphagia committee reviews cases of pneumonia, acting in an advisory role to the interdisciplinary team.  Tr. 6411-13 (L. Henderson).  If a resident has a case of pneumonia, the central dysphagia committee will follow up with that resident one to three months after the case of pneumonia to ascertain that resident's respiratory status.  Tr. 6414 (L. Henderson).

Dr. Mikkelsen testified that the rate of death from aspiration pneumonia at Conway Human Development Center was excessive compared to facilities in Massachusetts.[26]  Tr. 3776-77, 3918 (E. Mikkelsen).  In 2005, twenty-seven percent of the deaths at Conway Human Development Center were caused by aspiration pneumonia, while twenty-one percent of the deaths in Massachusetts facilities were caused by aspiration pneumonia.  Tr. 4101 (T. Kastner).  Over a two year period, there were nine deaths at Conway Human Development Center due to aspiration pneumonia and six at the Massachusetts facilities.  Tr. 4101 (T. Kastner).  Although there was some difference between the

---

[26] Carly Crawford also testified that the number of incidences of aspiration pneumonia at Conway Human Development Center was excessive.  However, as mentioned above, Crawford was not qualified to testify as an expert in that field, nor did she offer any benchmarks as evidence from which one could compare Conway Human Development Center with other institutions.

number of deaths due to aspiration pneumonia at Conway Human Development Center and facilities in Massachusetts, the difference between the rates of death is quite small and is not statistically significant.  Tr. 4100-01 (T. Kastner).

Conway Human Development Center exercises reasonable care to prevent and to detect pneumonia.  Although the plaintiff alleges that the residents of Conway Human Development Center experience a high rate of aspiration pneumonia, the evidence fails to show that the rate of aspiration pneumonia at Conway Human Development Center is statistically higher than the rate in other facilities or among any population with similar risks.  Tr. 4079 (T. Kastner).  The evidence fails to establish a pattern or practice at Conway Human Development Center of failing to take appropriate and reasonable steps to prevent aspiration pneumonia.

### 7.    Allegations that Conway Human Development Center Fails to Exercise Reasonable Care to Prevent Fractures

The plaintiff alleges that Conway Human Development Center fails to exercise reasonable care to prevent fractures, but the greater weight of the evidence establishes that the Center exercises reasonable care to prevent fractures.

The population at Conway Human Development Center has an increased risk of osteoporosis for a number of reasons.  In light of this risk, Conway Human Development Center takes a number of steps to prevent fractures among its residents.  The Center uses a DEXA (dual energy x-ray absorption) meter scan for assessing fracture risks.  Tr. 6403 (L. Henderson).  The DEXA meter has x-ray capability and uses computer software to analyze the lumbar spine and hip, determining bone mineral density and contents.  The software compares that information to what would be expected at peak bone age, which is about thirty years of age; compares previous scores and measurements; and then takes all of that information and formulates it into a risk assessment.  The resident is then

categorized as not at risk, at increased risk, or at high risk for bone fracture based on the results. The DEXA meter also includes a photographic representation of the scan of the bones, which shows spaces and gaps in the bones. Tr. 6403-05 (L. Henderson). Dr. Steve Kemp, an endocrinologist who consults with Conway Human Development Center, rates these scans and makes the diagnoses of osteoporosis, osteopenia, or normal scan. Tr. 6405, 6438 (L. Henderson). DEXA meter scans are conducted every two years, and the primary care physician reviews the DEXA scan results, as does the interdisciplinary team. Tr. 6405-06 (L. Henderson). Very few intermediate care facilities for the mentally retarded have an on-site DEXA meter. Tr. 4065 (T. Kastner).

Some residents are not susceptible to a DEXA scan because of body shape. For those residents, Conway Human Development Center uses a urine test called an "N-telopeptide," which assesses the rate of bone absorption in the urine. Tr. 6407 (L. Henderson). Conway Human Development Center also may perform other types of testing, such as endocrine testing, testing for Vitamin D, and testing for calcium. Tr. 6407-08 (L. Henderson).

In addition to testing for increased risk of fractures, Conway Human Development Center has procedures in place for treating residents who are at risk. Based on the results of a laboratory analysis of the resident's blood, the treatment protocol usually begins with Vitamin D and calcium treatments. If treatment is required for low bone mineral density, Conway Human Development Center usually starts with bisphosphonates. Boniva and Fosamax are the two most common bisphosphonates used at Conway Human Development Center. Other therapies for low bone mineral density are also used. Tr. 6408 (L. Henderson).

When a resident experiences a fracture at Conway Human Development Center, Linda Henderson does a clinical audit. She assesses the risk of osteoporosis and audits the resident's

medical records to see if bone fractures have occurred before.  Henderson then reviews the results of any DEXA scans; examines the types of interventions that have been performed; and reviews any medications related to osteoporosis that the resident receives, including calcium and Vitamin D.  She also ascertains whether the resident is having acute back pain, has had any loss of height, or has developed kyphosis.  From that information, Henderson then formulates a progress note that the physician will evaluate to see whether additional interventions are needed.  Tr. 6410 (L. Henderson).

At Conway Human Development Center, there were twenty-one fractures reported for 2008 (the last year for which data was available at the time of trial), which translates to a rate of approximately four fractures per hundred residents per year.  Tr. 4082 (T. Kastner). The only evidence of any benchmarks for comparison was Dr. Kastner's testimony regarding a published study of the annual rates of fractures at four intermediate care facilities for the mentally retarded in New England.  At those facilities, the rates of fractures ranged from 13.2 to 15.3 fractures per 100 residents per year.  Tr. 4297 (T. Kastner).  Thus, the rate of fractures at Conway Human Development Center is substantially lower than the fracture rates at other facilities according to the only benchmark offered for comparison.  Tr. 4082 (T. Kastner).[27]

Conway Human Development Center exercises reasonable care to prevent fractures.

### 8.    Allegations that Conway Human Development Center Fails to Exercise Reasonable Care to Prevent Decubitus Ulcers

The greater weight of the evidence establishes that Conway Human Development Center exercises reasonable care to prevent decubitus ulcers.  From June of 2007 until September 16, 2009,

---

[27] Carly Crawford testified that Conway Human Development Center had an excessive number of fractures.  However, as mentioned above, Crawford was not qualified to testify as an expert in that field, nor did she offer any benchmarks from which one could compare Conway Human Development Center with other institutions.

the Center recorded seventy-seven incidents of decubitus ulcers for forty-six residents.  There were thirty-one instances in 2007, twenty instances in 2008, and twenty-six instances in 2009 through September 16, 2009.  The rate of decubitus ulcers at the Center is lower than in comparable facilities in the United States.  Tr. 4065, 4081 (T. Kastner).  Most of the decubitus ulcers do not go beyond stage two, which involves superficial redness and superficial skin break and is a stage at which the ulcer can be resolved.  Tr. 3474 (M. Schmeler).  No evidence was offered to show that the occurrence of decubitus ulcers among the residents of Conway Human Development Center is excessive compared to similar populations elsewhere.[28]  Tr. 3470-71 (M. Schmeler).

9.      **Allegations that Conway Human Development Center Fails to Exercise Reasonable Care to Protect Residents from Injuries in General**

Residents at Conway Human Development Center do not suffer more frequent or more serious injuries than comparable populations in other settings.  In 2008 and the first half of 2009, the injury rate at Conway Human Development Center was .41 per person per year.  Tr. 5940 (K. Walsh).  The per person per year rates of specific injuries at Conway Human Development Center in 2008 and the first half of 2009 were: for cuts, .16; for fractures, .06; for bruises, .06; for bites, .02; for swellings/sprains, .03; for abrasions, .03; for burns, .00; and for other injuries, .05.  Tr. 5942 (K. Walsh).  Reported injury rates for other institutions range from .36 per person per year to .65 per person per year.  Tr. 5941 (K. Walsh).  The rate of injury at Conway Human Development Center falls into that range.  The greater weight of the evidence establishes that Conway Human Development exercises reasonable care to protect residents from injuries.

---

[28] Carly Crawford also testified that Conway Human Development Center had an excessive number of ulcers.  However, as mentioned above, Crawford was not qualified to testify as an expert in that field, nor did she offer any benchmarks from which one could compare Conway Human Development Center with other institutions.

10.     **Allegations that Residents of Conway Human Development Center Die at an Early Age Due to Poor Conditions in General**

Contrary to the plaintiff's allegations, the greater weight of the evidence does not establish that residents of Conway Human Development Center die at an early age because of substandard care.

Over a two-year period, twenty-two residents of Conway Human Development Center died. The average age of death at the Center during those two years was 46.5 years.  Tr. 3772 (E. Mikkelsen).   Dr. Mikkelsen testified that the average age of death at Conway Human Development Center was lower than the average age of death at facilities in Massachusetts and Connecticut, from which he concluded that residents of Conway Human Development Center die at a young age due to substandard care.  Tr. 3917-18 (E. Mikkelsen).  Dr. Mikkelsen's reasoning is flawed, however, because the Massachusetts and Connecticut facilities provide services only to an elderly population—the residents at those facilities were older than 46.5 years of age, so of course their average age of death is higher than 46.5.  In contrast, Dr. Kastner testified that the mortality rate at the facilities in Massachusetts and Connecticut was higher than the mortality rate in Conway Human Development Center, which also would be expected because those facilities serve an older population. Tr. 3980, 4096-97 (T. Kastner).  The facilities in Massachusetts and Connecticut are not comparable to Conway Human Development Center with respect to a critical risk factor for death—age—so these comparisons prove nothing.

The national mortality rate for intermediate care facilities is twenty-two per thousand per year. Tr. 3980, 4089, 4098 (T. Kastner).  The mortality rate at Conway Human Development Center is twenty-two per thousand per year.  Tr. 3980, 4089, 4098 (T. Kastner).  Thus, the mortality rate at Conway Human Development Center coincides with the national average for intermediate care

57

facilities.

The greater weight of the evidence fails to establish that residents of Conway Human Development Center are exposed to conditions that cause early deaths.

**11.    Conclusion as to Whether Conway Human Development Center Provides a Reasonably Safe Environment**

For all of the reasons that have been stated, the greater weight of the evidence establishes that Conway Human Development Center does not depart from generally accepted practices in its efforts to keep residents safe and free from undue restraint.  Conway Human Development Center is a reasonably safe facility that does not use undue restraint.

**C.    FINDINGS OF FACT REGARDING ALLEGATIONS THAT CONWAY HUMAN DEVELOPMENT CENTER VIOLATES THE INTEGRATION MANDATE OF THE AMERICANS WITH DISABILITIES ACT**

The plaintiff's second claim for relief alleges that Conway Human Development Center violates the Americans with Disabilities Act.  Specifically, the plaintiff claims that the Center is not the least restrictive, most integrated setting appropriate for its residents; fails to give adequate information to parents and guardians about less restrictive alternatives; and fails to exercise professional judgment in making its determinations as to whether the Center is the least restrictive setting for its residents.  The greater weight of the evidence does not support these allegations.

As mentioned above, Conway Human Development Center is certified by the Centers for Medicare and Medicaid as an intermediate care facility for the mentally retarded, which means that it is funded through Medicaid.  Medicaid is a program through which the federal government provides financial assistance to states so that they can provide medical care to needy persons.[29]  In

---

[29] *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502, 110 S. Ct. 2510, 2513, 110 L. Ed. 2d 455 (1990).

order to participate, a state must submit a plan that satisfies certain requirements of the Medicaid program. However, the Secretary of the United States Department of Health and Human Services is authorized to waive those requirements so that states can create programs that provide Medicaid-funded services to persons with long-term disabilities in noninstitutional settings. 42 U.S.C. § 1396n(c). Such programs are known as home and community based waiver programs, or simply waiver programs. If a state chooses to offer Medicaid-funded services through a waiver program, the state must apply to the Centers for Medicare and Medicaid Services for a waiver of the requirements of the Medicaid program that otherwise would be imposed.

Arkansas has a Medicaid home and community based waiver program for persons with developmental disabilities. Persons who meet the disability requirements for admission to an intermediate care facility for the mentally retarded and the Medicaid income eligibility requirements may qualify to participate in the waiver program. Tr. 1412-15 (C. Cromer). The waiver program provides an alternative to institutionalization. Defs.' Ex. 410 at 2. Waiver services in Arkansas include case management, supported employment, supported living, specialized medical supplies, adaptive equipment, community transition services, and other services. Tr. 1415-18 (C. Cromer); Defs.' Ex. 410 at 22-38. Providers of waiver services in Arkansas are licensed by the Divison of Developmental Disability Services and are compensated according to a daily rate not to exceed $176 per day for supportive living or $391.95 per day for persons who require the highest level of care. Tr. 806 (J. Green); Tr. 1418, 1429-30 (C. Cromer).

A state must apply for a certain number of "slots" when it applies for approval for a waiver program. Tr. 750-52 (J. Green). The number of "slots" is determined by the funds available to pay for services. Tr. 752 (J. Green). Arkansas has 4083 "slots," which means that it serves 4083 persons

through its waiver program.  Tr. 1426 (C. Cromer).  Although the plaintiff alleges that Arkansas promotes institutionalization of persons with developmental disabilities, the number of persons served in the Arkansas waiver program is four times greater than the number of persons served in the Arkansas human development centers.

When a person contacts the Division of Developmental Disability Services to inquire about obtaining services, that person is given a choice of services form that permits the person to apply to receive services from a human development center, through the waiver program, or both.  Tr. 1452 (C. Cromer); Tr. 6776 (A. Green).  If a person qualifies for services, that person is placed on a waiting list.  Tr. 1452 (C. Cromer).  In 2007, approximately 700 persons were on a waiting list to obtain services in the Arkansas waiver program.  Tr. 778-79 (J. Green).  As of April of 2010, approximately 1400 persons were on the waiting list.  Tr. 779 (J. Green).  At the time of trial, 1600 or 1700 persons were on the waiting list for waiver services in Arkansas.  Tr. 779 (J. Green); Tr. 1441 (C. Cromer).  Residents of a human development center who seek waiver services are given priority, which is to say that if the parent or guardian of a resident of a human development center seeks placement for the child or ward in waiver services, that resident will go to the top of the waiting list for waiver services.[30]  Tr. 695 (A. Richardson); Tr. 780 (J. Green); Tr. 4050 (T. Kastner); Tr. 6784 (A. Green).

---

[30] The plaintiff places a sinister interpretation on the fact that residents of human development centers are given priority, contending that it encourages parents and guardians to admit their children and wards to a human development center so as to attain priority on the waiting list for waiver services, but there is no evidence that any parent or guardian has sought to have a child or ward admitted to a human development center in order to receive priority on the waiting list for waiver services.  Tr. 4310 (T. Kastner).

1.     **Allegations that Conway Human Development Center Is Not the Least Restrictive, Most Integrated Placement Alternative Appropriate for its Residents**

The plaintiff alleges that residents of Conway Human Development Center are segregated in a restrictive environment where they are deprived of the opportunity to interact with nondisabled persons, whereas, according to the plaintiff, many, if not all of them, could be served in more integrated settings.  Much of the presentation at trial discussed this issue in terms that presupposed the outcome: the alternatives were described as "institutionalization" at Conway Human Development Center or "community placement" through waiver services.  "Community placement" is a term that implies a more integrated, less restrictive setting than does the term "institution," but it does not follow from the use of these terms that a resident automatically will have a greater degree of interaction in community placement, i.e., with a waiver provider, than in an institution such as Conway Human Development Center.  The evidence establishes that residents of Conway Human Development Center do interact with nondisabled persons—the Center is not a prison with inmates barred from interaction with the outside world; and conversely, the evidence establishes that placement with a waiver provider does not guarantee any amount of interaction with nondisabled persons.

Residents of Conway Human Development Center participate in activities outside of the facility.  As of July 31, 2009, eleven residents worked at jobs off campus.  Tr. 534 (A. Richardson); Tr. 6731 (B. Brewer); Pl.'s Ex. 229.  Some of the residents attend summer programs at the University of Central Arkansas.  Tr. 504 (S. Murphy).  Many go off campus for recreational activities.  Tr. 504 (S. Murphy).  Off-campus activities include, but are not limited to, going to the movies, eating out, shopping, bowling, fishing, going to parks, going to the state fair, going to the

library, attending athletic events at a local university, attending church, going on boy scout outings, going to pet therapy, and participating in the Special Olympics.  Tr. 5958-59 (K. Walsh); Tr. 6732 (B. Brewer); Tr. 6828 (M. Black); Pl.'s Ex. 230.  During the first six months of 2009, residents of Conway Human Development Center participated in 305 off-campus activities sponsored by the Center.  Tr. 5958-59 (K. Walsh).

In addition to off-campus activities sponsored by the Center, residents of Conway Human Development Center go off campus for visits with family and friends, sometimes during the day and sometimes overnight or over a weekend or some other extended period of time.  Tr. 3232 (E. Stoddard); Tr. 3284 (M. Catron); Tr. 6828 (M. Black); Tr. 6844-45 (B. Landen).  These interactions with persons off campus can be beneficial, enriching experiences for the Center's residents.  Tr. 3259 (E. Stoddard).  More importantly, these interactions render life at Conway Human Development Center less restrictive and more integrated for residents.

Conway Human Development Center also sponsors a panoply of on-campus activities, including but not limited to arts and crafts, bingo, chapel, Connect Four, cookouts, gymnasium activities, movies, miniature golf, and pizza parties.  Tr. 5959-60 (K. Walsh).  During the first quarter of 2009, there were 592 on-campus activities.  Tr. 5959 (K. Walsh).  Nondisabled volunteers also come to Conway Human Development Center to visit and work with the residents.  Pl.'s Ex. 1227.

The evidence does establish that many, if not all, of the residents of Conway Human Development Center could be served by organizations that provide services through the Arkansas home and community based waiver program.  After reviewing approximately forty individual program plans of residents of Conway Human Development Center, the plaintiff's expert Antoinette

62

Richardson testified that many of them could be considered for the possibility of placement with a provider of waiver services.  Tr. 528 (A. Richardson).  Similarly, four officers of organizations that provide waiver services in Arkansas reviewed approximately forty-six randomly selected individual program plans of residents of Conway Human Development Center and concluded that many, if not all, of them could be served through the waiver program.[31]  Tr. 868-99 (P. Bland); Tr. 1353-75 (C. Alberding); Tr. 1526-27 (K. Vire); Tr.1875-76 (J. Lambert).

Although the defense attempted in some measure to discredit this testimony, that some and perhaps all of the residents of Conway Human Development Center could receive services through the waiver program cannot seriously be denied.  Indeed, Calvin Price, the superintendent of Conway Human Development Center, when asked how many of the residents of the Center could be served through the waiver program, testified, "Maybe they all could with the proper supports . . . .  I possibly think that a lot of our individuals could live in the community if they had the appropriate resources."  Tr. 1714 (C. Price).  That many, if not all, of the residents at Conway Human Development Center could be served by waiver providers does not, however, *ipso facto* establish that a waiver provider is the appropriate placement for a specific resident or that the resident would have a greater degree of interaction with nondisabled persons in the waiver program.

Richardson testified that she toured a small intermediate care facility in Central Arkansas, as well as the Faulkner County Day School, Easter Seals in Little Rock, United Cerebral Palsy in Little Rock, and Pathfinders in Jacksonville.  Tr. 576, 590-91 (A. Richardson).  She testified that

---

[31] Those four persons were Pamela Bland, Executive Director of First Step, Inc.; Cindy Alberding, Executive Director of Independent Case Management; Keith Vire, Ph.D., Chief Executive Officer of Arkansas Support Network; and Jeff Lambert, Assistant Executive Director for programs for Bost Incorporated.

some of these providers could provide services such as those needed by residents of Conway Human Development Center.  Tr. 592 (A. Richardson).  She did not, however, testify that any of these placement alternatives would be the appropriate placement for any specific resident of Conway Human Development Center, nor did she testify that any specific resident of Conway Human Development Center would have a greater degree of interaction with nondisabled persons if that resident received services at the smaller intermediate care facility for the mentally retarded or through one of the providers of waiver services.

Richardson also visited a former resident of Conway Human Development Center who had been discharged and was living in an apartment with staffing and nursing help available.  Tr. 575 (A. Richardson).  The former resident required a lift to be transferred from a bed to a chair, as well as special arrangements for bathing and assistance with eating, dressing, and other such necessities of daily life.  Tr. 575 (A. Richardson).  Richardson's testimony did not compare the extent to which the former resident interacted with nondisabled persons while living alone in an apartment with the extent to which she interacted with nondisabled persons while living at the Center, nor is it obvious that this former resident interacts with nondisabled persons to a greater degree while living alone in an apartment than she did while living at Conway Human Development Center.

Richardson admitted that "some people can be in a fairly restrictive setting even in a community placement."  Tr. 693 (A. Richardson).  She also admitted that some people have left residential facilities, lived alone in an apartment, and never integrated at all into the community.  Tr. 693 (A. Richardson).  Richardson acknowledged that each resident should be studied individually in order to determine whether that resident should be placed with a provider of waiver services, and she admitted that she had not performed that type of study.  Tr. 700, 708 (A. Richardson).  Thus, just

as it is an error to assume that because Conway Human Development Center is an institution its residents have no interaction with nondisabled persons, so too is it an error to assume that a community placement *ipso facto* precludes the possibility of isolation or automatically provides more interaction with nondisabled persons than an institutional setting.

The testimony of some of the parents of Conway Human Development Center residents highlights the importance of making an individualized determination regarding the appropriate placement for a developmentally disabled person. The testimony of the parents also makes clear that it is a mistake to assume that every disabled person would have more interaction with nondisabled persons through the waiver program than at Conway Human Development Center.

Alan Fortney, speaking of his stepdaughter who resides at Conway Human Development Center, testified:

> She likes a lot of people interaction . . . a lot of people say community programs, living on your own and all this kind of stuff is the way to go. It would drive her nuts to live either by herself or [with only] one or two people. She likes a lot of people and a lot of interaction. While we were on this waiver program list, we even considered HUD housing and we came to the realization . . . that would drive her nuts. She would not be able to handle that.

Tr. 1501-02 (A. Fortney). It is apparent that the Fortneys have carefully considered the needs of their daughter and have concluded that Conway Human Development Center is the most appropriate place for her. They have also concluded, based on their daughter's individual characteristics, that placement with a waiver provider would not provide their daughter a greater degree of interaction with nondisabled peers.

Another parent, Melissa Catron, testified that her son lived at home and attended public school or a community school until he was fifteen, but "[h]e never was integrated into a regular classroom, except for . . . assemblies or things like that. He didn't tolerate being around normal

children." Tr. 3263 (M. Catron). As he got older, his behavior problems got worse. Tr. 3263-64 (M. Catron). His violent outbursts eventually reached the point that the Catrons could no longer keep him at home. Tr. 3268-69 (M. Catron). After several years in the waiver program, the Catrons placed their son at Conway Human Development Center, and they have found that he does better with other disabled children than with nondisabled children.[32] Tr. 3264-65, 3268-69 (M. Catron). Catron also testified that Conway Human Development Center is the appropriate placement for her son, rather than placement with a waiver provider, in part because

> he doesn't travel well. The fact that all of his classrooms are right there close to where he is, his doctors are right there where he is, the dentist, everything he needs is right there, he handles that transition much better that way than he would in the community. From experience, I just really don't think that that would be . . . the best option for him.

Tr. 3270 (M. Catron). Thus, the Catrons have determined based on their knowledge of their child that Conway Human Development Center is the appropriate placement for him rather than sending him back to a waiver provider.

Earline Stoddard made the point concisely when asked on cross-examination whether she had found some providers in the community that were not good: "Not where I'd want my son to be. Might be all right for someone else's child, but not for mine." Tr. 3255 (E. Stoddard).

As Angela Green of Conway Human Development Center testified, "[E]ach person is [an] individual. They have individual needs, they have their own preferences." Tr. 6764 (A. Green). Any decision regarding the least restrictive placement appropriate for a developmentally disabled

---

[32] Catron's experience is not unique. As Price testified, many of the residents of Conway Human Development Center previously received services through a waiver provider but were referred to Conway Human Development Center as a more appropriate placement. Tr. 1714-15 (C. Price); *see also* Tr. 5607-08 (B. Gale).

person must be based on that person's individual needs and individual preferences, as demonstrated by the testimony of the parents, Angela Green, and others.

No evidence was presented that Conway Human Development Center has refused to discharge a resident upon request by the parent or guardian or refused to assist in a placement with a provider of waiver services. If a parent or guardian of a resident of the Center requests placement with a provider of waiver services, staff will attempt to find one. Tr. 618 (A. Richardson). Residents who seek discharge from the Center are discharged without significant delay. Tr. 4049 (T. Kastner). From June of 2007 to July of 2009, eighteen residents were discharged. Seven of those residents were discharged to another human development center. Six were discharged to the care of organizations that provide waiver services. Five were discharged to their homes. Pl.'s Ex. 271. In the two years before trial, eight persons were discharged to waiver services. Tr. 6789-91 (A. Green). Conway Human Development Center does not have a waiting list of residents seeking discharge. Tr. 4049, 4331 (T. Kastner).

That residents of Conway Human Development Center could be served by organizations that provide waiver services does not establish that the residents would have a greater degree of interaction with nondisabled persons if they received services from a waiver provider, nor does it establish that services offered by the waiver provider are the appropriate services for any specific resident. The plaintiff offered no evidence that any specific placement with a provider of waiver services was the appropriate placement for any specific resident of Conway Human Development Center, nor did the plaintiff offer any evidence that any specific resident would have a greater degree of interaction with nondisabled persons if that resident were placed in a particular program of a waiver services provider. The plaintiff failed to prove that Conway Human Development Center is

not the least restrictive, most integrated setting appropriate to the needs of any specific resident.

### 2.     Allegations that Conway Human Development Center Fails to Give Adequate Information to Parents and Guardians Regarding Waiver Services

The plaintiff alleges that Conway Human Development Center does not provide parents and guardians with adequate information regarding waiver services, but the evidence proves that it does.

Before each annual interdisciplinary team meeting, Conway Human Development Center sends to the parent or guardian a brochure explaining services available through Arkansas's waiver program, a list of the providers of waiver services in the State of Arkansas, and a list of waiver providers in the county where the resident's family lives.  Tr. 501-02, 4898-99 (S. Murphy); Tr. 3244 (E. Stoddard); Tr. 6776 (A. Green).  The per county information describes the services provided by each provider and includes the locations of those services as well as contact information for those services.  Tr. 4899 (S. Murphy); Tr. 6776-77 (A. Green).  Conway Human Development Center also sends each parent or guardian a choice of services form on which the parent or guardian can choose whether to receive services through the waiver program or from the Center.  Tr. 847, 6777-78 (A. Green); Pl.'s Ex. 294; Defs.' Ex. 406.

At the resident's annual interdisciplinary team meeting, staff of the Center discuss whether the Center is the least restrictive, most integrated placement appropriate for serving the needs of the resident.  Tr. 6728-29 (B. Brewer).  As a part of that discussion, staff members ask the parent or guardian if he or she has received the brochure describing the waiver program and the list of waiver providers.  Staff members also ask the parent or guardian if he or she is interested in pursuing waiver services.  Tr. 502, 4899 (S. Murphy); Tr. 1476 (B. Brewer).  Members of the staff at Conway Human Development Center provide a parent or guardian information to see whether the parent or guardian

is interested in waiver services.  Tr. 3244 (E. Stoddard).

Members of the staff at Conway Human Development Center take steps beyond the annual interdisciplinary team meeting to ensure that parents and guardians are informed.  Whenever the Center becomes aware that a waiver provider has an opening in a location near the family of one of its residents, the Center notifies the family of that opening.  Tr. 529, 556 (A. Richardson); Tr. 840 (A. Green); Pl.'s Ex. 264. In the spring of 2010, the Center invited all of the waiver providers in the State of Arkansas to the campus during a meeting of Friends and Families of Care Facilities Residents, the statewide parent organization, so that the waiver providers could make information about their services available to parents and guardians. Tr. 841, 6777 (A. Green); Tr. 923 (P. Bland); Tr. 1338 (C. Alberding); Tr. 5065-66 (L. Taylor).

Parents and guardians also learn about alternative services through the two parent association groups and through social workers in their counties. Tr. 853 (A. Green).  Many of the parents and guardians have looked into alternative services before or during placement at Conway Human Development Center. Tr. 853 (A. Green); Tr. 3239, 3243, 3245 (E. Stoddard).  They are well-informed as to the availability of waiver service. Tr. 4050-51 (T. Kastner).  Parents and guardians of residents of Conway Human Development Center make informed decisions as to whether residents should be treated at the Center or discharged to an alternative placement.  Tr. 853 (A. Green); Tr. 4008 (T. Kastner).

Conway Human Development Center does not prevent any resident from moving to an alternative placement. The Center adequately informs parents and guardians of the nature and scope of the home and community based waiver program in Arkansas, and it provides the parents and guardians with a comprehensive list of waiver providers, including contact information.  The greater

69

weight of the evidence establishes that Conway Human Development Center provides adequate information to parents and guardians to enable them to make informed decisions regarding placement.

   3.   **Allegations that the Staff Members at Conway Human Development Center Fail to Exercise Professional Judgment in Determinations as to the Least Restrictive Placement Alternative**

Finally, the greater weight of the evidence establishes that staff members at Conway Human Development Center make professional judgments in determining the least restrictive placement appropriate for each resident.  The members of the interdisciplinary teams, including the parents and guardians, typically agree that Conway Human Development Center is the least restrictive placement alternative appropriate for serving the needs of the residents.  Tr. 482, 497 (S. Murphy); Tr. 837 (A. Green); Tr. 1464 (L. Brewer); Tr. 6729-30 (B. Brewer).  Although the professionals often do not recommend placement with a waiver provider unless requested to do so by the parents or guardians, Tr. 402 (J. Weaver); Tr. 547 (A. Richardson); Tr. 836-37 (A. Green), they frequently encourage guardians to consider placement with waiver providers, Tr. 6785 (A. Green), and they have recommended placement with a waiver provider without a prior request from a parent or guardian, Tr. 4896-97 (S. Murphy); Tr. 6729 (B. Brewer).  On at least two occasions, professionals at the Center have recommended community placement when the parent or guardian disagreed.  Tr. 855 (A. Green). The professionals exercise professional judgment in determining whether Conway Human Development Center is the least restrictive, most integrated placement alternative appropriate to serve its residents' needs.  Tr. 4007-08, 4041, 4086-88, 4329, 4403 (T. Kastner); Tr. 5999-6001 (K. Walsh).

D.      **ALLEGATIONS THAT CONWAY HUMAN DEVELOPMENT CENTER VIOLATES THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

The plaintiff's third claim for relief is for alleged violations of the Individuals with Disabilities Education Act, which requires certain institutions to provide a free appropriate public education in the least restrictive setting appropriate to school-aged children with disabilities. At the time of trial, Conway Human Development Center had forty-eight school-aged residents and a total of fifty-three children in its special education classes.[33]  Tr. 5096 (D. Nye).

The parties presented conflicting expert testimony on the issue of whether Conway Human Development Center complies with the Individuals with Disabilities Education Act. The plaintiff called as an expert witness Susan Thibadeau, Ph.D., while the defendants called Derek Nye, Ph.D., and Bruce Gale, Ph.D. All three were qualified as experts and all three testified credibly.

Dr. Thibadeau's ultimate conclusion was that Conway Human Development Center did not meet its obligation under the Individuals with Disabilities Education Act to provide each child with a free appropriate public education. Tr. 2176 (S. Thibadeau). She testified that many of the children were receiving only ninety minutes per day of special education services, or 450 minutes per week, which she believed was inadequate. Tr. 2176, 2187 (S. Thibadeau). Although the students, according to Dr. Thibadeau, nominally spent more than six hours per day in special education services, much of that time was actually spent in habilitation classes that were neither taught nor supervised by special education teachers. Tr. 2193, 2221-22 (S. Thibadeau). Furthermore, Dr. Thibadeau did not believe that the special education teachers at Conway Human Development Center received adequate supervision or sufficient ongoing training. Tr. 2182-83,  2336-40

---

[33] Five of the children were at Conway Human Development Center on respite, or short-term, status and were not actually residents of the Center. Tr. 5096 (D. Nye).

(S. Thibadeau).

Dr. Thibadeau also testified that Conway Human Development Center did not educate children in the least restrictive environment, as required by the Individuals with Disabilities Education Act. She testified that several of the children had mild cognitive disabilities and came to Conway Human Development Center because of behavioral problems, but with the improvement of the behavioral problems at the Center, she believed that those children could transition to a less restrictive environment. Tr. 2181, 2304-13 (S. Thibadeau).

In addition, Dr. Thibadeau criticized the assessment test used at Conway Human Development Center and the quality of the individualized education plans, including the transition plans. Tr. 2177, 2818-82, 2222-40 (S. Thibadeau). As a part of her criticism of the transition plans, Dr. Thibadeau testified that there was no indication that adult service agencies participated in transition planning. Tr. 2299 (S. Thibadeau). Dr. Thibadeau also "had concerns" about the "integration of different therapies," saying that the psychological examiners did not spend enough time in the classrooms. Tr. 2180 (S. Thibadeau). She also "had some concerns" about the students' "quality of life," referring specifically to the fact that nineteen of the forty-five children whose records she reviewed were not toilet trained and several were eating chopped or pureed food instead of being taught to eat more slowly. Tr. 2180-81 (S. Thibadeau).

Needless to say, the experts for the defendants disagreed with Dr. Thibadeau's conclusions. Their ultimate conclusion was that Conway Human Development Center complied with the Individuals with Disabilities Education Act and specifically that it provided a free appropriate public education. Tr. 5097 (D. Nye); Tr. 5585, 5659, 5690 (B. Gale). Contrary to Dr. Thibadeau, they testified that the amount of time spent in special education classes each day was adequate to comply

with the requirements of the Individuals with Disabilities Education Act.  Tr. 5100-01, 5152-53 (D. Nye); Tr. 5551-53 (B. Gale).  They disagreed that the assessment tool used by the Center was inappropriate.  Tr. 5156-57 (D. Nye); Tr. 5587 (B. Gale).  Dr. Nye testified that Conway Human Development Center is the least restrictive environment for the children there.[34]  Tr. 5155 (D. Nye).

The Arkansas Department of Education is charged with monitoring schools in Arkansas and enforcing compliance with the Individuals with Disabilities Education Act.  In January of 2010—after Dr. Thibadeau had completed her report—the Arkansas Department of Education officially investigated Conway Human Development Center for compliance with that Act.  The Arkansas Department of Education issued its official report on June 16, 2010, in the form of a letter to Calvin Price, Superintendent of the Center.  Tr. 2988 (M. Harding); Pl.'s Ex. 1104.  The report found that Conway Human Development Center was in substantial compliance with the least restrictive environment requirements of the Individuals with Disabilities Education Act, as well as some of the other significant requirements of the Act, but that there were fifteen areas of noncompliance.  Pl.'s Ex. 1104.

Several of the areas of noncompliance involved procedural or technical requirements that readily can be remedied.  Tr. 5167 (D. Nye).  For example, Conway Human Development Center was found not to be in compliance with the requirement that evaluation procedures be completed and a written report submitted to the Arkansas Department of Education within sixty days from receiving formal consent from a parent or guardian.  Pl.'s Ex. 1104 at 1; Tr. 2995 (M. Harding).  Another area of noncompliance related to the fact that in its evaluations the Center used categories applicable to the Medicaid program rather than categories applicable to the Individuals with Disabilities Education

---

[34] Dr. Gale was not called as an expert on the least restrictive environment issue.

Act. An example of this type of noncompliance given at trial was that the Center would classify a child as having cerebral palsy, whereas the proper category for special education purposes would be "health impaired" or "multiply disabled." Tr. 2996 (M. Harding).

Not all of the criticisms by the Arkansas Department of Education are merely technical. First, the Arkansas Department of Education found that the individualized education plans at Conway Human Development Center did not sufficiently take into account special factors that impede a child's learning, such as maladaptive behaviors, lack of English proficiency, impaired vision or hearing, and the like; did not adequately address the unique needs of each child; and did not adequately plan for children's transition after secondary school. Pl.'s Ex. 1104 at 2; Tr. 3000-05 (M. Harding). In regard to transition planning, it appeared that representatives of other agencies were not invited to meetings to discuss post-secondary goals and transition services. Tr. 2990-92 (M. Harding); Pl.'s Ex. 1104. Second, the Arkansas Department of Education found that Conway Human Development Center failed to provide a free appropriate public education because it failed to meet the required ratio of teachers to pupils. Tr. 3009-10 (M. Harding). For students whose primary program is special education, the teacher to pupil ratio should be one to fifteen, one to ten, or one to six, depending on how much time, attention, and related services each child needs. Tr. 3010 (M. Harding). Although the record is not as explicit on this point as the Court would like, it appears that for most of the children at Conway Human Development Center the requirement is no more than six pupils to every one teacher; the Center had more than six pupils per teacher. Third, the Arkansas Department of Education found that Conway Human Development Center was not providing a free appropriate public education because children did not spend sufficient time in school receiving special education services. The Arkansas Department of Education seemed to agree

with Dr. Thibadeau that many of the children at Conway Human Development Center were receiving only ninety minutes per day of special education. Tr. 3012-14 (M. Harding); Pl.'s Ex. 1210. Fourth, the Arkansas Department of Education found that Conway Human Development Center failed to provide a free appropriate public education because it failed to adopt "promising educational practices proven effective through research and demonstration for the provision of special education instruction." Tr. 3015 (M. Harding); Pl.'s Ex. 1104 at 15. As explained at trial, this finding means that teachers at Conway Human Development Center were not acquainted with some of the more current types of strategies, interventions, and programs that can be effective with children like those served at the Center, and no system was in place to keep teachers current. Tr. 3017 (M. Harding).

In short, the Arkansas Department of Education found that Conway Human Development Center did not adequately plan special education for each child, did not provide the children with adequate time in special education classes, did not provide an adequate number of teachers, and did not provide for continuing education adequate to enable the teachers to do their job well.

As noted above, the monitoring by the Arkansas Department of Education was conducted after Dr. Thibadeau had submitted her report, and the persons who conducted the monitoring reviewed Dr. Thibadeau's report. Tr. 3033 (M. Harding). It is apparent that the monitors from the Arkansas Department of Education examined the program at Conway Human Development Center with a view toward determining whether the criticisms made by Dr. Thibadeau were accurate or not, and they did so using a process that was systematic and impartial. Tr. 3026-33 (M. Harding). They confirmed many but not all of Dr. Thibadeau's criticisms. After considering all of the evidence, the Court is persuaded that the findings of the Arkansas Department of Education are true. The finding that Conway Human Development Center educates children in the least restrictive environment is

supported not only by the testimony of Dr. Nye but also by the determination of each child's individual education plan team—a team that consists of the persons who are best situated to make that decision regarding that child. The findings that Conway Human Development Center has failed to provide adequate plans and has failed to include other agencies in transition planning is supported by the testimony of Dr. Thibadeau. The finding that children spend too little time in special education classes is supported by the testimony of Dr. Thibadeau. The finding that teachers are not given appropriate continuing education is supported by the testimony of Dr. Thibadeau. Finally, as to the finding that the teacher to pupil ratio was inadequate, it is within the province of the Arkansas Department of Education to set a standard for the teacher to pupil ratio inasmuch as one element of the definition of "free appropriate public education" is compliance with standards of the state educational agency. 20 U.S.C. § 1401(9). The greater weight of the evidence supports the findings of the Arkansas Department of Education, as described above, so those findings are adopted as the findings of this Court.

In response to the letter of noncompliance, Conway Human Development Center was required to submit a corrective action plan. The process of submitting the corrective action plan had begun before trial, Tr. 3037 (M. Harding), but was continuing at the time of trial. Tr. 6503 (J. Buck); Tr. 6881 (C. Price); Defs.' Ex. JB-2. At the time of trial, the Center had added special education instruction times and developed new pupil schedules. Tr. 2117-18 (S. Milum); Tr. 3047 (M. Harding). Additional special education teachers had been hired. Tr. 3047 (M. Harding). Conway Human Development Center was in the process of hiring additional staff. Defs.' Ex. JB-2 at 4. The Center was also changing its professional development policies to bring them into compliance. Defs.' Ex. JB-2 at 4.

When the trial concluded and the record closed, the Arkansas Department of Education had not yet determined whether the corrective action taken by Conway Human Development Center would be sufficient to bring the Center's special education program into compliance with the Individuals with Disabilities Education Act.  The process was ongoing and was not scheduled to be completed until sometime after trial.  Nonetheless, the evidence was sufficient to show that the Arkansas Department of Education will ensure that the appropriate corrective action is taken to bring the Center's special education program into compliance with the Individuals with Disabilities Education Act.  Although the monitors from the Arkansas Department of Education did not review the file of every child at Conway Human Development Center, in the corrective action process, the Center will be required to review the programs for all similarly situated children and correct them. Tr. 3051 (M. Harding).  As Marcia Harding testified, "[W]e set out corrective actions, and we go in and assure that it gets corrected."  Tr. 3034 (M. Harding).  The Court believes her.

## II.
## CONCLUSIONS OF LAW

### A.    CONCLUSIONS OF LAW REGARDING THE PLAINTIFF'S STANDING

The Civil Rights of Institutionalized Persons Act authorizes the Attorney General to institute a civil action in the name of the United States to obtain "such equitable relief as may be appropriate to insure the minimum corrective measures necessary" to guarantee that institutionalized persons are not deprived of rights, privileges, or immunities secured by the Constitution or the laws of the United States.  42 U.S.C. § 1997a(a) (2006).  Conway Human Development Center is an institution as defined in the Civil Rights of Institutionalized Persons Act.  42 U.S.C. § 1997.  The United States has standing to bring this action.

**B.**   **CONCLUSIONS OF LAW REGARDING THE PLAINTIFF'S FOURTEENTH AMENDMENT CLAIMS**

The Supreme Court has held that when a mentally retarded person is involuntarily committed to a state institution, the state has certain obligations under the Fourteenth Amendment. *Youngberg v. Romeo*, 457 U.S. 307, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982).[35]   According to *Youngberg*, a mentally retarded person involuntarily committed to a state institution has the right to minimally adequate or reasonable training to ensure safety and freedom from undue restraint. *Id.* at 319, 102 S. Ct. at 2460.   The Court recognized:

> Yet these interests [in safety and freedom from restraint] are not absolute; indeed, to some extent they are in conflict.   In operating an institution such as [the one at issue in *Youngberg*], there are occasions in which it is necessary for the State to restrain the movement of residents – for example, to protect them as well as others from violence.   Similar restraints may also be appropriate in a training program.   And an institution cannot protect its residents from all danger of violence if it is to permit them to have any freedom of movement.   The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint or lack of absolute safety is such as to violate due process.

*Id.* at 319-20, 102 S. Ct. at 2460.   Determining whether the rights of a mentally retarded person in a state institution have been violated requires "that the courts make certain that professional judgment in fact was exercised.   It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made."   *Id.* at 321, 102 S. Ct. at 2461.   A mentally retarded person in a state institution is entitled to "minimally adequate training," defined as "such training as may be reasonable in light of [the individual's] liberty interests in safety and

---

[35] The parties agree that *Youngberg* applies in this case, so the Court need not and will not address the issue of whether *Youngberg* is inapplicable because some or all of the residents of Conway Human Development Center are there voluntarily.   *Cf. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989); *Dorothy J. v. Little Rock Sch. Dist.*, 7 F.3d 729 (8th Cir. 1993).

freedom from unreasonable restraints." *Id*. at 322, 102 S. Ct. at 2461.  Courts "must show deference to the judgment exercised by a qualified professional." *Id*.  The decision by a professional "is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id*. at 323, 102 S. Ct. at 2462.

Applying the *Youngberg* standards to this case, the Court concludes that Conway Human Development Center does not violate the mandates of the Fourteenth Amendment.  Conway Human Development Center provides minimally adequate training and protects the safety and freedom of its residents in a manner consistent with the standards of *Youngberg*.  The professionals at Conway Human Development Center exercise professional judgment.  Even if the professional judgment of some or all of the plaintiff's experts were better than the professional judgment of some or all of the professionals at Conway Human Development Center, the evidence does not prove that decisions of the latter represent such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that professional judgment was not actually exercised.  Conway Human Development Center is in compliance with the Fourteenth Amendment to the Constitution of the United States.

## C.  CONCLUSIONS OF LAW REGARDING THE AMERICANS WITH DISABILITIES ACT

The Americans with Disabilities Act provides, in pertinent part:

Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity.

42 U.S.C. § 12132.  This prohibition on discrimination

> may require placement of persons with developmental disabilities in community settings rather than in institutions when . . . the State's treatment professionals have determined that community placement is appropriate, the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and the placement can be reasonably accommodated, taking into account resources available to the State and the needs of others with mental disabilities.

*Olmstead v. Zimring*, 527 U.S. 581, 587, 119 S. Ct. 2176, 2181, 144 L. Ed. 2d 540 (1999).  A public entity must administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  *Id*. at 591-92, 119 S. Ct. at 2183; 28 C.F.R. § 35.130(d) (2010).  The most integrated setting appropriate to the needs of a qualified individual with a disability is a setting that enables the individual with a disability to interact with nondisabled persons to the fullest extent possible.  *Olmstead*, 527 U.S. at 592, 119 S. Ct. at 2183; 28 C.F.R. pt. 35, app. B (Mar. 15, 2011).  The Americans with Disabilities Act prohibits discrimination against qualified individuals, i.e., persons with disabilities who "with or without reasonable modifications to rules, policies, or practices, . . . mee[t] the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  *Olmstead*, 527 U.S. at 602, 119 S. Ct. at 2188 (quoting 42 U.S.C. § 12131(2)).  A state generally may rely on the reasonable assessments of its own professionals in determining whether an individual meets the essential eligibility requirements for habilitation in a community based program.  *Id*.  There is no requirement that community based treatment be imposed on persons who do not desire it.  *Olmstead*, 527 U.S. at 602, 119 S. Ct. at 2188; 28 C.F.R. § 35.130(e)(1).

The plaintiff failed to prove that Conway Human Development Center is in violation of the Americans with Disabilities Act.  The plaintiff failed to prove that Conway Human Development Center is not the most integrated setting appropriate to the needs of any specific resident.  The

plaintiff failed to prove that any alternative placement would enable any specific resident of Conway Human Development Center to interact with nondisabled persons to a greater extent.   The professionals at Conway Human Development Center exercise reasonable professional judgment in making recommendations for placement of the residents there.   No person determined by the State's treatment professionals to be appropriate for community placement has been denied community placement.   The parents and guardians of the residents at Conway Human Development Center make informed judgments regarding placement.   No resident of Conway Human Development Center has been denied community placement when a parent or guardian has requested such a placement.

Conway Human Development Center is not discriminating against persons with disabilities. It is not violating the Americans with Disabilities Act.

**D.      CONCLUSIONS OF LAW REGARDING THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT**

The special education program at Conway Human Development Center is subject to the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*.   The children at Conway Human Development Center are children with disabilities as defined in 20 U.S.C. § 1401(3).   Conway Human Development Center is required to provide each child with a free appropriate public education.   20 U.S.C. § 1412(a)(1) (2006).

> The term "free appropriate public education" means special education and related services that --
>> (A) have been provided at public expense, under public supervision and direction, and without charge;
>> (B) meet the standards of the State educational agency;
>> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(9).   Conway Human Development Center also has an obligation to educate the

children in the least restrictive environment.  Congress has defined that obligation as follows:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A).  To the extent appropriate, with consent of the parents, Conway Human Development Center must invite the agency that likely will be responsible for providing transition services to the individual education plan meeting when a purpose of the meeting will be to consider post-secondary goals and transition services.  34 C.F.R. § 300.321(b)(3) (2007).

Conway Human Development Center educates children in the least restrictive environment, but it has failed to provide children with a free appropriate public education, and it has failed to invite agencies that provide transition services to the meetings at which post-secondary goals and transition services are discussed.

Having concluded that Conway Human Development Center has failed to comply fully with the Individuals with Disabilities Education Act, the issue is whether to enter an injunction.  An injunction is an equitable remedy that does not issue as a matter of course.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311, 102 S. Ct. 1798, 1803, 72 L. Ed. 2d 91 (1982); *see also Salazar v. Buono*, __ U.S. __, 130 S. Ct. 1803, 1816, 176 L. Ed. 2d 634 (2010).  An injunction should issue only when legal remedies are inadequate and irreparable injury will occur without the injunction.  *Romero-Barcelo*, 456 U.S. at 312, 102 S. Ct. at 1803.  A court should be especially cautious when contemplating relief that implicates public interests.  *Salazar v. Buono*, 130 S. Ct. at 1816.  In determining whether to exercise the Court's equitable discretion to enter an injunction in a case such as this one, where Congress has provided a regulatory scheme, the Court should consider the

regulatory scheme at issue and the enforcement mechanisms provided therein.

> [C]ourt and agency are not to be regarded as wholly independent and unrelated instrumentalities of justice, each acting in the performance of its prescribed statutory duty without regard to the appropriate function of the other in securing the plainly indicated objects of the statute.  Court and agency are the means adopted to attain the prescribed end, and so far as their duties are defined by the words of the statute, those words should be construed so as to attain that end through co-ordinated action. Neither body should repeat in this day the mistake made by the courts of law when equity was struggling for recognition as an ameliorating system of justice; neither can rightly be regarded by the other as an alien intruder, to be tolerated if it must be, but never to be encouraged or aided by the other in the attainment of the common aim.

*Hecht Co. v. Bowles*, 321 U.S. 321, 330-31, 64 S. Ct. 587, 592, 88 L. Ed. 754 (1944) (quoting *United States v. Morgan*, 307 U.S. 183, 191, 59 S. Ct. 795, 799, 83 L. Ed. 1211 (1939)).

The Individuals with Disabilities Education Act imposes a duty for monitoring and supervising compliance with the Individuals with Disabilities Education Act on a state educational agency to be selected by the state:

> (11) State educational agency responsible for general supervision
>> (A) In general
>> The State educational agency is responsible for ensuring that–
>>> (i) the requirements of this subchapter are met;
>>> (ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency --
>>>> (I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
>>>> (II) meet the educational standards of the State educational agency[.]

20 U.S.C. § 1412(a)(11)(A).

As section 1412(a)(11)(A) makes clear, the state agency's responsibility to supervise special education programs includes not only a duty to monitor but also to enforce.  Section 1416(a)(1)(C) provides that the Secretary of Education must "require States to-- (i) monitor implementation of this

subchapter by local educational agencies; and (ii) enforce this subchapter in accordance with paragraph (3) and subsection (e)."  Paragraph (3) provides:

> (3) Monitoring priorities
> The Secretary shall monitor the States, and shall require each State to monitor the local educational agencies located in the State (except the State exercise of general supervisory responsibility), using quantifiable indicators in each of the following priority areas, and using such qualitative indicators as are needed to adequately measure performance in the following priority areas:
>> (A) Provision of a free appropriate public education in the least restrictive environment.
>> (B) State exercise of general supervisory authority, including child find, effective monitoring, the use of resolution sessions, mediation, voluntary binding arbitration, and a system of transition services as defined in sections 1401(34) and 1437(a)(9) of this title.
>> (C) Disproportionate representation of racial and ethnic groups in special education and related services, to the extent the representation is the result of inappropriate identification.

In Arkansas, the state educational agency responsible for monitoring and ensuring compliance with the Individuals with Disabilities Education Act is the Arkansas Department of Education.

As stated above, the Arkansas Department of Education has required Conway Human Development Center to submit a corrective action plan for bringing its special education program into compliance with the Individuals with Disabilities Education Act.  The Arkansas Department of Education will evaluate and determine whether the corrective action plan is appropriate and will ensure that the special education program at Conway Human Development Center complies with the Individuals with Disabilities Education Act.  Therefore, it is not necessary for this Court to enter an injunction in order to secure the rights guaranteed by the Individuals with Disabilities Education Act to students at Conway Human Development Center.

84

**CONCLUSION**

The Court finds and concludes that Conway Human Development Center complies with all of the requirements of the Fourteenth Amendment and the Americans with Disabilities Act but not all of the requirements of the Individuals with Disabilities Education Act.  Because Congress has provided for a state educational agency to enforce compliance with that Act, and because the evidence established that the state educational agency here is enforcing and will enforce compliance, no injunction is necessary or appropriate.

A judgment dismissing this action with prejudice will be entered separately.

IT IS SO ORDERED this 8th day of June, 2011.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE